**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

AIR CANADA AND AEROPLAN INC.,

          Plaintiffs,

      v.

LOCALHOST LLC,

          Defendant.

C.A. No. 23-1177-GBW

**DECLARATION OF EVAN NUTTALL IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

I.   **Background**

1.    I am a lawyer and principal at Smart & Biggar Alberta LLP (together with its affiliates, "**Smart & Biggar**"), a Canadian intellectual property law firm, where I practice out of the Calgary, Alberta office in the area of intellectual property litigation.

2.    I graduated from McGill University in 1990 with a Bachelor of Arts (with Distinction) in Economics and Political Science. Thereafter, I obtained a Masters of Science in Economics from London School of Economics and Political Science in 1991.

3.    In 1992 I obtained a Graduate Diploma in Law from the City University of London and was subsequently called to the Bar of England and Wales in 1993. Between 1994 and 2002 I practiced litigation as a Barrister at 3 Temple Gardens in London, England. In 2003-2004

I returned to university and obtained a Masters of Science in Finance from the London Business School.

4.      I returned to Canada in 2004 and qualified to practice law in Canada. In 2005 I gained employment with national Canadian firm Borden Ladner where between 2005 to 2020 I practiced in the area of commercial and intellectual property litigation, obtaining my call to the Alberta Bar in 2007.

5.      In 2020 I transferred to Smart & Biggar and was also called to the British Columbia Bar. I continue to practice under both the Alberta and British Columbia Bars through my employment at Smart & Biggar.

6.      A copy of my *curriculum vitae* is attached to my Declaration as **Exhibit EN-1**.


## II.   <u>Mandate</u>

7.      I have been provided with a copy of the Complaint dated October 19, 2023 in the United States District Court for the District of Delaware, Case No. 1:23-cv-01177, styled *Air Canada and Aeroplan Inc. v. Localhost, LLC* (the "**Air Canada Complaint**") and asked by the Plaintiffs to provide a declaration setting out:

   a.   the law in Alberta with respect to the formation and breach of browsewrap agreements; and

   b.   my opinion on whether, based on various documents presented to me and assumptions set out in the section immediately below, I would expect an Alberta court to conclude that an agreement was formed between Air Canada and the Defendant Localhost, LLC.

8.      For the purposes of this declaration ("**my Declaration**") I adopt the following definition from Barry Sookman's text *Computer, Internet, and Electronic Commerce* Law:

   A browsewrap agreement is an agreement where users become bound to its terms by merely navigating or using a website. They do not require users to sign

a document or click an "accept" or "I agree" button. The users are considered to give assent simply by using the website.[1]

9.     Where I refer to a "click-wrap" agreement, I am referring to an agreement formed by a user clicking on a designated icon to acknowledge acceptance or awareness of terms or of an agreement.

10.    Where I refer to screen-scraping, I am referring to the process by which a data scraper uses bots to run searches on a website's user interface application and then extracts the data that the user interface application returns in response to the request.[2]

11.    Where I refer to API-scraping, I am referring to the process by which a data scraper bypasses the user interface application and sends scraping requests directly to the website's application programming interface ("**API**").[3]

12.    Throughout my Declaration I refer to a number of documents or legal sources which I have incorporated as Exhibits to my Declaration. For readability, I have indicated their corresponding Exhibit number in square brackets at the end of the corresponding footnotes.

13.    At certain points of my Declaration, I identify cases from Quebec, a province in which various matters (including the law of contracts) are rooted in the civil law, rather than the common law. For clarity, I do not profess any expertise on Quebec civil law traditions or the *Civil Code of Québec* ("***Civil Code***")[4], but identify these cases as they could be canvassed and/or considered by an Alberta court asking to address the formation and enforcement of a browsewrap agreement. As I do not speak French, being the language in which many decisions of the Quebec courts are issued, where I refer to the Quebec Superior Court's decision in *Canadian Real Estate*, I used the Google Translate tool available via the Google Chrome browser in order to read an English translation of the case, and then confirmed my understanding of the decision with my colleague Guillaume Lavoie Ste-Marie, a native French speaker called to the Quebec Bar in 2014 and continuously

---

[1] Barry B. Sookman, *Sookman: Computer, Internet, and Electronic Commerce Law* (Toronto, Ont: WestLaw 2023) (loose-leaf updated 2023, release 5) *§ 10:7 Browse Wrap or Webwrap Agreements* at 2.
**[Exhibit EN-2]**
[2] Declaration of Paul Clark, at paras 21-24.
[3] Declaration of Paul Clark, at paras 21-25.
[4] *Civil Code of Québec*, CQLR c CCQ-1991.

practicing in Quebec since that time. In these instances, a copy of the original French decision, together with the unofficial English translation I obtained by the process above are bundled together in the corresponding exhibit referenced in the footnotes.

### III.    <u>Documents Reviewed and Underlying Assumptions</u>

14.    In preparing this Declaration, I have been provided by counsel for the Plaintiffs with the declarations of Jonathan Fagan, Paul Clark and Derek Whitworth, and have been asked to make a number of assumptions, as set out below.

15.    In particular, I have reviewed and relied upon copies of the following documents provided by counsel for the Plaintiffs:

| Description | Reference |
| --- | --- |
| Letter dated October 5, 2023 from Douglas A. Rettew of Finnegan, counsel for the Plaintiff to Ian Carroll, and enclosure titled "Terms of Use", hereinafter collectively the "**Demand Letter**", with the enclosure referred to in isolation as "**Air Canada Terms of Use**" | Docket 1-2 |
| Captures of the Air Canada Website (as defined below), including excerpts of <aircanada.com/ca/en/aco/home/aeroplan.html#> (the "**Aeroplan Homepage Capture**") and <aircanada.com/ca/en/aco/home/legal/terms-of-use.html#/> (the "**Air Canada Terms of Use Capture**") | Declaration of Jonathan Fagan ("**Fagan Decl.**"), Ex. 6 |
| Letter dated October 17, 2023 from Steven Susser of Carlson, Gaskey & Olds to Douglas A. Rettew of Finnegan (the "**Demand Response**") | Fagan Decl., Ex. 5 |
| Various screen captures of posts by "ian", which I have been told were posted on a social media platform called Discord, each a "**Discord Post**" and collectively the "**Discord Posts**" | Fagan Decl., Ex. 3 |

| | |
|---|---|
| Captures of the Seats.aero website ("**Seats.aero Captures**"), including the Seats.aero homepage ("**Seats.aero Homepage Capture**") and document titled "Seats.aero Terms and Conditions," indicated to have been "last updated: Sep 3rd, 2023" ("**Seats.aero Terms and Conditions**"), which, based on my familiarity with the Wayback Machine on Archive.org and the URL displayed on the document, I have assumed to be a copy of the Seats.aero Terms and Conditions as logged by the Wayback Machine as being captured from the Seats.aero/terms webpage on October 8, 2023 | Fagan Decl., Ex. 7 |

16.     For the purposes of my Declaration I have been asked by counsel for the Plaintiffs to assume the following:

    a.  The "**Air Canada Website**", www.aircanada.com, offers website services including at least the ability to search flight options and review flight information, including but not limited to the departure and arrival locations, flight times, and the associated costs (whether in traditional currency or through Aeroplan points);

    b.  The Air Canada Terms of Use enclosed in the Demand Letter were made available by way of hyperlink at the bottom of the Air Canada Website for at least the period between the sending of the October 5, 2023 Demand Letter until the present. The "Terms of Use" located at the bottom of the Aeroplan Homepage Capture is such a hyperlink and is representative of how the hyperlink appeared during the relevant period;[5]

    c.  When a user clicks on the hyperlink at the bottom of the Air Canada Website they are redirected to the Website's Terms of Use webpage. The Air Canada Terms of Use Capture depicts what an Air Canada Website user would see at the loading of this page.[6] The light grey table of headers beginning with "Linking" is a list of different provision headers which are expandable through clicking on the respective

---

[5] Aeroplan Homepage Capture, Declaration of Jonathan Fagan, Ex. 6 at 1.
[6] Air Canada Terms of Use Capture, Declaration of Jonathan Fagan, Ex. 6 at 2.

row, in which case the detailed provisions appear on the same webpage, without further redirection or external pop-up windows;[7]

d.  Ian Carroll controls and operates the Defendant Localhost, LLC;

e.  Localhost, LLC is the registered owner of the website Seats.aero ("**Seats.aero Website**");

f.  The Defendant employs unauthorized data scraping or screen scraping, and API scraping of data from the Air Canada Website (the "**Scraped Information**"); [8]

g.  The Defendant incorporates the Scraped Information into its own Seats.aero Website (the collection and reproduction of the Scraped Information collectively being the "**Scraping Activity**");

h.  Seats.aero is operated for a commercial purpose;[9]

i.  Seats.aero makes the Seats.aero Terms and Conditions available via hyperlink on the Seats.aero Website;[10]

j.  The Discord Posts were made by the Defendant (or Ian Carroll, who controls the Defendant);

k.  The Demand Letter and Response to Demand are true copies of the correspondence exchanged between counsel for the Plaintiffs and the Defendant on October 5, 2023 and October 17, 2023, respectively;[11] and

l.  The Scraping Activity was conducted both prior to and after the issuance of the October 5, 2023 Demand Letter, and following the issuance of the October 17, 2023 Demand Response. [12]

---

[7] Air Canada Terms of Use Capture, Declaration of Jonathan Fagan, Ex. 6 at 3.

[8] See also Declaration of Derek Whitworth, at paras 36-55; Declaration of Paul Clark, at paras 28-56; and Discord Posts dated April 20, 2023, May 14, 2023, May 28, 2023, June 1, 2023, August 13, 2023, and August 17, 2023, Declaration of Jonathan Fagan, Ex. 3 at 2-6 and 9.

[9] See also, Seats.aero Captures, Declaration of Jonathan Fagan, Ex. 7 at 2, where near the bottom of the page the capture reads "When you're ready, a PRO account unlocks up to a year of availability on all routes, advanced filters, SMS alerts, and more. Only $9.99/month.".

[10] Seats.aero Homepage Capture and Seats.aero Terms and Conditions, Declaration of Jonathan Fagan, Ex. 7 at 1 and 4-10.

[11] Demand Letter, Docket 1-2; Demand Response, Declaration of Jonathan Fagan, Ex. 5; and see also Declaration of Derek Whitworth at paras 71-75.

[12] See also Declaration of Derek Whitworth, at paras 36-55; Declaration of Paul Clark, at paras 28-56; and Discord Posts dated April 20, 2023, May 14, 2023, May 28, 2023, June 1, 2023, August 13, 2023, and August 17, 2023, Declaration of Jonathan Fagan, Ex. 3 at 2-6 and 9.

## IV.  **Overview**

17.    I am not aware of any Alberta legislation or reported decisions that directly address the formation and enforcement of browsewrap agreements.

18.    Alberta's *Electronic Transactions Act* contains a provision that expressly recognizes that an enforceable contract can be formed by clicking on an icon on a computer screen:

> Unless the parties otherwise agree, an offer, the acceptance of an offer or any other matter that is material to the formation or operation of a contract may be expressed
>
> (a) by means of information or a record in electronic form, or
>
> (b) by an act that is intended to result in electronic communication, such as
>
>> (i) touching or clicking on an appropriate icon or other place on a computer screen, or
>>
>> (ii) speaking.[13]

19.    I have caused the above provision of the Alberta legislation to be researched and am not aware of any decisions considering this provision. However, based on the express reference to an "appropriate icon", as well as the Supreme Court of Canada's decision in *Douez v Facebook* which held that the corresponding provision of the British Columbia ("**B.C.**") *Electronic Transactions Act* was a codification of the common law rule that "an enforceable contract may be formed by clicking an appropriately designated online icon", I do not think that it speaks to browsewrap agreements, where (as I've defined above), a user is bound to its terms by merely navigating or using a website, without clicking on any designated icons.[14]

20.    I am similarly unaware of any Alberta jurisprudence expressly considering the legal issue of the formation of browsewrap contracts. In fact, I am only aware of a few decisions across Canada that have considered the formation of browsewrap agreements.

---

[13] *Electronic Transactions Act,* SA 2001, c E-5.5, s 27 **[Exhibit EN-3].**
[14] *Douez v Facebook, Inc,* 2017 SCC 33 at para 137 **[Exhibit EN-4]**, citing *Electronic Transactions Act,* SBC 2001, c 10, s 15(1) **[Exhibit EN-3]** and *Rudder v Microsoft Corp* (1999), 2 CPR (4th) 474 (Ont SCJ) **[Exhibit 5]**

21.     I understand *Century 21 Canada Ltd Partnership v Rogers Communications Inc* ("***Century 21***")[15] to be the only reported Canadian court common law *final* judgment which squarely considers a contested issue of formation and enforcement of a browsewrap agreement. *Century 21* held, *inter alia,* that a browsewrap agreement was formed and was breached. I discuss *Century 21* beginning at paragraph 46 below.

22.     There are other Canadian cases which consider browsewrap agreements that I discuss below, including *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc* ("***Canadian Real Estate***"[16] – see beginning at paragraph 53 below) which was cited favourably in the *Century 21* case.[17] In this case, the Quebec Superior Court expressly considered the formation of browsewrap contracts not in a final judgment but at an application for an interlocutory injunction. I am advised by my colleague Guillaume Lavoie Ste-Marie that to be granted an interlocutory injunction in Quebec, a party must demonstrate, *inter alia,* that it has an appearance of right such that an injunction should be granted pending trial. The Quebec Superior Court in *Canadian Real Estate* found such an appearance of right on the issue of breach of contract (based on the defendant's data scraping) and granted the injunction.[18]

23.     As the above cases were issued from courts of first instance from another province, they are not binding on Alberta courts:

> The hierarchy of precedential authority means that [the Alberta Court of King's Bench is] bound only by the ratio of any decisions of the Alberta Court of Appeal and the Supreme Court of Canada. Decisions of The Judicial Committee of the Privy Council, the House of Lords and the Appellate Courts of the other eight Common Law Canadian Provinces tend to be strongly persuasive.

---

[15] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 **[Exhibit EN-6]**.

[16] *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 (QCCS), together with the unofficial English translation retrieved as referenced at paragraph 13 of my Declaration **[Exhibit EN-7]**.

[17] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 104 and 108 **[Exhibit EN-7]**, citing *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 (QCCS).

[18] *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 at paras 43-45 (QCCS), together with the unofficial English translation retrieved as referenced at paragraph 13 of my Declaration **[Exhibit EN-7]**.

Decisions of foreign courts with similar legal traditions may be of some persuasive value depending on their circumstances.[19]

24.     Some factors the Alberta Court of King's Bench has considered regarding whether foreign judgments have persuasive value are the underlying legal traditions, whether or not the judgments are reported, the area of law, and similarities between the factual circumstances.[20]

25.     While *Century 21* is not binding on Alberta courts, it is my opinion that Alberta courts would find that it has persuasive value. The Alberta Court of King's Bench (a court of first instance and the superior trial court in the Province of Alberta) has noted that case law from other Canadian jurisdictions may be important, and that trial decisions from other provinces may show emerging trends that have not yet been considered by Alberta case law.[21]

26.     The openness of the Alberta courts to case law of other Canadian provinces is noted in the "ski ticket cases" discussed below at paragraphs 40-41, where the Alberta Court of King's Bench expressly notes that an earlier *Alberta* case is unhelpful due to the underlying facts, but that there are several cases from B.C. and Ontario that shed light on the issue. [22]

27.     In decisions turning on Quebec civil law or specific Quebec civil code provisions, I would expect an Alberta court to consider any principles or comments of the judiciary that relate to shared concepts between the jurisdictions, or comments regarding technology or e-commerce that are rooted in Canadian consumer behaviour, and are not particular to Quebec civil law traditions. Notably, in reaching its decision in the *Century 21* case, the

---

[19] *Edmonton (City) v Protection Mutual Insurance Co*, [1997] 10 WWR 11, cited to 1997 CarswellAlta 141 at para 161 (ABKB), aff'd without comment on this point 1999 ABCA 6, leave to appeal ref'd [1996] SCCA No 126 **[Exhibit EN-8]**.

[20] *Edmonton (City) v Protection Mutual Insurance Co*, [1997] 10 WWR 11, cited to 1997 CarswellAlta 141 at paras 146-149 and 160 (ABKB), aff'd without comment on this point 1999 ABCA 6, leave to appeal ref'd [1996] SCCA No 126 **[Exhibit EN-8]**

[21] *R v Biever,* 2015 ABQB 301 at para 88 **[Exhibit EN-9]**, in which the Court dealing with a criminal matter referenced the value of extra-provincial decisions that may show emerging trends in criminal law, and which I take to note as an example of where the Alberta court will turn to decisions of other provinces to look for emerging trends in other areas of law. Note, references to the Alberta Court of King's Bench include the "Court of Queen's Bench", as it was called during Queen Elizabeth's reign. These two names and their abbreviations "ABQB" and "ABKB" are both used throughout to refer to the same Alberta superior trial court.

[22] *Pelechytik v Snow Valley Ski Club,* 2005 ABQB 532 at para 12 **[Exhibit EN-10]**; *Champion v Marmot Ski Basin,* 2005 ABQB 535 at para 14 **[Exhibit EN-11]**.

9

B.C. court considered not only the B.C. common law of contracts and developments with ticket cases, but it also considered electronic contracting cases from a variety of jurisdictions, including the *Canadian Real Estate* decision from Quebec.[23]

28.    In view of the above, this Declaration will discuss, in turn:

    a.  a background of the basics of contract law in Alberta, including various Alberta decisions on standard-form contracts, which I define as contracts where the offeror sets the terms of the contract and does not negotiate with the offeree;

    b.  the case law from other Canadian jurisdictions related to browsewrap agreements;

    c.  other Canadian judicial commentary on electronic terms of use;

    d.  whether I think an Alberta Court would be likely to come to similar conclusions to the decision rendered by the British Columbia Supreme Court in *Century 21*; and finally

    e.  whether, based on the assumptions of fact, above, and law canvassed below, I would expect an Alberta court would conclude that an agreement was reached between the parties in this matter.

---

[23] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 104 and 108 **[Exhibit EN-6]**. It is clear from paragraph 108 of *Century 21* that the B.C. Supreme Court has adopted the *Canadian Real Estate* principles referenced in the earlier paragraph 104.

## V.    **The Law of Contract**

29.    The cause of action for breach of contract in Alberta requires proof of the existence of a contract and a breach of one or more of the terms of the contract. There is no requirement to prove damages to ground a cause of action in breach of contract. [24]

30.    As held by Alberta Court of Appeal in *Setoguchi v Uber BV,* if a party seeks compensable damages for the breach, proof of loss is required for there to be something to compensate.[25]

31.    Standard-form contracts are valid and enforceable in Canada, barring any overriding legislation.[26] I am not aware of any Alberta legislation that would give rise to a blanket prohibition on browsewrap agreements, which are a type of standard-form contract.

32.    The law of contract formation was recently stated by the Supreme Court of Canada as follows: "[a] contract is formed where there is 'an offer by one party accepted by the other with the intention of creating a legal relationship, and supported by consideration'[.]"[27]

33.    An offeror can include within its terms what constitutes acceptance of said terms, and acceptance must be communicated in the mode dictated (if so dictated), or any other mode deemed reasonable.[28] Acceptance can be conveyed by conduct, including performance.[29]

34.    Consideration need not be monetary. Alberta's appellate court has recognized that consideration can be either "some right, interest, profit or benefit accruing to the one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the

---

[24] *Atlantic Lottery v Babstock,* 2020 SCC 119 at paras 49 and 105 **[Exhibit EN-12]**; *Setoguchi v Uber BV,* 2023 ABCA 45 at para 32, leave to appeal ref'd [2023] SCCA No 190 **[Exhibit EN-13]**.
[25] *Setoguchi v Uber BV,* 2023 ABCA 45 at para 66, leave to appeal ref'd [2023] SCCA No 190 **[Exhibit EN-13]**.
[26] *Seidel v Telus Communications Inc,* 2011 SCC 15 at para 2 **[Exhibit EN-14]**. I note the Supreme Court of Canada has used the more traditional language of "contract of adhesion", but in Canada this language is used to describe a contract where the terms are presented by the offeror without the ability for negotiation, and therefore encompasses the same type of contract I refer to as "standard form".
[27] *Ethiopian Orthodox Tewahedo Church of Canada St Mary Cathedral v Aga,* 2021 SCC 22 at para 35 **[Exhibit EN-15]**, citing *Scotsburn Co-operative Services Ltd v WT Goodwin Ltd,* [1985] 1 SCR. 54, at p 63.
[28] GHL Fridman, *The Law of Contract in Canada,* 6th ed (Toronto: Carswell 2011) at 50 **[Exhibit EN-16]**.
[29] *Regehr et al v Ketzakey Silver Mines Ltd et al,* 10 DLR (3d) 171, cited to 1970 CarswellAlta 159 at para 19 (Superior Court of Alberta, Appellate Division, predecessor to ABCA) **[Exhibit EN-17]**, citing *Saint John Tug Boat Co Ltd v Irving Refining Ltd,* [1964] SCR 614.

other."[30] The Alberta Court of Appeal has further confirmed that the common law does not concern itself with the *value* of the consideration given, and that "a peppercorn will provide ample consideration to support a transaction."[31]

35.    The intention to create legal relations is an objective analysis and is determined not by "what the parties subjectively had in mind", but rather by whether a reasonable person would conclude that the conduct indicated an intention to be bound.[32] In applying this test the courts may go beyond the four corners of the alleged agreement to consider the surrounding circumstances.[33]

36.    The question surrounding an intention to contract is apparent in cases of standard-form contracts, where the offeree is not involved in the negotiation of the terms.

37.    One area of standard-form contracts considered by Canadian courts on a number of occasions is the area of "ticket" cases.  In fact, *Century 21* identifies such "ticket" cases exemplary of jurisprudence addressing changing methods of contracting. In particular, *Century 21* refers to the United Kingdom's House of Lords decision in *Hood v Anchor Line (Henderson Bros)*, which held that where a company did what was reasonably sufficient to give notice of conditions on the back of a ticket, the person taking the ticket would be so bound.[34]

---

[30] *Regehr et al v Ketzakey Silver Mines Ltd et al,* 10 DLR (3d) 171, cited to 1970 CarswellAlta 159 at para 20 (Sup Ct AB, App Div) **[Exhibit EN-17]**, citing *Fleming v Bank of New Zealand,* [1900] AC 577 and *Currie v Misa* (1875) LR 10 Ex 153.

[31] *Mikkelsen v Truman Development Corp,* 2017 ABCA 99 at para 23, leave to appeal ref'd [2017] SCCA No 176 **[Exhibit EN-18]**.

[32] *Ethiopian Orthodox Tewahedo Church of Canada St Mary Cathedral v Aga,* 2021 SCC 22 at para 37, **[Exhibit EN-15]**, citing *Kernwood Ltd v Renegade Capital Corp* (1997), 97 OAC 3 and *Smith v Hughes* (1871), LR 6 QB 597.

[33] *Ethiopian Orthodox Tewahedo Church of Canada St Mary Cathedral v Aga,* 2021 SCC 22 at para 37, **[Exhibit EN-15]**, citing *Leemhuis v Kardash Plumbing Ltd,* 2020 BCCA 99 and *Owners, Strata Plan LMS 3905 v Crystal Square Parking Corp,* 2020 SCC 29.

[34] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at para 68 **[Exhibit EN-6],** citing *Hood v Anchor Line (Henderson Bros),* [1918] AC 837 (HL).

38.     The Supreme Court of Canada, in *Union Steamship Ltd v Barnes*,[35] considered *Hood v Anchor Line (Henderson Bros)* and various other "ticket" law cases from the United Kingdom, ultimately adopting a similar conclusion from the decision of the King's Bench in *Nunan v Southern Railway Company*:

> I am of opinion that the proper method of considering such a matter is to proceed upon the assumption that where a contract is made by the delivery, by one of the contracting parties to the other, of a document in a common form stating the terms upon which the person delivering it will enter into the proposed contract, such a form constitutes the offer of the party who tenders it, and if the form is accepted without objection by the person to whom it is tendered this person is as a general rule bound by its contents and his act amounts to an acceptance of the offer to him whether he reads the document or otherwise informs himself of its contents or not, and the conditions contained in the document are binding upon him; but that if there be an issue as to whether the document does contain the real intention of both the parties the person relying upon it must show either that the other party knew that there was writing which contained conditions or that the party delivering the form had done what was reasonably sufficient to give the other party notice of the conditions, and that the person delivering the ticket was contracting on the terms of those conditions.[36]

39.     Put simply, the delivery of a standard-form offer and subsequent acceptance without objection will generally be treated as acceptance (whether or not the offeree has read the terms), but where there is any dispute as to the intention to contract, the party relying on the agreement must show either (i) actual knowledge of writing which contained conditions, or (ii) reasonable notice of said conditions.

---

[35] *Union Steamship Ltd v Barnes,* [1956] SCR 842, cited to 1956 CarswellBC 186 at paras 34 and 37 **[Exhibit EN-19]**, citing *Hood v Anchor Line (Henderson Bros),* [1918] AC 837 (HL).

[36] *Union Steamship Ltd v Barnes,* [1956] SCR 842, cited to 1956 CarswellBC 186 at para 35 **[Exhibit EN-19]**, citing *Nunan v Southern Railway Company,* [1923] 2 KB 703.

40.     These same principles have been followed outside of the historical transportation case law and into modern cases surrounding other standard-form contracts. Examples of the application of this law in the Alberta Court of King's Bench is found in ski ticket waiver cases, such as *Pelechytik v Snow Valley Ski Club*[37] and *Champion v Marmot Ski Basin,*[38] which considered the sufficiency of notice of limitation of liability provisions relied upon by the defendants as defences to claims brought under the Alberta *Occupiers Liability Act.*

41.     In these ski ticket cases, the Alberta court held that in the absence of the offeree having *actual* notice off the terms, the occupier [offeror] must demonstrate that reasonable steps have been taken to alert the visitor [offeree] to the terms in order to deem valid the visitor's acceptance of such terms, and that such an analysis will be a finding of fact based on the evidence in each case.[39] Notably, in reaching its conclusions in the two cases, the Alberta court noted that there were no helpful Alberta decisions, and canvassed cases from B.C. and Ontario courts of first instance, which considered the terms, design and colouring of the ski tickets and waiver signs, the placement of waiver signs at the ticket sales area, and the general knowledge of the offeree regarding the type of terms.[40]

42.     When considering sufficiency of notice of terms, Alberta courts also consider the personal circumstances of the offeree and the nature of the terms themselves. In *Budget Rent A Car of Edmonton Ltd v University of Toronto,* the Alberta Court of Appeal enforced limitation of liability provisions on the back of a rental car contract after noting the experience of the offeree renter and its agent who signed the contract with such contracts, the arrangement of the terms on the contract, and the fact that the terms in question were "in no way surprising, unusual, unexpected, onerous, or unfair."[41]

---

[37] *Pelechytik v Snow Valley Ski Club,* 2005 ABQB 532 **[Exhibit EN-10]**.

[38] *Champion v Marmot Ski Basin,* 2005 ABQB 535 **[Exhibit EN-11]**.

[39] *Pelechytik v Snow Valley Ski Club,* 2005 ABQB 532 at paras 12-17 **[Exhibit EN-10]**; *Champion v Marmot Ski Basin,* 2005 ABQB 535 at paras 13-18 **[Exhibit EN-11]**.

[40] *Pelechytik v Snow Valley Ski Club,* 2005 ABQB 532 at paras 12-17 **[Exhibit EN-10]**; *Champion v Marmot Ski Basin,* 2005 ABQB 535 at paras 13-18 **[Exhibit EN-11]**;*see also Lotepro Engineering and Construction Ltd. v Air Canada,* [1982] 2 WWR 630, cited to 1981 CarswellAlta 301 (ABKB) **[Exhibit EN-20]** (holding the notice requirement was met where the agent of the party against whom the contract was enforced had the opportunity to read the contract and the offeror had copies of relevant terms incorporated by reference that could have been made available upon request).

[41] *Budget Rent A Car of Edmonton Ltd v University of Toronto,* 1995 ABCA 52 at paras 4-5, leave to appeal ref'd [1995] SCCA No 141 **[Exhibit EN-21]**.  Regarding the sophistication and experience of the

43.    In the 1989 copyright case of *North American Systemshops Ltd v King,* the Alberta Court of King's Bench considered whether certain proposed terms of software license accompanied the sale of a compact disc ("**CD**") with software.  In the facts of that case, the CD was enclosed within a booklet, which package was then shrink-wrapped. The Court concluded that the proposed licence terms were not on the CD itself, but rather in the back of the accompanying booklet that a consumer would not have needed to rely on in order to run the software.  The Court therefore found there was insufficient notice for these license terms to have formed implied restrictions in the contract of sale.[42]

44.    Based on my review of the above Alberta case law involving standard-form contracts, I believe that an Alberta court would find that an agreement was reached where the offeror has provided sufficient notice of the terms to the offeree at the time of entering the agreement. To that end, an Alberta court would consider factors including the following:

   a.   an opportunity to review the terms;[43]

   b.   the language of the terms;[44]

   c.   the nature of the terms (eg., whether surprising, unusual, unexpected, onerous, unfair);[45]

   d.   the placement of the terms;[46]

   e.    the appearance of the terms or other notices to draw the consumer's attention to the terms,[47]

---

contracting parties, see also *Mikkelsen v Truman Development Corp,* 2017 ABCA 99 at para 18, leave to appeal ref'd [2017] SCCA No 176 **[Exhibit EN-18]**.

[42] *North American Systemshops Ltd v King,* [1989] AWLD 749, cited to 1989 CarswellAlta 111 at paras 16 and 33 (ABKB) **[Exhibit EN-22]**.

[43] *Lotepro Engineering and Construction Ltd v Air Canada,* [1982] 2 WWR 630, cited to 1981 CarswellAlta 301 at para 5 (ABKB) **[Exhibit EN-20]**; *Union Steamships v Barnes,* [1956] SCR 842, cited to 1956 CarswellBC 186 at paras 25 and 38 (SCC) **[Exhibit EN-19]**.

[44] *Union Steamships v Barnes,* [1956] SCR 842, cited to 1956 CarswellBC 186 at para 25 (SCC) **[Exhibit EN-19]**.

[45] *Budget Rent A Car of Edmonton Ltd v University of Toronto,* 1995 ABCA 5 at para 5, leave to appeal ref'd [1995] SCCA No 141 **[Exhibit EN-21]**.

[46] *Union Steamships v Barnes,* [1956] S.C.R. 842, cited to 1956 CarswellBC 186 at paras 37-38 (SCC) **[Exhibit EN-19]**; *Champion v Ski Marmot Basin* 2005 ABQB 535 at paras 13-18 **[Exhibit EN-11]**; *North American Systemshops Ltd v King,* [1989] AWLD 749, cited to 1989 CarswellAlta 111 at paras 16 and 33 (ABKB) **[Exhibit EN-22]**.

[47] *Union Steamships v Barnes*, [1956] S.C.R. 842 cited to 1956 CarswellBC 186 at para 38 (SCC) **[Exhibit EN-19]**; *Dell v Union des Consommateurs,* 2007 SCC 34 at para 100 **[Exhibit EN-23]**;

    f.   the offeree's general knowledge of the types of agreements or terms in question;[48] and

    g.   the experience or sophistication of the offeree.[49]

## VI. **Browsewrap Jurisprudence**

45.    Having surveyed case law involving standard-form contracts generally, I now move to consider how an Alberta court would consider a browsewrap agreement specifically.

46.    As far as I am aware, *Century 21* is the 'leading case' in Canada on browsewrap agreements, being the only reported final judgment which squarely considers a contested issue of formation and enforcement of a browsewrap agreement. The plaintiff alleged that the defendant breached the terms of use of the plaintiff's website by using a robot to scrape data from the plaintiff's website that the defendant then displayed for commercial purposes on its own website.[50] The plaintiff sent the defendant a cease-and-desist letter drawing its attention to the terms of use, and the defendant continued to conduct the indexing after receipt of the letter.[51]

47.    The defendant raised a number of defences in the litigation, including that a contract was not formed because the defendant was never required to read the terms of use and never affirmatively agreed to them, because there was allegedly no consideration for the contract, and because accepting browsewrap agreements would be contrary to public policy as it would imperil the operation of the internet.[52]

---

*Pelechytik v Snow Valley Ski Club,* 2005 ABQB 532 at paras 14-16 **[Exhibit EN-10]**; *Champion v Ski Marmot Basin* 2005 ABQB 535 at paras 13-17 **[Exhibit EN-11]**.

[48] *Pelechytik v Snow Valley Ski Club,* 2005 ABQB 532 at paras 14-16 **[Exhibit EN-10]**; *Champion v Ski Marmot Basin,* 2005 ABQB 535 at paras 17-18 **[Exhibit EN-11]**.

[49] *Budget Rent A Car of Edmonton Ltd v University of Toronto,* 1995 ABCA 5 at para 4, leave to appeal ref'd [1995] SCCA No 141 **[Exhibit EN-21]**; *Mikkelsen v Truman Development Corp,* 2017 ABCA 99 at para 18, leave to appeal ref'd [2017] SCCA No 176 **[Exhibit EN-18]**.

[50] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 2, 18-22 and 37-41 **[Exhibit EN-6]**.

[51] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 26-30 and 40 **[Exhibit EN-6]**.

[52] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 62, 109 and 122 **[Exhibit EN-6]**.

48.     The *Century 21* Court considered: general common law of contract principles, "ticket cases", modern electronic contract cases (including *Canadian Real Estate* and various U.S. browsewrap cases), and factors to be considered where analyzing sufficiency of notice of the terms and whether the offeree had constructive knowledge of the terms of the contract.[53] The Court made the following comments on browsewrap agreements:

> Browse wrap agreements have the advantage of being readily available for perusal by the user. Their enforcement requires a clear opportunity for the user to read them which, given the nature of computer and the Internet, is likely to be a better opportunity than that available to the user of a product with a standard form contract presented at the time of purchase. A properly enforceable browse wrap agreement will give the user the opportunity to read it before deeming the consumer's use of the website as acceptance of the Terms of Use.[54]

49.     Ultimately, the Court upheld the existence of the agreement based on actual knowledge. The Court determined that it did not need to make any factual findings on constructive notice because the defendant acknowledged it was aware of the Terms of Use and what conduct was deemed to be acceptance. The Court further made note that the defendant had acknowledged said terms of use were an industry standard, and evidence demonstrated that it relied on similar Terms of Use on its own website.[55] The Court held that there was consideration (value) exchanged, noting the defendant's actions in copying the information affirmed there was value in the information, and further noted the amounts spent on both parties web databases makes it clear that website databases have value.[56]

---

[53] *Century 21 Canada Ltd Partnership v Rogers Communications Inc*, 2011 BCSC 1196 at paras 64-108 **[Exhibit EN-6]**.
[54] *Century 21 Canada Ltd Partnership v Rogers Communications Inc*, 2011 BCSC 1196 at para 108 **[Exhibit EN-6]**.
[55] *Century 21 Canada Ltd Partnership v Rogers Communications Inc*, 2011 BCSC 1196 at para 108 **[Exhibit EN-6]**.
[56] *Century 21 Canada Ltd Partnership v Rogers Communications Inc*, 2011 BCSC 1196 at para 123 **[Exhibit EN-6]**.

50.     The Court also rejected the defendant's public policy argument because to accept it would deny the right of website operators to control access to their business assets and information. The Court made the following comments of note regarding electronic contracting:

> 114  The evolution of the Internet as an "open" medium with its ability to hyperlink, being key to its success, does not mean it must function free of traditional contract law. It is simply the manner of contracting that has changed, not the law of contract. The acceptance of click wrap and browse wrap agreements acknowledges the right of parties to control access to, and the use of, their websites.
>
> 115     Just because a party chooses to do business on the Internet should not mean they relinquish their rights to control access to their business assets and information. The defendants' submission would deny that right to the plaintiff Century 21. In turn, that would decrease their motivation to create and operate their Website.
>
> 116     In my opinion, a publically available website does not necessarily give a right of access free of any contractual terms. Depending on the circumstances, a contract may be formed.
>
> 117     It is important for commercial efficacy that contract terms can be agreed upon as easily in the electronic world as in the world of paper. In my opinion, the defendants' suggestion that the Internet would be crippled by enforcing Terms of Use is incorrect. To render Terms of Use unenforceable would impair the utility and health of the Internet as creator's products would not be capable of contractual protection. If offerors could not place information on the Internet without some measure of control, its utility would be diminished.
>
> 118     The defendants argue that what Century 21 provides, in making their Website available to the public, (as opposed to an internal "Intranet"), is merely a grant of access to the site. The defendants' argument may be correct in part; however, when a user accesses a main page that merely places the user at Century 21's door. Entry is an additional step and one that website owners clearly control and users can undoubtedly choose to take.
>
> 119     Taking the service with sufficient notice of the Terms of Use and knowledge that the taking of the service is deemed agreement constitutes acceptance sufficient to form a contract. The act of browsing past the initial page of the website or searching the site is conduct indicating agreement with the Terms of Use if those terms are provided with sufficient notice, are available

for review prior to acceptance, and clearly state that proceeding further is acceptance of the terms.[57]

51.    *Century 21* clearly contemplates that one can demonstrate notice of terms either through actual notice or constructive notice, in alignment with the pre-existing Alberta principles established in case law on non-electronic contracting. Further, although the Court upheld the agreement on the basis of actual notice, the decision appeared to favourably consider other factors of constructive notice considered in either or both B.C. ticket case law or electronic contracting cases of other jurisdictions. Examples of such factors acknowledged by the B.C. Supreme Court are: whether the party is an individual or commercial entity,[58] the sophistication of the consumer,[59] whether the defendant relied on similar terms on their own website (if applicable),[60] website visitation/use frequency,[61] the placement and appearance (prominence) of the notice of the terms,[62] and whether there was clear and consistent access to terms webpages.[63] These factors are also aligned with those considered in the Alberta case law discussed in Part V, above.

---

[57] *Century 21 Canada Ltd Partnership v Rogers Communications Inc*, 2011 BCSC 1196 at paras 114-119 **[Exhibit EN-6]**.

[58] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 93, 105, 107, 120, and 125 **[Exhibit EN-6]**, citing *Register.com, Inc. v. Verio, Inc.,* 126 F. Supp. 2d 238 (Dist. Court S.D.N.Y. 2000), aff'd 356 F.3d 393 (2d Cir. N.Y. 2004) and *American Airlines Inc. v. FareChase Inc.,* No. 067-194022-2 (Tex. 67th District Court, Tarrant County, Texas, Mar. 8, 2003).

[59] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 107, 120 and 125 **[Exhibit EN-6]**.

[60] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 104 and 108 **[Exhibit EN-6]**, citing *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc*, 2003 CarswellQue 682 at para 44g **[Exhibit EN-7]**.

[61] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 93, 107, cited to 2011 CarswellBC 2348 at paras 93, 107 **[Exhibit EN-6]**, citing *Register.com, Inc. v. Verio, Inc*., 126 F. Supp. 2d 238 (Dist. Court S.D.N.Y. 2000), aff'd 356 F.3d 393 (2d Cir. N.Y. 2004).

[62] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 97-98 and 107 **[Exhibit EN-6]**, citing *Pollstar v. Gigmania Ltd.*, 170 F.Supp.2d 974 (U.S. Dist. Ct. E.D. Cal. 2000).

[63] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 93, 100 and 108 **[Exhibit EN-6]**, citing *Specht v. Netscape Communications Corp*., 306 F. 3d 17 (Court of Appeals, 2nd Cir. 2002) and *Register.com, Inc. v. Verio, Inc*., 126 F. Supp. 2d 238 (Dist. Court S.D.N.Y. 2000), aff'd 356 F.3d 393 (2d Cir. N.Y. 2004).

52.     In considering sufficiency of notice, *Century 21* considered the *Canadian Real Estate* case, which it cited favourably for the Quebec court's emphasis of the defendant's actual knowledge of the user conditions and the defendant's imposition of similar user conditions on its own website.[64]

53.     In *Canadian Real Estate,* the plaintiff sought an interlocutory injunction against the defendant based upon, *inter alia, th*e defendant's alleged breach of the plaintiff's website's terms of use by using software to download data from the plaintiff's website to display on its own website for commercial purposes, contrary to the terms of use.[65] The plaintiff sent two demand letters to the defendant, accusing the defendant of violating the terms of use.[66] After the demand letters were sent, the defendant continued the activities (albeit modified activities after the commencement of the injunction proceedings).[67] The defendant claimed that it never consented to the terms of use of the plaintiff's website, because there was no prompt to click "I agree".[68]

54.     The court left the issue of the absence of an "I agree" button to the trial judge. However, in applying the test for an interlocutory injunction under Quebec law, the court found the existence of a plaintiff's apparent right, if not a clear right, such that there was a reasonable chance of success at trial. Specifically, the court noted that the defendant had not established any right to use the information contained on the plaintiff's site beyond the conditions of use of said site; the plaintiff's website's homepage clearly mentioned the existence of terms of use; downloading is an expression of consent to the terms of use; that

---

[64] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 104 and 108 **[Exhibit EN-6]**, citing *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 at para 44g (QCCS) **[Exhibit EN-7]**.

[65] *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 at paras 1-18 (QCCS), together with the unofficial English translation retrieved as referenced at paragraph 13 of my Declaration **[Exhibit EN-7]**.

[66] *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 at paras 15-16 (QCCS)*,* together with the unofficial English translation retrieved as referenced at paragraph 13 of my Declaration **[Exhibit EN-7]**.

[67] *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 at paras 22-23 (QCCS)*,* together with the unofficial English translation retrieved as referenced at paragraph 13 of my Declaration **[Exhibit EN-7]**.

[68] *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 at para 43 (QCCS)*,* together with the unofficial English translation retrieved as referenced at paragraph 13 of my Declaration **[Exhibit EN-7].**

the defendant downloaded the information, modified its content and published the modified content; and that the defendant knew that terms of use apply and also imposed similar terms of use on its own website.[69] As noted, the decision was for an interlocutory injunction and there is no reported final judgment on the merits.

55.     The Ontario Superior Court of Justice acknowledged the validity of browsewrap agreements in *Magill v Expedia*.[70] The dispute centered on whether Expedia's "Website Terms, Conditions and Notices" (a browsewrap agreement) was a separate contract from the "Reservation Contract" that arises as a result of concluding a booking, and if so, whether certain provisions of the "Website Terms, Conditions and Notices" were incorporated into the Reservation Contract.[71] The Court noted that Expedia had no way of knowing whether a customer accesses the Website Terms of Use, and that the booking path specifies that by completing the booking, the customer agrees to having read and accepted the Website Terms, Conditions and Notices, notwithstanding that customers can enter into said Reservation Contracts without ever actually reading the Website Terms, Conditions and Notices.[72] The Court recognized the existence of a contract governing the use of a website:

> I agree that the Terms of Use, standing alone, are a separate or discrete contract. **The Terms of Use standing alone provide a contract for customers who use the website but who do not go on to make a hotel reservation.** However, the Terms of Use in that separate contract become terms of the Reservation Contract for those customers that so make a Reservation Contract.[73] (emphasis added)

---

[69] *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc,* 2003 CanLII 22519 at paras 42 and 44 (QCCS), together with the unofficial English translation retrieved as referenced at paragraph 13 of my Declaration **[Exhibit EN-7]**.

[70] *Magill v Expedia*, 2014 ONSC 2073 **[Exhibit EN-24]**.

[71] *Magill v Expedia*, 2014 ONSC 2073 at paras 7-10 and 14 **[Exhibit EN-24]**.

[72] *Magill v Expedia*, 2014 ONSC 2073 at para 26 **[Exhibit EN-24]**.

[73] *Magill v Expedia*, 2014 ONSC 2073 at para 72 **[Exhibit EN-24]**.

56.     The comments of the Ontario Superior Court of Justice clearly indicate the Court's acceptance of browsewrap agreements (in this case the "Website Terms, Conditions and Notices") as a legitimate form of contract governing website use, and one separate and distinct from purchase agreements, which purchase agreements may nevertheless incorporate the browsewrap agreement by reference.

57.     Thus, British Columbia, Quebec, and Ontario all have, in some capacity, recognized the validity and enforceability of browsewrap agreements. As previously noted, decisions from these other jurisdictions are not binding on an Alberta court. However, I think that an Alberta court would still closely consider British Columbia and Ontario case law on browsewrap formation, particularly in view of the absence of Alberta case law. Further, I think an Alberta court is likely to also consider those findings in the Quebec *Canadian Real Estate* decision that are not specific to the civil law of Quebec, as did the court in *Century 21*.[74]

58.     Further, given the absence of Alberta case law and few reported Canadian decisions expressly considering the formation of browsewrap agreements, I would expect an Alberta court considering the issue of browsewrap formation to consider commentary from other Canadian courts on principles relating to internet contracting generally, particularly where such commentary relates to comments on trends or user expectation, which can be categorized as court findings or reflections on Canadian society.

59.     As noted above, in some instances the Alberta courts will consider foreign jurisprudence rooted in similar legal traditions and, as such, may consider U.S. jurisprudence on browsewrap agreements determined on common law principles. However, the consideration of non-Canadian jurisprudence is outside of my mandate and I decline to comment on such foreign jurisprudence in my Declaration.

---

[74] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 1196 at paras 104 and 108 **[Exhibit EN-6]**, citing *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc*, 2003 CarswellQue 682 at para 44g **[Exhibit EN-7]**.

## VII.   **Other Canadian commentary on electronic terms of use or sale**

60.   Outside of pure browsewrap cases, Canadian courts have considered the enforceability of online terms such as terms or conditions of sale that shed light on the Court's attitudes towards internet contracting, including the sufficiency of notice of terms in an online setting.

61.   For example, at least as early as 1999 the Ontario Superior Court of Justice considered a click-wrap agreement in *Rudder v Microsoft*.[75] The court enforced an agreement where it was "readily viewable by using the scrolling function on the portion of the computer screen where the Membership Agreement was presented".[76] In reaching its decision, the court considered the language, design and placement of the terms:

> I have viewed the Member Agreement as it was presented to Rudder during the sign-up procedure. All of the terms of the Agreement are displayed in the same format. Although, there are certain terms of the Agreement displayed entirely in upper-case letters, there are no physical differences which make a particular term of the agreement more difficult to read than any other term. In other words, there is no fine print as that term would be defined in a written document. The terms are set out in plain language, absent words that are commonly referred to as "legalese". Admittedly, the entire Agreement cannot be displayed at once on the computer screen, but this is not materially different from a multi-page written document which requires a party to turn the pages. Furthermore, the structure of the sign-up procedure is such that the potential member is presented with the terms of membership twice during the process and must signify acceptance each time. Each time the potential member is provided with the option of disagreeing which terminates the process. The second time the terms are displayed occurs during the on-line portion of the process and at that time, the potential member is advised via a clear notice on the computer screen.[77]

62.   In 2007, the Supreme Court of Canada in *Dell v Union des Consommateurs* ("***Dell***"), considered the applicability of arbitration provisions between Dell and an online purchaser, and whether the provisions, available by hyperlink, were "external" provisions based on a specific provision of the Quebec *Civil Code*.[78]

---

[75] *Rudder v Microsoft Corp,* 2 CPR (4th) 474, cited to 1999 CarswellOnt 3195 **[Exhibit EN-5]**.

[76] *Rudder v Microsoft Corp,* 2 CPR (4th) 474, cited to 1999 CarswellOnt 3195 at para 13 **[Exhibit EN-5]**.

[77] *Rudder v Microsoft Corp,* 2 CPR (4th) 474, cited to 1999 CarswellOnt 3195 at para 14 **[Exhibit EN-5]**.

[78] *Dell v Union des Consommateurs,* 2007 SCC 34 **[Exhibit EN-23]**.

63.     The majority in *Dell* concluded that the arbitration clause was not external, finding that it was reasonably accessible given that the clause could be accessed by clicking only once on a hyperlink for "Terms and Conditions of Sale", which hyperlink reappeared on every page accessed by the consumer.[79] Although this discussion arose in the context of the Quebec *Civil Code* and reasonably accessible clauses, the Supreme Court notes that the accessibility issue is tied to the concept that a contract clause cannot be binding unless the contracting party had a reasonable opportunity to read it,[80] which maps onto Alberta's common law principles of contracting. As such, the Court's comments on internet contracts would also appear relevant to the common law context in Alberta.

64.     Notably, while the dissenting judges concluded that the underlying matter should not be sent to arbitration based on entirely distinct Quebec *Civil Code* provisions, they did not need to consider the external clause issue. However, they intentionally addressed it due to their concern with the underlying Court of Appeal findings,[81] and made the following comment on electronic contracting:[82]

> The context of e-commerce requires courts to be sensitive to a number of considerations.  First, we are dealing with a different means of doing business than has heretofore been generally considered by the courts, with terminology and concepts that may not easily, though nevertheless must be fit within the existing body of contract law.  Second, as e-commerce increasingly gains a greater foothold within our society, courts must be mindful of advancing the goal of commercial certainty (see *Rudder v. Microsoft Corp.* (1999), 1999 CanLII 14923 (ON SC), 2 C.P.R. (4th) 474 (Ont. S.C.J.)).  Finally, the context demands that a certain level of computer competence be attributed to those who choose to engage in e-commerce.  As noted by the Ontario Superior Court of Justice in *Kanitz v. Rogers Cable Inc. (*2002), 2002 CanLII 49415 (ON SC), 58 O.R. (3d) 299:

>> We are here dealing with people who wish to avail themselves of an electronic environment and the electronic services that are available through it.  It does not seem unreasonable for persons who are seeking electronic access to all manner of goods, services and products, along with

---

[79] *Dell v Union des Consommateurs,* 2007 SCC 34 at paras 99-101 **[Exhibit EN-23]**.

[80] *Dell v Union des Consommateurs,* 2007 SCC 34 at para 98 **[Exhibit EN-23]**.

[81] *Dell v Union des Consommateurs,* 2007 SCC 34 at paras 217 and 231 **[Exhibit EN-23]**.

[82] *Dell v Union des Consommateurs,* 2007 SCC 34 at paras 231 and 232 **[Exhibit EN-23]**, citing *Rudder v Microsoft,* 2 CPR (4th) 474**[Exhibit EN-5]** and *Kanitz v Rogers Cable,* 58 OR (3d) 299. The passage from *Kanitz v Rogers Cable,* was also cited favourably by the B.C. Supreme Court in *Century 21* at paras 95-96 **[Exhibit EN-6]**.

> information, communication, entertainment and other resources, to have the
> legal attributes of their relationship with the very entity that is providing
> such electronic access, defined and communicated to them through that
> electronic format. [para. 32]

65.     The dissent went on to note that whether a hyperlinked document is expressly brought to the attention of the consumer at the formation of the contract should be approached based on whether the hyperlink was functional and clearly visible.[83] When addressing the location and visibility of the Terms and Conditions of Sale generally, the dissent held that the hyperlink in small font at the bottom of every shopping page was consistent with industry standards at that time, and that it was therefore proper to assume that e-commerce consumers would have expected to find a company's terms and conditions at the bottom of a webpage.[84]

66.     While these comments from the dissent and the majority arose in consideration of a specific Quebec Civil Code provision on external clauses, the Supreme Court of Canada's comments on internet contracting appear relevant to the general flexibility of the courts to recognize the need to apply the law of contract in accordance with technological evolution.[85] As such, this commentary is not specific to civil law, and I therefore expect an Alberta court would find these comments from Canada's highest court persuasive.

---

[83] *Dell v Union des Consommateurs,* 2007 SCC 34 at para 237 **[Exhibit EN-23]**.
[84] *Dell v Union des Consommateurs,* 2007 SCC 34 at para 238 **[Exhibit EN-23]**.
[85] See, for example, *Dell v Union des Consommateurs,* 2007 SCC 34 at paras 99, 100 and 231 **[Exhibit EN-23]**.

67.    In 2009, the Ontario Superior Court of Justice decision in *Pacific Express Travel Ltd v Expedia Canada Corp* ("**Pacific Express**") also considered the application of terms of use incorporated via a website.[86] The plaintiff, a retail travel business, booked tickets through Expedia's website and was accused of engaging in certain ticketing practices prohibited by the carrier's conditions of carriage, which were incorporated by reference into Expedia's website terms and conditions.[87] Although the court did not rule on whether the particular prohibition formed part of the agreement between the parties, the Court made a point of noting that regardless of the plaintiff's actual knowledge of the prohibition, he ought to have been aware of it, noting that his customers relied on his expertise in the travel business and his making legitimate flight bookings.[88] The Court further noted that the Plaintiff was clearly aware of the prohibited practice when it rebooked the cancelled tickets after having received a cease and desist letter from the defendant.[89]

68.    Although the *Pacific Express* decision is not expressly on browsewrap agreement formation, it is another instance of a Canadian court considering the application of online terms and conditions, and in particular (i) considering the existence of actual notice following a cease-and-desist communication, and (ii) considering the circumstances and expected knowledge of a user in the discussion of constructive notice.

69.    In 2014, the Supreme Court of Canada in *R v Spencer* considered privacy expectations of an accused while using his sister's internet service in the context of criminal search and seizure case. The Supreme Court of Canada did not have to consider whether there was a contractual relationship between the accused and the service provider, but noted "[a] reasonable user would be aware that the use of the service would be governed by certain terms and conditions, and those terms and conditions were readily accessible through [the service provider's] website."[90]

---

[86] *Pacific Express Travel Ltd v Expedia Canada Corp*, 179 ACWS (3d) 419, cited to 2009 CarswellOnt 4500 (ONSC) **[Exhibit EN-25]**.
[87] *Pacific Express Travel Ltd v Expedia Canada Corp*, 179 ACWS (3d) 419, cited to 2009 CarswellOnt 4500 at paras 29-30 (ONSC) **[Exhibit EN-25]**.
[88] *Pacific Express Travel Ltd v Expedia Canada Corp*, 179 ACWS (3d) 419, cited to 2009 CarswellOnt 4500 at paras 33, 41 and 72 (ONSC) **[Exhibit EN-25]**.
[89] *Pacific Express Travel Ltd v Expedia Canada Corp*, 179 ACWS (3d) 419, cited to 2009 CarswellOnt 4500 at paras 12-18 and 72 (ONSC) **[Exhibit EN-25]**.
[90] *R v Spencer,* 2014 SCC 43 at para 57 **[Exhibit EN-26]**.

70.    An Alberta court may find such statements from the Supreme Court of Canada as indicative of user expectations and would likely consider that reasonable users of websites (similar to users of internet services), would be aware that use of the website would be governed by certain terms and conditions made available via the website.

71.    In the 2018 decision *Fletcher et al v Hull et al,* the Manitoba Court of King's Bench considered the sufficiency of notice surrounding contractual terms made available via a website. The plaintiff sought an interim mandatory injunction requiring the defendant dog rescue company to return a dog that the plaintiff had adopted from, and then had been required to return to, the defendant.[91] The Manitoba Court of Queen's Bench held that it could not determine the terms of the adoption agreement on the interlocutory application, noting that both parties had potential arguments, having considered the following evidentiary issues:

> The Declarations and cross-examinations before me are unclear as to where on the webpage the adoption terms and conditions were published. I cannot tell from the evidence before me whether it was impossible to make an application without acknowledging by a click of a mouse that the applicant would be bound by the terms and conditions, or whether the terms and conditions, if on the webpage at all at the material time, were sufficiently located on the webpage to give a prospective applicant significant notice of their existence.[92]

The comments of the court clearly indicate that it was prepared to consider the sufficiency of notice of such terms outside of a click-wrap arrangement requiring express clicking of a designated icon.

72.    The aforementioned cases, although not pure browsewrap, demonstrate the general acknowledgment of Canadian courts of the changing landscape of contract law in the internet era, their willingness to ascribe a certain level of user sophistication with respect to a consumer's ability to use the internet and the expectations they should expect to have when using it, and their application of the "sufficient notice" principles evident in early "ticket" cases into online contracting.

---

[91] *Fletcher et al v Hull et al,* 2018 MBQB 46 **[Exhibit EN-27]**.
[92] *Fletcher et al v Hull et al,* 2018 MBQB 46 at para 34 **[Exhibit EN-27]**.

73.    The above provincial cases can be contrasted with the Federal Court of Canada's decision in *1394804 Ontario Ltd. (Blacklock's Reporter) v Canada* ("***Blacklock's***"), in which that court considered whether a reporter's copying and distribution to 6 colleagues of a particular news article constituted fair dealing.[93]  The initial copy was legally obtained as part of a subscription, and the evidence demonstrated that the individual did not have actual knowledge of the terms restricting distribution.[94]  The Federal Court noted that the subscription application included a reference to Terms & Conditions at the base of the application, but that the potential subscriber did not have to acknowledge and accept any terms of use prior to the transaction being concluded. The Federal Court (which is a statutory court that will only consider common law matters in extremely limited circumstances) declined to infer knowledge of the terms and conditions based on inference or reference to the sophistication of users.[95]   However, even in this case it appears the Federal Court may have concluded differently if the offeree had been aware of the Terms and Conditions at the time of purchase.[96]

*74.*    In view of the Alberta law of contract, including with respect to constructive notice of standard-form terms and the sophistication of contracting parties, the case law discussed above on sufficiency of notice of online terms and conditions (browsewrap or otherwise), together with the provincial courts having more experience considering the common law cause of action for breach of contract, I expect an Alberta court would give little weight to *Blacklock's.*

---

[93] *1394804 Ontario Ltd. (Blacklock's Reporter) v Canada*, 2016 FC 1255 **[Exhibit EN-28]**.

[94] *1394804 Ontario Ltd. (Blacklock's Reporter) v Canada*, 2016 FC 1255 at paras 36(a), 36(i) **[Exhibit EN-28]**.

[95] *1394804 Ontario Ltd (Blacklock's Reporter) v Canada*, 2016 FC 1255 at paras 5 and 39-42 **[Exhibit EN-28]**.

[96] *1394804 Ontario Ltd (Blacklock's Reporter) v Canada*, 2016 FC 1255 at para 41 **[Exhibit EN-28]**.

**VIII.** **Conclusion on Anticipated Alberta Treatment of Browsewrap Agreements**

75. It is my opinion that an Alberta court would consider the *Century 21* decision important to its analysis. *Century 21* is the only reported common law decision that expressly considers when a browsewrap agreement is formed. Further, and as noted above in Part VI, the issues of actual notice and sufficient notice discussed in *Century 21* align with the pre-existing Alberta principles established in case law on non-electronic contracting.

76. I would expect this to be especially true in the instant case, given the similarity of underlying facts between the *Century 21* decision (which considered breach of a browsewrap agreement through data scraping, including after a demand letter was issued) and the facts of the instant case.

77. The full paragraphs of 107 and 108 of *Century 21* are worth emphasizing:

> As noted in the authorities referred to above, the law of contract requires that the offer and its terms be brought to the attention of the user, be available for review and be in some manner accepted by the user. Such an analysis turns on the prominence the site gives to the proposed Terms of Use and the notice that the user has respecting what they are agreeing to once they have accepted the offer. To establish a binding contract consideration will also be given to whether the user is an individual consumer or a commercial entity and in addition a one-time user or a frequent user of the site.
>
> Browse wrap agreements have the advantage of being readily available for perusal by the user. Their enforcement requires a clear opportunity for the user to read them which, given the nature of computer and the Internet, is likely to be a better opportunity than that available to the user of a product with a standard form contract presented at the time of purchase. A properly enforceable browse wrap agreement will give the user the opportunity to read it before deeming the consumer's use of the website as acceptance of the Terms of Use. In the case at bar, notice is not an issue given the defendant has acknowledged it was aware of the Terms of Use and what conduct was deemed to be acceptance. In addition, the defendant Zoocasa relies on similar Terms of Use on its own Website. The defendants have also acknowledged that the Century 21 Website Terms of Use are industry standard.[97]

---

[97] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 119, at paras 107 and 125 [**Exhibit EN-6**].

78.    The principles canvassed by *Century 21* already map on to the existing law in Alberta.

79.    Both B.C. and Alberta share the general requirements of offer and acceptance.

80.    In both B.C. and Alberta, notice of terms of an agreement can be demonstrated through actual knowledge or constructive notice.[98]

81.    Where actual knowledge is not present and sufficiency of notice is to be considered, Alberta courts examine the same factors considered by *Century 21*:

   a.    an opportunity to review the terms,[99] which is also reflected in *Century 21*'s consideration of whether a party has repeatedly accessed a site;

   b.    the placement of the terms[100] and the appearance of the terms or other notices to draw the consumer's attention to the terms,[101] which is reflected in the "prominence" the site gives to the terms, referenced in *Century 21* above;

   c.    the offeree's general knowledge of the types of agreements or terms in question,[102] which is reflected in *Century 21*'s consideration of whether a party has employed similar terms on its own website; and

---

[98] *Union Steamships v Barnes*, [1956] SCR 842, cited to 1956 CarswellBC 186 at para 35 (SCC) **[Exhibit EN-19]**, citing *Nunan v Southern Railway Company*, [1923] 2 KB 703 and *Thompson v London Midland and Scottish Railway Company*, [1930] 1 KB 41; *Pelechytik v Snow Valley Ski Club*, 2005 ABQB 532 at paras 14-16 **[Exhibit EN-10]**.

[99] *Lotepro Engineering and Construction Ltd. v Air Canada*, 1981 CanLII 1213, cited to 1981 CarswellAlta 301 at para 5 (ABKB) **[Exhibit EN-20]**; *Union Steamships v Barnes*, [1956] SCR 842, cited to 1956 CarswellBC 186 at paras 37-38 (SCC) **[Exhibit EN-19]**.

[100] *Dell v Union des Consommateurs*, 2007 SCC 34 at paras 100-101 and 237-238, **[Exhibit EN-23]**; *Union Steamships v Barnes*, [1956] SCR 842, cited to 1956 CarswellBC 186 at paras 37-38 (SCC) **[Exhibit EN-19]**; *Mikkelsen v Truman Development Corp*, 2017 ABCA 99 at para 18, cited to 2017 CarswellAlta 473 at para 18, leave to appeal ref'd [2017] SCCA No 176 **[Exhibit EN-18]**; *Lotepro Engineering and Construction Ltd v Air Canada*, [1982] 2 WWR 630, cited to 1981 CarswellAlta 301 at para 5 (ABKB) **[Exhibit EN-20]**; *Champion v Ski Marmot Basin* 2005 ABQB 535 at paras 13-18 **[Exhibit EN-11]**; *Canadian Real Estate Association v Sutton (Québec) Real Estate Services Inc*, 2003 CanLII 22519 (QCCS) at paras 42 and 44 **[Exhibit EN-7]**.

[101] *Union Steamships v Barnes*, [1956] SCR 842 **[Exhibit EN-19]** at 856, 1956 CanLII 63 (SCC), cited to 1956 CarswellBC 186 at para 25; *Dell v Union des Consommateurs*, 2007 SCC 34 at para 100 **[Exhibit EN-23]**; *Pelechytik v Snow Valley Ski Club*, 2005 ABQB 532 at paras 14-16 **[Exhibit EN-10]**; *Champion v Ski Marmot Basin*, 2005 ABQB 535 at paras 13-17 **[Exhibit EN-11]**.

[102] *Pelechytik v Snow Valley Ski Club*, 2005 ABQB 532 at paras 14-16 **[Exhibit EN-10]**; *Champion v Ski Marmot Basin*, 2005 ABQB 535 at paras 17-18, **[Exhibit EN-11]**.

d. the experience or sophistication of the offeree,[103] which is reflected in *Century 21*'s express reference to sophistication as well as its consideration of whether the offeree is an individual consumer or commercial entity.[104]

82. I would also expect that evidence of an industry standard (particularly when viewed in light of the comments of the dissent in the Supreme Court of Canada decision in *Dell*) would be a factor that the Alberta courts would consider, as this could be relevant in assessing certain existing factors recognized in the Alberta law, including the language of the terms [105] and the nature of the terms (*e.g.*, whether surprising, unusual, unexpected, onerous, unfair).[106]

83. For all of these reasons, I expect that an Alberta court would find that a browsewrap agreement is formed where:

a. the offeror includes on its website terms and conditions which indicate that acceptance is communicated through the use or navigation of the website;

b. there is consideration; and

c. a user uses or navigates said website at or after such time where either:

    i. the user has actual knowledge of the existence of the terms and conditions on the website (such as a via a demand letter attaching the terms and conditions); or

    ii. the offeror has made reasonable efforts to bring the terms and conditions to the attention of the user, which will be assessed based on all of the surrounding circumstances, including:

        1. the factors already expressly covered in the Alberta case law and identified at paragraph 44:

            a. an opportunity to review the terms;

---

[103] *Budget Rent A Car of Edmonton Ltd v University of Toronto,* 1995 ABCA 5 at para 4, leave to appeal ref'd [1995] SCCA No 141 **[Exhibit EN-21]**.
[104] *Century 21 Canada Ltd Partnership v Rogers Communications Inc,* 2011 BCSC 119 at paras 107, 120 and 125 **[Exhibit EN-6]**.
[105] *Union Steamships v Barnes,* [1956] SCR 842 at 851, cited to 1956 CarswellBC 186 at para 25 (SCC) **[Exhibit EN-19]**.
[106] *Budget Rent A Car of Edmonton Ltd v University of Toronto,* 1995 ABCA 5 at para 4, leave to appeal ref'd [1995] SCCA No 141 **[Exhibit EN-21]**.

      b.  the language, appearance, and placement of the terms;

      c.  the nature of the terms (e.g., whether surprising, unusual, unexpected, onerous, unfair);

      d.  the offeree's sophistication and/or general knowledge of the types of agreements or terms in question; and

2.  likely also the following additional factors identified in *Century 21* (for the reasons set out above at paragraph 81):

      a.  whether the user is an individual or a commercial entity;

      b.  the number of times the user attends the website;

      c.  the user's incorporation of similar terms on its own website; and

      d.  whether the terms are industry standard.

## IX.   Expected Application of the Law in this Case

84.    I have been asked to provide my opinion on whether, based on various documents presented to me and assumptions set out in Part III of my Declaration, I would expect an Alberta court to conclude that an agreement was formed between Air Canada and the Defendant Localhost.

85.    I believe that an Alberta court would find that the elements of contract formation are present, namely that Air Canada made an offer that was accepted by Localhost, LLC with the intention of creating a legal relationship, and supported by consideration.

### A.  The Air Canada Offer

86.    Based on the documents and assumptions set out in Part III of my Declaration, I expect that an Alberta Court would find that Air Canada making available the Air Canada Website and associated website services, subject to the Air Canada Terms of Use, constitutes an offer. Air Canada's offering of the Air Canada Website and associated website services subject to the Air Canada Terms of Use is hereinafter referred to as the "**Offer**".

87.     An offeror can specify what constitutes acceptance of said terms, and the Air Canada Terms of Use clearly indicate that access or use of the Air Canada Website results in the formation of a contract and an agreement to be bound by the Air Canada Terms of Use, as demonstrated in the excerpt reproduced below:[107]

## Acceptance of the Terms of Use

The following terms of use ("Terms of Use") govern your use of the Website. Please review these Terms of Use carefully before using the Website. Each time you access or use the Website, you are entering into a contract with us and you agree to be bound by these Terms of Use. If you do not agree to be bound by and comply with these Terms of Use, please do not access or use the Website.

We also reserve the right to deny you access to or use of the Website if we have reason to believe that you do not comply with these Terms of Use.

88.     The language is clear and unequivocal: "Each time you access or use the Website, you are entering into a contract with us and you agree to be bound by these Terms of Use". Further, this language appears near the top of the first page and under a large bold heading titled "Acceptance of the Terms of Use".[108]

### B.  Consideration

89.     As set out above, the Alberta Court of Appeal has recognized the low threshold for even a peppercorn to provide consideration for a contract,[109] and has further noted that consideration can be "some right, interest, profit or benefit accruing to the one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other."[110]

---

[107] Demand Letter dated October 5, 2023 at Air Canada Terms of Use, "Acceptance of the Terms of Use", Docket 1-2, 3.
[108] Demand Letter dated October 5, 2023 at Air Canada Terms of Use, "Acceptance of the Terms of Use", Docket 1-2, 3.
[109] *Mikkelsen v Truman Development Corp,* 2017 ABCA 99 at para 23, leave to appeal ref'd [2017] SCCA No 176 **[Exhibit EN-21]**.
[110] *Regehr et al v Ketzakey Silver Mines Ltd et al,* 10 DLR (3d) 171**,** cited to 1970 CarswellAlta 159 at para 20 (Sup Ct AB, App) **[Exhibit EN-20]**, citing *Fleming v Bank of New Zealand,* [1900] AC 577 and *Currie v Misa* (1875), LR 10 Ex 153.

33

90.     I have been told to assume that the Air Canada Website offers website services including at least the ability to search flight options and review flight information.[111]  The provision of website services is a responsibility undertaken by Air Canada.  I further expect that an Alberta Court would agree with the reasoning of the B.C. Supreme Court in *Century 21* that the information made available on the website (and copied by the Defendant) has a value or benefit to the user, which value is evident by the Defendant seeking to copy said information.

91.     For the foregoing reasons, I expect that an Alberta court would find that there is sufficient consideration.

## C.  Acceptance with an Intention to be Bound

92.     As set out above, the offeror may proscribe what will constitute acceptance of an offer.  In this case, the Air Canada Terms of Use dictate that acceptance of the Offer is provided through access or use of the Air Canada Website.

93.     I have reviewed the declarations of Derek Whitworth and Paul Clark and have been asked to assume that the Defendant has scraped data from the Air Canada Website both prior to and after the issuance of the October 5, 2023 Demand Letter, and continuing to the present.[112]

94.     I expect that an Alberta court would conclude that scraping data from a website constitutes *use* of said website (even if ultimately determined to be improper or unauthorized use based on any terms of the website).[113]  Further, in order to scrape data from a website one must first *access* the website.  Notably, the Air Canada Terms of Use provisions under "Limitations of Use" expressly prohibit, *inter alia,* any access or use of the Air Canada Website to directly or indirectly perform the act of scraping and other automated processes that may, *inter alia,* search, generate searches, extract or copy data.[114]

---

[111] See also Declaration of Derek Whitworth, at paras 7-12.
[112] See Declaration of Derek Whitworth, at paras 36-55; Declaration of Paul Clark, at paras 28-56; and Discord Posts dated April 20, 2023, May 14, 2023, May 28, 2023, June 1, 2023, August 13, 2023, and August 17, 2023, Declaration of Jonathan Fagan, Ex. 3 at 2-6 and 9.
[113] See also Declaration of Paul Clark, at paras 24-25.
[114] Demand Letter dated October 5, 2023 at Air Canada Terms of Use, "Limitations of Use", Docket 1-2, 3.

95.     As such, I expect that an Alberta court would treat the Defendant's scraping of data from the Air Canada Website as access and/or use of the Air Canada Website and therefore acceptance of the Offer, provided that the Defendant had either actual knowledge or constructive knowledge that the Air Canada Website had terms of use at the time of access or use of the Air Canada Website.

96.     As discussed above in Part V, where there is a dispute as to the intention of the parties to contract, the party relying on the agreement must demonstrate that the other party had either (i) actual knowledge of writing which contained conditions, or (ii) reasonable notice of said conditions (i.e. constructive knowledge).[115]

### i.  Actual knowledge

97.     I have been asked to assume that the Demand Letter and enclosed Air Canada Terms of Use[116] was sent on October 5, 2023. I've also been asked to assume that Defendant's Counsel responded with the Demand Response dated October 17, 2023.[117] I have further been asked to assume that the Discord Posts of "ian" are posts of the Defendant on the social media platform Discord.[118]

98.     Air Canada clearly asserts in the Demand Letter that the data scraping violates the Air Canada Terms of Use for accessing the Air Canada website, and encloses a copy of the referenced Terms of Use.[119]

99.     The October 6, 2023 Discord Post publicly acknowledges receipt of a cease and desist letter from Air Canada.[120]

100.    The Demand Response clearly indicates that the Defendant has knowledge of writing that contains conditions, as it acknowledges the Air Canada Terms of Use, and infers the acknowledgement terms specifically through its dispute of the enforceability of browsewrap agreements under American law.

---

[115] *Union Steamship Ltd v Barnes,* [1956] SCR 842, cited to 1956 CarswellBC 186 at para 35 **[Exhibit EN-22]** citing *Nunan v Southern Railway Company,* [1923] 2 KB 703.
[116] Demand Letter dated October 5, 2023, Docket 1-2.
[117] Declaration of Jonathan Fagan, Ex. 5.
[118] Declaration of Jonathan Fagan, Ex. 3.
[119] Demand Letter dated October 5, 2023, Docket 1-2.
[120] Discord Post dated October 6, 2023, Declaration of Jonathan Fagan, Ex. 3 at 7.

101.   As discussed at length above, I expect an Alberta court will find that a browsewrap agreement exists where the agreement complies with the general requirements of Alberta's common law of contract. In Canada, the offeror can set the terms of acceptance. In this case, Air Canada indicated that acceptance occurs through access and use of the Air Canada Website. At least as early as the October 17, 2023 Demand Response, the Defendant clearly had actual knowledge of this particular term of acceptance, let alone the lower threshold of mere awareness of the existence of writing containing conditions.

102.   Based on the Canadian authorities I expect that an Alberta court would find that an agreement was formed between Air Canada and Localhost LLC with respect to any use or access by Localhost of the Air Canada Website taking place when the Defendant had actual or constructive knowledge of the Air Canada Terms of Use, and therefore that an agreement existed *at least* at such time as the Defendant accessed or used the Air Canada Website after October 17, 2023.

103.   I note that while the Discord Post does not expressly reference the allegations of breach of the Air Canada Terms of Use, it is further possible that an Alberta court would consider the Discord Post as an acknowledgment that the Defendant had received the Demand Letter on or before October 6, 2023, and may therefore be prepared to find that at least as early as October 6, 2023 the Defendant was aware of the existence of writing containing conditions (which writing clearly set out the terms of acceptance through access or use of the Air Canada Website) and therefore may be prepared to find that any access or use of the Air Canada Website by the Defendant after October 6, 2023 was done with actual knowledge and therefore resulted in the formation of an agreement with Air Canada.

### ii.  **Constructive Knowledge**

104.   Actual knowledge and constructive knowledge are two different means to demonstrate intention to contract. As such, if an Alberta court were to find contract formation based on actual knowledge, it may elect not to conduct a full analysis of whether there was also constructive knowledge of the terms.

105.   As I have already indicated that I expect an Alberta court would find that an agreement was formed between the parties based on actual notice, I do not need to form any conclusion on whether an Alberta court would similarly find that a contract was formed based on

constructive knowledge of the terms.  However, in case it should assist the Court in these proceedings, I note that I would expect an Alberta court to consider all of the surrounding circumstances when assessing whether the Defendant had constructive knowledge of the existence of the Air Canada Terms of Use at such time as it accessed or used the Air Canada Website.  These surrounding circumstances could consider evidence led by both parties before the Court. Based on the documents I have been provided and the assumptions I have been asked to make regarding the parties' respective websites, respective terms of use, and the Defendant's Discord Posts, I think an Alberta court is likely to consider the following factors and related assumed facts, where applicable, based on the date of the access or use being considered:

a. **an opportunity to review the terms**;

    i. I have been asked to assume that the Air Canada Terms of Use were available by hyperlink at the bottom of the Air Canada Website from at least October 5, 2023 through to the present.[121]

    ii. A copy of the Air Canada Terms of use was enclosed with the October 5, 2023 Demand Letter, which I assume to be the cease and desist letter referred to in the October 6 2023 Discord Post by "ian".[122]

    iii. I expect an Alberta court would *at least* consider that the Defendant had a clear opportunity to review the terms prior to any access or use of the Air Canada website by the Defendant following receipt of the October 5, 2023 Demand Letter.[123]

    iv. I think an Alberta court may also be prepared to find that the Defendant had an opportunity to review the Air Canada Terms of Use prior to use of the Air Canada Website for data scraping.

---

[121] Aeroplan Homepage Capture and Air Canada Terms of Use Capture, Declaration of Jonathan Fagan, Ex. 6.
[122] Discord Post dated October 6, 2023, Declaration of Jonathan Fagan, Ex. 3 at 7.
[123] Demand Letter dated October 5, 2023, Docket 1-2.

b. **the number of times the Defendant attended the Air Canada Website:**

    i. I have reviewed the declarations of Derek Whitworth and Paul Clark, and have been asked by counsel for the Plaintiffs to assume, that Defendant accesses the Air Canada Website numerous times every day.[124]

c. **The placement, language and appearance of the terms:**

    i. I have been asked to assume that the Air Canada Terms of Use were available by hyperlink at the bottom of the Air Canada Website from at least October 5, 2023 through to the filing of the Complaint,[125] and the Seats.aero Terms and Conditions are similarly hyperlinked near the bottom of the Seats.aero Website.[126]

    ii. I have been asked to assume that clicking the hyperlink on the bottom of the Air Canada takes one directly to the Air Canada Terms of Use (there were not multiple levels of hyperlinks to get to the Terms of Use).

    iii. The terms outlining what constitutes acceptance are plainly located near the top of the page.[127]

    iv. The language outlining what conduct constitutes acceptance is clear and unequivocal: "Each time you access or use the Website, you are entering into a contract with us and you agree to be bound by these Terms of Use".[128]

---

[124] See Declaration of Derek Whitworth, at paras 36-55; Declaration of Paul Clark, at paras 28-56; and Discord Posts dated April 20, 2023, May 14, 2023, May 28, 2023, June 1, 2023, August 13, 2023, and August 17, 2023, Declaration of Jonathan Fagan, Ex. 3 at 2-6 and 9.

[125] Aeroplan Homepage Capture and Air Canada Terms of Use, Declaration of Jonathan Fagan, Ex. 6.

[126] Seats.aero Homepage Capture and Seats.aero Terms and Conditions, Declaration of Jonathan Fagan, Ex. 7 at 1 and 4-10.

[127] Air Canada Terms of Use Capture, Declaration of Jonathan Fagan, Ex. 6 at 2. [**Exhibit EN-3**]; Demand Letter at Air Canada Terms of Use, Docket 1-2, 3.

[128] Air Canada Terms of Use Capture, Declaration of Jonathan Fagan, Ex. 6 at 2; Demand Letter at Air Canada Terms of Use, Docket 1-2, 3.

    d.  **the nature of the terms** (e.g., whether surprising, unusual, unexpected, onerous, unfair):

      i.  In considering this factor as it relates to the Air Canada Terms of Use acceptance provision, I expect an Alberta court would consider any evidence presented regarding industry standards on website terms of use, including browsewrap language, and would also consider the Defendant's own use of browsewrap language as noted further in sub-paragraph 105g below.

    e.  **the Defendant is a commercial entity:**

      i.  I have been asked by counsel for the Plaintiffs to assume that the Defendant operates Seats.aero, a for-profit website, as noted in the Seats.aero Captures where the website expressly indicates a rate of $9.99 month for a " PRO account".[129]

    f.  **the Defendant's sophistication and general knowledge of the types of agreements or terms in question**:

      i.  I expect an Alberta court would consider at least the following facts I have been asked to assume in connection with respect to the experience or sophistication of the offeree:

          1.  The Defendant is using automated bots to access, interact with, and copy data from the Air Canada Website and then reproduce said data on the Seats.aero Website; and

          2.  The Defendant is operating the Seats.aero Website for a commercial purpose.[130]

      ii.  The Defendant is knowledgeable about the existence of website terms and conditions, generally.

          1.  The Seats.aero Website is also offered under browsewrap terms and conditions, as discussed under the next factor.[131]

          2.  The Seats.aero Website similarly provides a hyperlink to its terms of use near the bottom of the Seats.aero homepage.[132]

---

[129] Seats.aero Captures, Declaration of Jonathan Fagan, Ex. 7 at 2.
[130] Seats.aero Captures, Declaration of Jonathan Fagan, Ex. 7 at 2.
[131] Seats.aero Terms and Conditions, Acknowledgement, Declaration of Jonathan Fagan, Ex. 7 at 5.
[132] Seats.aero Homepage Capture, Declaration of Jonathan Fagan, Ex. 7 at 1.

3. The Seats.aero Terms and Conditions include language that indicates that the Seats.aero Website may contain links to third-party web sites or services not owned or controlled by Localhost LLC, disclaims liability for aspects of those third-party web sites, and cautions the Seats.aero user as follows: "We strongly advise You to read the terms and conditions and privacy policies of any third-party web sites that You visit."[133]

g. **the user's incorporation of similar terms on its own website;**

i. The Defendant's knowledge of browsewrap agreements is demonstrated through its use of same for its own Seats.aero Website. Similar to the Air Canada Terms of Use, Seats.aero Terms and Conditions stipulate that by accessing or using the Service (defined as the Seats.aero Website) the user agrees to be bound by the Terms and Conditions, as demonstrated in the excerpt below: [134]

## Acknowledgment

These are the Terms and Conditions governing the use of this Service and the agreement that operates between You and the Company. These Terms and Conditions set out the rights and obligations of all users regarding the use of the Service.

Your access to and use of the Service is conditioned on Your acceptance of and compliance with these Terms and Conditions. These Terms and Conditions apply to all visitors, users and others who access or use the Service.

By accessing or using the Service You agree to be bound by these Terms and Conditions. If You disagree with any part of these Terms and Conditions then You may not access the Service.

You represent that you are over the age of 18. The Company does not permit those under 18 to use the Service.

---

[133] Seats.aero Terms and Conditions, "Links to Other Websites", Declaration of Jonathan Fagan, Ex. 7 at 5-6.
[134] Seats.aero Terms and Conditions, Acknowledgement, Declaration of Jonathan Fagan, Ex. 7 at 5.

ii. I further expect that an Alberta court would consider the Defendant to be familiar at least with any other types of terms contemplated by its own terms of use, including at least terms on prohibited uses, such as prohibiting use of the website for a commercial purpose. The Seats.aero Terms and Conditions set out the "Terms and Conditions that form the entire agreement between [the individual accessing or using the Service, or the company, or other legal entity on behalf of which such individual is accessing or using the Service…] and Localhost LLC regarding use of the Service[,]"[135] including a prohibition on use of application programming interfaces (APIs) or their data for a Commercial Purpose without Localhost's written permission.[136]

**D.  Conclusion**

106.   Based on the documents and assumptions set out in Part III above, and as detailed in the sections immediately above, I expect that an Alberta court would find that a contract was formed when the Defendant accessed or used the Air Canada Website with actual or constructive knowledge of the Air Canada Terms of Use:

a.  Air Canada making available the Air Canada Website services subject to the Air Canada Terms of Use constitutes an offer;

b.  The Air Canada Website services, including search services and resulting data, have value and therefore there is consideration;

c.  The Air Canada Terms of Use includes language which clearly indicates that access or use of the Air Canada Website is an agreement to be bound by the Air Canada Terms of Use and results in the formation of a contract;

d.  The Demand Response indicates that the Defendant had actual knowledge of the Air Canada Terms of Use and the acknowledgement terms specifically *at least* as

---

[135] Seats.aero Terms and Conditions, Definitions: "Company", "Terms and Conditions", "You", Declaration of Jonathan Fagan, Ex. 7 at 4-5.
[136] Seats.aero Terms and Conditions, Definitions: "Commercial Purpose", and Usage of Data, Declaration of Jonathan Fagan, Ex. 7 at 4 and 6-7.

early as October 17, 2023, and an Alberta court may further be prepared to find that the Discord Post by "ian" dated October 6, 2023 referencing a cease and desist letter sent by Air Canada is indicative of actual knowledge of writing containing conditions at least as of that date; and

e.   The Defendant's access and use of the Air Canada Website *at least* with actual knowledge of the existence of website terms of use after October 17, 2023, if not after October 6, 2023, constitutes acceptance of the Offer forming an agreement between the parties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 20, 2023.

Evan Nuttall

**EXHIBIT EN-1**

**TO THE DECLARATION OF EVAN NUTTALL**

**SMART & BIGGAR**

# Evan Nuttall.

Principal, Smart & Biggar Alberta LLP

T:587.774.3692 | enuttall@smartbiggar.ca

**BAR ADMISSIONS**

- British Columbia Bar, 2020
- Alberta Bar, 2007
- England and Wales Bar, 1993

**EDUCATION**

- London Business School, M.Sc. (Finance), 2003-2004
- Inns of Court School of Law 1992-1993
- City University of London, Graduate Diploma in Law, 1991-1992
- London School of Economics and Political Science, M.Sc. (Economics), 1990-1991
- McGill University, B.A. (with Distinction) (Economics and Political Science), 1988-1990

**PROFESSIONAL LEGAL EXPERIENCE**

- Smart & Biggar Partner/Principal 2020-present
- Borden Ladner Gervais LLP Partner 2010- 2020
- Borden Ladner Gervais LLP Associate 2006- 2010
- Borden Ladner Gervais LLP Student at law 2005- 2006
- 3 Temple Gardens, Chambers of John Coffey Q.C. 1993-2002
- Member, Canadian Bar Association
- Member, Bar of England and Wales


**IP litigator and strategist with a proven track record of success.**

An experienced and accomplished litigator, sought after for complex intellectual property matters by some of the leading players in the energy, oil and manufacturing sectors and has held the role of lead counsel in numerous high-profile patent disputes.


**Sophisticated legal understanding meets practical business acumen.**

Practice is focused exclusively on complex litigation matters including infringement actions relating to patents, licensing, trademarks, copyright and industrial designs. Known as extremely diligent and capable, uses practical knowledge of business objectives to provide solid strategic advice and act as a forceful advocate on behalf of clients. Appeared before the Court of Queen's/King's Bench of Alberta, the Alberta Court of Appeal, the Supreme Court of British Coumba, the Court of Appeal for British Columbia, the Federal Court of Canada and Federal Court of Appeal (Canada), Court of Appeal (England and Wales)

**SMART & BIGGAR**

**Recognized for finely honed advocacy skills.**

Has been honoured regularly by top publications including Lexpert, Best Lawyers and Benchmark Litigation. Colleagues have described him as "extremely diligent, capable and knowledgeable", as "a strong advocate with superior analytical skill", and as "passionately advancing his client's position while at the same time bringing a practical approach" (Lawyers.com).

**RANKINGS & RECOGNITION**

- Benchmark Litigation | Litigation Star in IP | Benchmark Canada | 2014-2023
- Benchmark Litigation | Litigation Star: Alberta | Benchmark Canada | 2012-2017
- Best Lawyers | Intellectual Property Law | The Best Lawyers in Canada | 2016-2024
- Best Lawyers | Corporate and Commercial Litigation | The Best Lawyers in Canada | 2021-2024
- IAM | Leading Patent Litigation Practitioner | IAM Patent 1000 - The World's Leading Patent Professionals | 2019-2023
- Lexpert® Ranked | Intellectual Property | The Canadian Legal LEXPERT® Directory | 2023
- Lexpert® Ranked | Litigation - Intellectual Property | The Canadian Legal LEXPERT® Directory | 2019-2020 & 2023
- MIP | Notable Practitioner | IP Stars Guides | 2021-2022
- WIPR | WIPR Leader | World IP Review Leaders | 2022-2023

**EXHIBIT EN-2**

**TO THE DECLARATION OF EVAN NUTTALL**

Case 1:23-cv-01177-GBW  Document 19  Filed 12/21/23  Page 47 of 534 PageID #: 232

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

**Sookman: Computer, Internet, and Electronic Commerce Law § 10:7**

Sookman: Computer, Internet, and Electronic Commerce Law
Barry B. Sookman

Chapter 10. Electronic Contracting

II. Enforceability of Online Agreements

§ 10:7. Browse Wrap or Webwrap Agreements

Although "click-wrap" agreements generally pose no conceptual problem to their enforceability, "web-wrap" or "browse-wrap" agreements do. Many companies seek to obtain customers' consent to web site terms and conditions by posting terms and conditions at their web sites and notifying customers that their use of the web sites will constitute acceptance of the terms and conditions. The types of agreements are referred to as "Web-wrap Agreements" or "Browse-wrap Agreements". This process for obtaining agreement to web site terms and conditions is based, in part, on the practice developed by software publishers to obtain customer agreement to "shrink-wrap" contracts distributed in the packaging of software products. American courts have upheld shrink-wrap agreements in a number of cases. [1] Their enforceability has been premised on there being an act by the proposed licensee manifesting assent to the terms of the shrink-wrap licence or indicating an understanding that a contract is being formed as a result of action taken by the user. The status of shrink-wrap licences in Canada is unclear, however. In the one case which addressed the issue, *North American SystemShops Ltd. v. King*, [2] a shrink-wrap licence was held not to be enforceable against an ordinary purchaser unless there is some clear communication of the terms of use at the time of purchase. [3]

[3]     See, § 2:19 of this book in which the principles related to shrink-wrap licences are discussed. The same principles would apply to the enforceability of web-wrap agreements.

[2]     North American SystemShops Ltd. v. King (1989), 68 Alta. L.R. (2d) 145 (Q.B.).

[1]     See §§ 2:24 to 2:27 of this book.

In some cases individuals have contended they are not bound by clickwrap or other on-line agreements because they were not the person that had entered into the agreement. Courts that have considered issues such as these have often found legal theories to enforce such contracts against the non-party. [4] However, in *Ajemian v Yahoo, Inc.* [5] the Court held that Yahoo's terms of service, which were restricted to only the parties, did not bind the administrators of the subscribers' estate.

[4]     See Motise v. America Online, Inc., 346 F.Supp.2d 563, 566 (S.D.N.Y.2004) (User who used website while it was logged in under another user's account was still bound by the account's terms because the user had "derivative rights" and could not have more rights than the account originator who agreed to the account terms.); Adsit Co., Inc. v. Gustin, 874 N.E.2d 1018, 1024 (Ind.Ct.App.2007); (Both the actual user of a website and the person for whom the user was using the website were bound by website's terms.); Westendorf v. Gateway 2000, Inc., 2000 WL 307369 (Del. Ch. Mar. 16, 2000); (Two customers who bought computers for one another and exchanged them as gifts were both bound by the terms of one another's respective purchases.); Burcham v. Expedia, Inc., 2009 WL 586513 (E.D.Mo.2009) (User claiming he did not create the user account.)

[5]     Ajemian v Yahoo, Inc., 2013 Mass. App. LEXIS 73 (Ma. App. May 7, 2013).

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 48 of 534 PageID #: 233

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

Another common form of online agreement is a browsewrap agreement. A browsewrap agreement is an agreement where users become bound to its terms by merely navigating or using a website. They do not require users to sign a document or click an "accept" or "I agree" button. The users are considered to give assent simply by using the website. [6] The courts in the U.S. enforce browsewrap agreements only when there is actual or constructive knowledge of terms. When there is no evidence that users have actual knowledge of terms at issue, the validity of a browsewrap agreement hinges on whether a website provided reasonable notice of the terms of the contract.

6     Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th.Cir. 2014); Southwest Airlines v. BoardFirst, LLC, 2007 U.S. Dist. LEXUS 96230 (N.D. Tex. Sept. 12, 2007).

To determine whether a website provides reasonable constructive notice, courts in the U.S. have applied two different approaches. In the first approach, courts only look at whether hyperlinks or texts of agreements were conspicuous enough. The conspicuousness depends on design and contents of defendants' website and agreements' webpages. [7]

7     Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1177; Specht v. Netscape Communications Corp., 306 F.3d 17, 28–30 (2d Cir. 2002).

In the second approach, the recent trend in both U.S. federal district and appellate courts is to require (i) conspicuous hyperlinks or texts of agreements and (ii) an explicit text referencing terms of agreements or instructing users that they are assenting to agreements. An additional requirement of an explicit reference is to protect users who may have no reason to suspect that they will be bound by the terms hidden in hyperlink agreements. [8] An increasing number of courts require an explicit text informing users that they are giving their assents to agreements when they navigate websites. [9]

8     Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th.Cir. 2014); In re Zappos.com, Inc., Customer Data Sec. Breach Lit., 893 F.Supp.2d 1058, 1064 (D. Nev. 2012).

9     Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th.Cir. 2014); Sgouros v TransUnion Corp., 2015 U.S.Dist. LEXIS 13691 (E.D.Ill. Feb. 2015) affirmed Sgouros v. TransUnion Corporation, 817 F.3d 1029 (7th Cir. 2016).

Numerous cases have considered the enforceability of browse-wrap agreements, many of them in the United States. Where there is no evidence that the website user had actual knowledge of the agreement, the validity of browsewrap agreements has turned on whether the website has put a reasonably prudent user on inquiry notice of the terms of the contract. [10] Some authorities have gone further and not enforced browsewrap agreements even where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but provides no notice to users nor prompts them to take any affirmative action to demonstrate assent. [11] Whether a user has inquiry notice of a browsewrap agreement in turn depends on the design and content of the website and the agreements' webpage. [12] U.S. Courts have tended to shy away from enforcing browsewrap agreements that require no outward manifestation of assent. The courts have been more willing to enforce terms of use against corporations, but have been less willing to do so against individuals. [13] A California District Court recently underscored the common law principles that will govern contractual enforcement of web site terms and conditions in the case of *Ticketmaster Corp. v. Tickets.com, Inc.* [14] In this case, Ticketmaster claimed, *inter alia,* that rival Tickets.com's practice of deep linking, that is, linking directly to web pages within Ticketmaster's web site, violated the terms and conditions of Ticketmaster's web site. The judge granted Tickets.com's motion to dismiss the breach of contract claim. Key to the judge's decision to dismiss the breach of contract claim appeared to be the lack of conspicuousness of the terms and conditions at issue. The judge noted:

10    Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th.Cir. 2014); Specht v. Netscape Communication Corp., 306 F. 3d 17 (2d. Cir. 2002); Schnabel v. Trilegiant Corp., 697 F. 3d 110 (2nd. Cir. 2012); Long v. Provide Commerce, Inc., 245 Cal. App. 4th 855.

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 49 of 534 PageID #: 234

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

11    Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th. Cir. 2014).

12    Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th. Cir. 2014); Berkson v. Gogo LLC, 2015 WL 1600755 (E.D.N.Y. 2015).

13    Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th. Cir. 2014); referring to *Woodrow Hartzog, Website Design as Contract*, 60 Am. U.L.Rev. 1635, 1644 (2011); Mark A. Lenley, Terms of Use, 91 Minn. L. Rev. 459 (2006). See also, Berkson v. Gogo LLC, 2015 WL 1600755 (E.D.N.Y. 2015).

14    Ticketmaster Corp. v. Tickets.com, Inc., 2000 U.S. Dist. Lexis 4553 (C.D. Cal. 2000).

> The home page contains (if a customer scrolls to the bottom) "Terms and Conditions" which proscribe, among other things, copying for commercial use. However, the customer need not view the Terms and Conditions to proceed straight to the event page which interests him.

The judge in *Ticketmaster* distinguished the lack of conspicuousness of the notice and the lack of a requirement of consent in this case from shrink-wrap cases, noting:

> In defending this claim, Ticketmaster makes reference to the "shrink-wrap license" cases, where the packing on the outside of the CD stated that opening the package constitutes adherence to the license agreement (restricting republication) contained therein. This has been held to be enforceable. That is not the same as this case because the "shrink-wrap license agreement" is open and obvious and in fact hard to miss. Many web sites make you click on "agree" to the Terms and Conditions before going on, but Ticketmaster does not. Further, the Terms and Conditions are set forth so that the customer needs to scroll down the home page to find and read them. Many customers instead are likely to proceed to the event page of interest rather than reading the "small print." *It cannot be said that merely putting the Terms and Conditions in this fashion necessarily creates a contract with anyone using the web site. The motion is granted with leave to amend in case there are facts showing Tickets' knowledge of them plus facts showing implied agreement to them.* [Emphasis added]

The enforceability of browse-wrap agreements was also considered by a California federal court in *Pollstar v. Gigmania Ltd.* [15] In *Pollstar,* the plaintiff's web page offered allegedly proprietary information. Notice of a licence agreement appeared on the plaintiff's web site. Clicking on the notice linked the user to a separate web page containing the full text of the license agreement, which allegedly bound any user of the information on the site. However, the user was not required to click on an icon expressing assent to the licence, or even view its terms, before proceeding to use the information on the site. The court referred to this arrangement as a "browse-wrap" licence. The defendant allegedly copied proprietary information from the site. The plaintiff sued for breach of the licence agreement, and the defendant moved to dismiss for lack of mutual assent sufficient to form a contract. The court, although denying the defendant's motion to dismiss, expressed concern about the enforceability of the browse-wrap licence in the following portion of the opinion:

15    Pollstar v. Gigmania Ltd., 2000 W.L. 33266437 (E.D. Cal. 2000).

> In the present case, Pollstar alleges that users of the concert information are bound by the license agreement. This license agreement is not set forth on the homepage but is on a different web page that is linked to the homepage. However, the visitor is alerted to the fact that "use is subject to license agreement" because of the notice in small gray print on gray background. Since the text is not underlined, a common Internet practice to show an active link, many users presumably are not aware that the license agreement is linked to the homepage. In addition, the homepage also has small blue text which when clicked on, does not link to another page. This may confuse visitors who may then think that all colored small text, regardless of color, do not link the homepage to a different web page.

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 50 of 534 PageID #: 235

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

While the court agrees with Gigmania that the user is not immediately confronted with the notice of the license agreement, this does not dispose of Pollstar's breach of contract claim. The court hesitates to declare the invalidity and unenforceability of the browse wrap license agreement at this time. Taking into consideration the examples provided by the Seventh Circuit — showing that people sometimes enter into a contract by using a service without first seeing the terms — the browser wrap license agreement may be arguably valid and enforceable.

A browse-wrap agreement was also not enforced by a New York court in *Hines v. Overstock.com, Inc.* [16] The Court stated in ruling upon the validity of browse-wrap agreements, that courts must consider primarily whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site. On the facts of the case, the Court concluded that the plaintiff was not aware and had no reasonable basis to be aware of the site's terms and conditions. According to the Court:

[16]   Hines v. Overstock.com, Inc., 668 F.Supp.2d 362 (E.D.N.Y. 2009).

In the instant case, it is clear that Plaintiff had no actual notice of the Terms and Conditions of Use. Defendant has also failed to show that Plaintiff had constructive notice. The Hawkins Affidavit … [or] refute Plaintiff's sworn statement that she was never advised of the Terms and Conditions and could not even see the link to them without scrolling down to the bottom of the screen-an action that was not required to effectuate her purchase. Notably, unlike in other cases where courts have upheld browsewrap agreements, the notice that "Entering this Site will constitute your acceptance of these Terms and Conditions," was only available within the Terms and Conditions… Hines therefore lacked notice of the Terms and Conditions because the website did not prompt her to review the Terms and Conditions and because the link to the Terms and Conditions was not prominently displayed so as to provide reasonable notice of the Terms and Conditions.

A similar enforceability problem arose in the US case of *Hoffman v. Supplements Togo Management Company, LLC.* [17] That case involved the enforcement of a forum selection clause in a web-wrap agreement. The hyperlink was considered to be submerged in the lower portion of the web page and was not easily visible to the consumer. The Court gave the following reasons for not enforcing the forum selection clause:

[17]   Hoffman v. Supplements Togo Management, LLC, 2011 WL 1885675 (N.J. Super.A.D. 2011).

Defendants provide nothing to contradict plaintiff's contention that the forum selection clause would not be visible on an Erection MD purchaser's computer screen unless he or she scrolled down to a submerged portion of the webpage where the disclaimer containing the clause appeared. Nor do defendants rebut plaintiff's contention that if a purchaser selected one of their products…advertised on the site, by clicking that item and adding it to his or her electronic "shopping cart," the webpage would skip ahead to new pages that do not contain the disclaimer. [18]

[18]   See also, Kraft Real Estate Investments, LLC v Homeway.com, Inc., 2012 WL 220271 (D.S.Car. Jan 24, 2012) (browsewrap not enforced where the user did not have actual or constructive knowledge of the terms and conditions such that the use of the website could constitute assent to the terms), Ajemian v. Yahoo!, Inc., 2013 Mass. App. LEXIS 73 (Ma. App. May 7, 2013) (forum selection clause in browsewrap agreement not enforced); Sharon Roller v TV Guide Online Holdings, 2013 Ark. 285 (Ark Sup.Ct. 2013) (browse-wraps not enforced); EDME v Internet Brands, Inc, 968 F.Supp.2d 519 (E.D.N.Y.2013) (forum selection clause not enforced where court could not tell what type of agreement was being asserted); Tompkins v. 23andMe, INC., 2014 WL 2903752 (N.D. Cal. Jun. 25, 2014):

23andMe cannot rely on purported acceptance of the TOS upon purchase to demonstrate a valid agreement. As explained above, during checkout, the website did not present or require acceptance of the TOS. Rather, the only way for a customer to see the TOS at that stage was to scroll to the very bottom of the page and click a link under the heading "LEGAL." Such an arrangement provided insufficient notice to customers and website visitors. For example,

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 51 of 534 PageID #: 236

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

in Be In, this Court held that "mere use of a website" could not demonstrate users' assent, and that the "mere existence of a link" failed to notify users of terms of service. 2013 U.S. Dist. LEXIS 147047. Other courts have held that similar browsewrap-style agreements are ineffective. E.g., Specht, 306 F.3d at 20, 32 (finding that a "reasonably prudent Internet user" would not have seen "a reference to the existence of license terms on a submerged screen"); Jerez v. JD Closeouts, LLC, 943 N.Y.S.2d 392, 398 (Dist. Ct. 2012) ("[E]-commerce merchants cannot blithely assume that the inclusion of sale terms, listed somewhere on a hyperlinked page on its website, will be deemed part of any contract of sale.").

A web-wrap agreement was also considered by a New York court in *Register.com v. Verio Inc.* [19] In this case the plaintiff posted license terms on its web site, alongside a statement that "by submitting this query [to the plaintiff's database], you agree to abide by these terms". The court held that "in light of this sentence at the end of Register.com's terms of use, there can be no question that by proceeding to submit a query, Verio manifested its assent to be bound by Register.com's terms of use and a contract was formed and subsequently breached".

19    Register.com v. Verio Inc., 126 F. Supp. 2d 238 (S.D.N.Y. 2000).

The case was appealed to the U.S. Second Circuit Court of Appeal [20] which affirmed the ruling of the court below on this point. Critical to the decision was the fact that Verio had been to the site numerous occasions and knew the terms of use applicable to the site. The court expressed its opinion on this point as follows:

20    U.S. Second Circuit Court of Appeal, 356 F. 3d 393 (2d. Cir. 2004).

> Verio's next contention assumes that Register was legally authorized to demand that takers of WHOIS data from its systems refrain from using it for mass solicitation by mail and telephone, as well as by email. Verio contends that it nonetheless never became contractually bound to the conditions imposed by Register's restrictive legend because, in the case of each query Verio made, the legend did not appear until after Verio had submitted the query and received the WHOIS data. Accordingly, Verio contends that in no instance did it receive legally enforceable notice of the conditions Register intended to impose. Verio therefore argues it should not be deemed to have taken WHOIS data from Register's systems subject to Register's conditions.

> Verio's argument might well be persuasive if its queries addressed to Register's computers had been sporadic and infrequent. If Verio had submitted only one query, or even if it had submitted only a few sporadic queries, that would give considerable force to its contention that it obtained the WHOIS data without being conscious that Register intended to impose conditions, and without being deemed to have accepted Register's conditions. But Verio was daily submitting numerous queries, each of which resulted in its receiving notice of the terms Register exacted. Furthermore, Verio admits that it knew perfectly well what terms Register demanded. Verio's argument fails.

The situation might be compared to one in which plaintiff P maintains a roadside fruit stand displaying bins of apples. A visitor, defendant D, takes an apple and bites into it. As D turns to leave, D sees a sign, visible only as one turns to exit, which says "Apples — 50 cents 11 apiece." D does not pay for the apple. D believes he has no obligation to pay because he had no notice when he bit into the apple that 50 cents was expected in return. D's view is that he never agreed to pay for the apple. Thereafter, each day, several times a day, D revisits the stand, takes an apple, and eats it. D never leaves money.

> P sues D in contract for the price of the apples taken. D defends on the ground that on no occasion did he see P's price notice until after he had bitten into the apples. D may well prevail as to the first apple taken. D had no reason to understand upon taking it that P was demanding the payment. In our

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 52 of 534 PageID #: 237

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

view, however, D cannot continue on a daily basis to take apples for free, knowing full well that P is offering them only in exchange for 50 cents in compensation, merely because the sign demanding payment is so placed that on each occasion D does not see it until he 21 has bitten into the apple. Verio's circumstance is effectively the same. Each day Verio repeatedly enters Register's computers and takes that day's new WHOIS data. Each day upon receiving the requested data, Verio receives Register's notice of the terms on which it makes the data available — that the data not be used for mass solicitation via direct mail, email, or telephone. Verio acknowledges that it continued drawing the data from Register's computers with full knowledge that Register offered access subject to these restrictions. Verio is no more free to take Register's data without being bound by the terms on which Register offers it, than D was free, in the example, once he became aware of the terms of P's offer, to take P's apples without obligation to pay the 50 cent price at which P offered them.

Verio seeks support for its position from cases that have dealt with the formation of contracts on the Internet. An excellent example, although decided subsequent to the submission of this case, is *Specht v. Netscape Communications Corp.,* 306 F.3d 17 (2d Cir. 2002). The dispute was whether users of Netscape's software, who downloaded it from Netscape's web site, were bound by an agreement to arbitrate disputes with Netscape, where Netscape had posted the terms of its offer of the software (including the obligation to arbitrate disputes) on the web site from which they downloaded the software. We ruled against Netscape and in favor of the users of its software because the users would not have seen the terms Netscape exacted without scrolling down their computer screens, and there was no reason for them to do so. The evidence did not demonstrate that one who had downloaded Netscape's software had necessarily seen the terms of its offer.

Verio, however, cannot avail itself of the reasoning of *Specht.* In *Specht,* the users in whose favor we decided visited Netscape's web site one time to download its software. Netscape's posting of its terms did not compel the conclusion that its downloaders took the software subject to those terms because there was no way to determine that any downloader had seen the terms of the offer. There was no basis for imputing to the downloaders of Netscape's software knowledge of the terms on which the software was offered. This case is crucially different. Verio visited Register's computers daily to access WHOIS data and each day saw the terms of Register's offer; Verio admitted that, in entering Register's computers to get the data, it was fully aware of the terms on which Register offered the access.

A web-wrap agreement was also enforced in *American Airlines Inc. v. Farechase, Inc.* [21] That case involved the enforcement of American Airline's on-line terms and conditions which prohibited users from using information for commercial purposes. The terms were held to be applicable to prevent a competitor from using a scraper tool to collect information from the plaintiff's website.

[21]     American Airlines Inc. v. Farechase, Inc., No. 067-194022-2 (Tex. 67 District Court, Mar. 8, 2003).

However, a United States District Court refused to enforce a browsewrap agreement containing terms against webscraping in *Alan Ross Machinery Corporation v. Machinio Corporation.* [22] The plaintiff had argued that the defendant had constructive knowledge of the terms and conditions because of their conspicuous placement on the website. However, the hyperlink terms and conditions of every page was considered to be insufficient to provide adequate constructive notice to create a contract based on a browsewrap agreement.

[22]     Alan Ross Machinery Corporation v. Machinio Corporation, 2018 WL 3344364 (N.Ill. July 9, 2018).

Case 1:23-cv-01177-GBW Document 19 Filed 12/21/23 Page 53 of 534 PageID #: 238

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

In *EF Cultural Travel BV v. Zefer Corporation* [23] the 1st Circuit Court of Appeals expressed the opinion that website terms and conditions could be used to indicate to potential users a lack of authorization for particular restrictions the website operator might seek to impose. In particular, the court noted that if a website operator desires to ban scrapers the operator should include a sentence on its own page or in its terms of use stating that no scrapers may be used.

[23]    EF Cultural Travel BV v. Zefer Corporation, 2003 WL 174756 (1st Cir. Jan. 28, 2003).

A decision of a New York court analyzed the principles to be applied in assessing the enforceability of web-wrap agreements. In *Specht v. Netscape Communications Corp.* [24] Netscape attempted to enforce an arbitration clause in an end user licence agreement. The licence agreement was allegedly made by Netscape and agreed to by users by downloading computer software known as "SmartDownload" from Netscape's web site by clicking on a mouse in a designated box that they wished to obtain it. By clicking on the box, visitors initiated the downloads. The sole reference to the licence agreement appeared in text that was visible only if a visitor scrolled down through the page to the next screen. If the visitor did so, he or she saw an invitation to review the licence agreement. [25] Visitors were not required affirmatively to indicate their assent to the licence agreement, or even to view the licence agreement, before proceeding with a download of the software. The *Netscape* court refused to enforce the Smart-Download Licence Agreement. The court distinguished this form of agreement from both click-wrap and shrink-wrap licences, which require users to perform an affirmative action unambiguously expressing assent to a contract. Netscape's SmartDownload, in contrast, allowed a user to download and use the software without taking any action that plainly manifested assent to the terms of the associated licence or indicating an understanding that a contract was being formed. Accordingly, the court refused to find Netscape's licence enforceable. The Court stated the following:

[24]    Specht v. Netscape Communications Corp., 206 F.3d 17 (S.D. N.Y. 2001) affirmed 306 F.3d 17 (2d. Cir. 2002).

[25]    The wording of the licence stated the following: "Please review and agree to the terms of the *Netscape SmartDownload Software License Agreement* before downloading and using the software."

> Netscape argues that the mere act of downloading indicates assent. However, downloading is hardly an unambiguous indication of assent. The primary purpose of downloading is to obtain a product, not to assent to an agreement. In contrast, clicking on an icon stating "I assent" has no meaning or purpose other than to indicate such assent. Netscape's failure to require users of SmartDownload to indicate assent to its license as a precondition to downloading and using its software is fatal to its argument that a contract has been formed…
>
> The case law on software licensing has not eroded the importance of assent in contract formation. Mutual assent is the bedrock of any agreement to which the law will give force. Defendants' position, if accepted, would so expand the definition of assent as to render it meaningless. Because the user Plaintiffs did not assent to the license agreement, they are not subject to the arbitration clause contained therein and cannot be compelled to arbitrate their claims against the Defendants.

The case was appealed to the U.S. Second Circuit Court of Appeals. [26] That court reinforced the principle that traditional common law rules apply in determining the enforceability of a web wrap agreement. In particular, the court, like the court in the *Ticketmaster* case, held that a transaction, in order to be a contract, requires a manifestation of agreement between the parties. That agreement can be manifested by actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact. On the facts of the case the court was not persuaded that a reasonably prudent offeree would have known of the existence of the license terms. The court stated the following in this regard:

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 54 of 534 PageID #: 239

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

26      Specht v. Netscape Communications Corp., 306 F. 3d 16 (2d Cir. 2002).

> Whether governed by the common law or by Article 2 of the Uniform Commercial Code ("UCC"), a transaction, in order to be a contract, requires a manifestation of agreement between the parties. … a consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms." Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact. Cal. Civ. Code § 19. These principles apply equally to the emergent world of on-line product delivery, pop-up screens, hyperlinked pages, clickwrap licensing, scrollable documents, and urgent admonitions to "Download Now!"

> We conclude that in circumstances such as these, where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms… Internet users may have, as defendants put it, "as much time as they need" to scroll through multiple screens on a webpage, but there is no reason to assume that viewers will scroll down to subsequent screens simply because screens are there. When products are "free" and users are invited to download them in the absence of reasonably conspicuous notice that they are about to bind themselves to contract terms, the transactional circumstances cannot be fully analogized to those in the paper world of arm's-length bargaining."

The United States Court of Appeals for the Second Circuit comprehensively reviewed the enforceability of online agreements in *Schnabel v. Trilegiant Corp.* [27]   In canvassing the enforceability of webwrap agreements, the court observed that the contract-formation question in such cases turns on whether a reasonably prudent offeree would be on notice of the webwrap terms at issue. The offeree need not necessarily have actual notice of the terms. He/she may still be bound by the terms if the person is on "inquiry notice" of the terms and assents to them through the conduct that a reasonable person would understand to constitute assent. These terms do not actually have to be read by the offeree. Sufficient inquiry notice of a term depends on various factors including, but not limited to, the conspicuousness of the term, the course of dealing between the parties and industry practices. Ultimately, however, the touchstone of the analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them.

27      Schnabel v. Trilegiant Corp., 697 F. 3d 110 (2nd. Cir. 2012).

A California Court also declined to enforce a browsewrap agreement in *Be, In Inc v. Google Inc.* [28]   The issue in the case was whether terms in the browsewrap agreement prohibiting use, copying or distribution of contents at a website known as CamUp could be used to advance a case against Google for trade secret misappropriation in its Hangouts part of Google+. The Court held that beyond the mere existence of a link to the terms of service, there was no grounds for the Court to find the defendants were put on notice that the mere use of the website would be interpreted as agreement to the Terms of Service. According to the Court:

28      Be, In Inc v. Google Inc., 2013 U.S.Dist. LEXIS 147047 (N.D.Cal. Oct. 13, 2013).

> The Court finds that these pleadings are insufficient to establish contract formation because, as a matter of law, they do not establish grounds for the Court to find a manifestation of Defendants' mutual assent to the Terms of Service. Be In argues that the SAC properly alleges that Defendants agreed to the Terms of Service because of its conclusory statement that "Defendants agreed to [the Terms of Service] when they used and/or visited the CamUp website." … Defendants' mere use of the website can only serve as a manifestation of assent where Defendants had, or should have had, reason to know that mere use would be so interpreted… The SAC provides no grounds, beyond the mere existence of a link, for the Court to find that Defendants were put on notice that mere use of the

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 55 of 534 PageID #: 240

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

website would be interpreted as agreement to the Terms of Service. The SAC does not allege the size or typeface of the link, the perhaps central or obvious location of the link on the page, or even the text of the link, but merely alleges the existence of such a link. Because browsewrap agreements, where enforceable, are a powerful means of binding users with very little affirmative assent, a complaint must state facts establishing the means by which the link in question would give notice to a reasonably prudent internet user.

The enforceability of browsewrap agreements was comprehensively reviewed by the Ninth Circuit Court of Appeals in *Nguyen v. Barnes and Noble, Inc.* [29] The issue in the case was whether an arbitration clause in Barnes and Noble's browsewrap agreement was enforceable. The website terms of use were available via a "Terms of Use" hyperlink located in the bottom left-hand corner of every page on the website which appeared alongside other hyperlinks labelled "NOOK Store Terms", "Copyright", and "Privacy Policy". The hyperlinks also appeared in green typeface in the lower left-hand corner of every page in the online checkout process. Nguyen neither clicked on the Terms of Use hyperlink nor actually read the Terms of Use. Had he done so, he would have been taken to a page containing the full text of Barnes and Noble's Terms of Use, which stated in relevant part:

29      Nguyen v. Barnes and Noble, Inc., 763 F. 3d 1171 (9th. Cir. 2014).

> By visiting any area in the Barnes and Noble.com Site, creating an account, [or] making a purchase via the Barnes and Noble.com Site … a User is deemed to have accepted the Terms of Use." Nguyen also would have come across an arbitration provision…

The Ninth Circuit Court noted that if there had been any evidence that Nguyen had actual notice of the Terms of Use or was required to affirmatively acknowledge the Terms of Use before completing his online purchase, the online agreement might have been enforced. Indeed, said the Court, "courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement". According to the Court:

> …where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements. See, e.g., *Cairo, Inc. v. Crossmedia Servs., Inc.*, 2005 WL 756610 (N.D.Cal. Apr. 1, 2005) (enforcing forum selection clause in website's terms of use where every page on the website had a textual notice that read: "By continuing past this page and/ or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site").

The Court then explained that in the absence of evidence that the website user had actual knowledge of the agreement, the question turned on whether the website put a reasonable prudent user on inquiry notice of the terms of the contract. This, in turn, depended on the design and content of the website and the agreements' webpage. According to the Court:

> But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract. *Specht, 306 F.3d at 30–31;* see also *In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F.Supp.2d 1058, 1064 (D.Nev.2012). Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage. *Google, 2013 WL 5568706.* Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement.

The Court went on to rule that the proximity or conspicuousness of a hyperlink alone is not enough to give rise to constructive notice. Users should be provided with notice or prompts to take affirmative action to demonstrate assent to the terms of use, which is not provided merely by close proximity of a hyperlink to the relevant buttons users must click on.

> Barnes and Noble argues that the placement of the "Terms of Use" hyperlink in the bottom left-hand corner of every page on the Barnes and Noble website, and its close proximity to the buttons

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 56 of 534 PageID #: 241

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

a user must click on to complete an online purchase, is enough to place a reasonably prudent user on constructive notice…

But the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice, and Barnes and Noble directs us to no case law that supports this proposition…

In light of the lack of controlling authority on point, and in keeping with courts' traditional reluctance to enforce browsewrap agreements against individual consumers, *we therefore hold that where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on — without more — is insufficient to give rise to constructive notice.* Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound. [30]

[30]   Long v. Provide Commerce, Inc., 245 Cal. App. 4th 855 (Court expressing opinion that the bright line rule established by Nguyen is necessary to ensure that internet consumers are on inquiry notice of a browsewrap agreement's terms and that a notice is required to advise consumers that continued use of a website will constitute the consumers' agreement to be bound by the website's terms of use.) See also, Sgouros v TransUnion Corp., 2015 U.S.Dist. LEXIS 13691 (E.D.Ill. Feb. 2015), Sgouros v. TransUnion Corporation, 817 F.3d 1029 (7th Cir. 2016) (browsewrap agreement not enforced notwithstanding that the agreement terms were located in a window and a user had clicked on a button to accept terms as there were insufficient information to inform users that their clicks would constitute assent to the terms in the window. Further, the defendant failed to provide constructive notice to users as there was no explicit reference indicating that users should read the terms in the window. According to the Court "It is unreasonable to expect users to scroll down the Window when they are not aware of a possibility of being bound by the terms in the Window. Therefore, this Agreement is not a valid browsewrap agreement because it did not provide sufficient constructive notice to users that they are being bound by the terms in the Window by using the website."). See also, James v. Global Tel*Link Corporation, 2016 WL 589676 (D.N.J. Feb. 11, 2016) (following *Nguyen*), In Re Facebook Biometric Information Privacy Litigation, 2016 WL 2593853 (N.D.Cal. May 5, 2016). The Court found that Facebook had shown by a preponderance of evidence that the users had agreed to the current terms of use. They were provided notice that the terms of the use of the agreement were changing through an email from Facebook sent directly to the email addresses Facebook had on file. They also received a jewel notification on their individual Facebook news feeds. This individualized notice in combination with the users' continued use was enough for notice and assent.

The enforceability of on-line terms and conditions which are displayed at a site and which are encountered during users' use of the site was considered by an appellant court in Illinois in *Hubbert v. Dell Corp.* [31] The case involved an appeal by Dell from a trial court's order denying its motion to compel arbitration. The plaintiffs were purchasers of computers which they had bought on-line at Dell's website. To make their purchases, each of the purchasers completed online forms on five of the defendant's web pages. On each of the five web pages, the defendants' "Terms and Conditions of Sale" were accessible by clicking on a blue hyperlink. The beginning of the Terms and Conditions of Sale stated: "PLEASE READ THIS DOCUMENT CAREFULLY!! IT CONTAINS VERY IMPORTANT INFORMATION ABOUT YOUR RIGHTS AND OBLIGATIONS, AS WELL AS LIMITATIONS AND EXCLUSIONS THAT MAY APPLY TO YOU. THIS DOCUMENT CONTAINS A DISPUTE RESOLUTION CLAUSE." The Terms and Conditions also contained the familiar statement that the customer agreed to be bound and to accept the agreement. Dell argued that by making the Terms and Conditions of Sale available on its website pursuant to a blue hyperlink and by stating on several web pages completed by the plaintiffs that all sales were subject to his terms and conditions, it created a binding agreement, which included a provision requiring mandatory arbitration of disputes. The court agreed with Dell. Dell's notices were sufficient to place a reasonable person on notice that there were terms to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase. Further, the court pointed out that, "Common sense dictates that because the plaintiffs were purchasing computers on-line, they were not novices when using computers." The court's reasons for decision were expressed as follows:

[31]   Hubbert v. Dell Corp., 835 N.E. 2d 113 (Ill. App. 5 Dist. 2005), appeal denied, 844 N.E. 2d 965.

Case 1:23-cv-01177-GBW Document 19 Filed 12/21/23 Page 57 of 534 PageID #: 242

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

We find that the on-line contract included the "Terms and Conditions of Sale." The blue hyperlink entitled "Terms and Conditions of Sale" appeared on numerous Web pages the plaintiffs completed in the ordering process. The blue hyperlinks for the "Terms and Conditions of Sale" also appeared on the defendant's marketing Web pages, copies of which the plaintiffs attached to their complaint. The blue hyperlinks on the defendant's Web pages, constituting the five-step process for ordering the computers, should be treated the same as a multipage written paper contract. The blue hyperlink simply takes a person to another page of the contract, similar to turning the page of a written paper contract. Although there is no conspicuousness requirement, the hyperlink's contrasting blue type makes it conspicuous. Common sense dictates that because the plaintiffs were purchasing computers on-line, they were not novices when using computers. A person using a computer quickly learns that more information is available by clicking on a blue hyperlink.

Additionally, on three of the defendant's Web pages that the plaintiffs completed to make their purchases, the following statement appeared: "All sales are subject to Dell's Term[s] and Conditions of Sale." This statement would place a reasonable person on notice that there were terms and conditions attached to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase. The statement that the sales were subject to the defendant's "Terms and Conditions of Sale," combined with making the "Terms and Conditions of Sale" accessible on-line by blue hyperlinks, was sufficient notice to the plaintiffs that purchasing the computers on-line would make the "Terms and Conditions of Sale" binding on them. Because the "Terms and Conditions of Sale" were a part of the online contract and because the plaintiffs did not argue that their claims were not within the scope of the arbitration agreement, they were bound by the "Terms and Conditions of Sale," including the arbitration clause.

Several other cases have enforced web-wrap agreements. For example, a browse-wrap agreement was enforced in *Major v McCallister;* [32] the Court's reasons for enforcing the agreement were as follows:

[32] Major v McCallister, (Miss.CT.App. Dec 23, 2009). See also, Small Justice LLC v Xcentric Ventures LLC, 2015 WL 1431071 (D.Mass Mar. 27, 2015) (Court enforcing a browsewrap agreement which purported to transfer copyright ownership by means of the browsewrap agreement.

Here, the Court concludes that a reasonably prudent user was on inquiry notice of the terms and conditions associated with the ROR, and, therefore, the transfer of copyright ownership was valid. The screen where users submitted their reports prominently featured a portion of the terms in the center of the screen, above the "continue" button that the users clicked to conclude the posting process. That screen, along with at least two of the other screens used in the posting process, also contained blue links to the terms of service at the bottom of the page which were conspicuously visible without scrolling beyond the "continue" button used to progress to the subsequent screen. The conspicuousness of the terms is supported by the contrasting color of the link to them coupled with the placement of the terms themselves on the final screen prior to submission.

Court not considering the requirement for a writing or signature under the U.S. Copyright Act).

The legal effect of online agreements may be "an emerging area of the law," but courts still "apply traditional principles of contract law and focus on whether the plaintiff had reasonable notice of and manifested assent to the online agreement."

ServiceMagic's site was a browsewrap — i.e., one where users need not "click" to accept the website terms. Instead, browsewraps indicate in some fashion that use of the site constitutes acceptance of its terms of service … uphold browsewraps if the user "has actual or constructive knowledge of a site's terms and conditions prior to using the site."

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 58 of 534 PageID #: 243

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

ServiceMagic did put "immediately visible notice of the existence of license terms" — i.e., "By submitting you agree to the Terms of Use" and a blue hyperlink — right next to the button that Appellant pushed. A second link to those terms was visible on the same page without scrolling, and similar links were on every other website page…

> For these reasons, Appellant's contention that the website terms were so inconspicuous that a reasonably prudent Internet user could not know or learn of their existence, or assent to them without a "click," is unconvincing.

A browse-wrap agreement was also enforced by another U.S. court in *DC Laboratories, Inc. v. Hach Co.* [33] The Court's reasons for enforcing the clause are summarized in the paragraph below:

[33]  DC Laboratories, Inc. v. Hach Co., 2009 WL 2605270 (C.D.Ill., Aug 25, 2009). See also AvePoint, Inc. v. Power Tools, Inc., 2013 WL 5963034 (W.D.Va., Nov. 7, 2013) (The Court declined to rule a browse-wrap agreement unenforceable where it alleged facts that the defendant had actual or constructive knowledge of the website terms and conditions and had surreptitiously used the website to download proprietary software). According to the court:

> At this stage of the proceedings, the court is constrained to conclude that the facts set forth in the amended complaint are sufficient to plausibly allege the existence of an enforceable browsewrap agreement…AvePoint has alleged more than the mere existence of a link at the bottom of the AvePoint website. See Cvent Inc., 739 F.Supp.2d at 936 (holding that the plaintiff's "bare assertion[ ] that its terms of use were displayed on its website" was insufficient to establish that the defendants were on actual or constructive notice of those terms); Be In, Inc., 2013 WL 5568706, at *9, 2013 U.S. Dist. LEXIS 147047, at *33 (holding that the plaintiff failed to provide allegations from which the court could infer valid contract formation, where the plaintiff "merely allege[d] the existence of … a link [to the website's terms and conditions]"). Instead, AvePoint cites additional facts to support its claim that Axceler had actual or constructive knowledge of the Website Terms and Conditions. Specifically, AvePoint contends that the fact that Axceler went to the trouble of creating a fictitious profile and email account in order to download the software suggests that Axceler had knowledge of the Terms and Conditions, and was aware that they prohibit users from downloading materials for commercial use. AvePoint also claims that Axceler has a similar browsewrap agreement on its own website that restricts the use of downloaded software and, thus, that it should have known that AvePoint's website has similar terms and conditions.

> the Court finds that the Terms were conspicuous enough. … It is undisputed that the Terms were hyperlinked on three separate pages of the online Plate order process in underlined, blue, contrasting text… Further evidence of the Terms' conspicuousness is the fact that they were brought to attention by being specifically referenced in the final order step which read: "STEP 4 of 4: Review terms, add any comments, and submit order," and was followed by a hyperlink to the Terms… Though PDC does not state whether or not they read the Terms, it is inconsequential to the Terms' conspicuousness or PDC's accent thereto. See *Druvan v. Jagger*, 508 F.Supp.2d 228, 237 (S.D.N.Y. 2007) (where the court found that the plaintiff was bound to online terms regardless of whether she actually read them).

The enforceability of a web-wrap agreement was also considered by an Irish Court in *Ryanair Limited v. Billigfluege.De GMBH.* [34] The plaintiff sought to enforce an exclusive jurisdiction clause which was in the plaintiff's terms of use, accessible through a hyperlink on the page. The Court found the web-wrap agreement binding. In so doing, the Court reviewed the general principals of contract law and held web-wrap agreements to be enforceable for the following reasons:

[34]  Ryanair Limited v. Billigfluege.De GMBH, [2010] IEHC 47.

> Do the Terms of Use constitute an Agreement for the purpose of Article 23 of the Brussels Convention?

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 59 of 534 PageID #: 244

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

In order to find that Article 23 applies, the Court must first be satisfied as to the existence of a contract between the parties and the existence of a contract is strenuously denied by the defendants who argue that the Terms of Use on Ryanair's website lack contractual force because they are nothing more than a set of unilaterally imposed conditions which they never agreed to. I find this argument unconvincing. By way of analogy, if I enter a shop and see an item on sale for € 10, the fact that I never agreed to the € 10 price tag or the fact that the shop owner unilaterally imposed that price without consulting me about it does not mean that I am not bound to pay that price if I go to the counter and seek to buy the product. In today's market, given the change in economic conditions, it may very well be that we have a return to a system of haggling but as matters stand, the defendant's argument that one cannot impose certain unilateral terms is not an accurate description of the law on contract as I understand it. It will often be the case that one party will set out certain terms, such as not using information on a website for commercial purposes without the owner's consent, and if another party wishes to flout those terms, they cannot then say that because the term was unilaterally imposed, it had no legal effect. That seems to me to be what the defendants in this case have been attempting to argue.

The defendants claim that they never consented to the Terms of Use or entered into any agreement with the plaintiff. The plaintiff says this is not the case and that at all material times its Terms of Use governed its relationship with the defendants. As regards whether or not the Terms of Use were binding on the defendant, it is a well established general principle of law that parties to a contract cannot be bound by terms which they have not had an opportunity of reading prior to making the contract. That is not to say that a party will not be bound because they have not read the terms — they will only escape being bound if they can show they were not afforded a reasonable opportunity to read the term in question before entering into the contract. In *Interfoto Picture Library Ltd. v. Stiletto Visual Programmes Ltd.* [1989] Q.B. 433 it was held that where a condition is particularly onerous or unusual, the party seeking to enforce it must show that that condition was fairly brought to the notice of the other party. As per Dillon L.J., at p. 439:

> … if one condition in a set of printed conditions is particularly onerous or unusual, the party seeking to enforce it must show that that particular condition was fairly brought to the attention of the other party.

Similarly, in *Thornton v. Shoe Lane* [1971] 2 W.L.R. 585, a case involving an exclusion of liability clause and a ticket issued by an automatic machine in a car park, Lord Denning M.R. made the following observations, at p. 588:

> The customer pays his money and gets a ticket. He cannot refuse it. He cannot get his money back. He may protest to the machine, even swear at it. But it will remain unmoved. He is committed beyond recall. He was committed at the very moment when he put his money into the machine. The contract was concluded at that time. It can be translated into offer and acceptance in this way: the offer is made when the proprietor of the machine holds it out as being ready to receive the money. The acceptance takes place when the customer puts his money into the slot. The terms of the offer are contained in the notice placed on or near the machine stating what is offered for the money. The customer is bound by those terms as long as they are sufficiently brought to his notice before-hand, but not otherwise.

In *Thornton,* the House of Lords held that the defendant's had not taken sufficient steps to ensure that the notice containing the exclusion of liability clause was brought to the attention of customers of the car-park before they purchased their tickets and in those circumstances that the clause was invalid and of no effect. Here, the exclusive jurisdiction clause was contained in the Terms of Use on the plaintiff's website, highlighted by way of a hyperlink. In such circumstances, the Terms of Use on Ryanair's website were "fairly brought to the attention of the other

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 60 of 534 PageID #: 245

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

party". It seems that the Terms of Use were clearly accessible by way of a hyperlink which was at all times clearly visible to users of the plaintiff's site. The Terms were not hidden in an awkward part of the screen or in any way concealed or difficult to find. The inclusion by Ryanair of their website terms of use via a hyperlink that the website user is required to view and assent to results in the user entering into what is known as "a click-wrap agreement" with Ryanair. The plaintiff referred to the U.S. cases of *Caspi v. Microsoft Network* 323 NJ Super. 118; 732 A. 2d 528 (New Jersey Appellate Division, 1999) and *Specht v. Netscape & AOL* 306 f. 3d 17 in this regard. In addition to claiming that the terms of use lacked contractual effect, the defendants also argued that regardless of the validity of the terms, they did not "use" the plaintiff's website, the customer did. In this regard, while the defendants may not be the actual customer or person who will sit on the seat in the plane, they are commercial entities who nonetheless engage with the plaintiff's website for the purpose of gleaning or "scraping" information from it for onward transmission to their own customers. To claim that that activity is not "use" of the plaintiff's website by the defendants is an exercise in semantics and an unconvincing argument.

> In resolving this issue of the validity of the plaintiff's Terms of Use, the Court has had regard to the traditional contract principles of offer, acceptance and consideration and has asked itself what was the consideration provided in the instant case? The defendants claim there was no consideration, or, for that matter, no acceptance.

> Consideration must be provided by the party who seeks to enforce the contract. Here, Ryanair are seeking to enforce their Terms of Use. Ryanair, therefore, must satisfy the Court that they have provided the defendant with consideration. It seems to me that the plaintiff, through its website, offer information for use, subject at all times to their Terms of Use policy, to the users of their website, including the defendants. Although the defendants deny that they use the plaintiff's website and claim that it is the customer or the consumer who does so, it again seems to be that the defendants accept the offer of information made by the plaintiff when they systematically access the Ryanair website though the screen-scraping mechanism. In my view, the provision of information as to flights and prices of flights by Ryanair on their site, subject at all times to their Terms and Conditions, constitutes a sufficient act of consideration for the purposes of making the contract legally binding.

> I therefore find for the plaintiffs on the issue of whether or not a legally binding contract exists in this case, being convinced for the reasons set out above that the Terms of Use constitute a contractual document entered into by the parties and in respect of which consideration was provided by the plaintiff in the making available of the information for use by the defendant.

In principle, there is no reason why under common law principles a browsewrap agreement would not be capable of resulting in a valid online agreement under the traditional principles of offer and acceptance. The website terms which may be accessible online may be construed as constituting an offer to make the website available, subject to the terms and conditions at the site. [35] To constitute an offer, however, the offer and its terms accessible through the website must be brought to the attention of the user and be available for review. Whether the terms are sufficiently brought to the attention of the user, in any case, will turn on the prominence the site gives to the proposed terms and the notice that the user has respecting what they are agreeing to once they have accepted the offer. [36] The elements of the offer were described in the *Century 21 v. Rogers* case [37] as follows:

35    Century 21 Canada Limited Partnership v. Rogers Communications Inc., 2011 BCSC 1196.

36    Century 21 Canada Limited Partnership v. Rogers Communications Inc., 2011 BCSC 1196.

37    Century 21 Canada Limited Partnership v. Rogers Communications Inc., 2011 BCSC 1196.

Case 1:23-cv-01177-GBW   Document 19   Filed 12/21/23   Page 61 of 534 PageID #: 246

§ 10:7. Browse Wrap or Webwrap Agreements, Sookman: Computer, Internet, and...

The law of contract requires that the offer and its terms be brought to the attention of the user, be available for review and be in some manner accepted by the user. Such an analysis turns on the prominence the site gives to the proposed Terms of Use and the notice that the user has respecting what they are agreeing to once they have accepted the offer.

Browse wrap agreements have the advantage of being readily available for perusal by the user. Their enforcement requires a clear opportunity for the user to read them which, given the nature of computer and the Internet, is likely to be a better opportunity than that available to the user of a product with a standard form contract presented at the time of purchase. A properly enforceable browse wrap agreement will give the user the opportunity to read it before deeming the consumer's use of the website as acceptance of the Terms of Use. In the case at bar, notice is not an issue given the defendant has acknowledged it was aware of the Terms of Use and what conduct was deemed to be acceptance.

© 2023 Thomson Reuters Canada Limited.

---

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# EXHIBIT EN-3

# TO THE DECLARATION OF EVAN NUTTALL



Province of Alberta

# ELECTRONIC TRANSACTIONS ACT

Statutes of Alberta, 2001
Chapter E-5.5

Current as of April 1, 2023

Office Consolidation

© Published by Alberta King's Printer

Alberta King's Printer
Suite 700, Park Plaza
10611 - 98 Avenue
Edmonton, AB T5K 2P7
Phone: 780-427-4952

E-mail: kings-printer@gov.ab.ca
Shop on-line at kings-printer.alberta.ca

information and prescribing requirements for the electronic signature of the information.

## Electronic Transactions and Electronic Agents

### Formation and operation of electronic contracts

**27**   Unless the parties otherwise agree, an offer, the acceptance of an offer or any other matter that is material to the formation or operation of a contract may be expressed

   (a)   by means of information or a record in electronic form, or

   (b)   by an act that is intended to result in electronic communication, such as

      (i)   touching or clicking on an appropriate icon or other place on a computer screen, or

      (ii)   speaking.

### Involvement of electronic agents

**28**   A contract may be formed by the interaction of an electronic agent and a person or by the interaction of electronic agents.

### Errors re transactions with electronic agents

**29**   An electronic transaction between a person and another person's electronic agent has no legal effect if

   (a)   the person makes a material error in the electronic information or an electronic record used in the transaction,

   (b)   the electronic agent does not give the person an opportunity to prevent or correct the error,

   (c)   on becoming aware of the error, the person promptly notifies the other person, and

   (d)   in a case where consideration is received as a result of the error, the person

      (i)   returns or destroys the consideration in accordance with the other person's instructions or, if there are no instructions, deals with the consideration in a reasonable manner, and

      (ii)   does not benefit materially by receiving the consideration.

**EXHIBIT EN-4**

**TO THE DECLARATION OF EVAN NUTTALL**

2017 SCC 33, 2017 CSC 33

Supreme Court of Canada

Douez v. Facebook, Inc.

2017 CarswellBC 1663, 2017 CarswellBC 1664, 2017 SCC 33, 2017 CSC 33, [2017] 1 S.C.R.
751, [2017] 1 R.C.S. 751, [2017] 7 W.W.R. 637, [2017] B.C.W.L.D. 4054, 1 C.P.C. (8th) 213, 279
A.C.W.S. (3d) 522, 3 C.P.C. (8th) 1, 411 D.L.R. (4th) 434, 71 B.L.R. (5th) 1, 97 B.C.L.R. (5th) 1

## Deborah Louise Douez (Appellant) and Facebook, Inc. (Respondent) and Canadian Civil Liberties Association, Samuelson-Glushko Canadian InternetPolicy and Public Interest Clinic, Information Technology Association of Canada and Interactive Advertising Bureau of Canada (Interveners)

McLachlin C.J.C., Abella, Moldaver, Karakatsanis, Wagner, Gascon,Côté JJ.

Heard: November 4, 2016

Judgment: June 23, 2017

Docket: 36616

Proceedings: reversing *Douez v. Facebook, Inc.* (2015), 73 C.P.C. (7th) 87, 2015 CarswellBC 1671, 2015 BCCA 279, [2016] 1
W.W.R. 287, 77 B.C.L.R. (5th) 116, [2015] B.C.J. No. 1270, 642 W.A.C. 56, 374 B.C.A.C. 56, 387 D.L.R. (4th) 360, Bauman
C.J.B.C., Goepel J.A., Lowry J.A. (B.C. C.A.); reversing *Douez v. Facebook, Inc.* (2014), 53 C.P.C. (7th) 302, 2014 BCSC 953,
2014 CarswellBC 1487, [2014] B.C.J. No. 1051, 313 C.R.R. (2d) 254, Susan A. Griffin J. (B.C. S.C.)

Counsel: Ward K. Branch, Q.C., Christopher Rhone, Michael Sobkin for Appellant
Mark A. Gelowitz, W. David Rankin for Respondent
Cynthia Kuehl, Meredith E. Jones for Intervener, Canadian Civil Liberties Association
Paul J. Bates, Marina Pavlovic, Jeremy de Beer for Intervener, Samuelson-Glushko Canadian Internet Policy and Public Interest
Clinic
Matthew P. Gottlieb, Paul Michell, Ian C. Matthews for Intervener, Information Technology Association of Canada
Derek J. Bell, Jason M. Berall for Intervener, Interactive Advertising Bureau of Canada

*Karakatsanis, Wagner, Gascon JJ.*:

## I. Overview

1     Forum selection clauses purport to oust the jurisdiction of otherwise competent courts in favour of a foreign jurisdiction.
To balance contractual freedom with the public good in having local courts adjudicate certain claims, courts have developed
a test to determine whether such clauses should be enforced. This test has mostly been applied in commercial contexts, where
forum selection clauses are generally enforced to hold sophisticated parties to their bargain, absent exceptional circumstances.
This appeal requires the Court to apply this test in a consumer context.

2     Deborah Douez is a resident of British Columbia and a member of the social network Facebook.com. She claims that
Facebook, Inc. infringed her privacy rights and those of more than 1.8 million British Columbians, contrary to the *Privacy Act*
of that province. Facebook is seeking to have the action stayed on the basis of the forum selection clause contained in its terms
of use, which every user must click to accept in order to use its social network.

3     The chambers judge refused to stay the action, concluding that the *Privacy Act* overrides the clause, and that it provides
strong reasons not to enforce it. The Court of Appeal reversed her decision, concluding instead that the clause was enforceable
and that Ms. Douez had failed to show strong cause not to enforce it.

4      Like our colleague Abella J., although for different reasons, we would allow the appeal. In our view, while s. 4 of the Privacy Act does not override forum selection clauses, Ms. Douez has established strong reasons not to enforce the clause at issue here. The grossly uneven bargaining power between the parties and the importance of adjudicating quasi-constitutional privacy rights in the province are reasons of public policy that are compelling, and when considered together, are decisive in this case. In addition, the interests of justice, and the comparative convenience and expense of litigating in California, all support a finding of strong cause in the present case.

## II. Background

5      The respondent, Facebook, Inc., is an American corporation headquartered in California. It operates Facebook.com, one of the world's leading social networks, and generates most of its revenues from advertising. The appellant, Ms. Douez, is a resident of British Columbia and has been a member of Facebook since 2007.

6      In 2011, Facebook created a new advertising product called "Sponsored Stories". This product used the name and picture of Facebook members, allegedly without their knowledge, to advertise companies and products to other members on the site and externally.

7      Ms. Douez brought an action against Facebook when she noticed that her name and profile picture had been used in Sponsored Stories. She alleges that Facebook used her name and likeness without consent for the purposes of advertising, in contravention to s. 3(2) of the Privacy Act, R.S.B.C. 1996, c. 373:

> (2) It is a tort, actionable without proof of damage, for a person to use the name or portrait of another for the purpose of advertising or promoting the sale of, or other trading in, property or services, unless that other, or a person entitled to consent on his or her behalf, consents to the use for that purpose.

Ms. Douez also seeks certification of her action as a class proceeding under the Class Proceedings Act, R.S.B.C. 1996, c. 50. The proposed class includes all British Columbia residents who had their name or picture used in Sponsored Stories. The estimated size of the class is 1.8 million people.

8      Facebook is free to join and use, but all potential users — including Ms. Douez — must agree to its terms of use as part of the registration process. These terms include a forum selection and choice of law clause requiring that disputes be resolved in California according to California law:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for purpose of litigating all such claims. [A.R., vol. II, p. 138]

9      Facebook brought a preliminary motion to stay Ms. Douez's action on the basis of this forum selection clause. Alternatively, it argued that the action should be stayed because British Columbia is *forum non conveniens* under s. 11 of the Court Jurisdiction and Proceedings Transfer Act, S.B.C. 2003, c. 28 ("CJPTA"). In our Court, however, Facebook focused its submissions exclusively on the forum selection clause and did not argue that British Columbia is *forum non conveniens*.

## III. Decisions Below

### A. Supreme Court of British Columbia (Griffin J.), 2014 BCSC 953, 313 C.R.R. (2d) 254 (B.C. S.C.)

10      The chambers judge declined to enforce the forum selection clause. Although she found it to be *prima facie* valid, clear and enforceable, she held that s. 4 of the Privacy Act overrides forum selection clauses and provides a strong public policy not to enforce them. In her view, the British Columbia Supreme Court has exclusive jurisdiction under s. 4 to hear actions under the Act. As a result, she concluded that the plaintiff would be unable to bring her claim elsewhere if the claim was stayed.

2

11     While the chambers judge's findings on s. 4 were sufficient to resolve the motion, she also found that there was strong cause not to enforce the forum selection clause. Enforcing it would, in her view, exclude Facebook from liability because only the British Columbia Supreme Court had jurisdiction over the matter. Ms. Douez did not need to prove California courts would refuse to hear her claim. In addition, she found that the jurisdiction clause and purposes of the *Privacy Act* provide strong public policy reasons supporting a finding of strong cause.

12     Lastly, the chambers judge concluded on the basis of the factors in s. 11 of the CJPTA that the courts of California would not be more appropriate than the courts of British Columbia to hear the action. She found that it would be more convenient to hear the matter in British Columbia than in California. Thus, the chambers judge refused Facebook's request to stay the proceeding.

*B. Court of Appeal for British Columbia (Bauman C.J. and Lowry and Goepel JJ.A.), 2015 BCCA 279, 77 B.C.L.R. (5th) 116 (B.C. C.A.)*

13     The Court of Appeal reversed the decision of the chambers judge and ordered that the action be stayed on the basis of Facebook's forum selection clause. It confirmed that the analysis of forum selection clauses is distinct from the analysis of the appropriate forum under s. 11 of the CJPTA.

14     The Court of Appeal concluded that the chambers judge erred in her interpretation of s. 4 of the Privacy Act. In its view, the chambers judge failed to give effect to the principle of territoriality, under which provincial legislation cannot regulate civil rights in another jurisdiction. Section 4 concerns subject-matter competence, not territorial competence, and therefore it only confers jurisdiction to the Supreme Court of British Columbia to the exclusion of other courts in British Columbia. Had the legislature wanted to override forum selection clauses, it would have done so explicitly.

15     The Court of Appeal held that the forum selection clause was enforceable, and that Ms. Douez had failed to show strong cause. In finding strong cause, the chambers judge's analysis was tainted by her erroneous interpretation of s. 4 of the Privacy Act. The fact that a stay would extinguish a claim might provide strong cause, but Ms. Douez failed to provide evidence establishing that this would be the case here. Since the clause should be enforced, the Court of Appeal did not consider s. 11 of the CJPTA.

**IV. Issues**

16     Facebook does not dispute that British Columbia courts have territorial jurisdiction. The main issue is whether Ms. Douez's action should be stayed on the basis of the forum selection clause contained in its terms of use. The parties also disagree on whether the analysis of forum selection clauses should be subsumed under s. 11 of the CJPTA, or whether they are distinct concepts.

**V. Analysis**

17     As we shall explain, the *forum non conveniens* test adopted in the *CJPTA* was not intended to replace the common law test for forum selection clauses. In our view, this case should be resolved under the strong cause analysis established by this Court in *Z.I. Pompey Industrie v. ECU-Line N.V.*, 2003 SCC 27, [2003] 1 S.C.R. 450 (S.C.C.).

*A. The Interaction Between Forum Selection Clauses and the CJPTA*

18     At common law, forum selection clauses and the *forum non conveniens* doctrine command different analyses: "Each class of case has its own onus, test and rationale" (*Momentous.ca Corp. v. Canadian American Assn. of Professional Baseball Ltd.*, 2010 ONCA 722, 103 O.R. (3d) 767 (Ont. C.A.), at para. 37, aff'd 2012 SCC 9, [2012] 1 S.C.R. 359 (S.C.C.)). Our Court has confirmed that "the presence of a forum selection clause" is "sufficiently important to warrant a different test", and that "a unified approach to *forum non conveniens*, where a choice of jurisdiction clause constitutes but one factor to be considered" may not be preferable (*Pompey*, at para. 21).

3

19    Ms. Douez argues that the *CJPTA* provides a complete framework to determine the court's jurisdiction, and that forum selection clauses should be considered as another factor within the *forum non conveniens* analysis under s. 11.

20    In our view, the courts below rightly rejected Ms. Douez's proposed approach. Section 11 of the CJPTA "constitutes a complete codification of the common law test *for forum non conveniens* [that] admits of no exceptions" (*Lloyd's Underwriters v. Cominco Ltd.*, 2009 SCC 11, [2009] 1 S.C.R. 321 (S.C.C.), at para. 22 (emphasis added)). It was never intended to codify the test for forum selection clauses. Not only does s. 11 make no mention of contractual stipulations, the comments on the uniform act that served as a basis for the *CJPTA* are also silent on this point (Uniform Law Conference of Canada, Uniform Court Jurisdiction and Proceedings Transfer Act (online)). The analysis of forum selection clauses thus remains separate, despite the enactment of the *CJPTA*.

21    Several Canadian provinces have adopted their own *CJPTA*, with identical or similar provisions. Their appellate courts have consistently held that the analysis of forum selection clauses remains distinct (see e.g. *Viroforce Systems Inc. v. R & D Capital Inc.*, 2011 BCCA 260, 336 D.L.R. (4th) 570 (B.C. C.A.), at para. 14; *Armoyan v. Armoyan*, 2013 NSCA 99, 334 N.S.R. (2d) 204 (N.S. C.A.), at para. 218). Even the Court of Appeal of Saskatchewan, which held that forum selection clauses should be considered as part of the *CJPTA* analysis, held that "*Pompey* continues to apply notwithstanding [its] enactment" (*Hudye Farms Inc. v. Canadian Wheat Board*, 2011 SKCA 137, 377 Sask. R. 146 (Sask. C.A.), at para. 10; see also *Frey v. Bell Mobility Inc.*, 2011 SKCA 136, 377 Sask. R. 156 (Sask. C.A.), at paras. 112-14).

22    In short, the *CJPTA* was never intended to replace the common law test for forum selection clauses. In the absence of legislation to the contrary, the common law test continues to apply and provides the analytical framework for this case.

**B. The Forum Selection Clause at Common Law: Pompey**

23    We turn next to the common law test for forum selection clauses adopted by this Court in *Pompey*, and to how we propose to apply it in a consumer context.

24    Forum selection clauses serve a valuable purpose. This Court has recognized that they "are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law" (*Pompey*, at para. 20). Forum selection clauses are commonly used and regularly enforced.

25    That said, forum selection clauses divert public adjudication of matters out of the provinces, and court adjudication in each province is a public good. Courts are not merely "law-making and applying venues"; they are institutions of "public norm generation and legitimation, which guide the formation and understanding of relationships in pluralistic and democratic societies" (T. C. W. Farrow, *Civil Justice, Privatization, and Democracy* (2014), at p. 41). Everyone has a right to bring claims before the courts, and these courts have an obligation to hear and determine these matters.

26    Thus, forum selection clauses do not just affect the parties to the contract. They implicate the court as well, and with it, the court's obligation to hear matters that are properly before it. In this way, forum selection clauses are a "unique category of contracts" (M. Pavlovi[cacute], "Contracting out of Access to Justice: Enforcement of Forum-Selection Clauses in Consumer Contracts" (2016), 62 McGill L.J. 389, at p. 396).

27    Of course, parties are generally held to their bargain and are bound by the enforceable terms of their contract. However, because forum selection clauses encroach on the public sphere of adjudication, Canadian courts do not simply enforce them like any other clause. In common law provinces, a forum selection clause cannot bind a court or interfere with a court's jurisdiction. As the English Court of Appeal recognized long ago, "no one by his private stipulation can oust these courts of their jurisdiction in a matter that properly belongs to them" (*"Fehmarn" (The)* (1957), [1958] 1 All E.R. 333(Eng. C.A.), at p. 335).

28    Instead, where no legislation overrides the clause, courts apply a two-step approach to determine whether to enforce a forum selection clause and stay an action brought contrary to it (*Pompey*, at para. 39). At the first step, the party seeking a stay based on the forum selection clause must establish that the clause is "valid, clear and enforceable and that it applies to the cause

of action before the court" (*Preymann v. Ayus Technology Corp.*, 2012 BCCA 30, 32 B.C.L.R. (5th) 391 (B.C. C.A.), at para. 43; see also *Hudye Farms Inc.*, at para. 12, and *Pompey*, at para. 39). At this step of the analysis, the court applies the principles of contract law to determine the validity of the forum selection clause. As with any contract claim, the plaintiff may resist the enforceability of the contract by raising defences such as, for example, unconscionability, undue influence, and fraud.

29    Once the party seeking the stay establishes the validity of the forum selection clause, the onus shifts to the plaintiff. At this second step of the test, the plaintiff must show strong reasons why the court should not enforce the forum selection clause and stay the action. In *Pompey*, this Court adopted the "strong cause" test from the English court's decision in *"Eleftheria" (The) (Cargo Owners) v. "Eleftheria" (The)*, [1969] 1 Lloyd's Rep. 237 (Eng. P.D.A.). In exercising its discretion at this step of the analysis, a court must consider "all the circumstances", including the "convenience of the parties, fairness between the parties and the interests of justice" (*Pompey*, at paras. 19, 30 and 31). Public policy may also be a relevant factor at this step (*Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of)*, 2001 SCC 90, [2001] 3 S.C.R. 907 (S.C.C.), at para. 91, referred to in Pompey, at para. 39; *Frey*, at para. 115).

30    The strong cause factors were meant to provide some flexibility. Importantly, *Pompey* did not set out a closed list of factors governing the court's discretion to decline to enforce a forum selection clause. Both *Pompey* and *The "Eleftheria"* acknowledged that courts should consider "all the circumstances" of the particular case (*Pompey*, at para. 30; *The "Eleftheria"*, at p. 242). And the leading authority in England continues to recognize that the court in *"Eleftheria"* did not intend its list of factors to be comprehensive (*Donohue v. Armco Inc.*, [2001] UKHL 64, [2002] 1 All E.R. 749 (U.K. H.L.), at para. 24).

31    That said, the strong cause factors have been interpreted and applied restrictively in the commercial context. In commercial interactions, it will usually be desirable for parties to determine at the outset of a business relationship where disputes will be settled. Sophisticated parties are justifiably "deemed to have informed themselves about the risks of foreign legal systems and are deemed to have accepted those risks in agreeing to a forum selection clause" (*Aldo Group Inc. v. Moneris Solutions Corp.*, 2013 ONCA 725, 118 O.R. (3d) 81 (Ont. C.A.), at para. 47). In this setting, our Court recognized that forum selection clauses are generally enforced and to be encouraged "because they provide international commercial relations with the stability and foreseeability required for purposes of the critical components of private international law, namely order and fairness" (*Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, 2005 SCC 46, [2005] 2 S.C.R. 401 (S.C.C.) [hereinafter GreCon Dimter]. 22).

32    In *Pompey*, for example, our Court enforced a forum selection clause contained in a bill of lading concluded between two sophisticated shipping companies. The parties were of similar bargaining power and sophistication, since they were "corporations with significant experience in international maritime commerce. ... [that] were aware of industry practices" (para. 29). The Court held that the "forum selection clause could very wel have been negotiated" between the parties (*ibid.*). This context manifestly informed the Court's application of the strong cause test.

33    But commercial and consumer relationships are very different. Irrespective of the formal validity of the contract, the consumer context may provide strong reasons not to enforce forum selection clauses. For example, the unequal bargaining power of the parties and the rights that a consumer relinquishes under the contract, without any opportunity to negotiate, may provide compelling reasons for a court to exercise its discretion to deny a stay of proceedings, depending on the other circumstances of the case (see e.g. *Straus v. Decaire*, 2007 ONCA 854 (Ont. C.A.), at para. 5 (CanLII)). And as one of the interveners argues, instead of supporting certainty and security, forum selection clauses in consumer contracts may do "the opposite for the millions of ordinary people who would not foresee or expect its implications and cannot be deemed to have undertaken sophisticated analysis of foreign legal systems prior to opening an online account" (Samuelson-Glushko Canadian Internet Policy and Public Interest Clinic Factum, at para. 7).

34    Canadian courts have recognized that the test may apply differently, depending on the contractual context (see *Expedition Helicopters Inc. v. Honeywell Inc.*, 2010 ONCA 351, 100 O.R. (3d) 241 (Ont. C.A.), at para. 24; *Stubbs v. ATS Applied Tech Systems Inc.*, 2010 ONCA 879, 272 O.A.C. 386 (Ont. C.A.), at para. 58). The English courts have also recognized that not all forum selection clauses are created equally. The underpinning of the transaction is relevant to the exercise of discretion under the strong cause test: "... a defendant who cynically flouts a jurisdiction clause which he has freely negotiated is more likely to be enjoined than one who has had the clause imposed upon him ..." (*Sweet & Maxwell Ltd. v. Rosa Maritime Ltd.*, [2003]

EWCA Civ 938, [2003] 2 Lloyd's Rep. 509 (Eng. C.A.), at para. 48; see also *"Bergen" (The)*, [1997] 2 Lloyd's Rep. 710 (Eng. Adm. Ct.), at p. 715); D. Joseph, *Jurisdiction and Arbitration Agreements and their Enforcement* (2nd ed. 2010), at para. 10.13). Similarly, Australian courts have found "that in a consumer situation [courts] should not place as much weight on an exclusive jurisdiction clause in determining a stay application as would be placed on such a clause where there was negotiation between business people" (Quinlan v. Safe International Försäkrings AB[2005] FCA 1362(Australia Fed. Ct.), at para. 46 (AustLII); see also *Incitec Ltd. v. Alkimos Shipping Corp.*, [2004] FCA 698, 206 A.L.R. 558 (Australia Fed. Ct.), at para. 50).

35      As these cases recognize, different concerns animate the consumer context than those that this Court considered in *Pompey*, where a sophisticated commercial transaction was at issue. Because of these concerns, we agree with Ms. Douez and several interveners that the strong cause test must account for the different considerations relevant to this context.

36      In our view, recognizing the importance of factors beyond those specifically listed in *"Eleftheria"* is an appropriate incremental response of the common law to a different context (*Bhasin v. Hrynew*, 2014 SCC 71, [2014] 3 S.C.R. 494 (S.C.C.), at paras. 33-34 and 40). Such a development is especially important since online consumer contracts are ubiquitous, and the global reach of the Internet allows for instantaneous cross-border consumer transactions. It is necessary to keep private international law "in step with the dynamic and evolving fabric of our society" (*R. v. Salituro*, [1991] 3 S.C.R. 654 (S.C.C.), at p. 670).

37      After all, the strong cause test must ensure that a court's plenary jurisdiction only yields to private contracts where appropriate. A superior court's general jurisdiction includes "all the powers that are necessary to do justice between the parties" (*80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd.*, [1972] 2 O.R. 280(Ont. C.A.), at p. 282; *TCR Holding Corp. v. Ontario*, 2010 ONCA 233, 69 B.L.R. (4th) 175(Ont. C.A.), at para. 26; *Kelly v. Prince Edward Island (Human Rights Commission)*, 2008 PESCAD 9, 276 Nfld. & P.E.I.R. 336 (P.E.I. C.A.), at para. 8).

38      Therefore, we would modify the *Pompey* strong cause factors in the consumer context. When considering whether it is reasonable and just to enforce an otherwise binding forum selection clause in a consumer contract, courts should take account of all the circumstances of the particular case, including public policy considerations relating to the gross inequality of bargaining power between the parties and the nature of the rights at stake. The burden remains on the party wishing to avoid the clause to establish strong cause.

39      Although the steps are distinct, some considerations may be relevant to both steps of the test. For example, a court may consider gross inequality of bargaining power at the second step of the analysis, even if the circumstances of the bargain do not render the contract unconscionable at the first step. Taking into account the fact that the parties did not negotiate on an even playing field recognizes that the reasons for holding parties to their bargain carry less weight when there is no opportunity to negotiate a forum selection clause. This is not to say that the gross inequality of bargaining power will be sufficient, on its own, to show strong cause. However, it is a relevant circumstance that may be taken into account in the analysis.

40      The two steps governing the enforcement of forum selection clauses ultimately play conceptually distinct roles. Professor Pavlovi[cacute] explains that at the first step, where the court determines the validity of the forum selection clause, "[c]ontract rules provide a core legal basis for the enforcement of jurisdiction agreements" (p. 402). On the other hand, the strong cause test at the second step "limits contractual autonomy in order to protect the authority (jurisdiction) of otherwise competent courts" (*ibid.*). This second step recognizes that there may be strong reasons to retain jurisdiction over a matter in the province.

### C. Application

#### (1) Section 4 of the Privacy Act

41      As this Court recognized in *Pompey*, legislative provisions can override forum selection clauses. In the present case, the chambers judge found that s. 4 of the Privacy Act had overtaken the forum selection clause in conferring exclusive jurisdiction to the Supreme Court of British Columbia. We disagree.

42      Section 4 reads as follows:

**4** Despite anything contained in another Act, an action under this Act must be heard and determined by the Supreme Court [of British Columbia].

43    Section 4 lacks the clear and specific language that legislatures normally use to override forum selection clauses. This Court referred to such overrides on at least two occasions. First, it found an override in s. 46(1) of the Marine Liability Act, S.C. 2001, c. 6, which specifically mentions and sets aside contracts that purport to provide for the adjudication of claims in another forum (*Pompey*, at paras. 37-38). Second, it found that the Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2, was intended to override arbitration clauses (*Seidel v. Telus Communications Inc.*, 2011 SCC 15, [2011] 1 S.C.R. 531 (S.C.C.), at paras. 5-7 and 31). Section 3 of that enactment specifically prevents consumers from contractually waiving their rights under the statute.

44    In contrast, although s. 4 of the Privacy Act expressly provides that it applies "[d]espite anything contained in another Act", it is silent on contractual provisions. If the legislature had intended to override forum selection clauses, it would have done so explicitly. While the legislature intended s. 4 of the Privacy Act to confer jurisdiction to the British Columbia Supreme Court to resolve matters brought under the Act, nothing suggests that it was also intended to override forum selection clauses.

*(2) The Pompey Test*

45    As discussed above, the *Pompey* test involves a two-step analysis. At the first step, the court must be satisfied that the contract is otherwise enforceable, having regard to general principles of contract law.

46    In this regard, Ms. Douez argues that the clause is unenforceable primarily because it was made unclear by Facebook's statement that it "strive[s] to respect local laws". We disagree. This general statement, which is also contained in the terms of use, does not prevail over the clear and specific language of the forum selection clause. Indeed, "where there is apparent conflict between a general term and a specific term, the terms may be reconciled by taking the parties to have intended the scope of the general term to not extend to the subject-matter of the specific term" (*BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 1 S.C.R. 12 (S.C.C.), at p. 24; see also G.R. Hall, *Canadian Contractual Interpretation Law* (3rd ed. 2016), at p. 19). And as Facebook rightly notes, s. 15(1) of the Electronic Transactions Act, S.B.C. 2001, c. 10, permits offer and acceptance to occur in an electronic form through "clicking" online.

47    Our colleague Abella J. concludes that the clause is not enforceable at this first step based upon other considerations. We prefer to address these considerations at the "strong cause" step of the test.

48    At the second step of *Pompey* — the strong cause test — Facebook argues that Ms. Douez has failed to meet her burden because she did not provide any evidence that her contract with Facebook is the result of grossly uneven bargaining power or that a California court would be unable to hear her claim. For her part, Ms. Douez emphasizes the distinctions between a commercial contract amongst sophisticated parties and the consumer context. She also stresses the importance of privacy rights and the public policy underpinning the British Columbia legislature's decision to enact a statutory cause of action to allow for vindication of these rights.

49    As we note above, in exercising its discretion at this step of the analysis, a court must consider "all the circumstances", including the "convenience of the parties, fairness between the parties and the interests of justice" (*Pompey*, at paras. 19, 30-31). As we have said, public policy may also be an important factor at this step (*Holt Cargo Systems Inc.*, at para. 91, referred to in Pompey, at para. 39; *Frey*, at para. 115).

50    We conclude that Ms. Douez has met her burden of establishing that there is strong cause not to enforce the forum selection clause. A number of different factors, when considered cumulatively, support the chambers judge's finding of strong cause. Most importantly, the claim involves a consumer contract of adhesion and a statutory cause of action implicating the quasi-constitutional privacy rights of British Columbians. We begin with these compelling factors, which are decisive in this case when considered together.

**(a) Public Policy**

51    There are strong public policy considerations which favour a finding of strong cause. As we have mentioned, this Court has emphasized party autonomy and commercial certainty in the context of contracts involving sophisticated parties. This usually justifies enforcement of forum selection clauses in the commercial context (*Pompey*, at para. 20; *GreCon Dimter*, at para. 22). Facebook argues that there is no reason to depart from this balance in the consumer context. We disagree.

52    There are generally strong public policy reasons to hold parties to their bargain and it is clear that forum selection clauses are not inherently contrary to public policy. But freedom of contract is not unfettered. A court has discretion under the strong cause test to deny the enforcement of a contract for reasons of public policy in appropriate circumstances. Generally, such limitations fall into two broad categories: those intended to protect a weaker party or those intended to protect "the social, economic, or political policies of the enacting state in the collective interest" (C. Walsh, "The Uses and Abuses of Party Autonomy in International Contracts" (2010), 60 U.N.B.L.J. 12, at p. 15). In this case, both of these categories are implicated. It raises both the reality of unequal bargaining power in consumer contracts of adhesion and the local court's interest in adjudicating claims involving constitutional or quasi-constitutional rights.

53    First, the forum selection clause is included in a contract of adhesion formed between an individual consumer and a large corporation. As we discussed above, even if a contract is not unconscionable, gross inequality of bargaining power is still a relevant factor at the strong cause step of the analysis in this context.

54    Despite Facebook's claim otherwise, it is clear from the evidence that there was gross inequality of bargaining power between the parties. Ms. Douez's claim involves an online contract of adhesion formed between an individual and a multi-billion dollar corporation. The evidence on the record is that Facebook reported almost $4.28 billion in revenue in 2012 through advertising on its social media platform. It is in contractual relationships with 1.8 million British Columbian residents, approximately 40 percent of the province's population. Ms. Douez is one of these individuals.

55    Relatedly, individual consumers in this context are faced with little choice but to accept Facebook's terms of use. Facebook asserts that Ms. Douez could have simply rejected Facebook's terms. But as the academic commentary makes clear, in today's digital marketplace, transactions between businesses and consumers are generally covered by non-negotiable standard form contracts presented to consumers on a "take-it-or-leave-it" basis (Pavlovi[cacute], at p. 392).

56    In particular, unlike a standard retail transaction, there are few comparable alternatives to Facebook, a social networking platform with extensive reach. British Columbians who wish to participate in the many online communities that interact through Facebook must accept that company's terms or choose not to participate in its ubiquitous social network. As the intervener the Canadian Civil Liberties Association emphasizes, "access to Facebook and social media platforms, including the online communities they make possible, has become increasingly important for the exercise of free speech, freedom of association and for full participation in democracy" (I.F., at para. 16). Having the choice to remain "offline" may not be a real choice in the Internet era.

57    Given this context, it is clear that the difference in bargaining power between the parties is large. This distinguishes the situation from *Pompey*, where the Court emphasized that the respondent in that case could have chosen to negotiate the forum selection clause in the bill of lading (para. 29). Nothing suggests in this case that Ms. Douez could have similarly negotiated the terms of use.

58    Secondly, Canadian courts have a greater interest in adjudicating cases impinging on constitutional and quasi-constitutional rights because these rights play an essential role in a free and democratic society and embody key Canadian values. There is an inherent public good in Canadian courts deciding these types of claims. Through adjudication, courts establish norms and interpret the rights enjoyed by all Canadians.

59    At issue in this case is Ms. Douez's statutory privacy right. Privacy legislation has been accorded quasi-constitutional status (*Lavigne v. Canada (Commissioner of Official Languages)*, 2002 SCC 53, [2002] 2 S.C.R. 773(S.C.C.), at paras. 24-25).

This Court has emphasized the importance of privacy — and its role in protecting one's physical and moral autonomy — on multiple occasions (see Lavigne, at para. 25; *Dagg v. Canada (Minister of Finance)*, [1997] 2 S.C.R. 403 (S.C.C.), at paras. 65-66; *R. v. Dyment*, [1988] 2 S.C.R. 417 (S.C.C.), at p. 427). As the chambers judge noted, the growth of the Internet, virtually timeless with pervasive reach, has exacerbated the potential harm that may flow from incursions to a person's privacy interests. In this context, it is especially important that such harms do not go without remedy. And since Ms. Douez's matter requires an interpretation of a statutory privacy tort, only a local court's interpretation of privacy rights under the *Privacy Act* will provide clarity and certainty about the scope of the rights to others in the province.

60      Moreover, the British Columbia legislature's creation of a statutory cause of action evidences an intention to create local rights and protections for the privacy rights of British Columbia residents. As the chambers judge noted, local courts are better placed to adjudicate these sorts of claims:

> ... local courts may be more sensitive to the social and cultural context and background relevant to privacy interests of British Columbians, as compared to courts in a foreign jurisdiction. This could be important in determining the degree to which privacy interests have been violated and any damages that flow from this. [para. 75]

61      Similarly, the legislature's creation of a statutory privacy tort that can be established without proof of damages reflects the legislature's intention to encourage access to justice for such claims. As well, British Columbia's *Class Proceedings Act* provides important procedural tools designed to improve access to justice (*Endean v. British Columbia*, 2016 SCC 42, [2016] 2 S.C.R. 162 (S.C.C.), at para. 1).

62      Yet commentators recognize the practical reality that forum selection clauses often operate to defeat consumer claims (E. A. Purcell, Jr., "Geography as a Litigation Weapon: Consumers, Forum-Selection Clauses, and the Rehnquist Court" (1992), 40 UCLA L. Rev. 423, at pp. 446-49). Given the importance of constitutional and quasi-constitutional rights, it is even more important that reverence to freedom of contract and party autonomy does not mean that such rights routinely go without remedy.

63      Overall, the public policy concerns weigh heavily in favour of strong cause.

**(b) Secondary Factors**

64      In addition to the strong public policy reasons favouring strong cause, two other secondary factors also suggest that the forum selection clause should not be enforced. These factors are the interests of justice and the comparative convenience and expense of litigating in the alternate forum.

*(i) Interests of Justice*

65      The interests of justice (*Pompey*, at para. 31), support adjudication of Ms. Douez's claim in British Columbia. This factor is concerned not only with whether enforcement of the forum selection clause would unfairly cause the loss of a procedural advantage, but also with which forum is best positioned to hear the case on its merits. Of course, unlike in the *forum non conveniens* analysis, the burden is on the party resisting enforcement of the clause to show good reason why the parties should not be held to their bargain.

66      The lack of evidence concerning whether a California court would hear Ms. Douez's claim was a significant focus of the hearing before us. In front of the chambers judge, Facebook argued that the substantive law of California would defeat the application of the *Privacy Act*. Before this Court, Facebook emphasizes the lack of any expert evidence on whether this would in fact be the case if the claim proceeded in California. According to Facebook, the fact that Ms. Douez has not provided expert evidence establishing that a California court would not apply the British Columbia Privacy Act is decisive. Similarly, the British Columbia Court of Appeal placed significant weight on this lack of expert evidence.

67      Yet, none of the leading authorities on the strong cause test, *Pompey* included, make proof that the claim would fail in the foreign jurisdiction a mandatory element of strong cause (see e.g. *"Eleftheria"*, *Momentous.ca Corp.* and *Pompey*). A plaintiff may choose to rely on expert evidence to establish that the selected forum would be unable or unwilling to litigate his

or her claim. Similarly, the defendant may provide his or her own expert evidence to show that the selected forum would be willing and able to litigate the claim. However, while such evidence may be helpful, its absence is not determinative. Under the *Pompey* analysis, there is no separate requirement for the party trying to avoid the forum selection clause to prove that her claim would necessarily fail in the foreign jurisdiction.

68    In addition, Ms. Douez's claim is premised on a British Columbia cause of action. Yet, her contract with Facebook includes a choice of law clause in favour of California:

> The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions.

69    We disagree with Facebook that the choice of law question is irrelevant. Although we do not decide which body of law will apply, and how the choice of law clause might interact with the *Privacy Act*, in our view, the interests of justice are best served if this question is adjudicated in British Columbia.

70    Generally, common law courts will give effect to choice of law clauses as long as they are *bona fide*, legal and not contrary to public policy (*Vita Food Products Inc. v. Unus Shipping Co.*, [1939] A.C. 277(Jud. Com. of Privy Coun.), at p. 290). Furthermore, even if a choice of law clause is generally enforceable, local laws may still apply to a dispute if the local forum intends such laws to be mandatory and not avoidable through a choice of law clause (S. G. A. Pitel and N. S. Rafferty, *Conflict of Laws* (2nd ed. 2016), at p. 299).

71    Usually, courts consider laws of the *local* forum when determining whether the legislature intended there to be mandatory rules that supersede the parties' choice of law (G. Saumier, "What's in a Name? Lloyd's, International Comity and Public Policy" (2002), 37 Can. Bus. L.J. 388, at pp. 395-97; J. Walker, *Castel & Walker: Canadian Conflict of Laws*, (6th ed. (loose-leaf)), at p. 31-2). Whether courts in common law legal systems may similarly consider the intention of *foreign* legislatures, as set out in statutes like the *Privacy Act*, is uncertain (*ibid.*). In Avenue Properties Ltd. v. First City Development Corp.19867 B.C.L.R. (2d) 45(B.C. C.A.), at pp. 57-58, McLachlin J.A. (as she then was) recognized the likelihood that a foreign court would be unable to consider the public policy evidenced in the local statute as a reason why the local court should refuse a *forum non conveniens* application.

72    But even assuming that a California court could or would apply the *Privacy Act*, the interests of justice (*Pompey*, at para. 31) support having the action adjudicated by the British Columbia Supreme Court. This court, as compared to a California one, is better placed to assess the purpose and intent of the legislation and to decide whether public policy or legislative intent prevents parties from opting out of rights created by the *Privacy Act* through a choice of law clause in favour of a foreign jurisdiction.

*(ii) Comparative Convenience and Expense of Litigating in the Alternate Forum*

73    Another consideration in the strong cause analysis is the comparative expense and convenience of litigating in the alternate forum (*Pompey*, at para. 31; *"Eleftheria"*, at p. 242). Therefore, related to the concerns about fairness and access to justice discussed above, the expense and inconvenience of requiring British Columbian individuals to litigate in California, compared to the comparative expense and inconvenience to Facebook, further supports a finding of strong cause.

74    Although Facebook argued its relevant books and records were located in California, the chambers judge found it would be more convenient to have Facebook's books and records made available for inspection in British Columbia than requiring the plaintiff to travel to California to advance her claim. There is no reason to disturb this finding.

75    While these secondary factors might not have justified a finding of strong cause on their own, they nonetheless support our conclusion that Ms. Douez has established sufficiently strong reasons why the forum selection clause should not be enforced and the action should proceed in British Columbia.

**VI. Conclusion**

76     We would allow the appeal with costs to the appellant. Ms. Douez provided strong reasons to resist the enforcement of the clause: most importantly, the gross inequality of bargaining power between her and Facebook and the quasi-constitutional privacy rights engaged by her claim. The forum selection clause is unenforceable.

77     As a result, the chambers judge's order dismissing Facebook's application to have the British Columbia Supreme Court decline jurisdiction is restored.

*Abella J.*:

78     Anyone who wants to use Facebook's service must register as a member and accept Facebook's terms of use. The issue in this appeal is the enforceability of the forum selection clause in Facebook's terms of use, whereby all disputes are required to be litigated in Santa Clara County in California.

79     In *Z.I. Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450(S.C.C.), this Court held that a party relying on a forum selection clause must first show that it is enforceable applying a contractual approach. If it is, the onus shifts to the other party to show that there is "strong cause" for the court to decline to apply the forum selection clause based on considerations grounded in *forum non conveniens* principles.

80     In my view, Facebook's forum selection clause is not enforceable under the first step of the *Pompey* test.

**Background**

81     When a Facebook user "liked" a post associated with a business, Facebook occasionally displayed the user's name and portrait in an advertisement on the newsfeeds of the user's friends. These advertisements were referred to as "Sponsored Stories". One of those users whose name and portrait were used in a Sponsored Story was Deborah Louise Douez.

82     Ms. Douez claims that she gave no consent to having her name or portrait used in Sponsored Stories. As a result, she brought proceedings in the Supreme Court of British Columbia alleging that Facebook violated her rights contrary to s. 3(2) of the British Columbia Privacy Act, R.S.B.C. 1996, c. 373 ("Act"):

> **3**
>
> . . . . .
>
> (2) It is a tort, actionable without proof of damage, for a person to use the name or portrait of another for the purpose of advertising or promoting the sale of, or other trading in, property or services, unless that other, or a person entitled to consent on his or her behalf, consents to the use for that purpose.

83     Under s. 4, actions under the *Privacy Act* must be heard in the Supreme Court of British Columbia:

> **4** Despite anything contained in another Act, an action under this Act must be heard and determined by the Supreme Court.

84     Ms. Douez also brought a class action proceeding under the Class Proceedings Act, R.S.B.C. 1996, c. 50. The proposed class consisted of approximately 1.8 million British Columbia residents whose names or portraits had been used by Facebook in a Sponsored Story.

85     Facebook applied for a stay of the proceedings based on the forum selection clause in its terms of use, which states in part:

> *You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County.* The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for purpose of litigating all such claims.

[Emphasis added.]

86    In the Supreme Court of British Columbia, Griffin J. declined to enforce the forum selection clause and certified the class action. She found that s. 4 of the Privacy Act grants exclusive jurisdiction to the Supreme Court of British Columbia to hear claims under that Act, overriding any forum selection clause. As such, it was unnecessary for Ms. Douez to show "strong cause" why the forum selection clause should not be applied.

87    The Court of Appeal for British Columbia allowed the appeal and granted Facebook's request for a stay of proceedings based on the forum selection clause.

**Analysis**

88    *Pompey* involved a bill of lading between sophisticated commercial entities. This is the first time the Court has been asked to consider how *Pompey* applies to a forum selection clause in an online consumer contract of adhesion.

89    In concluding that the forum selection clause in *Pompey* should be enforced, Bastarache J. set out the following test, based on the 1969 decision in *"Eleftheria" (The) (Cargo Owners) v. "Eleftheria" (The)*, [1969] 1 Lloyd's Rep. 237(Eng. P.D.A.):

> *Once the court is satisfied that a validly concluded bill of lading otherwise binds the parties*, the court must grant the stay unless the plaintiff can show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case.

> [Emphasis added; para. 39.]

90    He also framed it as follows:

> ... once it is determined that the bill of lading otherwise binds the parties (*for instance, that the bill of lading as it relates to jurisdiction does not offend public policy, was not the product of fraud or of grossly uneven bargaining positions*), [the "strong cause" test] constitutes an inquiry into questions such as the convenience of the parties, fairness between the parties and the interests of justice ...

> [Emphasis added; para. 31.]

91    The Court found that the forum selection clause in the bill of lading was enforceable at the first step because the parties were experienced commercial entities who were aware of industry practices and were also, notably, in a position to negotiate the forum selection clause. As a result, there was no "grossly uneven bargaining power":

> Bills of lading are typically entered into by *sophisticated parties familiar with the negotiation of maritime shipping transactions* who should, in normal circumstances, be held to their bargain. ... The parties in this appeal are corporations with significant experience in international maritime commerce. The respondents were aware of industry practices and could have reasonably expected that the bill of lading would contain a forum selection clause. A forum selection clause *could very well have been negotiated* with the appellant ... *There is no evidence that this bill of lading is the result of grossly uneven bargaining power that would invalidate the forum selection clause contained therein*.

> [Emphasis added; para. 29.]

92    The Court went on to conclude that strong cause had not been shown and that a stay should therefore be granted.

93    It is clear that the *Pompey* test engages two distinct inquiries. The first is into whether the clause is enforceable under contractual doctrines like public policy, duress, fraud, unconscionability or grossly uneven bargaining positions, tools for examining the enforceability of contracts. If the clause is enforceable, the onus shifts to the consumer to show "strong cause" why the clause should not be enforced because of factors typically considered under the *forum non conveniens* doctrine. Those factors were set out in *"Eleftheria"* as including:

(a) In what country the evidence on the issues of fact is situated, or more readily available, and the effect of that on the relative convenience and expense of trial as between the English and foreign Courts.

(b) Whether the law of the foreign Court applies and, if so, whether it differs from English law in any material respects.

(c) With what country either party is connected, and how closely.

(d) Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantages.

(e) Whether the plaintiffs would be prejudiced by having to sue in the foreign Court because they would

    (i) be deprived of security for that claim;

    (ii) be unable to enforce any judgment obtained;

    (iii) be faced with a time-bar not applicable in England; or

    (iv) for political, racial, religious or other reasons be unlikely to get a fair trial. [p. 242]

94    Unlike my colleagues in dissent, I think, with respect, that a compelling argument can be made for modifying the strong cause test to include a wider range of factors than the *forum non conveniens* kind of considerations that have been traditionally applied, but I am also of the view that keeping the *Pompey* steps distinct means that before the onus shifts to the consumer, the focus starts where it should, namely on whether the contract or clause itself satisfies basic contractual principles. A contractual approach for determining the enforceability of forum selection clauses in consumer contracts of adhesion finds significant academic support (William J. Woodward Jr., "Finding the Contract in Contracts for Law, Forum and Arbitration" (2006), 2 Hastings Bus. L.J. 1, at p. 46; M. P. Ellinghaus, "In Defense of Unconscionability" (1969), 78 Yale L.J. 757; Linda S. Mullenix, "Another Easy Case, Some More Bad Law: Carnival Cruise Lines and Contractual Personal Jurisdiction" (1992), 27 Tex. Int'l L. J. 323; Stephen Waddams, "Review Essay: The Problem of Standard Form Contracts: A Retreat to Formalism" (2012), 53 Can. Bus. L.J. 475; Peter Benson, "Radin on Consent and Fairness in Consumer Boilerplate: A Brief Comment" (2013), 54 Can. Bus. L.J. 282).

95    Starting with a contractual analysis also permits the necessary contextual scope to explore enforceability depending on what the nature of the contract or clause is and what contractual rights are at stake. Only if the clause is found to be enforceable do we move to the second step, where the consumer must demonstrate that there is strong cause why, even though the forum selection clause is enforceable, it should nonetheless be disregarded.

96    Our first task in this case, as a result, is to determine whether the clause is enforceable using contractual principles. In my respectful view, the clause is not enforceable under the principles set out in the first step of *Pompey*.

97    In deciding whether a clause is unenforceable for reasons of public policy, the court decides "when the values favouring enforceability are outweighed by values that society holds to be more important" (Stephen Waddams, *The Law of Contracts* (6th ed. 2010), at para. 560). As Prof. McCamus notes, "[a]greements contrary to public policy at common law rest on a judicial determination that the type of agreement in question is sufficiently inconsistent with public policy that it should be treated as unenforceable" (John D. McCamus, *The Law of Contracts* (2nd ed. 2012), at p. 453).

98    I accept that certainty and predictability generally favour the enforcement at common law of contractual terms, but it is important to put this forum selection clause in its contractual context. We are dealing here with an online *consumer* contract of adhesion. Unlike *Pompey*, there is virtually no opportunity on the part of the consumer to negotiate the terms of the clause. To become a member of Facebook, one must accept all the terms stipulated in the terms of use. No bargaining, no choice, no adjustments.

99      Online contracts such as the one in this case put traditional contract principles to the test. What does "consent" mean when the agreement is said to be made by pressing a computer key? Can it realistically be said that the consumer turned his or her mind to all the terms and gave meaningful consent? In other words, it seems to me that some legal acknowledgment should be given to the automatic nature of the commitments made with this kind of contract, not for the purpose of invalidating the contract itself, but at the very least to intensify the scrutiny for clauses that have the effect of impairing a consumer's access to possible remedies.

100     As Prof. Waddams has pointed out:

> ... there may be scope for application of the concept of public policy in respect of unfair clauses that oust the jurisdiction of the court. It would be open to a court to say that, although arbitration and choice of forum clauses are acceptable if freely agreed by parties of equal bargaining power, *there is reason for the court to scrutinize the reality of the agreement with special care in the context of consumer transactions and standard forms*, since these are clauses that, on their face, offend against one of the traditional heads of public policy.

> [Emphasis added.]

> (Waddams (2012), at p. 483. See also Judith Resnik, "Procedure as Contract" (2005), 80 *Notre Dame L. Rev.* 593; Woodward, at p. 46.)

101     Much has been written about the burden of forum selection clauses on consumers and their ability to access the court system. They were described by Prof. Edward Purcell as creating "an egregious disproportionality" (Edward A. Purcell, Jr., "Geography as a Litigation Weapon: Consumers, Forum-Selection Clauses, and the Rehnquist Court" (1992), 40 U.C.L.A. L. Rev. 423, at p. 514). They range from added costs, logistical impediments and delays, to deterrent psychological effects. Prof. Purcell refers to these constraints as "burdens of distance" or "burdens of geography":

> The deterrent effects of geography are numerous and weighty. The threshold task of merely retaining counsel in a distant location, which may seem routine to attorneys and judges, is profoundly daunting to ordinary people. The very decision to retain an attorney is so troublesome, in fact, that most claimants are content to accept a settlement without one. The result of that commonplace decision, as numerous studies have repeatedly shown, is that such claimants almost invariably obtain much less from their adversaries than they otherwise would. If claimants learn, perhaps from company representatives they contact, that they must retain an attorney in a distant contractual forum in order to initiate a legal action on their claims, that information alone may dissuade a significant number from proceeding and lead them to accept whatever offer, if any, the company might make.

> . . . . .

> Once litigation begins, the process quickly piles on additional burdens. One is the obvious need to travel and communicate over long distances, which makes the suit more costly as well as more inconvenient in terms of both litigation planning and client-attorney consultation. Another is the compounded costs and risks created by the attorney's need to communicate with the client's witnesses and to prepare them for depositions and trial testimony. The party may either have to pay additional travel costs for in-person meetings or risk the creation of potentially discoverable documents that could spur additional and costly motion practice and, if disclosed, weaken the party's position in negotiations and at trial. A third burden is the likely additional delays involved in prosecuting the case, as distance and inconvenience combine to complicate various pretrial events and to remove from the attorney the spur of a human client who can or does present himself in person at his attorney's office. A fourth burden is the added cost of participating in a distant trial, including the costs and risks involved in securing the attendance of witnesses at such a location. *All of these burdens will be especially heavy if the plaintiff's claim arises from events in his home state and many or all of his witnesses reside there.*

> . . . . .

> A final burden is the risk that the cumulative effect of some or all of the preceding complications may combine to so hamper the party's trial preparations that he will ultimately feel compelled to "cave" on the courthouse steps or end up putting on a materially weaker case than he otherwise would have. If settlement comes after full pretrial discovery and

motion practice, costs will consume a larger proportion of any settlement payment.... The risks of geography increase the likelihood of such unfavorable outcomes, and that ultimate concern further compounds the pressures that push nonresident claimants toward earlier and less favorable settlements.

The burdens of geography are thus numerous and heavy. They are emotional as well as financial. Some are readily apparent, while others are subtle and surely unmeasurable. When placed on individuals who lack relevant interstate connections and experience or who lack extraordinary personal or financial resources, however, their *de facto* impact as a general matter is severe and certain. They impose sharp discounts on the value of the claims involved and discourage large numbers of plaintiffs from attempting to enforce their legal rights.

[Emphasis added; pp. 446-49.]

(See also Catherine Walsh, "The Uses and Abuses of Party Autonomy in International Contracts" (2010), 60 *U.N.B.L.J.* 12, at p. 20.)

102    As Prof. William Woodward has observed:

... unless the case is a large one or the "chosen" forum convenient, a choice-of-forum clause can eliminate a customer's legal claim entirely. Only in theory can a customer make a cross-country trip to pursue a $100 warranty claim. [p. 17]

103    These concerns are what motivated the statutory protections found in art. 3149 of the *Civil Code of Québec*, which render forum selection clauses in consumer or employment contracts unenforceable:

**3149.** Québec authorities also have jurisdiction to hear an action based on a consumer contract or a contract of employment if the consumer or worker has his domicile or residence in Québec; the waiver of such jurisdiction by the consumer or worker may not be set up against him.

104    In general, then, when online consumer contracts of adhesion contain terms that unduly impede the ability of consumers to vindicate their rights in domestic courts, particularly their quasi-constitutional or constitutional rights, in my view, public policy concerns outweigh those favouring enforceability of a forum selection clause.

105    Public policy concerns relating to access to domestic courts are especially significant in this case given that we are dealing with a fundamental right like privacy. In *UFCW, Local 401 v. Alberta (Information and Privacy Commissioner)*, [2013] 3 S.C.R. 733 (S.C.C.), this Court acknowledged the quasi-constitutional status of legislation relating to privacy protection:

The ability of individuals to control their personal information is intimately connected to their individual autonomy, dignity and privacy. These are fundamental values that lie at the heart of a democracy. As this Court has previously recognized, legislation which aims to protect control over personal information should be characterized as "quasi-constitutional" because of the fundamental role privacy plays in the preservation of a free and democratic society .... [para. 19]

106    The Privacy Act in British Columbia sought to protect individuals from invasions of privacy by introducing two new torts:

• Using the name or portrait of another person for the purpose of advertising property or services, or promoting their sale or other trading in them, without that person's consent; [s. 3(2)]

• Wilfully violating the privacy of another person. [s. 1(1)]

107    Section 4 of the Privacy Act states that these torts "must be heard and determined by the Supreme Court" despite anything contained in another *Act*. Section 4 is a statutory recognition that privacy rights under the British Columbia Privacy Act are entitled to protection in British Columbia by judges of the British Columbia Supreme Court. I do not, with respect, accept Facebook's argument that s. 4 gives the Supreme Court of British Columbia exclusive jurisdiction only vis-à-vis other courts *within* the province of British Columbia. What s. 4 grants is exclusive jurisdiction to the Supreme Court of British Columbia

to the exclusion not only of other courts in British Columbia, but to the exclusion of all other courts, within and outside British Columbia. That is what exclusive jurisdiction means.

108     Where a legislature grants exclusive jurisdiction to the courts of its own province, it overrides forum selection clauses that may direct the parties to another forum (see *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, [2005] 2 S.C.R. 401(S.C.C.), at para. 25). It would, in my respectful view, be contrary to public policy to enforce a forum selection clause in a consumer contract that has the effect of depriving a party of access to a statutorily mandated court. To decide otherwise means that a clear legislative intention can be overridden by a forum selection clause. This flies in the face of *Pompey*'s acknowledgment that legislation takes precedence over a forum selection clause (*Pompey*, at para 39).

109     The approach used by Wittmann A.C.J.Q.B. in *Zi Corp. v. Steinberg* (2006), 396 A.R. 157(Alta. Q.B.) is apposite. The Alberta Court of Queen's Bench declined to enforce a forum selection clause mandating proceedings in Florida, because s. 180(1) [1] of the Alberta Securities Act, R.S.A. 2000, c. S-4, granted jurisdiction to the Court of Queen's Bench for applications under that provision. Wittmann A.C.J.Q.B. concluded that the effect of giving jurisdiction to the Court of Queen's Bench meant that it had exclusive jurisdiction *both within and outside Alberta*. In reaching his conclusion, Wittmann A.C.J.Q.B. relied on years of jurisprudence interpreting similar provisions as granting exclusive jurisdiction to the courts of a particular province to hear claims for oppression remedies (see also *Gould v. Western Coal Corp.* (2012), 7 B.L.R. (5th) 19(Ont. S.C.J.), at paras. 319-39; *Ironrod Investments Inc. v. Enquest Energy Services Corp.*, 2011 ONSC 308(Ont. S.C.J. [Commercial List]); Inc. Broadcasters Ltd. v. Canwest Global Communications Corp.200120 B.L.R. (3d) 289Ont. S.C.J. [Commercial List], at paras. 112-17, aff'd 200363 O.R. (3d) 431(Ont. C.A.); *Takefman v. Golden Hope Mines Ltd.*, 2015 QCCS 4947(C.S. Que.); Nord Resources Corp. v. Nord Pacific Ltd.200337 B.L.R. (3d) 115(N.B. Q.B.)).

110     Any uncertainty about the legislature's intention that privacy rights under the British Columbia Privacy Act be heard by the Supreme Court in British Columbia is dispelled by the introductory words in s. 4: "Despite anything contained in another Act ..." That reflects a clear statutory intention that exclusive jurisdiction over the enforcement of the *Privacy Act* be retained by the Supreme Court despite what any other legislation states. It would defy logic to think that the legislature sought to protect the British Columbia Supreme Court's exclusivity from the reach of other statutes, but not from the reach of forum selection clauses in private contracts.

111     Tied to these public policy concerns is the "grossly uneven bargaining power" of the parties. Facebook is a multi-national corporation which operates in dozens of countries. Ms. Douez, a videographer, is a private citizen. She had no input into the terms of the contract and, in reality, no meaningful choice as to whether to accept them given Facebook's undisputed indispensability to online conversations. As Prof. Cheryl Preston noted: "... if one's family, friends, and business associates are on Facebook ... using a competitor's service is not a reasonable choice" (Cheryl B. Preston, "'Please Note: You Have Waived Everything': Can Notice Redeem Online Contracts?" (2015), 64 Am. U. L. Rev. 535, at p. 554).

112     The doctrine of unconscionability, a close jurisprudential cousin to both public policy and gross bargaining disparity, also applies to render the forum selection clause unenforceable in this case.

113     This Court confirmed in *Tercon* that unconscionability can be used to invalidate a single clause within an otherwise enforceable contract (*Tercon Contractors Ltd. v. British Columbia (Minister of Transportation & Highways)*, [2010] 1 S.C.R. 69(S.C.C.), at para. 122).

114     As Prof. McCamus notes, the doctrine of unconscionability is a useful tool for addressing the enforceability of some clauses in consumer contracts of adhesion:

> ... the doctrine of the unconscionable term may provide a common law device, long awaited by some, that can ameliorate the harsh impact of unfair terms in boilerplate or "adhesion" contracts, offered particularly in the context of consumer transactions on a take-it-or-leave-it basis. [Footnote omitted; p. 444.]

(See also Jean Braucher, "Unconscionability in the Age of Sophisticated Mass-Market Framing Strategies and the Modern Administrative State" (2007), 45 *Can. Bus. L.J.* 382.)

115    Two elements are required for the doctrine of unconscionability to apply: inequality of bargaining powers and unfairness. Prof. McCamus describes them as follows:

> ... one must establish both inequality of bargaining power in the sense that one party is incapable of adequately protecting his or her interests *and* undue advantage or benefit secured as a result of that inequality by the stronger party.

> [Emphasis added; pp. 426-27.]

116    In my view, both elements are met here. The inequality of bargaining power between Facebook and Ms. Douez in an online contract of adhesion gave Facebook the unilateral ability to require that any legal grievances Ms. Douez had, could not be vindicated in British Columbia where the contract was made, but only in California where Facebook has its head office. This gave Facebook an unfair and overwhelming procedural — and potentially substantive — benefit. This, to me, is a classic case of unconscionability.

117    For all these reasons, the forum selection clause is unenforceable under the first step of the *Pompey* test.

118    I would allow the appeal with costs throughout and dismiss Facebook's application for a stay of proceedings.

*McLachlin C.J.C., Côté J.* **(Moldaver J. concurring):**

119    The respondent, Facebook, Inc., is a successful global corporation based in California. It operates a social media website (www.facebook.com) used by millions of users throughout the world. Facebook's website allows users to establish their own "facebook", through which they communicate with "friends", with whom they share news, information, opinions, photos and videos.

120    To become a Facebook user, a person must enter into a contract with Facebook. The appellant, Deborah Louise Douez wanted to become a Facebook user. When Ms. Douez chose to sign up as a user of Facebook, she agreed to Facebook's terms of use, which included a forum selection clause. A version of the clause provides:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for purpose of litigating all such claims. [A.R., vol. II, at p. 138]

121    Ms. Douez wants to start a class action against Facebook. She says that Facebook used her name and face in an advertising product called "Sponsored Stories", without her consent, contrary to s. 3(2) of the Privacy Act, R.S.B.C. 1996, c. 373, which creates a statutory tort of invasion of privacy. Facebook, for its part, says it obtained Ms. Douez's consent through the "terms of use" to which she consented in her contract with Facebook.

122    The question on this appeal concerns the place where the lawsuit should be heard. Facebook argues that the dispute must be tried before a state or federal court in Santa Clara County, California, as Ms. Douez agreed to in her contract with Facebook. Ms. Douez, on the other hand, argues that the lawsuit should be tried in British Columbia. She does not dispute that she agreed by contract to have all disputes with Facebook tried in California. However, she argues that the clause should not be enforced against her.

123    The issue assumes great importance in a world where millions of people routinely enter into online contracts with corporations, large and small, located in other countries. Often these contracts contain a forum selection clause, specifying that

any disputes must be resolved by the corporation's choice of court. In this way, global corporations, be they American, Canadian or from some other country, seek to ensure that they are not dragged into litigation in foreign countries.

124    The principles of private international law support the enforcement of forum selection clauses, while recognizing that in exceptional cases courts may decline to enforce them. Forum selection clauses provide certainty and predictability in cross-border transactions. When parties agree to a jurisdiction for the resolution of disputes, courts will give effect to that agreement, unless the claimant establishes "strong cause" for not doing so.

125    We see no need to depart from the settled principles of private international law on forum selection clauses — principles repeatedly confirmed by courts around the world, including the Supreme Court of Canada. The simple question in this case, as we see it, is whether Ms. Douez has shown "strong cause" for not enforcing the forum selection clause to which she agreed. We agree with the Court of Appeal of British Columbia that strong cause has not been shown, and that the action must be tried in California, as the contract requires. A stay of the underlying claim should be entered.

**I. Forum Selection Clauses and Forum Non Conveniens**

126    The test for the enforcement of forum selection clauses in contracts was settled by this Court 14 years ago in *Z.I. Pompey Industrie v. ECU-Line N.V.*, 2003 SCC 27, [2003] 1 S.C.R. 450 (S.C.C.). The inquiry proceeds in two steps. First, the court must determine whether the forum selection clause is enforceable and applies to the circumstances: *Pompey*, at para. 39; *Preymann v. Ayus Technology Corp.*, 2012 BCCA 30, 32 B.C.L.R. (5th) 391 (B.C. C.A.), at para. 43. Second, the court must assess whether there is strong cause in favour of denying a stay, despite the enforceable forum selection clause: *Pompey*, at paras. 19 and 39.

127    Ms. Douez argues that the courts should not apply the settled *Pompey* test to her case. Instead, she argues, they should consider the forum selection clause within the context of the Court Jurisdiction and Proceedings Transfer Act, S.B.C. 2003, c. 28 ("CJPTA"). We disagree.

128    Section 11 of the CJPTA outlines the circumstances in which a court may decline jurisdiction where there is a more appropriate forum. It deals with the situation where two different courts have jurisdiction, and provides instructions to settle which of the two courts should take jurisdiction. It provides:

> **11** (1) After considering the interests of the parties to a proceeding and the ends of justice, a court may decline to exercise its territorial competence in the proceeding on the ground that a court of another state is a more appropriate forum in which to hear the proceeding.
>
> (2) A court, in deciding the question of whether it or a court outside British Columbia is the more appropriate forum in which to hear a proceeding, must consider the circumstances relevant to the proceeding, including
>
>> (a) the comparative convenience and expense for the parties to the proceeding and for their witnesses, in litigating in the court or in any alternative forum,
>>
>> (b) the law to be applied to issues in the proceeding,
>>
>> (c) the desirability of avoiding multiplicity of legal proceedings,
>>
>> (d) the desirability of avoiding conflicting decisions in different courts,
>>
>> (e) the enforcement of an eventual judgment, and
>>
>> (f) the fair and efficient working of the Canadian legal system as a whole.

As this Court noted in *Lloyd's Underwriters v. Cominco Ltd.*, 2009 SCC 11, [2009] 1 S.C.R. 321 (S.C.C.), at para. 22, "[s.] 11 of the *CJPTA* ... constitutes a complete codification of the common law test for *forum non conveniens*. It admits of no exceptions."

129     This code for deciding which of two available jurisdictions should, as a matter of convenience, take jurisdiction, does not apply to oust forum selection clauses. Where the parties have agreed in advance to a choice of forum, there is no need to inquire into which of two forums is the more convenient; the parties have settled the matter by their contract, unless the contractual clause is invalid or inapplicable (the first step of the *Pompey* test) or should not be applied because the plaintiff has shown strong cause not to do so (the second step of the *Pompey* test). In such cases, the duty of the court is to enforce the contractual agreement, unless the plaintiff shows strong cause otherwise.

130     What Ms. Douez suggests, in effect, is that the two-part *Pompey* test be changed for a unified test that would apply forum selection clauses as an element of the *forum non conveniens* test. This Court rejected this very contention in *Pompey*. Justice Bastarache stated that he was "not convinced that a unified approach to *forum non conveniens*, where a choice of jurisdiction clause constitutes but one factor to be considered, is preferable" (para. 21). He shared the concerns expressed by author, Edwin Peel that such an approach would not give full weight to forum selection clauses because other factors weigh in the balance — factors that the parties must be deemed already to have considered when they agreed to a forum selection clause: E. Peel, "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] L.M.C.L.Q. 182.

131     We therefore agree with the British Columbia and Saskatchewan Courts of Appeal that *Pompey* continues to apply when the courts consider forum selection clauses: see *Viroforce Systems Inc. v. R & D Capital Inc.*, 2011 BCCA 260, 336 D.L.R. (4th) 570(B.C. C.A.), at para. 14; *Preymann*, at para. 39; *Frey v. Bell Mobility Inc.*, 2011 SKCA 136, 377 Sask. R. 156 (Sask. C.A.), at paras. 112-14; *Hudye Farms Inc. v. Canadian Wheat Board*, 2011 SKCA 137, 377 Sask. R. 146 (Sask. C.A.), at para. 10. While the *CJPTA* is a complete codification of the common law related to *forum non conveniens*, it does not supplant the common law principles underlying the enforcement of forum selection clauses. Where the parties have agreed to a forum selection clause, the court must apply that clause unless the test in *Pompey* is satisfied. If the test is satisfied and the forum selection clause is inapplicable, the result is a situation where there are two competing possibilities for forum. At this point, the *CJPTA* which codifies the common law provisions for *forum non conveniens* applies.

132     *Pompey* is considered first. Since we conclude that the test in *Pompey* is not satisfied, s. 11 of the CJPTA does not assist Ms. Douez.

**II. Step One: Is the Forum Selection Clause Enforceable?**

133     Having rejected Ms. Douez's contention that the *Pompey* test should be rolled into the codified provisions for *forum non conveniens*, the next step is to apply the two-part *Pompey* framework.

134     The first step in the *Pompey* test asks whether the forum selection clause is enforceable and applies in the circumstances. Facebook bears the burden of establishing this. In our opinion, Facebook has discharged this burden. On its face, the answer is affirmative. The language of the clause is clear and appears to cover all disputes, including this one.

135     Ms. Douez suggests three reasons why the forum selection clause is invalid or inapplicable to her situation. None of them withstand scrutiny. First, she argues that the forum selection clause was not brought to her attention. Second, she argues that the terms of use are unclear. Third, she argues that s. 4 of the Privacy Act renders the forum selection clause unenforceable. Abella J. adds a fourth; that the forum selection clause offends public policy. In our view, these arguments are not persuasive.

136     The first argument is that the forum selection clause is unenforceable because Ms. Douez was simply invited to give her consent to the clause by clicking on it, without her attention being drawn to its specific language. In other words, she is not bound because electronic clicking without more does not indicate her agreement to the forum selection clause.

137     We cannot accede to this submission. In British Columbia, s. 15(1) of the Electronic Transactions Act, S.B.C. 2001, c. 10, codifies the common law rule set out in *Rudder v. Microsoft Corp.* (1999), 2 C.P.R. (4th) 474 (Ont. S.C.J.), and establishes that an enforceable contract may be formed by clicking an appropriately designated online icon:

**15** (1) Unless the parties agree otherwise, an offer or the acceptance of an offer, or any other matter that is material to the formation or operation of a contract, may be expressed

. . . . .

(b) by an activity in electronic form, including touching or clicking on an appropriately designated icon or place on a computer screen or otherwise communicating electronically in a manner that is intended to express the offer, acceptance or other matter.

138      Ms. Douez relies on Berkson v. Gogo LLC97 F.Supp.3d 359(U.S. Dist. Ct. E.D. N.Y. 2015), at para. 22, where a U.S. district court, in the absence of legislation on electronic formation of contract, adopted a four-step procedure to determine whether a contract was formed by accepting terms of use online. In British Columbia, s. 15(1) of the Electronic Transactions Act answers the question, providing that clicking on a screen suffices to indicate acceptance.

139      Ms. Douez's second contention is that the terms of use contradict the forum selection clause, rendering it unclear. She points to the provision that Facebook will "strive to respect local laws", and suggests that this requires Facebook to defer to s. 4 of the British Columbia Privacy Act, which grants the Supreme Court of British Columbia subject matter jurisdiction over *Privacy Act* claims, to the exclusion of other tribunals. The tension between the strict terms of the forum selection clause in the contract, and the provision that Facebook will "strive to respect local laws", introduces an ambiguity, rendering the forum selection clause unenforceable, Ms. Douez contends.

140      This argument cannot succeed. The contract on its face is clear. There is no inconsistency between a commitment to "strive" to apply local laws and an agreement that disputes will be tried in California. A forum selection clause does not disrespect the laws of British Columbia.

141      This brings us to Ms. Douez's third argument — that s. 4 of the Privacy Act invalidates forum selection clauses for actions under this Act. Section 4 provides that "an action under [the *Privacy Act*] must be heard and determined by the Supreme Court [of British Columbia]". Ms. Douez argues that this clause amounts to a stipulation that all actions under this Act must be heard in British Columbia, with the result that forum selection clauses providing other jurisdictions are invalid.

142      We do not agree. Section 4 of the Privacy Act grants the Supreme Court of British Columbia subject matter jurisdiction over *Privacy Act* claims to the exclusion of other British Columbia courts. Nothing in the language of s. 4 suggests that it can render an otherwise valid contractual term unenforceable.

143      We do not dispute that legislation can limit the scope of forum selection clauses or render them altogether unenforceable: see Pompey, at para. 38. Nor do we dispute that some jurisdictions have adopted a "protective model" limiting the impact of forum selection clauses in consumer contracts: Z. S. Tang, *Electronic Consumer Contracts in the Conflict of Laws* (2nd ed. 2015), at p. 357. However, when they have done so, they have used clear language. For example, *Regulation (E.U.) No. 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast)*, [2012] O.J. L.351/1, provides consumers with a positive right to bring proceedings in his or her home state (art. 18), unless the clause was agreed to after a dispute had arisen, provides additional forum options to the consumer, or concerns parties resident in the same state (art. 19). The *Civil Code of Québec* is more absolute: art. 3149 provides that Québec courts have jurisdiction to hear actions based on consumer contracts, and that "the waiver of such jurisdiction by the consumer or worker may not be set up against him".

144      The British Columbia legislature has not adopted the "protective model" approach. It has not legislated an absolute or limited right to bring an action in British Columbia, in the face of a forum selection clause stipulating a different jurisdiction. It has focussed not on where the action can be brought, but on the protection of consumer rights in the Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2 ("BPCPA"). The choice to focus on rights rather than forum was made after this Court's decision in *Pompey*. Section 3 of the BPCPA provides that "[a]ny waiver or release by a person of the person's rights, benefits or protections under this Act is void except to the extent that the waiver or release is expressly permitted by this Act." If the legislature had intended to render forum selection clauses inoperable for claims made under the *Privacy Act*, it would have

said so expressly: see *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, 2005 SCC 46, [2005] 2 S.C.R. 401 (S.C.C.), at para. 25. Courts are obliged to respect this choice.

145    Ms. Douez does not argue that the forum selection clause is unconscionable. Such an argument would have to be based on evidence (see Pompey, at para. 29); none was adduced in this case. Inequality of bargaining power, even if it were established here, does not, on its own, give the court reason to interfere with the freedom to contract. As noted by Angela Swan and Jakub Adamski in *Canadian Contract Law* (3rd ed. 2012), at § 9.114:

> The mere fact that, as might happen in very many transactions, the parties are not equally competent in looking after their own interests or equally informed is not a basis for relief. There has to be, as has been suggested, some relation of dependence or likelihood of undue influence, *i.e.*, some element of procedural unconscionability, inequality or unfairness, *and* a bad bargain, *i.e.*, some element of substantive unfairness.

> [Emphasis in original.]

146    Finally, we come to the argument that forum selection clauses violate public policy and should therefore be treated as invalid and inapplicable. This contention, too, cannot prevail.

147    It is unclear to us how a court can invalidate a contractual provision simply because the court finds it is contrary to public policy in the abstract. While the court can refuse to enforce otherwise valid contractual provisions that offend public policy, the party seeking to avoid enforcement of the clause must prove "the existence of an overriding public policy ... that outweighs the very strong public interest in the enforcement of contracts": *Tercon Contractors Ltd. v. British Columbia (Minister of Transportation & Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69 (S.C.C.), at para. 123 (per Binnie J., in dissent, but not on this point). In our view, no such overriding public policy is found on the facts of this case.

148    Forum selection clauses, far from being unconscionable or contrary to public policy, are supported by strong policy considerations. Forum selection clauses are well-established and routinely enforced around the world: see e.g. *Donohue v. Armco Inc.*, [2001] UKHL 64, [2002] 1 All E.R. 749 (U.K. H.L.), at para. 24; Atlantic Marine Const. Co. Inc. v. U.S. Dist. Court for Western Dist. of Texas134 S.Ct. 568(U.S. Sup. Ct. 2013), at pp. 581-82, citing M/S Bremen v. Zapata Off-Shore Co.407 U.S. 1 (1972), at pp. 17-18; Akai Pty Ltd. v People's Insurance Co. (1996) 188 C.L.R. 418, at pp. 441-42 (H.C.A.); Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd.[1997] 1 N.Z.L.R. 186(New Zealand C.A.). Forum selection clauses serve an important role of increasing certainty and predictability in transactions that take place across borders. The fact that a contract is in standard form does not affect the validity of such a clause: *Pompey*, at para. 28; Carnival Cruise Lines Inc. v. Shute499 U.S. 585(U.S. Sup. Ct. 1991), at pp. 593-94.

149    That is not to say that forum selection clauses will always be given effect by the courts. As Abella J. notes, "burdens of distance" and "burdens of geography" may render the application of a forum selection clause unfair in the circumstances. However, those considerations are relevant at the second step of *Pompey*, not the first. As we discuss below, a court in assessing strong cause can consider the relative convenience and expense of local and foreign courts, as well as any prejudice a plaintiff might suffer in being forced to bring their claim in a foreign court: see *"Eleftheria" (The) (Cargo Owners) v. "Eleftheria" (The)*, [1969] 1 Lloyd's Rep. 237(Eng. P.D.A.), at p. 242. But these considerations play no role at the first step of the *Pompey* test.

150    We conclude that the forum selection clause is valid and applicable and that the first step of the *Pompey* test has been met. It remains to determine whether Ms. Douez has shown strong cause why it should not be given effect.

**III. Step Two: Has Ms. Douez Shown Strong Cause?**

151    We have concluded that step one of the *Pompey* test has been met: Facebook has established that the forum selection clause is enforceable and applies to these circumstances. It remains to ascertain whether Ms. Douez has established strong cause why the clause should not be enforced in this case.

152     The strong cause exception to the enforceability of forum selection clauses confers a discretion on the judge, to be exercised in accordance with settled factors, to decline to enforce the clause. The strong cause test means that forum selection clauses are enforced, upholding predictability and certainty, unless the plaintiff shows that enforcement of the clause would unfairly deny her an opportunity to seek justice.

153     The party seeking to displace the forum selection clause bears the burden of establishing strong cause. There are good reasons for this. First, enforceability of forum selection clauses is the rule, setting them aside the exception. Generally, parties seeking an exceptional exemption must show grounds for what they seek. Second, it is the party seeking the exception who is in the best position to argue why it should be granted, not for the party seeking to rely on the rule to show why the rule should not be vacated; generally, burdens fall on the party asserting a proposition and in the best position to prove it. Reversing the burden would require a defendant to prove a negative — that "strong cause" does not exist. This would ask a defendant to anticipate and counter all the arguments a plaintiff might raise in support of there being strong cause. Finally, to reverse the burden would undermine the general rule that forum selection clauses apply and introduce uncertainty and expense into commercial transactions that span international borders. It would detract from the "certainty and security in transaction" that is critical to private international law (*Pompey*, at paras. 20 and 25). For many businesses, having to prove in a foreign country why there is not strong cause would render the contract costly and in many cases, practically unenforceable. Businesses, small suppliers as well as giants like Facebook, would be required to amass proof of a negative in a host of foreign countries. Accordingly, the law in Canada and elsewhere has consistently held that it is the plaintiff — the party seeking to set aside the forum selection clause — who bears the burden of showing strong cause for not giving effect to the enforceable forum selection clause by entering a stay of proceedings: *Pompey*, at para. 25; *"Eleftheria"*, at p. 242.

154     In *Pompey*, Bastarache J. explained the reasons for embracing the strong cause test and the burden on the plaintiff to prove strong cause (para. 20):

> These clauses are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law .... In the context of international commerce, order and fairness have been achieved at least in part by application of the "strong cause" test. This test rightly imposes the burden on the plaintiff to satisfy the court that there is good reason it should not be bound by the forum selection clause. It is essential that courts give full weight to the desirability of holding contracting parties to their agreements. There is no reason to consider forum selection clauses to be non-responsibility clauses in disguise. In any event, the "strong cause" test provides sufficient leeway for judges to take improper motives into consideration in relevant cases and prevent defendants from relying on forum selection clauses to gain an unfair procedural advantage.

155     This brings us to what the plaintiff must show to establish strong cause why a forum selection clause should not be enforced. The factors that govern the judge's exercise of his discretion were set out in *"Eleftheria"*, at p. 242, and were adopted in Pompey, at para. 19, per Bastarache J.:

> (1) Where plaintiffs sue in England in breach of an agreement to refer disputes to a foreign Court, and the defendants apply for a stay, the English Court, assuming the claim to be otherwise within the jurisdiction, is not bound to grant a stay but has a discretion whether to do so or not.

> (2) The discretion should be exercised by granting a stay unless strong cause for not doing so is shown.

> (3) The burden of proving such strong cause is on the plaintiffs.

> (4) In exercising its discretion the Court should take into account all the circumstances of the particular case.

> (5) In particular, but without prejudice to (4), the following matters, where they arise, may be properly regarded:

>> (a) In what country the evidence on the issues of fact is situated, or more readily available, and the effect of that on the relative convenience and expense of trial as between the English and foreign Courts.

(b) Whether the law of the foreign Court applies and, if so, whether it differs from English law in any material respects.

(c) With what country either party is connected, and how closely.

(d) Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantages.

(e) Whether the plaintiffs would be prejudiced by having to sue in the foreign Court because they would

  (i) be deprived of security for that claim;

  (ii) be unable to enforce any judgment obtained;

  (iii) be faced with a time-bar not applicable in England; or

  (iv) for political, racial, religious or other reasons be unlikely to get a fair trial.

156    Applying these factors to the case at bar, it is clear that the motions judge should not have found strong cause for not enforcing the forum selection clause to which Ms. Douez agreed. The court must consider all the circumstances of the case. None of the circumstances relied on by Ms. Douez show strong cause why the forum selection clause should not be enforced.

157    The analysis starts with the proposition that the discretion should be exercised by enforcing the forum selection clause unless the plaintiff shows strong cause for not doing so. Strong cause means what it says — it is not any cause, but strong cause. The default position is that forum selection clauses should be enforced.

158    There is good reason for this. By offering services across borders, online companies risk uncertainty and unpredictability of the possible jurisdictions in which they may face legal claims. Professor Geist (M. A. Geist, "Is There a There There? Toward Greater Certainty for Internet Jurisdiction" (2001), 16 *B.T.L.J.* 1345 describes this risk:

  Since websites are instantly accessible worldwide, the prospect that a website owner might be haled into a courtroom in a far-off jurisdiction is much more than a mere academic exercise; it is a very real possibility. [p. 1347]

159    Other commentators point out that since online companies do not know in advance where their customers are located, it is difficult for them to proactively determine jurisdiction issues in advance: Z. Tang, "Exclusive Choice of Forum Clauses and Consumer Contracts in E-commerce" (2005), 1 *J. Priv. Int. L.* 237. In our view, these risks are best addressed through adherence to the existing system of private international law that has been carefully developed over decades to provide a measure of certainty, order, and predictability. Requiring the plaintiff to demonstrate strong cause is essential for upholding certainty, order, and predictability in private international law, especially in light of the proliferation of online services provided across borders. Holding otherwise would ask the court to ignore valid and enforceable, contractual terms.

160    It is not only large multi-national corporations like Facebook that benefit from emphasizing the need for order in private international law. The intervener, Information Technology Association of Canada, points out that small and medium-sized businesses benefit from the certainty that flows from enforcing forum selection clauses, and that by reducing litigation risk they can generate savings that can be passed on to consumers. Facebook adds that the certainty which comes with enforcement of forum selection clauses allows foreign companies to offer online access to Canadians. In our view, these benefits accrue to online businesses of all sizes, and in all locations.

161    We cannot help but note our profound disagreement with the suggestion in the reasons of Karakatsanis, Wagner and Gascon JJ., that forum selection clauses are inherently contrary to public policy. They state: "... forum selection clauses divert public adjudication of matters out of the provinces, and court adjudication in each province is a public good" (para. 25). The

overwhelming weight of international jurisprudence shows that, far from being a subterfuge to deny access to justice, forum selection clauses are vital to international order, fairness and comity.

162    We turn now to the specific factors that *Pompey* directs the court to consider in determining whether the plaintiff has established strong cause for not enforcing the forum selection clause.

163    First, Ms. Douez has not shown that the facts in the case and the evidence to be adduced shifts the balance of convenience from the contracted state of California to British Columbia. The evidence in the case may be expected to revolve around Facebook's use of Ms. Douez's photo and name in its advertisement without her consent. This involves Facebook's conduct from its headquarters in California. Facebook's defence is that Ms. Douez consented, not by her actions in British Columbia, but by agreeing to the terms of use. The issue is a legal matter of construing the contract. There is no basis for suggesting this factor shows strong cause to oust the forum selection clause.

164    Our colleague Abella J. makes reference to the "burdens of distance" and the "burdens of geography" that a plaintiff may carry when faced with a forum selection clause. Similarly, Ms. Douez argued that setting aside the forum selection clause would increase consumers' access to justice. During oral argument, her counsel called it "a very important principle" (transcript, at p. 33), and in her factum she said that "no rational British Columbia resident would travel to California to litigate nominal damages claims" (A.F., at para. 90). Yet, there is no evidence regarding the "relative convenience and expense of trial" in California as compared to British Columbia. Strong cause cannot be established in absence of a sufficient evidentiary basis.

165    Nor does the applicable law show strong cause to override the forum selection clause, in our view. It is true that the law giving rise to the tort is a British Columbia statute. However, the British Columbia tort created by the *Privacy Act* does not require special expertise. The courts of California have not been shown to be disadvantaged in interpreting the Act as compared with the Supreme Court of British Columbia. The most the motions judge could say on this factor was that

> local courts may be more sensitive to the social and cultural context and background relevant to privacy interests of British Columbians, as compared to courts in a foreign jurisdiction. This could be important in determining the degree to which privacy interests have been violated and any damages that flow from this.

> (Trial reasons, 2014 BCSC 953, 313 C.R.R. (2d) 254, at para. 75)

If possible sensitivity to local context is sufficient to show strong cause, forum selection clauses will never be upheld where a tort occurs in a different country. What this factor contemplates is evidence that the local court will be better placed to interpret the legal provisions at issue than the court stipulated in the forum selection clause. Ms. Douez presented no such evidence.

166    Ms. Douez did not adduce any evidence of California law or California procedure related to either private international law or the adjudication of privacy claims. She did not provide evidence of California law related to territorial jurisdiction. Bauman C.J.B.C. described the vacuum thus (para. 77):

> In my opinion, Ms. Douez failed to provide the Court with any reason to conclude that this proceeding could not be heard in the courts of Santa Clara. There is no evidence in the record as to California private international law. This Court cannot conduct its own research and take judicial notice (see *Duchess di Sora v. Phillipps* (1863), 10 H.L. Cas. 624, (U.K.H.L.) at 640; *Bumper Development Corp. v. Commissioner of Police of the Metropolis*, [1991] 1 W.L.R. 1362(Eng. C.A.), at 1369).

A court should not be put in the position of having to speculate as to whether a California court would exercise its discretion to assume jurisdiction over a matter, whether that court would apply the laws of British Columbia, whether privacy laws in California are analogous to those in British Columbia, whether the procedural rules in California parallel those in British Columbia, or whether the remedies available in California would be capable of providing Ms. Douez with comparable remedies to what she might obtain in British Columbia. Without evidence, there is respectfully no basis for our colleagues Karakatsanis, Wagner and Gascon JJ. to raise the spectre of harms going "without remedy" (paras. 59 and 62).

24

167     The country with which the parties are connected does not establish strong cause. Facebook has its headquarters in California. Ms. Douez, while resident in British Columbia, was content to contract with Facebook at that location. Nothing in her situation suggests that the class action she wishes to commence could not be conducted in California just as easily as in British Columbia. To show strong cause to oust a foreign selection clause on the basis of residence, the plaintiff must point to more than the mere fact that she lives in the jurisdiction where she seeks to have the action tried. If this sufficed, forum selection clauses would be routinely held inoperative.

168     The next factor to consider is whether the defendant is merely seeking procedural advantages. If Ms. Douez could show that Facebook does not genuinely desire the trial to take place in California, but wants the trial there simply to gain procedural advantages over her, this might support her case that strong cause lies to oust the forum selection clause. However, she has not shown this. There is no suggestion that Facebook does not genuinely wish all litigation with users to take place in California. Indeed, it is clear it does so, for reasons of substance and convenience. The purpose of the forum selection clause is to avoid costly and uncertain litigation in foreign countries, which in turn would increase its costs and divert its energy.

169     Finally, Ms. Douez has not shown that application of the forum selection clause would deprive her of a fair trial because she would be deprived of security for the claim; be unable to enforce any judgment obtained; be faced with a time-bar not applicable in British Columbia; or because of political, racial, religious or other reasons. She does not and cannot take issue with the fact that the state of California has a highly developed and fair legal system, nor with the fact that she will get a fair trial there.

170     It is thus apparent that all the factors endorsed by this Court in *Pompey* point to enforcing the forum selection clause to which Ms. Douez agreed. None of them establish strong cause.

171     For this reason, Ms. Douez asks this Court to modify the strong cause test endorsed by this Court in *Pompey*. She urges two modifications. First, she suggests that "the strong cause test should be applied in a nuanced manner, accounting for parties' inherent inequality or consumers' lack of bargaining power" (A.F., at para. 71). Alternatively, she says that the test "should be modified to place the burden on the defendant in the context of consumer contracts of adhesion" (A.F., at para. 72). We cannot accept either of these proposals. They would amount to inappropriately overturning this Court's decision in *Pompey* and substituting new and different principles, and would introduce unnecessary and unprincipled uncertainty into the strong cause test.

172     Ms. Douez's first submission is that instead of considering the factors set out in *"Eleftheria"* and *Pompey* in determining whether strong cause not to enforce the forum selection clause has been established, the court should consider a different factor — the consumer's lack of bargaining power. Our colleagues Karakatsanis, Wagner and Gascon JJ. accept this argument. With respect, we disagree.

173     This argument conflates the first step of the test set out in *Pompey* with the second step, in a way that profoundly alters the law endorsed by this Court in *Pompey*. Consideration of "all the circumstances of the particular case" at the second step is not an invitation to blend the first step into the second. As discussed above, the party seeking to rely on the forum selection clause must first demonstrate that it is enforceable. It is at this step that inequality of bargaining power is relevant. Inequality of bargaining power may lead to a clause being declared unconscionable — something not argued in the case at bar. Short of unconscionability, the stronger party relying on a standard form contract faces the *contra proferentem* rule under which any ambiguity is resolved against them: *Ledcor Construction Ltd. v. Northbridge Indemnity Insurance Co.*, 2016 SCC 37, [2016] 2 S.C.R. 23 (S.C.C.), at para. 51. As we have said, concerns about inequality of bargaining power may inspire legislators to intervene by making forum selection clauses unenforceable — but the British Columbia legislature has chosen not to do so. There is no reason here to second guess this choice by conflating or modifying the *Pompey* analysis. In this case, Facebook has demonstrated that the forum selection clause is enforceable. We note parenthetically that the strength of the contention of unequal bargaining power seems tenuous, when one realizes that Ms. Douez received the Facebook services she wanted, for free and without any compulsion, practical or otherwise. Even if remaining "'offline' may not be a real choice in the Internet era", as suggested by our colleagues Karakatsanis, Wagner and Gascon JJ. (at para. 56), there is no evidence that foregoing

Facebook equates with being "offline". In any case, enforcement of the forum selection clause does not deprive Ms. Douez, or anyone else, of access to Facebook.

174    Ms. Douez's alternative suggestion of reversing the burden of proof is inconsistent with the principles underlying the strong cause test: certainty, security, and fairness (*Pompey*, at para. 20). These principles remain as relevant in the 21st century domain of global online social media as they were in the 20th century climate of international commercial shipping. The principles of order and fairness underpin private international law and "ensure security of transactions with justice": *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.), at p. 1097. The twin goals of justice and fairness in private international law are only achievable by enforcing rules that ensure security and predictability: *Van Breda v. Village Resorts Ltd.*, 2012 SCC 17, [2012] 1 S.C.R. 572 (S.C.C.), at paras. 73 and 75; see also *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.), at p. 1058. As already discussed, there are good reasons why this Court, like the courts in the United Kingdom and elsewhere, places the burden of showing strong cause for not enforcing a forum selection clause on the plaintiff seeking to avoid the clause.

175    Ms. Douez's submissions that we "nuance" *Pompey* or shift the burden of showing strong cause contrary to *Pompey*, are not supported by principle or policy. They would undermine certainty in private international law. And they amount to overruling this Court's decision in *Pompey*. This Court has established stringent criteria for departing from a previous decision of recent vintage: see e.g. *Fraser v. Ontario (Attorney General)*, 2011 SCC 20, [2011] 2 S.C.R. 3 (S.C.C.), at paras. 129-39; *R. v. Bernard*, [1988] 2 S.C.R. 833 (S.C.C.), at pp. 850-61; *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609 (S.C.C.), at paras. 45-46. Those conditions are not met here.

176    We conclude that Ms. Douez has failed to establish strong cause why the forum selection clause she agreed to should not be enforced.

## IV. Disposition

177    The forum selection clause is valid and enforceable, and Ms. Douez has not shown strong cause to not enforce it. We would dismiss her appeal.

*Appeal allowed.*

*Pourvoi accueilli.*

Footnotes

1    180(1) of the Securities Act, R.S.A. 2000, c. S-4, stated:

**180(1)** On the application of an interested person, the Court of Queen's Bench, where it is satisfied that a person or company has not complied with this Part or the regulations made in respect of this Part, may make an interim or final order
(a) compensating any interested person who is a party to the application for damages suffered as a result of a contravention of this Part or the regulations made in respect of this Part;

(b) rescinding a transaction with any interested person, including the issue of a security or a purchase and sale of a security;

(c) requiring any person or company to dispose of any securities acquired pursuant to or in connection with a bid;

(d) prohibiting any person or company from exercising any or all of the voting rights attaching to any securities;

(e) requiring the trial of an issue;

(f) respecting any matter not referred to in clauses (a) to (e) that the Court considers proper.

**EXHIBIT EN-5**

**TO THE DECLARATION OF EVAN NUTTALL**

1999 CarswellOnt 3195

Ontario Superior Court of Justice

Rudder v. Microsoft Corp.

1999 CarswellOnt 3195, [1999] O.J. No. 3778, [1999] O.J. No. 4275, 106 O.T.C. 381,
2 C.P.R. (4th) 474, 40 C.P.C. (4th) 394, 47 C.C.L.T. (2d) 168, 91 A.C.W.S. (3d) 745

**Michael Rudder and Mark La Rochelle, Plaintiffs and Microsoft Corporation, Defendant**

Winkler J.

Heard: October 4, 1999

Judgment: October 8, 1999 [*]
Docket: 97-CT-046534CP

Proceedings: additional reasons at (November 12, 1999), Doc. 97-CT-046534CP (Ont. S.C.J.)

Counsel: *Craig M. Houle*, for plaintiffs (respondents).
*Deborah Glendinning* and *Joseph Starkman*, for defendant (moving party).

**Winkler J.:**

1    This is a motion by the defendant Microsoft for a permanent stay of this intended class proceeding. The motion is based on two alternative grounds, first that the parties have agreed to the exclusive jurisdiction, and venue, of the courts in King County in the State of Washington in respect of any litigation between them, and secondly, that in any event, Ontario is not the appropriate forum for the conduct of this proceeding and that the service *ex juris* of the Statement of Claim ought to be set aside.

2    The Microsoft Network ("MSN"), is an online service, providing, *inter alia*, information and services including Internet access to its members. The service is provided to members, around the world, from a "gateway" located in the State of Washington through computer connections most often made over standard telephone lines.

3    The proposed representative plaintiffs in this action were subscriber members of MSN. Both are law school graduates, one of whom is admitted to the Bar in Ontario while the other worked as a legal researcher. They were associated with the law firm which originally represented the intended class. The plaintiffs claim under the *Class Proceedings Act*, 1992, S.O., C.6 on behalf of a Canada-wide class defined as:

All persons resident in Canada who subscribed for the provision of Internet access or information or services from or through MSN, The Microsoft Network, since September 1, 1995.

This class is estimated to contain some 89,000 MSN members across Canada.

4    The plaintiffs claim damages for breach of contract, breach of fiduciary duty, misappropriation and punitive damages in the total amount of $75,000,000.00 together with an accounting and injunctive relief. The plaintiffs allege that Microsoft has charged members of MSN and taken payment from their credit cards in breach of contract and that Microsoft has failed to provide reasonable or accurate information concerning accounts. The Statement of Claim was served on Microsoft at its offices in Redmond, Washington on January 5, 1998.

5    The contract which the plaintiffs allege to have been breached is identified by MSN as a "Member Agreement." Potential members of MSN are required to electronically execute this agreement prior to receiving the services provided by the company. Each Member Agreement contains the following provision:

15.1 This Agreement is governed by the laws of the State of Washington, U.S.A., and you consent to the exclusive jurisdiction and venue of courts in King County, Washington, in all disputes arising out of or relating to your use of MSN or your MSN membership.

The defendant relies on this clause in support of its assertion that the intended class proceeding should be permanently stayed.

6    Although the plaintiffs rely on the contract as the basis for their causes of action, they submit that the court ought not to give credence to the "forum selection clause" contained within. It is stated in support of this contention that the representative plaintiffs read only portions of the Member Agreement and thus had no notice of the forum selection clause. Alternatively, the plaintiffs contend, in any event, that the Washington courts are not appropriate for the conduct of this lawsuit.

7    I cannot accede to these submissions. In my view, the forum selection clause is dispositive and there is nothing in the factual record which persuades me that I should exercise my discretion so as to permit the plaintiffs to avoid the effect of the contractual provision. Accordingly, an order will go granting the relief sought by the defendant. My reasons follow.

**Analysis and Disposition**

8    Forum selection clauses are generally treated with a measure of deference by Canadian courts. Madam Justice Huddart, writing for the court in *Sarabia v. "Oceanic Mindoro" (The)* (1996), 4 C.P.C. (4th) 11 (B.C. C.A.); leave to appeal denied (May 22, 1997), Doc. 25790 (S.C.C.), adopts the view that forum selection clauses should be treated the same as arbitration agreements. She states at 20:

Since forum selection clauses are fundamentally similar to arbitration agreements, ... there is no reason for forum selection clauses not to be treated in a manner consistent with the deference shown to arbitration agreements. *Such deference to forum selection clauses achieves greater international commercial certainty, shows respect for the agreements that the parties have signed, and is consistent with the principle of international comity*. (Emphasis added.)

9    Huddart J.A. further states at 21 that "a court is not bound to give effect to an exclusive jurisdiction clause" but that the choice of the parties should be respected unless "there is strong cause to override the agreement." The burden for a showing of a "strong cause" rests with the plaintiff and the threshold to be surpassed is beyond the mere "balance of convenience." The approach taken by Huddart J.A. is consistent with that adopted by courts in Ontario. (See *Holo-Deck Adventures Ltd. v. Orbotron Inc.* (1996), 8 C.P.C. (4th) 376 (Ont. Gen. Div.); *Mithras Management Ltd. v. New Visions Entertainment Corp.* (1992), 90 D.L.R. (4th) 726 (Ont. Gen. Div.)).

10    The plaintiffs contend, first, that regardless of the deference to be shown to forum selection clauses, no effect should be given to the particular clause at issue in this case because it does not represent the true agreement of the parties. It is the plaintiffs submission that the form in which the Member Agreement is provided to potential members of MSN is such that it obscures the forum selection clause. Therefore, the plaintiffs argue, the clause should be treated as if it were the fine print in a contract which must be brought specifically to the attention of the party accepting the terms. Since there was no specific notice given, in the plaintiffs' view, the forum selection clause should be severed from the Agreement which they otherwise seek to enforce.

11    The argument advanced by the plaintiffs relies heavily on the alleged deficiencies in the technological aspects of electronic formats for presenting the terms of agreements. In other words, the plaintiffs contend that because only a portion of the Agreement was presented on the screen at one time, the terms of the Agreement which were not on the screen are essentially "fine print."

12    I disagree. The Member Agreement is provided to potential members of MSN in a computer readable form through either individual computer disks or via the Internet at the MSN website. In this case, the plaintiff Rudder, whose affidavit was filed on the motion, received a computer disk as part of a promotion by MSN. The disk contained the operating software for MSN and included a multi-media sign up procedure for persons who wished to obtain the MSN service. As part of the sign-up routine,

potential members of MSN were required to acknowledge their acceptance of the terms of the Member Agreement by clicking on an "I Agree" button presented on the computer screen at the same time as the terms of the Member Agreement were displayed.

13      Rudder admitted in cross-examination on his affidavit that the entire agreement was readily viewable by using the scrolling function on the portion of the computer screen where the Membership Agreement was presented. Moreover, Rudder acknowledged that he "scanned" through part of the Agreement looking for "costs" that would be charged by MSN. He further admitted that once he had found the provisions relating to costs, he did not read the rest of the Agreement. An excerpt from the transcript of Rudder's cross-examination is illustrative:

Q. 314. I will now take you down to another section. I am now looking at heading 15, which is entitled "General," and immediately underneath that is subsection 15.1. Now, do I take it, when you were scanning, you would have actually scanned past this, and you would have at least seen there was a heading that said "General?" Is that fair? Or did you not even scan all the way through?

A. I did not go all the way down, I can honestly say. Once I found out what it would cost me, that is where I would stop.

Q. 315. So, I take it that you did not read 15.1?

A. No, I definitely did not read this, no.

Q. 316. I now have 15.4 on the screen, and presumably you did not read that either?

A. No, I did not.

Q. 317. I take it, during the whole signup process that you did, you did the whole thing online on the computer...

A. Yes.

Q. 318. ... using the disk? And we will come to the connection. You did not have any voice communication with MSN?

A. No.

Q. 319. Or with Microsoft Corporation?

A. No.

Q. 320. You did not have any written correspondence with them at the time of signup?

A. No.

Q. 321. All right. Now, I take it that, after doing the review of this that you did do, you clicked, "I agree?" Is that what you did?

A. *After I was satisfied with what it was going to cost me, I agreed.* (Emphasis added.)

14   I have viewed the Member Agreement as it was presented to Rudder during the sign up procedure. All of the terms of the Agreement are displayed in the same format. Although, there are certain terms of the Agreement displayed entirely in upper-case letters, there are no physical differences which make a particular term of the agreement more difficult to read than any other term. In other words, there is no fine print as that term would be defined in a written document. The terms are set out in plain language, absent words that are commonly referred to as "legalese." Admittedly, the entire Agreement cannot be displayed at once on the computer screen, but this is not materially different from a multi-page written document which requires a party to turn the pages. Furthermore, the structure of the sign-up procedure is such that the potential member is presented with the terms of membership twice during the process and must signify acceptance each time. Each time the potential member is provided with

the option of disagreeing which terminates the process. The second time the terms are displayed occurs during the online portion of the process and at that time, the potential member is advised via a clear notice on the computer screen of the following:

> ... The membership agreement includes terms that govern how information about you and your membership may be used. To become a MSN Premier member, you must select "I Agree" to acknowledge your consent to the terms of the membership agreement. If you click "I Agree" without reading the membership agreement, you are still agreeing to be bound by all of the terms of the membership agreement, without limitation. ..."

15    On cross-examination, Rudder admitted to having seen the screen containing the notice. In order to replicate the conditions, portions of the cross-examination were conducted while Rudder was being led through an actual sign-up process including the online connection portion. While online, and after having been shown the notice posted above, Rudder responded to questioning as follows:

> Q. 372. All right. You see immediately below the printing that we have just read, a rectangular box that says, "MSN Premier Membership Rules?"

> A. Yes.

> Q. 373. And, below that, a larger white box that says, "Please click MSN Membership Rules and read the membership agreement?"

> A. Yes.

> Q. 374. Did you read the phrase that I just stated in the big white box?

> A. No. What I probably did... I can't say for sure ... is I probably just went to "I Agree," and then "Next."

> Q. 375. Did you understand, when you clicked "I Agree" on this occasion, that you were agreeing to was something that was going to govern your legal relationship surrounding your use of MSN?

> A. If you are asking me if I made a mental note, or if I had knowledge of that, no, I did not really pay attention to that. That is a common practice when I sign up on anything. Like I said, my main concern is what the costs are.

16    It is plain and obvious that there is no factual foundation for the plaintiffs' assertion that any term of the Membership Agreement was analogous to "fine print" in a written contract. What is equally clear is that the plaintiffs seek to avoid the consequences of specific terms of their agreement while at the same time seeking to have others enforced. Neither the form of this contract nor its manner of presentation to potential members are so aberrant as to lead to such an anomalous result. To give effect to the plaintiffs' argument would, rather than advancing the goal of "commercial certainty," to adopt the words of Huddart J.A. in *Sarabia*, move this type of electronic transaction into the realm of commercial absurdity. It would lead to chaos in the marketplace, render ineffectual electronic commerce and undermine the integrity of any agreement entered into through this medium.

17    On the present facts, the Membership Agreement must be afforded the sanctity that must be given to any agreement in writing. The position of selectivity advanced by the plaintiffs runs contrary to this stated approach, both in principle and on the evidence, and must be rejected. Moreover, given that both of the representative plaintiffs are graduates of law schools and have a professed familiarity with Internet services, their position is particularly indefensible.

18    Having found that the terms of the Member Agreement, including the forum selection clause, bind the plaintiffs, I turn to a consideration of whether it is appropriate to exercise my discretion to override the forum clause agreed to by the parties. In my view, the submissions made by the defendant are compelling. On the facts of this case, it would not be appropriate for this court to permit the plaintiff to continue this action in Ontario contrary to the forum selection clause.

19      Simply put, I find that the plaintiffs have not met the burden of showing a "strong cause" as to why the forum selection clause should not be determinative. In *Sarabia*, Huddart J.A. referred to the English case, *"Eleftheria" (The) (Cargo Owners) v. "Eleftheria" (The)*, [1969] 2 All E.R. 641 (Eng. P.D.A.), as the decision most often followed in Canada in setting out the factors that a court will consider in determining whether it should exercise its discretion and refuse to enforce a forum selection clause in an agreement.

20      The factors to consider may be paraphrased as follows:

(1) in which jurisdiction is the evidence on issues of fact situated, and the effect of that on the convenience and expense of trial in either jurisdiction;

(2) whether the law of the foreign country applies and its differences from the domestic law in any respect;

(3) the strength of the jurisdictional connections of the parties;

(4) whether the defendants desire to enforce the forum selection clause is genuine or merely an attempt to obtain a procedural advantage;

(5) whether the plaintiffs will suffer prejudice by bringing their claim in a foreign court because they will be

    (a) deprived of security for the claim; or

    (b) be unable to enforce any judgment obtained; or

    (c) be faced with a time-bar not applicable in the domestic court; or

    (d) unlikely to receive a fair trial.

21      When these factors are applied within the factual matrix of this case, it is apparent that the plaintiffs cannot meet the threshold of a "strong cause." Most of the activities associated with the provision of services pursuant to the Member Agreements that are the subject of the allegations in the Statement of Claim are carried out in King County, Washington. This includes the business management of accounts of MSN members, member authentication, policy-making regarding member accounts, billing and customer service. All of the computers in which MSN content and information are contained are located in King County. The sheer size of the intended class means that there is a potential that voluminous amounts of billing statements and related information, which is most likely to be located in Washington, will be required as evidence. Furthermore, the MSN witnesses are located at the company's center of operations in King County.

22      Since I have found that the forum selection clause applies in this case, by operation of that clause the choice of law agreed to by the parties is the law of the State of Washington. Regardless of whether this action where tried in Ontario or elsewhere, the law to be applied would remain the same.

23      Microsoft has demonstrated substantial connection to the State of Washington, and in particular to King County. The plaintiffs, on the other hand, propose to represent a Canada-wide class whose connections to Ontario are not readily apparent on the evidence before the court. Class proceedings may be conducted under both the federal and state court systems in the State of Washington and while the test for certification may be somewhat more advantageous to the plaintiffs in Ontario, it is not sufficiently so as to permit me to ignore the other factors which clearly favour the defendant in this case. Moreover, in the interests of international comity, and in the absence of any evidence to the contrary, there is nothing to suggest that the plaintiffs would not receive a fair trial in the State of Washington. Indeed, considering that the defendant is resident there, it would be more advantageous to the plaintiffs, in respect of enforcement, if a judgment were obtained from a court in that jurisdiction.

24      I note in passing that this forum selection clause has been upheld on appeal in an intended class proceeding in the State of New Jersey. (*Caspi v. Microsoft Network, L.L.C.*, 732 A.2d 528 (U.S. N.J. Super. A.D. 1999).

25      In view of my disposition on the first point, it is unnecessary to deal with the *forum non conveniens* and service *ex juris* arguments.

26      The defendant shall have the relief requested. The action brought by the plaintiffs in Ontario is permanently stayed. The defendant shall have its costs of this motion, which, by agreement of the parties will be fixed by the court and payable forthwith. Counsel may make brief written submissions with respect to costs within two weeks of the date of release of these reasons.

*Motion granted.*


Footnotes

\*       Additional reasons at (November 12, 1999), Doc. 97-CT-046534CP (Ont. S.C.J.)

**EXHIBIT EN-6**

**TO THE DECLARATION OF EVAN NUTTALL**

2011 BCSC 1196

British Columbia Supreme Court

Century 21 Canada Ltd. Partnership v. Rogers Communications Inc.

2011 CarswellBC 2348, 2011 BCSC 1196, [2011] B.C.W.L.D. 7925, [2011] B.C.W.L.D. 7939, [2011] B.C.W.L.D. 7941, [2011] B.C.W.L.D. 7942, [2011] B.C.W.L.D. 7943, [2011] B.C.W.L.D. 7944, [2011] B.C.W.L.D. 7947, [2011] B.C.W.L.D. 7948, [2011] B.C.W.L.D. 7960, [2011] B.C.W.L.D. 7983, [2011] B.C.W.L.D. 7984, [2011] B.C.W.L.D. 7985, [2011] B.C.W.L.D. 7988, [2011] B.C.W.L.D. 7989, [2011] B.C.W.L.D. 7990, [2011] B.C.W.L.D. 7991, [2011] B.C.W.L.D. 7992, [2011] B.C.W.L.D. 7993, [2011] B.C.W.L.D. 7994, [2011] B.C.W.L.D. 7995, [2011] B.C.W.L.D. 7996, [2011] B.C.W.L.D. 7997, [2011] B.C.W.L.D. 7998, [2011] B.C.W.L.D. 8042, [2011] B.C.W.L.D. 8047, [2011] B.C.W.L.D. 8048, [2011] B.C.W.L.D. 8049, [2011] B.C.W.L.D. 8050, [2011] B.C.W.L.D. 8051, [2011] B.C.W.L.D. 8057, [2011] B.C.W.L.D. 8061, [2011] B.C.J. No. 1679, [2012] 3 W.W.R. 708, 207 A.C.W.S. (3d) 245, 26 B.C.L.R. (5th) 300, 338 D.L.R. (4th) 32, 92 B.L.R. (4th) 167, 96 C.P.R. (4th) 1

## Century 21 Canada Limited Partnership, Nechako Real Estate Ltd. doing business as Century 21 In Town Realty, Charles R. Bilash, Charles Bilash Personal Real Estate Corporation and Michael James Walton (Plaintiffs) and Rogers Communications Inc. and 2167961 Ontario Inc. doing business as Zoocasa Inc. (Defendants)

R. Punnett J.

Heard: May 19-21, 2010
Judgment: September 2, 2011
Docket: Vancouver S088463

Counsel: M. Vesely, J.S. Popp for Plaintiffs
W.S. Martin, M.E. Fancourt-Smith for Defendants

**R. Punnett J.:**

1    The ability of the law to adapt is part of its strength. Technological innovation tests that resilience. This case considers that ability as claims for breach of contract, trespass to chattels and copyright infringement meet the Internet. At the root of this lawsuit is the legitimacy of indexing publically accessible websites.

2    The plaintiffs seek an injunction and damages against the defendants for their conduct in accessing Century 21 Canada's Website and copying photographs and text from that Website without consent.

**Parties**

3    The plaintiff, Century 21 Canada Limited Partnership, is a limited partnership and is the master franchisor of all independent real estate brokerage offices operated under the "Century 21" brand and trademarks in Canada ("Century 21").

4    The plaintiff, Nechako Real Estate Ltd. ("Nechako"), does business as Century 21 In Town Realty ("In Town Realty") as a real estate broker pursuant to a Century 21 franchise agreement with Century 21.

5    The plaintiffs, Charles R. Bilash ("Bilash") and Michael James Walton ("Walton"), are licenced real estate salespersons engaged by In Town Realty.

6    The defendant 2167961 Ontario Inc., doing business as Zoocasa ("Zoocasa") is a wholly owned subsidiary of Rogers Communications Inc. ("Rogers").

7      The plaintiff claims against the defendant Rogers on the basis it participated in creating, developing, maintaining and marketing the Zoocasa Website.

**Overview**

8      This case arises from the desire of Century 21 to allow public access to its Website, yet at the same time limit commercial access by its competitors. These competing goals have given rise to this dispute over the defendant Zoocasa's access to and use of the plaintiffs' Website and its contents.

9      The actions of the defendants that are complained of evolved during the course of this litigation. The plaintiffs allege that Zoocasa was bound by the Terms of Use of the Century 21 Website and breached them. It is also alleged that the defendant Zoocasa breached copyright held by the plaintiffs. The claims against the defendant Rogers are that Rogers authorized the breach of copyright contrary to s. 27 of the *Copyright Act*, R.S.C. 1985, c. C-42 and, in the alternative, that Roger's induced the breach of contract by Zoocasa.

**Terminology**

10      While the Internet has become part of contemporary society some of the terminology involved may still not have wide exposure. As a result defining of some of the terms is necessary.

a. *Hyperlink*: *Computing* a link from a hypertext document to another location, activated by clicking on a highlighted word or image: Concise Oxford English Dictionary.

b. *Indexing:* The extraction of index terms from web pages without specific layouts or formatting: Expert Report of John Levine.

c. *Scraping:* A form of indexing that looks for specific information located in known positions on selected web pages with known layouts. Used particularly to build specialized websites combining information from other websites. The defendants' expert opines that there is no generally accepted definition in law in Canada of scraping but it is acknowledged to be a subset of indexing:

d. *Frame (Framing):* *Computing* a graphic panel in an Internet browser which encloses a self-contained section of data and permits multiple independent document viewing: Concise Oxford English Dictionary.

e. *Robot.txt file*: A robot.txt file contains code that can be read by the automated software programs called robots or spiders that are used by search engines to index websites. To function they require that they know the name of the search engines robot: Expert Report of John Levine.

f. *Cache (Caching):* an auxiliary memory from which high-speed retrieval is possible: Concise Oxford English Dictionary.

g. *Hosting or Host*: a computer which mediates multiple access to databases or provides other services to a network: Concise Oxford English Dictionary.

h. *IP Address:* Computing Internet Protocol: Concise Oxford English Dictionary.

**Facts**

11      Century 21 developed and promotes its real estate website, which is found at the uniform (or universal) resource locator ("URL") address www.century21.ca (the "Century 21 Website" or the "Website"). The Website is hosted by www.WhereToLive.com in the state of Minnesota ("WTL").

12      The Century 21 Website features property listings belonging to Century 21 brokers and agents from British Columbia and across Canada. It allows users to search for properties by location, price and other features or attributes of the property.

2

The Century 21 Website features, among other things, property listings belonging to In Town Realty and its representatives, Bilash and Walton.

13     The goal of Century 21 in creating the Website was to create a site superior to their competitors that would give them a competitive advantage for their franchisees and salespersons. The Website features among other things property listings belonging to In Town Realty and its representatives Bilash and Walton.

14     Century 21, Bilash, Charles Bilash Personal Real Estate Corporation, In Town Realty and Walton claim copyright protection for photographs of properties listed for sale along with prose descriptions of the properties and property details (the "Works").

15     Century 21 also claims copyright protection of property listings and photographs pursuant to an Assignment of Copyright Agreement with Bilash and Walton (the "Assignment"). According to Century 21, the Assignment was created to simplify this proceeding such that the claim for copyright protection may now lie with Century 21.

16     The defendant Zoocasa created, developed, maintains and markets a website found at the URL address www.zoocasa.com (the "Zoocasa Website").

17     The Zoocasa Website includes the following content:

a. background information regarding the municipalities or neighbourhoods in which particular property listings are located including mapping, satellite imagery, street level photography, neighbourhood descriptions, schools information, demographic information and a "walkscore" for the neighbourhood rating how conveniently amenities can be reached on foot;

b. a hyperlink for each property listing that directs the user to the website of the listing agent or broker for that property listing;

c. revenue-generating advertisements, including advertisements targeted to persons in British Columbia when the Zoocasa Website is accessed by users in British Columbia; and

d. photographs, written descriptions and other information regarding residential property listings in British Columbia and across Canada;

18     The concept behind the Zoocasa Website is to offer consumers an Internet tool that approaches house buying in the way that consumers do, with the focus not on large geographic areas, but rather on the neighbourhood. This approach provides consumers with information such as whether a listing is near a good school or how far away shopping or work would be. As a result it purports to provide a service of value to the consumer.

19     The Zoocasa Website functions as a type of search engine, indexing property listings from a number of real estate websites and returning relevant ones in response to search queries by a site visitor such as: location, price, number of bedrooms, etc. Zoocasa then brings together different neighbourhood information together with listing "hits", including mapping, street level photography, school descriptions, neighbourhood descriptions and demographic information.

20     Zoocasa is however a "vertical search engine", as opposed to a general one, as it is a search engine focused on one area — real-estate listings in Canada. Initially, Zoocasa indexed and displayed to users information that included a property's address, price, number of bedrooms, a varying number of the characters of the property description and a photograph of the listing from the source website. The user could then click through to the originating site for more detailed information.

21     In November 2008, Zoocasa changed its indexing practices to limit its indexing to truncated real property descriptions. It found that the rate of "click-throughs" increased when less information was provided.

22     The plaintiffs, Bilash and Walton, have not given permission to the defendants to copy or use the content of their respective real estate listings. They object to the use of their content by the defendants. Century 21 has never given its consent to either Zoocasa or Rogers to index the Century 21 Website.

**Chronology**

23     Rogers New Ventures, a division of Rogers, commenced development of Zoocasa in the spring of 2007. In the summer of 2007, Rogers started building a search engine.

24     Darren Phillipson, an employee of Rogers registered the domain name for the Zoocasa Website on January 19, 2007. Zoocasa was incorporated on March 28, 2008, as 2167961 Ontario Inc. and was first launched to the public in August 2008.

25     The plaintiff Century 21 first became aware of Zoocasa in August 2008, when representatives of Rogers made a presentation to Century 21 seeking their cooperation in Zoocasa's plans. Despite Rogers' overtures, Century 21 decided not to participate or cooperate with Zoocasa. Notwithstanding that, Zoocasa proceeded to access the Century 21 Website.

26     On September 2, 2008, Century 21 Canada's solicitors advised Zoocasa, by a letter to Rogers, that Century 21 did not consent to Zoocasa downloading or copying any material from their Website.

27     On October 5, 2008, Century 21 placed the Terms of Use on their Website, and they have not been amended since.

28     On October 6, 2008, Century 21's solicitors, again by letter, advised solicitors for Zoocasa and Rogers that their client did not consent to Zoocasa's activity and demanded that they remove all of their materials from Zoocasa's Website and sever all links. They also advised Zoocasa's solicitors of the existence of the Terms of Use and their alleged breach of them. Zoocasa requested further meetings with Century 21.

29     Once again on October 17, 2008, solicitors for Century 21 advised solicitors for Zoocasa and Rogers that their client was not interested in any negotiations and that it appeared litigation was necessary to resolve matters.

30     On November 6, 2008, solicitors for Century 21 wrote to solicitors for Zoocasa advising them that their conduct in continuing to access the Century 21 Website was putting Century 21 at risk of losing access to the Multiple Listing Service database.

31     On November 20, 2008, Zoocasa commenced displaying truncated property descriptions instead of complete property descriptions.

32     On December 2, 2008 Bilash, Walton and In Town Realty signed Copyright Licence Agreements with Century 21 and assigned to Century 21 the right to bring an action for copyright infringement. On December 3, 2008, this action was commenced.

33     On August 20, 2009, Zoocasa began "framing" indexed site information.

34     On December 15, 2009, Zoocasa ceased framing.

35     On February 12, 2010, Charles Bilash Personal Real Estate Corporation signed a Copyright Licence Agreement with Century 21 and assigned to Century 21 its right to bring action for copyright infringement.

36     Zoocasa's search engines stopped indexing the Century 21 Website in early 2010 and stopped indexing Century 21 listings on March 5, 2010, save and except for cases where individual real estate agents or salespeople requested that their listings be indexed by Zoocasa. Zoocasa now states it will not index the Century 21 Website further without the permission of Century 21.

**Findings Respecting Activities of Zoocasa**

4

37      Initially, the Zoocasa Website indexed and linked to the Century 21 Website. It is not disputed that the Zoocasa's robot accessed the Century 21 Website once a day. Such access included a group of requests as opposed to one request. For example, in accessing the listings of Century 21, Zoocasa would access all of the listings as part of that once a day request. The robot would then index the page for information, assess its relevance and continue to the next web page.

38      Zoocasa took data from certain fields on the Century 21 Website and put it in certain fields in the display of the Zoocasa Website. Initially this included the full property description. As noted earlier, this practice ceased on November 20, 2008.

39      The Zoocasa Website also included reproductions and republications of the Works in full and hyperlinks that directed their users to specific pages of the Century 21 Website that contained property listings, both with respect to the Works and with respect to property listings of other Century 21 brokers and agents.

40      Zoocasa acknowledged that they could stop indexing the Century 21 Website by removing it from their list of websites to be indexed. It confirmed it could do so within a week. Despite the letters from solicitors for the plaintiffs, Zoocasa chose not to do so until early 2010, nearly 2 $^1/_2$ years after Century 21 first advised Zoocasa they did not consent to Zoocasa's activities and advised them of the Century 21 Terms of Use and Zoocasa's alleged breach of these terms.

41      It is clear that Zoocasa's operations are commercial in nature. Interestingly, Zoocasa has posted on its site Terms of Use that are similar to those used by the plaintiff. In addition, Zoocasa uses the robot.txt exclusion itself, to prevent others from indexing its site, but does not make available the name of its spider so that others can use the robot.txt exclusion to exclude Zoocasa from indexing their sites.

**Issues**

42      The issues in this case are as follows:

    a. Are the Terms of Use an enforceable contract between the parties?

    b. Has there been copyright infringement by the defendant Zoocasa?

    c. Has the defendant Zoocasa committed the tort of trespass to chattels in accessing Century 21's Website?

    d. Is Rogers liable for the actions of Zoocasa?

    e. Are the plaintiffs entitled to injunctive relief?

    f. Are damages recoverable for breach of copyright?

    g. Are damages recoverable for breach of contract?

**Preliminary Matters**

*Expert Reports*

43      The parties filed expert reports with respect to certain technical matters relating to the claims. The plaintiffs filed a report from John Levine. The defendants' response report is that of Samuel E. Trosow. The plaintiffs also filed a reply report from John Levine. The defendants object to the admission into evidence of the John Levine reports.

44      There is no dispute respecting the general principles applicable to expert reports. Expert evidence must not be argumentative, it must not consist of findings of fact or conclusions of law and the facts upon which the expert opinion is founded must be included in the report: See *Cogar Estate v. Central Mountain Air Services Ltd.*, [1990] B.C.W.L.D. 1422 (B.C. S.C.) [*Cogar Estate v. Central Mountain Air Services Ltd.*, 1990 CarswellBC 1736 (B.C. S.C.)], appeal dismissed (1992), 72 B.C.L.R. (2d) 292 (B.C. C.A.); *Emil Anderson Construction Co. v. British Columbia Railway* (1987), 17 B.C.L.R. (2d) 357

(B.C. S.C.), at 359-360; *Quintette Coal Ltd. v. Bow Valley Resource Services Ltd.* (1988), 29 B.C.L.R. (2d) 127 (B.C. S.C.); *Goerzen v. Sjolie* (1997), 86 B.C.A.C. 44 (B.C. C.A.) at paras. 16-24.

45     With respect to a reply report of an expert it must be limited to a response to the expert evidence to which it is a reply: *Canadian National Railway v. Canada*, 2002 BCSC 1669 (B.C. S.C. [In Chambers]).

***Discussion of Expert Reports***

*Report of Dr. John R. Levine*

46     The report of Dr. John R. Levine addresses the use and operation of search engines on the Internet. The expertise of Dr. Levine is not challenged nor are his comments respecting what is effectively "trade usage" on the Internet in relation to the operation of general search engines. The defendants however do object to those portions of the report that comment on Zoocasa's alleged failure to comply with certain conventions commonly used by search engines.

47     The first objection of the defendants is specifically to those portions of John Levine's report that characterize the conduct of the defendants. The wording they object to is contained in three paragraphs which comment on whether search engines that do not comply with the conventions are "reputable" or "legitimate". The specific paragraphs objected to are:

   16. As a concrete example, Google Web Search's automated software program is known as the "Googlebot." The Googlebot crawls Internet websites to enable Google to create its index. In my experience, I have found that the Googlebot, like the spiders at all reputable search engines, respects the industry-standard protocols concerning crawling, indexing and caching web pages...

   30. In my experience, it is standard industry practice that all legitimate search engines disclose the name of their web spiders, and make that information easy to find.

   33. In my experience, all legitimate search engines follow the robot exclusion protocol, and manage their indices in accordance with the instructions in robots.txt. The search engines that do not follow the protocol generally are run for unethical or illegal purposes, such as collecting e-mail addresses for spamming, or looking for security holes that can be exploited by malicious software ("malware").

48     The use of terms such as "reputable", "unethical", "illegal" or "legitimate" is, in my view, outside the scope of Dr. Levine's expertise and usurps the role of the court in determining what are issues of law and value judgments. Whether or not a practice is "legitimate" is clearly an issue requiring a legal conclusion. That is the role of the court, not the expert. Such terms raise the appearance of advocacy rather than independent expert evidence.

49     The defendants also object to para. 36. Reference must be made to paras. 34-35 in order to place para. 36 in context:

   34. Specialized search engines sometimes use a modified indexing scheme informally known as "scraping". The distinction between scraping and regular indexing is that scraping looks for specific information located in known positions on selected web pages with known layouts, while indexing uses more general techniques to extract index terms from web pages without specific layouts or formats.

   35. In recent years, web scraping has become a common way to build specialized web sites combining information from other web sites, with the other sites' consent. Examples include travel price comparison web sites such as kayak.com which scrape fare and schedule information from multiple airline and travel agent web sites to create combined listings showing the best prices and schedules.

   36. In this case, it is straightforward to determine what Zoocasa is doing. Their web site contains highly structured entries for each listed property, specifically showing the address, asking price, offering agent, number of bedrooms and bathrooms, property description, and a property photograph. The only plausible ways for Zoocasa to present this level of detail is either for the listing agents to provide the data directly, or for Zoocasa to scrape the details from pages of the source web

sites. Since I am informed that Century 21 is not voluntarily providing any information to Zoocasa, the Zoocasa entries for Century 21 listings must have been created by scraping. Their site also provides conventional search by keyword, which shows they are also indexing the pages they spider.

50    The defendants submit that the words in para. 36 stating "in this case, it is straightforward to determine what Zoocasa is doing" are objectionable because there is no disclosure of what facts or materials are relied upon and, in addition, the statement purports to make determinations of fact that are properly the function of the court.

51    The objections are well founded. I am satisfied however that the report is admissible with editing of the offending paragraphs. The editing is ordered as follows:

a. Paragraph 16 is amended by removing the words "In my experience, I have found that the Googlebot, like the spiders at all reputable search engines, respects the industry-standard protocols concerning crawling, indexing and caching web pages ...";

b. Paragraphs 30 and 33 are deleted from the report; and,

c. Paragraph 36 is deleted from the report as it makes factual determinations that are outside the purview of an expert.

*Report of Samuel E. Trosow*

52    The report of Mr. Trosow was filed by the defendants. The plaintiffs do not object to its content. The report of Mr. Trosow comments on the importance of linking and indexing to the functioning of the World Wide Web. It confirms that linking is fundamental to the operation of the web and that indexing facilitates access. He also confirms that Zoocasa links to external websites and that it indexes such sites although he notes that "Canadian jurisprudence has not yet developed specific and particular definitions for concepts such as "indexing" and the usage among various user communities varies".

53    In addition he opines that "scraping" is not clearly defined and is currently an informal term although he would characterize it as a subset of the broader concept of indexing. His comments on those portions of Dr. Levine's report that have been excised are no longer of relevance. However, he does end his report by saying:

... The relevant question in my view is whether the materials are being utilized in a transformative manner in order to provide a usable and informative aid for the end-user searching for information about listings.

54    "Transformative use" is an American concept and one that I will address later in these reasons in the context of copyright infringement and fair dealing.

*Reply Report of Dr. John L. Levine*

55    The defendants' objection to the reply report is that it states that Dr. Levine has reviewed the Trosow report and the affidavits of J. R. Langlois and Michael Lee filed on behalf of the defendants but fails to respond to any matters in the Trosow report. They state that it responds only to the fact evidence of Mr. Langlois.

56    In my opinion, the real issue is that the content of the reply report is argumentative and judgmental. Rule 11-2 (1) states:

**Duty of expert witness**

(1) In giving an opinion to the court, an expert appointed under this Part by one or more parties or by the court has a duty to assist the court and is not to be an advocate for any party.

57    The following principals are to be considered when assessing expert reports that are overly argumentative:

a. Inferences which should be drawn from the proven facts are, in most situations, for the court not the experts. The report draws many inferences which are then used to support the opinions expressed: *Emil Anderson* at 32-33.

b. It is unnecessary ... for experts to perform the court's function or for counsel to adduce arguments in the guise of evidence: *Sengbusch v. Priest* (1987), 14 B.C.L.R. (2d) 26 (B.C. S.C.), at 40.

c. [An expert] may not assess the value or justifiability of the [Claimant's] claim: *Quintette Coal Ltd. v. Bow Valley Resource Services Ltd.* (1988), 29 B.C.L.R. (2d) 127 (B.C. S.C.), at 130.

58     The last two sentences of paragraph 4 and all of paragraphs 5 and 6 of the Levine Reply Report are inadmissible on the basis that they are argumentative and do not fall within the purview of an expert report. Furthermore, those paragraphs dispute certain factual evidence of a witness and attempt to draw inferences and conclusions based on these facts. I do not find it necessary to deal with the defendant's contention that the reply report fails to respond to the Trosow report. Even if I were to find that the reply report was proper in form, the noted portions would still be inadmissible for the reasons stated above.

**Contract**

*Breach of Contract: Terms of Use*

59     On October 5, 2007, the plaintiff, Century 21, posted Terms of Use on their Website. They were located on the main Century 21 Website at the bottom of the home or first page of the Website. They were not drawn to the attention of users in any active way. The Century 21 Website did not require that the user acknowledge reading and agreeing to the Terms of Use before accessing the Website. The terms stated that upon accessing the Website the user was bound by them. That is, the act of accessing the remainder of the Website was agreement by the user to the contractual terms. This raises issues respecting the formation of a contract, standard form contracts and electronic contracts.

*The Terms of Use*

60     The relevant provisions of the Terms of Use of Century 21 Limited's Website are as follows:

**CENTURY 21 CANADA LIMITED PARTNERSHIP WEBSITE TERMS OF USE**

THESE TERMS OF USE CONTAIN LEGAL OBLIGATIONS. PLEASE READ THESE TERMS OF USE BEFORE USING THIS WEBSITE.

*Acceptance of these Terms of Use and any Revisions thereto*

Century 21 Canada Limited Partnership ("**CENTURY 21**") provides this website (the "**Website**") to you ("**You**") subject to your acceptance of the following terms and conditions of use (these "**Terms of Use**"). By accessing or using the Website You agree to be bound by these Terms of Use without limitation or qualification. If You do not agree to be bound by these Terms of Use, You must not access or use the Website.

CENTURY 21 may, at any time, without notice or liability, revise these Terms of Use by updating this posting. You should periodically revisit this posting to review any revisions to these Terms of use. If any revision is not acceptable to You, You must cease accessing and using the Website. If You continue to access or use the Website after any revisions are posted You will be deemed to have accepted those revisions.

*Use and Restrictions*

You may access and use the Website and the information, features and services thereon (collectively, the "**Content**") only in accordance with all applicable laws and regulations and with these Terms of Use.

Subject to these Terms of Use, CENTURY 21 grants You a non-exclusive, non-transferable, revocable licence to use the Website and the Content solely for your own personal and non-commercial use. Content may only be printed, copied or saved onto your own computer for your personal and non-commercial use.

You must not, directly or indirectly, print, copy, reproduce, save onto your own computer, modify, translate, merge with other data, frame in another website, post on another website, or otherwise use the Content for any public, commercial or non-personal purpose. You must not, directly or indirectly, display, post, disseminate, distribute, publish, broadcast, transfer, sell or sublicense the Content to another individual or entity. The prohibited uses expressly include but are not limited to "screen scraping", "database scraping" and any other activity intended to collect, store, re-organize, summarize or manipulate any Content (whether via an automatic program or a manual process).

. . .

### Intellectual Property Rights

The Website and all of the Content (including the organization and layout of the Website and all software used in connection with the Website) are, and at all times remain, the property of CENTURY 21, its franchisees, brokers, sales people and/or licensors. The Website and all of the Content are protected by intellectual property rights owned by CENTURY 21, its franchisees, brokers, sales people and/or licensors. You agree to abide by all intellectual property notices, information and restrictions on, or displayed with, the Content. Note that any Content owned by CENTURY 21's franchisees, brokers, sales people or licensors may be subject to additional restrictions.

. . .

The display of the Content, the CENTURY 21 IP and the Third Party IP on the Website does not convey or create any licence or other rights in any of the Content, the CENTURY 21 IP or the Third Party IP. You acknowledge and agree that You do not acquire:

1. any ownership rights in any of the Content, the CENTURY 21 IP or the Third Party IP;

2. any right to use any of the Content, the CENTURY 21 IP or the Third Party IP for commercial purposes including sale, resale, licence or sublicense; or

3. any right to reproduce, distribute, display, post, disseminate, publish, broadcast, or transfer any of the Content, the CENTURY 21 IP or the Third Party IP.

Use of any of the Content, the CENTURY 21 IP or the Third Party IP, without the prior written consent of CENTURY 21, or the applicable franchisee, broker, sales person, licensor or third party, is strictly prohibited.

. . .

### Links to the Website on Third Party Websites

If You want to include a link to the Website on your website (the "**Third Party Link**"), You must:

1. provide CENTURY 21 with prior written notice describing the nature and features of your website and the proposed appearance and location of the Third Party Link; and

2. obtain the prior written consent of CENTURY 21 to establish the Third Party Link and abide by any terms and conditions required by CENTURY 21 as part of its consent.

CENTURY 21 may at any time, in its sole and absolute discretion, revoke its consent to establish a Third Party Link, with or without cause, upon reasonable notice to You. Upon exercise of this right by CENTURY 21, You must immediately remove all of your links to the Website and must cease all use of the CENTURY 21 IP. If You refuse or neglect to remove all of your links to the Website or to cease using the IP, You acknowledge that such refusal or neglect will result in immediate and irreparable damage to

CENTURY 21 and that CENTURY 21 shall be entitled to relief in the way of temporary and permanent injunctions and such other and further relief as a court may deem just and proper.

. . .

**Guarantees**

You represent and warrant that:

. . .

3. You will use the Website only for your personal and non-commercial use and only as authorized by these Terms of Use.

4. You are fully able and competent to enter into, and abide by, these Terms of Use.

. . .

**Plaintiffs' Argument**

61     The plaintiffs submit that the legal principals developed with respect to the law of contract remain intact and have adapted to new technology such as the Internet. They submit that Terms of Use displayed on a website can constitute a binding contract between the owner of the website and its users. They rely on established principles of contract law that they say are applicable to electronic contracts. They state that the Terms of Use found on the Century 21 Website constitute the terms of a contract between Century 21 and those who, with notice of the Terms of Use, choose to use the Century 21 Website.

**Defendants' Argument**

62     The defendants submit that visitors to the Century 21 Website are not required to read or agree to the Terms of Use. They state that they are not prominently displayed. They allege they are an attempt to impose a unilateral contract. They argue that Zoocasa never agreed to the Terms of Use and that there was no consideration.

63     The defendants submit that the Terms of Use did not create an enforceable agreement prohibiting Zoocasa from indexing the Century 21 Website. They state that the issue at bar is whether any contract is ever formed at all, something that does not turn on notice. In Zoocasa's submission affirmative agreement is required even if they had notice of the terms.

**Discussion**

*Law of Contract*

64     It is trite law that creation of a contract requires that there be an offer, acceptance and consideration to form a valid and binding contract. Over time as business practices evolved, so too has the determination of what is an offer, what is acceptance, what constitutes consideration and when a contract is formed. Hinds J., in *Beatty v. First Exploration Fund 1987 & Co.* (1988), 25 B.C.L.R. (2d) 377 (B.C. S.C.), at 383 and 385, noted:

. . .

The law has endeavoured to take cognizance of, and to be receptive to, technological advances in the means of communication....

. . .

The conduct of business has for many years been enhanced by technological improvements in communication. Those improvements should not be rejected automatically when attempts are made to apply them to matters involving the law.

They should be considered and, unless there are compelling reasons for rejection, they should be encouraged, applied and approved....

. . .

65      While *Beatty* addressed the use of faxed documents, the observations of Hinds J. apply no less to the law of contract when applied to the technology of the Internet.

66      G.H.L. Fridman, *The Law of Contract in Canada* (Toronto: Thomson Carswell, 2006) at 13 states:

**(a) The essence of a contract**

Agreement is at the basis of any legally enforceable contract. The absence of assent prevents the creation of a binding contract. There must be a substratum of agreement, or *consensus ad idem*. For example, in the case of a contract for the sale of land at the minimum there must be *consensus ad idem* on the parties, the land description and the price. Such agreement must be clearly manifested, expressly or by implication. "In order to bring a contract into existence there must be a communication of the parties' intention by means of outward expression." It is necessary not only to show an intention in the party to be charged to agree, but also to show an expression of that intention. An inward intent will not suffice. But how does the law determine the existence and nature of a party's intent? In the words of Sirois J. of Saskatchewan in *Butheil v. Caledonia No. 99I R. M.*: "The law judges of the intention of a person by his outward expression only and it judges of an agreement between two persons exclusively from those expressions of their intentions, which are communicated between them". Hence the requisite agreement may be established by the conduct of the parties subsequent to the alleged contract. [Citations omitted.]

67      And at page 84:

...there must be, as Lennox J. said in *Loranger v. Haines*, "reciprocal undertakings". So if one party is neither giving anything, nor is promising to do or give anything, there is no consideration for the other party's act or promise. What is meant here by the expression "value" must not be taken in a literal, entirely materialistic sense. In most instances, of course, it will be money or money's worth that is involved. But it is not so exclusive. Consideration means something which is of some value in the eyes of the law. It must be real. This could include some act, or promise of an act, which is incapable of being given a monetary value, though it has value, some benefit, in the sense of advantage for the party who is the present or future recipient or beneficiary of the act.

68      Examples of the law addressing changing methods of contracting are the "ticket" cases that arose in the late 18th century. As public transportation developed the practical matter of establishing the terms of the agreement arose. The House of Lords in *Hood v. Anchor Line (Henderson Brothers) Ltd.*, [1918] A.C. 837 (U.K. H.L.), stated that "if it is found that the company did what was reasonably sufficient to give notice of conditions printed on the back of a ticket, the person taking the ticket would be bound by such conditions".

69      Hall J., in *Schuster v. Blackcomb Skiing Enterprises Ltd. Partnership* (1994), 100 B.C.L.R. (2d) 298, [1995] 3 W.W.R. 443 (B.C. S.C.), at para. 14, provides a useful history and analysis of the "ticket" cases. He states:

14 It is to be noted that these were all what I think could properly be described as "ticket" cases but the principles that were there developed continue to be applicable today and in my judgment appear usually to turn on the question of the efficacy of notice to the customer....

70      The plaintiffs argue that such cases stand for the principle that no outward manifestation of acceptance, beyond taking the service with notice of the conditions, is necessary to form a contract provided notice of the contractual terms has been sufficient.

71      The defendants assert that the "ticket cases" do not address the issue of whether a contract was formed at all. That is, they start from the proposition that the parties know they are entering into a contract and then the issue addressed is whether they have sufficient notice of the terms of the contract. They know that they have the option of accepting the service offered

and entering into an agreement or rejecting the offered service. Despite the fact that in ticket cases most consumers likely do not read the fine print they do know that they are entering into an agreement. They know that they are purchasing a service. The defendants submit that what the ticket cases really address is the issue of notice of the terms of a contract. They submit that in the world of the Internet there is no awareness that accessing a website forms a contract.

72    While the ticket cases deal with notice of contractual terms, the principles applicable can, in my view, be equally applied to the issue of contract formation in the sense that the formation of a contract requires that a party have knowledge or notice of an offer in order to accept it or reject it.

73    If notice of the terms is sufficient, the issue in principle then becomes whether or not the terms are accepted by confirmation either by express agreement or by implied conduct. Communication of acceptance to the offeror is normally fundamental to the formation of a contract. However, the key issue is whether there is a bargain. Has the offeree accepted the terms in a manner which is "equivalent to acceptance": Waddams, S.M., *The Law of Contracts*, 6th ed. (Canada Law Book Inc.: Aurora, Ont., 2010) at 66-69. Conduct may constitute acceptance: Waddams at 75. In this case the defendant had clear notice of the terms hence the nub of the dispute between these parties is whether there has been communication by the defendant Zoocasa of their acceptance of an offer.

74    The defendants submit that, in the case of electronic communications, the option of acceptance or rejection of the contractual terms does not exist. They assert that a contract is not formed merely because they perform an activity that they have the right to do without a contract. They submit for example that in looking at a billboard no contract is formed. This latter example, however, ignores the fact that a billboard does not make an offer capable of a response. It is static while a website can make an offer that is capable of being responded to. It also ignores the fact that a website consists of multiple pages whereas a billboard does not. There is nothing the observer of a billboard does that is capable of indicating consent. The observer merely views the billboard. A user of a website can respond by accessing deeper layers (pages) of the website.

75    Fundamental to the defendants' argument is their assertion that a public website gives a right to access it without any contract. This begs the question before this Court, which is: can accessing a publically available website result in the formation of a contract? In addition, is there a distinction between merely accessing a website and the taking of subsequent steps to use the information on that website? The defendants" argument that a website is like a billboard, while perhaps a reasonable analogy to the first page of a website, ignores the active nature of an Internet website. A more apt analogy is that a website is like a book and the first page is simply the cover page or table of contents.

76    The defendants' position also implies that, by permitting public access to a website, the owner of that website loses any proprietary claims they may have in the information contained therein, other than those arising under copyright law.

77    The manner in which the web has developed with freely available access may differentiate a user's expectations of the web from the user of a service such as a bus, train or aircraft. While the expectation of a user may be that access is free and without restrictions, the Internet and its use is an evolving entity. As such, expectations change as does the sophistication of the user. In addition, it is not the users' expectation that is determinative. What they assume to be the case does not take precedence over the existence of an offer, notice of that offer and the act of acceptance. An erroneous expectation, even with legal advice, does not prevail.

78    The defendants say that the Terms of Use on the Century 21 Website did not create an enforceable agreement between Zoocasa and Century 21 under which Zoocasa was contractually bound not to index the Century 21 Website. They submit that:

i. The Terms of Use are not structured to create a consensus *ad idem*, the basic and indispensable requirement for a contract, and that as a matter of fact there never was agreement that the Terms of Use were binding.

ii. There is a lack of consideration.

iii. The Terms of Use are not capable of creating an enforceable agreement.

79     The defendants state that the plaintiffs' position amounts to saying: "If you do something you have a right to do, I will say that you accepted a contract with me, even though I know you don't assent to the contract". They assert that a contract cannot be imposed in this way. This argument however starts from the erroneous proposition that the defendants have an unrestricted right of access.

80     The issues therefore are whether there was an offer, whether there was consensus or agreement, whether there was consideration, and whether an enforceable contract was created by Zoocasa accessing the Century 21 Website.

### Was a Contract Formed?

81     There is limited Canadian jurisprudence on the subject of electronic contracts.

82     Sookman, *Computer, Internet and Electronic Commerce Law, loose leaf* (Carswell: Toronto, Ont., 1989) at 10.3 states:

One of the issues relevant to determining where and when an electronic contract has been concluded is to establish what constitutes an "offer" in an electronic commerce transaction. An "offer" is an intimation, by words or conduct of the willingness to enter into a legally binding contract, and which in its terms expressly or impliedly indicates that it is to become binding on the offeror as soon as it has been accepted by an act, forbearance or return promise on the part of the person to whom it is addressed. An offer is effected when it is communicated to the offeree and a wide variety of communications means may be used to make an offer including communications by mail, telegram, telex, fax and telephone. There are also no apparent reasons why offers may not be made electronically such as by electronic mail, or to an information processing device set up to receive contract offers. [Citations omitted.]

83     A consideration of Canadian and US authorities respecting the electronic formation of contracts reveals that courts have grappled with the changes in contract formation brought about by electronic communications including such matters as software licences and contracts created over the Internet. Those changes have produced new descriptions of contracts such as "shrink wrap" agreements, "click wrap" agreements and "browse wrap" agreements.

### Shrink Wrap Agreements

84     The earliest cases addressed the issue of software licensing agreements which purported to bind purchasers by virtue of their purchase and use of the software.

85     A seminal case that considered shrink wrap agreements is *ProCD Inc. v. Zeidenberg*, 86 F.3d 1447 (U.S. C.A. 7th Cir. 1996), where a purchaser of a CD-ROM containing a telephone directory was held bound by the shrink wrap agreement. The court, at para. 2 noted that:

(... The "shrinkwrap license" gets its name from the fact that retail software packages are covered in plastic or cellophane "shrink wrap," and some vendors, though not *ProCD* have written licenses that become effective as soon as the customer tears the wrapping from the package. Vendors prefer "end user license," but we prefer the more common term.) ...

86     In *ProCD Inc.* the outside of the box indicated that the purchase was subject to a licence and the licence appeared in the manual enclosed with the software. The licence also appeared on the computer when the software was used. The user had the opportunity to read the licence and accept its terms before using the software. The court held the terms were binding. In doing so they commented on other transactions where the consumer makes purchases before receiving the detailed contractual terms such as a traveler purchasing an airplane ticket.

87     In *North American Systemshops Ltd. v. King* (1989), 68 Alta. L.R. (2d) 145, 97 A.R. 46 (Alta. Q.B.), at 155, the Alberta Court held that a shrink wrap licence was not enforceable because the vendor did not properly notify the purchaser of any restriction on the use of the product:

In the case at bar, the plaintiff manifestly did not bring home to the defendants, or any of them, that there were restrictions on the purchase. None of the simple, cheap, obvious methods to do this were used by the plaintiff. No implied restrictions were necessary to the sale; therefore the court should not, in the absence of explicit instructions brought to the notice of the purchaser, introduce any implied restrictions into the contract of sale.

88     The result in *North American Systemshops Ltd.* turned on the lack of notice of the Terms of Use. The preponderance of authority in the US, provided notice is adequate, is that such an arrangement can result in an enforceable agreement.

### Click Wrap Agreement

89     As technology evolved purchases of software occurred over the Internet with no box or physical medium being purchased. This led to the concept of the "click wrap" agreement. In such a situation the user indicates their agreement by clicking on an "I Agree" box.

90     In *Rudder v. Microsoft Corp.* (1999), 106 O.T.C. 381, 2 C.P.R. (4th) 474 (Ont. S.C.J.), Winkler J. upheld a click wrap agreement. At paras. 16 -17, Winkler J. stated:

16 It is plain and obvious that there is no factual foundation for the plaintiffs' assertion that any term of the Membership Agreement was analogous to "fine print" in a written contract. What is equally clear is that the plaintiffs seek to avoid the consequences of specific terms of their agreement while at the same time seeking to have others enforced. Neither the form of this contract nor its manner of presentation to potential members are so aberrant as to lead to such an anomalous result. To give effect to the plaintiffs' argument would, rather than advancing the goal of "commercial certainty", to adopt the words of Huddart J.A. in Sarabia, move this type of electronic transaction into the realm of commercial absurdity. It would lead to chaos in the marketplace, render ineffectual electronic commerce and undermine the integrity of any agreement entered into through this medium.

17 On the present facts, the Membership Agreement must be afforded the sanctity that must be given to any agreement in writing....

91     In *i.Lan Systems Inc. v. Netscout Service Level Corp.*, 183 F.Supp.2d 328 (U.S. Dist. Ct. D. Mass. 2002), the terms of the agreement appeared on the website after the purchase was made. The plaintiff was found to have consented to the agreement when it clicked the "I Agree" box. At 338 the court stated: "If *ProCD Inc.* was correct to enforce a shrink wrap licence agreement, where any assent is implicit, then it must also be correct to enforce a click wrap licence agreement, where the assent is explicit".

### Browse Wrap Agreement

92     The final form of agreement referred to is a "browse wrap" agreement. A browse wrap agreement does not require that the purchaser indicate their agreement by clicking on an "I Agree" button. All that is required is that they use the product after being made aware of the product's Terms of Use.

93     In *Register.com Inc. v. Verio Inc.*, 126 F.Supp.2d 238 (U.S. Dist. Ct. S.D. N.Y. 2000), aff'd 356 F.3d 393 (U.S. C.A. 2nd Cir. 2004), *Register.com's* website contained their Terms of Use which stated that if the user accessed the database then the user agreed to the terms. The defendant submitted that simply making a query of the database was insufficient to indicate their consent. *Register.com* involved commercial parties where the defendant Verio accessed the plaintiff's computers daily and saw the Terms of Use each time they did so and admitted that they were aware of the terms. Verio conceded that its use of the data for solicitations by mail and telemarketing breached *Register.com's* Terms of Use. *Registrar.com* notified Verio that they were in breach of *Register.com's* Terms of Use. Verio argued that it was not bound because the notice was provided after the transaction occurred, not before. The United States Court of Appeals for the Second Circuit found that this argument would only succeed if Verio accessed *Register.com's* computers infrequently. The court held that Verio had notice of the terms because of its numerous daily queries and the presence of the Terms of Use after each query.

94      The Second Circuit Court of Appeals in *Register.com* held, at 403, that an express statement of agreement is not always required in either paper or online contracts:

> . . .
>
> We recognize that contract offers on the Internet often require the offeree to click on an "I agree" icon. And no doubt, in many circumstances, such a statement of agreement by the offeree is essential to the formation of a contract. But not in all circumstances. **While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract. It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree**....
>
> [Emphasis added].
>
> . . .

The court held that by taking the benefit of the information on *Register.com*, Verio accepted the offer of contract.

95      In *Kanitz v. Rogers Cable Inc.* (2002), 58 O.R. (3d) 299, 21 B.L.R. (3d) 104 (Ont. S.C.J.), the defendant sought to stay the action on the grounds that there was an agreement between the parties that provided for arbitration of all claims. The disputed agreement stated it was subject to amendment and that notice of amendments would be provided. The court held that notice of the amendments was sufficient and that, pursuant to the agreement, continued use indicated consent. As a result, conduct can imply consent.

96      The court also commented on the electronic environment as follows at paras. 32-33:

> [32] I am also mindful, in reaching my conclusion on this point, of the fact that we are dealing in this case with a different mode of doing business than has heretofore been generally considered by the courts. We are here dealing with people who wish to avail themselves of an electronic environment and the electronic services that are available through it. It does not seem unreasonable for persons, who are seeking electronic access to all manner of goods, services and products along with information, communication, entertainment and other resources, to have the legal attributes of their relationship with the very entity that is providing such electronic access, defined and communicated to them through that electronic format.
>
> [33] I conclude, therefore, that there was adequate notice given to customers of the changes to the user agreement which then bound the plaintiffs when they continued to use the defendant's service. Consequently, I find that there is an arbitration agreement between the parties.

97      In *Pollstar v. Gigmania Ltd.*, 170 F.Supp.2d 974 (U.S. Dist. Ct. E.D. Cal. 2000), Pollstar's website contained a notice that use of the website was subject to a licence agreement and that proceeding to retrieve any further information from the website was agreement to be bound by the terms of the licence agreement. On a motion by the defendant to dismiss, the court held that the licence was arguably valid and enforceable. They noted that this was so even though the notice was in small gray print on a gray background.

98      However, not all browse wrap agreements have been enforced. The defendants rely on *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (U.S. C.A. 2nd Cir. 2002). In *Specht* the court rejected a browse wrap agreement for downloading software where the purchaser could download the software without seeing the notice of Terms of Use. The Terms of Use were only accessed if the purchaser scrolled down the page. There was no reason for them to do so, given they could access and download the software without needing to view the portions of the web page where the Terms of Use were posted.

99      *Specht* is a notice case. Presumably, if the notice of the terms had been prominently placed such that the notice was adequate, then the agreement would have been enforceable.

100      The *Specht* decision held that there are two requirements that must be met before a contract is found: first, that notice of the Terms of Use is clearly given; and, second, that there is clear assent to those terms by the user.

101      In the case at bar, the plaintiffs do not disagree that notice is required. They submit however, that acceptance of such terms does not require an express statement of agreement such as clicking on an "I Agree" button in order to access the Website or download information or software.

102      The Appeal Court in *Register.com* distinguished *Specht* as follows at 402:

. . .

Verio, however, cannot avail itself of the reasoning in *Specht*. In *Specht*, the users in whose favor we decided visited Netscape's web site one time to download its software. Netscape's posting of its terms did not compel the conclusion that its downloaders took the software subject to those terms because there was no way to determine that any downloader had seen the terms of the offer. There was no basis for imputing to the downloaders of Netscape's software knowledge of the terms on which the software was offered....

. . .

103      The real issue is whether the electronic nature of the transaction meets contractual requirements. In *Specht* the United States District Court Judge A. Hellerstein stated at 587:

Promises become binding when there is a meeting of the minds and consideration is exchanged. So it was at King's Bench in common law England; so it was under the common law in the American colonies; so it was through more than two centuries of jurisprudence in this country; and so it is today. Assent may be registered by a signature, a handshake, or a click of a computer mouse transmitted across the invisible ether of the Internet. Formality is not a requisite; any sign, symbol or action, or even wilful inaction, as long as it is unequivocally referable to the promise, may create a contract.

. . .

104      The plaintiffs rely on *Canadian Real Estate Assoc./L'Assoc. Canadienne d'immeuble c. Sutton (Québec) Real Estate Services inc.*, [2003] J.Q. No. 3606 (C.S. Que.), 2003 CanLII 22519, in which Terms of Use were found to be enforceable for the purposes of an interlocutory injunction. The court emphasized that the respondent was aware of the Terms of Use and had its own browse wrap Terms of Use. In granting the injunction, the court stated at para. 44(g):

**44** . . .

g. Sutton sait que des conditions d'utilisation s'appliquent et elle-même en impose aux utilisateurs de son propre site;

[TRANSLATION: Sutton knows that the user conditions apply and it even imposes similar user conditions on users of its website;]

. . .

105      The 67th District Court of Texas, in *American Airlines Inc. v. FareChase Inc.*, No. 067-194022-2 (Tex. 67th District Court, Tarrant County, Texas, Mar. 8, 2003), on a temporary injunction application, found that the defendant had violated *American Airline's* Terms of Use which prohibited use of their website for commercial purposes and that *American Airlines* had a probable right of recovery. The defendant FareChase used software to obtain copies of *American Airlines* flight schedules, seat availability and fares by giving users access to *American Airline's* computer system and website. Such access was contrary to the Terms of Use. FareChase continued to access the data despite notice to cease and desist. The court granted an interim injunction restraining the defendant's access to the plaintiff's website.

106      Initially in *Ticketmaster Corp. v. Tickets.Com Inc.*, 54 U.S.P.Q.2d 1344 (U.S. C.D. Cal. 2000) the California District Court refused a preliminary injunction against Tickets.com where the defendant had not been required to click an "I Agree" button. The plaintiff's website stated that going beyond that webpage was acceptance of their Terms of Use. Later however, after the plaintiff's website was modified to make the Terms of Use more prominent and to include a warning that proceeding further bound the user, the court denied the defendants motion for summary judgment having found that the matter of the contract claim should proceed to trial. The court in *Ticketmaster Corp. v. Tickets.Com Inc.* [(March 7, 2003), Doc. CV 99-7654 HLH (U.S. C.D. Cal.)], 2003 U.S. Dist. Lexis 6483 at para. 6 stated:

> ... a contract can be formed by proceeding into the interior web pages after knowledge (or in some cases, presumptive knowledge) of the conditions accepted when doing so.

107      As noted in the authorities referred to above, the law of contract requires that the offer and its terms be brought to the attention of the user, be available for review and be in some manner accepted by the user. Such an analysis turns on the prominence the site gives to the proposed Terms of Use and the notice that the user has respecting what they are agreeing to once they have accepted the offer. To establish a binding contract consideration will also be given to whether the user is an individual consumer or a commercial entity and in addition a one-time user or a frequent user of the site.

108      Browse wrap agreements have the advantage of being readily available for perusal by the user. Their enforcement requires a clear opportunity for the user to read them which, given the nature of computer and the Internet, is likely to be a better opportunity than that available to the user of a product with a standard form contract presented at the time of purchase. A properly enforceable browse wrap agreement will give the user the opportunity to read it before deeming the consumer's use of the website as acceptance of the Terms of Use. In the case at bar, notice is not an issue given the defendant has acknowledged it was aware of the Terms of Use and what conduct was deemed to be acceptance. In addition, the defendant Zoocasa relies on similar Terms of Use on its own Website. The defendants have also acknowledged that the Century 21 Website Terms of Use are industry standard.

***Public Policy Issue***

109      The defendants submit that to accede to the plaintiffs' arguments, respecting the binding nature of the Terms of Use, would be contrary to public policy as it would have negative effects on the operation of the Internet. The defendants suggest that accepting use of a website as conduct that serves as acceptance sufficient to form a contract would imperil the operation of the Internet as it currently functions. The concerns expressed are that this would have a chilling effect on the function and structure of the Internet in Canada. They state that the plaintiffs' claims are vague and would lead to results contrary to the public interest.

110      The defendants concerns, at first blush, appear to have some substance. That is, it would seem inappropriate that by users simply accessing a website which contains terms and conditions they will be bound contractually as a result, despite not having overtly agreed to such.

111      The defendants' argument implies that all information that is made available on the web must be available to all without contractual restrictions. They go so far as to state that the existence of the Internet depends upon it and indexing and linking are essential to the operations of the World Wide Web. I do not accept that submission.

112      The World Wide Web industry itself has recognized that the owners of websites have the right to restrict access to some or all of the information on their site. For this reason protocols designed to enable a search engine to determine what it is permitted to be included and what it is not have been created. Implicit in such standards is the recognition that the information on the Internet is not open to all. In addition, it is an acknowledgment that restrictions do not in fact inhibit or negatively affect the operation of the Internet to an unacceptable degree.

113      In *Cyber-Surfing on the High Seas of Legalese: Law and Technology of Internet Agreements*, (2008) 18 Alb. L.J. Sci & Tech 69 at 121,Ty Tasker & Daryn Pakcyk, the authors state:

Further, there is no blanket presumption of open, public access to a web site just because it is accessible via the World Wide Web.

114    The evolution of the Internet as an "open" medium with its ability to hyperlink, being key to its success, does not mean it must function free of traditional contract law. It is simply the manner of contracting that has changed, not the law of contract. The acceptance of click wrap and browse wrap agreements acknowledges the right of parties to control access to, and the use of, their websites.

115    Just because a party chooses to do business on the Internet should not mean they relinquish their rights to control access to their business assets and information. The defendants' submission would deny that right to the plaintiff Century 21. In turn, that would decrease their motivation to create and operate their Website.

116    In my opinion, a publically available website does not necessarily give a right of access free of any contractual terms. Depending on the circumstances, a contract may be formed.

117    It is important for commercial efficacy that contract terms can be agreed upon as easily in the electronic world as in the world of paper. In my opinion, the defendants' suggestion that the Internet would be crippled by enforcing Terms of Use is incorrect. To render Terms of Use unenforceable would impair the utility and health of the Internet as creator's products would not be capable of contractual protection. If offerors could not place information on the Internet without some measure of control, its utility would be diminished.

118    The defendants argue that what Century 21 provides, in making their Website available to the public, (as opposed to an internal "Intranet"), is merely a grant of access to the site. The defendants' argument may be correct in part; however, when a user accesses a main page that merely places the user at Century 21's door. Entry is an additional step and one that website owners clearly control and users can undoubtedly choose to take.

119    Taking the service with sufficient notice of the Terms of Use and knowledge that the taking of the service is deemed agreement constitutes acceptance sufficient to form a contract. The act of browsing past the initial page of the website or searching the site is conduct indicating agreement with the Terms of Use if those terms are provided with sufficient notice, are available for review prior to acceptance, and clearly state that proceeding further is acceptance of the terms.

120    While courts may in the future face issues such as the reasonableness of the terms or the sufficiency of notice given to users or the issue of contractual terms exceeding copyright (or Parliament may choose to legislate on such matters), none of those issues arises in the present case for the following reasons:

   i. the defendants are sophisticated commercial entities that employ similar online Terms of Use themselves;

   ii. the defendants had actual notice of Century 21 Canada's Terms of Use;

   iii. the defendants concede the reasonableness of Century 21 Canada's Terms of Use, through their admissions on discovery and by their own use of similar Terms of Use.

121    By October 6, 2008, the defendants knew that the Century 21 Website had Terms of Use, and had read those Terms of Use as solicitors for Century 21 had, by letter dated October 6, 2008 to the defendants' solicitors, attached a copy of them. The defendants also knew by October 6, 2008 that Century 21 was taking the position that the Zoocasa Website was breaching those Terms of Use. The website notice and adequacy of such notice is therefore irrelevant.

*Was There Consideration?*

122    The defendants also argue that in offering access to their Website, Century 21 is not giving any promise of benefit and undertakes no burden and as a result there is no consideration. I do not find this in fact to be the case.

123     Clearly the databases created by developers of websites have value. Information has value. The evidence in this case is that Zoocasa has spent over $6 million on its Website. Century 21 has expended over $6,345,849.59 from 2006 to December 31, 2009. Zoocasa's actions in accessing the Century 21 Website and copying photographs, property descriptions and other information affirms that there is value. Presumably if the information was without value Zoocasa would not seek it or use it. In my opinion there is consideration for the contract as Zoocasa obtained the benefit of the information displayed on the Website.

*Selective Litigation*

124      The defendants further claim that acceding to the plaintiffs' claims for breach of contract would encourage selective and differential treatment of website visitors undertaking the same activity, who may not even be aware of the existence of the Terms of Use. Their concern appears to be that the plaintiffs are claiming against them when they are only doing what any other visitor to the Century 21 Website does, yet no others are being sued.

125     Firstly, the evidence does not support such a proposition. It has not been shown that others are in violation of either the Terms of Use or the copyright of the plaintiffs. Even if that were the case, it is the plaintiffs' right to decide who to pursue, not that of the defendants. Secondly, Zoocasa is distinguishable from the common consumer as they have a commercial purpose and are a sophisticated consumer.

126     There can be a myriad of reasons for a plaintiff to initiate an action in one instance and not in another. The decision is theirs.

*The Automated Nature of Web Indexing*

127      Does the fact that Internet search engines access sites such as those of Century 21 using search engines, crawlers and robots change the legal situation? In my view it does not.

128      The involvement of a machine in the contractual process was considered by Lord Denning long before the ubiquitous presence of personal computers and the Internet. In the 1970 decision *Thornton v. Shoe Lane Parking Ltd.* (1970), [1971] 1 All E.R. 686 (Eng. C.A.), the plaintiff parked his car in an automatic car park, purchased a ticket from a dispenser and parked. Lord Denning stated at 689:

> . . .

> ... The customer pays his money and gets a ticket. He cannot refuse it. He cannot get his money back. He may protest to the machine, even swear at it; but it will remain unmoved. He is committed beyond recall. He was committed at the very moment when he put his money into the machine. The contract was concluded at that time. It can be translated into offer and acceptance in this way. The offer is made when the proprietor of the machine holds it out as being ready to receive the money. The acceptance takes place when the customer puts his money into the slot....

> . . .

129      A machine or a computer and the software that runs it has at some point been constructed and programmed by an individual. As noted by Sookman at 10.5:

> ... an electronic agent, such as a computer program or other automated means employed by a person, is a tool of that person. Ordinarily, the employer of a tool is responsible for the results obtained by the use of the tool since the tool has not independent volition of its own. When computers are involved, the requisite intention flows from the programming and use of the computer."

I agree with this statement. Liability is not avoided by automating the actions in question.

130    In this instance, the defendant Zoocasa has acknowledged that, prior to indexing the Century 21 Website, the layout of that site was reviewed by an employee. In other words, the initial access was in fact not automated and an individual programmed the automated indexing. J. R. Langlois, the president of Zoocasa stated that:

When Zoocasa first indexes a website, a Zoocasa employee reviews the website, looks at the architecture of the site, and sets parameters for locating the desired items. Once the indexing has been set up, it is automatically repeated daily.

This was done to insure that particular information such as price, description, address, bedrooms, bathrooms and the agent and broker information was included.

131    While the Terms of Use were not posted when Zoocasa initially set up the automated indexing of the Century 21 Website, they were subsequently made aware of those terms.

**Was a Contract Formed Between the Plaintiff Century 21 and the Defendant Zoocasa?**

132    Zoocasa acknowledges it became aware of the existence of the Terms of Use after they were brought to their attention in October 2008. Mr. Lee, a representative of Zoocasa, admitted that by October 6, 2008, they knew that the Century 21 Website had Terms of Use and had read the Terms of Use. As a result, there is no issue respecting sufficient notice of the Terms of Use or their provisions. The defendants also acknowledge that the Century 21 Website Terms of Use are industry standard. They were also aware that if they did not agree to the Terms of Use then they should not use the Website. They knew as well that if they accessed the Website the Terms of Use purported to form a contract. Notwithstanding these admissions, the defendants state that at no time did they agree to be bound by the Terms of Use.

133    As a result, notice of the Terms of Use, knowledge of their content and their purported effect are not in issue. The sole issue is whether, with that notice and knowledge, Zoocasa's acts of accessing the Century 21 Website, formed an agreement.

134    As previously discussed, where notice of the Terms of Use is established along with the knowledge that using the Website will serve as agreement to the Terms of Use, then I am satisfied that agreement is proven. As noted in the browse wrap cases, the act of proceeding further into the website is sufficient to communicate agreement. I find that Zoocasa's conduct formed a contract. It is not a case of a contract being imposed without their assent.

135    However, the defendants also state that for there to be an enforceable contract there must be certainty over the terms of the contract. They note that the Terms of Use purport to allow Century 21 to unilaterally amend the Terms of Use from time to time and to terminate the agreement unilaterally at any time without notice and in its sole discretion. They state that if Century 21 takes no steps to obtain affirmative agreement to any such amendment or its process, then there is no enforceable agreement. In substance they rely on the principle that one party cannot arbitrarily and unilaterally end an agreement or change the terms of an agreement.

136    Century 21 confirms that there have been no changes to the Terms of Use that were posted on their Website on October 5, 2008. The Terms of Use are also not capable of retroactive change. Given there have been no changes since the Terms of Use were first posted, the plaintiffs rely on the Terms of Use posted on October 5, 2008. As a result of the foregoing, I do not need to further consider the issues that arise from unilateral changes without further notice.

137    The defendants also state that certain terms of the purported agreement are uncertain. They specifically identify the use of the word "scraping". As noted earlier, the experts differ on the precise meaning of "scraping". They do appear however to agree that it is a type of indexing. Dr. Levine defines it at para. 34 of his report as follows:

Specialized search engines sometimes use a modified indexing scheme informally known as "scraping". The distinction between scraping and regular indexing is that scraping looks for specific information located in known positions on selected web pages with known layouts, while indexing uses more general techniques to extract index terms from web pages without specific layouts or formats.

138     Century 21 does not dispute that the term is not well defined. Given my findings that Zoocasa has copied both property descriptions and photographs, regardless of whether the act of indexing was of a general nature or involved scraping, is not relevant to the issues in dispute. As a result, I do not need to delve further into whether it is presently capable of precise definition.

*Allegations of Breach of Terms of Use*

139     The Terms of Use prohibit a user from doing the following with content from the Century 21 Website:

a. "copy" the content;

b. "reproduce" the content;

c. "save [the content] onto your own computer";

d. "merge with other data";

e. "frame in another website";

f. "post on another website";

g. "use the Content for any public, commercial or non-personal purpose";

h. "display" or "disseminate" the content to another individual or entity;

i. "screen scraping" or "database scraping" and "any other activity intended to collect, store, re-organize, summarize or manipulate any Content (whether via an automatic program or a manual process)";

j. "accessing" the Century 21 Website in breach of the Terms of Use; and

k. maintaining a link to the Century 21 Website after Century 21 has given notice that it has revoked its consent for such a link.

140     I find that Zoocasa has breached each of the above provisions. The evidence of the plaintiffs and the admissions of Zoocasa support findings that Zoocasa has, at the times in question, done the following:

a. "copied" content from the Century 21 Website;

b. "reproduced" the content of the Century 21 Website, such as property descriptions, on the Zoocasa Website;

c. "saved" and stored the content onto Zoocasa's computer servers;

d. "merged" the content taken from the Century 21 Website with other data on the Zoocasa Website;

e. "framed" the Century 21 Website within the Zoocasa Website for a period of time;

f. "posted" the content on another website being the Zoocasa Website;

g. "used" the content for a "commercial" purpose;

h. "displayed" and "disseminated" content taken from the Century 21 to the public on the Zoocasa Website;

i. "accessed" the Century 21 Website for a commercial purpose;

j. "maintained" a link to the Century 21 Website after Century 21 has given notice that it had revoked its consent for such a link.

141    I find that Century 21's Terms of Use constitute a binding contract between the parties, that Zoocasa had actual knowledge of the Terms of Use and in continuing its actions after notice of those Terms of Use, Zoocasa breached those terms.

**Copyright**

142    Copyright is a creature of statute. In *Compo Co. v. Blue Crest Music Inc.* (1979), [1980] 1 S.C.R. 357 (S.C.C.), at 372-373, Estey J. commented:

> . . .
>
> ... copyright law is neither tort law nor property law in classification, but is statutory law. It neither cuts across existing rights in property or conduct nor falls between rights and obligations heretofore existing in the common law. Copyright legislation simply creates rights and obligations upon the terms and in the circumstances set out in the statute. This creature of statute has been known to the law of England at least since the days of Queen Anne when the first copyright statute was passed. It does not assist the interpretive analysis to import tort concepts. The legislation speaks for itself and the actions of the appellant must be measured according to the terms of the statute.
>
> . . .

143    Sections 5 and 27 of the *Copyright Act -* R.S.C., 1985, c. c-42, provide that:

> **5.** (1) Subject to this Act, copyright shall subsist in Canada, for the term hereinafter mentioned, in every original literary, dramatic, musical and artistic work if any one of the following conditions is met:
>
> (a) in the case of any work, whether published or unpublished, including a cinematographic work, the author was, at the date of the making of the work, a citizen or subject of, or a person ordinarily resident in, a treaty country; ...

> **27.** (1) It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

***Plaintiffs' Position***

144    The plaintiffs base their claim for copyright infringement on property descriptions and photographs. Copyright in the property descriptions and in the photographs lies with Bilash and Walton. However, each of Bilash and Walton licenced to Century 21 "use of the Works to promote the business of Century 21 Canada, including, without limitation, use on the Century 21 Canada's Website". In addition they assigned their right of action for copyright infringement to Century 21. As a result, Century 21 seeks damages for copyright infringement. In the alternative, if the Copyright Licence Agreements are not effective, then judgment is sought in favour of Bilash and Walton for copyright infringement.

***Defendants' Position***

145    The defendants say that the plaintiffs are proposing to apply an extreme reading of copyright law. They argue that Zoocasa's indexing and linking is not an infringement of copyright because linking and indexing by search engines on the Internet are integral to the functioning of the Internet. They further argue that policies that seek to impede linking across the Internet threaten the open nature of this system and public policy should discourage attempts to impose such impediments.

146    The defendants also take issue with who among the plaintiffs is entitled to advance a claim for breach of copyright.

***Ownership of Copyright and Copyright Licence***

147    The Copyright Licence Agreement dated December 2, 2008, licences Century 21 to use the Works of Nechako, Bilash and Walton (the "December Assignment"). The Works are defined as including photographs of properties offered for sale along with their descriptions and other details. It also assigns to Century 21 the right to bring an action for copyright infringement

regarding the Works. Similar terms are found in the Copyright Licence Agreement dated February 12, 2010, between Century 21 and Charles Bilash Personal Real Estate Corporation (the "February Assignment").

148      Century 21 does not assert that they have a claim in copyright. Their claim is based upon the licences granted by the December Assignment and the February Assignment (the "Assignments") along with the assignment of the right to bring an action for copyright infringement.

149      Section 13 of the *Copyright Act* provides:

**Ownership of Copyright**

**13.** (1) Subject to this Act, the author of a work shall be the first owner of the copyright therein.

**Assignments and licences**

(4) The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

**Ownership in case of partial assignment**

(5) Where, under any partial assignment of copyright, the assignee becomes entitled to any right comprised in copyright, the assignee, with respect to the rights so assigned, and the assignor, with respect to the rights not assigned, shall be treated for the purposes of this Act as the owner of the copyright, and this Act has effect accordingly.

**Assignment of right of action**

(6) For greater certainty, it is deemed always to have been the law that a right of action for infringement of copyright may be assigned in association with the assignment of the copyright or the grant of an interest in the copyright by licence.

**Exclusive licence**

(7) For greater certainty, it is deemed always to have been the law that a grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence.

150      In order for Century 21 to bring an action for copyright infringement with respect to the Works, the plaintiffs must establish who owns the copyright in the Works, whether the copyright has been validly assigned and the effective date of such assignment.

151      The defendants challenge the plaintiffs' assertions respecting who owns the Works on the basis that the plaintiffs did not indicate who specifically owned the Works until late in the day. They note as well that the further amended statement of claim advances several alternative assertions as to the ownership of the copyright in the Works and holds out Bilash and Walton as but two possible owners of copyright in the Works in addition to Bilash Corporation, In Town Realty and Century 21.

152      In the case of Mr. Walton, he writes his own property descriptions and takes his own pictures. On the day this action was started Walton entered into the December Agreement.

153      The defendants challenge the Agreements and describe that challenge as follows:

First, the "Works" are not defined with any specificity whatsoever. They are simply described as "certain works produced in connection with properties listed for sale in British Columbia by Bilash and Walton" which are said to "[i]nclude photographs of the properties listed for sale, property descriptions, and other property details."

Second, the Works are not even attributed to one person, but rather to Bilash, Walton, and Nechako Real Estate Ltd.

Third, there is no apparent provision for future-created works. Accordingly, it would appear that the only Works in respect of which Walton could assign a right to bring an action would be those created before December 2, 2008.

Fourth, there is no fixed term of the Agreement.

154    With respect to the first two objections, the specific Works and the ownership in those Works is a matter of evidence. In *EW Savory Ltd. v. World of Golf Ltd.*, [1914] 2 Ch. 566 (Eng. Ch.), at 568, the copyright holder in that case gave a written assignment to the plaintiffs for "five original card designs inclusive of all copyright" and "four golfing subjects". The defendants, much like the case at bar, challenged the validity of the assignment on the basis that the description of the subject-matter was not sufficient to validly assign copyright. Neville J. held that the court could admit parol evidence to identify the subject-matter of a contract and found that the copyright over the subject-matter that the plaintiffs claimed had been infringed was in fact the same subject-matter referred to in the assignment agreement. In the case at bar the agreement states that it covers properties listed by Bilash and Walton in British Columbia. In my view that description combined with the listings identified in the statement of claim and established by the evidence is sufficiently specific to identify the subject-matter of the assignment.

155    With respect to the lack of a provision relating to future created Works the agreement does not address the issue of past, present or future works. Copyright in a non-existent (future) work cannot be assigned, just as you cannot transfer property in non-existent land or goods. However, on the authority of *Performing Right Society Ltd. v. London Theatre of Varieties Ltd.* (1923), [1924] A.C. 1 (U.K. H.L.), at 13 when a work that is not yet created is assigned, parties are treated in equity as promising to assign the future copyright once the work is created. At that point, the promisee becomes the equitable assignee and the beneficial owner of the copyright, and the promissor is the equitable assignor with a bare legal title: David Vaver, *Intellectual Property Law* (Irwin Law: Toronto, Ont, 1997) at 245. The power of assignment is not confined to an assignment of the legal property, but will apply to the transfer of any interest, whether legal or equitable: *Performing Right Society* at 18. As a result, the assignment of future created works is still valid in equity as between the parties provided it is made for valuable consideration. As soon as the works are created the copyright is validly assigned to the assignee.

156    See also *Ward, Lock & Co. v. Long*, [1906] 2 Ch. 550 (Eng. Ch.), where the court held that there can be an assignment in future works in the form of an agreement to assign.

157    As a result, unless specified otherwise, the assignment agreement applies generally to the Works produced relating to the properties listed by Bilash and Walton.

158    With respect to Bilash, they also challenge the agreement for similar reasons but in addition address the fact that Bilash did not write the property descriptions in issue. Rather the property descriptions in which he claims copyright were written by his employee Ms. Gray.

159    Section 13(3) of the *Copyright Act* provides as follows with respect to works created by an employee in the course of his or her employment:

> **13.** (3) Where the author of a work was in the employment of some other person under a contract of service or apprenticeship and the work was made in the course of his employment by that person, the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright, but where the work is an article or other contribution to a newspaper, magazine or similar periodical, there shall, in the absence of any agreement to the contrary, be deemed to be reserved to the author a right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical.

160    Ms. Gray had a written contract of employment with Bilash whereby, until January 1, 2009, Bilash personally paid Ms. Gray's salary. It is not disputed that until January 2009 copyright in the property descriptions resided in Bilash as Ms. Gray's employer. After January 2009, Ms. Grey continued to work for Bilash as his employee absent a written agreement.

161     However, in January 2009 Mr. Bilash incorporated a company. The evidence is that the corporation did not enter into an employment agreement with Ms. Gray. The only employment agreement was that between Bilash personally and Ms. Gray. However, Bilash also stated that he intended to declare her income for tax purposes as being paid from the corporation.

162     What I take from the evidence is that Bilash incorporated the company with the intention of running his real estate business through his corporation but, as is often the case, he did not formalize this change in relation to his own employment agreement nor the employment agreement with Ms. Gray. The evidence does not indicate if the corporation paid Ms. Gray from a corporate bank account. The evidence of Bilash in response to whom paid her salary was, "Well, when the taxes are going to be done, I mean, she's going to be taxed as an employee for Bilash Corporation."

163     I conclude that, at the time of hearing, Ms. Gray's existing employment agreement had not yet been cancelled or varied. Bilash remained her employer. As a result I am satisfied that Bilash retains copyright in Ms. Grey's work.

164     This finding would normally result in the conclusion as well that the assignment of copyright made by Bilash to Century 21 remains validly assigned. At first blush this may appear to have changed on February 12, 2010, when Bilash Corporation entered into the February Agreement with Century 21. That Agreement however specifically provides that "Bilash Corporation may be the owner of copyright ...". It is therefore only an assignment of such copyright as Bilash Corporation may own.

165     With respect to the photographs, Bilash stated that he hired the photographers. However, he also stated he carried on business through his corporation. He did not state his corporation hired the photographers. He did acknowledge that his company paid them.

166     It is clear from the affidavit and discovery evidence that Bilash has a layman's appreciation of the impact of incorporation which I infer was done primarily for tax purposes. He appears to operate on the basis that his accountant at the end of the year determines what is corporate and what is personal. No documentary evidence was produced indicating any written agreement respecting the photographs as apparently none exists. Nor was there evidence that Bilash informed those photographers that they were now dealing with his company, not him.

167     I conclude on the balance of probabilities that Bilash personally continued to contract with the photographers and that this arrangement did not change.

168     On the basis of my conclusion respecting the employment status of Ms. Gray and Bilash's practice with respect to hiring photographers, I find that after Bilash incorporated, the copyright in the property descriptions created by Ms. Gray and the copyright in the photographs Bilash hired to be taken, remained that of Bilash. Bilash Corporation has no copyright to assign.

169     Given these findings the nature and effect of the December and February Copyright Licence Agreements must be considered.

*Copyright Licence Agreement*

170     As noted earlier in preparation for these proceedings and in order to enable Century 21 to claim for copyright infringement, Bilash, Walton and Bilash Corp. each executed a Copyright Licence Agreement (the "Agreements") that purport to assign their interest in copyright to Century 21.

171     The operative portion of each of the Agreements reads as follows:

**Permitted Uses**

During the term of this Agreement, Century 21 Canada may:

(i) use the Works to promote the business of Century 21 Canada, including, without limitation, use on Century 21 Canada's website; and

25

(ii) subject to the consent of [copyright holder], which consent shall not be unreasonably withheld, use, copy and reproduce, incorporate, adapt and otherwise utilize the Works, in whole or in part, and any derivatives thereof. If any derivative work based upon the Works is created by or for Century 21 Canada for its use, [copyright holder] shall be entitled to own the copyright therein and the derivative work shall be subject to the terms of this Agreement.

**Assignment of Right of Action**

[Copyright holder] assigns to Century 21 Canada the right to bring an action for copyright infringement with respect to the Works.

172    The Agreements are described as "Copyright Licence Agreements". An issue arises between the purported licence to use the Works and the effect of the assignment of the right of action for copyright infringement.

173    As noted in John McKeown, *Fox Canadian Law of Copyright*, 3d ed. (Carswell: Scarborough, Ont., 2000) [*Fox Canadian Law of Copyright*] at 380:

The fact that the document describes the grantor as the licenser and the grantee as the licensee may be immaterial if the intent to be gathered from the document as a whole is that it is to operate as an assignment and not a licence. Frequently, the terms are used indiscriminately. The court must look to the substance of the transaction, not its form. [Citations omitted.]

174    An assignment is a transfer of a right such that the assignee is the owner of the legal interest in the right and the assignor is left without any control over the right transferred, except for moral rights. Under a licence, the licencee is given permission to do certain acts which might otherwise constitute infringement of the licencor's rights and does not involve any change of ownership in the copyright: *Marquis v. DKL Technologies Inc.* (1989), 24 C.I.P.R. 289 (C.S. Que.); *Fox Canadian Law of Copyright*, at 380.

175    In this instance, the terms of the licence simply grant to Century 21 the use of the Works. It is not even an exclusive use. The copyright holder clearly retains the copyright including any other use or derivative use of the Works. In addition, the use of the Works is pursuant to the ongoing consent of the party which holds copyright, rather than an outright assignment of the copyright in the Works. As a result, I am of the view that what Bilash, Walton and Bilash Corporation purport to grant as an assignment is in fact a licence.

176    What then is the effect of the assignment to Century 21 of the right to bring an action for copyright infringement with respect to the Works?

177    The right to assign a right of action arises from s. 13 of the *Copyright Act* ss. 6 and 7 which I will repeat for convenience:

**Assignment of right of action**

(6) For greater certainty, it is deemed always to have been the law that a right of action for infringement of copyright may be assigned in association with the assignment of the copyright or the grant of an interest in the copyright by licence.

**Exclusive licence**

(7) For greater certainty, it is deemed always to have been the law that a grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence.

178    The right is procedural and grants to the licencee the authority to enforce the rights of the copyright holder to the extent they are granted under the terms of the assignment or exclusive licence.

179    The licence in this instance is not exclusive as it fails to state such. It simply grants a right to Century 21 to use the Works. Century 21 does not possess a proprietary interest or the grant of an interest in the infringed works. As a result, Century 21 can only enforce licencing, not copyright, infringement to the limited extent granted to it by the licence. In this case, that is

the right to use the Works. However, as the licence that Century 21 holds is not exclusive, the assignment of the right of action to enforce copyright infringement is moot.

180     The claims for copyright infringement therefore lie with Bilash and Walton, not Century 21. The claim of Century 21 for copyright infringement is dismissed.

**Discussion of Copyright**

181     The initial issue is whether the property descriptions and photographs used by the plaintiffs are entitled to copyright protection. The work must have some "literary character". The work must provide "information, instruction or ... literary enjoyment" and the "author must bestow some brainwork upon a work and that a work must not be a 'mere collection of copies of public documents'": John McKeown, *Fox Canadian Law of Copyright and Industrial Designs*, 4th ed. looseleaf (Toronto: Carswell, 2003), at s. 7:4 [*Fox*].

182     In *CCH Canadian Ltd. v. Law Society of Upper Canada*, 2004 SCC 13 (S.C.C.), at paras. 16-17 the Supreme Court of Canada discussed what kind of work is entitled to copyright protection:

> 16 For a work to be "original" within the meaning of the *Copyright Act*, it must be more than a mere copy of another work. At the same time, it need not be creative, in the sense of being novel or unique. What is required to attract copyright protection in the expression of an idea is an exercise of skill and judgment. By skill, I mean the use of one's knowledge, developed aptitude or practised ability in producing the work. By judgment, I mean the use of one's capacity for discernment or ability to form an opinion or evaluation by comparing different possible options in producing the work. This exercise of skill and judgment will necessarily involve intellectual effort. The exercise of skill and judgment required to produce the work must not be so trivial that it could be characterized as a purely mechanical exercise. For example, any skill and judgment that might be involved in simply changing the font of a work to produce "another" work would be too trivial to merit copyright protection as an "original" work.

> 17 In reaching this conclusion, I have had regard to: (1) the plain meaning of "original"; (2) the history of copyright law; (3) recent jurisprudence; (4) the purpose of the *Copyright Act*; and (5) that this constitutes a workable yet fair standard.

183     Works used for commercial purposes are also entitled to copyright protection. For example, an advertisement inserted in a newspaper has been held entitled to copyright protection: *Fox Canadian Law of Copyright* at s. 4:6; *Slumber-Magic Adjustable Bed Co. v. Sleep-King Adjustable Bed Co.* (1984), [1985] 1 W.W.R. 112, 28 A.C.W.S. (2d) 371 (B.C. S.C.). In *Slumber-Magic*, McLachlin J. stated at 115:

> . . .

> The question is whether the plaintiff had copyright in the brochure? In my opinion, it did. The defendants suggest that there is no copyright in the brochure because it used ideas and elements which are also found in the brochures of other competitors. That, however, does not defeat a claim for copyright. It is well established that compilations of material produced by others may be protected by copyright, provided that the arrangement of the elements taken from other sources is the product of the plaintiff's thought, selection and work. It is not the several components that are the subject of the copyright, but the overall arrangement of them which the plaintiff through his industry has produced. The basis of copyright is the originality of the work in question. So long as work, taste and discretion have entered into the composition, that originality is established. In the case of a compilation, the originality requisite to copyright is a matter of degree depending on the amount of skill, judgment or labour that has been involved in making the compilation: *Ladbroke (Football) Ltd., v. William Hill (Football) Ltd.*, [...] [1964] 1 All E.R. 465 (H.L.)....

184     In *Ladbroke (Football) Ltd. v. William Hill (Football) Ltd.*, [1964] 1 All E.R. 465 (U.K. H.L.), at 469 Lord Reid said:

> ... Copyright gives the exclusive right to do certain things including "reproducing the work in any material form",... and reproduction includes reproduction of a substantial part of the work.... Broadly, reproduction means copying, and does not

include cases where an author or compiler produces a substantially similar result by independent work without copying. If he does copy, the question whether he has copied a substantial part depends much more on the quality than on the quantity of what he has taken. One test may be whether the part which he has taken is novel or striking, or is merely a commonplace arrangement of ordinary words or well-known data. So it may sometimes be a convenient short cut to ask whether the part taken could by itself be the subject of copyright. **But, in my view, that is only a short cut, and the more correct approach is first to determine whether the plaintiff's work as a whole is "original" and protected by copyright, and then to inquire whether the part taken by the defendant is substantial**. A wrong result can easily be reached if one begins by dissecting the plaintiff's work and asking, could section A be the subject of copyright if it stood by itself, could section B be protected if it stood by itself, and so on. To my mind, it does not follow that, because the fragments taken separately would not be copyright, therefore the whole cannot be. Indeed, it has often been recognised that if sufficient skill and judgment have been exercised in devising the arrangements of the whole work, that can be an important or even decisive element in deciding whether the work as a whole is protected by copyright.

[Emphasis added].

185     The property descriptions describe particular real properties. They are created to market the property to potential buyers. It is apparent they are written for each property in a manner to highlight the positive aspects of the properties. There is also the evidence of Bilash and Walton that there is some level of skill involved in writing an effective property description. I am satisfied that the property descriptions are the product of skill and judgment. As a result they meet the threshold for copyright protection.

186     Section 13(2) of the *Copyright Act* provides as follows with respect to photographs:

**13**. (2) Where, in the case of an engraving, photograph or portrait, the plate or other original was ordered by some other person and was made for valuable consideration, and the consideration was paid, in pursuance of that order, in the absence of any agreement to the contrary, the person by whom the plate or other original was ordered shall be the first owner of the copyright.

187     With respect to the photographs in question, the requirement for originality is low and can arise from the choice of subject matter, the creation of the scene, the angle of the photograph or other factors: *Fox Canadian Law of Copyright* at s. 10:11(c). Again, I am satisfied that they satisfy the originality requirements of the *Copyright Act* and they are entitled to copyright protection.

188     Bilash deposed that he retained a professional photographer to take photographs of each property that he was hired to market as the listing agent. Ms. Gray arranged for photographers to take photographs of the property. Bilash ordered and paid for the original electronic files of the digital images so that he could copy and use them as he saw fit in his marketing campaigns, as opposed to ordering just prints of the photographs. Prior to January 1, 2009, the money to pay the photographers came from Bilash's personal account. From January 1, 2009, onwards, the money to pay the photographers came from the account of Bilash Corporation.

189     I am satisfied that Bilash owns copyright in the photographs pursuant to s. 13(2) given he ordered them, they were made for valuable consideration, he paid for the originals and there was no agreement between him and the photographers to the contrary.

190     Walton owns the copyright in the five property descriptions written by him which are the subject matter of his claim. Bilash owns the copyright in the property descriptions written by his assistant Ms. Gray as she was his employee: s. 13(3) *Copyright Act*. With respect to the photographs ordered and paid for by him he also owns the copyright in them: s. 13(2) *Copyright Act*.

***Infringement of Copyright***

191     Section 2 of the *Copyright Act* defines "infringing" as: "in relation to a work in which copyright subsists, any copy, including any colourable imitation, made, or dealt with in contravention of this *Act*."

192    Section 27(1) of the *Copyright Act* prohibits copyright infringement as follows:

It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

193    Section 3(1) in turn provides the owner of copyright with the sole right to do the following:

For the purposes of this Act, "copyright", in relation to a work, means the sole right to produce or **reproduce the work or any substantial part thereof in any material form whatever**, ...

. . .

and to authorize any such acts.

[Emphasis added]

194    In order to find copyright infringement, a plaintiff must prove copying of the work or a substantial part thereof and access to the copyright protected work: *Kantel v. Grant*, [1933] Ex. C.R. 84 (Can. Ex. Ct.), at 96. Determining whether a substantial part of the work has been taken is a question of fact: *King Features Syndicate Inc. v. Lechter*, [1950] Ex. C.R. 297 (Can. Ex. Ct.); *U & R Tax Services Ltd. v. H & R Block Canada Inc.* (1995), 62 C.P.R. (3d) 257 (Fed. T.D.), at para 35. For example, in *Hawkes & Son (London) Ltd. v. Paramount Film Service Ltd.*, [1934] Ch. 593 (Eng. C.A.) a film reproduced 20 seconds of the 4 minute long Colonel Bogey March. The portion reproduced was the principal air of the march. The court held that given the portion reproduced was clearly recognizable as the Colonel Bogey March what was reproduced was, in the words of Slesser, L.J., "a substantial, a vital, and an essential part". He also noted that "other matters beyond mere quantity may and have to be looked at."

*Has There Been Infringement?*

195    Zoocasa admits that it copied the property descriptions and photographs belonging to Bilash and Walton onto its servers. It also admits that it indexed the Century 21 Website and that it indexed all the property listings found within the Website. That indexing included the URL, price, MLS description, address, province, city, bedrooms, bathrooms, lot size, listing style, year built, status, taxes, storeys, agent name, agent email, agent title, agent website, broker name, broker email, broker phone, broker address, broker website and image URL.

196    For each property listing that it indexed until approximately November 20, 2008, Zoocasa copied, among other things, the full property description and one photograph onto its servers. That information was stored in Zoocasa's database. After November 20, 2008, Zoocasa displayed a truncated portion of the description but continued to copy the whole description and a photograph onto its servers.

197    Given the admissions of Zoocasa all of the listings of Walton and Bilash were accessed as described. The plaintiffs have chosen to rely on a total of 128 Works consisting of 29 property descriptions and 99 photographs that were copied. While Zoocasa disputes that certain of the 128 Works were in fact copied by their company, I am satisfied based on the evidence of Bilash, Walton, WTL and the notices to admit that at least 29 property descriptions and 99 photographs were copied. Zoocasa's disagreement appears to be based on their inability to match certain of the property descriptions to their records rather than a denial that the Works were copied.

198    The breakdown of those 128 Works are that 24 of the property descriptions and 99 photographs are owned by Bilash and 5 property descriptions belonging to Walton were copied. The defendants assert that they did not display a substantial portion of the plaintiffs' Works. They refer to "snippets" having been copied. While that may be the case once they reverted to truncated property descriptions, the previous copying of the complete written property descriptions cannot, in my view, be described as a "snippet".

199     What is substantial is not simply a question of quantity. Other factors relevant to the question of whether the taking was "substantial" are the importance of the part, the nature of the work and the use of the work to compete with the copyright holder.

200     An example of a property description characteristic of those copied is:

175 W 39th

A Stunning Cambie Bungalow home with basement that is the perfect for any family without breaking the bank!!

This is a gorgeous completely renovated home, located in the fantastic Cambie neighborhood just steps to the Queen E Park, Oakridge Shopping Centre, walking distance to the new Canada Line.

Major renovations include new drain tiles, new electrical/wiring, new roof, new double paned windows, new exterior and interior paint, new backyard & fence with 700 sq ft large cedar entertaining deck, permanent outdoor kids play area and much more.

Beautifully finished living spaces including a brand new chef's kitchen with superior quality Jenn Air appliances including built in fridge, gas stove, dishwasher, trash compactor, built in microwave, industrial quality canopy hood fan plenty of solid wood shaker style cabinetry and granite countertops.

Enjoy your view to the deck and children's play area through the large double windows.

The French doors off both the kitchen and dining room area open to the fantastic cedar deck with glass railings.

Completely new bathrooms with custom imported tumbled marble stonework; oversize soaker jet tub; Italian travertine flooring and chrome fixtures.

Other features of this home include re-finished solid oak flooring throughout, recessed pot lighting on both levels; cozy gas fireplace with a travertine surround and solid wood mantle; original cove ceiling in the living room; all brand new double paned windows with white trims; designer color scheme throughout with solid wood 8 inch baseboards and new smooth ceiling finish.

Main level features the huge master bedroom with tons of custom built closet space. Follow the open railed staircase which leads you downstairs to 2 spacious bedrooms with cream Berber carpets there is also a perfect wine cellar space; a great family room; den area; brand new bathroom; laundry room with side by side Maytag appliances and a separate entrance to the backyard.

This wide lot has an excellent level front yard with great landscaping for a clean contemporary look. The entire street has great curb appeal and is a very quiet family neighbourhood. Approximately $250,000 spent in renovations; all you need to do is move in. Please call for price.

201      In my view, such property descriptions were a substantial portion of each real estate listing page on the Century 21 Website, not only with respect to quantity but also in their overall significance respecting the property listing described.

202     An example of the truncated property description which Zoocasa commenced using in November 2008 is:

212-819 Hamilton St, Vancouver, B.C. V6Z 6M2 $285,000 - 1 Bed, 1 Bath - Great Newly Updated Jr 1 Bedroom at 819 Hamilton. This is a great West facing 1 bedroom suite which has lots of great....

203     I find that the practice of Zoocasa, from its inception until November 2008, of indexing and copying the entire property description was, in the words of Slesser, L.J. in *Hawkes*, "the indexing and copying of a substantial, a vital, and an essential part" of the plaintiffs' Works.

204     The continued copying of the entire property description to the Zoocasa server is a violation of copyright. The truncated versions of the property description in my view do not infringe copyright as they do not meet the criteria for substantial copying sufficient for copyright infringement.

205     With respect to the photographs, Zoocasa was not merely copying a thumbnail image as in the case of *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (U.S. C.A. 9th Cir. 2003), but rather the entire photograph. This was a clear violation of copyright.

*Defences to Copyright Infringement*

206     Section 29 of the *Copyright Act* creates an exception for copyright infringement known as the fair dealing exception. Once it has been shown that copyright has been infringed without permission of the copyright holder, the defendant may plead relief under the fair dealing provisions of the *Copyright Act*. The *Copyright Act* creates a two-part test for determining if fair dealings are exempted from copyright infringement. First, the dealing must be fair and second, it must be done for the purpose of research, private study, criticism, review, or news reporting all of which must be without motive or gain. The leading case in Canada concerning fair dealing is *CCH* cited above at para. 181.

207     In *CCH* at paras. 9-10, the Supreme Court of Canada discussed copyright infringement as follows:

9 In Canada, copyright is a creature of statute and the rights and remedies provided by the *Copyright Act* are exhaustive: see *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34, at para. 5; *Bishop v. Stevens*, [1990] 2 S.C.R. 467, at p. 477; *Compo Co. v. Blue Crest Music Inc.*, [1980] 1 S.C.R. 357, at p. 373. In interpreting the scope of the *Copyright Act*'s rights and remedies, courts should apply the modern approach to statutory interpretation whereby "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42, at para. 26, citing E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87.

10 Binnie J. recently explained in *Théberge, supra*, at paras. 30-31, that the *Copyright Act* has dual objectives:

The *Copyright Act* is usually presented as a balance between promoting the public interest in the encouragement and dissemination of works of the arts and intellect and obtaining a just reward for the creator ....

The proper balance among these and other public policy objectives lies not only in recognizing the creator's rights but in giving due weight to their limited nature.

In interpreting the *Copyright Act*, courts should strive to maintain an appropriate balance between these two goals.

208     The Supreme Court of Canada, in *CCH*, at para. 53 adopted from the appeal decision of Linden J.A. in the Federal Court of Appeal and in *Hubbard v. Vosper* (1971), [1972] 1 All E.R. 1023 (Eng. C.A.), at 1027, "as well as the doctrine of fair use in the United States" certain factors to be considered when assessing fair dealing identified as follows:

. . .

(1) the purpose of the dealing;

(2) the character of the dealing;

(3) the amount of the dealing;

(4) alternatives to the dealing;

(5) the nature of the work; and

(6) the effect of the dealing on the work.

. . .

209    These factors are neither essential nor exhaustive. Not all of these factors will arise in every instance and in some contexts there may be factors other than those listed that will be relevant to a determination of whether the dealing was fair.

**The Application of the Principles of CCH**

*Fair Dealing*

210    Both parties refer to American authorities. In doing so the comments of Estey J. in *Compo* at 367, and relied upon in *Galerie d'art du Petit Champlain inc. c. Théberge*, 2002 SCC 34 (S.C.C.) at para. 72, must be kept in mind:

72 . . .

... United States court decisions, even where the factual situations are similar, must be scrutinized very carefully because of some fundamental differences in copyright concepts which have been adopted in the legislation of that country.

211    Zoocasa admits to indexing the Century 21 Website and that up to March 4, 2010, it indexed all of the property listings and a photograph for each of the listings on the Century 21 Website.

212    The defendants have pleaded that their copying of the plaintiffs' Works constitutes "fair dealing" under the *Copyright Act*. Section 29 of the *Copyright Act* provides an exception from infringement for "fair dealing":

29 Fair dealing for the purpose of research or private study does not infringe copyright.

213    To qualify for the fair dealing exception, the defendant must prove that the dealing was for a permitted purpose such as research or private study and that the dealing was fair: *CCH* at para. 50.

214    The court in *CCH* further commented on fair dealing as follows at paras. 48 and 50-52:

48 Before reviewing the scope of the fair dealing exception under the *Copyright Act*, it is important to clarify some general considerations about exceptions to copyright infringement. Procedurally, a defendant is required to prove that his or her dealing with a work has been fair; however, the fair dealing exception is perhaps more properly understood as an integral part of the *Copyright Act* than simply a defence. Any act falling within the fair dealing exception will not be an infringement of copyright. The fair dealing exception, like other exceptions in the *Copyright Act*, is a user's right. In order to maintain the proper balance between the rights of a copyright owner and users' interests, it must not be interpreted restrictively. As Professor Vaver, *supra*, has explained, at p. 171: "User rights are not just loopholes. Both owner rights and user rights should therefore be given the fair and balanced reading that befits remedial legislation."

. . .

50 In order to show that a dealing was fair under s. 29 of the *Copyright Act*, a defendant must prove: (1) that the dealing was for the purpose of either research or private study and (2) that it was fair.

51 The fair dealing exception under s. 29 is open to those who can show that their dealings with a copyrighted work were for the purpose of research or private study. "Research" must be given a large and liberal interpretation in order to ensure that users' rights are not unduly constrained I agree with the Court of Appeal that research is not limited to non-commercial or private contexts. The Court of Appeal correctly noted, at para. 128, that "[r]esearch for the purpose of advising clients, giving opinions, arguing cases, preparing briefs and factums is nonetheless research." Lawyers carrying on the business of law for profit are conducting research within the meaning of s. 29 of the *Copyright Act*.

52 The *Copyright Act* does not define what will be "fair"; whether something is fair is a question of fact and depends on the facts of each case. See McKeown, *supra*, at p. 23-6. Lord Denning explained this eloquently in *Hubbard v. Vosper, [1972] 1 All E.R. 1023* (C.A.), at p. 1027:

> It is impossible to define what is 'fair dealing'. It must be a question of degree. You must consider first the number and extent of the quotations and extracts. Are they altogether too many and too long to be fair? Then you must consider the use made of them. If they are used as a basis for comment, criticism or review, that may be a fair dealing. If they are used to convey the same information as the author, for a rival purpose, that may be unfair. Next, you must consider the proportions. To take long extracts and attach short comments may be unfair. But, short extracts and long comments may be fair. Other considerations may come to mind also. But, after all is said and done, it must be a matter of impression. As with fair comment in the law of libel, so with fair dealing in the law of copyright. The tribunal of fact must decide.

*Purpose of the Dealing*

215      The plaintiffs' assert that Zoocasa's purpose or motive is purely commercial. It generates money from advertising including advertising on the pages of property descriptions on which the plaintiffs' listings and data appeared. This they say can result in a finding that its use "may not be as fair": *CCH* at para. 54.

216      Zoocasa argues that the purpose of the dealing will be fair if it is for one of the allowable purposes under the *Copyright Act*, namely research, private study, criticism, review, or news reporting. They note that in *Public Performance of Musical Works, Re, 2010 FCA 123* (F.C.A.) [*SOCAN*] at paras. 17-20, the Federal Court of Appeal held that "research" included "the action or instance of searching carefully for a specified thing or person" and that commercial research by a consumer qualified as research. Further, the purpose of the dealing in question was to be considered from the point of view of the person for whom the dealings were intended. They argue that the plaintiff is focusing on the purpose of profit as opposed to the purpose for which the dealing was intended.

217      Zoocasa states that in providing search results and "snippets" of the copyrighted Works to the users to determine if they wish to access the source website they are engaging in an activity that falls within the scope of "research" as contemplated by the *Copyright Act*. That is, it enables individuals to research real property listings.

*Discussion of Purpose of the Dealing*

218      It is not disputed that Zoocasa's motive is commercial. While apparently not yet profitable, it is endeavouring to generate income by selling advertising space on the web pages on which the plaintiffs' listings and data appear.

219      Century 21's primary purpose is to list and sell real property. Their Website is not simply a vehicle for advertising; rather it is to promote their property listings to potential buyers.

220      The Supreme Court of Canada in *CCH* states that research, even if commercial in nature, may be fair. However, as noted by the Supreme Court of Canada, at para 54, "some dealings, even if for an allowable purpose, may be more or less fair than others; research done for commercial purposes may not be as fair as research done for charitable purposes." Also, as quoted in *CCH* at para. 52 from *Hubbard*, "[i]f they are used to convey the same information as the author, for a rival purpose, that may be unfair".

221      Additionally, the Federal Court of Appeal in *SOCAN* at para. 22, held that when assessing if a dealing was fair the dealing must be considered "from the point of view of the person for whom they are intended: the consumer of the subject-matter of the copyright." The issue in *SOCAN* was whether 30 second previews of musical works available on the Internet were subject to royalty payments. The court agreed with the Copyright Board's decision that the length of each preview in proportion to the length of the completed work was considered fair as the user's objective was research, in that case, the seeking and finding of a desired musical work.

222     The commercial aspect is therefore not determinative but is one of the factors to be taken into account. The nature of the commercial aspect however can vary. When the intended use of copyrighted material is to generate revenue in competition to the copyright holder the use may be less fair. However, if the purpose produces a value to the public interest that may be more fair. If however the first factor, that of revenue to the user outweighs any public benefit, then the use may not be fair.

*Character of the Dealing*

223     The plaintiffs emphasize that custom or practice in a particular trade or industry is relevant in determining whether or not the character of the dealing is fair: *CCH*, at para. 55. The plaintiffs place considerable emphasis on Zoocasa's failure to abide by the Robot Exclusion Standard.

224     The defendants emphasize that the focus of the inquiry at this stage is "how the Works were dealt with". They state that the plaintiffs, in focusing on the remark in *CCH* that it "may be relevant to consider the custom or practice in a particular trade or industry", are ignoring the analysis required by *CCH*, that is, how were the Works dealt with?

225     They assert that the Robot Exclusion Standard is irrelevant to the fair dealing analysis because all it does is permit indexing or permit indexing of some pages and not others or does not permit indexing at all.

**Discussion of Character of the Dealing**

*Transformative Use*

226     In the US the concept of "fair dealing" is described as "fair use". The defendant argues that American jurisprudence has developed four factors similar to those listed in *CCH* the first of which is the "purpose and character of the use". In doing so they place particular emphasis on the US concept of "transformative use".

227     In *Perfect 10 Inc. v. Amazon.com Inc.*, 508 F.3d 1146 (U.S. C.A. 9th Cir. 2007), the Ninth Circuit Court of Appeals considered the public importance of search engines and the "transformative" nature of their use of copyrighted material. *Perfect 10* involved a copyright owner's efforts to stop an Internet search engine from facilitating access to infringing images.

228     The Court in *Perfect 10* stated at para. 1164:

. . .

... A work is "transformative" when the new work does not "merely supersede the objects of the original creation" but "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message"....

. . .

229     In considering whether the use of thumbnails by search engines was transformative the court commented at para. 1165:

. . .

Google's use of thumbnails is highly transformative. In *Kelly*, we concluded that Arriba's use of thumbnails was transformative because 'Arriba's use of the images serve[d] a different function than Kelly's use-improving access to information on the [I]nternet versus artistic expression. Although an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information. Just as a "parody has an obvious claim to transformative value" because "it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one," a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool. Indeed, a search engine may be more transformative than a parody because a search engine provides an entirely new use for the original work, while a parody typically has the same entertainment purpose as the original work." ... [Citations omitted].

230   Zoocasa argues that by indexing the property listings in question, they transformed them from advertisements of properties for sale into an electronic reference tool, or a signpost, indicating where the property listing could be found. They say that the character of use in creating the signpost is entirely different from the purpose of the property listings in question. They submit, for example, that brokers or real estate salespeople create property listings to advertise properties for sale while Zoocasa creates an electronic reference tool to enable consumers to better find those advertisements. In essence, they characterize their approach as a more focused search engine. What they call a vertical search engine.

231   With respect to the photographs at issue, Zoocasa created a lower resolution thumbnail image that served as a link to the original property listing. With respect to the property descriptions, Zoocasa created a copy on its server and then later reproduced a portion of it, calculated to provide a visitor with just enough information to decide whether or not to click through to the original listing.

232   This issue of transformative use is addressed by the United States Court of Appeals, Second Circuit in *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (U.S. C.A. 2nd Cir. 1994), at 923:

**2. Transformative Use.**

The District Court properly emphasized that Texaco's photocopying was not "transformative." After the District Court issued its opinion, the Supreme Court explicitly ruled that the concept of a "transformative use" is central to a proper analysis under the first factor, see *Campbell*, 114 S. Ct. at 1171-73. The Court explained that though a "transformative use is not absolutely necessary for a finding of fair use, ... the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Id. S. Ct. at 1171.

The "transformative use" concept is pertinent to a court's investigation under the first factor because it assesses the value generated by the secondary use and the means by which such value is generated. To the extent that the secondary use involves merely an untransformed duplication, the value generated by the secondary use is little or nothing more than the value that inheres in the original. Rather than making some contribution of new intellectual value and thereby fostering the advancement of the arts and sciences, an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use. See *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir.) (explaining that a use merely for the same "intrinsic purpose" as original "moves the balance of the calibration on the first factor against" secondary user and "seriously weakens a claimed fair use"), *cert. denied*, 493 U.S. 883, 107 L.Ed. 2d 172, 110 S. Ct. 219 (1989)

In contrast, to the extent that the secondary use "adds something new, with a further purpose or different character," the value generated goes beyond the value that inheres in the original and "the goal of copyright, to promote science and the arts, is generally furthered." *Campbell*, 114 S. Ct. at 1171, see also Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L.Rev. 1105, 1111 (1990) [hereinafter Leval, *Toward a Fair Use Standard*]....

233   As a result, Zoocasa asserts that the character of the dealing supports a finding of fair dealing by Zoocasa.

234   In my opinion, the difficulty that arises from the defendants' emphasis on "transformative use" is that what may be transformative, and as a result fair use in the US, may still be copyright infringement in Canada. For example, The US *Copyright Act of 1976*, 17 U.S.C. s. 107 [US Copyright Act] refers to "fair use of a copyright work, for purposes such as criticism, comment, news reporting, teaching, scholarship or research". The nature of this defence in the US is very broad and is essentially a codification of a judge-made rule. In comparison, Canadian copyright law is rooted in the *Copyright Act* which specifically grants to the creator rights to the reproduction of the entire work or a substantial portion of the work: *Copyright Act*, s. 3. Under the Canadian *Copyright Act*, the exceptions or defences to copyright are more narrowly defined and extensively listed (although the list is not exhaustive) such as the purpose of the dealing is for research, private study, criticism, review or news reporting: see ss. 29, 29.1 and 29.2 of the *Copyright Act*. Canadian courts have not recognized "transformative use" as a characteristic of fair dealing.

*Failure to Comply with Robot Exclusion Standard*

235     The plaintiffs state that the failure to comply with the Robot Exclusion Standard overshadows any finding that the character of the dealing is fair. They state that the Robot Exclusion Standard is evidence of custom or practice in the search industry and as a result applies to a consideration of the character of the dealing. They state that in fact the defendants' failure to abide by the Robot Exclusion Standard is decisive.

236     The defendants, however, submit that consideration of the Robot Exclusion Standard as a factor in the fair dealing analysis is misconceived and that whether or not a website owner wishes the contents of the site to be found by search engines is not the issue and is irrelevant to the analysis. This despite the fact that Zoocasa itself uses the Robot Exclusion Standard on its Website.

237     The defendants argue that an analysis of the authorities cited by the plaintiffs reveal that none of the cases incorporate the Robot Exclusion Standard issue into the four factors considered in the US concept of fair use. The issue arises in those cases in the context of implied licence or an additional factor of good faith.

238     They note that the issue is not custom or practice respecting indexing, rather the plaintiffs rely on *CCH* where the court stated that the focus of the inquiry at this stage of analysis is "how the works were dealt with". The defendants state that the plaintiffs, in focusing on the remark that it "may be relevant to consider the custom or practice in a particular trade or industry", ignore the emphasis on the purpose of the inquiry.

239     It is not disputed that the Robot Exclusion Standard is a "kind of *de facto* standard" in the industry that governs relations between websites and automated processes. Nor is it disputed that it permits websites to opt out if they do not want to be indexed. It also permits selective opting out where some search engines are permitted, some are not and indeed where only certain pages are permitted to be indexed.

240     The major search engines such as Google, Bing and Yahoo! make the information required to opt out from their search engines publicly available. The defendant does not participate in this industry standard nor do they provide such information if requested. In fact, they do not have a "branded" Internet robot although the evidence is there is no technical reason why they could not.

*Discussion of the Robot Exclusion Standard as a Characteristic of Fair Dealing*

241     Mr. Levine, the plaintiffs' expert, explains the Robot Exclusion Standard in his expert report in this way:

> a) the Robot Exclusion Standard is the industry standard governing how search engines and website owners interact;
>
> b) the Robot Exclusion Standard provides a mechanism by which a website operator can choose to opt out of a specific search engine(s), while still remaining accessible to other search engines; and
>
> c) the Robot Exclusion Standard requires that a search engine disclose the name of its "robot" so that website operators can use either a robots.txt file or meta tags to opt out of being searched by that search engine.

242     In *eBay Inc. v. Bidde's Edge Inc.*, 100 F.Supp.2d 1058 (U.S. Dist. Ct. N.D. Cal. 2000) the United States District Court defined the Robot Exclusion Standard as follows at 1161:

> The eBay site employs "robot exclusion headers".... A robot exclusion header is a message, sent to computers programmed to detect and respond to such headers, that eBay does not permit unauthorized robotic activity. (*Id*) Programmers who wish to comply with the Robot Exclusion Standard design their robots to read a particular file, "robots.txt," and to comply with the control directives it contains....

243     Zoocasa acknowledges that it was aware of the Robot Exclusion Standard and that it is widely followed in the marketplace and among search engines. It was also aware that the Robot Exclusion Standard allows a website to opt out of being indexed by

all search engines or just specific search engines by inserting the appropriate line of text in the robots.txt file. As noted earlier, Zoocasa itself implements the Robot Exclusion Standard and enjoys the benefits of using the standard.

244    Century 21's Website has a robot.txt file and uses it to indicate to specific search engines that Century 21 does not want them to index the Century 21 Website. However, Century 21, through its website operator, has not been able to use its robot.txt file to block Zoocasa because it does not know the name of Zoocasa's robot or spider. That information is required before a site can be blocked. Zoocasa has refused to provide the name of its robot. On this application Zoocasa indicated for the first time that it does not currently have a "branded" Internet robot. Zoocasa has not explained why it does not given how widespread the standard is in the industry.

245    The Robot Exclusion Standard is an accepted industry standard that permits search engines to function by allowing them to copy content from websites without obtaining the prior consent of potentially many millions of websites, and it also allows individual website operators to opt out of being indexed if they wish.

246    The plaintiffs assert that American courts have recognized the Robot Exclusion Standard as striking the appropriate balance in determining what use is "fair" for the purposes of the fair dealing exception (or the "fair use" exception, as it is known in the United States). In particular, they rely on *Field v. Google Inc.*, 412 F.Supp.2d 1106 (U.S. D. Nev. 2006), and *Parker v. Yahoo!* 2008 U.S. Dist. LEXIS 74512, [88 U.S.P.Q.2d 1779 (U.S. Dist. Ct. E.D. Penn. 2008)].

247    In *Field*, the plaintiff claimed for copyright infringement against Google alleging that Google's caching of the plaintiff's web pages breached copyright. The plaintiff knew that he could use a meta tag to instruct Google not to provide a cached link. The plaintiff also created his own robots.txt file and set it to permit all robots to access his website and to index all of the pages on his website. Google removed the cached links as soon as it was served with the lawsuit. Based on these facts and the expert evidence of John Levine, who is also the plaintiffs' expert in the case at bar, Jones J. found that the plaintiff's conduct could be reasonably interpreted as a grant of a licence to Google to index and cache his website.

248    Jones J. commented about the use of industry standard protocols between website owners and search engines as follows:

17. Given the breadth of the Internet, it is not possible for Google (or other search engines) to personally contact every Web site owner to determine whether the owner wants the pages in its site listed in search results or accessible through "Cached" links....

18. The Internet industry has developed a set of widely recognized and well-publicized industry standard protocols by which Web site owners can automatically communicate their preferences to search engines such as Google.... Google provides instructions for Web site owners to communicate their preferences to Google at *http://www.google.com/remove.html. ...*

19. A principal way for Web site owners to communicate with Google's robot is by placing specific instructions in "meta-tags" within the computer code (called HTML) that comprises a given page. When the Googlebot visits a page, it reads through this code. If it encounters meta-tags, it follows the instructions provided. Thus, for example, a site owner can place the following meta-tag within a page to tell Google's robot not to analyze the page or include it in Google's Web index and search results: ...

. . .

22. Web site owners can also communicate with search engines' robots by placing a "robots.txt" file on their Web site.... For example, if the Web site owner does not want robots to crawl the owner's Web site, the owner can create a robots.txt file with the following text: "User-agent: * Disallow: /" ... The above text tells the robots that they should not crawl the owner's Web site ... If Google's robot encounters a robots.txt file with the above text, then it will not crawl the Web site, and there will be no entry for that Web page in Google's search results and no cached link ... The Internet industry has widely recognized the robots.txt file as a standard for controlling automated access to Web pages since 1994....

249     In *Parker*, the US District Court of Eastern Pennsylvania followed *Field* and found that a website owner, who, despite knowing about the electronic protocols to prevent indexing and caching (including robots.txt), failed to object to the infringing conduct was granting a licence for the infringing use.

250     In *Parker*, Yahoo! continued to display works even after the commencement of the lawsuit. The court held that initiation of a lawsuit itself may constitute revocation of an implied licence if there was no consideration for the licence. In *obiter*, the court also said that continuing to display works after the commencement of the lawsuit may constitute direct copyright infringement.

251     In the case at bar, Zoocasa has failed to abide by the Robot Exclusion Standard, despite acknowledging it as an industry standard and using it itself. As a result, Zoocasa, in choosing not to embrace the industry standard, has made itself vulnerable to claims of copyright infringement. Zoocasa explains that it was of the view that any site that did not want to be accessed could simply block the Zoocasa IP address. They understood that all websites log visitors IP addresses and it is a technically easy task to block certain addresses. Unbeknownst to them the operator of the plaintiff Century 21's Website did not log such addresses. In addition, as was stated in *eBay*, blocking IP addresses is an inefficient and ineffective means of controlling access from unwanted robotic searches. Zoocasa implicitly acknowledged on discovery that it does not attempt to avoid or evade IP blocking.

252     The issue of fair dealing only arises where there is no consent to the activity complained of. The fact that consent has not been given, or has been refused, whether orally or in writing or in a robots.txt file, is only the starting point for a fair dealing analysis. It is not the end point for an analysis of fair dealing. The test is the character of dealing not the dealing without consent.

253     In my opinion the Robot Exclusion Standard addresses how the copyrighted material was acquired, not how it was used. How the works in question come into the possession of a party is quite irrelevant to a consideration of fair dealing which is concerned with the use of the works, not their manner of acquisition. The manner of acquisition may have relevance to other claims such as bad faith in damage claims but in my view does not assist in a fair dealing analysis.

***Alternatives to Dealing***

254     The determination of fairness includes consideration of "non-copyrighted equivalent of the work that could have been used instead of the copy-righted work ... [and] ... whether the dealing was reasonably necessary to achieve the ultimate purpose": *CCH*, at para. 57.

255     The plaintiffs' analysis regarding this issue is that the dealing was not reasonably necessary to achieve the ultimate purpose because if the industry can function with sites being entitled to opt out of being indexed, then there are alternative sources of information. In this case, the fact that Zoocasa did at one time and now once again does not index those sites that do not want to be indexed is alleged to be evidence that there are alternative non-copyrighted equivalents to the Century 21 Works.

256     The defendants submit that this factor involves a determination of whether or not there was an alternative to the dealing with the infringed work. That is, was there a non-copyrighted equivalent of the work in question available? They submit that in this case, there was no non-copyrighted alternative if they were to accurately index actual listings.

257     They further state that the plaintiffs' analysis is flawed as the issue, in their view, is not whether to index sites that do or do not want to be indexed, but rather, the issue is whether there was an alternative non-copyrighted source of the work in question. Fair dealing is premised on a lack of consent. However, the lack of consent is not relevant to the analysis itself.

258     According to the evidence of Mr. Lee, Zoocasa, in September 2008, operated on the basis that target websites could opt out of being indexed. However, shortly thereafter they abandoned that policy and in the case of the plaintiffs continued to index their site and information despite knowing they did not wish to be indexed. They have now returned to the earlier policy of allowing websites to opt out of being indexed. Mr. Lee stated "now that the business focus of Zoocasa has been refined, it is apparent that it is not part of Zoocasa's business model to index sites that do not wish to be indexed". The fact that Zoocasa was once and is now able to function adequately without indexing websites that do not wish to be indexed demonstrates that there are alternatives to dealing with infringed works. The practice of all major search engines allowing websites to opt out

of being indexed also supports a finding that there are viable alternatives to Zoocasa's previous practice of copying content despite the website operator's objections.

259      The issue, in my view, is whether alternative information is available. It is apparent that if given the choice, Zoocasa would prefer to have access to the Century 21 Website. Their business plan is premised on linking to as many real estate listings as possible.

260      Alternatives to the dealing was defined by the Supreme Court of Canada in *CCH* at para. 57, as "non-copyrighted equivalent of the work that could have been used instead of the copy-righted work ... [and] ... that it will also be useful for courts to attempt to determine whether the dealing was reasonably necessary to achieve the ultimate purpose."

261      It appears therefore that the test is whether there is a non-copyright equivalent of the work. However, the test is premised on the determination that an equivalent was necessary to accomplish what was intended.

262      In this instance, the evidence respecting non-copyrighted equivalents of the Works is that the public is free to access the information sought through individual real estate agents of Century 21. In addition, it appears that the manner of obtaining the copyright work, although preferred by Zoocasa, was not reasonably necessary to achieve its ultimate purpose given they can source the material elsewhere. I find that Zoocasa had alternatives to the dealing that they chose not to pursue in order to minimize time and expense. As a result their dealings with respect to this factor were not fair.

### Amount of the Dealing

263      The court in *CCH*, at para. 56, articulated the principles used to guide courts when determining whether the amount of the dealing was fair. In this regard the court said:

> 56 Both the amount of the dealing and importance of the work allegedly infringed should be considered in assessing fairness. If the amount taken from a work is trivial, the fair dealing analysis need not be undertaken at all because the court will have concluded that there was no copyright infringement. As the passage from *Hubbard* indicates, the quantity of the work taken will not be determinative of fairness, but it can help in the determination. It may be possible to deal fairly with a whole work. As Vaver points out, there might be no other way to criticize or review certain types of works such as photographs: see Vaver, *supra*, at p. 191. The amount taken may also be more or less fair depending on the purpose. For example, for the purpose of research or private study, it may be essential to copy an entire academic article or an entire judicial decision. However, if a work of literature is copied for the purpose of criticism, it will not likely be fair to include a full copy of the work in the critique.

264      In *Hubbard*, *supra* at 1027, the English Court of Appeal considered the scope of the defence of fair dealing in relation to criticism or review of literary works. Lord Denning made the following remarks:

> . . .

> It is impossible to define what is 'fair dealing'. It must be a question of degree. You must consider first the number and extent of the quotations and extracts. Are they altogether too many and too long to be fair? Then you must consider the use made of them. If they are used as a basis for comment, criticism or review, that may be fair dealing. If they are used to convey the same information as the author, for a rival purpose, that may be unfair. Next, you must consider the proportions. To take long extracts and attach short comments may be unfair. But short extracts and long comments may be fair. Other considerations may come to mind also. But, after all is said and done, it must be a matter of impression....

> . . .

265      Substantial taking is not always measured by the quantity of matter reproduced from a copyrighted work, though that may be a significant factor: *Horn Abbot Ltd. v. W.B. Coulter Sales Ltd.* (1984), 77 C.P.R. (2d) 145 (Fed. T.D.) (The "Trivial Pursuit" case). Courts will also look to the quality of matter reproduced. In *U & R Tax Services Ltd. v. H & R Block Canada Inc.*

(1995), 97 F.T.R. 259 (Fed. T.D.), at para. 35, the court held that assessing whether or not a taking is substantial may depend upon a number of factors such as:

. . .

(a) the quality and quantity of the material taken;

(b) the extent to which the defendant's use adversely affects the plaintiff's activities and diminishes the value of the plaintiff's copyright;

(c) whether the material taken is the proper subject-matter of a copyright;

(d) whether the defendant intentionally appropriated the plaintiff's work to save time and effort; and

(e) whether the material taken is used in the same or a similar fashion as the plaintiff's.

266      Zoocasa, throughout all times in issue, copied the whole of Century 21's property descriptions onto its servers. Until approximately November 20, 2008, they also displayed those full property descriptions on their Website. After November 20, 2008, they displayed truncated descriptions on their Website. They also copied and displayed the whole photographs that are the subject of this claim. The plaintiffs submit this amount of dealing militates against a finding of fairness.

267      Zoocasa submits that it only takes a portion of the data from the property listings it indexes. They emphasize that the property description must be looked at as part of a whole. They assert that the amount taken may be more or less fair depending on its purposes. As a result, the quantity of the work dealt with will not be determinative of the fairness. They state that given the sole purpose of indexing the property listings in question was to better publicize them and further their purpose of advertising property for sale, that even if the court considers that a substantial portion of the Works or the property listing has been dealt with, the dealing is nonetheless fair.

268      The copying of basic information such as the property address and the legal description is in my view not copyright infringement. However the copying of the property description created for the purpose of encouraging property sales goes beyond such basic information. The written description of the property contains the key information concerning the property. It is a description of the property in prose form while the remainder of the site consists of basic information such as lot size, property taxes etc. In addition, the repeated daily access and indexing of such information militates against a defence of fair dealing. This is not a situation of a one-time copy being taken. It is conduct consisting of repeated actions by the defendants. In my view the amount of dealing exceeds what is fair.

***Nature of the Work***

269      In regard to the nature of the work, the court in *CCH* at para. 58, stated:

58 The nature of the work in question should also be considered by courts assessing whether a dealing is fair. Although certainly not determinative, if a work has not been published, the dealing may be more fair in that its reproduction with acknowledgement could lead to a wider public dissemination of the work — one of the goals of copyright law. If, however, the work in question was confidential, this may tip the scales towards finding that the dealing was unfair. See *Beloff v. Pressdram Ltd.*, [1973] 1 All E.R. 241 (Ch. D.), at p. 264.

270      The plaintiffs submit that this relates to unpublished confidential work, neither of which factors are present in the case at bar and as a result this factor is not relevant.

271      The defendants however state that the nature of the Works, in this case a property description and a property listing, is significant on the basis that the Works exist solely in order to publicize property for sale. They argue that the plaintiffs' position rests on a restrictive interpretation of the statement in *CCH* that dissemination of an unpublished work might be more fair, while the dissemination of a confidential work might be less fair: *CCH* at para 58.

272    However, *CCH* reveals that the Supreme Court of Canada appears to favour "wider public dissemination of the work" where the work in question is unpublished but not confidential. In the case at bar the work is published on the Century 21 Website for advertising purposes. As a result this favours fair dealing.

### Effect of the Dealing on the Work

273    The court in *CCH* described this factor as follows:

> 59 ... If the reproduced work is likely to compete with the market of the original work, this may suggest that the dealing is not fair. Although the effect of the dealing on the market of the copyright owner is an important factor, it is neither the only factor not the most important factor that a court must consider in deciding if the dealing is fair....

274    Zoocasa submits that the copying is fair because its Website is intended to drive traffic to the Century 21 Website. The evidence indicates that less than 1% of the Century 21 Website traffic comes from Zoocasa's site. This however is not the real issue. Zoocasa competes with the Century 21 Website for Internet users who are searching for properties for sale. Zoocasa's own marketing materials state that it "helps reduce the time and effort" required to search for properties online by allowing the user to avoid having to use individual realty websites such as the Century 21 Website.

275    Although the primary purpose of Century 21's Website is to facilitate real estate sales and Zoocasa's primary purpose is to gain profit from advertising such listings, the Zoocasa Website clearly competes with the Century 21 Website in the market for Internet users seeking to search for properties for sale. Both Century 21 and Zoocasa use the copied material in the same way. That is, to facilitate searches by users for real properties.

276    As a result, this factor favours a finding that the dealing is not fair.

### Conclusion on Fair Dealing

277    The Supreme Court of Canada in *CCH* discussed how to assess the fair dealing factors as follows at para 60:

> 60 To conclude, the purpose of the dealing, the character of the dealing, the amount of the dealing, the nature of the work, available alternatives to the dealing and the effect of the dealing on the work are all factors that could help determine whether or not a dealing is fair. These factors may be more or less relevant to assessing the fairness of a dealing depending on the factual context of the allegedly infringing dealing. In some contexts, there may be factors other than those listed here that may help a court decide whether the dealing was fair.

278    The preparation of the property descriptions and the photographs, as I have noted, required some level of skill. The fact that they had value is indicated by the fact that the Zoocasa availed itself of them. In *University of London Press v. University Tutorial Press Ltd.*, [1916] 2 Ch. 601 (Eng. Ch. Div.), at 610 Peterson J. noted that "there remains the rough practical test that what is worth copying is prima facie worth protecting".

279    Based on my conclusions above regarding the elements of the test for fair dealing, and given it is a matter of impression, in my view the actions of Zoocasa during the time that they copied and displayed the whole of the property descriptions and a photograph were, in my opinion, not fair.

280    In this case, the Robot Exclusion Standard is not an additional element because it addresses only the manner in which access was gained not the issues relevant to fair dealing.

### No Relief for the Defendants under Section 39 of the Copyright Act

281    At para. 27 of their amended statement of defence, the defendants plead reliance on s. 39 of the *Copyright Act*. Section 39(1) provides as follows:

39. (1) Subject to subsection (2), in any proceedings for infringement of copyright, the plaintiff is not entitled to any remedy other than an injunction in respect of the infringement if the defendant proves that, at the date of the infringement, the defendant was not aware and had no reasonable ground for suspecting that copyright subsisted in the work or other subject-matter in question.

282    The defendants are unable to shelter under this provision for two reasons. First, the defendants were put on notice by September 2, 2008, that Zoocasa's indexing of the Century 21 Website was contrary to the *Copyright Act*. Secondly Mr. Lee on behalf of Zoocasa admitted on discovery that Zoocasa understood there is copyright protection in the prose that people write and the photographs that people take.

**Trespass to Chattels**

283    The plaintiffs submit that by continuing to access the servers used to host the Century 21 Website after Century 21 demanded that Zoocasa cease doing so, Zoocasa committed the tort of trespass to chattels.

284    Zoocasa argues that such an action cannot be maintained for two reasons. First, the tort does not apply in Canada to the act of accessing computer systems. Second, the plaintiff has no possessory interest in the servers that are used to host their Website.

*Discussion*

285    Trespass to goods is defined as in Halsbury's Laws of Canada, *Torts*, 1st ed. (LexisNexis: Markham, Ont. 2007) at 150 as:

**Trespass to goods.** "Chattel" or "goods" refers to tangible personal property, as opposed to real property or intellectual property. Any direct touching of another person's chattel constitutes a trespass to goods, unless such touching is justified by law....The plaintiff does not have to establish ownership of the goods, merely that he or she was in possession of the goods at the material time....

286    This raises the issue of whether Century 21 is in possession of the servers from which its Website is operated to a degree sufficient to support the tort of trespass to chattels. In *1162994 Ontario Inc. v. Bakker*, [2004] O.J. No. 2565 (Ont. C.A.), at para. 20, the court stated:

**20** Possession is a difficult concept to define. Both in common and legal parlance, it connotes some form of control over the thing said to be possessed: e.g. D. Dukelow, B. Nuse, The Dictionary of Canadian Law 2nd ed., (1995) Carswell at p. 916; The Shorter Oxford English Dictionary, Vol. II (1973) p. 1635. Clearly, possession in s. 86(1)(b) is not limited to immediate physical control. For example, a tenant who locks up a rental unit and leaves on an extended vacation, continues to exercise sufficient control over that rental unit so as to qualify as a "tenant in possession" for the purposes of s. 86(1)(b). In my view, possession of a rental unit refers to some form of control over that unit as demonstrated by factors such as access to, use of, or occupation of the unit.

287    Black's Law Dictionary, 6th ed. (West Publishing Co.: St. Paul, Minn., 1990) at 1163 defines "possession" as follows:

The law, in general, recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it. The law recognizes also that possession may be sole or joint....

288    *Marsh v. Kulchar* (1951), [1952] 1 S.C.R. 330, [1952] 1 D.L.R. 593 (S.C.C.), at 334-335, also considered the meaning of possession:

. . .

The word "possession" in English law is, as has often been pointed out, a most ambiguous word. As most often used, however, it imports actual physical possession. ... When a motor car is stolen from the owner, the thief takes actual physical possession, and thus takes it out of the possession of the owner, although the right to possession remains with the latter. That this is the idea in contemplation of the statute is shown by the use of the phrase, "or otherwise...taken out of his possession." ...

. . .

289     Any claim by the plaintiff to possession of the computer system that supports its Website is based on its agreement with WTL. The plaintiff entered into an agreement with WTL dated July 27, 2006 (the "WTL Agreement"). I assume for the moment that any claim the plaintiff has to trespass with respect to its Website involves the servers on which the Website content, listings, property descriptions and photographs are located. As a result, the provisions of the agreement must be considered.

290     The WTL Agreement states that WTL provides "Internet-based software services to the real estate industry". The definitions applicable to the trespass issue are as follows:

a. "Hosting Services" means electronic access to, hosting of and management of the C21 CA Website, including but not limited to WTL Supplied Software, C21 CA Content and Third Party Provider content on servers controlled by WTL or its Third Party Providers.

n. "WTL Technology" means WTL's (or its licensors' or suppliers') proprietary technology, including but not limited to WTL's industry-specific products, the Services, WTL Supplied Software and other software, tools, database designs, algorithms, user interface designs, architecture, class libraries, objects and documentation, network design, know-how, training documentation, support documentation, source code, content and other information or materials supplied or provided by WTL as part of the Services.

291     The relevant provisions of the WTL Agreement are:

3. Hosting Services:

a. Hosting. WTL agrees to provide, and C21 CA agrees to take and pay for, Hosting Services for the WTL Technology and the C21 CA Content during the term in accorance with this Agreement.

f. Infrastructure. WTL agrees to provide the Hosting Services via commercially accepted infrastructure, including servers, security and bandwidth scalable in excess of the needs of the Website.

6. WTL Technology:

a. WTL hereby grants to C21 CA a nonexclusive license during the term of this Agreement to use the WTL Technology solely for the purposes of using the Website and the Services. Subject to such license, WTL (and/or its licensors and/ or suppliers) will retain all rights in all WTL Technology....

292     Through the WTL Agreement, WTL granted Century 21 a licence to use WTL Technology for its Website and the corresponding services. They do not have any grant of licence respecting the infrastructure which includes the servers. That is simply the technology used by WTL to provide hosting services.

293     In this instance it is alleged that the trespass occurred on the WTL servers. Century 21 relies on *eBay* for the assertion that American courts have held that accessing a website without authorization constitutes a trespass to chattels. In that case *eBay* sought a preliminary injunction against Bidder's Edge on the ground of trespass to prevent Bidder's Edge from crawling its website. Bidder's Edge operated an aggregation site that scraped content from several auction sites and posted that content to its own site. In some respects this is similar to the activities of Zoocasa which accumulates real estate listings from multiple sites.

294     The court, in granting *eBay's* application for an interlocutory injunction, found that the right of Bidder's Edge to use *eBay's* personal property, even if the use was negligible, was not a right recognized by law and held as follows at 1070:

. . .

... eBay's servers are private property, conditional access to which eBay grants the public. eBay does not generally permit the type of automated access made by BE. In fact, eBay explicitly notifies automated visitors that their access is not permitted....eBay repeatedly and explicitly notified BE that its use of eBay's computer system was unauthorized. The entire reason BE directed its queries through proxy servers was to evade eBay's attempts to stop this unauthorized access....

. . .

295     The tort has traditionally been applied to physical interference with a chattel. The issue then becomes whether or not electronic access is "physical" or whether it needs to be "physical" for the tort claim to succeed. In *Thrifty-Tel Inc. v. Bezenek*, 46 Cal. App. 4th 1559 (U.S. Cal. Ct. App. 4 Dist. 1996), the court held that electronic access is sufficient and stated at 1566-1567:

Trespass to chattel, although seldom employed as a tort theory in California (indeed, there is nary a mention of the tort in Witkin's Summary of California Law), lies where an intentional interference with the possession of personal property has proximately caused injury. (See, e.g., *Itano v. Colonial Yacht Anchorage* (1968) 267 Cal. App. 2d 84, 90 [72 Cal. Rptr. 823].) Prosser notes trespass to chattel has evolved considerably from its original common law application — concerning the asportation of another's tangible property — to include even the unauthorized *use* of personal property: "Its chief importance now," according to Prosser, "is that there may be recovery ... for interferences with the possession of chattels which are not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered. Trespass to chattels survives today, in other words, largely as a little brother of conversion." (Prosser & Keeton on Torts, *supra*, § 14, pp. 85-86, fn. omitted; see also *Zaslow v. Kroenert* (1946) 29 Cal. 2d 541, 551 [176 P.2d 1] ["Where the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of ... the personal property, the owner has a cause of action for trespass" to chattel, but not for conversion].) [Citations omitted].

296     It is not at all clear that Canadian law supports the proposition that electronic access to a computer system is a physical act involving some degree of force. As noted by G.H.L. Fridman, *The Law of Torts in Canada*, 2d ed. (Carswell: Toronto, 2002) at 125: "Trespass involves a physical act *vis-a-vis* the object in question". However, given my findings below respecting Century 21's claim to a possessory interest in WTL's website servers it is not necessary to resolve this issue.

297     Even assuming that in Canada, as has been found in the US, that electronic signals are sufficiently tangible to trespass there must still be a physical object that is trespassed upon: *Thrify-Tel Inc.*, *supra*; *Compuserve Inc. v. Cyber Promotions Inc.*, 962 F. Supp. 1015 (U.S. S.D. Ohio 1997); *eBay*, *supra*; and *Intel Corp. v. Hamidi* [(April 28, 1999), Doc. 98AS05067 (U.S. Cal. Sup. Ct.)], 1999 WL 450944.

298     In Canada, the physical trespass of a chattel is a requirement necessary to plead the tort of trespass: Fridman, *The Law of Torts in Canada*, above at para. 297 at 121-123.

299     The chattels in question are the servers of WTL or its third party suppliers. Century 21 under its agreement with WTL has no possessory interest in those servers. As a result, an essential element of the tort of trespass to chattels is not present. Any potential claim for trespass to chattels would be that of WTL. They are not a party to this action. Century 21's claim respecting trespass to chattels is dismissed.

**Liability of Rogers**

300     The plaintiff advances its claim against Rogers on several grounds. They claim that Rogers is liable for authorizing the breach of copyright pursuant to s. 27(1) of the *Copyright Act*. They also claim that Rogers is liable for inducing Zoocasa's breach of contract arising under the Terms of Use and finally that Rogers is guilty of the tort of inducing breach of contract.

301     The plaintiffs base Roger's liability on allegations that Rogers has gone beyond the role of shareholder and investor and has directly supported and promoted the Zoocasa Website. The plaintiffs make this claim on the basis of Rogers' initial role in developing Zoocasa and its ongoing support for the company.

302     In particular, the plaintiffs cite the involvement of Rogers' employees in developing the Zoocasa idea, Website and search engine before Zoocasa was incorporated on March 28, 2008, and in advancing the Zoocasa project by leveraging relationships that Zoocasa had with the industry.

303     The plaintiffs further cite Rogers' ongoing support for the project, noting that Rogers is the sole provider of funding and support for the development and maintenance of the Zoocasa Website. The plaintiffs note several instances where Rogers' employees, acting in their capacity as such, actively promoted the Zoocasa Website to Century 21. The plaintiffs also cite the fact that Zoocasa's three directors are all officers of Rogers.

*Defendants' Position*

304     The defendants deny that Rogers can be liable as asserted by the plaintiffs and say that the Zoocasa Website is operated by a separate legal entity, all employees are now those of the numbered company and any decisions about indexing and listing are made by Zoocasa, not Rogers. The defendants say that Rogers is a shareholder of Zoocasa and is not liable for the actions of Zoocasa. They deny that Rogers authorized the conduct of Zoocasa.

*Rogers Involvement in Zoocasa*

305     Rogers has actively participated in Zoocasa's business. Michael Lee and Barry Choi developed the idea for the Zoocasa project in the spring of 2007 while they were both employees of Rogers and before Zoocasa was incorporated.

306     The work to build the search engine for the Zoocasa Website began in late summer of 2007, before Zoocasa was incorporated. Rogers, not Zoocasa, registered the domain name for the Zoocasa Website. Rogers also lent employees to Zoocasa for the development of the Zoocasa Website and leveraged relationships that Rogers had with the industry, both of which helped to advance the Zoocasa project. The initial programming for the Zoocasa Website was completed by Rogers' employees.

307     In addition, Zoocasa has three directors, all of whom are officers of Rogers. Rogers is also the sole provider of funding and support for the development and maintenance of the Zoocasa Website having contributed $2.1 million in 2008 and $2.2 million in 2009.

308     Rogers also supports the Zoocasa Website by providing services in kind (i.e., using other business units to drive traffic to the Zoocasa Website). Rogers has also provided legal services to support the Zoocasa Website as Rogers and its external counsel drafted the terms of use for the Zoocasa Website.

309     Even after Zoocasa was incorporated on March 28, 2008, employees of Rogers continued to be actively involved in promoting the Zoocasa Website. On July 4, 2008, Darrell Cox of Rogers sent an email to Barbara Fromm of Century 21 to introduce her to the Zoocasa Website. He identified himself in the email as Director of Business Development, Rogers Communications Inc., and stated as follows:

> As per my voice mail, I'd love to get the time with you to discuss a real estate vertical search website we have developed.... From a Rogers perspective we want to drive brand awareness with consumers who will soon be in the market for cable, home phone and/or broadband services.

310     When Mr. Phillipson and Mr. Cox met with Century 21 in the summer of 2008, they presented themselves with their Rogers business cards as being, respectively, Manager, Business Development, Rogers Communications Inc., and Director, Business Development, Rogers Communications Inc.

311     Darren Phillipson, who was actively involved in developing and promoting the Zoocasa Website, was never officially an employee of Zoocasa. He was at all times an employee of Rogers. Mr. Cox also worked on the Zoocasa project while an employee of Rogers to "help support the venture", as did Mr. Lewin for a period of time.

312     On October 16, 2008, C.B. Ross, a representative of Rogers Wireless who had no position with Zoocasa, sent two emails to Ms. Fromm of Century 21, in which he underscored Rogers' direct involvement in the development and maintenance of the Zoocasa Website.

313     Direct conduct by Rogers continued thereafter directly in the operation of the subsidiary. On January 13, 2009, Mr. Cox, writing in his capacity as Director of Business Development, Rogers Communications Inc., from Roger's head office in Toronto, sent an email to Sherry Chris, a representative of the owner of the Century 21 brand in the United States, in which he attempted to arrange a meeting between representatives of Rogers and Century 21 USA to discuss the Zoocasa Website.

*Discussion*

*Roger's Alleged Authorization of Copyright Infringement*

314     Is Rogers liable for copyright infringement by authorizing Zoocasa's infringement? The plaintiffs' submit that s. 27(1) of the *Copyright Act* prohibits anyone from doing that which only the owner of the copyright owner has the right to do. Pursuant to s. 3(1), only the copyright owner has the right to "authorize" the reproduction of a work.

315     Liability for contravening s. 3(1) through authorizing violations of copyright is found in s. 27 of the *Copyright Act*:

**27.** (1) It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

316     The meaning of "authorize" in this context was reviewed by the Supreme Court of Canada in *CCH* at para. 38 where the court stated as follows:

38 "Authorize" means to "sanction, approve and countenance": *Muzak Corp. v. Composers, Authors and Publishers Association of Canada, Ltd.*, [1953] 2 S.C.R. 182, at p. 193; *De Tervagne v. Beloeil (Town)*, [1993] 3 F.C. 227 (T.D.). Countenance in the context of authorizing copyright infringement must be understood in its strongest dictionary meaning, namely, "[g]ive approval to; sanction, permit; favour, encourage": see *The New Shorter Oxford English Dictionary* (1993), vol. 1, at p. 526. Authorization is a question of fact that depends on the circumstances of each particular case and can be inferred from acts that are less than direct and positive, including a sufficient degree of indifference: *CBS Inc. v. Ames Records & Tapes Ltd.*, [1981] 2 All E.R. 812 (Ch. D.), at pp. 823-24. However, a person does not authorize infringement by authorizing the mere use of equipment that could be used to infringe copyright. Courts should presume that a person who authorizes an activity does so only so far as it is in accordance with the law: *Muzak*, *supra*. This presumption may be rebutted if it is shown that a certain relationship or degree of control existed between the alleged authorizer and the persons who committed the copyright infringement: *Muzak*, *supra*; *De Tervagne*, *supra*; see also J. S. McKeown, *Fox Canadian Law of Copyright and Industrial Designs* (4th ed. (loose-leaf)), at p. 21-104, and P. D. Hitchcock, "Home Copying and Authorization" (1983), 67 C.P.R. (2d) 17, at pp. 29-33.

[Emphasis added]

317     It is not disputed that Rogers, through its employees and representatives, directly supported and promoted the Zoocasa Website. However, the plaintiff submits that in addition Rogers has directly sanctioned, approved, countenanced, favoured, and encouraged the Zoocasa Website. They submit that liability for authorizing copyright infringement can arise from acts that are less than direct and positive, including a sufficient degree of indifference.

318     Zoocasa relied on Rogers for development and support of its Website, search engine and "spider" or "robot". However, the court in *CCH* made it clear that "a person does not authorize infringement by authorizing the mere use of equipment". Therefore, the question then becomes whether Rogers authorized Zoocasa's alleged copyright infringement?

319     The relevant principle is stated in *de Tervagne v. Beloeil (Town)*, [1993] 3 F.C. 227 (Fed. T.D.) at para. 49, where the Federal Court cited P. D. Hitchcock's article "Home Copying and Authorization" (1983), 67 C.P.R. (2d) 1983, at 17-49:

**49** The position of Kellock J. may be summarized as follows: "[i]n order to 'authorize' a person must sanction, approve or countenance more than mere use of **equipment that might possibly be used in an infringing performance but, on the other hand, a person need not go so far as to grant or purport to grant the right** to perform" ....

320     In *CCH*, the Supreme Court of Canada rejected the claim that the Law Society of Upper Canada authorized copyright infringement by providing self-service photocopiers in the Great Library at Osgoode Hall in Toronto, stating as follows:

43 First, there was no evidence that the photocopiers had been used in a manner that was not consistent with copyright law.... Although the Court of Appeal assumed that the photocopiers were being used to infringe copyright, I think it is equally plausible that the patrons using the machines were doing so in a lawful manner.

321     Similarly, and in the context of the Internet, the Supreme Court of Canada in *SOCAN* at paras. 122-123, expanded on this issue:

122 Of course there is a good deal of material on the Internet that is not subject to copyright, just as there was a good deal of law-related material in the Great Library at Osgoode Hall that was not copyrighted in the recent *CCH* appeal. In that case, as here, the copyright owners asserted that making available a photocopier and photocopying service by the Law Society of Upper Canada implicitly "authorized" copyright infringement....

123 The operation of the Internet is obviously a good deal more complicated than the operation of a photocopier, but it is true here, as it was in the *CCH* case, that when massive amounts of non-copyrighted material are accessible to the end user, it is not possible to impute to the Internet Service Provider, based solely on the provision of Internet facilities, an authority to download copyrighted material as opposed to non-copyrighted material.

322     In *SOCAN*, the court approved the decision of the Copyright Board that an institution's knowledge that the means provided may be used to infringe copyright does not, in and of itself, constitute authorization. The Copyright Board had stated as follows:

124 On this point the Board concluded as follows (at p. 458):

Even knowledge by an ISP that its facilities may be employed for infringing purposes does not make the ISP liable for authorizing the infringement if it does not purport to grant to the person committing the infringement a license or permission to infringe. An intermediary would have to sanction, approve or countenance more than the mere use of equipment that may be used for infringement. Moreover, an ISP is entitled to presume that its facilities will be used in accordance with law.

323     The Court in *SOCAN* continued:

124 ... This conclusion is generally consistent with the decision of this Court in the *CCH* case", although I will point out that copyright liability may well attach if the activities of the Internet Service Provider cease to be content neutral, e.g. if it has notice that a content provider has posted infringing material on its system and fails to take remedial action.

324     However, the court did not have to consider the possibility that knowledge of a copyright infringement coupled with failure to take remedial action might constitute implicit authorization:

127 The knowledge that someone *might* be using neutral technology to violate copyright (as with the photocopier in the *CCH* case) is not necessarily sufficient to constitute authorization, which requires a demonstration that the defendant did "(g)ive approval to; sanction, permit; favour, encourage" (*CCH*, at para. 38) the infringing conduct. I agree that notice of infringing content, and a failure to respond by "taking it down" may in some circumstances lead to a finding of "authorization". However, that is not the issue before us. Much would depend on the specific circumstances. An overly quick inference of "authorization" would put the Internet Service Provider in the difficult position of judging whether the copyright objection is well founded, and to choose between contesting a copyright action or potentially breaching its contract with the content provider. A more effective remedy to address this potential issue would be the enactment by Parliament of a statutory "notice and take down" procedure as has been done in the European Community and the United States.

128 In sum, I agree with the Court of Appeal that "authorization" could be inferred in a proper case but all would depend on the facts.

325    Where a party supplies equipment but does not have control over how the equipment is to be used, that party does not "authorize" the copyright infringement. In *Canadian Performing Right Society Ltd. v. Vigneux*, [1943] S.C.R. 348 (S.C.C.), reversed [1945] UKPC 1 [1945] A.C. 108 (Canada P.C.), the defendants supplied a phonograph to a restaurant and, in exchange for a monthly rental, provided records. The Privy Council found this did not constitute the defendants "authorizing" the restaurant owner's public performance of the works in question as they did not give the alleged performance nor have control over the machine. As stated by Lord Russell at 123:

. . .

... They had no control over the use of the machine; they had no voice as to whether at any particular time it was to be available to the restaurant customers or not. The only part which they played in the matter was, in the ordinary course of their business, to hire out to Raes one of their machines and supply it with records, at a weekly rental of ten dollars.

. . .

326    In *Muzak Corp. v. Composers, Authors & Publishers Assn. (Canada)* [1953 CarswellQue 18 (S.C.C.)], referred to above, Kellock J. cited with approval the above passage from *Vigneux* . In *Muzak* the court held that merely furnishing electronic transcriptions of musical works, arranged so as to be performed on transcription turntables, did not authorize the use of these works in a manner which violated the owner's copyright. This could not be construed as authorization because, as in *Vigneux*, *Muzak* did not have control of the actual performances.

*Did Rogers Authorize More Than "Mere Use of Equipment"?*

327    In my view, Rogers, in providing the means by which to establish the Zoocasa idea, Website and search engine, did no more than "authoriz[e] the mere use of equipment which could be used to infringe copyright." As in *SOCAN*, the technology in question is "neutral technology" in the sense that there are plausible legal uses for tools which index, list and link websites. Indeed, the evidence suggests that allowing for automatic indexing is an industry standard provided that the site being indexed can reasonably exercise a right to "opt-out" if this is desired.

328    Furthermore, the situation is akin to that in *Vigneux* and *Muzak* as there is no evidence that Rogers exercised specific control over the manner in which the tool operated. In particular, there is no evidence that Rogers controlled which sites Zoocasa's "robot" or "spider" accessed or the process by which the tool's administrator prevented the collection information from parties who did not want such information collected. The evidence is that the tool that Rogers assisted Zoocasa to develop was able to exclude specific websites upon request.

329    However, if implicit authorization can be established based on knowledge by Rogers of the alleged infringement and the support offered despite this knowledge the presumption that it only authorized Zoocasa to index, list and link websites in

accordance with the law, may be rebutted by evidence that "a certain relationship or degree of control existed" between Rogers and Zoocasa.

330    This then leads to the question of whether there was such a relationship or degree of control between Rogers and Zoocasa so as to rebut the presumption that the activity was only authorized in so far as it is in accordance with the law.

*Exercise of Control by a "Parent" Company over Its Subsidiary*

331    Ordinarily, control exercised by Rogers in its capacity as a shareholder in Zoocasa would not make Rogers liable. Recognition of such control would pierce the corporate veil. As stated by the British Columbia Court of Appeal in *Edgington v. Mulek Estate*, 2008 BCCA 505 (B.C. C.A.), a case involving a breach of contract, control by a shareholder of a corporation is expected and that on its own is not sufficient to disregard the separate legal personality of the corporation:

> [20] ... Parties to transactions employ the use of corporate vehicles for a reason, as they are entitled to do. Shareholders, despite being in a position of control, do not, as a rule, incur liability for the breach of their corporation's contractual obligations. It is not a matter of control; the shareholders of a closely held company like Westpark invariably have control of the company.

> [21] The separate legal personality of the corporation will not be lightly disregarded. As recognized in *Big Bend Hotel Ltd. v. Security Mutual Casualty Co.* (1980), 19 B.C.L.R. 102 at 108 (B.C.S.C.), respect for the corporate form is strict:

>> On the whole, Canadian and English courts rigidly adhere to the concept set out in *Salomon*, supra, that a corporation is an independent legal entity not to be identified with its shareholders.

> [22] There are certain circumstances in which what the authorities state to be the "corporate veil" will be "pierced" or "lifted", or where the separate legal personality of the corporation will be disregarded. Such circumstances generally arise where the corporate form has been abused - that is, it has been used for fraudulent or illegitimate purposes (see *Big Bend Hotel*).

332    In *Mentmore Manufacturing Co. v. National Merchandise Manufacturing Co.* (1978), 89 D.L.R. (3d) 195 (Fed. C.A.), at 202-203, [1978] 2 A.C.W.S. 486 (Fed. C.A.), the Federal Court of Appeal stated, in the context of patent infringement, that a corporation's shareholders are not considered to have authorized an infringement by that corporation:

> . . .

> ... There is no reason why the small, one-man or two-man corporation should not have the benefit of the same approach to personal liability merely because there is generally and necessarily a greater degree of direct and personal involvement in management on the part of its shareholders and directors. This view finds support, I believe, in the cases. It has been held that the mere fact that individual defendants were the two sole shareholders and directors of a company was not by itself enough to support an inference that the company was their agent or instrument in the commission of the acts which constituted infringement or that they so authorised such acts as to make themselves personally liable. *British Thompson-Houston Company Ltd. v. Sterling Accessories Ltd.* (1924), 41 R.P.C. 311; *Prichard & Constance (Wholesale) Ltd. v. Amata Ltd.* (1924), 42 R.P.C. 63. It is the necessary implication of this approach, I think, that not only will the particular direction or authorisation required for personal liability not be inferred merely from the fact of close control of a corporation but it will not be inferred from the general direction which those in such control must necessarily impart to its affairs....

> . . .

> [Emphasis added]

333    The "personal liability" of the shareholder referred to in *Mentmore* should be identified with liability of shareholders generally — regardless of whether the shareholder is a natural person or another corporation.

334    In my view, I can only consider Rogers' control of Zoocasa as shareholder if, in the present circumstances, the corporate veil can be pierced when dealing with a subsidiary corporation. The law with regard to when the court should look behind a subsidiary corporation and place liability on the parent company is stated in *International Trademarks Inc. v. Clearly Canadian Beverage Corp.* (1999), 47 B.L.R. (2d) 193, 85 A.C.W.S. (3d) 306 (B.C. S.C.), at paras. 10-1:

> [10] The test in these circumstances is that set out in *Aluminum Co. of Canada Ltd. v. Toronto*, [1944] 3 D.L.R. 609 (S.C.C.), Rand J. at 614:

>> The question, then, in each case, apart from formal agency which is not present here, is whether or not the parent company is in fact in such an intimate and immediate domination of the motions of the subordinate company that it can be said that the latter has, in the true sense of the expression, no independent functioning of its own.

> [11] This test was discussed with approval in *Harrington v. Dow Corning Corp.*, [1998] B.C.J. No. 831, (2 April 1998), Vancouver C954330 (B.C.S.C.) by Mackenzie J. (as he then was):

>> The test for an alter ego or agency relationship sufficient to impose liability on a parent company is a stringent one. The subsidiary must be under the complete control of the parent to an extent that it has no independent functions of its own. It exercises no discretion independently of the parent: *Aluminum Company of Canada v. The Corporation of the City of Toronto*, [1944] 3 D.L.R. 609 (S.C.C.); *Gregorio v. Intrans-Corp.* (1994), 18 O.R. (3d) 527 (C.A.); *Hunt v. T & N PLC.*, [1989] B.C.J. No. 2173, November 29, 1989, B.C.C.A., Vancouver Registry CA011399.

(See also: *Simon Fraser University v. British Columbia (Information and Privacy Commissioner)*, 2009 BCSC 1481 (B.C. S.C.), citing the above.)

335    The evidence does not establish that Zoocasa was "under the complete control" of Rogers and had "no independent functioning of its own." As a result, the court is not entitled to consider control exercised by Rogers in its capacity as a shareholder of Zoocasa. The corporate veil is not pierced.

*Relationship of Control between Rogers and Zoocasa*

336    As stated in *CCH*, the presumption that the activity was only authorized to the extent that it conforms with the law may be rebutted if "a certain relationship or degree of control existed between the alleged authorizer and the persons who committed the copyright infringement" can be shown.

337    In *CCH*, the court determined that the Law Society of Upper Canada lacked sufficient control over the Great Library's patrons to permit a finding that it authorized the infringement. In particular, the court stated that the Law Society and Great Library patrons "are not in master-servant" or "employer-employee relationship."

338    For the proposition that a relationship of control must exist in order to rebut the presumption of lawful use, the court in *CCH* cited, *inter alia*, *Muzak*, *de Tervagne* and P. D. Hitchcock's, "Home Copying and Authorization" (1983), 67 C.P.R. (2d) 17, at 29-33.

339    In *de Tervagne*, the Federal Court once again relied upon P.D. Hitchcock's analysis of *Muzak* for this principle:

> **53** According to Hitchcock, this is primarily a question of fact which depends on the circumstances of each case. The first factor to be considered is the degree of control that the defendant exercised over the infringer. That control must be such that he or she could prevent the infringement from being committed. The second factor is that a reasonable person would be led to conclude that the defendant sanctions, approves or countenances the infringements, and that the defendant should have known that his or her words, actions or inaction would be seen as such by a reasonable person. It is Hitchcock's opinion that such authorization may be express or implied.

340    In *de Tervagne*, the court analyzed English and Australian jurisprudence and concluded that:

> **60** ... the degree of control exercised by the defendants over the people who committed the infringement was determined on the basis of the master-servant or employer-employee relationship that existed between the parties....

Older Canadian case-law suggests that a principal-agent relationship can also serve to rebut the relevant presumption: see *Canadian Performing Right Society Ltd. v. Yee*, [1943] 4 D.L.R. 732 (Alta. Dist. Ct.).

341     As a result, the necessary relationship to establish Rogers' liability under this category is one of "master-servant", "employer-employee" or "principal-agent".

342     Although, the plaintiffs plead that Rogers, "through its employees and representatives, directly supported and promoted the Zoocasa Website", the plaintiffs did not plead that any of the above categories of relationship existed between Zoocasa and Rogers. Nor does the evidence establish the necessary relationship. As a result, the plaintiffs have failed to rebut the presumption that Rogers only authorized Zoocasa to use the Zoocasa Website in accordance with the law.

**Inducing Breach of Contract**

343     The plaintiffs also submit that Rogers is liable for inducing Zoocasa's alleged breach of contract. The test for this tort was recently stated by the Ontario Court of Appeal in *Drouillard v. Cogeco Cable Inc.*, 2007 ONCA 322 (Ont. C.A.) at para. 26, as follows:

> . . .
>
> 1) [The plaintiff] had a valid and enforceable contract with [a third party];
>
> 2) [The defendant] was aware of the existence of the contract;
>
> 3) [The defendant] intended to and did procure the breach of the contract; and
>
> 4) As a result of the breach, the plaintiff suffered damages.
>
> . . .

344     A similar test was articulated in *Super-Save Enterprises Ltd. v. 249513 B.C. Ltd.*, 2004 BCCA 183 (B.C. C.A.). However, the main difference was that the court required that the "defendant was or can be assumed to have been aware of the existence of the contract." This requirement is discussed further below.

345     Although not addressed in the plaintiffs' submissions, if the plaintiffs succeed in establishing all of the elements of the tort, the defendants can still show legal justification for their action. I will discuss justification after addressing the elements of the tort.

346     As discussed above, Rogers' liability for the tort of inducing breach of contract can only arise from its corporation-to-corporation relationship with Zoocasa. To take into account Rogers' role as the sole shareholder in Zoocasa would be to pierce the corporate veil. Indeed, the Alberta Court of Appeal has affirmed this position in the specific context of a shareholder alleged to have induced a breach of contract: *Brae Centre Ltd. v. 1044807 Alberta Ltd.*, 2008 ABCA 397 (Alta. C.A.) at para. 1.

*Discussion*

*Elements of the Tort of Inducing Breach of Contract*

*Existence of a Valid and Enforceable Contract*

347     As I noted earlier in my reasons, the Terms of Use are a valid and enforceable contract between Century 21 and Zoocasa. This element of the test is met.

*Awareness of the Existence of the Contract*

348    The plaintiffs state that Rogers was aware of the existence of this contract as a result of correspondence that Century 21 sent to Rogers consisting of four "cease and desist" letters sent either to Rogers or to their solicitors.

349    The knowledge requirement for the tort of inducing breach of contract includes situations where knowledge of the contract can be assumed. In this regard, the Alberta Court of Appeal in *Royal Bank v. Wilton* (1995), 123 D.L.R. (4th) 266, 28 Alta. L.R. (3d) 1 (Alta. C.A.), at 272, adopted the explanation of the "knowledge" requirement given in N. Klar, *Tort Law* (Carswell, Toronto 1991) at 436:

> . . .

> ... it follows that the defendant's knowledge of the existence of a contract, and its terms, is an essential element of the cause of action. It has been held that knowledge of the precise terms of a contract is not required, as long as the defendant had "the means of knowledge" yet deliberately disregarded them. A party who induces another to terminate its contract with the plaintiff, without regard to whether this can lawfully be done, runs the risk that the contract will be breached as a result of this inducement.

> . . .

See also: *Posluns v. Toronto Stock Exchange* (1964), 46 D.L.R. (2d) 210 (Ont. H.C.), at 268,.

350    As a result, the plaintiffs are required to prove that the defendants were aware of the contract or had "the means of knowledge" to be aware of the contract. The plaintiffs are not required to establish that the defendants were aware of the contract's precise terms although they would need to know the nature of the contract and that it prohibited indexing without permission.

*The Defendant Intended To and Did Procure the Breach of the Contract*

351    This element of tort has two requirements. First, that Rogers possessed the necessary intention to procure the breach of contract. Second, that Roger's action in fact resulted in the breach of the contract.

352    With regard to the "intention" requirement, the court in *Drouillard*, at paras. 29-30 stated the following:

> [29] To satisfy the third element of the tort, the procurement of the breach must be intended and direct. In Professor Lewis N. Klar's text *Tort Law* (Toronto: Carswell, 2003) at 612, he states:

>> In order to succeed, a plaintiff must prove that the defendant intended to procure a breach of contract. In this respect, intention is proven by showing that the defendant acted with the desire to cause a breach of contract, or with the substantial certainty that a breach of contract would result from the defendant's conduct.

> [Citations omitted]

> [30] In John G. Fleming's text *The Law of Torts*, 9th ed. (Sydney: LBC Information Services, 1998) at 761, he notes that to be liable under this tort the defendant must have acted with the "necessary knowledge and intent of procuring a breach of contract,": Fleming continues at 761-62:

>> Merely that the breach was a natural consequence of his conduct is not sufficient: he must have intended it. Not that he need have actually known the precise terms of it or that his object could be accomplished only through its breach. If - turning a blind eye - he went about it regardless of whether it would involve a breach, he will be treated just as if he had knowingly procured it. Indifference is equated with intent.

353    In order to prove that the defendant intended to procure a breach of contract, the plaintiff must show that the defendant acted with the desire to cause a breach of contract, with substantial certainty that a breach of contract would result from the

defendant's conduct or with indifference to whether the contract would be breached: *Thermo King Corp. v. Provincial Bank of Canada* (1981), 130 D.L.R. (3d) 256 (Ont. C.A.); *Dirassar v. National Trust Co.* (1966), 59 D.L.R. (2d) 452 (B.C. C.A.); *Emerald Construction Co. v. Lowthian*, [1966] 1 W.L.R. 691 (Eng. C.A.), at 704.

354   As a result, the plaintiffs must establish that Rogers desired to cause Zoocasa to breach its contract with Century 21 or acted with substantial certainty that a breach of contract would result or, at a minimum, that Rogers was indifferent to whether a breach would result as a consequence of its actions.

355    As stated in *Garry v. Sherritt Gordon Mines Ltd.* (1987), 45 D.L.R. (4th) 22, [1988] 1 W.W.R. 289 (Sask. C.A.), at 335, the requirement that the defendant's actions "in fact resulted in the breach of the contract" is a straightforward question of causation. The standard to be applied is whether the breach is "fairly attributable to any such pressure, persuasion or procuration on the part of the ... defendants": *D.C. Thomson & Co. v. Deakin*, [1952] Ch. 646 (Eng. C.A.), at 686.

356   As a result, if the plaintiffs are able to establish that Rogers intended to procure the breach of contract, they must still establish that Zoocasa's breach of contract is "fairly attributable" to the actions Rogers is alleged to have taken in support of Zoocasa.

357   The plaintiffs submit that Century 21 has established all the elements of the tort because:

i. Century 21's Terms of Use constitute a binding contract with those who access the Century 21 Website;

ii. Rogers knew that Zoocasa was accessing the Century 21 Website, and that there were Terms of Use that governed the access to that Website;

iii. Rogers intended to and did procure Zoocasa's breach of the Terms of Use. Rogers was fully aware of Zoocasa's conduct and of Century 21's objection to that conduct. Specifically, Rogers was aware from the correspondence it received that Century 21 took the position that Zoocasa's conduct amounted to a breach of the Terms of Use. Rogers played an active role in promoting, facilitating and enabling the conduct by Zoocasa that breached the Terms of Use contract;

iv. Century 21 has suffered damages as a result of Zoocasa's breach of the Terms of Use;

v. The initial development of Zoocasa was carried out by the Rogers New Ventures unit; and

vi. Rogers is therefore also liable for the tort of inducing Zoocasa's breach of that contract;

358   The defendant Rogers states that:

i. The indexing and linking activities are those of Zoocasa, not Rogers;

ii. Rogers is a shareholder only and as such not liable for the actions of Zoocasa;

iii. The fact that Rogers set up Zoocasa in its initial stages and that Roger's employees assisted it is irrelevant to the question of whether Rogers authorized the activities complained of; and

iv. The plaintiffs' initial letters of complaint were against Zoocasa, not Rogers, indicating they were aware it was a separate entity.

### *Discussion of Intent to Procure Breach of Contract and Authorize Copyright Infringement*

359   The argument of the plaintiffs is that the authorization of copyright infringement and inducing breach of contract do not raise the issue of piercing the corporate veil. The liability of Rogers is alleged to arise from its position as the only shareholder of Zoocasa and its active participation, support and control over it.

360     To establish that Rogers authorized copyright infringement or induced breach of contract the plaintiffs must establish more than the level of involvement of Rogers that they have shown. The fact that Rogers funded, supported and assisted with the development of Zoocasa does not establish that Rogers authorized Zoocasa to infringe copyright or to breach the contract.

361     The plaintiffs assert that liability for authorizing copyright infringement can arise from facts that are less than direct and positive and that such liability can be established by a "sufficient degree of indifference".

362     While Rogers level of involvement in the planning, creation, funding and promotion of Zoocasa has been established the evidence does not establish that Rogers intended that Zoocasa breach copyright or Century 21's Terms of Use. Nor does the evidence support a finding that Rogers turned "a blind eye". I am not satisfied that the plaintiff has, on the balance of probabilities, succeeded in proving that Rogers is liable for Zoocasa's copyright infringement or breach of contract.

**Injunctive Relief**

***Century 21's Claim for Injunctive Relief***

363     Century 21 seeks an injunction preventing the defendants from accessing the Century 21 Website.

364     Zoocasa states that an injunction is not required because in September 2008, it declared that it would not index a website that did not want to be indexed.

365     However, on discovery, Mr. Lee, on behalf of Zoocasa, stated that while the defendant Zoocasa has agreed not to access the Century 21 Website generally, they intend to resume accessing the Website where individual realtors give their consent.

366     While individual realtors have certain rights with respect to the text and the photographs, it is Century 21 which controls the Terms of Use upon which users can access their Website. It would be a breach of the Terms of Use if Zoocasa indexed that portion of the Century 21 Website respecting individual realtors who have consented as such access also requires the consent of Century 21.

367     However, the defendant notes that on discovery Century 21 stated that it had no objection to Zoocasa indexing and linking to any property listing on century21.ca where the realtor in question gives consent. A close reading of the discovery evidence reveals that Century 21 does not object to brokers or salespeople giving permission for the indexing of data by Zoocasa "... if they send the data ... to Zoocasa". Likewise a letter from solicitors for Century 21 indicates that the plaintiff does not object to Zoocasa obtaining information directly from their brokers but at no time has Century 21 consented to such material being accessed through its Website.

368     Century 21's concern is that the apparent policy of the defendant Zoocasa has changed and may change again. Given that fact, they seek an injunction to ensure that the plaintiffs' contractual rights respecting the Terms of Use are protected.

369     Given my findings respecting copyright infringement, Century 21's claim for an injunction can only be based in breach of contract and cannot be enforced as a remedy for copyright infringement. An injunction is an equitable remedy and is within the court's discretion. Before granting an injunction the court must first consider whether damages or an injunction, or both, are the appropriate remedy for breach of contract.

370     In *North West Community Video Ltd. v. T.W.U.*, [1978] 2 W.W.R. 289 (B.C. S.C.), at 296 MacDonald J. adopted the words of A.L. Smith, L.J. in *Shelfer v. London Electric Lighting Co.* (1894), [1895] 1 Ch. 287 (Eng. C.A.), at 322-323, respecting the granting of a permanent injunction:

. . .

In my opinion, it may be stated as a good working rule that —

(1) If the injury to the plaintiff's legal rights is small,

(2) And is one which is capable of being estimated in money,

(3) And is one which can be adequately compensated by a small money payment,

(4) And the case is one in which it would be oppressive to the defendant to grant an injunction:

then damages in substitution for an injunction may be given ...

. . .

371    A.L. Smith, L.J. then said at p. 323:

. . .

It is impossible to lay down any rule as to what, under the differing circumstances of each case, constitutes either a small injury, or one that can be estimated in money, or what is a small money payment, or an adequate compensation, or what sould be oppressive to the defendant. This must be left to the good sense of the tribunal which deals with each case as it comes up for adjudication. ... Each case must be decided upon its own facts; but to escape the rule it must be brought within the exception....

. . .

372    In situations where damages are an adequate remedy, injunctions will be inappropriate to restrain actionable wrongs: *London & Blackwall Railway v. Cross* (1886), 31 Ch. D. 354 (Eng. C.A.), at 369. In the same manner, injunctions should not be granted in situations where the plaintiff can be fully compensated by an award of damages or where the wrongdoing has ceased and there is no likelihood of its recurring: *Proctor v. Bayley* (1889), 42 Ch. D. 390 (Eng. C.A.).

373    However, where the defendant wrongfully interferes with the claimant's rights as an owner of property, and intends to continue that interference, the claimant is *prima facie* entitled to an injunction: *Hilton v. British Columbia (Ministry of Transportation & Highways)*, [1986] B.C.J. No. 1077 (B.C. S.C.)at para. 18 citing *Pride of Derby & Derbyshire Angling Assn. Ltd. v. British Celanese Ltd.* (1952), [1953] Ch. 149 (Eng. C.A.), at 181; *Canadian Pacific Ltd. v. Paul* (1983), 2 D.L.R. (4th) 22 (N.B. C.A.), at 40.

374    An injunction may also be necessary in circumstances where the breach of contract cannot be fairly compensated through a monetary award. A defendant cannot buy the privilege of infringing the claimant's rights.

375    In my view, the plaintiff is entitled to injunctive relief given the difficulty of assessing damages, Zoocasa's past conduct and their apparent view that with the consent of Century 21 brokers they can access the Century 21 Website in violation of the Terms of Use.

376    Century 21 is therefore entitled to a permanent injunction restraining Zoocasa, by itself, its servants, agents, affiliates, subsidiaries, or otherwise from accessing the Century 21 Website in contravention of the Terms of Use posted on the Century 21 Website.

***Bilash and Walton's Claim for Injunctive Relief***

377    The notice of motion also seeks injunctive relief on behalf of Bilash and Walton. I am not inclined to grant injunctive relief on the claims advanced by Bilash and Walton as there is no indication that Zoocasa is or will continue to infringe the copyright of Bilash and Walton.

**Damages for Breach of Contract**

378     On September 2, 2008 solicitors for Century 21 advised Zoocasa that the plaintiff did not consent to their proposed access to and use of their Website. Despite that knowledge, Zoocasa proceeded to access the Website.

379     In order to award damages, I must first determine what damages have been established.

380     Century 21's evidence is that they suffered loss, inconvenience and expense as a result of having to deal with Zoocasa's actions. Employees spent time dealing with the problems created by the Zoocasa Website. The evidence of Mr. Lawby of Century 21 was that he had spent approximately 18 hours dealing with Zoocasa's breach of the Terms of Use, not including time spent preparing for and attending for discovery and that his staff had spent another six hours also dealing with the same matters. His evidence was that his time, and that of his staff, was valuable and that dealing with Zoocasa's breach has been a cost to the plaintiff's business.

381     In addition, Zoocasa's actions caused problems for Century 21 with respect to its relationship with what is called the REB4 Boards being a group consisting of the the Real Estate Board of Greater Vancouver, Fraser Valley Real Estate Board, the Chilliwack and District Real Estate Board, and the Calgary Real Estate Board.

382     Time and legal expenses were incurred when Century 21 was required to consult with legal counsel to protect their proprietary interest in the listings and photographs contained on their Website. Additionally, their Website operator WTL spent time dealing with the Zoocasa Website which resulted in an opportunity cost to Century 21 as WTL had less time to spend developing and promoting the Century 21 Website. WTL estimated the Zoocasa actions used approximately 70 hours of staff time that would have otherwise been devoted to expanding, improving and promoting the Century 21 Website.

383     Century 21 also claims loss specifically arising from Zoocasa's practice for a time of framing from the Century 21 Website within its own Website. As noted earlier, framing involves the practice of displaying information from one website within another in a manner that has the appearance of making the framed site's content that of the framing website. The result is confusion for the user as to the source of the content. It also permits the website that is doing the framing to claim attribution for the page viewing giving it an advantage in terms of how websites are ranked by search engines. The framing commenced in August 2009 and ceased after the matter was raised at the discovery of Mr. Lee on December 14, 2009.

384     The defendants state that no damages of any substantial character have been established. As a corporation they state Century 21 has not shown any actual monetary loss. They specifically note the following:

a. There is no evidence of specific harm suffered by Century 21 as a result of time spent on the Zoocasa issue;

b. No estimates of the loss is given other than hours spent which, as a result, fails to provide a basis for calculating the appropriate measure of damages;

c. The legal costs incurred in writing to the REB4 Boards have not been provided;

d. Mr. Lawby of Century 21 estimates he spent 18 hours dealing with Zoocasa's breach but does not provide details as to what he did for those 18 hours. As a result the court cannot determine whether or not the time spent was actually caused to be spent by Zoocasa's actions nor can the court determine whether they were necessary or not;

e. The REB4 claim respecting third party linking involved a letter sent by REB4 to WTL, not Century 21;

f. WTL asserts that staff spent 70 hours on the Zoocasa breach but provides no evidence of how that delayed certain activities respecting Century 21's Website nor evidence of the actual damage suffered by the delay of certain other activities to be performed for the benefit of Century 21. There is no evidence of what the delay was or its impact;

g. WTL fails to specify what issues relating to the Zoocasa Website were dealt with. Nor does the evidence establish if the issues arose from indexing or some other matter.

385    As a result the defendants state the court cannot determine appropriate damages even if the breach is proven.

386    I am satisfied that Zoocasa breached Century 21's Terms of Use and in doing so caused loss, inconvenience and expense to Century 21. They may have done so in the belief that such Terms of Use were not binding. However, I have determined that such belief was incorrect. An award of damages is therefore appropriate.

387    In *Pinewood Recording Studios Ltd. v. City Tower Development Corp.* (1996), 31 C.L.R. (2d) 1, 67 A.C.W.S. (3d) 71 (B.C. S.C.), Pinewood J. described the assessment of damages as follows:

169 A Judge approaching this task of assessment is to be reminded of the comments by McEachern C.J.B.C. in *Begusic v. Clark, Wilson & Co.* (1991), 57 B.C.L.R. (2d) 273 at 290 (B.C.C.A.):

The assessment of damages is not a precise science; it is not even a calculation.

Elsewhere in Begusic, Chief Justice McEachern referred to the well known instruction of Lord Blackburn in *Livingstone v. Rawyards Coal Company* (1880), 5 App. Cas. 25 at 39 (H.L.) wherein he said the measure of damages should be:

... that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation.

388    Century 21's claim for damages for breach of contract consists of both a general damage claim founded in damages for breach but also includes as part of the damages claimed expenses incurred in dealing with the consequences of the breach. The latter is normally addressed through the issue of costs. S. M. Waddams, *Law of Damages*, 3d ed., (Canada Law Book: Aurora, Ont., 1997) at 314 states:

Litigation costs are not generally considered to be part of the law of damages .... However, some cases have permitted recovery, not as costs but as damages, of the expense of investigating the defendant's wrong. Such recovery has been allowed in cases of breach of contract and of inducing breach of contract, and nuisance, and there seems no reason why recovery should not be supported wherever investigatory costs can be anticipated as a natural and probable consequence of the defendant's wrong.

389    Waddams relies on *Acme Investments Ltd. v. York Structural Steel Ltd.* (1974), 9 N.B.R. (2d) 699, 1 A.P.R. 699 (N.B. C.A.), a breach of construction contract case where the New Brunswick Court of Appeal stated:

**31** While the plaintiff is clearly entitled to the cost of correcting deficiencies in the defendant's work on the principle of reinstatement I do not think the plaintiff is precluded from recovering any other expense reasonably incurred in ascertaining the extent of the defendant's breaches of contract and the cost of correcting them. In *Victoria Laundry (Windsor) Ld. v. Newman Industries Ld. Coulson & Co. Ld. (Third Parties)*, [1949] 2 K.B. 528, Asquith, L.J., said at p. 539:

(1) It is well settled that the governing purpose of damages is to put the party whose rights have been violated in the same position, so far as money can do so, as if his rights had been observed: *Sally Wertheim v. Chicoutimi Pulp Company*, [1911] A.C. 301).

(2) In cases of breach of contract the aggrieved party is only entitled to recover such part of the loss actually resulting as was at the time of the contract reasonably foreseeable as liable to result from the breach. [*page715]

(3) What was at that time reasonably so foreseeable depends on the knowledge then possessed by the parties or, at all events, by the party who later commits the breach.

(4) For this purpose, knowledge 'possessed' is of two kinds; one imputed, the other actual. Everyone, as a reasonable person, is taken to know the 'ordinary course of things' and consequently what loss is liable to

result from a breach of contract in that ordinary course. This is the subject matter of the 'first rule' in *Hadley v. Baxendale*, 9 Exch. 341.

**32** In my opinion reasonable person in the position of the defendant would be taken to know there was a serious possibility that in the "ordinary course of things" an owner who had reason to believe a building contract was improperly performed by the builder would seek the assistance of a professional engineer to ascertain the deficiencies and the cost of correcting them. In its factum the plaintiff submits that the award of $ 30,000.00 is reasonable. In my opinion the cost of such services as are reasonable would not be less than that sum and I would accordingly not disturb the award.

390      In my view, it was reasonably foreseeable that breach of the Terms of Use would cause the plaintiff to incur certain expenses arising from the breach. Century 21 is entitled to damages for such loss as part of their claim for general damages for breach of contract.

391      Century 21 also claims that as a result of Zoocasa framing their Website from August 20, 2008 to December 14, 2009, they have suffered damages. However, the evidence in support is limited to the assertion that framing causes confusion to the user as to the source of content and results in the framer being able to claim attribution.

392      While Century 21 has established that it suffered loss for breach of contract, they have not provided evidence of the value of that loss. Presumably they could have done so given the nature of some of the damages claimed. For example, the time spent by Wheretolive.com has not been supported by any values, the legal fees incurred to respond to REB4's communications have not been disclosed, nor has the value of the time spent by Century 21 staff dealing with the Zoocasa breach been quantified.

393      In such a situation should the court order damages?

394      Just because the loss is difficult to establish does not mean damages will not be awarded. However, that assumes there are difficulties in quantifying the loss, not the situation where the plaintiff has chosen not to lead specific evidence on the issue.

395      An award of damages for breach of contract where proof of damage is minimal can be addressed by an award of nominal damages although nominal does not necessarily mean that the damages will be small: *RBC Dominion Securities Inc. v. Merrill Lynch Canada Inc.*, 2004 BCSC 1464 (B.C. S.C.), (where a nominal award was $1,000) var'd on other matters 2007 BCCA 22 (B.C. C.A.), var'd on other matters 2008 SCC 54 (S.C.C.). However, in *McGee v. Clarke*, [1927] 1 W.W.R. 593 (B.C. C.A.) and *State Vacuum Stores of Canada Ltd. v. Phillips*, [1954] 3 D.L.R. 621 (B.C. C.A.) both courts relied on the dictum of Lord Halsbury in *"Mediana" (The)*, [1900] A.C. 113 at 116 (H.L.) and held that nominal damages are not the same as small damages. However, it seems evident from the context in *"Mediana" (The)* that Lord Halsbury meant that compensatory damages might sometimes be small, not that nominal damages should be large.

396      I find that Century 21 has not proven damages of any substantial character. In my view however an award of nominal damages is appropriate. Such damages need not be small: *Green v. Stanton* (1969), 6 D.L.R. (3d) 680 (B.C. C.A.), at 691-692. As stated in Green:

It has been long established that because damages cannot be calculated with certainty is no reason why an award should not be made, and that a Judge must do the best he can to arrive at a proper figure. Notwithstanding the deficiencies in the evidence and the failure of the respondents to produce, or to even attempt to produce, evidence of how their income was affected, I am prepared to say that some loss must have been sustained. But whether it be trivial or substantial cannot be determined from the evidence. The onus was on the respondents to at least give some realistic base for pecuniary compensation, and it is not the obligation of the appellant to "account" for any profits he might have made, as was apparently thought proper by the learned trial Judge.

The large amount awarded, calculated at $750 per month, appears to me to be based on pure conjecture speculated on an unfortunate misinterpretation of the only evidence dealing with damages. In my respectful view, the respondents are entitled to damages, but they must be nominal in the absence of anything upon which to properly assess them. Nominal

damages need not be small, and in recent times more than token damages are often given. I would set aside the award of damages in the amount of $14, 927.42 and substitute therefore the sum of $1,000.

397     In my view, based on the lack of evidence of loss and expenses incurred relating to the actions of Zoocasa, an award in the sum of $1,000 in favour of Century 21 would be appropriate.

**Damages for Copyright Infringement**

***Position of the Parties***

398     On May 18, 2010, the plaintiffs delivered an election to claim statutory damages pursuant to s. 38.1 of the *Copyright Act*. Section 38.1 provides as follows:

**38.1** (1) Subject to this section, a copyright owner may elect, at any time before final judgment is rendered, to recover, instead of damages and profits referred to in subsection 35(1), an award of statutory damages for all infringements involved in the proceedings, with respect to any one work or other subject-matter, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $500 or more than $20,000 as the court considers just.

**Where defendant unaware of infringement**

(2) Where a copyright owner has made an election under subsection (1) and the defendant satisfies the court that the defendant was not aware and had no reasonable grounds to believe that the defendant had infringed copyright, the court may reduce the amount of the award to less than $500, but not less than $200.

399     In seeking statutory damages for each individual Work, the plaintiffs Bilash and Walton claim for a total of 128 individual Works (29 property descriptions and 99 photographs) and submit that $500 per infringement is appropriate for total statutory damages of $64,000.

400     With respect to property descriptions, 24 belong to Bilash and five to Walton. All 99 photographs belong to Bilash.

401     The plaintiffs further argue that the defendants cannot be said to have acted in good faith for the purposes of s. 38.1, and, for this reason, a significant award of damages is appropriate. They assert that a significant award is also needed to deter not only the defendants but others who might adopt a similar online business model.

402     The defendants state that if statutory damages are warranted that they should be assessed at the lowest possible quantum. They submit there is no evidence of bad faith, no need to deter other infringements of the copyright in question and finally that the court has a discretion to order a per work award of statutory damages below $200.

403     The president of Zoocasa, J. R. Langlois, in his affidavit of May 13, 2010, deposed that Zoocasa was in a "learning process concerning some aspects of the real estate industry. In particular, the question of rights in respect of property listing data is very entangled in Canada." He stated that:

This leads to complex issues as different parties - the realtors, MLS, and the website operators such as Canada 21 - assert various kinds of rights with respect to the on-line property listing data. These complexities had not been apparent to Zoocasa originally.

By July 2009, Zoocasa had learned a considerable amount about the complex structure of the real estate industry in Canada, but had not turned this knowledge into a fully-conceived business plan.

Since July 2009, Zoocasa has evolved considerably in its understanding of both the data issues and the business issues.

404     In other words, Zoocasa apparently entered into the market without due consideration of the legal issues surrounding copyright and intellectual property generally. Counsel for Zoocasa also referred to the conduct of both parties leading to this litigation as stubborn.

405     I am not satisfied that Zoocasa's intransigence was rooted in bad faith. Rather, it appears to have its roots in entering into a new area with a new business model and a lack of appreciation of the legal issues arising. In *Gateway Realty Ltd. v. Arton Holdings Ltd.* (1991), 106 N.S.R. (2d) 180 (N.S. T.D.), at 191-198, aff'd on appeal (1992), 112 N.S.R. (2d) 180 (N.S. C.A.), the trial judge articulated the doctrine of good faith performance in the following terms:

> The law requires that parties to a contract exercise their rights under that agreement honestly, fairly and in good faith. This standard is breached when a party acts in a bad faith manner in the performance of its rights and obligations under the contract. "Good faith" conduct is the guide to the manner in which the parties should pursue their mutual contractual objectives. Such conduct is breached when a party acts in "bad faith" - a conduct that is contrary to community standards of honesty, reasonableness or fairness. The insistence on a good faith requirement in discretionary conduct in contractual formation, performance, and enforcement is only the fulfillment of the obligation of the courts to do justice in the resolution of disputes between contending parties.

406     In *Mesa Operating Ltd. Partnership v. Amoco Canada Resources Ltd.* (1994), 19 Alta. L.R. (3d) 38 (Alta. C.A.) at para. 14, Kerans J. accepted the trial judge's observations regarding implied contractual terms of good faith and corresponding bad faith. To this end Kerans J. held that "the duty to act in good faith extends beyond the duty to avoid acting for bad motives". At trial, the trial judge held and Kerans J. accepted that:

> **14** . . .
>
> In Canada, the test ... does not include the need for the plaintiff to show that the defendant intentionally acted in bad faith.
>
> ... the common law duty to perform in good faith is breached when a party acts in bad faith, ...

407     The obligation of good faith is an obligation not to act in relation to the contract so as to nullify the bargain objective or benefit owing to the other party: *Mannpar Enterprises Ltd. v. Canada*, 1999 BCCA 239 (B.C. C.A.); *Schluessel v. Maier*, 2001 BCSC 60 (B.C. S.C.). Once the contract has been entered into, the parties must perform their respective obligations in good faith: *Gateway Realty Ltd.* above.

408     However, failure to act in good faith does not necessarily imply that a party has acted in bad faith. Bad faith conduct is conduct that is contrary to community standards of honesty, reasonableness or fairness. It is also conduct where a party acts in a manner that substantially nullifies the contractual objectives or causes significant harm to the other, contrary to the original purposes or expectations of the parties: *Mesa Operating Ltd. Partnership*.

409     Good faith conduct on the other hand holds that the parties should pursue their mutual contractual objectives. From this perspective, the good faith obligation is different from the obligation to act reasonably in that the interests of the party acting in good faith are not subordinate to any other party. Rather, the party acting in good faith cannot act in ways that are abusive, unfair or dishonest: *Peel Condominium Corp. No. 505 v. Cam-Valley Homes Ltd.* (2001), 196 D.L.R. (4th) 621 (Ont. C.A.); *Freedman v. Mason*, [1958] S.C.R. 483 (S.C.C.).

410     I cannot find that Zoocasa acted dishonestly, unreasonably or unfairly toward the plaintiffs. Although Century 21 alleges that Zoocasa's refusal to operate by the Robot Exclusion Standard indicates bad faith, I do not find it to be so. Rather, Zoocasa believed that a website that does not want to be indexed could simply block their IP address. As I mentioned earlier, Zoocasa appears to have entered into a new market without due appreciation for the standardized protocols of the industry. While Zoocasa may have been negligent in educating themselves regarding industry and community standards, I cannot find that they acted in bad faith.

**Discussion of Damages for Copyright**

411     Subsection 38.1(5) of the *Copyright Act* provides a list of relevant factors for the court to consider in exercising its discretion when awarding statutory damages. Those relevant factors include:

**Factors to consider**

(5) In exercising its discretion under subsections (1) to (4), the court shall consider all relevant factors, including

(a) the good faith or bad faith of the defendant;

(b) the conduct of the parties before and during the proceedings; and

(c) the need to deter other infringements of the copyright in question.

The analysis of Taylor J. in *Pinewood Recording Studios Ltd.*, discussed above, is still relevant to damages for copyright infringement.

412     Additionally, in *Microsoft Corp. v. PC Village Co.*, 2009 FC 401 (F.C.), the Federal Court considered the factors listed in s. 38.1(5) of the *Copyright Act*. The defendants were found to have infringed Microsoft's copyright in its Microsoft Office software programs. In assessing statutory damages, the court emphasized that the defendants had ignored cease and desist letters from Microsoft. The court held that an award of statutory damages must be sufficiently high to deter future infringements by the named defendants and others: at paras. 34 and 39. The court awarded $10,000 per infringement.

413     The plaintiffs submit that in the present case, as in *Microsoft*, the defendants ignored repeated cease and desist letters from the plaintiffs and continued to infringe copyright even after the litigation had started. They state that the defendants also made a public pronouncement that they did not index websites that did not want to be indexed and allowed that pronouncement to remain publicly accessible long after they knew it was no longer true.

414     In reply the defendants submit that there is no evidence of bad faith and that in fact Zoocasa held an honest belief in its ability to index a publicly available website, particularly where that website encouraged other search engines to do what they viewed as the same thing. They also note that the effect of their actions was to promote the plaintiffs' listings and hence their business. In addition, the defendants have voluntarily stopped indexing the plaintiffs' Website and have agreed to not index it further save for realtors or brokers who provide their consent.

415     The plaintiffs have relied on the cease and desist letters sent to the defendants in September and October 2008. The defendants argue that those letters were sent by counsel for Century 21, not Bilash or Walton, and at the time Century 21 had no ownership in copyright nor a basis to claim for infringement. Century 21 was entitled to seek compliance with their Terms of Use. The cease and desist letters of September 8, 2008, was restricted to notice of copyright infringement. The October 6, 2008, letter gave notice respecting alleged breach of both copyright and contract.

416     However, the defendants' argument focuses on the legitimacy of the letters and ignores the fact of notice. Surely the point is that notice alerts them to a potential claim which may or may not be proven valid at a future date. To ignore a claim however is to run the risk of potential liability if breach of contract or ownership of copyright and its infringement is eventually proven.

417     The defendants also rely on s. 38.1(2) of the *Copyright Act* which states:

**Where defendant unaware of infringement**

(2) Where a copyright owner has made an election under subsection (1) and the defendant satisfies the court that the defendant was not aware and had no reasonable grounds to believe that the defendant had infringed copyright, the court may reduce the amount of the award to less than $500, but not less than $200.

**Special case**

(3) Where

    (a) there is more than one work or other subject-matter in a single medium, and

    (b) the awarding of even the minimum amount referred to in subsection (1) or (2) would result in a total award that, in the court's opinion, is grossly out of proportion to the infringement,

the court may award, with respect to each work or other subject-matter, such lower amount than $500 or $200, as the case may be, as the court considers just.

418    Since the defendants were put on notice in the fall of 2008 that copyright subsisted in the property descriptions and photographs, the defence set out in s. 38.1(2) of the *Copyright Act* does not assist them. Section 38.1(3) however is potentially available to the defendants.

419    In *Telewizja Polsat S.A. v. Radiopol Inc.*, 2006 FC 584 (F.C.), the Federal Court found that the overarching mandate of a judge assessing statutory damages in lieu of loss of profits is to arrive at "a reasonable assessment in all of the circumstances in order to yield a just result.": para. 37. Pursuant to s. 38.1 3(b), the court has the power to order a per-work award of statutory damages of below $200 "where the awarding of even the minimum amount referred to in ss. 38.1 (1) or (2) would result in a total award that, in the court's opinion, is grossly out of proportion to the infringement."

420    As the court noted in *Telewizja* at paras. 38 and 39:

    [38] Such a mandate clearly flows from the structure of section 38.1 which provides an initial range per work of statutory damages from a minimum of $500 to a maximum of $20,000 per work.

    [39] This initial range may be cut back in two circumstances: first, in the case of an innocent defendant, which is not the case here, and second, in the case where there is more than one work in a single medium and where awarding the minimum per work would yield a total award that is grossly out of proportion to the infringement.

421    There are a number of factors that may be relevant in considering the applicability of 38.1(3). In this case the length of the infringement was relatively short, there was no evidence that a high award is required to deter others. The defendant stopped the activity and I have not made a finding of bad faith on the part of Zoocasa. In addition, the nature of the infringement, the fact that the copyright serves a commercial purpose, and that there was, in the eyes of the defendants, a benefit to the plaintiff, supports a lesser award. Of most importance is that the actual damages claimed are not substantial. The evidence of Bilash and Walton on discovery was as follows:

**Bilash**

    539 Q Now, Mr. Bilash, I've asked your counsel for particulars of the damages claimed and for documents related to damages, and I want to ask you, do you assert that you've suffered any damage that you can identify by reason of the indexing of any properties on Zoocasa?

    A Have I suffered any damage from Zoocasa indexing my properties? That's the question?

    540 Q Yes.

    A I guess I don't know if I have, but I don't know if I've gained anything either.

Walton has, similarly, said:

    280 Q But is it fair to say so far as your knowledge goes, it hasn't had any sort of impact on your business as a salesperson?

A Like I said, I don't know. It may have. It may have not.

281 Q But you don't — you can't identify for me any impact that it's had on your business?

A Correct.

422   Due the temporary nature of online property listings, the plaintiffs are unable to provide evidence of each and every instance of Zoocasa's copyright infringement of their photographs and property descriptions. However, the plaintiffs have adduced evidence that Zoocasa infringed copyright in no less than 99 photographs and 29 property descriptions.

423   The defendants dispute the number of infringements claimed. However, they base that on factors such as not locating the property description, only finding properties under the MLS copies or not matching the property descriptions on the Zoocasa pages. I am not satisfied that the defendants have shown that the number of infringements differs from those established by the plaintiffs.

424   Zoocasa acknowledges indexing the Century 21 Website during the periods alleged and the evidence of the plaintiffs respecting the properties listed on the site during those periods. I am satisfied that the plaintiff has established that the defendant Zoocasa infringed copyright of the plaintiffs with respect to at least 29 properties of which Bilash was the original owner of 24 and Walton was the original owner of 5 of the infringed listings.

425   Likewise, with respect to the 126 photographs claimed to have been copied I am satisfied that at least that many were copied by Zoocasa. The 99 photographs for which copyright infringement are claimed are those that are the property of Bilash.

426   Statutory damages provided for in s. 38.1, are set at $500.00 per infringement, this would result in a statutory damage award of $64,000. However, given the circumstances of this case including Zoocasa's apparent unintentional infringement such an award is grossly out of proportion to the infringements. I therefore order damages in the sum of $250 per infringement resulting in a total statutory damage award of $32,000.

427   Bilash, as the holder of copyright to 24 real property descriptions and 99 photographs is entitled to damages of $30,750. Walton, as the holder of copyright to 5 real property descriptions is entitled to damages in the sum of $1,250.

***Punitive Damages***

428   Punitive damages are awarded where the conduct of a party is egregious and deterrence is appropriate. Such damages can be awarded for breach of contract and, as well, for infringement of copyright. The act does not prohibit such an award: *Pro Arts Inc. v. Campus Crafts Holdings Ltd.* (1980), 28 O.R. (2d) 422 (Ont. H.C.), at 441.

429   The plaintiff describes the conduct of the defendants as "calculated and deliberate". They say that the defendants are "sophisticated commercial entities that employ similar Terms of Use on their own websites." They point to the continued indexing and copying of the Century 21 Website after notice that the plaintiffs objected and the awareness of the defendant Zoocasa that their right to do so was in issue. They also note from the discovery of Mr. Lee on behalf of Zoocasa:

693 Q Now, this one has been printed off more recently. And can you confirm that what is happening here is what we talked about earlier; there is framing going on. Correct?

A This was brought to my attention yesterday. Yes.

694 Q And so the Century 21 link is framed by a Zoocasa page? Is that fair?

A Yes.

695 Q And, taking a look at the url, do you recall you said that whether there is a problem with attribution will depend on the source url for the frame and which domain it's under. So, which domain is this Century 21 listing we are looking at on the second page under?

A Zoocasa.

696 Q Okay. Thank you. Would you agree with me that Zoocasa is doing here what its terms of use would prohibit others from doing?

A Yes.

697 Q Let me show you a series of some other similar listings. These are marked as Exhibits 21, 22 and 23. Take a moment and look through those. Just for the record, 21, 22 and 23; Exhibits 21, 22 and 23 are the Plaintiffs' numbers beginning 232, 237 and 242 respectively.

EXHIBIT NO 21: Plaintiffs' document 232.

EXHIBIT NO. 22: Plaintiffs' document 237.

EXHIBIT NO. 23: Plaintiffs' document 242.

MR. VESELY:

698 Q Have you had a chance to look through those three exhibits?

A Yes.

699 Q I appreciate you haven't done those searches yourself but do they appear to you, from your knowledge of the Zoocasa web site, to be in each case the Zoocasa property description page with the broker or agent page that one would find when one clicked on the link?

A Yes.

700 Q In each case, the broker listing page is framed with a Zoocasa domain url. Correct?

A Yes.

701 Q When did Zoocasa begin using framing?

A I don't know the answer to that. I only was made aware of this yesterday.

702 Q Does it raise concerns for you?

A I have asked them to look at this.

703 Q Have you asked them to look at this because it raises some concerns for you?

A Yes.

704 Q And could I leave it as an outstanding request to determine when framing began?

MR. MARTIN: Yes.

430    I note that Zoocasa, which had begun framing the Century 21 Website on August 20, 2008, ceased doing so immediately after Mr. Lee's examination for discovery on December 14, 2009.

431     The defendants' position is summarized by them as follows:

   a. Zoocasa held an honest belief in its ability to index a publicly available website;

   b. Zoocasa believed that it was only doing what the plaintiffs already did which was to actively encouraged other search engines to search its site;

   c. Zoocasa believed that in doing so, it was only serving to promote the plaintiffs' listings, and thus, their business.

432     Punitive damages are granted where the conduct of the plaintiff is particularly egregious. I am not satisfied that in the circumstances of this case the conduct of the defendant was particularly egregious. In my opinion the conduct of the defendant Zoocasa, while deliberate, was not of a nature that warrants punitive damages.

**Summary**

433     In summary:

   a. The claim of Century 21 for damages for copyright infringement is dismissed;

   b. The claim of Century 21 for damages for breach of contract is granted. The sum of $1,000 is awarded;

   c. All claims against Rogers are dismissed;

   d. The claim of Century 21 for damages for trespass are dismissed;

   e. Century 21 is granted a permanent injunction against Zoocasa;

   f. The plaintiff Bilash is entitled to statutory damages for breach of copyright in the sum of $30,750;

   g. The plaintiff Walton is entitled to statutory damages for breach of copyright in the sum of $1,250;

   f. The plaintiffs Century 21, Bilash and Walton are entitled to interest pursuant to the *Court Ordered Interest Act*.

434     If the parties cannot agree on costs they are at liberty to apply.

*Action allowed in part.*

# EXHIBIT EN-7

# TO THE DECLARATION OF EVAN NUTTALL



# Canadian Real Estate Assoc. / Assoc. Canadienne d'immeuble v. Sutton (Québec) Real Estate Services Inc., 2003 CanLII 22519 (QC CS)

| | |
|---|---|
| Date: | 2003-04-10 |
| File Number: | 500-05-074815-026 |
| Other quotes: | EYB 2003-40471 — [2003] JQ No 3606 |
| Reference: | Canadian Real Estate Assoc. / Assoc. Canadienne d'immeuble v. Sutton (Québec) Real Estate Services Inc., 2003 CanLII 22519 (QC CS), <https://canlii.ca/t/7cm8>, accessed 2023-12-14 |

JJ 0304

SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

Number: 500-05-074815-026

DATE: 11 April 2003

_____
_____

UNDER THE CHAIRMANSHIP OF: THE HONOURABLE CAROLE JULIEN, J.C.S.

_____
_____

THE CANADIAN REAL ESTATE ASSOCIATION / CANADIAN REAL ESTATE ASSOCIATION
        Plaintiff
c.
SUTTON, QUEBEC REAL ESTATE SERVICES INC.
        Defendant

_____
_____

### RECTIFICATION JUDGMENT

_____
_____

[[1] **WHEREAS** on 10 April 2003 a judgement was rendered;

[[2] **CONSIDERING** that a clerical error has crept into paragraph 68 of the Opinion the said judgment;

[[3] **CONSIDERING** article 475 *C.C.P.;*

**THE COURT:**

[[4] **CORRECTS** paragraph 68 of the conclusions of the judgment delivered on 10 April 2003 the terms of the judgment corrected and signed today;

[5] **THE WHOLE FREE OF CHARGE.**

_____
_____

CAROLE JULIEN, J.C.S.

Mr. François M. Grenier
Me Alain Y Dussault
Léger, Robic, Richard
Counsel for the Plaintiff

Me Michel Ménard
Me France Lessard
Lapointe, Rosenstein
Counsel for the Defendant

Hearing date:  20 February 2003

JJ 0304

SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT MONTREAL
OF

Numb  500-05-074815-026
er:

DAT    11 April 2003
E:

_____
_____

UNDER THE CHAIRM  THE  HONO  CAROLE JULIEN, J.C.S.
ANSHIP OF:          URABLE

_____
_____

THE CANADIAN REAL ESTATE  CANADIAN REAL ESTATE AS
SOCIATION
      Plaintiff
c.
SUTTON, QUEBEC REAL ESTATE SERVICES INC.
      Defendant

_____
_____

                    CORRECTED JUDGMENT

_____
_____

[1] **HAVING REGARD** to the error in paragraph 68 of the conclusions of the judgement rendered on 10 April 2003;

**THE COURT:**

[2] **ORDERS** the applicant to post security in the amount of $10,000;


                    _____
                    _____
                    CAROLE JULIEN, J.C.S.


Mr. François M. Grenier
Me Alain Y Dussault
Léger, Robic, Richard
Counsel for the Plaintiff

Me Michel Ménard
Me France Lessard
Lapointe, Rosenstein
Counsel for the Defendant

Hearing date:  20 February 2003


JJ 0304

SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT MONTREAL
OF

Numb    500-05-074815-026
er:

DAT    10 April 2003
E:

_____
_____

**UNDER THE CHAIRM** **THE  HONO** **CAROLE JULIEN, J.C.S.**
**ANSHIP OF:** **URABLE**

_____
_____

**THE CANADIAN REAL ESTATE CANADIAN REAL ESTATE AS**
**SOCIATION**
        Plaintiff
c.
**SUTTON, QUEBEC REAL ESTATE SERVICES INC.**
        Defendant

_____
_____

**JUDGEMENT**

_____
_____

[1] The Canadian Real Estate Association / L'Association Canadienne **d'immeuble (CREA**) seeks the issuance of an interlocutory injunction order v. Sutton (Quebec) Real Estate Inc. (**Sutton**). She complained that Sutton's violation of the rules governing the use of her "**Website**". Sutton uploads excerpts to her own site that she appropriates, modifies as he pleases and then displays.

[2] According to CREA, this behavior violates the agreement of use of its site and its copyright in the compilation of the data listed by it.

[3] Sutton pleads that it has never consented to the rules of use of the site and that CREA does not own the copyright in the information it publishes on the its website.

## THE CONCLUSIONS SOUGHT

[4] To interlocutory stage, AERC requests:

        "**A. GRANTING the present motion;**

        **B.        GRANTING first a provisional and then an interlocutory and permanent**
        **injunction restraining the Defendant, its officers, directors, servants, agents or**
        **employees and all others acting in concert with the defendant, whether**

> *contracted or hired by the defendant as well as all other having knowledge of said order, directly or indirectly, from:*
>
> > *i) continuing its acts as described in paragraphs 27 to 31 of Plaintiff's Declaration and motion for provisional, interlocutory and permanent injunction;*
> >
> > *ii) breaching its contract with the Plaintiff by downloading, printing, saving or otherwise using individual pages of the mls.ca website for public commercial use, property listings, data or any information found on CREA's website bearing the domain name www.mls.ca;*
> >
> > *iii) breaching its contract with the Plaintiff by modifying, altering in any respect, merging with other data communicating on the internet or any other media or publishing in any form, in whole or in part, property listings, data or any information found on CREA's website bearing the domain name www.mls.ca;*
> >
> > *iv) infringing or assisting in the infringement of CREA's copyright in the compilation of the information found on the website bearing the domain name www.mls.ca by copying, downloading, printing, communicating on the internet or any other media or publishing in any form, in whole or in part, property listings, data or any information, found on said website;*
>
> *C.      DISPENSING Plaintiff from furnishing security;*
>
> *D. GRANTING permission to Plaintiff to serve and file the present Declaration and motion for provisional, interlocutory and permanent Injunction (Articles 751 ff. C.C.P.) outside of the legal delays, and to serve the present Declaration and motion for provisional, interlocutory and permanent Injunction (Articles 751 ff. C.C.P.) by facsimile;*
>
> *E.          ORDERING that any injunction granted herein to remain in effect notwithstanding any appeal;*
>
> *F. THE WHOLE with costs."*

[5]  The 6th In November 2002, the Honourable François Bélanger refused to issue a Interim Interlocutory Injunction Order. No Backup has not been issued in this folder.

## THE PARTIES

[6] CREA is correctly described in paragraphs 1 to 6 of the application:

> *'1. The Canadian Real Estate Association ("CREA") is a not-for-profit body politic organized under Part III of Canada Corporations Act. CREA is one of the largest single-purpose industry trade associations in Canada, representing over 65 000 real estate professionals across the Country working through 103 Real Estate Boards, 10 Provincial Associations, One Territorial Association.*
>
> *2. No real estate professional is required to join a real Estate Board. Membership in a real estate board, however, also includes membership in the provincial real estate association and CREA. Organized real Estate operates on a tri-partite basis and each level has its own responsibilities. CREA, as the national association, represents its membership at the federal level of government and advocates policies which improve the industry's market environment and the public's real property rights and ownership.*
>
> *3. As it more fully appears from a copy of relevant pages of CREA's website, discloses to the Defendant and filed as Exhibit P-1, CREA's objectives and responsibilities are, inter alia:*

- *to collect, analyze and disseminate information on significant market, economic, demographic and technological conditions affecting the housing and real estate industry;*

- *to formulate, promote and foster consistent professional standards of behaviour, integrity and ethical conduct among the membership.*

4.    *Some of the significant national policies developed by CREA include:*

(a)    *the Code of Ethics and Standards of Business Practice, which sets the standard for professionalism in real estate;*

(b)    *the Privacy Code for organized real estate, which protects the privacy of consumers when dealing with our members;*

(c)    *the Principles of Competition, which contributes to the competitive marketplace.*

5. *CREA is also the owner of a number of certification trademarks, including MLS,® Multiple Listing Service®, and a number of associated design marks. These marks are licensed to CREA's member boards to identify the real estate data base systems operated by those boards. While the MLS® systems themselves are owned and operated by the boards, their operation is subject to the rules established from time to time by CREA.*

6. *CREA, as the national association was asked by its member board in 1994 to develop a business plan which called for, amongst other things, the creation of a national website which would be the Internet gateway to advertising type listing information of all of the properties contained on the MLS® systems of its member boards. The culmination of that business plan was the development of the website bearing the domain name "www.mls.ca" ("the mls.ca" website") on which can be found relevant information regarding real estate properties listed for sale at any given time on the MLS® systems of real estate boards, across Canada. CREA is the owner and operator of this site and performs all development, maintenance and enhancement activity."*

[7] Sutton, represents 24 franchisees in Quebec, spread over 51 offices and served by 1700 real estate agents. Sutton is not a member of the House Montreal's real estate company, but its agents are. (*paras. 33, 34 of the contestation*).

## THE FACTS

[8] The real estate agents from the various brokerages transmit to the MLS system of the Montréal Real Estate Board, their real estate listings. That The MLS system is called "*Edgar*".

[9] The Real estate agents have access to the Edgar system, but the public does not. This one has free access to CREA's website which lists MLS listings transmitted by Edgar and by the other systems of the various Chambers real estate in Canada.

[10] The Sutton prosecutors agree that CREA's MLS directory is essential for integrate MLS listings from other firms' agents into its own site brokerage. Otherwise, Sutton would have to list this data by collection on the various sites of its competitors.

[[11] In In fact, Sutton accesses the directory of properties listed on the website CREA by all real estate agents, including the listings of the other brokerages.

[[12] She uploads to its own site the registrations that interest it and the appears under his name.

[13] To CREA's MLS website, the description sheets of the properties offered for sale include a photograph, a brief description of the building, its specifications and identifies the agent with contact information and its brokerage.

[14] TO As of April 2002, Sutton has incorporated this fact sheet into its website and has hidden all information that identifies the listing agent and his or her home brokerage. It puts its logo on it and displays the photo and contact information of one of them of its agents. The public, having access to its site, is encouraged to contact agent to eventually complete a transaction (*P-5*).

[15] The 5th September 2002, CREA sent Sutton a formal notice (*P-9*) to cease this unauthorized use of its site and to remove the the listings of competing real estate agents incorporated on its site Internet.

[16] The 2 October 2002, CREA reiterates this formal notice. She accuses Sutton of a violation of the terms of use of its site and its copyrights (*P-10*).

[17] The Exchange correspondence between AERC and Sutton will continue until October 25, 2002. Sutton alleges that the registrations belong to the listing agents and no to CREA. She adds that the real estate brokerage system requires the the widest possible dissemination of registrations in order to facilitate the conclusion of the Transactions.

[[18] CREA, for its part, maintains its initial position.

[19] The 25th In October 2002, the Montréal Real Estate Board wrote to CREA. She advises him to the adoption of two resolutions, on 22 and 23 October 2002, the implementation of which is suspended during injunction proceedings (*P-8*):

> « (...)
>
> *I would like to take this opportunity to Let me be very clear that the resolution of Tuesday, October 22 mentions 4 points including the suspension of the sending of registrations on SIA.CA. The resolution of the Wednesday, October 23, temporarily suspends the application of this measure to give the Canadian Real Estate Association time to proceed quickly and efficiently with an interlocutory injunction.*
>
> *It is clear in the minds of the members of the Board of Directors, only in the absence of a positive and short-term outcome regarding the interlocutory injunction, the Grand Real Estate Board Montreal will reinstate its resolution of Tuesday, October 22 and will Registrations will be sent to SIA.CA immediately. You are well aware that if such action were taken, irreparable damage would be caused to the SIA.CA in Quebec and would make it virtually impossible to reactivate this system with our members.*
>
> *Indeed, such a measure would diminish the usefulness of this system to such an extent that it would lapsed and inoperative for members. We are aware of the consequences that such a measure will have on the industry, but we will see ourselves in the the obligation to apply it in order to adequately protect our members. »*

[20] The 15th November 2002, Remax Québec inc. notifies CREA that, as a result of the diversion by Sutton of Remax agent registrations from the MLS.ca site, it is "*under the obligation to notify all of our REALTORS® ... to cease to send their registration forms to MLS.ca, as long as Sutton does not will not cease this illegal activity...* (*RE-1, JG-2*).

[[21] According to Pierre Beauchamp (*Chief Executive Officer of CREA*):

> "30. As it more fully appears from Exhibit P-8, the Montreal Board has advised CREA_that if CREA is unable to prevent SUTTON from illegally using the data on the mls.ca website and displaying properties listed by others as its own, it will discontinue uploading_ property listings to the mls.ca website.
>
> *31. The failure of the Montreal Board to provide its listings to the mls.ca website would cause irreparable harm to CREA for the following Reasons:*
>
> > *(a) as Montreal is the largest metropolitan centre in Quebec, the Montreal board listings not only represent a significant portion of Quebec, but*

*also constitute a substantial part of the value of the Quebec listings. The listings from the Montreal board are viewed twice as often as any of the other listings in Quebec. Losing them would, for all intents and purposes, remove a large and vital part of Quebec from the mls.ca website. This would destroy the national nature of the website;*

*(b) the mls.ca website, as the most comprehensive real estate website in Canada, is relied on heavily by CREA's members. The 6,000 members of the Montreal Board would be deprived of this advertising tool, which in turn would, in all likelihood, result in financial losses in amounts impossible to determine;*

*(c)     as no equivalent real estate website exists for the province of Quebec, members of the public would be prejudiced by being unable to access this information from another source.*

*32.     Further, the integrity of the mls.ca website is dependent on the uniform application of the rules for use. Failure by SUTTON to immediately cease its activities may render it impossible for CREA to require compliance by its other 65,000 members, resulting in the irreparable degradation of the website.*

*33. Finally, as all real estate professionals are required to abide by the rules, regulations and policies of CREA, and as this unauthorized use contravenes those policies, the conduct of SUTTON is jeopardising the membership of all of its real estate professionals in CREA and their real Estate boards."*

*(emphasis added)*

[[22] The Injunction proceedings were filed on November 4, 2002. Subsequently, Sutton modified the descriptive sheets imported from the CREA site by adding a discreet reference to the brokerage and the agent but without specifying his or her contact information (***para. 87 of the Julie Gaucher affidavit of December 2, 2002 and D-14***).

[23] This Sutton operation has been ongoing since April 10, 2002. CREA has taken some in September 2002 (***affidavit of Pierre Beauchamp, at para. 35***).

[24] CREA attempted to block Sutton's use of its site, which turned out to be not technically feasible for the reasons explained by affiant Peter Simpson:

*'14. CREA instituted technological measures as explained below, intended to block the unauthorized access by SUTTON, directly or through VORTEX, to the mls.ca website.*

*15. When a member of the public visits a website, the software on the visitors computer also sends information to the website identifying the source Internet address of the visitor (IP address) and in some cases the name of the website (URL header information). In order to protect the privacy of the public, this information is not mandatory and can actually be hidden or falsified. Because of this it is quite difficult to know for certain the location or identity of a visitor. In fact, there are websites that offer this "stealthing" service to the public.*

*16. The Internet does, however, publish the Internet addresses of websites as well as the sets of IP addresses that are owned by various Organizations.*

*17. CREA began blocking activity on or about September 20, 2002 and continued to attempt to block SUTTON's access to the mls.ca website, on a daily basis until about October 20, 2002. The initial blocks singled out the sutton.ca website. Before initiating the blocks, CREA traced the location of the sutton.ca website servers to the company CrystalTech Web Hosting, operating out of Pheonix Arizona.*

**18. Once identified, the sutton.ca website activity was initially blocked by noting certain characteristics of the URL header. SUTTON quickly became aware that they were being blocked and it spent considerable time trying various changes in the URL header, use of stealthing services and finally, various combinations of source IP address.**

**19.     When SUTTON realised that out primary blocking was focusing on the source IP address, it enhanced its program to vary the address with each request sent to the mls.ca website.**

**20. It was thought that the blocking measures had been effective. However, SUTTON, directly or through VORTEX, reconfigured its software to defeat the blocks."**

## 1. The Interlocutory Injunction

[25] Recall that an interlocutory injunction is an exceptional, universal and discretionary[1].

[[26] Exceptional because the litigant, after establishing the colour of right, must justify the exceptional nature of the facts in question in order to issue the injunction and must establish compliance with the applicable criteria interpreted restrictively.

[[27] Universal since injunctive relief is available in most sectors activities which include, unless otherwise specified, the technical innovations.

[[28] Discretionary since the Tribunal has broad authority in this regard and will be able to take into account many factors, including the availability of other remedies, the attitude and conduct of the parties, deadlines, etc.

[[29] The Injunction The application for this letter takes place in a private law context that deals with the ownership, copyright and compliance with an agreement that would be between the parties. In this private law context, the Court of First Instance applies the traditional criteria for issuing an injunction interlocutory proceedings, as described in the classic decision in *Société de James Bay v. Kanatewat* [2].

## 2. The Existence of a Clear or Apparent Right

[30] is to assess whether AERC's claim presents a reasonable chance of success. success in the final judgment.

[31] AERC refers to the terms of use governing its website. She pleads that this site belongs to him even if the ownership of the information contained in the descriptive sheets are owned by third parties, i.e., the listing agents of the various banners.

[[32] The CREA's ownership of its website seems clear. CREA has dedicated the financial and technological resources to the creation of this site and organizes and manages (**see affidavit of Peter Simpson**).

[[33] In this regard, Sutton or its agents appear to be the owners of the rights to the content of the descriptive sheets that emanate from them. They did not convince the At this stage, *prima facie*, they may have the same rights to the content of their competitors' fact sheets, and made available on CREA's website, MLS.ca.

[[34] The CREA identifies CREA as the owner of the rights to this website. There is a learns that (**P-1**):

> **"CREA's primary mission is to represent its members at the federal level of government and to act as a watchdog on national legislation that pertains to the real estate industry. CREA has frequently taken strong stands to defend the public's right to own and enjoy property.**

CREA owns the MLS® trade mark and has a proprietary interest in the REALTOR trade mark. As a member of CREA, you can offer your clients an unbeatable marketing combination with both trademarks. The REALTOR trade mark is your clients' assurance of integrity. It can only be used in Canada by members of The Canadian Real Estate Association and indicates that you, as a member, accept and respect a strict Code of Ethics. The real estate data base systems operated by our member boards and associations under the MLS® trade mark provide an ongoing inventory of available properties and ensure maximum exposure of properties listed for dirty. This is important because about 90 per cent of all resale homes in Canada go through MLS."®

[35] The Address Electronics (***www.mls.ca***) a home page that informs the user of AERC rights (***P-2***):

« Welcome to MLS®Online<sup>TM,</sup> the official gateway to all Canadian MLS® information sponsored by the Canadian Real Estate Association.

(...)

Search By MLS®Number | REALTOR® / Office Search

(...)

... <u>Terms of use</u>

MLS MULTIPLE LISTING SERVICE

©1998-2002 The Canadian Real Estate Association.  All rights reserved. Site hosted by Onramp Network Services Inc.

MLS,® MLS®Online<sup>TM,</sup> REALTOR® and all related graphics are trademarks of The Canadian Real Estate Association.

REALTOR is a trademark owned by REALTOR Canada Inc., a corporation owned by the National Association of REALTORS and The Canadian Real Estate Association. REALTORS accept and respect a strict Code of Ethics, which is the consumer's assurance of integrity.

MLS® is a co-operative marketing system used only by Canadian Real Estate Boards to ensure maximum exposure of properties for sale."

[36] This Home page displays a reference to the site's terms of use ("***Terms of use***"). The user can ignore this command and continue to visit the site, or query this command. He then discovers the terms of use (***P-2***):

'1. Copyright

All materials on this site are copyrighted and are owned either by CREA or the real estate board who has supplied the property listings and other data.  Property listings and other data available at this site are intended for the private, non-commercial use by individuals.  Any commercial use of the listings or data in whole or in part, directly or indirectly, is specifically forbidden except with the prior written authority of the owner of the copyright.  Users may, subject to these Terms and Conditions, print or otherwise save individual pages for private, non-commercial use.  Further, property listings and/or data may not be modified or altered in any respect, merged with other data or published in any form, in whole or in part.  <u>By downloading the property listings and data, the user confirms agreement with, and acceptance of the foregoing conditions of use</u>.

2.      Trade Marks

*The trade marks displayed on this site, including CREA®, MLS®, Multiple Listing Service®, MLS®Online<sup>TM</sup> and the associated logos and design marks are owned by CREA. REALTOR is a trade mark in which CREA has a proprietary interest. Other trade marks may be owned by real estate boards and other third parties. Nothing contained on this site gives any user the right or license to use any trade mark displayed on this site without the express permission of the owner.*

*(...)*

*5.    Real Estate Professionals*

*Anyone legally licensed to sell real property in their province or territory may download, transmit and distribute property ads and the web pages of REALTORS and real estate firms for the sole purpose of introducing a potential buyer of the property. Such ads and pages cannot be modified, re-posted or otherwise used."*

*(emphasis added)*

[[37] The Terms of Use affirm CREA's ownership of the content of the site and those of the real estate boards that submitted the registrations.

[[38] Usage For commercial purposes, information on the site is prohibited without the owner's written permission. It is, however, permissible for to use and reproduce the information contained on the Site in the "*sole purpose*" to introduce a potential buyer for a transaction on a property.

[[39] The Articles 1 and 5 prohibit the modification of the content of the site.

[40] The Downloading the description sheets by a user confirms their acceptance of these conditions.

[41] Sutton admits to having downloaded the descriptive sheets from the CREA's MLS site and have modified them[3].

[42] Sutton, on a balance of probabilities, is a company initiated into the rules of the real estate brokerage and the importance of a site's terms of use electronics. It itself owns the rights to its own site and imposes to users conditions similar to those applied by AERC (*P-3*).

*"SUTTON®*

*TERMS OF USE AND PRIVACY POLICY*

*Terms of Use*

*Please read this agreement carefully before accessing or using this site. <u>By accessing or using the site, you agree to be bound by this agreement</u>. Sutton Group Realty Services Ltd. referred to as "SGRS", and other entities providing information and services on the site ("Suppliers") provides the information and services on this site to you, the user, conditional upon your acceptance without modification of the terms, conditions, and notices contained herein. <u>Your use of this Web site constitutes your agreement to all such terms, conditions, and notices</u>.*

*(...)*

*Personnal and Limited Commercial Use Limitations*

*You may access, download and print materials on this Site for your personal and commercial use. <u>You may not modify, display, perform, publish, license, create derivative works from, frame in another Web page, use on any other web site, transfer or sell any information, software, lists of users, databases or other lists, products or services obtained from this Site</u>. The foregoing prohibition expressly includes, but is not limited to, the practices of "screen scraping" or "database scraping" to obtain lists of users or other information. If and when requested by SGRS, you agree to provide true, accurate and complete user information and to*

> *refrain from impersonating or falsely representing your affiliation with any person or entity. Except with the written permission of SGRS, you agree to refrain from accessing or attempting to access password protected, secure or non-public areas of this Site. Unauthorized individuals attempting to access prohibited areas of this Site may be subject to prosecution.*
>
> *Proprietary Rights*
>
> *All materials on this site (as well as the organization and layout of the site) are owned and copyrighted by SGRS or its Suppliers, and all rights are reserved. No reproduction, distribution, or transmission of the copyrighted materials at this site is permitted without the written permission of SGRS and its Suppliers."*
>
> *(emphasis added)*

[43] Sutton pleads that it has not consented to these terms of use of the site MLS.ca CREA since this site does not have an "*I agree*" icon that it would have activated.

[44] The The Tribunal considers that this discussion is a matter for the final judgment. At the stadium interlocutory, it is sufficient to note that, on a preponderance basis:

a. CREA is the owner of the rights to the website MLS.CA created and managed by it and *prima facie* it shares these rights with the chambers and the REALTORS® from which the information originates listed on this site in relation to their own registrations; the The issue of ownership is in dispute and will be resolved at the time of judgment final;

b. Sutton has not established a right to use the information contained on this site from its competitors beyond the terms of use of this site;

c. The home page clearly mentions the existence of Terms of Use;

d. These Terms of Use prohibit modification information downloaded from this site;

e. Downloading is an expression of consent of the user to these Terms of Use;

f. Sutton downloads the content of the MLS.CA site, modifies it, appropriates it and displays the altered content, including the information in question. from its competitors;

g. Sutton understands that terms of use apply and it itself imposes them on the users of its own site;

h. CREA claims copyright in the directory created by it, which will be a serious issue to be resolved at the final judgment;

i. Sutton conceded in oral argument, through his counsel, that the site MLS.ca is an essential cog in the operation carried out by it to incorporate the information listed by CREA into its own website, avoiding the need to collect and process data itself in order to incorporation into its site.

[45] To this At this stage, the Tribunal must conclude that there is an apparent, if not clear, right of AERC to the use and maintenance of the integrity of its site.

### 3. The weight of the disadvantages

[46] This aspect is discarded when the law appears clear. In the present case, the Court of First Instance Faced with a poorly developed legal context with uncertainties in the due to the recent nature of technological developments related to the cyberspace.

[47] From Moreover, the interlocutory stage is not the designated stage for deciding and resolve these uncertainties. The Tribunal adopts an approach based on the apparent nature of the rights alleged by CREA.

[[48] However, the weight of disadvantage is tilted in favour of CREA.

[49] If the interlocutory injunction is issued, the prior *status quo* is Restored. Sutton and his agents find themselves in the same situation as the other competing brokers and agents. It continues to operate and can use CREA's MLS.ca site in accordance with the Terms of Use just like his competitors do.

[50] If the interlocutory injunction is not issued, the integrity of the site MLS.ca is jeopardized to the detriment of AERC's efforts and discipline imposed by it on REALTORS® by terms of use now discarded. Business ethics apparently respected by the in the use of the site MLS.ca is then removed from the benefit from everyone's technological power grabs. There is a risk important to distort the objectives of the creation of this site under the under the aegis of CREA.

[51] He It is questionable why competitors would maintain their membership in this site, which then serves as a transmission belt so that the information about their registrations be monopolized, by some and others, without affording protection to their commercial interests Sufficient.

[[52] Moreover, This is a concern for the industry. Indeed, in the Webzine of the Real Estate Brokerage Professionals (*ACAIQ)* Notice has been issued to the following effect (*D-13*):

> *« Brossard, November 7, 2002 -- The Association notes that it is becoming more and more common for a broker to disseminates, through a website or any other means, building descriptions for which he is not the registrant.*

> *This press release recalls the requirements of the Real Estate Brokerage Act as to the significance to a Broker to obtain prior authorization from the Broker Listing of disseminate to the public its inscriptions and the need to reproduce the name of the listing broker on any descriptive sheet.*

> *Thus, the descriptive sheets must contain the name of the listing broker, and as follows:*

> > *- The name of the broker must appear on each of the cards Registrant with the mention "Chartered Real Estate Broker". By Example: "Source of information: ABC Buildings Inc., chartered real estate broker";*

> > *- This statement must be located at the top of the descriptive data sheet and, for records accessible via the Internet, it must be visible without the user having to use the scroll bar;*

> > *- The name of the listing broker must be reproduced as it appears appears on the card from which the registration information is drawn;*

> > *- The statement must appear in a typeface of the same colour and at least the same size as the other information contained in the Fact Sheet;*

> > *- The mention must appear when a card is printed Descriptive.*

> *Finally It should be noted that in terms of professional liability and ethics, Failure to do so could, in certain circumstances, result in unfortunate consequences.*

> *... »*

[[53] The The contents of this press release are disputed in certain respects. This discussion will take place in during the hearing on the merits. The Tribunal finds that CREA's argument, Dealers' concerns about similar practices to those of Sutton, is founded. It is reasonable to believe that these concerns could lead to action by dealers potentially harmful to CREA's MLS.ca site.

### 4. Irreparable harm

[54] The loss of trust and disaffection of REALTORS® in the site MLS.ca of AERC are the predominant risk to AERC if The interlocutory injunction is refused. In this case, the final judgment, even if it agrees with CREA, it may be ineffective.

[55] Sutton argues that there has been no prejudice to date. The Montréal Real Estate Board does not would constitute only a small portion of the AERC membership at the national level. Canadian. In addition, this chamber did not act on the resolutions threatening to withdraw from MLS.ca. It would not have the power to decide Thus, in any event, that power is that of the REALTORS® Room.

[56] Sutton stresses that Remax, one of the protagonists of the legal process undertaken by CREA, has not stopped communicating its registrations.

[[57] These threats would be staged in order to create a situation artificial harm to further the commercial interests of the Sutton's competitors, envious of his technological discovery.

[58] Sutton thus derives the subject-matter of the present proceedings. Sutton also continues commercial interests equivalent to those of its competitors. Progress technology allows them to appropriate content on which they do not demonstrate. no right and derogating from the terms of use applicable to all. It breaks the previous *status quo* and compromises the integrity of a site that is is based on AERC's efforts and on consent and mutual trust competitors in the search for a common goal of standardizing, publicizing and inform the public and other brokers and agents of transactions Available.

[59] AERC does not have to bear the risks associated with loss of confidence and Brokers' disaffection. In this regard, it is likely that the final judgment could not remedy it.

### 5. Urgency

[60] Sutton criticises CREA for the delays that have elapsed. However, there are no such time limits.

[61] Sutton commenced the alleged activities in April 2002. CREA has taken note of it only in September 2002. She immediately began to approach Sutton in order to convince her to stop. Sutton and his agents are part of the and AERC is acting reasonably when it attempts to make a conciliation process. This process ends on October 25 and the Procedures are instituted on 2 November.

[[62] At the same time, CREA is taking the technical means to counter the technology used by Sutton. The latter realises this and modifies its approach in order to override the CREA's attempts. CREA has not extended this modern version of the cat game and the mouse, but he cannot be blamed for attempting it.

[[63] The Injunction was denied and the parties proceeded expeditiously to proceed with the interlocutory stage.

[[64] There is no reproach to be made against CREA with regard to the delay.

[65] Other On the other hand, there is an urgent need to return the parties to the previous *status quo* and to Preserve AERC's rights during the judicial process.

### FOR THESE REASONS, THE TRIBUNAL:

[[66] **GRANTS** the motion for an interlocutory injunction;

[67] **ORDERS** the Respondent, its agents, officers, employees, directors and any a person acting under its control:

(a) to cease, directly or indirectly, by any means, download the information listed on the www.MLS.ca site of the applicant for the purpose of modifying the content or presentation of these information or to display, distribute, publish such changes on its website. own ***website or*** on the a site under its control or otherwise;

(b) to take such necessary and reasonable steps as are necessary to that the uploading, transmission and distribution of information available on the applicant's www.MLS.ca website be made in Compliance of the rules of use of this site, by persons legally authorized to act in connection with the sale of immovable property in the territory of the province of Quebec, for the sole purpose of introducing a potential buyer for a property listed on this site, without modification of any kind, and without posting on any site under its control;

[[68] **ORDERS** the defendant to post security in the amount of $10,000;

[[69] **ORDERS** the Applicant to serve this Order in accordance with the service applicable to originating proceedings;

[70] **THE ALL AT EXPENSE.**

_____
_____
CAROLE JULIEN, J.C.S.

Mr. François M. Grenier
Me Alain Y Dussault
Léger, Robic, Richard
Counsel for the Plaintiff

Me Michel Ménard
Me France Lessard
Lapointe, Rosenstein
Counsel for the Defendant

Hearing date: 20 February 2003

---

[1] P.A. **GENDREAU**, F. **THIBAULT**, D. **FERLAND**, B. **CLICHE,** M. **GRAVEL**: "*L'injonction*", Les Éditions Yvon Blais, Cowansville, 1998, p. 320.

[2] ] [1975] C.A. 166.

[3] Interrogation of Julie Gaucher, pp. 38, 57 and D-7, JG-10, JG-11 (Tab 11).



# Canadian Real Estate Assoc. / Assoc. Canadienne d'immeuble c. Sutton (Québec) Real Estate Services Inc., 2003 CanLII 22519 (QC CS)

| | |
|---|---|
| Date : | 2003-04-10 |
| Numéro de dossier : | 500-05-074815-026 |
| Autres citations : | EYB 2003-40471 — [2003] JQ no 3606 |
| Référence : | Canadian Real Estate Assoc. / Assoc. Canadienne d'immeuble c. Sutton (Québec) Real Estate Services Inc., 2003 CanLII 22519 (QC CS), <https://canlii.ca/t/7cm8>, consulté le 2023-12-14 |

JJ 0304

COUR SUPÉRIEURE

CANADA
PROVINCE DE QUÉBEC
DISTRICT DE MONTRÉAL

N° :   500-05-074815-026

DATE :   11 avril 2003

_____
_____

SOUS LA PRÉSIDENCE DE :   L'HONORABLE CAROLE JULIEN, J.C.S.

_____
_____

**THE CANADIAN REAL ESTATE ASSOCIATION /L'ASSOCIATION CANADIENNE D'IMMEUBLE**
Demanderesse
c.
**SUTTON (QUÉBEC) REAL ESTATE SERVICES INC.**
Défenderesse

_____

_____

## JUGEMENT DE RECTIFICATION

_____

_____

[1] **ATTENDU** que le 10 avril 2003, un jugement a été rendu;

[2]   **ATTENDU** qu'une erreur cléricale s'est glissée au paragraphe 68 des conclusions dudit jugement;

[3] **ATTENDU** l'article 475 *C.p.c.;*

**LE TRIBUNAL :**

[4]   **RECTIFIE** le paragraphe 68 des conclusions du jugement rendu le 10 avril 2003 suivant les termes du jugement rectifié et signé ce jour;

[5] **LE TOUT SANS FRAIS.**

_____
_____
CAROLE JULIEN, J.C.S.

Me François M. Grenier
Me Alain Y Dussault
Léger, Robic, Richard
Avocats de la demanderesse

Me Michel Ménard
Me France Lessard
Lapointe, Rosenstein
Avocats de la défenderesse

Date  d'audie  20 février 2003
nce :

JJ 0304

COUR SUPÉRIEURE

CANADA
PROVINCE DE QUÉBEC
DISTRICT MONTRÉAL
DE

N° :      500-05-074815-026

DAT      11 avril 2003
E :

_____
_____

SOUS  LA  PRÉSIDEN  L'HONORA  CAROLE JULIEN, J.C.S.
CE DE :              BLE

_____
_____

THE  CANADIAN  REAL  ESTATE  ASSOCIATION /L'ASSOCIATI
ON  CANADIENNE  D'IMMEUBLE
        Demanderesse
c.
SUTTON (QUÉBEC) REAL ESTATE SERVICES INC.
        Défenderesse

_____
_____

                     **JUGEMENT RECTIFIÉ**

_____
_____


[1]  **VU** l'erreur cléricale au paragraphe 68 des conclusions du jugement rendu le 10 avril 2003;

**LE TRIBUNAL :**

[2]  **ORDONNE** à la demanderesse de fournir une caution de 10 000 $;



                         _____
            _____
                         CAROLE JULIEN, J.C.S.

Me François M. Grenier
Me Alain Y Dussault
Léger, Robic, Richard
Avocats de la demanderesse

Me Michel Ménard
Me France Lessard
Lapointe, Rosenstein
Avocats de la défenderesse

Date  d'audie  20 février 2003
nce :


JJ 0304

COUR SUPÉRIEURE

CANADA
PROVINCE DE QUÉBEC
DISTRICT DE MONTRÉAL

N° :    500-05-074815-026

DATE :   10 avril 2003

_____

SOUS LA PRÉSIDENCE DE :   L'HONORABLE CAROLE JULIEN, J.C.S.

_____

THE CANADIAN REAL ESTATE ASSOCIATION /L'ASSOCIATION CANADIENNE D'IMMEUBLE
        Demanderesse
c.
SUTTON (QUÉBEC) REAL ESTATE SERVICES INC.
        Défenderesse

_____

JUGEMENT

_____

[1]        The Canadian Real Estate Association / L'Association Canadienne d'immeuble (**CREA**) demande l'émission d'une ordonnance d'injonction interlocutoire contre Sutton (Québec) Real Estate inc. (**Sutton**).  Elle se plaint de la transgression par Sutton des règles d'utilisation de son site « **Internet** ».  Sutton télécharge sur son propre site des extraits qu'elle s'approprie, modifie à son gré et affiche ensuite.

[2]        Selon CREA, ce comportement viole la convention d'utilisation de son site et ses droits d'auteur quant à la compilation des données répertoriées par elle.

[3]        Sutton plaide n'avoir jamais consenti aux règles d'utilisation du site et que CREA n'est pas titulaire de droits d'auteur sur les informations qu'elle publie sur son site.

## LES CONCLUSIONS RECHERCHÉES

[4]        Au stade interlocutoire, CREA demande :

        « A.        GRANTING the present motion;

        B.            GRANTING first a provisional and then an interlocutory and permanent injunction restraining the Defendant, its officers, directors, servants, agents or employees and all others acting in concert with the defendant, whether

*contracted or hired by the defendant as well as all other having knowledge of said order, directly or indirectly, from:*

> *i) continuing its acts as described in paragraphs 27 to 31 of Plaintiff's Declaration and motion for provisional, interlocutory and permanent injunction;*

> *ii) breaching its contract with the Plaintiff by downloading, printing, saving or otherwise using individual pages of the mls.ca website for public commercial use, property listings, data or any information found on CREA's website bearing the domain name www.mls.ca;*

> *iii) breaching its contract with the Plaintiff by modifying, altering in any respect, merging with other data communicating on the internet or any other media or publishing in any form, in whole or in part, property listings, data or any information found on CREA's website bearing the domain name www.mls.ca;*

> *iv) infringing or assisting in the infringement of CREA's copyright in the compilation of the information found on the website bearing the domain name www.mls.ca by copying, downloading, printing, communicating on the internet or any other media or publishing in any form, in whole or in part, property listings, data or any information, found on said website;*

**C.** *DISPENSING Plaintiff from furnishing security;*

**D.** *GRANTING permission to Plaintiff to serve and file the present Declaration and motion for provisional, interlocutory and permanent injunction (articles 751 ss. C.C.P.) outside of the legal delays, and to serve the present Declaration and motion for provisional, interlocutory and permanent injunction (articles 751 ss. C.C.P.) by facsimile;*

**E.** *ORDERING that any injunction granted herein to remain in effect notwithstanding any appeal;*

**F.** *THE WHOLE with costs."*

[5]     Le 6 novembre 2002, l'honorable François Bélanger a refusé l'émission d'une ordonnance d'injonction interlocutoire provisoire.  Aucune ordonnance de sauvegarde n'a été émise dans ce dossier.

## LES PARTIES

[6]     CREA est correctement décrite aux paragraphes 1 à 6 de la requête :

> « 1.     *The Canadian Real Estate Association ("CREA") is a not-for-profit body politic organized under Part III of Canada Corporations Act.  CREA is one of the largest single-purpose industry trade associations in Canada, representing over 65 000 real estate professionals across the country working through 103 real estate boards, 10 provincial associations, one territorial association.*

> 2.     *No real estate professional is required to join a real estate board. Membership in a real estate board, however, also includes membership in the provincial real estate association and CREA.  Organized real estate operates on a tri-partite basis and each level has its own responsibilities.  CREA, as the national association, represents its membership at the federal level of government and advocates policies which improve the industry's market environment and the public's real property rights and ownership.*

> 3.     *As it more fully appears from a copy of relevant pages of CREA's website, discloses to the Defendant and filed as Exhibit P-1, CREA's objectives and*

*responsibilities are, inter alia:*

- *to collect, analyze and disseminate information on significant market, economic, demographic and technological conditions affecting the housing and real estate industry;*

- *to formulate, promote and foster consistent professional standards of behaviour, integrity and ethical conduct among the membership.*

4. *Some of the significant national policies developed by CREA include:*

(a) *the Code of Ethics and Standards of Business Practice, which sets the standard for professionalism in real estate;*

(b) *the Privacy Code for organized real estate, which protects the privacy of consumers when dealing with our members;*

(c) *the Principles of Competition, which contributes to the competitive marketplace.*

5. *CREA is also the owner of a number of certification trademarks, including MLS®, Multiple Listing Service®, and a number of associated design marks. These marks are licensed to CREA's member boards to identify the real estate data base systems operated by those boards. While the MLS® systems themselves are owned and operated by the boards, their operation is subject to the rules established from time to time by CREA.*

6. *CREA, as the national association was asked by its member board in 1994 to develop a business plan which called for, amongst other things, the creation of a national website which would be the Internet gateway to advertising type listing information of all of the properties contained on the MLS® systems of its member boards. The culmination of that business plan was the development of the website bearing the domain name "www.mls.ca" ("the mls.ca" website") on which can be found relevant information regarding real estate properties listed for sale at any given time on the MLS® systems of real estate boards, across Canada. CREA is the owner and operator of this site and performs all development, maintenance and enhancement activity."*

[7]     Sutton, quant à elle, représente 24 franchisés au Québec, répartis dans 51 bureaux et desservis par 1700 agents immobiliers.  Sutton n'est pas membre de la Chambre immobilière de Montréal, mais ses agents le sont. (*par. 33, 34 de la contestation*).

## LES FAITS

[8]     Les agents immobiliers des diverses maisons de courtage transmettent au système MLS de la Chambre immobilière de Montréal, leurs inscriptions d'immeubles.  Ce système MLS porte le nom d' « *Edgar* ».

[9]     Les agents immobiliers ont accès au système Edgar, mais pas le public.  Celui-ci a accès librement au site Internet de CREA qui répertorie les inscriptions MLS transmises par Edgar et par les autres systèmes des diverses Chambres immobilières au Canada.

[10]     Les procureurs de Sutton admettent que le répertoire MLS de CREA est essentiel pour intégrer à son propre site les inscriptions MLS des agents des autres maisons de courtage. Autrement, Sutton devrait elle-même répertorier ces données par une collecte sur les divers sites de ses concurrentes.

[11]     En fait, Sutton accède au répertoire des propriétés inscrites sur le site Internet de CREA par l'ensemble des agents immobiliers incluant les inscriptions des autres maisons de courtage.

[12]     Elle télécharge sur son propre site les inscriptions qui l'intéressent et les affiche sous son nom.

[13]     Au site MLS de CREA, les fiches descriptives des propriétés offertes à la vente comportent une photographie, une description sommaire de l'immeuble, ses spécifications et identifie, avec ses coordonnées pour le joindre, l'agent inscripteur et sa maison de courtage.

[14]     À compter d'avril 2002, Sutton incorpore à son site cette fiche et occulte toutes les informations permettant d'identifier l'agent inscripteur et sa maison de courtage.  Elle appose son sigle et affiche la photo et les coordonnées de l'un de ses agents.  Le public, ayant accès à son site, est incité à s'adresser à cet agent pour effectuer éventuellement une transaction (*P-5*).

[15]     Le 5 septembre 2002, CREA adresse à Sutton une mise en demeure (*P-9*) de cesser cette utilisation non autorisée de son site et d'enlever les inscriptions des agents immobiliers concurrents incorporés à son site Internet.

[16]     Le 2 octobre 2002, CREA réitère cette mise en demeure.  Elle accuse Sutton d'une violation des conditions d'utilisation de son site et de ses droits d'auteur (*P-10*).

[17]     L'échange de correspondance entre CREA et Sutton se poursuivra jusqu'au 25 octobre 2002.  Sutton allègue que les inscriptions appartiennent aux agents inscripteurs et non à CREA.  Elle ajoute que le système de courtage immobilier exige la diffusion la plus vaste des inscriptions afin de favoriser la conclusion de transactions.

[18]     CREA, de son côté, maintient sa position initiale.

[19]     Le 25 octobre 2002, la Chambre immobilière de Montréal écrit à CREA.  Elle l'avise de l'adoption de deux résolutions, les 22 et 23 octobre 2002 dont l'application est suspendue pendant les procédures en injonction (*P-8*) :

> *« (…)*
>
> *Je voudrais par la présente qu'il soit très clair que la résolution de mardi le 22 octobre fait état de 4 points dont la suspension de l'envoi des inscriptions sur SIA.CA.  La résolution de mercredi le 23 octobre, suspend temporairement l'application de cette mesure pour laisser à l'Association canadienne de l'immeuble le temps de procéder rapidement et efficacement avec une injonction interlocutoire.*
>
> *Il est clair dans l'esprit des membres du Conseil d'administration, qu'à défaut d'un résultat positif et à court terme concernant l'injonction interlocutoire, la Chambre immobilière du Grand Montréal remettra en vigueur sa résolution du mardi 22 octobre et arrêtera immédiatement l'envoi des inscriptions sur SIA.CA.  Vous êtes bien conscient qu'advenant une telle mesure, des dommages irréparables seraient causés au SIA.CA au Québec et rendraient pratiquement impossible la réactivation de ce système auprès de nos membres.*
>
> *En effet, une telle mesure viendrait tellement amenuiser l'utilité de ce système, qu'il en viendrait caduque et inopérant pour les membres.  Nous sommes conscients des conséquences graves qu'une telle mesure aura sur l'industrie, mais nous nous verrons dans l'obligation de l'appliquer afin de protéger adéquatement les inscriptions de nos membres. »*

[20]     Le 15 novembre 2002, Remax Québec inc. avise CREA qu'en raison du détournement opéré par Sutton des inscriptions des agents Remax à partir du site MLS.ca, elle est « *dans l'obligation d'aviser tous nos courtiers et agents … de cesser d'envoyer leurs fiches d'inscription à MLS.ca, et ce, tant que Sutton ne cessera pas cette activité illégale …* » (*RE-1, JG-2*).

[21]     Selon l'affiant, Pierre Beauchamp (*Chief Executive Officer of CREA*) :

> *"30.   As it more fully appears from Exhibit P-8, the Montreal Board has advised CREA that if CREA is unable to prevent SUTTON from illegally using the data*

*on the mls.ca website and displaying properties listed by others as its own, it will discontinue uploading property listings to the mls.ca website.*

*31. The failure of the Montreal Board to provide its listings to the mls.ca website would cause irreparable harm to CREA for the following reasons:*

*(a) as Montreal is the largest metropolitan centre in Quebec, the Montreal board listings not only represent a significant portion of Quebec, but also constitute a substantial part of the value of the Quebec listings. The listings from the Montreal board are viewed twice as often as any of the other listings in Quebec. Losing them would, for all intents and purposes, remove a large and vital part of Quebec from the mls.ca website. This would destroy the national nature of the website;*

*(b) the mls.ca website, as the most comprehensive real estate website in Canada, is relied on heavily by CREA's members. The 6,000 members of the Montreal Board would be deprived of this advertising tool, which in turn would, in all likelihood, result in financial losses in amounts impossible to determine;*

*(c) as no equivalent real estate website exists for the province of Quebec, members of the public would be prejudiced by being unable to access this information from another source.*

*32. Further, the integrity of the mls.ca website is dependent on the uniform application of the rules for use. Failure by SUTTON to immediately cease its activities may render it impossible for CREA to require compliance by its other 65,000 members, resulting in the irreparable degradation of the website.*

*33. Finally, as all real estate professionals are required to abide by the rules, regulations and policies of CREA, and as this unauthorized use contravenes those policies, the conduct of SUTTON is jeopardising the membership of all of its real estate professionals in CREA and their real estate boards."*

*(nos soulignements)*

[22] Les procédures en injonction ont été déposées le 4 novembre 2002. Par la suite, Sutton a modifié les fiches descriptives importées du site de CREA en ajoutant à ses modifications une référence discrète à la maison de courtage et à l'agent inscripteur, mais sans préciser ses coordonnées (*par. 87 de l'affidavit de Julie Gaucher du 2 décembre 2002 et D-14*).

[23] Cette opération de Sutton se poursuit depuis le 10 avril 2002. CREA en a pris connaissance en septembre 2002 (*affidavit de Pierre Beauchamp, par. 35*).

[24] CREA a tenté de bloquer cette utilisation de son site par Sutton, ce qui s'est avéré irréalisable au plan technique pour les motifs expliqués par l'affiant Peter Simpson :

« *14. CREA instituted technological measures as explained below, intended to block the unauthorized access by SUTTON, directly or through VORTEX, to the mls.ca website.*

*15. When a member of the public visits a website, the software on the visitors computer also sends information to the website identifying the source Internet address of the visitor (IP address) and in some cases the name of the website (URL header information). In order to protect the privacy of the public, this information is not mandatory and can actually be hidden or falsified. Because of this it is quite difficult to know for certain the location or identity of a visitor. In fact there are websites that offer this "stealthing" service to the public.*

**16.** **The Internet does however publish the Internet addresses of websites as well as the sets of IP addresses that are owned by various organisations.**

**17.** **CREA began blocking activity on or about September 20, 2002 and continued to attempt to block SUTTON's access to the mls.ca website, on a daily basis until about October 20, 2002. The initial blocks singled out the sutton.ca website. Before initiating the blocks, CREA traced the location of the sutton.ca website servers to the company CrystalTech Web Hosting, operating out of Pheonix Arizona.**

**18.** **Once identified, the sutton.ca website activity was initially blocked by noting certain characteristics of the URL header. SUTTON quickly became aware that they were being blocked and it spent considerable time trying various changes in the URL header, use of stealthing services and finally various combinations of source IP address.**

**19.** **When SUTTON realised that out primary blocking was focusing on the source IP address, it enhanced its program to vary the address with each request sent to the mls.ca website.**

**20.** **It was thought that the blocking measures had been effective. However, SUTTON, directly or through VORTEX, reconfigured its software to defeat the blocks."**

## 1. L'injonction interlocutoire

[25] Rappelons qu'une injonction interlocutoire est un recours exceptionnel, universel et discrétionnaire[1].

[26] Exceptionnel puisque le plaideur, après avoir établi l'apparence de droit, doit justifier le caractère exceptionnel des faits en cause pour émettre l'injonction et doit établir le respect des critères applicables interprétés restrictivement.

[27] Universel puisque le recours en injonction est disponible dans la plupart des secteurs d'activités ce qui inclut, sauf dispositions contraires, le secteur des innovations techniques.

[28] Discrétionnaire puisque le Tribunal jouit d'un large pouvoir à cet égard et pourra tenir compte de nombreux facteurs incluant l'existence d'autres recours, l'attitude et la conduite des parties, les délais, etc.

[29] L'injonction demandée ici intervient dans un contexte de droit privé qui touche aux aspects de la propriété, du droit d'auteur et du respect d'une convention qui serait intervenue entre les parties. Dans ce contexte de droit privé, le Tribunal applique les critères traditionnels de l'émission d'une injonction interlocutoire, tels que décrits dans l'arrêt classique de *Société de développement de la Baie James* c. *Kanatewat* [2].

## 2. L'existence d'un droit clair ou apparent

[30] Il s'agit d'évaluer si le recours de CREA présente une chance raisonnable de succès lors du jugement final.

[31] CREA réfère aux conditions d'utilisation régissant son site Internet. Elle plaide que ce site lui appartient même si la propriété des informations contenues aux fiches descriptives appartient à des tiers soit, les agents inscripteurs des diverses bannières.

[32] Le droit de propriété de CREA sur son site paraît clair. CREA a consacré les ressources financières et technologiques à la création de ce site et elle en assure l'organisation et la gestion (*voir affidavit de Peter Simpson*).

[33] À cet égard, Sutton ou ses agents paraissent être titulaires des droits reliés au contenu des fiches descriptives qui émanent d'eux. Ils n'ont pas convaincu le Tribunal à ce stade, que *prima*

*facie*, ils puissent détenir les mêmes droits sur le contenu des fiches descriptives émanant de leurs concurrents et rendues disponibles par le site Internet de CREA, MLS.ca.

[34]    La page d'accueil identifie CREA comme la titulaire des droits sur ce site.  On y apprend que (***P-1***) :

> ***"CREA's primary mission is to represent its members at the federal level of government and to act as a watchdog on national legislation that pertains to the real estate industry.  CREA has frequently taken strong stands to defend the public's right to own and enjoy property.***
>
> ***CREA owns the MLS® trade mark and has a proprietary interest in the REALTOR trade mark.  As a member of CREA, you can offer your clients an unbeatable marketing combination with both trademarks.  The REALTOR trade mark is your clients'assurance of integrity.  It can only be used in Canada by members of The Canadian Real Estate Association and indicates that you, as a member, accept and respect a strict Code of Ethics.  The real estate data base systems operated by our member boards and associations under the MLS® trade mark provide an ongoing inventory of available properties and ensure maximum exposure of properties listed for sale.  This is important because about 90 per cent of all resale homes in Canada go through MLS®."***

[35]    L'adresse électronique (***www.mls.ca***) comporte une page d'accueil qui informe l'utilisateur des droits de CREA (***P-2***) :

> ***« Welcome to MLS®Online$^{TM}$, the official gateway to all Canadian MLS® information sponsored by the Canadian Real Estate Association.***
>
> ***(…)***
>
> ***Search By MLS®Number | REALTOR® / Office Search***
>
> ***(…)***
>
> ***… <u>Terms of use</u>***
>
> ***MLS MULTIPLE LISTING SERVICE***
>
> ***©1998-2002 The Canadian Real Estate Association.  All rights reserved. Site hosted by Onramp Network Services Inc.***
>
> ***MLS®, MLS®Online$^{TM}$, REALTOR® and all related graphics are trademarks of The Canadian Real Estate Association.***
>
> ***REALTOR is a trademark owned by REALTOR Canada Inc. a corporation owned by the National Association of REALTORS and The Canadian Real Estate Association. REALTORS accept and respect a strict Code of Ethics which is the consumer's assurance of integrity.***
>
> ***MLS® is a co-operative marketing system used only by Canadian Real Estate Boards to ensure maximum exposure of properties for sale."***

[36]    Cette page d'accueil affiche une référence aux conditions d'utilisation du site (« ***Terms of use*** »).  L'utilisateur peut ignorer cette commande et poursuivre sa consultation du site ou peut interroger cette commande.  Il découvre alors les conditions d'utilisation rédigées en ces termes (***P-2***) :

> ***« 1.    Copyright***
>
> ***All materials on this site are copyrighted and are owned either by CREA or the real estate board who has supplied the property listings and other data.  Property listings and other data available at this site are intended for the private, non-commercial use by individuals.  Any commercial use of the listings or data in whole***

*or in part, directly or indirectly, is specifically forbidden except with the prior written authority of the owner of the copyright. Users may, subject to these Terms and Conditions, print or otherwise save individual pages for private, non-commercial use. Further, property listings and/or data may not be modified or altered in any respect, merged with other data or published in any form, in whole or in part. By downloading the property listings and data, the user confirms agreement with, and acceptance of the foregoing conditions of use.*

*2.     Trade Marks*

*The trade marks displayed on this site, including CREA®, MLS®, Multiple Listing Service®, MLS®Online*TM *and the associated logos and design marks are owned by CREA.REALTOR is a trade mark in which CREA has a proprietary interest. Other trade marks may be owned by real estate boards and other third parties. Nothing contained on this site gives any user the right or license to use any trade mark displayed on this site without the express permission of the owner.*

*(…)*

*5.     Real Estate Professionals*

*Anyone legally licensed to sell real property in their province or territory may download, transmit and distribute property ads and the web pages of REALTORS and real estate firms for the sole purpose of introducing a potential buyer of the property. Such ads and pages cannot be modified, re-posted or otherwise used."*

*(nos soulignements)*

[37]     Les conditions d'utilisation affirment le droit de propriété de CREA sur le contenu du site et ceux des chambres immobilières ayant transmis les inscriptions.

[38]     L'utilisation à des fins commerciales des informations du site est interdite sans l'autorisation écrite du propriétaire. Il est, toutefois, permis aux agents immobiliers d'utiliser et reproduire les informations contenues au site dans le « *seul but* » d'introduire un acheteur potentiel en vue d'une transaction sur une propriété.

[39]     Les articles 1 et 5 interdisent la modification du contenu du site.

[40]     Le téléchargement des fiches descriptives par un utilisateur confirme son acceptation de ces conditions.

[41]     Sutton admet avoir téléchargé sur son site les fiches descriptives en provenance du site MLS de CREA et les avoir modifiées[3].

[42]     Sutton, selon la preuve prépondérante, est une entreprise initiée aux règles du courtage immobilier et à l'importance des conditions d'utilisation d'un site électronique. Elle-même est titulaire des droits sur son propre site et impose aux utilisateurs des conditions similaires à celles appliquées par CREA (*P-3*).

*« SUTTON®*

*TERMS OF USE AND PRIVACY POLICY*

*Terms of Use*

*Please read this agreement carefully before accessing or using this site. By accessing or using the site, you agree to be bound by this agreement. Sutton Group Realty Services Ltd. referred to as "SGRS", and other entities providing information and services on the site ("Suppliers") provides the information and services on this site to you, the user, conditional upon your acceptance without modification of the terms, conditions, and notices contained herein. Your use of this Web site constitutes your agreement to all such terms, conditions, and notices.*

(...)

***Personnal and Limited Commercial Use Limitations***

***You may access, download and print materials on this Site for your personal and commercial use. <u>You may not modify, display, perform, publish, license, create derivative works from, frame in another Web page, use on any other web site, transfer or sell any information, software, lists of users, databases or other lists, products or services obtained from this Site</u>. The foregoing prohibition expressly includes, but is not limited to, the practices of "screen scraping" or "database scraping" to obtain lists of users or other information. If and when requested by SGRS, you agree to provide true, accurate and complete user information and to refrain from impersonating or falsely representing your affiliation with any person or entity. Except with the written permission of SGRS, you agree to refrain from accessing or attempting to access password protected, secure or non-public areas of this Site. Unauthorized individuals attempting to access prohibited areas of this Site may be subject to prosecution.***

***Proprietary Rights***

***All materials on this site (as well as the organization and layout of the site) are owned and copyrighted by SGRS or its Suppliers, and all rights are reserved. No reproduction, distribution, or transmission of the copyrighted materials at this site is permitted without the written permission of SGRS and its Suppliers."***

***(nos soulignements)***

[43]    Sutton plaide n'avoir pas consenti à ces conditions d'utilisation du site MLS.ca de CREA puisque ce site n'est pas muni d'une icône « *I agree* » qu'elle aurait actionnée.

[44]    Le Tribunal estime que cette discussion relève du jugement final. Au stade interlocutoire, il suffit de constater que, de façon prépondérante :

a.    CREA est titulaire des droits sur le site MLS.CA créé et géré par elle et *prima facie* elle partage ces droits avec les chambres immobilières et les courtiers et agents dont émanent les informations répertoriées à ce site relativement à leurs propres inscriptions ; la question du droit de propriété est en litige et sera résolue lors du jugement final ;

b.    Sutton n'a pas établi un droit d'utilisation des informations contenues à ce site en provenance de ses concurrents au-delà des conditions d'utilisation de ce site ;

c.    La page d'accueil mentionne clairement l'existence de conditions d'utilisation ;

d.    Ces conditions d'utilisation prohibent la modification des informations téléchargées à partir de ce site ;

e.    Le téléchargement constitue l'expression du consentement de l'utilisateur à ces conditions d'utilisation ;

f.    Sutton télécharge le contenu du site MLS.CA, le modifie, se l'approprie et affiche le contenu altéré,incluant les informations en provenance de ses concurrents ;

g.    Sutton sait que des conditions d'utilisation s'appliquent et elle-même en impose aux utilisateurs de son propre site ;

h.    CREA revendique des droits d'auteur à l'égard du répertoire créé par elle ce qui constituera une question sérieuse à résoudre lors du jugement final ;

i.    Sutton admet en plaidoirie, par ses procureurs, que le site MLS.ca constitue un rouage essentiel à l'opération effectuée par elle pour incorporer les informations répertoriées par CREA à son propre site, lui évitant de procéder elle-même à la cueillette et au traitement des données pour cette incorporation à son site.

[45]    À ce stade, le Tribunal doit conclure à un droit apparent sinon clair de CREA à l'utilisation et la conservation de l'intégrité de son site.

## 3.    Le poids des inconvénients

[46]    Cet aspect est écarté lorsque le droit paraît clair. En l'espèce, le Tribunal est confronté à un contexte juridique peu élaboré et comportant des incertitudes en raison du caractère récent des développements technologiques reliés au cyberespace.

[47]    De plus, le stade interlocutoire n'est pas l'étape désignée pour décider et résoudre ces incertitudes. Le Tribunal adopte une démarche fondée sur le caractère apparent des droits allégués par CREA.

[48]    Or, le poids des inconvénients penche en faveur de CREA.

[49]    Si l'injonction interlocutoire est émise, le *statu quo* antérieur est rétabli. Sutton et ses agents se retrouvent dans la même situation que les autres courtiers et agents concurrents. Elle continue ses opérations et peut utiliser le site MLS.ca de CREA en conformité des conditions d'utilisation comme ses compétiteurs le font.

[50]    Si l'injonction interlocutoire n'est pas émise, l'intégrité du site MLS.ca est mise en péril au détriment des efforts déployés par CREA et de la discipline imposée par elle aux courtiers et agents par des conditions d'utilisation désormais écartées. L'éthique commerciale apparemment respectée par les courtiers et agents dans l'utilisation du site MLS.ca est alors retirée au bénéfice des coups de force technologiques de chacun. Il y a un risque important de dénaturer les objectifs visés par la constitution de ce site sous l'égide de CREA.

[51]    Il est permis de se demander pourquoi les concurrents maintiendraient leur adhésion à ce site qui sert alors de courroie de transmission afin que les informations concernant leurs inscriptions soient accaparées, par les uns et les autres, sans accorder à leurs intérêts commerciaux une protection suffisante.

[52]    D'ailleurs, cet aspect préoccupe cette industrie. En effet, dans le Webzine des professionnels du courtage immobilier (***ACAIQ***) un avis a été émis à l'effet suivant (***D-13***) :

> *« Brossard, 7 novembre 2002 -- L'Association constate qu'il arrive de plus en plus fréquemment qu'un courtier immobilier diffuse, par le biais d'un site Internet ou tout autre moyen, des fiches descriptives d'immeuble dont il n'est pas l'inscripteur.*
>
> *Le présent communiqué rappelle les exigences de la Loi sur le courtage immobilier quant à l'importance pour un courtier d'obtenir au préalable l'autorisation du courtier inscripteur de diffuser auprès du public ses inscriptions et la nécessité de reproduire le nom du courtier inscripteur sur toute fiche descriptive.*
>
> *Ainsi, les fiches descriptives accessibles au public doivent contenir le nom du courtier inscripteur, et ce, de la façon suivante :*
>
> - *Sur chacune des fiches doit apparaître le nom du courtier inscripteur avec la mention « courtier immobilier agréé ». Par exemple : « Source de l'information :  Les immeubles ABC inc., courtier immobilier agréé »;*
>
> - *Cette mention doit être située dans la partie supérieure de la fiche descriptive et, pour les fiches accessibles par Internet, elle doit être visible sans que l'internaute n'ait à utiliser la barre de défilement;*

- *Le nom du courtier inscripteur doit être reproduit tel qu'il apparaît sur la fiche où sont puisées les informations de l'inscription;*

- *La mention doit apparaître dans un caractère typographique de la même couleur et d'une grandeur au moins équivalente aux autres informations contenues à la fiche descriptive;*

- *La mention doit apparaître lors de l'impression d'une fiche descriptive.*

*Enfin, notons qu'en matière de responsabilité professionnelle ainsi qu'en déontologie, l'absence d'une telle mention pourrait, dans certaines circonstances, entraîner de fâcheuses conséquences.*

*… »*

[53]     Le contenu de ce communiqué est contesté à certains égards.  Cette discussion aura lieu lors de l'audition au mérite.  Le Tribunal conclut que l'argument de CREA, quant aux préoccupations des courtiers relativement à des pratiques semblables à celles de Sutton, est fondé.  Il est raisonnable de croire que ces préoccupations pourraient entraîner, de la part des courtiers, des mesures défensives éventuellement nuisibles au site MLS.ca de CREA.

### 4.     Le préjudice irréparable

[54]     La perte de confiance et la désaffection des courtiers et agents envers le site MLS.ca de CREA constituent de façon prépondérante le risque encouru par CREA si l'injonction interlocutoire est refusée.  En ce cas, le jugement final, même s'il donne raison à CREA, risque d'être inefficace.

[55]     Sutton plaide l'absence de préjudice à ce jour.  La chambre immobilière de Montréal ne constituerait qu'une faible partie des membres de la CREA à l'échelle canadienne.  De plus, cette chambre n'a pas donné suite aux résolutions menaçant de se retirer de MLS.ca.  Elle n'aurait pas le pouvoir de décider ainsi, de toute façon, ce pouvoir étant celui des courtiers et agents de la Chambre.

[56]     Sutton souligne que Remax, l'une des protagonistes de la démarche judiciaire entreprise par CREA, n'a pas cessé de communiquer ses inscriptions.

[57]     Ces menaces constitueraient une mise en scène afin de créer une situation artificielle de préjudice pour favoriser des intérêts commerciaux des concurrents de Sutton, envieux de sa trouvaille technologique.

[58]     Sutton fait ainsi dériver l'objet des présentes procédures.  Sutton poursuit également des intérêts commerciaux équivalents à ceux de ses concurrents.  Son avancée technologique lui permet de s'approprier un contenu sur lequel elle ne démontre pas de droit et en dérogeant de conditions d'utilisation applicables à tous.  Elle brise le *statu quo* antérieur et compromet l'intégrité d'un site qui repose sur les efforts de CREA et sur le consentement et la confiance mutuelle des compétiteurs dans la recherche d'un but commun d'uniformiser, publiciser et informer le public et les autres courtiers et agents des transactions disponibles.

[59]     CREA n'a pas à supporter les risques associés à la perte de confiance et à la désaffection des courtiers.  À cet égard, il est probable que le jugement final ne pourrait y remédier.

### 5.     L'urgence

[60]     Sutton reproche à CREA les délais écoulés.  Or, il n'y a pas de tels délais.

[61]     Sutton a débuté les activités reprochées en avril 2002.  CREA en a pris connaissance en septembre 2002 seulement.  Aussitôt, elle entreprend une démarche auprès de Sutton afin de la convaincre de cesser.  Sutton et ses agents font partie de la famille des courtiers et CREA agit raisonnablement lorsqu'elle tente ainsi une démarche de conciliation.  Cette démarche se termine le 25 octobre et les procédures sont instituées le 2 novembre.

[62]     Parallèlement, CREA prend les moyens techniques de contrer la technologie utilisée par Sutton.  Celle-ci s'en aperçoit et modifie sa démarche afin de passer outre aux tentatives de CREA.  CREA n'a pas prolongé cette version moderne du jeu du chat et de la souris, mais on ne peut lui reprocher de l'avoir tenté.

[63]     L'injonction provisoire a été refusée et les parties ont fait diligence afin de procéder au stade interlocutoire.

[64]     Il n'y a aucun reproche à formuler envers CREA quant au délai.

[65]     D'autre part, il est urgent de ramener les parties au *statu quo* antérieur et de préserver les droits de CREA pendant le processus judiciaire.

**PAR CES MOTIFS, LE TRIBUNAL :**

[66]     **ACCUEILLE** la requête en injonction interlocutoire ;

[67]     **ORDONNE** à la défenderesse, ses agents, officiers, employés, administrateurs et à toute personne agissant sous son contrôle :

a)      de cesser, directement ou indirectement, par tous moyens, de télécharger les informations répertoriées au site www.MLS.ca de la demanderesse pour les fins de modifier le contenu ou la présentation de ces informations ou d'afficher, distribuer, publier telles modifications sur son propre site « *Internet* » ou sur un site sous son contrôle ou autrement;

b)      de prendre les moyens nécessaires et raisonnables afin que le téléchargement, la transmission et la distribution des informations disponibles sur le site www.MLS.ca de la demanderesse soient effectués en conformité des règles d'utilisation de ce site, par des personnes légalement autorisées à agir dans le cadre de la vente d'immeubles sur le territoire de la province de Québec, dans le seul but d'introduire un acheteur potentiel pour une propriété répertoriée à ce site, et ce, sans modification d'aucune sorte et sans affichage sur un site sous son contrôle;

[68]     **ORDONNE** à la défenderesse de fournir une caution de 10 000 $;

[69]     **ORDONNE** à la demanderesse de signifier la présente ordonnance en conformité des modes de signification applicables à une procédure introductive d'instance;

[70]     **LE TOUT AVEC DÉPENS**.

_____

_____
CAROLE JULIEN, J.C.S.

Me François M. Grenier
Me Alain Y Dussault
Léger, Robic, Richard
Avocats de la demanderesse

Me Michel Ménard
Me France Lessard
Lapointe, Rosenstein
Avocats de la défenderesse

Date  d'audie  20 février 2003
nce :

[1] P.A. **GENDREAU**, F. **THIBAULT**, D. **FERLAND**, B. **CLICHE**, M. **GRAVEL** : « *L'injonction* », Les Éditions Yvon Blais, Cowansville, 1998, p. 320.

[2] [1975] C.A. 166.

[3] Interrogatoire de Julie Gaucher, p. 38, 57 et D-7, JG-10, JG-11 (onglet 11).

# EXHIBIT EN-8

# TO THE DECLARATION OF EVAN NUTTALL

1997 CarswellAlta 141

Alberta Court of Queen's Bench

Edmonton (City) v. Protection Mutual Insurance Co.

1997 CarswellAlta 141, [1997] 10 W.W.R. 11, [1997] A.J. No. 149, 197
A.R. 81, 42 C.C.L.I. (2d) 166, 49 Alta. L.R. (3d) 233, 69 A.C.W.S. (3d) 361

## The City of Edmonton (Plaintiff) and Protection Mutual Insurance Company (Defendant)

Lee J.

Judgment: February 14, 1997
Docket: Edmonton 9303-18136

Counsel: *E.F. Macklin, Q.C., J. Hope, Q.C.*, and *S. McLeod*, for plaintiff.
*E.P. Groody* and *D. Smith*, for defendant.

*Lee J.*:

### A. The Parties

1    The Plaintiff is a Municipal Corporation duly incorporated in accordance with the laws of Alberta. The Plaintiff established the Edmonton Power Authority for the purposes of managing and operating Edmonton Power which is wholly owned by the Plaintiff.

2    The Defendant is an insurer carrying on business in Alberta and elsewhere. The Factory Mutual system is made up of three different insurers — the Defendant, Protection Mutual; Arkwright Mutual Insurance Company and Allendale Mutual Insurance Company.

Exhibit 171, Read-Ins of the Plaintiff from the Examination for Discovery of John Smith, pages 10-11.

### B. The Policy of Insurance

3    Protection Mutual Insurance Company Policy Number 341304-89 insured the Plaintiff between July 1st, 1989 and July 1st, 1992 for the coverages and at the locations shown in the Policy. The Policy is Exhibit 1 and is the Policy in issue in this lawsuit.

4    Section III of the Policy provides Boiler and Machinery Coverages for the locations specified in the Policy where the two subject steam turbines are located.

### C. Clover Bar Generating Station

5    The Clover Bar Generating Station, owned and maintained by the Plaintiff, was designed in the late 1960s for the purposes of generating electricity.

### D. Plaintiff's Purchase of Two Escher-Wyss Steam Turbines

6    In order to commence operations at the Clover Bar Generating Station, the Plaintiff purchased two Escher-Wyss steam turbines. The first ("Unit 1") was commissioned or put in service in 1970 and the second ("Unit 2") was commissioned in 1973. Operations commenced at Clover Bar when Unit 1 was commissioned in August of 1970.

7    The Thermal Engineering Department for Edmonton Power prepared specifications for the supply, delivery and supervision of the erection and commissioning of the two steam turbine generators. The specification is dated April 6th, 1966 and is Exhibit 2.

8    A contract was entered into on December 19th, 1966 by the Plaintiff with Escher-Wyss/Oerlikon Canada Limited for the purchase of the two steam turbine generators. The contract was assigned by Oerlikon Canada Limited to Brown Boveri (Canada) Limited on December 18th, 1970. The purchase agreement and the assignment is Exhibit 3.

9    Each of the two steam turbine units is made up of three rotors:

   a.) the High Pressure (H.P.) Rotor consisting of stages 1-12;

   b.) the Intermediate Press (I.P.) Rotor consisting of stages 13-24; and

   c.) the Low Pressure (L.P.) Rotor consisting of stages 25-28 on the generator side and stages 25-28 on the turbine side.

**E. The Origins of Steam Turbines**

10    The technology employed in producing steam in a turbine began in the late 1890s.

11    Mr. Parsons and Mr. Curtis both developed the technology for utilizing energy in steam to convert into rotational mechanical energy. They had slightly different approaches, and as a result of that slightly different approach, two basic designs were used in large steam turbines. One is an impulse design, and the other is a reaction design. The steam turbines in this case are of an impulse design.

12    Westinghouse aligned themselves with Mr. Parsons and began developing reaction turbines. G.E. aligned themselves with Mr. Curtis and began producing impulse turbines.

13    In my view, it is helpful to understand the basic operation of the two steam turbines in question, and the design and stress challenges inherent therein to fully appreciate the problems the two turbines herein had.

**F. The Basic Internal Workings of the Two City of Edmonton Escher-Wyss Steam Turbines**

14    A steam turbine has many components. Some components are stop valves to protect the unit from steam when the unit is not operating. There are auxiliary systems including lubrication systems. The ends of the rotor need to be sealed from the atmosphere. The design uses steam so there is a steam seal system. There is a combined reheat and stop valve that admits steam into the intermediate pressure section.

15    The rotor casings stand 10 or 11 feet high above the operation platform. Each entire turbine, including the three rotors and the generator, spans approximately 50 feet in length.

16    Within each section: high pressure, intermediate pressure and low pressure section, there are a number of components. There is the rotating element called the rotor. There are stationary components called diaphragms or nozzles which are non-moving airfoils separating the disks. Each rotor is bolted mechanically to its adjacent rotor. Blades and buckets are terms used for the moving airfoils which are attached to wheels or disk at blade roots or blade attachments.

17    All of this equipment is designed for one purpose and that is to turn the generator rotor to make electricity.

18    The two steam turbines in question take high energy steam, at an elevated temperature of 1000 degrees, and at a high pressure of 1800 pounds per square inch and utilizes that steam through an expansion process to turn the turbine rotors, which eventually turn the generator rotor and produce electricity.

2

19      The reason there are three casings in the two steam turbines is that the turbine manufacturer wanted to utilize the full energy of the steam. There is 1000 degree, 1800 pounds per square inch steam coming in the high pressure section. In order to utilize all of the energy in that steam, it needs to expand through a series of stages through this low pressure section.

20      In addition to that, each section is operating under different conditions. This high pressure section is operating under a higher pressure than the other sections. It is also operating under elevated steam conditions. The intermediate pressure section is operating at a lower pressure than the high pressure section. There is 1000 degree steam in the front end of the intermediate pressure section. The low pressure section is operating again at a lower pressure than the intermediate pressure section.

21      Because of these different conditions, material requirements are different for these sections, and that leads to separating these sections into different casings.

22      The steam is admitted to the turbine through what are known as control valves just above the high pressure section.

23      There are three control valves mounted on top of the high pressure section and three control valves mounted on the lower half of the high pressure section also. They control the amount of steam that is coming into the turbine, and they regulate how many megawatts the generator is producing. When the turbine is initially started up, either one or two of these control valves, depending upon the design, admits steam into the high pressure section.

24      This steam expands through the high pressure section, and the high pressure section is comprised of a series of stages. In this case, it is comprised of 12 stages. Each stage is the combination of a stationary part, a diaphragm and its corresponding rotating blade which is attached to the rotor. The purpose of the stationary part is to direct the steam into the proper angle of the rotating blades.

25      In this case, there are 12 stages in the high pressure section. The flow is from right to left. The steam at the admission side is about 1000 degrees, 1800 pounds per square inch. The exhaust is about 700 degrees. The largest rotating blade in the high pressure section is just a little over three inches. The combination of stationary blades and rotating blades form a path that the steam flows through, expands, works on the rotor and causes the rotor to turn.

26      As the steam passes through a stage and does its work, it requires more space, and that is why the blades increase in length as you go through the high pressure section. It does its work and it expands, goes to a lower pressure, requires more space and therefore the blades increase in length.

27      In order to make this turbine efficient, the steam, upon exiting the high pressure section, is returned to the boiler to be heated back up to 1000 degrees. Its pressure is not increased, but its temperature is increased. The steam goes through the boiler, returns from the boiler through the combined reheat valve and enters the intermediate pressure section. There the steam goes through a similar process, passing through a series of stages, in this case, stages 13 through 24. A stage is a combination of diaphragm and rotating blade. Both high pressure and intermediate pressure sections are called single flow sections. When the flow in a single flow section is in one direction in an impulse turbine there is some force exerted on that rotor. The steam pushes this rotor from right to left in the high pressure section. To counterbalance that, the manufacturer herein has put the flow in the intermediate pressure section from left to right, which reduces the effect of the high pressure section.

28      In the reheat section the last stage blade is approximately 11 inches long. The steam has expanded from the admission of the intermediate pressure rotor to the exhaust and now is transported to the low pressure section through a crossover pipe. It does not go back to the boiler for any more reheating. It is admitted directly into the low pressure section.

29      The low pressure rotor is of a slightly different configuration than the intermediate pressure or the high pressure rotor. It is what is known as a double flow rotor. Steam is admitted into the centre of that section.

30      The steam is split ideally into equal parts and flows to the left and to the right and expands from the 25th stage to the 28th stage of the turbine. The reason for doing this is that if this section was designed as a single flow section, these would be very

3

large blades on the last stage. One would either have to increase the diameter of the steam path or have very long blades which are very difficult to design. Therefore, the quite common practice is to split the flow in the low pressure section into two paths.

31     The diameter of the high pressure rotor, at the last stage of the high pressure rotor, from the tip of the blade to the tip of the blade is approximately 30 inches. On the intermediate pressure rotor, the largest stage being the last stage of the 24th stage, the diameter tip to tip of the blade is approximately four feet. The diameter in the last stage of the low pressure section of the blade airfoil length is about 28 inches, but the diameter tip to tip of the blade is approximately 80 inches.

**G. Steam Turbine Design Challenges and Stress Forces**

32     The two steam turbines in question weigh several tons each and they are subjected to stresses that are in the thousands of pounds per square inch. Yet there are some components on this turbine that must be machined to tolerances of about a thousandth of an inch and which turn at 3600 revolutions per minute (rpms), 60 times a second. There is great precision involved in machining, making, and assembling these turbines.

33     A major concern of a rotor designer is ensuring that the stresses that develop in the blade and in the rotor do not exceed the appropriate strength of the material.

34     In the lower temperature portion of the intermediate pressure rotor, the concern is ensuring that the stress loads that the blades and rotors experience do not exceed yield strength of the material. The yield strength is related to that point where it no longer returns to its original shape.

35     In the low temperature sections (generally below 700 degrees) of the rotor, the concern is to ensure the stresses in the rotor do not exceed the yield strength of the rotor or the stresses in the blades don't exceed the yield strength of the blades at that temperature. Yield strength is a function of temperature — the higher the temperature, the lower the yield strength for the particular component.

36     In the high temperature sections of the rotor operating above 700 degrees, there is the concern of creep-rupture. Creep is the time-dependent, temperature-dependent, stress-dependent deformation of material. When a load is applied to a particular component and it is heated up, even though that load does not exceed the yield strength, over a period of time that component may stretch, creep, elongate, or deform. Therefore, in the high temperature portion of the rotor, one is concerned about the creep-rupture strength.

   Joseph Lesiuk Testimony, Transcript page 727, line 26 to page 727, line 9

37     Since the creep-rupture strength is a function of time, stress and temperature, it becomes imperative that there is some norm established for the designer to use in the high temperature section.

   Joseph Lesiuk Testimony, Transcript page 728, line 10 to 14

38     This norm has historically been the 100,000 hour creep-rupture strength of the materials. The resulting design herein has more than 100,000 hours of inherent life from the creep-rupture point of view.

   Joseph Lesiuk Testimony, Transcript page 728, line 14 to Transcript page 720, line 7

39     Creep-rupture strength hours differs from the life expectancy hours of the machine.

   Joseph Lesiuk Testimony, Transcript page 757, line 1 to Transcript page 763, line 10

40     The creep-rupture strength, as I understand it, is part of the static or centrifugal stresses that exist in a rotor. In addition to this, the designer of a steam turbine generator must be concerned about the bending stresses that the rotor is subject to as it rotates. Torsional stresses exist when the rotor transmits energy to the generator rotor.

   Joseph Lesiuk Testimony, Transcript page 730, line 13 to 20

41    The dynamic aspects of the rotor are the critical speeds, the torsional natural frequencies, and the blade natural frequencies. Natural frequencies of a blade refer to its vibration when the blade is clamped down, bent and then let go. Each blade has an unlimited number of natural frequencies and different types of natural frequencies. There is a fundamental natural frequency of the blade in the tangential direction, that is rotating it in the direction of the wheel circumference. There is an axial natural frequency of the blade, that is, axial being in the direction of the steam flow. There are also complex tangential modes.

42    When these blades are grouped together and it shroud is put over them as occurs in a steam turbine, the group of blades have group natural frequencies. With group natural frequencies there must be concern by the steam turbine maker regarding group torsional frequencies, group tangential frequencies, group axial frequencies and complex modes. These forces then comprise the blade natural frequencies.

43    The rotor also has natural frequencies called critical speeds. In this regard, the steam turbine designer must avoid having these rotor critical speeds near the speed that you want to operate the rotor which in this case is 3600 rpm. Frequencies once again in this context are essentially vibration.

    Joseph Lesiuk Testimony, Transcript page 730, line 21 to Transcript page 732, line 13

44    Detailed verbatim description of the workings of the two steam turbines are found from the evidence of Mr. Joseph Lesiuk, the Plaintiff's expert witness, and Mr. John Mulka, the Plaintiff's Plant Manager at the Clover Bar Generating Station:

    Joseph Lesiuk Testimony, Transcript pages 718 to 764

    John Mulka Testimony, Transcript pages 42 to 49

    John Mulka Testimony, Transcript pages 230 to 260

from which Sections F and G herein have been summarized from.

**H. The Subject of the Action - The Intermediate Pressure (I.P.)Rotors in Unit 1 and 2 Clover Bar Generating Station (Sections H. to O. inclusive are taken from parts of the Agreed Statement of Facts filed shortly after this Trial commenced, which is Exhibit 6)**

45    The 24th, or last stage of the intermediate pressure rotor, is comprised of 109 blades approximately 16 inches long in a 360 degree array around the rotor, like a wheel around an axle.

46    Between every two stages of blades are stationary nozzles, not attached to the rotor. Superheated steam from the gas-fired boiler is directed through the turbine by the stationary nozzles at the blades. Steam pushing against the blades causes the rotor to turn. The rotors are connected to a generator which uses this rotation to produce electricity.

47    The blades are held in circumferential T-slots in the rotor. The blades have slots, which fit over the side grips on the rotor.

48    The within action by the Plaintiff against the Defendant insurer relates to the costs incurred by the Plaintiff in replacing the intermediate pressure rotors in Unit 1 and Unit 2. Cracks were first detected in the rotor wheel of Unit 1 in August of 1991 and in the rotor wheel of Unit 2 in March of 1992.

49    The blade-to-disk attachment is the location of the damage on several disks on the intermediate pressure rotors on Unit 1 and Unit 2. Each of the cracks in this action was on the side grip of the blade or on the nose portion of the wheel which fits completely into the side grip of the blade.

**I. The 1970s**

50    In November of 1975 an 8" piece of an low pressure blade broke off at the 28th stage generator side in Unit 1. Cracked and eroded blades at the 28th stage generator side of the low pressure rotor were found on inspection. The blades at that stage

were removed in December of 1975 and the Unit was returned to service. In April of 1979, new blades were installed at the 28th stage of the low pressure rotor generator side in Unit 1.

51    In April of 1976 during an overhaul of Unit 2, two small pieces of shrouding were found missing at the 27th stage of the low pressure rotor. Indications of erosion and cracking were found on several of the low pressure stationary blades.

52    In February and March of 1979, two cracked blades were found in the low pressure rotor at the 28th stage generator side. These blades were repaired by cutting them off at their respective cracks and the two diametrically opposite blades were shortened by the same amount.

**J. The 1980s**

53    During a major overhaul of Unit 1 in 1980 two cracks were found in the shrouding in the 27th stage turbine side of the Unit 1 low pressure rotor. The 28th stage turbine side blades of the low pressure rotor showed signs of erosion. Crack-line indications could be observed on many of these blades. During the same overhaul, mechanical deformation in numerous areas was detected on shroud rivet ends on the intermediate pressure rotor.

54    In 1981 a minor overhaul of Unit 2 took place between March and May 1981. At the 25th stage of the low pressure rotor one blade was found to be cracked on the generator side and three were found to be cracked on the turbine side. The cracking was found in the side grip of these blades. The Unit was returned to service with the blades in.

55    Unit 2 was re-inspected in October of 1981 when cracks in the blades were confirmed and four additional cracks were found in the wheel rim of the low pressure rotor.

56    In November of 1981 Unit 1 was inspected. In the low pressure rotor at the 25th stage generator side there was one blade cracked and two wheel rim cracks. On the turbine side at the 25th stage, there was one wheel rim crack. Unit 1 was returned to service.

57    The Plaintiff ordered two new sets of blades from Turbine Blading; one set for Unit 1, 25th stage and one set for Unit 2, 25th stage.

58    In September of 1982 there was a minor overhaul of Unit 2 for the purposes of installing the new blades at the 25th stage of the low pressure rotor. After the old blades were removed testing took place which showed cracks on the wheel rim of the 25th stage generator side and on the 25th stage turbine side. In addition, one crack was discovered in the T-slot in the 25th stage on the generator side and four cracks in the T-slot on the turbine side of the 25th stage. The Plaintiff received advice that due to the severity of the cracks in the T-slot area it should not re-blade the 25th stage. The cracks were ground out and the Unit returned to service without the 25th stage blades.

59    In December of 1982 the Plaintiff cancelled the blades that had been ordered for Unit 1 due to the cracks found in the 25th stage of Unit 2. The blades were removed from the 25th stage of Unit 1 and testing took place. Eight wheel rim cracks were found on the generator side at the 25th stage and five wheel rim cracks were found in the turbine side on the 25th stage. No cracks were found in the T-slot area of the 25th stage of Unit 1. Testing also took place on the 26th stage and no cracks were found. Unit 1 was returned to service without blades at the 25th stage.

60    In March of 1983 the Plaintiff decided to install the new blades that had been ordered and received for the 25th stage of Unit 2 into Unit 1. The 25th stage of Unit 1 was machined to remove the cracks in the side grip portion of the wheel, the blades were installed and the Unit was returned to service in May of 1983.

61    In September, during a warranty inspection of the 25th stage blades in Unit 1, testing showed that a crack had developed in a blade on the generator side of the 25th stage. In addition, four pieces of shroud were missing from the 25th stage. The Unit was returned to service with the cracked blade in the Unit.

62     In June of 1984 testing confirmed the crack on the blade of the 25th stage and revealed a further crack in the wheel rim of Unit 1 under this cracked blade. The blade was removed, the crack in the wheel rim was ground out and a new blade was installed. The shroud bands were welded together in arrangements of groups of blades to form long arc shrouding.

63     In August of 1984 a new blade root design and new blades were installed by Hitachi at the 25th stage of Unit 2.

64     Testing on Unit 1 in September of 1985 revealed cracking in the shrouding of the 25th stage generator and turbine sides.

65     In 1986 testing on Unit 1 showed that a blade tenon had cracked on the turbine side of the 25th stage.

**K. The 1990s - Unit 1**

66     A major overhaul of Unit 1 commenced on February 16th, 1990. At the 25th stage of the low pressure rotor, shroud cracks were found. One crack was found in the discharge side of a blade at the 24th stage in the intermediate pressure rotor. The Unit was returned to service with an inspection planned for 1991.

67     In May 1991 Edmonton Power ordered 5-14 blades to replace the cracked blade at stage 24 in Unit 1.

68     In August of 1991 the Plaintiff commenced an overhaul during which it planned to replace the cracked blade at the 24th stage of Unit 1. Ultrasonic testing by Canspec showed cracks in the intermediate pressure rotor wheel. The 24th stage blades were removed and magnetic particle testing confirmed many cracks on the rotor at the 24th stage, more than disclosed by the ultrasonic testing.

69     In September 1991 Edmonton Power sought proposals for repairing or modifying the 24th stage of Unit 1.

70     Canspec, Russell Technologies and General Electric did further ultrasonic testing of stages 20 through 23. Indications of cracks were found in each of those stages. The blades were not removed in those stages and, therefore, magnetic particle testing was not done at that time.

71     On October 31st, 1991 Mr. Dave Whitten of Edmonton Power recommended that the Unit 1 intermediate pressure rotor be replaced.

72     In November of 1991, Unit 1 was returned to service with the 24th stage blades removed.

73     Terry Munroe, a mechanical engineer with the Plaintiff's Generation Engineering Group, prepared a "Specification for the Replacement of Intermediate Pressure Turbine Rotor" on November 6th, 1991. It was then sent to prospective bidders for tenders for the design, manufacture, testing, delivery erection and commissioning of a new intermediate pressure rotor for Unit 1.

74     Bids were received and in January 1992 the City of Edmonton Management chose Asea Brown Boveri ("ABB") as the successful bidder in the event a new rotor was ordered.

75     The operating history of Unit 1 as of August 2nd, 1991 was as follows:

```
Hours operating - 108,554
Starts:
        Cold (shut down more than 72 hours)      153
        Warm                                     321
        Hot (shut down less than 8 hours)        108
                                                 ---
        Total Starts                             582
```

===

76      Magnetic particle examination conducted in 1996 showed cracks in the intermediate pressure rotor of Unit 1 at stages 20, 22 and 23. No cracks were found at stage 21. The Canspec magnetic particle testing reports are found at Exhibit 4.

**L. 1990s - Unit 2**

77      A major overhaul of Unit 2 took place between February 18th and June 30th, 1992. Ultrasonic testing by Canspec showed extensive cracking in the intermediate pressure rotor at the 22nd and 24th stages. Unit 2 was then put back into service.

78      On March 25th, 1992 Edmonton Power was advised by ABB of the costs of repair of two stages of Unit 2 and of a new replacement intermediate pressure rotor for Unit 2.

79      The operating history of Unit 2 (approximate) as of March 1st, 1992 was as follows:

```
        Hours operating - 91,264
        Starts:
              Cold (shut down more than 72 hours)      157
              Warm                                     266
              Hot (shut down less than 8 hours)        177
                                                       ---
              Total Starts                             600
                                                       ===
```

80      Magnetic particle examination conducted in 1996 showed numerous cracks in the intermediate pressure rotor of Unit 2 at stages 22 and 24. The Canspec magnetic particle testing reports are found at Exhibit 5.

**M. New Rotors Ordered for Units 1 and 2 1992 and Installed 1993**

81      The decision to replace the intermediate pressure rotor in Unit 1 was made on February 6th, 1992.

82      The Plaintiff forwarded a letter to ABB on February 10th, 1992 to formally accept its tender.

83      The decision to replace the intermediate pressure rotor in Unit 2 was made on April 23rd, 1992.

84      The purchase order to ABB for Unit 1 was amended by adding the Unit 2 replacement on April 29th, 1992.

85      The new intermediate pressure rotor in Unit 1 was installed in February 1993. The new intermediate pressure rotor in Unit 2 was installed in July 1993.

**N. The Insurance Claim**

86      Coverage under the Insurance Policy (Exhibit 1) was discussed in a letter sent by Marsh McLennan, Edmonton Power's insurance broker, to Edmonton Power on February 4th, 1992, in response to the request by Edmonton Power of December 9th, 1991.

87      In March 1992 Edmonton Power consulted legal counsel regarding a potential claim against Protection Mutual.

88      On April 9th, 1992 John Mulka of Edmonton Power initiated a claim against the Protection Mutual Insurance Company in regards to cracking that occurred in No. 1 and No. 2 Unit intermediate pressure rotors.

89      By letter dated February 17th, 1993 Factory Mutual Engineering, on behalf of the Defendant, denied coverage to the Plaintiff for any costs in connection with the cracking of the rotors.

90      By letter dated March 9th, 1993 Factory Mutual Engineering confirmed Mr. Mulka's advice on March 8th, 1993 that a Statement of Claim would be presented to the Defendant by the end of March 1993.

**O. Statement of Claim Issued**

91      The Statement of Claim was filed September 7th, 1993.

**P. Partial Agreement as to Damages**

92      After the trial of this matter had commenced, by Agreement letter [Exhibit 7] the parties hereto agreed that damages of the Plaintiff were to be quantified at $4,250,000.00 plus pre-judgment interest from the date of the loss, if liability was in fact determined to exist by this Court. This figure was also subject to the resolution of the "Deductible Issue", and therefore is before any deductible is applied.

**Q. The Expert Evidence of Joseph F. Lesiuk**

93      Joseph F. Lesiuk has been qualified by me as an expert witness in the:

(a) design of steam turbines;

(b) failure analysis of steam turbines;

(c) fracture mechanics as applied to steam turbine components;

(d) maintenance and repairs of steam turbines; and

(e) metallurgy of steam turbine components.

94      The facts he related to the specific intermediate pressure rotor cracking herein are as follows [Joseph Lesiuk Substance of Opinion Exhibit 168]:

1. Units 1 and 2 at Clover Bar are Escher Wyss + Oerlikon manufactured turbine generator sets rated at 165 MW. The turbine is comprised of three casings: a single flow high pressure (HP) section with stages 1-12, a single flow intermediate pressure (IP) section with stages 13-24, and a double flow low pressure (LP) section with stages 25-28. The initial steam conditions are 1800 psig/1000° F main steam and 1000° F reheat steam. The turbine generator rotors rotate at 3600 revolutions per minute. Units 1 and 2 went into commercial operation in 1970 and 1973, respectively.

2. The intermediate pressure rotor is manufactured from a CrMoV solid steel forging. The rotor blades are affixed to the rotor using a T-straddle or T-slot blade attachment design. The blade attachment on stages 13-16 are "double T-slot" designs. The remaining stages on the intermediate pressure rotor use a "single T-slot".

3. The first low pressure rotor blade, stage 25, is attached to the rotor using a single T-slot design. Stages 26 and 27 are attached with double T-slot designs and the last low pressure stage is attached using a finger-type attachment design.

4. The following rotor and blade cracking incidents have occurred on stage 25 of both units:

a) In March 1981, four blades from Unit 2 were found cracked in the side grip area. Unit 2 had experienced approximately 60,000 service hours and less than 110 starts. The unit was returned to service for five months and reinspected in October 1981 at which time blades were removed and cracking in the rotor was observed. In November 1984 new blades provided by Hitachi were installed.

b) In November 1981, cracks were found on Unit 1 in the blade side grip area. Unit 1 had experienced approximately 83,000 service hours and 175 startups. In May 1983 new blades were installed and the unit operated for approximately 1700 hours when cracks were found in the shrouding and side grip areas.

5. The following rotor and blade cracking incidents have occurred on stage 24 of both units.

a) In April 1990, one cracked blade was found on Unit 1. Unit 1 had experienced approximately 105,000 service hours and 550 startups at this time. The crack was located in the side grip and the unit was returned to service. In August 1991, Unit 1 was removed from service and additional cracking was observed in blades and damage to the rotor was found. Ultrasonic indications were noted on stages 20 through 23. The blades from stage 24 were removed from the rotor and the unit returned to service.

b) In March 1992, cracked blades were observed on Unit 2. Unit 2 had experienced approximately 95,000 hours and 550 startups.

6. The intermediate pressure rotor for Unit 1 was replaced in January 1993 and the Unit 2 intermediate pressure rotor was replaced in July 1993.

7. Removal of the blades from stages 20 through 23 of the Unit 1 intermediate pressure rotor revealed cracking in the side grip area on stages 20, 22 and 23.

8. Removal of the blades from stages 22 and 24 of the Unit 2 intermediate pressure rotor revealed extensive cracking in the side grip area of both stages.

9. Investigation of blades from Unit 1 revealed the blade root surfaces were not designed as to be machined to match the circumferential contour of the mating rotor surface. The blade root surfaces were machined flat rather than with the curvature of the rotor. Since all of the rows investigated were machined flat, it is probable the blades were not designed to be machined with a curvature.

95    The Substance of Joseph Lesiuk's opinion is as follows [Exhibit 168]:

1. The cracks and damages that have developed in stages 20 through 24 of both intermediate pressure rotors are the result of similar faulty design factors. The probable cause of the failures in the rotors is high cycle fatigue crack initiation and propagation under the influence of high mean stress and fretting caused by the faulty design.

a) The high cycle dynamic stress probably resulted from low per rev stimuli originating in the upstream diaphragms due to area variations among the nozzle openings. The magnitude was affected by the axial spacing between the diaphragms and the downstream rotor blades.

b) The single T-slot blade attachment design resulted in a large contact pressure between the blade and rotor at the side grip interface. The contact pressure in the side grip area produced a high mean stress in the rotor side grip. The high contact forces also rendered the design less tolerant of start-stop cycles since the side grip material is subject to a large stress cycle during the run up in speed and shut down.

c) The flatness of the blade root surfaces relative to the curvature of the rotor allowed the blades to "rock" on the rotor. A properly designed and assembled row of blades should be securely affixed to the rotor. Relative movement between the blades and rotor in the tangential and radial directions should be eliminated. The relative motion of the blades to the rotor led to the surface damage, fretting, observed in the side grip area of the intermediate pressure rotors. The motion was induced by steam path flow variations and was aided by looseness in the assembled row of blades. The fretting reduced the fatigue strength of the material.

10

2. The design of the Clover Bar intermediate pressure rotors did not meet industry standards of the time. The turbine designer in the late 1960s had available the necessary tools, industry knowledge and techniques to analyze the Clover Bar design and avoid the design faults found in these rotors. The existence of low per rev steam path stimuli was known. The effects of nozzle to blade axial spacing and nozzle partition design were qualitatively understood. Designers calculated average stress values and applied stress concentration factors to these average values to estimate the working stress levels. Full scale laboratory tests were conducted by manufacturers to calibrate the design calculations and evaluate the suitability of blade attachment techniques.

The damage observed to the Clover Bar intermediate pressure rotors was preventable. The phenomena that led to the damage on the intermediate pressure rotors were known and mitigating techniques were available. The blade attachment design could have been modified to reduce the mean stress, the effects of low per rev steam path stimuli could have been reduced, and the susceptibility to fretting could have been eliminated. A properly designed turbine could have incorporated these features with no or minimal cost increase.

3. The intermediate pressure rotor cracking is not related to unusual or abnormal operation by Edmonton Power. When the cracking developed in the intermediate pressure rotors, the units had experienced approximately 100,000 hours of service and less than 600 starts. These service parameters are within the expected service life of rotors designed and built in the late 1960s. Purchasers of steam turbine generators at that time expected and scheduled retirement of the units based on a 30 to 50 year service life. Designers expected a 30 to 50 year service life. During the service life of the turbine, replacement of "maintenance" components was anticipated by the manufacturers and the purchasers. These maintenance parts included sealing rings, gaskets, valve seats, bolting, and bearing liners. The list of maintenance parts did not include casings, valve chests, exhaust hoods, nor high pressure, intermediate pressure or low pressure rotors. These expectations have been borne out by experience.

4. The high cycle fatigue damage to the Clover Bar rotors should not have been expected under the conditions the unit was operated if the rotors had been properly designed. The intermediate pressure rotor cracking is not the result of typical rotor degradation or wear out mechanisms. The wear out mechanisms usually responsible for rotor replacement include creep-rupture life expenditure, low cycle (cyclic life) fatigue life expenditure, rotor bore crack propagation, and embrittlement. High cycle fatigue damage to the rotor shaft sections, resulting from rotor misalignment has resulted in rotor replacement. However, high cycle fatigue life expenditure is not considered an age related wear out mechanism for rotors.

5. The cracking observed in the intermediate pressure rotors was confined to the side grip areas of the blade and disks at the time rotor replacement was ordered. The experience with the Clover Bar units indicates the turbine can operate for a period of time with the side grip areas cracked. However, this condition causes a redistribution of the stresses in the blades and disk T-slot, increasing the stress in the T-slot fillet. The resulting higher stress in the T-slot fillet would probably lead to cracking. Prolonged operation of the intermediate pressure rotor with cracks in the side grip region of the 24th stage would raise the stresses in the disk T-slot fillet. Crack initiation and propagation in the T-slot fillets would lead to failure of the disk attachment area.

The sonic testing results of stages 20-23 in Unit 1 were indications the problem was also present in these stages and, if not corrected, would lead to serious cracking in the disk T-slots. The visible cracking in Unit 2 was an indication the problem was not unique to the conditions in Unit 1 and, although the fatigue life had not been consumed on all stages, it was reasonable to conclude similar serious problems would develop in the corresponding stages of the Unit 2 intermediate pressure rotor.

The decision to replace the intermediate pressure rotors based on the low pressure rotor cracking experience, the similarity of the cracking between the 24th and the 25th stages, the onset of problems in other intermediate pressure stages, as indicated by sonic testing, and the expectation that extensive fatigue problems would develop in other intermediate pressure stages, was prudent.

**R. The Relationship Between the Turbine Problems of the 1970s and 1980s to the Problems of the 1990s**

96      In addition to Exhibit 168, the Substance of Joseph Lesiuk's opinion, Mr. Lesiuk also testified with respect to some of the problems found in the steam turbines in the 1980s. His conclusion at Transcript page 753 beginning on line 9 to Transcript page 755, line 1, is that the Plaintiff's problems in the 1980s were essentially unrelated to and did not foreshadow the problems the Plaintiff's were to have in the 1990s which are the subject matter of this action:

Q Sir, now do you have an opinion as to what caused the problem to the 25th stage in the '80s?

A I think it's the same set of circumstances that led to the problems in the IP rotor, same mechanism, high cycle fatigue.

Q All right. Now, you have — you've heard evidence, I think, while you've been here in the courtroom, that the problems in the '80s at the 25th stage did not lead Edmonton Power to suspect future problems with the IP rotor. Could you comment on that, please?

A Their consultants, their experts indicated in the '80s that the failure was a high cycle fatigue failure, high vibration, not unheard of in the industry to have an isolated stage with these kinds of problems, and they accepted that. There was nothing to suggest that there was a problem with the single T-root attachment at that point other than the fact that cracks developed in that T-root attachment because of the high cycle forces that were exerted on the blade.

There was no evidence that the single T-root was experiencing gross section failure from overload that would lead one to become suspicious of that T-root design at that time. They were told it was a high cycle fatigue failure that existed on a single stage in the turbine. It showed up on all four 25th stages, and they did the appropriate testing of the 26th stage.

Q Now, sir, if — if the situation had been reversed and what had happened — what happened in the '90s had happened in the '80s and vice versa in terms of the failures we've talked about, could you comment on that in terms of what that might have led to?

A I would have become very suspicious of the 25th stage because it has a single T-root and because the problems that were seen in the IP rotor are related to the single T-root design. I would become suspicious of the blade attachments in the IP rotor which uses a single T-root design also.

Q Well, what — what's the difference between the two? Why in the one case do you become suspicious and in the other case you don't?

A In the '80s on the 25th stage we had problems on isolated stage. In the 1990s we are seeing problems on the 20th stage, the 21st — I'm sorry the 20th stage, the 22nd, 23rd, and 24th stage, much more — or wider spread cracking on the IP rotor.

97      It should also be noted that while certain exhibits have been entered and referred to during the course of evidence from inspection and consulting services such as Stress Technology incorporated ("STI") etc., these reports contain factual information and observations given at the time. They are not expert opinions and no expert evidence was called in this case other than by the Plaintiff who called Joseph Lesiuk. To the extent of course that Mr. Lesiuk adopted the information or facts from the various consulting reports, that is evidence before me. Additionally, the expert Mr. Lesiuk disagreed or commented on certain of these consulting reports such as in the following example. This has the effect of modifying the evidentiary value of the consulting reports regarding the issue of the fretting damage being a high cycle fatigue phenomenon:

Q Now, sir, you said that you looked to the STI report or reports, and I'll ask you please to refer to Exhibit 116.

Sir, you have in front of you STI technical report PA690, dated December, 1991?

A Yes, I do.

Q Is this one of the STI reports you consulted?

A Yes, it is.

Q Would you turn, Mr. Lesiuk, please, to page 47 where the conclusions are listed? I'm interested, sir, in paragraph 2, in particular, which says, and I quote:

   The fretting damage was caused by the start-stop cycles (low cycle fatigue).

Do you agree with the opinion that fretting damage was caused by the start-stop cycles?

A Absolutely not.

Q And why is that, sir?

A Fretting damage, in my opinion, is a high cycle phenomenon, requiring thousands, tens of thousands, hundreds of thousands of cycles in order for the damage to manifest itself.

Q Now, if the bracketed phrase low cycle fatigue were not in there, would you still disagree with the statement that fretting damage was caused by start-stop cycles?

A Yes, I would.

Joseph Lesiuk Transcript page 801, line 27 to Transcript page 802, line 25

98   With respect to the problems that developed in the rotors in the 1970s, the Plaintiff's Plant Manager, John Mulka, described why these problems did not lead them to expect the type of problems they experienced in the intermediate pressure rotors in the 1990s. Mr. Mulka's testimony in this regard is found at Transcript pages 97, line 10 to Transcript page 100, line 11.

Q Now, Mr. Mulka, can you read paragraph 15 of the agreed statement of facts and you will see that paragraph 15 refers to the two small pieces of shrouding that were missing at the 27th stage?

A Yes, it does.

Q Can you describe for the Court what was done about that?

A The pieces of shrouding that were missing were two very small pieces, and they were at the location where one shroud band meets the other, so in this particular instance, nothing was done about that, it was left as found.

Q And did that create any problem with the unit?

A No, it did not.

Q And again, the 27th stage is also in the low pressure rotor?

A Yes, it is.

Q Now, paragraph 15 goes on and indicates that there were indications of erosion and cracking found on several of the low pressure stationary blades; do you see that?

A Yes, I see that.

Q Can you describe for the Court where the stationary blades are located?

A The stationary blades or sometimes they are referred to as diaphragms, are the blades located in-between the rows of moving blades. For example —

Q I'm sorry to interrupt, Mr. Mulka, but perhaps you could refer to Exhibit 10 and show the Court where the blades would be located.

A For example, in the low pressure rotor, the steam enters and then passes in a double flow direction, and the stationary blades are located in-between the moving blades. For example, there is the 25th stage moving blade, 26th stage stationary blade, 26th stage moving blade, 27th stage stationary blade or diaphragm, 27th stage stationary blade or diaphragm, 27th stage moving blade, 28th.

Q In essence what you are describing is the stationary blades located between the rotating blades that are shown on Exhibit 10.

A That is correct.

Q And can you advise the Court about the function of the diaphragm or the stationary blades?

A The function of the diaphragm or stationary blades is to direct the steam from the upstream moving blades to the downstream moving blades so that it enters the downstream moving blades at the correct entry angle.

Q And when you are talking about the shrouding in paragraph 15, you — the shrouding was located on the 27th stage stationary blade?

A That is correct.

Q And that stationary blade is located between which two rotating blades?

A That would be between — that would be between the 26th and 27th.

Q Rotating blades?

A Rotating blades.

Q Now, Mr. Mulka, can you read paragraph 16 of the agreed statement of facts. Now, Mr. Mulka when you had the erosion problems that you discussed in the low pressure rotor in the 1970s, did you expect to find any future problems with respect to either of the intermediate pressure rotors?

A No, we did not.

Q Why is that?

A The steam at the intermediate pressure rotor is at a much different condition than it is at the low pressure rotor at the 28th stage. For example, the steam leaving the intermediate pressure rotor is at 35 psi and 392 degrees Fahrenheit. By the time the steam progresses to the 28th stage, it could be under a partial vacuum or a very small pressure.

Q And were you ever advised by anyone that as a result of the erosion problems at the 28th stage, that you could expect the types of problems that you later experienced in the intermediate pressure rotors in the 1990s?

A No, we weren't.

Q During the 1970s, was there any cracking ever found in either the rotor or the rotating blades of any rotor other than the 28th stage at the low pressure rotor?

A No, there was not.

**S. Issues**

14

99     There are three primary issues to be decided in this lawsuit, although there are numerous sub-issues that must be included in Primary Issue Number 1 and 2.

***Primary Issue Number 1 - The Coverage Issue***

100     Were the damages to the intermediate pressure rotors in the two steam turbines caused by an "Accident" as defined and contemplated by Section III, Boiler and Machinery Coverage, of the Policy?

***Primary Issue Number 2 - The Limitation Issue***

101     Did the Plaintiff commence the action within the appropriate limitation period?

***Primary Issue Number 3 - The Deductible Issue***

102     How many deductibles apply to the Plaintiff's damages?

**T. The Coverage Issue**

103     Section III of the Policy of Insurance, Exhibit 1 in these proceedings, reads as follows:

**A. Coverage**

This Section provides the following coverages for loss from an Accident to an Object designated and described as "Object Covered" in this Policy, occurring during the Policy Term and while the Object is in use or connected ready for use at location(s) specified:

1. payment to the Insured for direct physical loss or damage to property of the Insured ... directly caused by an Accident to an Object.

. . . . .

For purposes of this Section, "Accident" shall mean any sudden and accidental occurrence to the Object, or part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean:

1. depletion, deterioration, corrosion, or erosion of material;

2. wear and tear. ...

104     The Plaintiff submits that it has established that the problems in the intermediate pressure rotors were caused by an "Accident" pursuant to the coverage provided by Section III, Boiler and Machinery Coverages in the Defendant's policy.

105     To succeed in this claim for coverage under the Policy of Insurance the Plaintiff has the burden of proof to make out from the terms of the contract a right to recover. A defendant must likewise make out any defence based upon the agreement. *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), 112 D.L.R. (3d) 49 (S.C.C.).

***Definition of "Accident"***

106     The term "Accident" is defined in the policy as "any sudden and accidental occurrence to the Object...". It is therefore necessary to review each element of this definition to determine whether or not an "Accident" has occurred within the terms of the insurance coverage.

***"Sudden and Accidental Occurrence"***

107     A "sudden and accidental occurrence" to the Object must take place before coverage can be established.

108     The Plaintiff contends that this phrase means "an unexpected and unforeseen event" and that there is no temporal element to the phrase when it is used in the context of Boiler and Machinery policies.

109     The Plaintiff submits that this construction is in line with the usage of the phrase by the Defendant in its three updated versions of the Boiler and Machinery Reference Manuals used by Factory Mutual.

110     The Defendant is part of the Factory Mutual system which is made up of three different insurers:

The Defendant, Protection Mutual Insurance Company;

Arkwright Mutual Insurance Company; and

Allendale Mutual Insurance Company.

Exhibit 171, Read-Ins of the Plaintiff from the Examination for Discovery of John Smith, pages 10-11.

111     Factory Mutual provided engineering, inspection, loss prevention, loss investigation, and loss adjustment services for Protection Mutual. It also performed regular inspections of the Plaintiff's equipment and provided advice in regards to the operation, maintenance and testing procedures to be used by the Plaintiff.

John Mulka Testimony, Transcript page 79, lines 13 to 23;

Transcript page 148, lines 7 to 22;

Exhibit 171, Read-Ins of the Plaintiff from the Examination for Discovery of John Smith, page 12.

The Plaintiff however performed its own scheduled maintenance as it saw fit of which Exhibit 12 is an example.

112     Exhibit 123, a Boiler and Machinery Reference Manual, was provided by Factory Mutual to Edmonton Power.

John Mulka Testimony, Transcript page 105, lines 2 to 9.

113     Factory Mutual prepared an updated Boiler and Machinery Reference Manual in 1984 (Exhibit 115A) and 1988 (Exhibit 115B).

John Smith Testimony, Transcript page 901, lines 3 to 12 to Transcript page 902, lines 8 to 21.

114     The definition of "Accident" in the 1977 and 1984 versions of the Factory Mutual Reference Manuals is:

"Accident" means "...unforeseen, unexpected or unusual occurrence to an insured Object which causes a loss."

The 1988 Manual, which was the Manual in use at the time of this claim by the Plaintiff, provided that:

A sudden and accidental occurrence means something that happens by chance, that is unexpected and unforeseen as distinguished from something that, according to the usual course of things, should have been expected.

Exhibit 115B, p. LOSS-4;

John Smith Testimony, Transcript page 912, lines 5 to 12.

115     It is the Plaintiff's conclusion then that the cracking in the intermediate pressure rotors which constitutes the damage to the Objects herein was occasioned by an "Accident" as the high cycle fatigue that caused the cracks as described by the expert, Joseph Lesiuk, and other witnesses was both unusual and unexpected.

116     To establish this point the Plaintiff relies on a series of facts that, *in my view, have been established by the evidence*:

a. Edmonton Power expected that Unit 1 and Unit 2 Steam Turbines (hereinafter referred to as "the steam turbines"), purchased in the years 1970 and 1973 respectively, would have a life expectancy in excess of 200,000 hours or from 30-50 years of service.

John Mulka Testimony, Transcript page 207, line 11 to Transcript page 208, line 4;

Ron Alexander Testimony, Transcript page 535, line 18 to Transcript page 536, line 6;

Ron Alexander Testimony, Transcript page 596, line 27 to Transcript page 597, line 27.

b. This life expectancy is of the steam turbines and is different from the "creep-rupture strength of the materials" described at page 11, para [37] herein.

c. According to industry standards, the usual life expectancy of steam turbines and their major component parts, which include the rotors in issue here, is in excess of 200,000 hours. The intermediate pressure rotors in Unit 1 and Unit 2 lasted approximately one-half of their life expectancy (Agreed Statement of Facts, paragraphs 39 and 43).

Joseph Lesiuk Testimony, Transcript page 757, lines 1 to 19; Transcript page 761, lines 19 to 26.

Exhibit 168, Substance of Opinion of Joseph Lesiuk, page 3, paragraph 3.

Ron Alexander Testimony, Transcript page 536, lines 1-6; Transcript page 638, lines 8 to 14.

d. The cracking that occurred in the intermediate pressure rotors of Unit 1 and Unit 2 was the result of high cycle fatigue.

Joseph Lesiuk Testimony, Transcript page 734, lines 6 to 17.

Joseph Lesiuk, Exhibit 168 (Substance of Opinion), pages 2 to 3, paragraph C.I.

e. High cycle fatigue occurs very rapidly and can lead to very rapid crack development and crack propagation as stated by the only expert witness in this lawsuit:

It should not happen. The designer of a turbine rotor does everything in his power to avoid high cycle fatigue because of the consequences. It occurs very rapidly.

Joseph Lesiuk Testimony, Transcript page 743, line 19 to Transcript page 744, line 5.

f. The cracking found in the intermediate pressure rotors of the steam turbines was not expected by Edmonton Power.

John Mulka Testimony, Transcript page 208, lines 5 to 8.

Ron Alexander Testimony, Transcript page 565, lines 5 to 27; page 598, lines 22 to 26.

g. The cracking, and the conditions leading to the cracking, are not conditions that are usual or expected in steam turbines.

Joe Lesiuk Testimony, Transcript page 742, line 24 to Transcript page 743, line 27;

Exhibit 168 (Substance of Opinion), page 4, paragraph 4;

Joseph Lesiuk Testimony, Transcript page 747, line 13 to Transcript page 749, line 14;

Joseph Lesiuk Testimony, Transcript page 762, line 9 to Transcript page 763, line 5;

Joseph Lesiuk Testimony, Transcript page 818, lines 10 to 15;

Joseph Lesiuk Testimony, Transcript page 824, lines 10 to 23.

h. The cracking experienced by Edmonton Power at the 25th stage of the two low pressure rotors in the early 1980s did not cause Edmonton Power to expect cracking to occur in any other stages of the steam turbines.

John Mulka Testimony, Transcript page 149, lines 17 to 20.

Ron Alexander Testimony, Transcript page 567, lines 6 to 12.

i. Neither Protection Mutual nor Factory Mutual, who had conducted regular site inspections and completed loss prevention reports since 1977, expected to find cracking in the intermediate pressure rotors.

John Mulka Testimony, Transcript page 148, lines 7 to 12;

Transcript page 149, lines 21 to 24; page 150, lines 3 to 7.

j. Edmonton Power was not advised by any of the Consultants it retained in the 1980s to investigate the cracking at the 25th stage in the low pressure rotors, that it could expect future cracking in the intermediate pressure rotors.

John Mulka Testimony, Transcript page 149, line 25 to Transcript page 150, lines 1 to 2.

Ron Alexander Testimony, Transcript page 565, lines 5 to 10;

Transcript page 567, lines 18 to 22;

Transcript page 598, line 27 to Transcript page 599, line 6.

k. As a result of the cracking at the 25th stage in the low pressure rotors of the steam turbines in the 1980s, Edmonton Power consulted the original equipment manufacturer, Brown Boveri & Company, and was advised that it should not expect such cracking in any other stages.

Ron Alexander Testimony, Transcript page 565, lines 16 to 19;

Transcript page 567, lines 13 to 22;

Transcript page 599, lines 7 to 13.

Exhibit 39, Point 4.

117    The damage in this case as has been stated by the expert, Joseph Lesiuk, was a result of a design fault that the turbine designer in the late 1960s had the necessary tools, industry knowledge and techniques to avoid.

John Mulka Testimony, Transcript page 207, line 11 to Transcript page 208, line 4;

Ron Alexander Testimony, Transcript page 535, line 18 to Transcript page 536, line 6;

Ron Alexander Testimony, Transcript page 596, line 27 to Transcript page 597, line 27;

Exhibit 168, page 3, paragraph 2, "Substance of Opinion" of Joseph S. Lesiuk.

118    *The issue then is how to deal with the fact that the subject matter of this lawsuit — the cracking in the intermediate pressure rotors — was caused by high cycle fatigue that resulted from a design fault, in the context of the Insurance Policy definition of an "Accident".*

**U. The Coverage Issue - Analysis of the Case Authorities**

*Principles of Interpretation in Insurance Contracts - The Consolidated Bathurst Case (1979), 112 D.L.R. (3d) 49 (S.C.C.).*

119     Important legal principles are found in the four to three majority decision of Supreme Court of Canada decision in *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Company* (1979), 112 D.L.R. (3d) 49, [hereinafter referred to as "*Consolidated-Bathurst*"]. The dissenting opinion written by Justice Ritchie disagreed with the majority in the result. However he did not disagree with the majority's view of how to interpret insurance contracts and the *contra proferentum* rule. In this regard Ritchie, J. at page 50 of the Report states:

> I have had the privilege of reading the reasons for judgment prepared for delivery by my brother Estey in this case, but as I reach a different conclusion concerning the risk insured against by the policy in question, I have found it necessary to express my views separately.

and at page 52 of the Report Justice Ritchie in dissent continues:

> It will, however, be seen from what I have said that I do not find it necessary to resort to this rule [referring to the *contra proferentum* rule] in the interpretation of the policy here at issue.

120     In *Consolidated-Bathurst* some oil pipes in a piece of machinery became severely corroded. They corroded to the point where they leaked and oil escaped getting into a stream. There was some other damage to certain heat exchangers. As a result machinery had to be shut down for a period of time while repairs were made and there was a downtime loss.

121     The legal principles found in the *Consolidated-Bathurst* case govern the process of interpreting insurance contracts and the application of the *contra proferentum* rule. The main steps in interpretation as I understand them are:

> (a) Firstly, in a contract for insurance, as in any other contract, effect must be given to the intention of the parties to be gathered from the words they have used.

> (b) If ambiguity exists as to the intention of the parties as is found from the words the parties have used in the contract, the *contra proferentum* doctrine applies. The *contra proferentum* doctrine construes such ambiguity against the insurance carrier as being the author of the insurance contract.

> (c) Even apart from the possible application of the doctrine of *contra proferentum*, the normal rules of construction lead a Court to search for an interpretation which from the whole of the contract would appear to promote or advance the true intent of the parties at the time of entry into the contract, that is, the commercial atmosphere in which the insurance was contracted.

> (d) A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement.

122     The majority decision of the Supreme Court of Canada by Mr. Justice Estey commences at page 53 of the Report. The principles and other important concepts of how to interpret insurance contracts are set out beginning at the last paragraph of page 55. The portions I have underlined are of particular importance to the case at bar:

> At best, one must conclude that the definition of accident, including as it does the reference to corrosion, leaves two clear alternative interpretations open. Firstly, the definition may not include any event relating to corrosion. Secondly, the definition may exclude only the cost of making good the corrosion itself.

> *Insurance contracts and the interpretative difficulties arising therein have been before Courts for at least two centuries, and it is trite to say that where an ambiguity is found to exist in the terminology employed in the contract, such terminology shall be construed against the insurance carrier as being the author, or at least the party in control of the contents of the contract. This is, of course, not entirely true because of statutory modifications to the contract,* [underlining mine] but we

are not here concerned with any such mandated provisions. Meredith, J.A., put the proposition in *Pense v. Northern Life Assurance Co.* (1907), 15 O.L.R. 131 (Ont. C.A.) at p 137:

> There is no just reason for applying any different rule of construction to a contract of insurance from that of a contract of any other kind; and there can be no sort of excuse for casting a doubt upon the meaning of such a contract with a view to solving it against the insurer, however much the claim against him may play upon the chords of sympathy, or touch a natural bias. In such a contract, just as in all other contracts, effect must be given to the intention of the parties, to be gathered from the words they have used. A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement. The onus of proof, if I may use such a term in reference to the interpretation of a writing, is, upon each party respectively, precisely the same [underlining mine]. We are all, doubtless, insured, and none insurers, and so, doubtless, all more or less affected by the natural bias arising from such a position; and so ought to beware lest that bias be not counteracted by a full apprehension of its existence.

(Adopted in this Court in *Pense v. Northern Life Ass'ce Co.* (1908), 42 S.C.R. 246.) *Such a proposition may be referred to as step one in the interpretative process. Step two is the application, when ambiguity is found, of the contra proferentum doctrine.* This doctrine finds much expression in our law, and one example which may be referred to is found in Cheshire and Fifoot's *Law of Contract*, 9th ed. (1976), at pp. 152-3:

> If there is any doubt as to the meaning and scope of the excluding or limiting term, the ambiguity will be resolved against the party who has inserted it and who is now relying on it. As he seeks to protect himself against liability to which he would otherwise be subject, it is for him to prove that his words clearly and aptly describe the contingency that has in fact arisen. [underlining mine]

This Court applied the doctrine in *Indemnity Ins. Co. v. Excel Cleaning Service,* [1954] 2 D.L.R. 721 at p.730, [1954] S.C.R. 169 at pp. 179-80, [1951-55] I.L.R. 90, where it was stated:

> It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already described and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain ... Furthermore, the language of Lord Greene M.R. in *Woolfall & Rimmer Ltd. v. Moyle,* [1942] 1 K.B. 66 at p. 73 is appropriate. He there states: "*I cannot help thinking that, if underwriters wish to limit by some qualification a risk which, prima facie, they are undertaking in plain terms, they should make it perfectly clear what that qualification is.*" [underlining mine]

*As has already been stated, this is, of course, the second phase of interpretation of such a contract.* Cartwright, J., as he then was, stated in *Stevenson v. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. v. Canadian General Ins. Co.* (1956), 5 D.L.R. (2d) 673 at p. 686, [1956] S.C.R. 936 at p. 953, [1956-60] I.L.R. 127:

> The rule expressed in the maxim, verba fortius accipiuntur contra proferentem, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document. [underlining mine]

Lindley, L.J., put it this way:

> In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty. [underlining mine]

*Cornish v. Accident Ins. Co.* (1889), 23 Q.B. 453 (C.A.) at p. 456.

*Even apart from the doctrine of contra proferentem as it may be applied in the construction of contracts, the normal rules of construction lead a Court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract.* Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. *Said another way, the Courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract.* [underlining mine]

123    With these important legal principles of insurance contract interpretation in mind, I now propose to review some Canadian authorities with respect to the issue of what is meant by the term "sudden and accidental" in the context of boiler and machinery insurance policies.

**V. Canadian Case Authorities Regarding the Term "Sudden and Accidental Occurrence"**

***Trane Sales & Service H.C.B.C., A Division of M.E. Pritchard & Associates Ltd. v. Integrated Building Corporation (1987), 26 C.C.L.I. 36 [B.C.S.C.]***

124    In *Trane Sales & Service Agency, Division of M.E. Pritchard & Associates Ltd. v. Integrated Bldg. Corp.* (1987), 26 C.C.L.I. 36 (B.C. S.C.) [hereinafter referred to as "Trane Sales"] the British Columbia Supreme Court held that the term "sudden and accidental" means "unexpected and unforeseen".

125    Mr. Justice Taylor of the British Columbia Supreme Court in this case was dealing with a plaintiff, an air conditioning maintenance firm, which had sued the defendant for $49,436.00 as the cost of replacing a defective chiller motor in the defendant's downtown Vancouver office building. The defendant claimed over for indemnity under a "boiler and machinery" policy covering the chiller issued by the third party insurer. Justice Taylor cites the issue at page 37 of the Report:

The question on which the outcome of the litigation turns is whether the failure amounted to an "accident" within the meaning of the insurance policy. The policy defines "accident" as "a sudden and accidental breakdown of the object" that is to say the chiller) "or part thereof" (hear the rotor in the chiller motor, where failure occurred) "which manifests itself at the time of its occurrence by physical damage to the object that necessitates repair or replacement of the object or a part thereof". The policy goes on to exempt from this definition "depletion, deterioration, corrosion, or erosion of materials".

Thus to be within the definition of "accident", the failure in this case must be shown to amount to a "breakdown" of the chiller or of its component rotor which was "sudden and accidental" and which was not caused by "deterioration". These are the three matters in issue.

. . . . .

126    He ascertains the cause of the problem at the bottom of page 38 to page 39:

If it were necessary for me to decide whether the cause lay in an *inherent defect in the pouring of the aluminium or in some unusual operating condition affecting the electrical current.* (Underlining mine) I would be unable, on the evidence before me, to decide that question, that is to say on the balance of probabilities. The tests which would have answered it were never undertaken. But I do not believe it really matters which of these possible causes was at the root of the problem.

127    At page 40 he defines "sudden" in terms of his facts:

I think the word "sudden" should be taken in the present context to mean "unexpected" and "unforeseen": *Cyclops Corp. v. Home Insurance Corp.*, 352 F. Supp. 931 (U.S. Dist. Ct. W.D. Pennsylvania, 1973), and the definitions there referred to. The owner had no reason to expect or to foresee that the rotor might become damaged in this way, and had no opportunity to forestall such damage by inspection or periodic maintenance. The fact that the machine was operated after the first trip-out had indicated that damage had occurred does not, in my view, render the damage any less "sudden" in the sense which I believe should be given to the word in the context of this policy.

128    Justice Taylor concludes at the bottom of page 40:

I conclude that the word "deterioration", as here used, having particular regard to the nature of the coverage and to other words of the phrase in question, should be taken to refer to the gradual, and perhaps imperceptible, process of deterioration which would be expected to occur under normal circumstances. *It does not, in my view, extend to deterioration brought about in abnormal circumstances, such as led to the melting of these aluminum bars and the resulting fracture or discontinuity occurring between these bars and the rotor ends*. (Underlining mine)

It follows that the loss in question falls both within the definition of "accident" contained in the policy and outside the "deterioration" exception.

### *Park Plaza Cleaners Ltd. v. Saskatchewan Government Insurance, [1983] I.L.R. 1-1598 (Sask. Q.B.)*

129    In *Park Plaza Cleaners Ltd. v. Saskatchewan Government Insurance*, [1983] I.L.R. 1-1598 (Sask. Q.B.) [hereinafter referred to as "Park Plaza"] a leak in a boiler resulted in a claim under a boiler insurance policy for accidental boiler breakdown. The policy covered damage to leaks caused by accident. Accident was defined as a "sudden and accidental breakdown not including deterioration, corrosion, or wear and tear".

130    At page 6159 of the decision Justice Scheibel states in the first full paragraph:

If the pipes were defective when installed, and this defect caused the leak, such defect would not constitute an accident within the meaning of the policy, because this would not be a sudden accidental breakdown.

131    The law expressed by Mr. Justice Scheibel in the *Park Plaza* case would certainly lead one reasonably to the conclusion that a design defect could not be considered a sudden and accidental breakdown.

132    There is the factual difference between the *Park Plaza* case and the case before me in that I am dealing with an "occurrence" as opposed to a "breakdown" situation that existed in *Park Plaza*. This is essentially a minor difference that I note only as a matter of record. Although it has been argued in this case, it is my view that generally speaking there is practically little difference between the "breakdown" situation definition and the "occurrence" definition as it relates to the case at bar.

133    The *Park Plaza* case was dealing with a relatively minor $2,218.00 loss claim. Further while it was decided after the Saskatchewan Court of Appeal decision in *Regina Cold Storage Ltd. v. Gerling Global General Insurance Co.* which I will discuss next, that Court of Appeal decision in *Regina Cold Storage Ltd.*, *infra*, is not cited in the *Park Plaza* case. Similarly I have placed great reliance on the Supreme Court of Canada decision in *Consolidated-Bathurst*, *supra*, and I have already discussed the *Trane Sales* case, *supra*. *Consolidated-Bathurst*, *supra*, is not mentioned in the *Park Plaza* decision and the *Trane Sales* case, *supra*, had not yet been decided at the time of the *Park Plaza* case.

134    Therefore, the *Park Plaza* case has, with respect, in my opinion, limited persuasive value in the circumstances that I am dealing with presently.

### *Regina Cold Storage Ltd. v. Gerling Global General Insurance Co.* (1980), 102 D.L.R. (3d) 97 *(Sask. C.A.)*

135     In *Regina Cold Storage Ltd. v. Gerling Global General Insurance Co.* ((1980), 102 D.L.R. (3d) 97 (Sask. C.A.) the Saskatchewan Court of Appeal held that the term "accident" meant an "unlooked for mishap or occurrence which was neither expected nor designed" adopting these words from Halsbury's. The Court of Appeal continued:

> In the circumstances prevailing in this case the sudden and accidental breakdown of equipment, which was manifested at the time by physical damage thereto which necessitated repairs and replacement, resulted from an unlooked for mishap or untoward event which was neither expected nor designed. That being so, the appellant was liable under the terms of the policy of insurance for damage sustained.

**B.P. Canada v. Comco Service Station Construction & Maintenance Ltd. (1990), 73 O.R. (2d) 317 (H.C.)**

136     In the context of Canadian *environmental cases* the case of *B.P. Canada v. Comco Service Station Construction & Maintenance Ltd.* (1990), 73 O.R. (2d) 317 (H.C.) [hereinafter referred to as "B.P. Canada"] a decision of Mr. Justice Sutherland of the Ontario High Court of Justice provides some interesting passages.

137     The Jowetts sold gasoline through a B.P. retail gasoline outlet located on their property. As a result of an underground fuel leak, the soil and ground water table of the Jowetts' property and neighbouring properties were contaminated. B.P. cleaned up and sued the Jowetts in tort and contract for damages for the cost of containment and removal of the contaminated soil.

138     The Jowetts were insured under two policies. One was a composite Mercantile policy containing coverage for "premises liability" including property damage liability. The other was a business policy which included a "Garage Liability Coverage Rider" including coverage for property damage liability. Both insurers refused to defend the claim made against the Jowetts on the basis of various exclusionary clauses in their respective policies. The business policy contained an "environmental exclusion" endorsement which provided that the policy did not apply to property damage arising out of the discharger escape of contaminants or pollutants into or upon land. The exclusion did not apply if such discharge or escape was "sudden and accidental".

139     At pages 324 through to 326 of the Report Mr. Justice Sutherland gives a thorough analysis of the American Courts' interpretation of the meaning of the "sudden and accidental exception". He comes to the conclusion that American decisions on environmental exclusions show a growing consensus that "sudden" does not mean "unexpected and unintended". Based on the Canadian precedents, Justice Sutherland eventually in fact adopts the proposition that "sudden and accidental" in the context of an exception to the environmental exclusion in the insurance policy includes a temporal element. In the context of the *B.P. Canada* case the environmental exclusion is clearly not to be extended to include unintended consequences that are not "sudden". The effect then of this decision is to provide coverage.

140     Of particular importance in this case is the distinction drawn between cases that do not involve an environmental exclusion clause but rather a clause defining the term "accident" as a sudden and "accidental breakdown" which analysis takes place at the bottom of page 327 of the Report.

141     At page 328 of the Report, paragraph (a), Justice Sutherland distinguishes between the "sudden and accidental" *exception* and whether the *breakdown* was "sudden and accidental" so as to fall within the definition of "accident" stating that these clauses in question are "different in their purpose as well as semantically ...".

142     This case may well represent an analysis of the "commercial atmosphere in which the insurance was contracted" and the "intention of the parties at that time" as described in detail in the *Consolidated-Bathurst*, *supra*, case I discussed earlier.

143     In coming to this conclusion Justice Sutherland analyzed the authorities including the *Trane Sales* case, *supra*, which I have discussed previously. With respect to the breakdown definition, he found that as it related to breakdowns "sudden and accidental" means "unexpected and unforeseen".

144    It should however be noted that at page 328 of the Report paragraph (g) in the context of the "sudden and accidental" exception in environmental cases Mr. Justice Sutherland quite properly criticizes cases that convert the word "sudden" into nothing more than a synonym for "accidental" stating that:

This is, of course, contrary to the usual approach of rejecting constructions which result in surplusage: *Borland v. Mutterspach* (1985), 23 D.L.R. (4th) 664.

145     *Notwithstanding this quite correct criticism, in my view, the Canadian cases in the context of boiler and machinery policies tend to confirm that the phrase "sudden and accidental" means "unexpected and unforeseen event" incorporating no temporal element to this phrase*.

### W. Limitations and Cautions Regarding the Citation of American Case Authorities

146    Both parties herein have quoted a number of American decisions and American authorities to support their view in the Coverage Issue. Prior to reviewing these various American authorities it is, in my opinion, important to review the circumstances in which the American authorities should influence a Canadian court.

147    In the case before me no expert evidence was called with respect to the American *jurisprudence* being cited. This poses certain problems in that the hieratical relationship of the American courts represented in the decisions being cited to me is not known fully. Also, the local or national statute law is not fully known or fully appreciated by the Court.

148    Furthermore, non-Canadian authorities, particularly unreported decisions such as the *Arkwright* decision, *infra*, are more difficult to note up. Therefore this makes their precedential value somewhat more tenuous than with Canadian authorities.

149     *Having said the above however, there is clearly a long Canadian jurisprudential tradition of accepting American authorities in the field of Insurance law. Illustrations of this tradition can be found in the following decisions*:

150    (a) My sister Madam Justice Veit's decision in *Federal Business Development Bank v. Continental Insurance Co.* (1991), 116 A.R. 26 (Q.B.) at p. 30 states:

[20] I accept as persuasive the plaintiff's reliance on American jurisprudence as to the interpretation of the union mortgage endorsement.

[21] First, there is a long Canadian jurisprudential tradition of accepting American authorities in this specific area of law. This makes general economic sense since the economies are both similar and interrelated.

[22] Second, this makes particular sense with respect to airplane insurance. The geography of our country makes northern development in particular reliant on aircraft. These aircraft have to be financed. If the financer has to struggle to design special or unique coverage or has to accept less favourable treatment than American financers, there must surely be a risk that there will be fewer financers willing to accept risks associated with financing airplanes in Canada or that they will allocate fewer resources to that risk. It is in this way that the underlying principles of commercial reality referred to in *Co-operators* arise in this case.

[23] Third, there is no Canadian public policy argument which would prevent the adoption of the American experience in Canada. On the contrary, the Canadian insurance industry now accepts the American practice with respect to the status to mortgagees.

[24] It is true, of course, as the defendant states, that the Canadian mortgagee is able to procure an entirely separate policy to ensure its own interest in an aircraft. Nevertheless, there can be no question that the requirements of obtaining separate coverage are likely to be both more immediately expensive (note that there was no additional cost for the particular endorsement in this case) and more expensive to devise in a situation where the existing union mortgage endorsement can provide an adequate framework.

[25] In summary on this issue, the American position, as viewed through the prism of Canadian jurisprudence makes legal, economic and policy sense and should be adopted here.

(b) In the Ontario High Court of Justice decision of Mr. Justice Cory, as he then was, in *Partners Investments Ltd. v. Etobicoke (City)* (1981), 124 D.L.R. (3d) 125 at p. 126 he states:

> The insurer carries on business in the United States of American as well as Canada. The same all-risk policy with precisely the same exclusion clauses has been interpreted by American Courts. It might then be assumed that the insurer, and perhaps also the insured, would expect the policy to be interpreted in a similar manner in Canada as in the United States. It would be in the best interests of both the insurer and its clients in the business community if the interpretation of the policy was the same on both sides of the border. With this in mind, it might be helpful if I indicated what I take to be the position set forth by the American cases and then determine whether the reasoning in those cases is contrary to Canadian authorities that are binding upon me.

### American Case Law With Respect to the Coverage Issue

151    In this regard, the Plaintiff submits that the Courts have made it clear that the Plaintiff need not prove the reason for the problem occurring to come within the insurance coverage. The Plaintiff contends that it is sufficient that the problem occurred in circumstances where it was "unusual or unexpected". The Plaintiff believes that it is not necessary that the cause of the problem be identified.

### United States v. Arkwright-Boston Manufacturers Mutual Insurance Co., C-76-155 (U.S. Dist. Ct., Wash. 1982)

152    In this regard, the Plaintiff, amongst other things, urges that I follow a case that does have some similarities: *United States v. Arkwright-Boston Manufacturers Mutual Insurance Co.*, C-76-155 (U.S. Dist. Ct., Wash. 1982) [hereinafter referred to as "Arkwright"].

153    The Plaintiff analyzes the *Arkwright* case as follows:

a) Both cases involve claims against insurers in the Factory Mutual System. Arkwright Mutual Insurance Company and Protection Mutual Insurance Company, together with Allendale Mutual Insurance Company, form the Factory Mutual System.

b) The relevant policy wording in the two cases is identical.

c) Both policies utilize the "Occurrence" definition of Accident. As stated in *Arkwright* "it eliminates the requirement that damage manifest itself at the time it happens so that it clearly covers damage discovered upon inspection."

   *Arkwright*, page 7, lines 5 to 11;

   Exhibit 115 (b), page UND-2 and MKTG-6.

f) In both cases, the damage was completely unforseen and unexpected by the Plaintiffs, the insurers, and the original equipment manufacturers.

   *Arkwright*, page 10, lines 18 to 21;

g) High cycle fatigue resulted in the cracking to the rotors in both cases. The high cycle fatigue and cracking are unexpected and abnormal in turbine operation.

   *Arkwright*, page 10, lines 22-24;

   *Arkwright*, page 17, paragraph 5;

h) For a significant period of time prior to the discovery of the damages (in *Arkwright* four years, and in the case at bar approximately fourteen years), the insurers rendered reports to the Plaintiffs based upon their inspections praising the high quality of maintenance and operation of the turbines.

*Arkwright*, page 11, line 28 to page 12, line 5;

Exhibit 171, Read-ins of the Plaintiff from the Examinations for Discovery of Pat McCloskey, page 43.

Loss Prevention Reports (Exhibit 54 for example).

i) The Defendants did not deny liability under the policy until sometime after the cracking was discovered. In *Arkwright* the denial was six months later and in the case at bar, the denial was approximately one year later.

*Arkwright*, page 12, lines 16 to 17;

Exhibit 97.

7. The following are some of the conclusions of law found by the Court in *Arkwright*:

a) "Under the terms of the accident definition of the ... policy, plaintiff need only establish that there was a sudden and accidental occurrence to an object which results in damage necessitating repair. There is no requirement that *the cause of the occurrence be identified*. By comparing this accident definition with the less expensive alternative definition offered by the defendants, it is clear that this accident definition does not require that the damage manifest itself at the time of its occurrence. Therefore, this policy covers an occurrence which results in damage even though the damage is not discovered until a routine inspection. Finally, *the word "sudden" as used in this accident definition does not connote an instantaneous event, but rather restricts the occurrences covered to those which are unforeseen*." (Underlining added)

*Arkwright*, page 16, paragraph 4, lines 19 to 29.

b) "Based on the expert testimony regarding turbine design and the performance history of similar turbine buckets, the occurrence of the high-cycle fatigue process was *unforseen and unexpected*. ... Accordingly, it constituted a sudden and accidental occurrence within the meaning of the policy, and resulted in damage necessitating repair. ..." (Underlining added)

*Arkwright*, page 17, paragraph 5, lines 4 to 9.

154     The Plaintiff submits that the *Arkwright* decision is a unique authority for the proposition that the Plaintiff need not prove the reason for the problem occurring to come within insurance coverage as long as it is proven that the problem occurred in circumstances where it was unusual or unexpected. The *Arkwright* case also finds, in the Plaintiff's view, that as long as the high cycle fatigue process was unforseen and unexpected it constituted a sudden and accidental occurrence within the meaning of the policy.

155     It should be noted, however, that the Trial Court decision in the *Arkwright* case went to appeal before the United States Court of Appeals for the Ninth Circuit.

156     By Memorandum filed the 24th of October, 1983, the appeal from the decision of the Honourable Judge Quackenbush District Judge who decided the *Arkwright* case at trial in the United States District Court for the Eastern District of Washington was affirmed on appeal.

157     The Appeal Court however added:

The panel has concluded that the issues presented by this appeal do not meet the standards set by Rule 21, of the Rules of this Court for disposition by written opinion. Accordingly, it is ordered that disposition be by memorandum, foregoing publication in the *Federal Reporter*, and that this memorandum may not be cited to or by the courts of this circuit save as provided in Rule 21 (c).

Rule 21(c) provides:

Dispositions that do not meet the criteria of (b), above, shall not be published. A disposition that is not for publication *shall not be regarded as precedent and shall not be cited to or by this Court or any district court of the Ninth Circuit, either in briefs, oral argument, opinions, memoranda, or orders*, except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.

158    The point that should, therefore, in my view, be taken from these quoted cautions herein, is that the Court of Appeal's decision should not be regarded as a precedent or be cited.

159    It should be noted regarding this point that while Rule 21(c) referred to above does not apply to the trial decision of Judge Quackenbush, the trial decision was by Memorandum Opinion. As pointed out in Corpus Juris Secundum (the "Halsbury's" of the United States) Volume 21, Section 165 at page 201 unpublished Memorandum Opinion have lesser precedent value:

Unpublished decisions or opinions have no precedential value other than their persuasiveness and generally should not be cited: a summary disposition by the United States Supreme Court has appropriate precedential value, but which is considerably less than an opinion on the merits.

160    However, for the reasons I have already stated, the *Arkwright* decision and other American decisions have precedential value if they are factually somewhat on point and primarily because they involve insurance claims involving similarly worded insurance policies in the field of boiler and machinery insurance.

161    Having stated this however and being aware of the limitations of American authorities, the doctrine of *stare decisis* should be reiterated. The hierarchy of precedential authority means that I am bound only by the ratio of any decisions of the Alberta Court of Appeal and the Supreme Court of Canada. Decisions of The Judicial Committee of the Privy Council, the House of Lords and the Appellate Courts of the other eight Common Law Canadian Provinces tend to be strongly persuasive. Decisions of foreign courts with similar legal traditions may be of some persuasive value depending on their circumstances.

162    Additionally, the Defendant has identified correctly a number of factual distinctions between the *Arkwright* case and the case at bar exist which include:

1. An event was identified in *Arkwright*: either torsional oscillation, resulting from electrical system disturbances; or water induction, resulting from equipment malfunction. No such event or occurrence has been alleged or established in this case.

2. In *Arkwright* because of the cracks, "The turbine could not have been operated in this condition without posing a serious danger of catastrophic damage to persons and property." (p. 9) In this case the turbines were in fact operated for in excess of one year after cracks were identified. No catastrophic damage (or accident) occurred. Lesiuk said the danger was of other cracks developing at the blade root fillet, a location remote from the nose and side grips where cracks were found. To this day there is no evidence at all of any crack initiation at the blade root fillet.

3. Cracks were discovered in *Arkwright* after 8 years and 29,000 hours of service. In this case both unit 1 and unit 2 had operated more than 20 years and more than 100,000 actual hours.

4. The turbine unit in the *Arkwright* case consisted of a high power or high pressure section physically located between two low pressure sections whereas in the case before me we have a high, a low and intermediate pressure section with the intermediate pressure section being at issue. In the *Arkwright* case there was no intermediate pressure section in the steam-turbine.

5. The wheels in the *Arkwright* case are shrunk, fit and keyed onto the shaft of the rotor whereas in our case the wheels are forged as part of the rotor.

6. In the *Arkwright* case each group of buckets is held together by a one-half inch solid steel tie wire which is welded to and becomes an integral part of each bucket in the group. In our particular case we do not have tie wires.

7. The turbines in question in the *Arkwright* case were found in nuclear power plants whereas in our case our turbines are natural gas fired.

8. In the *Arkwright* case the two turbines are fed from the same steam supply whereas in our case turbine Unit 1 and turbine Unit 2 each have a separate boiler.

9. Another difference between the machines in the *Arkwright* case and our case is how the buckets are attached to the wheels. In *Arkwright* the buckets are attached to the wheels in the L-1 stages of the low pressure hoods by means of a dove tail assembly. The dove tails are a series of series of fingers in the wheels and in the rotor section of the bucket which when fitted together mate very closely. The dove tail fingers in the root section of the bucket are referred to as tangs. There are five tangs on each of the buckets. After the tangs are fitted into place on the wheel they are anchored by three stainless steel pins which are driven through accommodating holes in the dove tails to form a secure assembly. In the *Arkwright* case at page 12 of the Memorandum, Judge Quackenbush stated:

> The evidence also show that thousands of buckets which were identical in every significant aspect to these L-I buckets have been installed in other turbines and none have encountered any fatigue problems.

163    In this particular case the T-root with the side grip blade configurations were something that the expert Mr. Lesiuk had never seen before and there is no evidence that the identical buckets had ever been used successfully. This particular blade root configuration had, based on the evidence, only been used in the two units before me and at a power plant in Vouvry, France, and the experience there is similar to the experience here.

164    Some of these factual distinctions are of particular note such as factual distinctions number 1, 2, 3 and 9 in relationship to the Coverage Issue. Factual distinction number 8 has importance with respect to the Deductible Coverage Issue.

165    However, these real factual distinctions, as with all significant factual distinctions between cases cited and the case at bar, are subject to this restriction. Primarily what we are dealing with in the Coverage Issue herein is a Boiler and Machinery Policy of Insurance and its relationship to the facts in this case. The question is whether or not the facts herein bring the Plaintiff within the coverage provided by the Policy of Insurance so as to make the insurer liable for a quantified amount of damages. In this regard, careful attention must be had to cases dealing with boiler and machinery insurance policies particularly those that use wording similar to the wording in our present Boiler and Machinery Policy.

166    It must be remembered that no case amongst the myriad of cases that have been cited by both parties will have a fact situation exactly like or even close to being exactly similar to the fact situation in the present case at bar. Therefore, with respect, long lists of factual distinctions between cases while sometimes of some importance and even of critical importance in specific instances, rarely generally are crucial in my mind in this case. This is because the overall purpose of the cases cited is to incorporate principles of law arising out of similarly worded boiler and machine insurance coverage and to apply those principles of law to the facts of *this* particular case. The legal principles gleaned from the cases are the precedents. The facts *per se* in those cases are not the precedents, although they affect the persuasive value of the case. It is those legal principles that are then applied to the facts found on the evidence in the case before me.

***Anderson v. Lumbermen's Mutual Casualty Co., 33 P.2d 938 (U.S. Wash. S.C. 1959)***

167    In *Anderson v. Lumbermen's Mutual Casualty Co.*, 33 P.2d 938 (U.S. Wash. S.C. 1959) the Supreme Court of Washington held that "sudden and accidental" means "unforeseen and unexpected" and specifically rejected the suggestion that the word "sudden" in that context should mean "instantaneous" at page 941 of the Report, paragraph 4.

*Cyclops Corp. v. Home Insurance Corp., 352 F. Supp. 931 (U.S. Dist. Ct. W.D. Penn. 1973)*

168    In *Cyclops Corp. v. Home Insurance Corp.*, 352 F. Supp. 931 (U.S. Dist. Ct. W.D. Penn. 1973), the Pennsylvania United States District Court held that it meant an "unexpected and unforeseen" event at page 935 of the Report.

*Metropolitan Waste Control Commission v. Protection Mutual Insurance Co., F.C.C. 1333 (U.S. Minn. D.C. 1990)*

169    In *Metropolitan Waste Control Commission v. Protection Mutual Insurance Co.*, F.C.C. 1333 (U.S. Minn. D.C. 1990) [hereinafter referred to as the "Metropolitan Waste" case], the Plaintiff operated a water treatment plant in St. Paul, Minnesota. Protection Mutual issued a policy of insurance covering objects at the water treatment plant against accidents as defined in the policy:

> Accident shall mean any sudden and accidental occurrence to the Object, or part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion or erosion of material, (b) wear and tear ....

170    This is the same definition as exists in the Insurance Policy in issue herein.

171    As part of the treatment process, sludge was incinerated. Fans were used to create a draft to draw exhaust gases from the incinerator through a scrubber where pollutants were removed. The exhaust gases mixed with water in the scrubber. That resulted in the formation of two acids.

172    Due to the presence of the acids, the fans and the associated duct work were constantly exposed to a corrosive atmosphere. They were for that reason fabricated of stainless steel initially selected because it was believed by Metropolitan Waste Control to be the most corrosion-resistant and economically available material.

173    Within three years of installation of the fans, surface corrosion had visibly attacked sections of the duct work, the fan rotor and fan housing. The Commission made ongoing repairs and began testing other materials for use in the fans.

174    The Court found that the corrosion process was ongoing over a long period of time and resulted in the gradual deterioration of the integrity of the material which, if not caught in time, could lead to the violent and sudden self-destruction of the material. One of the fans in fact self-destructed, damaging itself and the surrounding duct work.

175    After that event, three other fans were shut down and inspected. Stress corrosion was discovered. The Court found that the shutdown and repair of the three other fans was a reasonable and necessary safety precaution in view of the stress corrosion which was found and which had manifested itself in the form of cracking.

176    The Plaintiff made a claim against Protection Mutual for the cost of replacing the fan which self-destructed and for repairing and/or replacing the other three fans. Protection Mutual paid for the repairs to the fan which self-destructed but denied liability for the other fans.

177    The Court made the following findings:

> 1. The condition of the three remaining fans was not the result of a sudden and accidental occurrence. The fans deteriorated through wear and tear as the result of operating in a corrosive environment. The corrosion began when the fans were installed and continued through their shutdown for inspection following the failure of the one fan. Thus, there was no identifiable event or occurrence which caused the condition of the fans. [Page 1335 of the Report, Left-Hand Column]

> 2. The fans were subjected to an aging process and simply were near the end of their useful life. The fact that the insured did not specifically expect or anticipate stress corrosion or an accelerated aging process did not render the condition of the fans a sudden and accidental occurrence.

3. The basic issue before the court was whether the stress corrosion and pitting corrosion in the rotors of the fans constituted a sudden and accidental occurrence. The court looked to the dictionary definitions of "sudden" (happening or coming unexpectedly; happening without previous notice or with very brief notice, coming or occurring unexpectedly, unforeseen, unprepared for) and "accidental" (occurring by chance or unexpectedly; happening by chance or unexpectedly, taking place not according to the usual course of things, casual and fortuitous).

4. The court said that language, together with the exceptions to the word "accident" as defined in the policy (depletion, deterioration, corrosion or erosion of materials and wear and tear) required judgment in favour of Protection Mutual. The court said "there is no evidence in this case that suggests that there was some sudden, unexpected occurrence that took place with respect to those three fans."

5. The plaintiff relied on evidence that its employees were not specifically aware that stress corrosion had affected the strength of the fans and urged that its lack of knowledge about the impact of stress corrosion should render the condition of the fans "sudden and accidental". The court said "it may be that the plaintiff was suddenly and accidentally educated but it is the fans which are the insured object under the policy not the plaintiff's degree of knowledge or experience." [Page 1337 of the Report, Left-Hand Column]

6. The fact that the fans were shut down and could not be operated safely did not suggest that any accident occurred. A determination that the condition of the metal as it existed in the fans prevented their safe operation is not a sudden and accidental occurrence. [Page 1336 of the Report, Left-Hand Column]

7. The court recognized that an insurer is not liable for an existing condition even though the condition would in all probability lead to an accident at some future time. [Page 1336 of the Report, Right-Hand Column]

8. The component simply deteriorated through wear and tear in the corrosive operating environment. Thus there was no identifiable event which caused the condition of the three remaining fans. [Page 1337 of the Report, Left-Hand Column]

178    The facts of the *Metropolitan Waste* case establish that the insured in that case was aware of the corrosion and the corrosive atmosphere that the machine was operating in. What they did not appear to be aware of was that the corrosion would do as much damage as it finally did. This situation led to the comment by the Court quoted earlier in paragraph number 5 above concerning the degree of the Plaintiff's knowledge or experience and the Plaintiff becoming "suddenly and accidentally" educated.

179    An important difference between the *Metropolitan Waste* case and the case at bar is that the high cycle fatigue and cracking herein was an abnormal, rapidly occurring event which the City of Edmonton Power Plant employees did not or could not expect. Unlike the fans in the *Metropolitan Waste* case which were simply "near the end of their useful life", the evidence in the case before me is different, in that the steam turbine rotors in question had only approximately reached half of their normal life expectancy.

180    The *Metropolitan Waste* case is distinguishable in that the facts taken as a whole were held to fall within the defined exception of "corrosion" found in the policy as a matter of law. In the case at bar "corrosion", and the other named policy exceptions, are not applicable policy exceptions on the facts.

181    The Court in the *Metropolitan Waste* case, in examining the "intention of the parties" found at page 1337 of the Report, Left-Hand Column:

The *intent not to ensure* (emphasis mine) the gradual deterioration of an object is also evidenced by the inclusion within the definition of an accident of the phrase "but accident shall not mean (a) depletion, deterioration, corrosion or erosion of material (b) wear and tear." While some courts have held that this language does not exclude a sudden and accidental occurrence which is caused by corrosion. *Cyclops Corp. v. Home Insurance Co.*, *supra*, ... Other courts have interpreted this language to exclude "sudden and accidental occurrences" caused by corrosion.

182     On the facts of the case at bar, the "intention of the parties" test will yield a different result from that of the *Metropolitan Waste* case.

**Central Louisiana Electric Co. v. Westinghouse Electric Corp., 579 S.O. 2d 981 (U.S. L.A.S.C. 1991)**

183     In *Central Louisiana Electric Co. v. Westinghouse Electric Corp.*, 579 S.O. 2d 981 (U.S. L.A.S.C. 1991) [hereinafter referred to as "CLECO"], at page 986 to 987.

    7. It would be nonsensical to conclude the stress to which the metal blades were subjected was a "sudden and accidental occurrence". Stress is an existing force within the blade material which is present from the moment the blades are manufactured.

184     In *CLECO* the Court drew a distinction between an "accident" and an "accident waiting to happen".

185     In the *CLECO* case, it was agreed between the plaintiff and the defendant that corrosion and corrosion pitting caused the cracks that were found in that particular machine. Under those circumstances the case then determined whether or not there had been an "accident".

186     The passage quoted from paragraph (7) above was in fact the final step in the analysis of the Court. Furthermore, the Report at page 986 indicates that as of 1978, *CLECO* was:

    *... aware of the corrosive influences of the various materials used in generating steam and had been warned by Westinghouse that all L-1 blade tips, due to a specific problem with blade design, were subject to the generic tenon cracking problem. Consequently, because corrosion pitting forms gradually and was a predictable and known event associated with this particular blade configuration, it cannot be considered a "sudden and accidental" occurrence. Moreover, corrosion pitting is simply one of many forms of corrosion. Because "corrosion" is expressly excluded from the definition of "accident", corrosion pitting would likewise be excluded.* [underlining mine]

187     In the case at bar, the employees of the Plaintiff did not expect the problems to occur. The evidence of the expert, Mr. Lesiuk, supports this view.

188     The numerous inspection reports by Factory Mutual of the steam turbines in question were not relied upon by the Plaintiff's employees in terms of their maintenance schedule. However, it is also noted that during the period the insurance was in effect, approximately 14 years, the Defendant's inspection arm, Factory Mutual, was conducting regular inspections and also did not detect the problems. Mr. John Mulka, the Plaintiff's Plant Manager, described these inspections and the resulting Loss Prevention Reports at Transcript page 100, line 12 to Transcript page 104, line 18.

189     *Notwithstanding some factual differences then, the American cases in the context of boiler and machinery policies tend to confirm that the phrase "sudden and accidental" means an "unexpected and unforeseen event", without a temporal element.*

**X. Wear and Tear - Policy Exception**

190     In the Insurance Policy herein, "Accident" shall not mean "depletion, deterioration, corrosion or erosion of materials or wear and tear". It appears that "wear and tear" is the primary exception that the Defendant has sought to rely on amongst this group of exceptions listed in the Policy.

191     The Defendant submits that "fretting" is a wear phenomenon as defined in the *Metals Handbook* which is Exhibit D141. "Fretting" is described at page 5 of Exhibit D141.

192     We know from the written expert's opinion, Exhibit 168 of Mr. Lesiuk, that "the probable cause of the failure is in the rotors is high cycle fatigue crack initiation and propagation under the influence of high mean stress and fretting caused by faulty design".

193     To fully assess however the exception to coverage under the heading "Wear and Tear" with respect to the concept of fretting, it is important to note that while fretting generally is a wear phenomenon as defined in the *Metals Handbook*, this must be modified by the expert evidence of Mr. Lesiuk on this point in terms of the specific circumstances of the case at bar. This modification of the general concept of fretting as it relates to this specific case presently being litigated is found at Transcript page 823, line 9 through to Transcript page 829, line 10, where Mr. Lesiuk is being cross-examined:

Q And I think, sir, the point you've just made is made in the final sentence of this paragraph in the Metals Handbook on page 148 where it says, sir, and I quote:

Prevention of crack propagation in components that carry considerable stresses such as axles or shafts is vitally important because the usual mode of failure of such components is fatigue initiated by fretting.

Is that saying the same thing that you just said about arresting the fatigue crack as soon as it's discovered?

A This statement says that the usual mode of failure of such components is fatigue initiated by fretting. I disagree with that.

Q And what's your problem with that statement, sir?

A You can have fatigue crack initiation and fatigue crack propagation without fretting.

Q But the statement here, as I read it, is that the usual mode of failure of components that carry considerable stresses such as axles or shafts is fatigue initiated by fretting. You're saying that there's such a thing as fatigue not initiated by fretting?

A Absolutely.

Q And are you saying that's the usual mode of failure?

A Of?

Q Those type of components.

A That's — you can have fatigue failures in blades and disk attachment areas without fretting.

Q So you're disputing that the usual mode of failure is initiated by fretting?

A Correct.

Q But you don't dispute that it's a mode of failure in those type of components?

A I do not dispute that. There is occasion for fretting in turbine rotors. I take exception to having fretting in a blade disk attachment area as being usual.

Q And it's something that ought to be guarded against in the design —

A Absolutely.

Q — as you've said.

Now, sir, you expressed some uncertainty about when the cause of fretting, which is to say the small relative motions, commenced?

A Yes.

Q Is that fair?

Now, sir, as I understand your evidence, the two variables that operate on the stressed components are geometry and steam load? You didn't say that. That's my summary.

A I'd like to hear that again, please.

Q I'm asking you whether, as a general proposition, the two variables that operate on the components that are subject to fretting are geometry, meaning the design and so forth of the diaphragms and that kind of thing, and the steam load which is the cyclic stress.

A Mr. Groody, I'm having trouble with that —

Q Well, that's fair enough. That was my attempt at being an engineer, and I'm not trained for it. Perhaps you could tell us what the variables are that affect, in general terms —

A We're talking about the initiation of fretting? Is that what we're looking for?

Q Yes, we are.

A As we've said, in order to have fretting, you need to have two surfaces moving relative to each other.

Q Right.

A And there has to be a certain level of contact between those two surfaces, and the motion of one relative to the other under the influence of some contact force or pressure will lead to — can lead to fretting.

Q And did in this case?

A And did.

Q So when you say that the designer had the tools available to predict the fretting, I'm wondering what he would look at to make that prediction. You've said that the nozzle passing frequency and so on, which I say is the geometry of the IP rotor, had an effect on it. Correct?

A. Yes.

Q Now, the designer who ought to have predicted the problem knew the geometry and knew that it would not change significantly. Correct?

A The geometry can change in the stationary parts through the maintenance of the unit. There are occasionally the need to repair diaphragms.

Q I appreciate —

A So —

Q — that, sir, but —

A — so that the geometry can change, but, you know, the geometry that he designed is not supposed to change, if that's your question.

Q Yes. And when you said he ought to have been able to predict, you're not suggesting that he ought to have predicted that the geometry would change, that the diaphragm would change, or is that how you say he ought to have predicted fretting?

A He should certainly be aware that there are going to be changes that are — could occur during the life of that unit. If those changes could lead to some stimulus acting on those blades, then he ought to — he should design that blade so that the effect of those changes are minimized, and again, we come back to the assembly of the blade.

Q Right. Now, when you said in your Exhibit 168 in paragraph 2, the damage observed to the Clover Bar IP rotors was preventable, then you go on to say what design changes could have been made, are you saying that — are you saying now that the designer ought to have predicted changes in the physical makeup of the diaphragm and therefore expected fretting?

A No, I'm not. I'm not saying that, no, Mr. Groody.

Q You're saying that working within the parameters of his design, he should have known there was going to be fretting in this case?

A Correct.

Q So the force that caused the fretting is the steam load, that's the variable. Correct?

A Steam load caused the motion. The contact force was a result of the centrifugal load on the blades.

Q But you say that if the designer had sat back and used the knowledge and techniques and tools available, he, we're assume it was a man, it was the '60s — would have predicted fretting?

A I'm sorry, could you say that again, please?

Q Sure. When you say the damage was preventable —

A Yes.

Q — your point is that a designer using the tools, knowledge and techniques available would have predicted a problem with this fit-up?

A He should have known that this particular design was susceptible to fretting.

Q All right. Now — and I'm interested in when the fretting ought to have been expected to begin, and I take it that you're not saying he should have expected that the geometry or the physical makeup of the diaphragm would have changed thereby causing fretting to initiate?

A Correct.

Q So does that not mean that it's the cyclic loading or the force of the steam, that type of thing, that he ought to have predicted would cause the fretting, given this design?

A He should have known that there is going to be some dynamic stimulus from the stationary parts acting on that row of blades and, therefore, since that dynamic force was going to be present, he has to make sure that that dynamic force doesn't result in damage.

As I indicated, we cannot predict the magnitude of that force. We know how to reduce it or what changes in the design have an effect on the amplitude of that force, and we certainly know that if a force was going to be applied to that row of blades, there's a potential for rocking, vibration in those blades, and therefore we have to minimize that, eliminate that.

Q Right. And so the sufficient dynamic force to cause the rocking would that have been present the first time the rotor went to full load?

A It certainly could have been, yes.

194    A key point in this passage came at the end in my view. There Mr. Lesiuk stated with respect to the two steam turbines in question before me, that the usual wear phenomenon of fretting is a result of the design difficulties inherent in the two steam turbines which certainly could have been present the first time the rotor went to full load. This in reference to the case at bar negates, in my view, the concept of fretting as a wear phenomenon as in the "wear and tear" exception in the Policy. "Wear and tear" seems to me to refer to a gradual wear process related to the normal concept of "fretting", not the design-instigated problems that were inherent in the machine from the beginning.

195    *On the facts herein, there is no applicable named or listed policy exception.*

**"Cause and Result" Analysis**

196    In order for there to be coverage in this case, damage must be *caused* by an "Accident".

197    *Cases cited by the Defendant construing accident and sickness Insurance policies are, with respect, only Instructive regarding the meaning of the word "cause" or "caused" in the context of "bodily injury caused by an accident". The accident and sickness insurance cases cited largely seek to define what is meant by an "accident", not apply a pre-agreed upon insurer-generated listed definition of "Accident" contained in a Policy of Insurance such as the one before me.*

198    In *Leontowicz v. Seaboard Life Insurance Co.* (1984), 58 A.R. 66 (Alta. C.A.) at page 71 the main issue was the interpretation of the expression "bodily injury caused by accident". The case emphasized the significant distinction between (1) a policy which insures against accidental injury, which concentrates on the nature of the result, and (2) a policy which insures against an injury caused by an accident, which concentrates on the nature of the cause.

199    In honouring the distinction between accidental damage (not covered) and accidental cause, the Alberta Court of Appeal followed *Columbia Cellulose Co. v. Continental Casualty Co.*, [1964] I.L.R. 1-119 (S.C.C.), affirming [1963] I.L.R. 1-106 (B.C. C.A.) and *Smith v. British Pacific Life Insurance Co.*, [1965] S.C.R. 434.

200    The Supreme Court of Canada dismissed the appeal in *Columbia Cellulose, (supra)*, saying only "the judgments of the courts below were correct." Sheppard J.A. in the British Columbia Court of Appeal had said (p. 491):

> On the literal meaning of the policy the accident must be the cause of the injury: it is not sufficient that the injury, that is the consequence, be an accident.
>
> . . . . .
>
> The exertion would be deliberate and not an accident; only the injury, that is the consequence, at the most would be an accident. Hence the plaintiffs' case is that the wilful act of exertion, which was no accident, has caused an unexpected consequence which is said to be an accident, but that is the reverse of what the policy requires.
>
> See also: *Bubric v. Confederation Life Insurance Co.* (1995), 175 A.R. 127 (Q.B.)

201    Here, however, what we have is loss or damage caused by high cycle fatigue, an "unexpected and unforeseen" event, the result of a latent design defect. This high cycle fatigue resulted in cracking which can occur rapidly thereby causing an "Accident" as that term is *specifically defined* in the Policy.

**"Occurrence"**

202    In this case an "Accident" must occur under the Policy. Therefore an "occurrence" must be established to find coverage. The Defendant submits this case does not involve an "occurrence". The Defendant states that an "occurrence" is a discrete event, in contrast to a condition or innate property of the object. The Defendant points out that the rotors over more than 20 years have been subjected to intensive and irregular stresses and strains and eventually cracks became evident due to fatigue and other similar inevitable phenomena.

203      The word "occurrence", according to Lloyd L.J. "... should be given its ordinary everyday meaning of a happening or event, but one which is not due to ordinary wear and tear, or, in the words of the judge, to the ordinary progression of natural causes."

    *"Alexion Hope" (The)*, [1988] 1 Ll. L.R. 311 (C.A.), 316

204      In the same case Nourse L.J. said at page 319 "... damage caused by wear and tear is not caused by an "occurrence", that is to say, by a single happening or event. It is caused by a gradual process of external erosion or internal decay and, as such, is not covered by [the policy] ... conditions."

205      In the case at bar, in my opinion, there has been an "occurrence", although admittedly no one has been able to establish the date of the actual "occurrence". The "occurrence" herein is that cited by the expert Joseph Lesiuk as described in the question and his answer found at Transcript page 743, line 15 to Transcript page 744, line 5 which reads as follows:

    Q Okay. Now, you told us that the — the cause of the cracking is high cycle fatigue. Is high cycle fatigue something that you must invariably find in a machine like this? Is it something that must happen?

    A It should not happen. The designer of a turbine rotor does everything in his power to avoid high cycle fatigue because of the consequences. *It occurs very rapidly.* [underlining mine] It can lead to very rapid crack development, crack propagation. The designer, as I said, does everything in his power to eliminate high cycle fatigue potential. He does everything in his power to eliminate fretting damage. You cannot tolerate fretting in a turbine rotor. It damages the fatigue strength of the material, and it can lead to the types of cracking that we see in this IP rotor. It is the turbine designer's responsibility to make sure that design is tight at assembly and tight at operating speed.

206      The Defendant also raises as part of its coverage defence other arguments. However, I have decided, with respect, that these areas do not have to be reviewed in detail for purposes of my decision with respect to the issue of whether there is coverage under the Insurance Policy based on the facts of this case.

## Y. The Coverage Issue - Overview

207      The coverage provided in the Policy of Insurance in this case is "for a loss from an Accident".

208      For purposes of Section III Boiler and Machinery Coverage in the Policy: "Accident shall mean any sudden and accidental occurrence to the object, or part thereof, which results in damage to the Object and necessitates repairs or replacement of the Object or part thereof."

209      "Accident" shall not mean "wear and tear". The Coverage Issue then essentially involves the interpretation of this series of definitions and the meanings of words contained therein.

210      Many cases have been referred to and from those cases a series of legal principles in my opinion have evolved.

211      Regarding the meaning of the term "sudden", on balance, the cases do not seem to incorporate a temporal element to this definition.

212      I accept that this is conceptually wrong in that it does not give meaning to the word "sudden". However, there is in my view, sufficient evidence before me that establishes the finding that the high cycle fatigue that caused the cracking damage in this case can occur "rapidly". Therefore, in any event, this concept of "rapid" crack development equates essentially to any concept of "sudden" in the temporal sense.

213      Nevertheless it is my conclusion after reviewing particularly the Boiler and Machinery Coverage cases which are essentially the primary cases to be referred to with respect to Boiler and Machinery Coverages, that "sudden" does not in that context contain a temporal element in any event.

214    The next concept that must be dealt with is the meaning of the term "accidental occurrence" to the Object.

215     In this regard, the cases have established that this phrase in the context of Boiler and Machinery Coverages means "unforeseen and unexpected".

216    I have concluded that the concept of "unexpected and unforeseen" does not eliminate a design-generated or latent defect such as exists in the two steam turbine rotors in question before me.

217    The terms of the actual Policy herein which is Exhibit 1 as it relates to Boiler and Machinery Coverages in my opinion allows for this interpretation. The cases that I reviewed are not inconsistent with this interpretation which essentially subjectively focuses the concept of "unexpected and unforeseen" from the point of view of the insured, the City of Edmonton and its employees.

218     Design and/or latent defect problems could have and should have been either specifically excluded by the insurer as a coverage exception, or clearly excluded by the general language of the Policy of Insurance as was done in other parts of the Policy of Insurance with respect to these two problems. An example of this specific exclusion is found at Section IV of the Policy which deals with fire coverage only. There "faulty workmanship, material, construction or design" appears as a specified exclusion.

219     However, under the rules of contractual interpretation as it relates to insurance policies, it is not necessarily important that the insurer could have done a better job in terms of easily eliminating certain disputes over the meaning of wording.

220    The important issue remains in *Consolidated-Bathurst*, *supra*, pattern of interpretation, whether the policy itself provides for the coverage as alleged by the Plaintiff, or provides for the exclusion as alleged by the Defendant. In my opinion, the evidence before me with respect to the "intention of the parties", "the commercial context" or the "contractual matrix" of the insurance policy between the parties hereto is inconclusive in the Coverage Issue.

221     There are however important principles of contractual interpretation from the cases that should be noted. These are firstly to interpret a policy logically and broadly to incorporate the initial intention of the parties with respect to coverage, which is to be gathered from the words that they used. Secondly, the concept that difficulty of interpretation is not "ambiguity". An "ambiguity" will not be created by a difficulty in interpretation, but rather that ambiguity "must actually exist on a simply reading of the wording of the policy". These points are discussed in detail in the *Consolidated-Bathurst*, *supra*, case and in cases cited in the Limitation Issue - Parol Evidence Rule which follows after this Section.

222     In this particular case the Boiler and Machinery Coverages in issue herein based on the interpretation of the wording both literally and from the case authorities, provides coverage for the damaged rotors that has been proven in this case.

223    Further or alternatively, the relevant clauses in the Policy of Insurance in question are, in my opinion, "ambiguous". The *contra proferentum* doctrine requires that such "ambiguity" must be construed as against the insurer/drafter of the Insurance Policy.

224     "Unexpected and unforeseen" relates to the subjective knowledge of the insured City of Edmonton and its employees. The evidence before me establishes, in my view, that the Plaintiff and its employees did not know of the design problems that lead to the high cycle fatigue problems that resulted in the crack propagation in this matter.

225    The Plaintiff's expectations with respect to life expectancy were reasonable ones and as such on the evidence I find that there is a significant shortfall in the normal life expectancy for the two steam turbines in question. It is correct that the evidence with respect to life expectancy of the two steam turbines in question is not complete in that no specific evidence was heard regarding the opinion of the manufacturer of the two steam turbines, Escher-Wyss. However, the remaining evidence before me is sufficient to establish that steam turbines in general have a certain life expectancy particularly in the rotor portion.

226     The Plaintiff's expectations backed up by the evidence of the expert, Joseph Lesiuk, are sufficient in my view to establish that these steam turbines reached only approximately 50 percent of their life expectancy before the damage was detected in the intermediate pressure rotors which necessitated the repairs in question.

227     These repairs by the Plaintiff, I find, were considered to be a reasonable and prudent decision as stated by Mr. Lesiuk in his Substance of Opinion, Exhibit 168, paragraph 5.

228     The fact that the Plaintiff operated the two steam turbines for approximately a year when the expert, Mr. Lesiuk, would not have advised it, and the fact that further more extensive cracking never did in fact occur are not material facts, in my view.

229     The ultimate decision of the Plaintiff to replace the rotors were prudent ones. Catastrophic or extensive damage is not a prerequisite to coverage in the Policy coverage. The damage that exists in this case is sufficient to constitute a loss from an "Accident".

230     The evidence before me also establishes that the actual date of cracking in the intermediate pressure rotors that forms the subject of this action is unknown, however we are aware of when the damage was finally discovered.

231     The coverage that is provided herein relates to an "occurrence" to the Object. In this regard, in my view, it has been established that the "Accident" occurred during the course of the Policy term(s) herein. The insurer provided the Boilers and Machinery Coverages to the insured between the years 1977 and 1992 continuously.

232     The "occurrence" definition contained in the said Boiler and Machinery Coverage is, as submitted, a reference to a discreet event. On the evidence of the Plaintiff it has been established that the rapid and unexpected crack propagation that occurred as a result of high cycle fatigue is a "sudden and accidental" occurrence within the meaning of the Insurance Policy - Boiler and Machinery Coverage.

**Z. Conclusion Primary Issue Number 1**

***Primary Issue Number 1 - The Coverage Issue***

233     Were the damages to the intermediate pressure rotors in the two steam turbines caused by an "Accident" as defined and contemplated by Section III, Boiler and Machinery Coverage, of the Policy?

234     For the reasons given, the Plaintiff has established in terms of this issue, coverage under the Policy of Insurance.

235     Having made this decision that the damages to the intermediate pressure rotors in the two steam turbines were caused by an "Accident" as defined and contemplated by Section III, Boiler and Machinery Coverages of the Defendant's Insurance Policy, it is now necessary to deal with the remaining two primary issues. These two particular issues stand independent of the Insurance Policy Coverage Issue and are important in their own right as well.

**AA. Primary Issue Number 2 - Did the Plaintiff Commence the Action within the Appropriate Limitation Period?**

***The Limitation Period Issue***

236     In order for the Plaintiff to have any success on this issue, Fire Statutory Condition 14 must have no application.

Exhibit 1, the Insuring Agreement herein states (underlining and italics added):

> *In consideration of the provisions and stipulations herein...* [Protection Mutual Insurance] Company, for the term of [36] months ... from July 1, 1989 ... *does insure City of Edmonton against direct loss or damage from the perils specified below,* to the property described in the policy pages, forms and endorsements attached hereto. ...

**Insured Perils**

Insurance is provided against direct loss or damage caused by fire, lightning, explosion due to ignition of natural or manufactured gas *or any other perils specified in the forms and endorsements attached to this policy*.

. . . . .

**Provisions Applicable to this Policy**

This policy is non-assessable and the liability of the policyholder is limited to the premium in force.

By acceptance of this policy, the named insured becomes a member of this Company and shall be entitled to vote at all the meetings of this Company...

Assignment of this policy shall not be valid except with the written consent of this Company.

*This policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated including the statutory conditions of the Standard Fire Policy, which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this policy*.

. . . . .

14. *Every action or proceeding against the Company for the recovery of any claim under or by virtue of this contract is absolutely barred unless commenced within one year next after the loss or damage occurs*. [Underlining and Italics Added]

237   The issue is whether the Fire Statutory Conditions located on the back of the jacket of the Insurance Policy were intended to apply to Section III (Boiler and Machinery Coverages) of the Policy.

238   The jacket herein is essentially a double-side standard form cover page with an essentially blank back pager. The standard form has some blanks completed which contain the insured's name and term of the Policy. It has one original signature, date and two pre-printed signatures. On the back of the cover page are the pre-printed statutory conditions.

239   The Policy in question is a multi-peril Policy of Insurance. It provides different coverages for a number of different locations owned by the Plaintiff. The only coverage provided to the Plaintiff at its Clover Bar location is Boiler and Machinery Coverages pursuant to Section III of the Policy. By contrast, coverage under Section II of the Policy for the peril of Fire is provided to the Plaintiff at its E.L. Smith Water Treatment Plant.

240   Part V of the *Insurance Act* requires any policy providing coverage for loss or damage to property arising from the peril of fire, to contain the Statutory Conditions set forth in Section 235.

*Insurance Act*, R.S.A., 1980, c. I-5 (as amended), section 229.

241   The top left hand corner of the cover page of the Insurance Policy is entitled "Canadian Fire Insurance Policy". One of the locations (the E. L. Smith Water Treatment Plant) did have Fire and Extended Coverages pursuant to Section II of the Insurance Policy.

242   Section III of the Policy, under which this claim is made, applies only to Boiler and Machinery Coverages. Boiler and Machinery Coverages are specifically excluded from the operation of Part V of the *Insurance Act* by Section 229(1)(a).

243   The *Insurance Act* clearly binds the parties to an insurance contract to the statutory conditions in the case of insurance for fire and extended perils. It does not require them to be so bound in respect of other perils in a multi-peril policy.

*Canadian Home Assurance Co. v. Genuine Auto Services Ltd.* (1990), 2 C.C.L.I. (2d) 103 (Alta. Q.B.)

*Tri-Service Machine Ltd. v. United States Fire Insurance Co.* (1994), 149 A.R. 379, 19 Alta. L.R. (3d) 163 (C.A.)

244   However, the Court of Appeal of Alberta has indicated that it is open to the parties to incorporate the Statutory Conditions into other parts of a multi-peril policy of insurance if it is done by express agreement in clear and unequivocal language.

*Andrews v. General Accident Assurance Co. of Canada* (1995), 165 A.R. 65 (C.A.) at paragraph 8, page 67

245     The Plaintiff submits that if the Defendant had intended that the provisions of the jacket, and particularly the Statutory Conditions on the back of the jacket, should apply to all coverages under the Policy, it could have easily said so. All it had to do was state that the Statutory Conditions are applicable to *all* parts of the policy. The Defendant did that with respect to Section I of the Policy where the Defendant actually stated the following:

**Section 1**

(Applicable to ALL COVERAGES unless otherwise provided).

Exhibit 1, Section I, page 1 of 5.

246     The Plaintiff submits that the Insurer has not used words in the Policy sufficient to incorporate the Statutory Conditions as part of the Boiler and Machinery Coverages for Clover Bar. The Plaintiff submits that Statutory Condition 14 has no application and that the within action was commenced well within the six year limitation period applicable to contracts.

247     The *Limitations of Actions Act*, R.S.A. 1980, c. L-15, s. 4(c)(i) states:

4(1) The following actions shall be commenced within and not after the time respectively hereinafter mentioned:
. . . . .
(c) actions

(i) for the recovery of money, other than a debt charged on land, whether recoverable as a debt or damages or otherwise, and whether on a recognizance, bond, covenant or other specialty or on a simple contract, express or implied, or
. . . . .
within 6 years after the cause of action arose;

248     It is correct, that the Statutory Conditions relate to all fire policies. The *Insurance Act* binds the parties to the statutory conditions in the case of fire insurance. However, it is open to incorporate the Statutory Conditions into other parts of a multi-peril policy.

249     The Defendant states that the very first page of the Policy of Insurance is that jacket page which wraps around, that is, applies to the entire Policy.

250     With respect, I prefer to describe the first page of the Policy of Insurance as consisting of a standard form cover page entitled "Canadian Fire Insurance Policy".

251     Regardless of how you wish to describe the cover page or the jacket, it is the first page of the Policy and the following provisos appear:

Insurance is provided against direct loss or damage caused by fire ... or any other perils specified in the forms and endorsements attached to this policy.
. . . . .
This policy is made and accepted subject to ... the statutory conditions of the Standard Fire Policy which are hereby made a part of this policy. ...

The Boiler and Machinery Insurance is a peril specified in a form attached to the Policy.

252     This contractual incorporation appears in a part of the jacket cover page entitled "Provisions Applicable to This Policy." It contains provisions of general application including the terms and conditions of the Policy, the liability of the insurer, the

—

insured's status as a member of the Defendant mutual insurance company, the insured's right to vote at the insurer's meetings, and requirements for assignment of the Policy.

253    The Defendant states that the *only* reason to use the incorporation clause at all is to incorporate the Statutory Conditions in parts of the Policy other than that covering fire. The Act itself provides that the Statutory Conditions apply to fire coverage, therefore, no incorporation clause is required for that purpose. The sole purpose of the incorporation clause is to apply the Statutory Conditions to Section III and Section IV coverages in the Defendant's submission.

254    In my view, with respect, this submission of the Defendant does not necessarily apply in this case. The fact that the E.L. Smith Water Treatment Plant location has fire coverage and the fact that the standard form coverage page is entitled "Canadian Fire Insurance Policy" make it equally arguable and sensible that there would be an incorporation clause incorporating the Statutory Conditions that apply to fire coverage. This argument is in my opinion even more compelling when you consider that, notwithstanding the somewhat misleading title of the coverage page - "Canadian Fire Insurance Policy", evidence before me has established that this cover page would be used by this Defendant in all multi-peril policies including those in which fire is not even a covered peril.

255    Therefore, one rationale in this regard is simply that the incorporation clause that purports to incorporate the Statutory Conditions is prudently there simply because of the many uses that the Defendant makes of the standard form.

## BB. Waiver and Estoppel

256    The Defendant quite correctly points out that as a matter of standard legal practice in the profession [and common sense], the Plaintiff could have quite easily protected itself from the expiry of the one year limitation period by issuing a Statement of Claim before the one year period expired.

257    This argument becomes even more cogent when it appears clear from the evidence that in February of 1993 there were a series of letters exchanged between the Plaintiff and the Defendant insurance company with respect to this claim.

258    Mr. DeVries, a senior insurance adjuster for the Defendant, in a letter dated March 9th, 1993 confirms a telephone conversation with Mr. Mulka which reads as follows:

> This letter will confirm our telephone conversation of March 8, 1993 wherein you advise a statement of claim will be presented to the Protection Mutual Company by the end of March 1993.

259    We also know that there was a series of letters exchanged regarding the claim and a clear indication by the Plaintiff that they would be issuing a Statement of Claim against the Defendant by the end of March 1993.

260    Of course it was not known to the parties at the time, in my findings that I will later review, that I have applied the "discoverability" principle with respect to determining the effective date from which a limitation period would commence. That appropriate date in my view would have been April 23, 1992, the date the decision to replace Unit 2 steam turbine generator was made.

261    Nevertheless, the Plaintiff should clearly, on the evidence, have realized that a one year limitation date could be applicable with respect to its claim.

262    Therefore, had the City, for example, actually carried through with its threat of March 8, 1993 to issue a Statement of Claim by the end of March 1993 it would have been within the one year limitation period. As it turns out the City waited more than a year after the decision to replace both of the two turbine generators was made and filed the Statement of Claim on September 7, 1993.

263    There is even reference to the involvement by the Plaintiff of legal counsel (not present legal counsel) as part of this process in the Agreed Statement of Facts as well.

264     The Plaintiff submits that part of the reason that the one year limitation period may have been missed herein is as a result of the conduct of the Defendant during the negotiation period that I have described that took place between February and July of 1993.

265     On the evidence, I believe that the Plaintiff was probably oblivious to the possibility of a one year limitation period herein. The conduct of the Defendant during the process of negotiating a settlement of the claim or determining the insurer's position with respect to the claim, to the extent it affected the Plaintiff, is essentially irrelevant for the purposes of this lawsuit.

266     That is not to say that the Plaintiff could not in some way have been logically affected by the insurer's position during the negotiations. However, the conduct of the Defendant insurer does not go to the issue or to the defence or to the claim of waiver and estoppel as that concept is known in insurance law.

267     In this regard, it appears that the Defendant, Protection Mutual or Factory Mutual, the Defendant's inspection arm, may not have taken a final position denying coverage until July of 1993, some five months after the February 17 denial letter which is found at Exhibit 90. It is also correct that no reference was ever made to a limitation period by the Defendants during the course of this process of assessing the claim.

268     In as much as the Plaintiff was probably oblivious to the one year limitation period, it appears that the Defendant was equally oblivious to the one year limitation period issue. The Defendant in fact never raised the issue of the one year limitation defence to the Plaintiff's claim until the Statement of Defence stage of this lawsuit.

269     The law on waiver and estoppel as it relates to insurance matters is quite clear however. In *Maracle v. Travellers Indemnity Co. of Canada,* [1991] I.L.R. 1-2728 (S.C.C.) even an admission of liability during the course of settlement negotiations was found to be insufficient to constitute promissory estoppel.

270     In *Gillis v. Burguard* (1983), 41 O.R. (2d) 107 (C.A.) the Ontario Court of Appeal states:

> It seems to us that what occurred here was, at best, no more than normal dealings between the parties attempting to resolve an insurance claim. To hold that it could or did give rise to any admission of liability or promise not to rely upon a condition of the contract, the limitation period, is completely unwarranted and puts in jeopardy the benefit of such dealings to litigants.

271     Therefore it appears clear that engaging in discussions of requesting or considering information before or after the one year limitation period expires are not unequivocal acts of waiver. There is nothing inconsistent about the insurer agreeing to limit liability or negotiating or investigating a claim and then relying on the provisions of the Statutory Condition. Even if there had been a waiver, there is no indication that the Plaintiff was ever lulled into or accepted such a waiver. As I have indicated, the Plaintiff as well as the insurer in this case were likely both oblivious to the possibility of a one year limitation period at the time those negotiations and settlement discussions were taking place. It is also quite likely that both these parties to this lawsuit were oblivious to this possible issue until the Statement of Defence plead this defence.

## CC. Parol Evidence Rule

272     As with any contract interpretation, parol evidence is generally not admissible. There are no circumstances here for the admission of parol evidence. It is not permissable to use a contracting party's opinion of the meaning or purpose of contractual provisions or a contracting party's statement of what it intended as any evidence in resolving the dispute over interpretation.

273     In the *Bank of British Columbia v. Turbo Resources Ltd.* (1983), 148 D.L.R. (3d) 598 (Alta. C.A.) at page 607 and 608 Chief Justice Laycraft distinguishes evidence about the setting or contractual matrix on the one hand from parol evidence of the intention of the parties:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial

purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

Justice Laycraft goes on to state:

Consideration of commercial setting in which a contract is made is not, of course, to be confused with parol evidence of the intention of the parties. That is not admissible.

274    In the *Northwestern Mechanical Installations Ltd. v. Yukon Construction Co.* (1982), 20 Alta. L.R. (2d) 156 (C.A.) case Justice Harradance writing for the Court of Appeal had to deal with an issue as to whether the trial judge was in error in applying the parol evidence rule on the grounds that the term "hydrostatic testing" was equivocal. Therefore parol evidence as to its meaning would have been admissible. Justice Harradance states the law in Alberta at page 164:

With deference to those who hold a contrary view, I am of the opinion that difficulty in interpretation is not synonymous with ambiguity.

275    Justice Harradance continues that in *St. Lawrence Petroleum v. Bailey Selburn Oil & Gas Ltd.* (1962), 41 W.W.R. 210 the Alberta Court of Appeal was called to interpret the provisions of a farm-out agreement. The appellant contended that clause 10(b) of the agreement was ambiguous and therefore parol evidence could be allowed into aid in construction. The trial judge held that this evidence was inadmissible but went on to hold that even if it had been admissible his decision would have been the same.

276    The Court of Appeal agreed that the evidence was inadmissible. Mr. Justice Johnson at page 214 stated:

We are also agreed that parol evidence is, in so far as it was led to explain the meaning of the agreement, should not have been admitted. The language used in clause 10(b), which is the clause that is said to be ambiguous, is plain enough. What the effect of these words is upon the other clauses of the agreement and what rights are thereby conferred upon the appellants, present difficulties, but these are difficulties of interpretation only and as this Court has pointed out (*Calvan Consol. Oil & Gas Co. v. Manning,* 22 W.W.R. 433, 10 D.L.R. (2d) 73 8, reversed 25 W.W.R. 641 at 658, 16 D.L.R. (2d) 27, which was affirmed (1959) S.C.R. 253, 17 D.L.R. (2d) 1) difficulty of interpretation is not synonymous with ambiguity.

277    An appeal to the Supreme Court of Canada was dismissed and this appeal is reported at (1963), S.C.R. 482, 45 W.W.R. 26, 41 D.L.R. (2d) 316. Mr. Justice Martland speaking for the Supreme Court of Canada said at page 488:

This Court agreed with the view that both the Courts below that clause 10(b) while presenting difficulties of interpretation, was not ambiguous and that the evidence was inadmissible.

278    In *Anderson v. Chaba* (1978), 81 D.L.R. (3d) 449 (Alta. C.A.) at page 452 the law is adopted from the Nova Scotia Court of Appeal in *Ogilvie v. Grant* (1906), 41 N.S.R. 1 Mr. Justice Townshend said at page 10:

Where the words used are ambiguous, no doubt, parol evidence may be given of the surrounding circumstances attending the execution of the deed to enable the court to interpret the language, but not what the parties say themselves they intended. In this case there is ambiguity as to what was included in the words "farm lot" and as to what was appurtenant, and so far as the evidence of user was received there could be no objection. The learned judge, however, was clearly in error when he allowed declarations of the grantor as to what he meant to convey to be given in evidence or an declaration on that subject made by the grantor.

. . . . .

In my view, the phrase as it is used in the contract is not so ambiguous as to be incapable of interpretation, making the clause void for uncertainty. What the parties respectively understood is not relevant — it is what they said which binds them, and what was said, as I interpret the agreement, is that a sale was made. (at page 454 of the *Anderson v. Chaba* Report)

279   What these cases indicate in addition to the fact that statements as to what the parties intended at the time is not admissible to determine that intention, is that evidence can be led about the context in which an agreement is made. This is often termed as the commercial setting or contractual matrix which was also described in the *Consolidated-Bathurst*, *supra*, case.

## DD. The "Commercial Setting" or the "Contractual Matrix" of the Policy

280   Unfortunately, with respect to this limitation issue and with respect to the coverage issue we have heard very little about the "intention of the parties", the "commercial setting" or the "contractual matrix" that existed herein between the Plaintiff and the Defendant at the time of their entering the Insurance Contract(s).

281   We know that the Defendant is part of a larger insurance group and has an inspection and engineering consulting arm, Factory Mutual which was involved in this case.

282   We know that the relationship between the Plaintiff and the Defendant as insured and insurer began in 1977. Exhibit 1, the Policy in question herein, is a renewal that began with a one year term in 1989, which was automatically renewable on the anniversary date for a further two years.

283   We know that the Plaintiff used Marsh McLennan, a professional insurance broker, to assist it in placing this insurance, and in negotiations with respect to this claim. We know that the Plaintiff had an insurance department, and had consulted lawyers other than their present legal counsel during the course of the events that led up to this lawsuit. We know that we have a multi-peril insurance policy herein.

284   All of this knowledge, however, in my view, is of little assistance in determining the intention of the parties when they entered into this commercial contract of insurance.

*Bank of British Columbia v. Turbo Resources Ltd.* (Alta. C.A.), *supra*, at page 607 and 608 per Chief Justice Laycraft;

*Northwestern Mechanical Installations v. Yukon Construction*, *supra*, page 161 and 164;

*Anderson v. Chaba*, *supra*, at p. 452

## EE. The Importance of the Presence of the Statutory Conditions

285   The Plaintiff submits none of the Statutory Conditions or terms printed on the jacket apply to Boiler and Machinery Coverage. Accepting the submission would result in an absurdity, according to the Defendant. The Statutory Conditions address matters of great importance to a policy of insurance: insurance on property owned by others; change of interest; notification of material change; manner of termination; notification and proof requirements and manner of giving notice and proof; salvage, entry, control and abandonment; appraisal rights; replacement rights; and, limitations. The Plaintiff's interpretation the Defendant states, would leave a vacuum with respect to numerous matters for coverages other than fire.

286   In this regard, with respect, I disagree with the Defendant's concept of a "vacuum" existing if the Statutory Conditions pre-printed on the back of the cover page did not apply to Boiler and Machinery Coverage within the Policy.

287   Many of the items listed in the Statutory Conditions are covered by common law principles or their meaning has been well established by the cases. Those Statutory Conditions would exist irrespective of whether they appeared on the back of the jacket page. Examples of Statutory Conditions covered by or covered in other parts of the Insurance Policy include:

Statutory Condition 1. With respect to misrepresentation;

Statutory Condition 2. With respect to property of others also known as "insurable interest";

Statutory Condition 3. With respect to change of interest;

Statutory Condition 4. Material change;

Statutory Condition 5. Termination of insurance which is also provided for in general situations under s.1, clause 12 of the Policy under the heading Cancellation of the Policy;

Statutory Condition 6. Requirement after loss is partly dealt with in s.1, condition 5, the general conditions as it relates to Statutory Condition no. 6(b)(iv);

Statutory requirement 6(v) with respect to the interest of the insured and all others is referred elsewhere in the policy under Part C, page A-1 which states that:

> Loss of any on all property unless otherwise shown shall be adjusted with the City of Edmonton and made payable to the City of Edmonton and shall also be payable to any additional named insurers, loss payees and mortgagees named in Part C when Part C is included.

Statutory Condition 7 to 11. Statutory Condition 7 Fraud is dealt with by the common law as are Statutory Condition 8, Who may give notice and proof; Statutory Condition 9, Salvage; Statutory Condition 10, Entry, Control, Abandonment; and Statutory Condition 11, Appraisal.

Statutory Condition 13. Statutory Condition 13 is found elsewhere in the Policy under form 4100 to the Policy which deals specifically with repair and/or replacement.

Statutory Condition 14. Statutory Condition 14 of course is what this limitation issue is all about.

## FF. Uniform Limitation Periods in Multi-Peril Policies

288    The Defendant submits that academic commentary encourages the uniform application of the conditions to all the perils:

> The first approach of treating the composite policy as evidencing several different contracts (or at least a contract with distinct coverages for each peril, each subject to different conditions) presents two kinds of problems. First, it tends to defeat the reasonable *expectations of the insuring public* [emphasis added] who are not likely to expect different terms (eg different claims procedures or limitation periods) to apply to each peril. Secondly, it deprives the insuring public of the protection afforded by the *Insurance Act*'s standard conditions for all losses other than fire.

289    "These problems are overcome", according to that author "if insurers, as a matter of contract, adopt the statutory conditions and expressly make them applicable to all the perils covered by the policy. This is often done by the insurance industry."

290    With respect, the Defendant's submission of the academic commentary quoted by them presents one significant problem in the context of this case. In my view, generally and certainly in the context of this case, the "expectations of the insuring public" would not readily welcome a significant reduction from the standard six year limitation period for commencing actions with respect to contracts to the one year limitation period provided for by the Statutory Conditions of the *Insurance Act*.

291    The second point in the academic commentary about "depriving the insuring public of the protection afforded by the *Insurance Act's* standard conditions for all other losses other than fire" clearly does not apply to the facts of this case where the "protection" being described is in fact a defence being used by the insurer, one that the insured does not want to be protected by.

292    I have already described how other clauses that are found in the Statutory Conditions which do "protect" are found in other parts either of the Policy generally or in the common law authorities.

293    In my view, the introduction of a drastically reduced limitation period from the normal six years for contract litigation by the insurer should be done in clear and unequivocal language within the Policy or it can constitute an ambiguity.

*Case Law Authorities With Respect to the Limitation Issue*

294    In *George A. Demeyere Tobacco Farms Ltd. v. Continental Insurance Co.* (1984), 7 C.C.L.I. 38 (Ont. H.C.) at page 42 [hereinafter referred to as "Demeyere"] of the Report the incorporation clause reads as follows:

This policy insures the described tobacco crops against direct loss or damage caused by hail, fire, lightening, wind, frost, spring blow-out, drought, excess rain, insect ravage, disease, explosion, smoke damage (kilns only), riot, vandalism or malicious acts, transportation, burglary, impact by aircraft or vehicles; *all as defined or limited herein and subject to the Statutory Conditions attached ...* (Underlining mine)

295    The incorporation clause in the *Demeyere* insuring agreement clearly uses the term "all" unlike the incorporation clause at bar.

296    Similarly the incorporation clause in *Freesman v. Royal Insurance Co. of Canada* (1986), 55 O.R. (2d) 562 (H.C.) [hereinafter referred to as "Freesman"] at page 569 of the decision stated:

**Conditions Applicable to the Various Coverages Provided Herein**

In respect of your Personal Liability Protection (including Residence Voluntary Compensation when added) — Statutory Conditions 1,3,4, 5 and 15 only apply. *Otherwise all of the Conditions set forth under the titles Statutory Conditions and Additional Conditions apply with respect to all of the perils insured by this policy except as these Conditions may be modified or supplemented by the Forms or Endorsements attached.* (Underlining mine)

297    In both the *Demeyere* and *Freesman* case, *supra*, the insurer by use of the word "all" made it clear that the Statutory Conditions were to apply as general conditions to *all* of the Policy.

298    In *Royal Bank v. Red River Valley Mutual Insurance Co.* (1986), 18 C.C.L.I. 75 (Man. C.A.) [hereinafter referred to as the "Royal Bank"] the insurance policy incorporation clause was as follows at pages 80 to 81 of the Report:

The insurance was expressed to be provided in consideration of (amongst other things) "... the conditions and stipulations contained herein or endorsed hereon and in the riders attached hereto...". The insurers liability was expressed to be "... subject to all of the conditions and stipulations in the policy..."

. . . . .

299    The Court then went on at page 81 of the report to state that:

Immediately following the Statutory Conditions are further Conditions under the heading "General Conditions". These conditions are numbered 16 through 24.

300    In finding that the Statutory Conditions were incorporated as General Conditions to that particular entire policy, the Manitoba Court of Appeal made note that the Statutory Conditions were numbered consecutively and were followed immediately by the General Conditions. Therefore in the *Royal Bank* case both Statutory Conditions and General Conditions were together.

301    The insurer therefore in the *Royal Bank* case made it clear that all were conditions to the policy.

302    In *Dressew Supply Ltd. v. Laurentian Pacific Insurance Co.* (1991), 57 B.C.L.R. (2d) 198 (C.A.) [hereinafter referred to as "Dressew"] the incorporation clause appears at paragraph 36 at the bottom of page 212 of the report and reads as follows:

CONDITIONS - The statutory conditions apply to the peril of fire *and* as modified or supplemented by riders or endorsements attached apply as policy conditions to all other perils insured by this policy.

STATUTORY CONDITIONS - (There then follows the Statutory conditions of the fire policies including statutory condition 14).

303     At page 215 of the Report supplementary reasons dated August 9, 1991 appear. Justice Locke of the Ontario Court of Appeal addresses an Ontario Court of Appeal decision that was decided between the time the *Dressew* case was argued and the time the *Dressew* decision was rendered *Sever v. Economical Mutual Insurance Co.* (1989), 66 O.R. (2d) 799 (C.A.) [hereinafter referred to as "Sever"].

304     The *Sever* decision is relatively short and is reproduced in its entirety herein:

**Extended Endorsement**

On the view we take of this appeal, it is unnecessary to address the issues of waiver, estoppel and any deficiency in the pleading appearing in para. 4 of the statement of defence.

The defence on which the insurer succeeded at trial was that a limitation period of 1 year for institution of action, which the plaintiff did not meet, was included in the policy of insurance by reason of the following provision:

**Conditions Applicable to the Various Coverages Provided Herein**

The Conditions herein set forth under the title Statutory Conditions apply with respect to insurance provided under Forms specifically covering FIRE AND EXTENDED COVERAGE PERILS.

Statutory conditions 1,3,4,5, and 15 only apply to Forms specifically covering LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE, MEDICAL PAYMENTS and RESIDENCE VOLUNTARY COMPENSATION.

*All of the Conditions herein set forth under the titles Statutory Conditions* and Additional Conditions *apply with respect to insurance provided under ALL OTHER FORMS* except as they may be modified or supplemented by the Forms or Endorsements attached." (Emphasis added)

*In our view, the wording of this provision does not, as the trial Judge* held, make the "statutory conditions, by the contract of the parties, apply to all the coverages provided for in the policy." *Rather, by the terms of the provision, the "statutory conditions apply with respect to insurance provided under ALL OTHER FORMS". In the context of the whole of the provision set out above and the entire policy, the reference to "insurance provided under ALL OTHER FORMS" either clearly does not extend to all the perils insured by the policy - in particular, theft - or, at its highest, is ambiguous whether it does so extend*. In either case, the insurer cannot succeed on the basis of this defence. (Underlining mine)

Counsel for the insurer submitted that, if we were of the view expressed above, this Court should not grant judgment in favour of the plaintiff but, rather, should direct a new trial so that evidence might be led on the subject. We respectfully do not agree. We view this question as one of construction of the provision appearing in the policy on which evidence are not in issue.

Liability and quantum are not in issue.

Accordingly, the appeal is allowed, the judgment below set aside and judgment may issue for the plaintiff for $76,089.95 together with pre-judgment interest thereon.

305     In the *Sever* case the Ontario Court of Appeal in the portions that I have underlined from the judgment that the Statutory Conditions were not incorporated as general conditions to the entire policy by virtue of the incorporation clause used therein. Although the incorporation clause refers to "ALL OTHER FORMS", the Ontario Court of Appeal held that this did not extend to all perils insured by the policy or at the very least was ambiguous whether it did so extend.

306     In the *Sever* case, however, the problem was not with the inclusion of the word "ALL", but rather appears to be as a result of a problem with the Theft Form. With respect, the *Sever* decision is so short regarding its facts that it is difficult to draw any definitive conclusion from it.

307     Nevertheless, the Defendant in the case at bar could have easily added words such as "all" on the cover page incorporation clause which, as has been demonstrated from the cases, would have referred to and clearly included Statutory Condition 14.

308     Another example of how the insurer could have been clearer as to its intention with respect to the incorporation of the Statutory Conditions is found in Section I which contains the General Conditions.

309      Unlike the *Royal Bank* case, *supra*, the General Conditions are numbered consecutively and do not appear right after the Statutory Conditions, but rather are located approximately 40 pages apart standing on their own.

310      In the case at bar, in Part A of the Policy entitled "Title Insured and Insuring" Clauses, Item No. 2 General Coverage Clause, the Defendant has said that "the property damage insurance coverage thereunder is as defined in Property Damage Form 4000 and all applicable sections which is hereby attached to and forms part of this Policy as respects all locations". The Defendant herein used the term "all" to indicate the extent of coverage.

311     Another example of the Defendant knowing that it could incorporate the Statutory Conditions with the General Conditions in another format as was done in the *Royal Bank* case, *supra*, is found in our Exhibit 106 in Form 3000C.

312     *Did the Plaintiff commence the action within the appropriate limitation period*?

**Date the Loss or Damage Occurred**

313     The Insurance Policy in Statutory Condition 14 stipulates that an action is absolutely barred unless commenced within one year next after the loss or damage occurs.

314      If an occurrence date should be pinpointed, it must logically predate the decisions to replace each of the two rotors. Coverage is provided only to repair or replace an insured object due to damage caused by a sudden and accidental occurrence necessitating repair or replacement, so it would be untenable to conclude the occurrence was after the decision to replace.

315      From Paragraphs 45 and 47 of the Agreed Statement of Facts, Exhibit 6 establish that the decision to replace Unit 1 was made February 6, 1992 and the decision to replace Unit 2 was made April 23, 1992. In the case of each of the two turbogenerators, the decision to replace the intermediate pressure rotor was made more than one year before September 7, 1993, the date the Statement of Claim was filed.

316     Therefore the issue in this area is as to whether the limitation period begins from the date of the physical occurrence of the damage or loss, or the date that the insured has knowledge of the problem.

317     I would have adopted the "discoverability" rule in this case to determine when the limitation period began to run.

318     The decision to repair and replace the intermediate pressure rotor in Unit 1 was made on February 6, 1992 and in Unit 2 on April 23, 1992. The limitation period should begin to run certainly by April 23, 1992 for clearly the problem had been discovered by the Plaintiff by that point.

319     The Plaintiff's Statement of Claim filed on September 7th, 1993 is clearly more than one year after the discovered problem.

**Limitation Issue - Overview and Conclusion**

320      Critical to the Plaintiff's case with respect to the limitation issue is the non-applicability of the Statutory Condition 14 which places the City of Edmonton beyond the one year limitation period stated in that Statutory Condition.

321     Additional references on the Statutory Conditions page and Section III indicating that the Boiler and Machinery Coverages were subject to the Statutory Conditions was an easily attainable drafting solution which would have eliminated the interpretation problem with respect to this issue.

322     As has been stated, however, in the case law, problems of interpretation are not necessarily the same as "ambiguity" or reason to allow the admission of parol evidence as to what the parties intended when they entered into the Policy of Insurance.

323     The fact that both parties in this case, Plaintiff and Defendant, appeared on the facts to be oblivious to the issue of the one year limitation issue or problem makes any parol evidence on this point, at this time, potentially rather self-serving and certainly makes it remote from the actual time the Policy renewal became effective.

324     With respect to the concept of the "intention of the parties", "commercial context" or "contractual matrix" of this particular Insurance Policy, we know that there are relatively few important facts that have been proven at this trial.

325     The Plaintiff could have easily avoided of course any problems with the one year limitation period had it been even remotely aware of the problem. In my view, the Plaintiff, notwithstanding its present argument, should have been aware certainly of the possibility of the one year limitation period contained in Statutory Condition 14.

326     On the evidence, negotiations and claims were being advanced by the Plaintiff's insurance brokers, Marsh McLennan, under the general direction of Mr. John Mulka the Plant Manager both before and after the one year limitation period would have clearly expired. We also are aware from the evidence that the Plaintiff had consulted legal counsel, who are not the present Plaintiff's counsel, during the course of these negotiations and discussions.

327     These facts must lead to the inescapable conclusion that the present position of the Plaintiff with respect to the issue of the applicability of Statutory Condition 14, the one year limitation period, is driven by a post-event analysis of this issue designed, with respect, to save itself from this serious problem.

328     At the time the Plaintiff, The City of Edmonton, entered into the contract of insurance with the Defendant, Protection Mutual, it is my view, quite safe to conclude that the presence of the Statutory Conditions was a non-issue with the Plaintiff. Nevertheless, any contracting party, and the Plaintiff is certainly a fairly sophisticated insurance consumer, should have considered the Policy generally with some care and attention.

329     After a review of the Plaintiff's cases it is correct that the Defendant insurer could have incorporated Statutory Condition 14 in a more thorough and conclusive manner than it did in Insurance Policy Exhibit 1. The Defendant insurer could have conclusively determined this issue quite succinctly by the use of the word "all" in the incorporation clause.

330     Notwithstanding this of course, all the Defendant insurer must do is clearly incorporate the Statutory Conditions of the Standard Fire Policy and make it applicable to Boiler and Machinery Coverages.

331     This does not necessarily mean however that the insurer has failed to do this simply because it could have or perhaps should have used better more conclusive wording to so incorporate the Statutory Conditions of the Standard Fire Policy to the Boiler and Machinery Coverages.

332     I have read the cover page and the references to the incorporation of the Statutory Conditions of the Standard Fire Policy as a whole. On the facts, the Statutory Conditions are sufficiently and clearly incorporated as regards the Boiler and Machinery Coverages in my opinion.

333     There is no ambiguity in my mind with respect to the actual application of Statutory Condition 14 to the facts of this case. In my view, the Defendant has used words in the Policy sufficient to incorporate the Statutory Conditions as part of the Boiler and Machinery Coverage for Clover Bar. The Court of Appeal of Alberta decision in *Andrews v. General Accident Assurance*, *supra*, applies as the statutory conditions have been incorporated into others parts of the multi-peril policy of insurance "by express agreement in clear and unequivocal language".

334     The front and centre of the Insurance Policy cover page indicates that "the policy is made and accepted subject to the statutory conditions of the Standard Fire Policy".

335     The Plaintiff's arguments and detailed analysis, with respect, lack the overriding regard that must be paid to the actual wording and meaning of the Insurance Policy cover page in this case.

336     The Plaintiff has argued at great length with great skill that this particular cover page and incorporation clause in Exhibit 1 is insufficient to apply the Boiler and Machinery Coverages herein. I have reviewed all the cases that the Plaintiff has referred to.

337     Similarly in this Limitation Issue, as I stated with respect to the Coverage Issue, the case law presents certain principles of law which I must still apply to Exhibit 1 the Insurance Policy herein and to the facts as I find them.

338     It is inherently difficult for any insurer in the context of the non-uniform use of "standard" incorporation clauses in the insurance industry generally to ever draft a perfect all-encompassing coverage page or additional pages that would deal with the concept of incorporation in a multi-peril policy such as the one before me.

339     The analysis in the *Consolidated-Bathurst* case, *supra*, must be applied to the insurance incorporation clause and cover page in this case. As stated in the *Consolidated-Bathurst* case, *supra*, real doubt ought to be construed against the insurers since they draft the policy and its limitations. However, the *contra proferentum* principle should only remove real doubt, not create a doubt or magnify an ambiguity when the circumstances of the case raise no real difficulty or, alternatively, simply raise a difficulty of interpretation.

340     On the facts I find that the cover page and incorporation clause are sufficiently clear within the document itself to accomplish the inclusion of Statutory Conditions of the Standard Fire Policy to Boiler and Machinery Coverages.

341     In this regard, it is clear from the cover page that this is a multi-peril policy of insurance as it purports to insure "against direct loss or damage from the perils specified below, to the property described in the Policy pages, forms and endorsements attached hereto".

342     The Policy of Insurance cover page goes on to state the definition for "Insured Perils" wherein that term is defined as follows:

> Insurance is provided against direct loss or damage caused by fire, lightning, explosion due to ignition of natural or manufactured gas or other perils specified in the forms and endorsements attached to this policy.

343     It is in the context of these passages from the cover page that the main incorporation clause for our purposes must be read, that main clause being:

> This policy is made and accepted subjected to the foregoing provisions and stipulations and those hereinafter stated including the statutory conditions of the Standard Fire Policy; which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this Policy.

344     This incorporation clause read then in the context of the cover page taken as a whole clearly speaks of the "Policy" as being the entire multi-peril Policy of Insurance. This is borne out by the reference to "This Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated including the Statutory Conditions of the Standard Fire Policy; which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this policy."

345     The overwhelming number of references to the Policy as a whole and the reference to "insured perils" as specified in the forms and endorsements attached to the Policy which of course includes the Boiler and Machinery Coverages leads me to conclude that the Policy of Insurance is clear enough regarding the incorporation of the Statutory Conditions of the Standard Fire Policy particularly Statutory Condition 14. The effect of the inclusion of Statutory Condition 14 which reads:

> Action 14. Every action of proceeding against the Company for the recovery of any claim under by virtue of this contract is absolutely barred unless commenced within one year next after the loss or damage occurs.

346     The effect then of the applicability of Statutory Condition 14 in view of my finding of fact with respect to the date at which the loss or damage occurred herein is to effectively bar any action by the Plaintiff as against the Defendant pursuant to this Policy of Insurance.

347     It is not necessary to proceed to the next step of the process of interpreting insurance policies as outlined in the *Consolidated-Bathurst* case, *supra*, because there is no ambiguity present in my opinion regarding the incorporation clause in this Policy of Insurance.

## GG. Applicable Deductible

### Primary Issue Number 3 - The Deductible Issue

348     How many deductibles apply to the Plaintiff's damages, if any?

349     The Plaintiff submits that on the facts of this case only one deductible is applicable.

## HH. Conclusion Primary Issue Number 3 - The Deductible Issue

### I Find That on the Facts of This Case, Two $1 Million Deductibles are Applicable.

350     Part D of the Policy, the Schedule of Deductibles, provides that a $1,000,000.00 deductible applies to property damage at the Clover Bar Generating Station.

351     Section I, Subsection D (General Conditions), Paragraph 3, provides, in part, that:

> In each case of loss or damage covered by this Policy, this company shall not be liable unless the Insured sustains a loss *in a single occurrence* [emphasis added] in excess of any applicable deductible provided elsewhere in this Policy and then only for its share of such excess.

> When the Policy covers more than one location, the deductible(s) shall apply against the *total loss* or *damage* covered by this Policy in any *one occurrence*. (Emphasis added.)

352     The Plaintiff argues that what has occurred in this case is a single occurrence or one occurrence and therefore only one deductible should be applied herein.

353     With respect, I disagree with this submission.

354     I find that the damages to the intermediate pressure rotors in the two steam turbines were caused by the two "Accidents", notwithstanding they arose from the same cause being the high cycle fatigue which was the result of the same design problem by the same manufacturer. There was no physical connection between the two steam turbines herein as there was for example in the *Arkwright*, *supra*, machines which had a single steam source. The Plaintiff's turbines both have separate steam sources.

355     The low pressure machines were purchased at different times, began operations at different times, were operated at different times, developed cracks at different times and places, and had their damage replaced at different times.

356     Therefore, two deductibles of $1 million each would have been applicable, reducing the Plaintiff's net award to $2.5 million plus pre-judgment interest from the date of the loss plus costs had I awarded any damages to the Plaintiff.

357     No damages are awarded to the Plaintiff because of its failure to have commenced action within one year of the "discovery" of the problem, which was in this case in breach of Statutory Condition 14 of the Policy.

## II. Judgment

Therefore, I find:

51

1. The cracks in the intermediate pressure rotors of the two steam turbines were caused by an "Accident" as contemplated by the Boiler and Machinery Insurance Policy herein.

2. The appropriate limitation period for the commencement of the action in this matter was one year.

3. Two $1 million deductibles would have been applicable to the Plaintiff's claim herein.

4. The Plaintiff's claim as against the Defendant is dismissed because of the Plaintiff's failure to file its Statement of Claim within the prescribed one year Limitation Period.

358    The parties are invited to speak to costs and other matters not spoken to previously within 30 days of the issuance of this Judgment.

*Action dismissed.*

1999 ABCA 6

Alberta Court of Appeal

Edmonton (City) v. Protection Mutual Insurance Co.

1999 CarswellAlta 560, 1999 ABCA 6, [1999] 6 W.W.R. 241, 188 W.A.C. 334, 213
W.A.C. 93, 228 A.R. 334, 250 A.R. 93, 5 C.C.L.I. (3d) 268, 69 Alta. L.R. (3d) 211

**The City of Edmonton, Plaintiff (Appellant/Respondent to Cross-Appeal) and Protection
Mutual Insurance Company, Defendant (Respondent/Appellant to Cross-Appeal)**

Hetherington, Picard, Sulatycky JJ.A.

Heard: January 6, 1999
Judgment: January 11, 1999
Docket: Edmonton Appeal 9703-0361-AC

Proceedings: affirming (1997), 49 Alta. L.R. (3d) 233 (Alta. Q.B.)

Counsel: *E. Macklin, Q.C.*, and *J. Hope, Q.C.*, for the Plaintiff (Appellant/Respondent to Cross-Appeal).
*E. Groody*, for the Defendant (Respondent/Appellant to Cross-Appeal).

***Per curiam*:**

1    We have considered carefully the submissions of counsel in this matter. Having done so, we find ourselves in agreement
with the trial judge. The appeal is therefore dismissed.

*Appeal dismissed.*

## *Edmonton (City) v. Protection Mutual Insurance Co.*

Supreme Court of Canada Rulings on Applications for Leave to Appeal and Other Motions

Supreme Court of Canada

Record created: March 12, 1999.

File No.: 27186

**[1999] S.C.C.A. No. 126**

The City of Edmonton v. Protection Mutual Insurance Company

## Counsel

Eric F. Macklin, Q.C. (Duncan & Craig), for the motion. Eric Groody (Code Hunter Wittman), contra.

**Chronology:**

1.  Application for leave to appeal:
    FILED: March 12, 1999. S.C.C. Bulletin, 1999, p. 538.

    SUBMITTED TO THE COURT: November 1, 1999. S.C.C. Bulletin,

    1999, p. 1727.

    DISMISSED WITH COSTS: December 2, 1999 (without reasons).

    S.C.C. Bulletin, 1999, p. 1923.

    Before: Major, Binnie and Arbour JJ.

**Procedural History:**

Judgment at first instance: Applicant's claim dismissed. Alberta Court of Queen's Bench, Lee J., February 14, 1997.

*[1997] A.J. No. 149*.

Judgment on appeal: Appeal dismissed.

Alberta Court of Appeal, Hetherington, Picard and

Sulatycky JJ.A., January 11, 1999. *[1999] A.J. No. 18*.

**End of Document**

# EXHIBIT EN-9

# TO THE DECLARATION OF EVAN NUTTALL

2015 ABQB 301

Alberta Court of Queen's Bench

R. v. Biever

2015 CarswellAlta 866, 2015 ABQB 301, [2015] 10 W.W.R. 680, [2015] A.W.L.D. 2666, [2015]
A.W.L.D. 2693, [2015] A.J. No. 528, 122 W.C.B. (2d) 25, 18 Alta. L.R. (6th) 260, 617 A.R. 119

**Her Majesty the Queen, Respondent / Crown and Clinton Biever, Applicant / Accused**

Robert A. Graesser J.

Heard: April 22-23, 2015
Judgment: May 12, 2015
Docket: Edmonton 130443914Q1

Counsel: J.-M. Dube, Carrie-Ann Downey, Susanne Thompson for Crown
Clinton Biever for himself
Adam Badari — Amicus Curiae

*Robert A. Graesser J.*:

**I. Introduction**

1    Clinton Biever is charged with a number of offences in connection with bank robberies in Calgary and Edmonton in 2012.
He is self-represented and has brought the application seeking "full access to legal materials, processes and any case law the
defendants may require to make full answer and defence."

2    Mr. Biever was denied bail and has been in custody on these charges since March, 2013. He has spent most of his pretrial
custody at the Edmonton Remand Center [the "ERC"].

3    At the hearing of the application, Mr. Biever testified that he required Internet access so that he could access relevant
case law through CanLII, Quicklaw/Lexis-Nexis, and Westlaw, legal information sites, government sites, to conduct general
searches using Google and Wikipedia, as well as to seek counsel and to communicate with counsel.

4    In support of his application, he submitted a large amount of information (marked as Exhibit M-6), case law including *R.
v. Frazer* (1989), 103 A.R. 81, 52 C.C.C. (3d) 511 (Alta. Q.B.), *R. v. Whitebear,* 2012 ABQB 626, 550 A.R. 149 (Alta. Q.B.),
and *R. v. Antinello,* 1995 ABCA 117, 165 A.R. 122 (Alta. C.A.).

5    Mr. Biever testified in support of his application. Robert J. Mills, deputy director of operations at the Edmonton Remand
Center testified in opposition to the application.

**II. Background**

6    The trial of the charges faced by Mr. Biever has been adjourned to November, 2015. It was originally to commence in June,
2014 but was adjourned for a number of reasons, including Mr. Biever's inability at the time to engage counsel satisfactory to
him, and because of a number of anticipated pre-trial applications, including:

   1. *habeas corpus,*

   2. for disclosure,

3. for severance,

4. *Charter* applications relating to search warrants, and

5. this application relating to the ability to make full answer and defence.

7    Mr. Biever had consulted a number of lawyers and had engaged some either through Legal Aid or privately with the assistance of family. To the time of the application, he had retained and then discharged some ten lawyers in Alberta. He retained a Vancouver firm to provide advice on the pending severance application.

8    He has at various case management and scheduling conferences expressed concerns over the independence, skill, and diligence of defence counsel. He has yet to find counsel he fully trusts and has for at least the time being elected to be self-represented.

9    Mr. Biever has long claimed that his s 7 *Charter* right to make full answer and defence has been denied by the shortage of legal reference materials made available to him while in pre-trial detention. When he appeared before Gates J on the pretrial conference he was unrepresented and made similar requests. No ruling was made, although Crown counsel facilitated access to some case law for Mr. Biever and also arranged, through the ERC, to provide Mr. Biever access to a laptop with the *DART Western Decisions* database ["*DART*"] loaded into it.

10    When the trial originally was scheduled to commence before me in June 2014, I directed that Mr. Biever be given access to CanLII and with the assistance of Court technology personnel and the Sheriffs, Mr. Biever was able to use a computer and access the CanLII website in a holding cell in the court house. This assisted in resolving a potential jurisdiction argument, which Mr. Biever then abandoned. Mr. Biever then retained defence counsel which led to a further adjournment.

11    The next date on which the trial was to start was April 13, 2015, but the proceeding was again adjourned for reasons similar to those that caused the adjournment in June, 2014. Mr. Biever was again unrepresented by counsel and intended to bring a number of pre-trial applications, including this application, an application to sever the counts relating to the robberies in each city, an application for further disclosure, and applications to exclude certain evidence.

12    In the meantime, the Crown had successfully applied to have an *amicus* appointed for Mr. Biever, and the Crown had consented to a re-election to trial by judge and jury.

13    A severance application and pre-trial *Charter* applications have been set for June, 2015. Work on full disclosure continues.

14    At numerous case management meetings and scheduling conferences before Gates J and myself, Mr. Biever has complained that the *DART* database he does have access to is of limited assistance because it:

1. is not current (although as a subscription service it is updated from time to time),

2. contains only Western Canadian cases after 1980, and

3. contains only case digests and not the text of the full cases.

His says his ability to research law relating to the charges he faces is therefore limited.

### III. Evidence

#### A. Mr. Biever

15    Mr. Biever testified at the hearing concerning his frustration at not being given access to legal materials. He testified about the difficulties getting copies of case law in the ERC even when they were sent to him by family members, the Crown, or Mr. Badari. He testified about the length of time taken to get legal materials to him in the ERC and the difficulties he has sending

2

materials out of the ERC. He also testified about the difficulties he encounters because he does not have access to photocopying, scanning, word processing, and someone to commission affidavits or documents (when necessary).

16     He acknowledged that there were some reference materials available and produced Exhibit M-1, which is an outdated ERC-produced list of the legal books available at the ERC.

17     I would note that Mr. Biever's notice of application and his written submission in support of the application are hand-written, and filing and copying have been facilitated by the Crown, the Court and Mr. Badari. Mr. Biever has had little assistance provided by the ERC.

18     Mr. Biever acknowledged that he was able to purchase and keep in his cell a 2013 version of Edward L. Greenspan, Marc Rosenberg, and Marie Henein, *Martin's Criminal Code* (Toronto: Canada Law Book) ["*Martin's*"] and that since June 2014 his access to photocopied cases from outside sources had improved. He agreed that access to information had improved greatly because of Mr. Badari's appointment as *amicus*, and acknowledges Mr. Badari's diligence and attentiveness since his appointment this past March.

19     Nevertheless, he testified that communications with and through Mr. Badari were slow partly because of ERC processes and Mr. Badari's availability (recognizing that Mr. Badaris has other clients and cannot devote his full time and attention to Mr. Biever and his issues).

20     Mr. Biever also testified about the limitations he has at the ERC with telephone communications with counsel and difficulties in locating counsel outside of Alberta.

***B. Mr. Mills***

21     Mr. Mills testified for the Crown and described the legal resources available to inmates at the ERC. Exhibit M-7 (attached) is a list of the books currently available to inmates on a first-come-first-served basis. He noted that there were ten 2015 *Martin's* available, as well as some 20 older copies.

22     He testified that the inmate population at the ERC varies between 1200 and 1400 inmates. There is no physical library. Books are accessed through inmate-instituted requests for interview forms (RFIs). Hardcover books are not allowed on the maximum security pods at the ERC for security reasons.

23     He also testified that the inmates have no access to the Internet. There is no ERC (or indeed Alberta Corrections Services) policy on Internet access as no Internet access is provided. While there are communication ports in various rooms in the ERC, they have not been hooked up.

24     Corrections officers have full Internet access at their stations or desks.

25     Mr. Mills testified that inmate access to the Internet posed operational concerns:

      1. financial expenditures necessary to provide space and necessary equipment;

      2. additional staffing costs to monitor Internet usage;

      3. logistical problems in where access might be provided;

      4. inmates may be able to use the Internet to interfere with witnesses; and

      5. from a security perspective, there are concerns about inmates being able to access information:

            a) about other inmates which might cause security risks to inmates;

            b) about correctional workers and cause problems with that; and

c) on weapons and contraband.

26      He also introduced the Correctional Services' policy on Center Programs and Library Services. Standards 1 and 2 state:

1. A library program shall be established for offenders within each correctional centre, remand center and camp.

2. As far as practical, the center library shall reflect the informational, educational, recreational and cultural goals of a public library.

## IV. Arguments

Mr. Badari argued on Mr. Biever's behalf and emphasized that Mr. Biever reasonably required Internet access because:

1. he has elected to be self-represented, which is his right;

2. he has been denied bail, so his liberty has been significantly affected; and

3. the conditions of his detention are such that he does not have reasonable access to legal information necessary to defend himself as a self-represented litigant.

27      He framed the issues as follows:

1. In the circumstances of Mr. Biever's case, has he had reasonable access to research materials?

2. Has Mr. Biever's need for access been obviated by the appointment of an amicus?

3. What are the rights of self-represented accused to access to research materials?

4. What is the appropriate remedy if any right has been infringed?

28      In addition to the cases cited by Mr. Biever in his written submissions, Mr. Badari submitted a large number of Canadian and American case law as well as several journal articles: *Vilardell v. Dunham*, 2014 SCC 59, [2014] 3 S.C.R. 31 (S.C.C.); *R. v. Hebert*, [1990] 2 S.C.R. 151, 110 N.R. 1 (S.C.C.); *R. v. Swain*, [1991] 1 S.C.R. 933, 125 N.R. 1 (S.C.C.); *R. v. Imona-Russell*, 2013 SCC 43, [2013] 3 S.C.R. 3 (S.C.C.); *R. v. Taylor*, 2014 SCC 50, [2014] 2 S.C.R. 495 (S.C.C.); *R. v. Hape*, 2007 SCC 26, [2007] 2 S.C.R. 292 (S.C.C.); *Standard Minimum Rules for the Treatment of Prisoners*; *Trang v. Alberta (Director, Edmonton Remand Centre)*, 2010 ABQB 6, 475 A.R. 1 (Alta. Q.B.); *R. v. Keegstra*, [1990] 3 S.C.R. 697, 117 N.R. 1 (S.C.C.); *Bounds v. Smith*, 430 U.S. 817 (U.S. Sup. Ct. 1977); *Lewis v. Casey*, 518 U.S. 343 (U.S. Sup. Ct. 1996); *Faretta v. California*, 422 U.S. 806 (U.S. Cal. Sup. Ct. 1975); *Martinez Rodriguez v. Jimenez*, 409 F. Supp. 582 (U.S. Dist. Ct. D. Puerto Rico 1976); *Wetmore v. Fields*, 458 F. Supp. 1131 (U.S. W.D. Wis. 1978); *Bribiesca v. Galaza*, 215 F.3d 1015 (U.S. C.A. 9th Cir. 2000); *Espitia v. Ortiz*, 113 Fed. Appx. 802 (U.S. C.A. 9th Cir. 2004); *Kane v. Garcia Espitia*, 546 U.S. 9 (U.S. Sup. Ct. 2005); Steven D Hinckley, "Bounds and Beyond: A Need to Reevaluate the Right to Prison Access to the Courts", (1987) 22 University of Richmond Law Rev 19; Josephine R Potuto, "The Right of Prisoner Access: Does Bounds Have Bounds?", (1978) 53 Ind Law J 207; *R. v. Terezakis*, 2010 BCCA 260, 288 B.C.A.C. 7 (B.C. C.A. [In Chambers]); *R. v. Wilder* [1994 CarswellBC 1170 (B.C. S.C.)], 1998 CanLII 4172; *R. v. Grabowski*, 2003 BCSC 2034, 71 W.C.B. (2d) 795 (B.C. S.C.); *R. v. Ciancio*, 2006 BCCA 311, 232 B.C.A.C. 1 (B.C. C.A.), leave denied [2006] S.C.C.A. No. 261-262 (S.C.C.); *R. v. Lalo* (1998), 173 N.S.R. (2d) 149, 40 W.C.B. (2d) 107 (N.S. S.C.); *R. v. Fok*, 2000 ABQB 695, 275 A.R. 381 (Alta. Q.B.); *R. v. Willick*, 2014 ABPC 243 (Alta. Prov. Ct.); *R. v. Stinchcombe*, [1991] 3 S.C.R. 326, 130 N.R. 277 (S.C.C.); *Meads v. Meads*, 2012 ABQB 571, 543 A.R. 215 (Alta. Q.B.).

29      In addition to his testimony, Mr. Biever made submissions in support of the application. Mr. Biever emphasized the difficulties he has had gaining access to case law, in particular noting that the case digests in *DART* do not allow him to analyze the arguments made, how the arguments were received, or the skills of counsel in making arguments or source materials referenced in the cases.

30     He noted that while he is now able to have family (and Mr. Badari) send him copies of cases and research materials, he is limited in knowing what to ask for because of his restricted access to information while in the ERC.

31     Mr. Biever observed that when he was provided with a full copy of the *Meads v. Meads*, decision he was able to determine that arguments he was raising concerning the coronation of Queen Elizabeth II were ill-advised and he withdrew them.

32     Mr. Biever submitted that but for Google searches done for him using Wikipedia, he would not have been able to gain an understanding of 4habeas corpus or other legal issues affecting him such as severance. He acknowledged that submissions he had made without access to legal materials were "poor in quality" and he had been led to advancing poor arguments. He contrasts his previous applications with his current severance application, which he considers to be well put together.

33     He acknowledged distrust of the legal profession and a need to be able to conduct his own research to verify for himself advice he is or may be given on issues concerning his defence. He seeks certainty as to his legal positions.

34     While Mr. Biever expressed appreciation and gratitude for the assistance given to him by Mr. Badari to date, he is concerned that since Mr. Badari is involved in other matters, he will not be able to have his concerns addressed in as timely a manner as he wishes, noting in particular that communications with Mr. Badari by telephone are limited because of institutional issues and that it takes up to ten days for him to receive something sent to him by Mr. Badari or his family.

35     In response, Mr. Dube on behalf of the Crown argued that:

> 1. Mr. Biever has reasonable access to legal information as provided in the ERC library;
>
> 2. he has been given access to *DART*;
>
> 3. he has been able to purchase his own copy of *Martin's* and can keep it in his cell;
>
> 4. he is able to purchase other legal texts, subject to satisfying ERC security concerns;
>
> 5. he can get case law printed out by family and friends;
>
> 6. after June, 2014 his access to legal information and his ability to obtain and keep photocopies in his cell have been improved;
>
> 7. Mr. Biever has been able to receive and send materials, have correspondence faxed and have envelopes provided to him;
>
> 8. the appointment of an *amicus* to assist Mr. Biever (and the Court) greatly assists in providing research materials;
>
> 9. restrictions on Internet access are legitimate and reasonable institutional concerns relating to expenditures (costs and staffing demands) and security; and
>
> 10. time delays in processing RFIs and delays in things like mail delivery and processing are unavoidable institutional issues as Mr. Biever is only one of some 1200 - 1400 inmates and ERC staff receive over 1000 RFIs a day.

36     Mr. Dube referred to a number of materials: *R. v. Cai*, 2002 ABCA 299, 317 A.R. 240 (Alta. C.A.); *R. v. John*, [2007] O.J. No. 2257 (Ont. S.C.J.) (QL); (2007), 74 W.C.B. (2d) 186 (Ont. S.C.J.); *R. v. Rose*, [1998] 3 S.C.R. 262, 166 D.L.R. (4th) 385 (S.C.C.); *R. v. Jordan*, [2002] O.J. No. 5250 (Ont. S.C.J.) (QL); *R. v. Parchment*, 2011 BCCA 174, 304 B.C.A.C. 60 (B.C. C.A. [In Chambers]); *R. v. Rowbotham* (1988), 25 O.A.C. 321, 41 C.C.C. (3d) 1 (Ont. C.A.).

37     He also cited the *Corrections Act*, RSA 2000, c C-29 and the *Designated Correctional Institutions Order*, Alta Reg 252/1999, which designates the ERC as a correctional institution, noting that::

7(2) The director of a correctional institution shall, subject to the direction of the Chief Executive Officer,

(a) direct and co-ordinate the programs of the correctional institution in accordance with the regulations, and

(b) direct the operation, management and administration of the correctional institution including matters of security, inmate control, staff discipline and the care, custody, treatment and training of inmates.

38    In dealing with remedies, Mr. Biever repeated his request for full Internet access at the ERC, recognizing that there may be some limits imposed for legitimate institutional and security purposes. He would like photocopying and scanning capabilities, as well as the ability to communicate with counsel through the Internet.

39    Mr. Badari, as *amicus*, suggested that a breach of Mr. Biever's *Charter* s 7 rights had been made out and that the Crown be directed to remedy the breach within a specified period (he suggested two weeks) failing which either Mr. Biever should be released from the remand centre or the charges against him stayed.

40    Mr. Dube for the Crown argued that any access difficulties have been remedied by the measures described above which provide Mr. Biever with reasonable access. He emphasized the services provided by Mr. Badari as *amicus* as being an important consideration in determining whether Mr. Biever's reasonable needs (and rights) have been satisfied.

**V. Analysis**

41    At the outset, I am mindful of the words at para 9 of *R. v. Cai*:

[9] Courts are not the best qualified agencies to determine spending priorities for public funds: ***Robinson***, ***supra*** at 487 (C.C.C.); ***Rain***, ***supra*** at 192 (C.C.C.). Courts do not set, nor are they asked to set, elevated fees for doctors or other professionals such as nurses, accountants, or midwives. Courts do not set health care premiums, levels of taxation, sessional indemnities or jury fees.

42    I am also mindful of the director's obligation to manage the ERC in accordance with the *Corrections Act*. I am loath to interfere with funding priorities, staffing priorities or security issues.

43    That being said, the director and the ERC do not operate in a vacuum. Like all government departments and agencies, they are required to comply with the *Charter*. Compliance is often a delicate and difficult balance between competing *Charter* rights and values.

44    I would also observe that the Crown and the ERC have taken steps that are likely unique to Mr. Biever in an attempt to accommodate his requests, going so far as to obtain and load a computer with *DART* and keep it updated. ERC has facilitated receipt and delivery of documents and they appear to have exercised discretions in favour of Mr. Biever relating to the type and quantity of paper materials he is allowed to have. The Crown and in particular Ms. Downey have provided Mr. Biever with materials and facilitated the filing and service of applications brought by him. Indeed, it was the Crown that applied successfully for the appointment of an *amicus* to assist Mr. Biever and the Court in what has obviously become a complicated matter.

45    Before I can legitimately weigh in, I must determine the fundamental question as to what Mr. Biever's rights are regarding access to legal information.

46    The Crown fairly concedes that Mr. Biever has a right to be self-represented and to elect to refuse the assistance of counsel. Mr. Biever has done so and it is I believe a fair observation from my ten or so months of involvement with the matter that Mr. Biever is likely to continue to be self-represented.

47    The appointment of an *amicus* is not the appointment of counsel. Mr. Badari's role is to provide information and advice to Mr. Biever, and to assist him in understanding the law and process, as well as to assist the Court in its duty to ensure that Mr. Biever has a fair trial. His role is not to take instructions from Mr. Biever and to do Mr. Biever's bidding. It is Mr. Biever

who will be responsible for decision-making and much of the work during trial, including cross-examining Crown witnesses and presenting his own defence.

48      Nevertheless, the appointment of an *amicus* is clearly a significant step in assisting Mr. Biever with the difficult task of defending himself in court.

49      This decision is not about the wisdom or advisability of being self-represented. Suffice it to say that there are many reasons why an accused may decide to represent themselves. That ultimate decision is his or hers, and not the court's.

50      The starting point is s 7 of the *Charter*:

> Everyone has the right to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice.

51      One of the rights recognized by s 7 is the right of an accused person to make full answer and defence. Both sides here refer to *R. v. Rose* and *R. v. Stinchcombe*. *R. v. Rose* describes this right:

> 98 The right to make full answer and defence is protected under s. 7 of the Charter. It is one of the principles of fundamental justice. In *R. v. Stinchcombe*, [1991] 3 S.C.R. 326, at p. 336, Sopinka J., writing for the Court, described this right as "one of the pillars of criminal justice on which we heavily depend to ensure that the innocent are not convicted". The right to make full answer and defence manifests itself in several more specific rights and principles, such as the right to full and timely disclosure, the right to know the case to be met before opening one's defence, the principles governing the re-opening of the Crown's case, as well as various rights of cross-examination, among others. The right is integrally linked to other principles of fundamental justice, such as the presumption of innocence, the right to a fair trial, and the principle against self-incrimination.

> 99 As suggested by Sopinka J. for the majority of this Court in *Dersch v. Canada (Attorney General)*, [1990] 2 S.C.R. 1505, however, the right to make full answer and defence does not imply an entitlement to those rules and procedures most likely to result in a finding of innocence. Rather, the right entitles the accused to rules and procedures which are fair in the manner in which they enable the accused to defend against and answer the Crown's case. As stated by Sopinka J., at p. 1515:

>> The right to full answer and defence does not imply that an accused can have, under the rubric of the Charter, an overhaul of the whole law of evidence such that a statement inadmissible under, for instance, the hearsay exclusion, would be admissible if it tended to prove his or her innocence.

> The sentiment expressed by Sopinka J. in Dersch accords with the more general principle stated by La Forest J. for the majority of the Court in *R. v. Lyons*, [1987] 2 S.C.R. 309, at pp. 361-62, that while "at a minimum, the requirements of fundamental justice embrace the requirements of procedural fairness", nevertheless the entitlement to procedural fairness does not entitle the accused to "the most favourable procedures that could possibly be imagined". Similar statements of this principle are found in *R. v. Harrer*, [1995] 3 S.C.R. 562, at p. 573, per La Forest J.; *R. v. Finta*, [1994] 1 S.C.R. 701, at p. 744, per La Forest J.; *R. v. Bartle*, [1994] 3 S.C.R. 173, at p. 225, per L'Heureux-Dubé J.; *Dehghani v. Canada (Minister of Employment and Immigration)*, [1993] 1 S.C.R. 1053, at p. 1077, per Iacobucci J.; and *Thomson Newspapers Ltd. v. Canada (Director of Investigation and Research, Restrictive Trade Practices Commission)*, [1990] 1 S.C.R. 425, at p. 540, per La Forest J.

52      While not specifically raised in the application, Mr. Badari properly points out that there are also arguments under s 11 relating to an accused's right to a fair trial which are arguably at play here. *Charter*, s 11(d) guarantees an accused the benefit of a fair and public hearing by an independent and impartial tribunal. Requiring a self-represented accused to go to trial without being able to be adequately prepared may infringe that right, according to Mr. Badari. However, nothing in this application turns on the difference between s 7 and s 11.

53      The Crown refers to the Canadian cases which appear to discuss the provision of legal resources other than counsel to an accused. In *R. v. Jordan*, the accused sought an order releasing him from custody so that he could prepare for his trial. Alternatively, he sought access to a computer, the Internet and a law library, noting that none of those resources were available at the detention centre he was housed in. That case bears a striking similarity to this one.

54      Nordheimer J denied the application, stating at paras 18 and 20:

18 Assuming for the moment that I have the jurisdiction to order the Ministry of Public Safety and Security to provide a computer and Internet access to Mr. Jordan, there are a host of practical problems which would accompany any such order. Those problems would overwhelm any reasons that might be advanced in favour of such an order being granted.

. . .

20 The fact of matter is that there is no practical way of allowing someone in custody to have access to these facilities without serious disruption to their normal operations, along with serious and overriding security concerns. I acknowledge that an argument could be made that if either of these resources were essential in order to allow Mr. Jordan to make full answer and defence to these charges, in the sense that there were no reasonable alternative remedies available, they might have to be provided. But there is a reasonable alternative remedy, and that is the appointment which has been made in this case through the presence of Ms. Rochman of a friend of the court to assist Mr. Jordan.

55      He commented on Mr. Jordan's concerns at para 22:

While there is some merit to what Mr. Jordan has to say in this regard, the fact is that these arrangements do not place Mr. Jordan in any different position than most accused persons place themselves in when they retain counsel to act on their behalf. They must similarly place their trust in the competence of their counsel. They must similarly reveal confidential information to their counsel. The fact that Mr. Jordan must similarly place his trust in the confidence of Ms. Rochman — and I hasten to add there is nothing to suggest that Ms. Rochman has done anything but a very competent job for Mr. Jordan to date — is not appreciably different in the result.

56      Nordheimer J also commented on Mr. Jordan's situation as an accused in custody at para 26:

The situation in which Mr. Jordan finds himself is clearly not to his liking. He wishes to be in the same position as a person who is not in custody. But the fact is that he is in custody. And there are restrictions that naturally flow from that fact. The conditions to which Mr. Jordan is subject also flow from the fact that Mr. Jordan has chosen to act for himself. He has that right, of course, but there are again consequences that flow from the exercise of that right.

57      He concluded at para 27:

27 Mr. Jordan cannot, in my view, choose to reject counsel and at the same time insist that he be treated exactly the same way as he would be if he had counsel. There are limits to the accommodations that can be realistically provided to someone in Mr. Jordan's position, and within those limits, everything has been done and will continue to be done to provide Mr. Jordan with all of the tools necessary to defend himself. While he is entitled to nothing less, he is not entitled to anything more.

58      In *R. v. John*, Wein J considered Mr. John's application for various relief relating to his need to have legal assistance and his wish to have the court provide him with legal training or access to legal materials. An *amicus* had been appointed for him. She dismissed his application for legal training and legal resources at paras 29 and 30:

29 Mr. John points out that a criminal act must be committed knowingly and willingly. He seeks a complete understanding of the criminal law, in areas that may arise in this case, noting that he cannot expect a fair trial when the Crown has access to a law library and he does not.

30 Mr. John's request for legal training or unrestricted access to a law library is simply not workable. In rejecting the opportunity he has been offered to have the assistance of counsel, Mr. John has in effect waived some of the advantages of having a legally trained person with him. To the extent that it is required for his appropriate defence, it is, of course, the obligation of the Court to assist him. However, wide-ranging access to a law library or additional legal training is simply not a realistic or reasonable request.

59    The Crown also cited *R. v. Parchment*, which was an appeal from conviction. Mr. Parchment argued that he required counsel or access to a full law library to prepare his appeal. Chiasson JA dismissed his application, noting at para 22 that Mr. Parchment had not made it clear on what basis he needed access to the law library. The grounds of appeal were not complex and did not raise any points of unsettled law: para 19.

60    Chiasson JA's conclusions are at paras 28-32:

28 Mr. Parchment appears to be clear on the errors he alleged occurred at his trial. He has access to source material and has undertaken his research. His complaint is that he can access the law library for only an hour at a time and that he cannot store his research in electronic form. He asserts that his ability to print his research is limited and that any computer he uses is erased at the end of each day. The Crown points out that there is no necessity to store material because Mr. Parchment can add to the previous day's computer work-product. The institutions have provided explanations for limited access to equipment that stores information and have addressed the limitation on printing.

29 Incarcerated offenders who are represented by counsel may simply rely on their lawyers to prepare the material required to present their appeals. Offenders who are not incarcerated can do so on their own without the constraints imposed by the requirements of institutional security. To that extent, there is an imbalance between Mr. Parchment's ability to prepare for his appeal and the ability of others to do so.

30 In my view, in the circumstances of this case it is not appropriate on an application under s. 684 to attempt to resolve any imbalance between the ability of a self-represented, incarcerated offender and other offenders to prepare an appeal where the difficulty faced by the applicant is not substantive.

31 Mr. Parchment's ability to prepare substantively for his appeal is not limited. He is inconvenienced by constraints imposed on him for practical and security reasons. I have no reason to question the validity of the explanations provided to me. I anticipate that the institutions will be sensitive to the requirements of self-represented inmates, but I do not consider it appropriate in the circumstances of this case for me to tell the institutions how to manage their security concerns. If the institutions improperly interfere with the rights of inmates, there may be other avenues of redress.

61    It is notable that the decision appends a letter to the Court from BC Correctional Services which details resources available to inmates in British Columbia Correctional Centres, including the one Mr. Parchment was housed in. The letter states (in part):

**Computers provided for general use in Provincial Correctional Centres**

Computers are available in supervised areas in correctional centres and are:

(a) Configured to operate in a similar manner to home or school computers, but without network connections,

(b) Enabled to access and print material, and

(c) Monitored by staff to ensure use is appropriate and that sensitive data is not copied, saved, reproduced, manipulated, printed or disseminated.

Specifically, staff monitors and prevents the unapproved use of external hard drives, CDs or DVDs on these computers.

. . .

**Computer access at NFPC**

I am advised that Mr. Parchment is currently housed at NFPC. At NFPC there are two computers in the unit in which Mr. Parchment is housed when in the general population, and there are printers available for printing material off of those computers. Material can be temporarily saved on those computers, but the computer is 'wiped clean' each night by a program called Deep Freeze. At one point, Deep Freeze did not function properly and Mr. Parchment saved approximately one hundred pages onto a unit computer. This material was printed off for Mr. Parchment before the computer was eventually wiped clean.

In addition to the two computers available for general use, there is a computer available for inmates' use in the law library for the purpose of legal research. Inmates may print from this computer as well.

From December 18th, 2010 to January 5, 2011, Mr. Parchment was held in the segregation unit and did not have access to the computers on the general living unit. However, while in segregation, he was provided with all of the material he had already printed off of the computers. He attended the law library on two occasions during that period.

Mr. Parchment is currently in segregation again pursuant to an institutional charge under the Correction Act Regulation. This term in segregation commenced on March 13th and will end on March 27th. He has been provided with boxes containing his legal documents and a pencil. In addition, he has access to the law library if requested and in the event he makes such a request, would be permitted approximately an hour in the library to prepare with the use of the library computer, a pen and paper.

[Emphasis in original.]

62    It seems clear from this relatively recent material that BC Correctional Centres have physical libraries and provide computer access to inmates, although Internet access (at least in 2011) was not provided.

63    The issue does not appear to have arisen in the reported cases from Alberta as no one provided any Alberta authorities on point, and I located none myself.

64    Mr. Biever provided a newspaper clip from Quebec in which it appeared that computer access had been permitted to inmates on remand who had escaped from the institution by helicopter. No connection between the computer access and the escape was noted in the article.

65    His other cases, *R. v. Frazer*, *R. v. Whitebear* and *R. v. Antinello*, dealt with *Charter*, s 11(d) issues relating to full answer and defence and fair trial (ineffectiveness of counsel), and onus of proof on s 7 breach allegations, respectively. No case authority was cited by Mr. Biever relating directly to the availability of legal materials to self-represented accused or accused in custody, which is not surprising having regard to the materials available to him.

66    Mr. Badari cited numerous authorities on the issues in the application. With respect to the provision of legal materials to inmates, he cited a number of American cases, mainly (as pointed out by Mr. Dube) from the 9th Circuit. There are similarities between cases from the 9th Circuit and those from British Columbia cited by Mr. Badari and as referenced below.

67    There are different positions relating to the provision of legal materials among the Circuits, and the United Supreme Court has declined so far to decide the point. *Lewis v. Casey*, 518 U.S. 343 (U.S. Sup. Ct. 1996) declined to make a decision in that case on the basis that the defendant accused had not proven actual harm. The different positions in various Circuits was discussed in *Kane v. Garcia Espitia*, 546 U.S. 9 (U.S. Sup. Ct. 2005). There the Supreme Court noted that the 6th and 7th Circuits had held that an accused who "knowingly and intelligently" waived his right to counsel also relinquished his right to access to a law library. That appears somewhat similar to the Ontario position, having regard to the cases cited by the Crown.

68    From the cases cited by Mr. Badari, some US principles appear:

1. a constitutional right of access to the courts requires prison authorities to provide inmates with adequate law libraries or adequate assistance from persons trained in the law (*Bounds v. Smith*, 430 U.S. 817 (U.S. Sup. Ct. 1977));

2. a person has a right to be self-represented, and to refuse the assistance of counsel (*Faretta v. California*, 422 U.S. 806 (U.S. Cal. Sup. Ct. 1975));

3. certain cases in the District Court such as *Wetmore v. Fields*, 458 F. Supp. 1131 (U.S. W.D. Wis. 1978) require prison authorities to provide "direct access to truly adequate law libraries":

> So radically and massively does government assault individual freedom when it engages in imprisonment that, in my view, the due process clause should be held to require that through the weeks, months, and years, prisoners be afforded abundant and effective means to mount challenges to particular conditions of confinement for resolution by the judicial branch. Without regard to the degree of formal education, intellectual powers, or gifts of expression of a particular prisoner, he or she should be constitutionally entitled to a choice among: adequate assistance from persons trained in the law, direct access to truly adequate law libraries, and the opportunity for assistance from fellow prisoners with legal research and writing.

4. certain cases in District Courts of Appeal such as *Bribiesca v. Galaza*, 215 F.3d 1015 (U.S. C.A. 9th Cir. 2000) had convictions set aside where the accused had been denied access to the law library. A good description of the position (at least in the 9th Circuit) is at page 7:

> An incarcerated criminal defendant who chooses to represent himself has a constitutional right to access to "law books. or other tools" to assist him in preparing a defense. See *Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir.1985). If the state had unconstitutionally denied Bribiesca such access, that denial would have been an independent basis for relief. But there is nothing in the record before us to suggest that the state acted, or would have acted, unconstitutionally in restricting or denying such access. So long as the state did not restrict or deny access unconstitutionally, it would have been up to Bribiesca to decide whether, under the circumstances, he wished to represent himself. Faretta holds that "a defendant has a Sixth Amendment right to conduct his own defense, provided *only* that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." McKaskle, 465 U.S. at 173, 104 S.Ct. 944

> [Emphasis in original.]

That decision may be in doubt following *Kane v. Garcia Espitia*.

69    Journal articles such as that authored by Hinkley rhetorically ask at p 46:

> How can the sixth amendment guarantee that a pro se litigant will be allowed to prepare and conduct his own defense be reconciled with the Bounds alternative access scheme that expressly allows states, with adequate prisoner legal assistance plans in place, to refuse to supply library materials to inmates? The courts have had difficulty in solving this conundrum. Some courts, while fully recognizing the constitutional right to a pro se defense, have followed steadfastly the *Bounds v. Smith* alternative access principle, holding that when legal assistance is available through a government-sponsored program, the state has met its constitutional obligation and need not provide additional prison law libraries simply because an inmate refuses legal representation and proceeds pro se. Several courts have indicated that where a defendant desires to proceed pro se, the appointment of counsel to act as an "informal legal advisor' or "standby" attorney, whether his services are used or not, discharges a state's constitutional duty to provide prisoners' access to the courts.81 In fact, the Supreme Court has held that a pro se defendant's sixth amendment right to conduct his own defense is not violated by the unsolicited participation of standby counsel as long as the defendant has a "fair chance to present his case in his own way.'" A prisoner whose access to legal materials is severed from the outset clearly will not have any chance to present his case in any way. [Citations omitted.]

70     Potuto argues at p 230:

> The test for what makes an effective counsel clearly suggests one necessary factor in the pro se fight - the right, and need, to prepare. Preparation is so crucial for an attorney that the question whether there was adequate preparation is the crux of most allegations of ineffective assistance of counsel. Thus, if the right to proceed pro se means anything, it must encompass the due process right, even for an incarcerated pro se defendant, to prepare. As has been said,
>
>> an adequate opportunity to prepare is a fundamental component of due process, guaranteed by the Fifth and Fourteenth Amendments. Put another way the state cannot prevent a jailed pro se defendant from preparing his defense merely because he has chosen to exercise his constitutional right of self-representation.
>
> [Citations omitted.]

71     Mr. Badari cites *R. v. Terezakis*, where Prowse JA determined in pre-appeal proceedings that it was necessary to appoint counsel under s 684 of the *Criminal Code* (an *amicus*). She observed at para 6:

> Given the lack of progress in moving matters forward, Mr. Riley offered to write to the Assistant Warden at Mountain Institution to explain the problem and seek a solution. In the somewhat unusual circumstances of this case, I concluded that it was appropriate for the Court to communicate its concerns and, for that reason, I, too, wrote to the Assistant Warden to seek a solution. It is important to state at this point that I am generally of the view that each part of the justice system has its own role to play in the administration of justice and that, for the most part, each segment of the system should be left to run its affairs as it deems fit based on its own expertise and knowledge of available resources. But, in this case, for reasons which were not entirely clear, it appeared that the Court, the Crown and Mr. Terezakis had reached an impasse which made it impossible for the Court to carry out its appellate function in relation to Mr. Terezakis' appeal. It is also important to note that, although the Crown is invariably helpful in providing the Court with relevant authorities, Crown counsel's role is not to represent Mr. Terezakis, nor should he be asked to do so. Mr. Terezakis is willing and able to do his own research and, in my view, should have been provided with reasonable access to appropriate materials to do so. Mr. Terezakis advised that the Institution would provide him with caselaw, but only if he knew the name of the case he wanted. Since the main purpose of doing research is to find cases you do not know about, this form of assistance entirely misses the point.

72     She ordered (at para 11):

> The appointment I am making is limited at this time and will not require counsel to represent Mr. Terezakis at the hearing, but only to provide him with relevant authorities that may assist him in pursuing his sentence appeal, together with a written legal opinion or memorandum. The extent of the necessary research will be for counsel to decide. I would ask that steps be taken to implement this order as quickly as possible so that the sentence appeal can be heard while it is still relevant. In that regard, a copy of these reasons should be expedited and made available to Mr. Terezakis, the Legal Services Society (since I assume, without knowing, that they will be involved in the actual appointment of counsel), to the Deputy Warden at Mountain Institution, and to Crown counsel.

73     *R. v. Wilder* is a delay case, but Scarth J described access to legal facilities at para 89:

> Mr. Wilder was held in custody as a result of his conviction on the Manitoba charges until his release on parole in early September, 1995. By that time he had been in prison for approximately one year. He attributes delay to the Crown both in the hearing of his pre-trial motions and his trial on the ground he was not afforded the necessary "facilities" to prepare. By "facilities" he means having ready access to the many boxes of documents relating to the case, a law library, pen, a computer and various other tools he needed to prepare his motions and defence. During the time he was in custody he brought this situation to the attention of the Court on at least 8 occasions - January 16, 1995, January 23rd, January 27th, February 14th, March 22nd, April 5th, August 8th and August 28th, 1995. The situation remained unresolved until Mr. Wilder's release from prison with certain judges indicating the Court lacked jurisdiction to direct the custodial authorities to provide the prisoner with such facilities.

74    *R. v. Grabowski* dealt with the accused's claim that he could not make full answer and defence and could not have a fair trial under sections 7 and 11 because he was double bunked and could not properly review his disclosure. Bennett J noted at para 10:

> I was not told by Corrections that there are no cells available, nor was I told of any security issue in relation to Mr. Grabowski if he is in a single-bunk cell. While I appreciate that Corrections wishes to control who is placed in what cell, there are also other considerations that must be taken into account, including Mr. Grabowski's right to a fair trial and his right to make full answer and defence.

75    She held at para 13:

> In my view, North Fraser Pre-trial Centre cannot provide Mr. Grabowski with appropriate facilities in order for him to prepare his defence. He is at trial, in court, most of the day. He has limited access to both the computer room and to the law library in the pre-trial centre. He has no other place to work and read, other than his cell, and it is only common sense that one would be distracted and unable to concentrate with someone else in a very small room with you watching television.

76    *R. v. Ciancio* dealt with similar issues. The BC Court of Appeal dismissed the appeal on the basis of a lack of jurisdiction (no jurisdiction for a court of appeal to interfere with pre-trial or mid trial rulings). However, the majority stated that it was "dubious about the jurisdiction of the court to make such an order": para 31. Thackery JA, in dissent, would have allowed the appeal, noting at para 44:

> In the result, the trial judge declined to order that Mr. Ciancio be single-bunked, but did order that the hours be extended in which he could have access to the computer in the interview room. The order that she made formalized the existing arrangement between the parties and added access to the interview room "between the hours of 9:45 p.m. and 12:00 a.m. every day of the week, despite the lock-up of the rest of the unit." It also provided for the abridgment of Mr. Ciancio's access "in the event of a security incident or other circumstances requiring the living unit or other area in which the private room is located to be locked down for safety, security or disciplinary reasons."

77    He continued at para 45:

> The judge made this order in the absence of a factual finding that Mr. Ciancio's right to a fair trial was in jeopardy. She declined to make the single-bunking order because of the absence of evidence upon which such a finding could be made. She made the order extending the access hours because the imminent commencement of the trial was going to eat into the daytime window provided under the existing arrangement. She therefore made an order that attempted to make up those lost hours at another time. It shifted the time period during which Mr. Ciancio was to be allowed to use the interview room to prepare his case. The judge indicated at paragraph 33 of her reasons that she was concerned about Mr. Ciancio's ability to "adequately instruct counsel", but aside from that there is nothing to indicate that there were fair-trial concerns.

78    In *R. v. Lalo*, the appointment of counsel at public expense to act on the preliminary hearing was considered. Hood J noted at page 7 of her decision:

> None of the conditional stay cases cited to me dealt with accused persons who were incarcerated. This places additional constraints on an accused person's ability to prepare to represent himself which would not be the case if he were at liberty. Some of these constraints are financial and some are physical. Just as examples, other accused persons would be free to go to a law library to read or obtain necessary materials. They would also have more ready access to such things as photocopiers and telephones. I have heard no evidence to contradict that of Mr. Lalo that there are few facilities available to him at Warkworth or at the Halifax County Correctional Centre which would assist him in preparing to represent himself, especially on short notice. I therefore consider this to be an important additional factor in this case in Mr. Lalo's ability to represent himself without infringing his right to a fair trial.

79      With reference to *R. v. Cai*, I am satisfied that Mr. Biever has demonstrated through his evidence and his submissions in court on this application and previous ones that he will not consider that he has had a fair trial unless he has had an opportunity to research legal issues himself. He is not prepared to rely on the research of others, including Mr. Badari, the *amicus*.

80      The test, of course, is not whether the accused subjectively feels that he has or will have a fair trial. The test is an objective one. It is certainly possible that Mr. Biever would have a fair trial with the assistance of the Court, the services of the *amicus*, and the cooperation of the Crown.

81      As a self-represented litigant, with (at present) very limited access to appropriate legal materials, he must depend heavily on the *amicus* who admittedly has limited time to devote to this file, and has limited financial resources (from Legal Aid) to conduct research. Mr. Biever expressed legitimate concerns over the time delays in making requests of Mr. Bedari and getting case law and information to him at the ERC. He described the process as typically taking ten days.

82      As a self-represented litigant, Mr. Biever is entitled to do his own research within his own capabilities. Many represented litigants are content to have their lawyer do all of the research and rely entirely on the lawyer's advice. Represented parties are not required to rely solely on their lawyer's advice and if they are not incarcerated, are able to use a number of readily available resources (including the court house libraries) to do research if they choose.

83      Mr. Biever is neither represented, nor, even when represented, is he content to rely on his lawyer's advice. An *amicus* is not equivalent to his own counsel, as the *amicus* is not required to take Mr. Biever's instructions or do his bidding.

84      Mr. Biever has demonstrated a need to be able to do research on his own. He has also demonstrated that he is capable of putting such research to use, and that this is not an idle request. When he has had access to legal resources, he has used them in a meaningful and useful manner.

85      Thus I conclude that Mr. Biever has satisfied the heavy onus on him that he will be unable to adequately prepare for the severance application scheduled for early June, 2015 and the subsequent *Charter* applications scheduled for later that month, unless he has greater access to legal resources than he presently does. Equally importantly, he will be unable to properly prepare for tiral if he is limited to the materials presently available to him.

86      I reject the notion that self-represented litigants should only be able to access legal materials if they demonstrate that their case is complex or involves novel points of law. That suggestion trivializes the necessity for knowledge of current legal procedures and practices and up-to-date knowledge of the law in many areas to properly prepare for a reasonable defence in a criminal case.

87      In making such a conclusion, I have determined that providing Mr. Biever with access to the list of materials provided by Mr. Mills and the laptop computer loaded with *DART* is not adequate. At a minimum, Mr. Biever should have timely and reasonable access to all Canadian criminal law case authority. By the time *DART* updates are made available to subscribers, they are already out of date. Supreme Court of Canada decisions come out weekly, and Alberta Court of Appeal decisions come out daily. Their decisions are binding authority in Alberta and timely access to these decisions is essential to anyone attempting to anyone presenting arguments in a criminal matter, whether it be at trial or on pre-trial applications. Familiarity with Alberta trial decisions are also essential to proper preparation.

88      Authorities from other Canadian jurisdictions may be important and while not of binding authority, Court of Appeal decisions from other provinces are highly persuasive, and trial decisions from other provinces may show emerging trends in criminal law that have not yet made their way into Alberta case law.

89      At this stage, I do not intend to attempt to prescribe Alberta Justice should go about improving Mr. Biever's access to adequate legal resources. That being said, it would be unfair for me to find inadequacies without making suggestions as to how the inadequacies might be improved.

90      Mr. Biever seeks full access to the Internet. That is not realistic or feasible having regard to legitimate security concerns as expressed by Mr. Mills. As well, Internet research is not necessarily appropriate legal research. Sites like Wikipedia are inappropriate sources of law. While Google searches and Wikipedia information are sometimes helpful shortcuts, such as searching for definitions, that kind of legal information resources is not filtered for reliability and is not usually specific to Canadian law, let alone Alberta law.

91      More accurate information can be obtained from legal texts, some of which are already available to inmates at the ERC, including *Black's Law Dictionary*, annotated versions of *Criminal Code* such as *Martin's*, Alan W Mewett & Morris Manning, *Mewett & Manning on Criminal Law* (Toronto: Butterworths, 1994), and other texts.

92      I am hard pressed to see, however, how adequate access can be provided without some Internet access. The CanLII website provides access to all Canadian statutes and regulations, and to virtually all recent Canadian reported decisions. Access is more timely than as provided in the case reports themselves, as courts (at least the courts in Alberta) provide their decisions to CanLII immediately on release. CanLII is now the formal public source for Alberta Court of Queen's Bench and Alberta Court of Appeal judgments.

93      It was demonstrated during an earlier application by Mr. Biever that Internet access restricted to the CanLII website could be provided to Mr. Biever in a safe and secure manner. It took less than twenty four hours for that to be accomplished in a holding cell in the Edmonton Law Courts. I would be surprised that a facility such as the ERC, which is advertised on the Alberta Justice and Solicitor General's website as "the largest, most technologically advanced remand facility in Canada", cannot find a way of providing an inmate with access to a computer which itself has access only to the CanLII website, and any materials stored in the computer. There must surely be a secure interview room that could be so equipped and easily monitored.

94      I note that there have been no submissions by the Crown that technology prevents this sort of limited Internet access from occurring. It would not be unreasonable in my view for there to be some monitoring of computer access as to whether there are or have been attempts to go to sites other than CanLII and any other site for which access is permitted.

95      While Mr. Biever would also like access to websites such as Quicklaw/LexisNexis and Westlaw, and the benefits of that type of access to information are obvious, there is a cost involved beyond making a computer with Internet access available to an inmate. While accessing CanLII is free, the cost of providing unlimited access to such commercial sites is not insignificant.

96      I recognize that a person who is not in custody may have access to Quicklaw and the criminal law resources on the Quicklaw/LexisNexis website at the law libraries throughout Alberta. Access to Westlaw is available only to those who have an account (meaning those who have obtained their own access and are paying for it).

97      I do not think that it can be said that inmates have a constitutional right to access to information that may be provided by law libraries, let alone a right to require law libraries to provide certain types of information. It would not appear unreasonable for the ERC to require inmates who wished to have access to a site such as Quicklaw/LexisNexis or Westlaw to obtain and pay for their own accounts. That might be facilitated at the ERC, or by family members or Legal Aid. But I make no finding here that Mr. Biever is entitled to have free (or any) access to commercial sites.

98      One reason for my concluding that CanLII access should be provided but commercial databases are not necessary is the nature of this particular action. Mr. Biever is an accused in a criminal law matter. While there are areas of law where much older authorities are highly relevant, that is less so in criminal litigation given the broad reshaping of this domain in the post-*Charter* period. Second, the CanLII database now has every reported Supreme Court of Canada decision dating to 1875. This provides a very broad foundation of the most significant Canadian jurisprudence.

99      I also make no finding here as to what additional (if any) materials should be loaded onto the laptop Mr. Biever already accesses. I do not intend to be an advertising site for any reference texts or series, but I will simply note that there are many excellent texts and services available that might be downloaded and updated from time to time without the necessity of providing Internet access to those materials. Undoubtedly, the ERC laptop could be beefed up considerably, but again with some cost.

100     I would observe that I do not think that access to law lists for jurisdictions other than Alberta need to be provided or made available to inmates. Alberta accuseds are generally best represented by Alberta lawyers. Lawyers from outside Canada cannot legitimately provide legal advice in Alberta or appear in Alberta courts without permission from the Alberta Law Society. Access to counsel of choice is limited to lawyers legally able to provide legal services.

101     I do not think that it is necessary to provide access to non-Canadian materials. I recognize that this decision has been influenced by American authorities that are not easily found other than by using law libraries or paying for expensive Internet access to international law information providers. It is somewhat rare for non-Canadian law or legal information to be helpful in a Canadian criminal case. In almost all cases, it would be necessary to have significant legal training as to how to make appropriate use of international information in an Alberta courtroom. Requiring access to such materials to inmates would not be reasonable, except in very exceptional circumstances.

102     With respect to Mr. Biever's charges, no special circumstances have been made out requiring access to non-Canadian materials.

103     His need for access to international materials for the purpose of this application has been satisfied by the excellent services provided by the *amicus*, Mr. Badari.

104     There are a couple of caveats to my decision. I recognize that there may be a "floodgates" reaction to it and fears that the consequences of this decision will be to cause the government to expend tens of thousands of dollars. I am not certain that is the likely cost of providing Mr. Biever with timely and regular access to CanLII. If there are cost or space requirements at the ERC, perhaps that can be satisfied by making arrangements to have Mr. Biever brought to the Law Courts and placed in a holding cell with such access (as was arranged in June, 2014).

105     Alternatively, there may be ways of loading Canadian case law on a computer and updating it on a regular (perhaps weekly) basis. That may not require a live connection to the Internet.

106     Secondly, this decision is limited to Mr. Biever. He has demonstrated that he will benefit from better access to legal information. My decision is based in large part on his testimony in court, and the history Mr. Biever has both before me and before Gates J as pretrial conference judge with requests for legal information and a demonstrated ability to make reasonable use of the resources he has been provided with.

107     Not all inmates in the remand centre are in similar situations to Mr. Biever: unrepresented, distrustful of the Alberta criminal bar, and capable of making use of legal resources themselves. Most non-lawyer accuseds are content to rely on their lawyers. Many others would have limited or no ability to make use of source information, even if it were made available.

108     In most cases, concerns might be addressed by the appointment of an *amicus*. My estimation is that the cost of providing an *amicus* to Mr. Biever will greatly exceed the cost of providing access to reasonable legal materials in the ERC, even including Internet access. However, I do not share the notion that a self-represented accused must simply accept the work or research done by someone appointed as an *amicus* and who has no solicitor-client relationship with the inmate.

109     Nor do I accept that a represented inmate must accept the advice of his lawyer (whether privately retained or appointed by Legal Aid) without any ability to verify it through his or her own research. People without medical training should not diagnose their own illnesses and determine their own treatments using the Internet, but access to information may better equip them to ask intelligent questions of their care-givers. The same can be said for the law.

110     I also reject the notion that accuseds who have been denied bail have limited their *Charter* rights. Such rights must be recognized and accommodated in the context of incarceration. *Charter* rights are still available to those who have previously committed criminal offences, or who may be viewed as presenting an unreasonable risk to society.

111     This decision is not intended to be a manifesto for the creation of generally available law libraries in remand centres or prisons. It is not unreasonable for budgetary considerations to have reasonable limitations in place. Mr. Mills testified that

as far as he knew, there were two or three other inmates apart from Mr. Biever who were using the laptop computer containing *DART*. I am certainly not suggesting that any inmate who wants a similarly-equipped laptop should be given one. Just like the lending library, computer access might be provided on a first-come first-served basis (within reason). I cannot see that it would be reasonable for an inmate to expect to be able to spend most of his remand time on a laptop computer looking through CanLII or other legal materials. The provision of legal materials is to assist inmates with the defence of their charges, not to provide them with a legal education or recreation.

112     Thirdly, when I speak of timely and regular access to information, I recognize that there are security and disciplinary considerations in correction centres required to maintain safety and order in the centre. Some inmates, for whatever reason, require protection. There are others whose behavior requires that they be segregated from other prisoners. There are others who from time to time require that disciplinary measures be taken against them.

113     There must be a reasonable balance between the Centre's administrative requirements and an inmate's right to have reasonable access to information.

114     Mr. Biever has also complained of the limited ability to make copies of things obtained from the laptop, and to be able to prepare legal documents. Research, without the ability to save the research and use it later, is of limited benefit. I cannot think that it would be particularly difficult to provide access to printing (as is available to people using law libraries) where printing can be done provided it is paid for by the user.

115     Law firms are able to recover the cost of printing by passing on the costs to clients. There is no reason why an inmate should expect free printing, but there is also no reason that I can think of that should prevent an inmate from being able to print and keep legal materials, or to have to rely on family, friends or an *amicus* to make copies of requested materials and deliver or post them to the inmate at the ERC.

116     Having the ERC provide the printing will ensure that any ink used in the ERC will not contain contraband, as is a risk with some materials entering the ERC from outside sources.

117     As with printing, I see no reason why an inmate who is representing himself in his or her defence, and who in doing so may have to prepare pleadings and briefs, cannot have access to word processing. There are free word-processing programs which might be downloaded on the laptop Mr. Biever has access to, and so long as he pays for the printing costs, it is difficult for me on the evidence to see how such access would involve a financial burden or staffing burden on the ERC.

118     Clearly the ERC is not required to provide paralegal or secretarial services, but it would seem to me that Mr. Biever should be able to retrieve any printing ordered by him while he has physical access to the laptop. I can think of no reason why printing should not be provided to him the same day and charged to his commissary account.

## VI. Conclusion

119     I am satisfied that Mr. Biever will likely be unable to make full answer and defence to the charges he faces if he is not provided with greater access to legal information than he presently has.

120     At this stage, I leave it to Alberta Justice to determine what additional resources to provide to Mr. Biever, and how they will be provided.

121     Mr. Biever has satisfied me that a prospective breach of his s 7 and s 11 *Charter* rights to a fair trial will likely occur in the absence of such greater access.

122     The severance application is to be heard commencing June 8. I note that the Crown has within the last few days provided its response to Mr. Biever's application. Implementation of this decision cannot wait long. In that regard, I would ask that the Crown advise as to what steps have or will be taken to provide Mr. Biever with additional legal resources sufficient to prepare for his severance application and respond to the Crown's brief and materials by the close of business on Friday, May 22, 2015.

123    It is inappropriate to order a stay or a conditional stay until the adequacy of Alberta Justice's suggested remedy is known and can perhaps be tested.

124    That, I suppose, is an option for Alberta Justice in the event it determines that it is unable or unwilling to provide reasonable additional legal resources to Mr. Biever for cost, manpower, security, or other reasons.

125    Any such remedy is premature.

126    As an observation, it appears to me that at a minimum, reasonable access to the CanLII website should be provided. In the absence of access to CanLII, timely access to all Canadian criminal cases at all levels of court should be provided so that Mr. Biever can be reasonably current in the state of Canadian case law.

127    Mr. Biever should also be provided with timely access to printing services for legal materials he wishes to have printed. It is not necessary that these services be provided without reasonable charge to Mr. Biever.

128    The Crown is to advise me, Mr. Biever, and Mr. Badari as to what steps have been or will be taken to provide Mr. Biever with additional legal resources sufficient to prepare for his severance application and respond to the Crown's brief and materials by the close of business on Friday, May 22, 2015.

129    I would encourage the ERC and Alberta Justice to investigate providing access to on-line resources such as Quicklaw/LexisNexus and/or Westlaw to inmates who have an account with those providers, and who are solely responsible for the subscription costs.

130    Communications with Legal Aid or the Edmonton Criminal Trial Lawyers' Association might also be helpful to identify other legal materials that could be provided by way of loading them into the laptop. Consideration might be given to having a commissioner for oaths or notary public available from time to time at the ERC to assist self-represented litigants with any oaths required to file court materials.

131    My suggestions should not be considered as mandatory. Alberta Justice and the ERC may be able to come up with a plan to provide reasonable access to legal materials in other ways.

132    The parties are free to come back to me as to the sufficiency or insufficiency of the ultimate solution proposed or provided by Alberta Justice and the ERC.

**VII. Observations**

133    This decision has nothing to do with the quality of service provided to Albertans by Legal Aid. Mr. Biever has been offered the services of a number of lawyers who enjoy excellent professional reputations as criminal defence lawyers. His family has provided assistance in attempting to secure legal counsel, and the lawyers identified by them are also well regarded. That being said, the selection of counsel is a highly personal one, and to feel adequately represented the client must have a high degree of confidence in counsel. That personal feeling is highly subjective, and cannot be measured on objective criteria. Subjective considerations are not always rational or reasonable to others.

134    Despite the highly publicized funding woes of Alberta's Legal Aid system, people represented by Legal Aid lawyers are generally well served.

135    I am indebted to counsel for the high quality of their arguments. Mr. Badari has been of invaluable assistance to the Court and to Mr. Biever with the quality of his written materials and oral presentation.

*Application granted.*

**Appendix "A" — Legal Books Available at the ERC**

Legal Reference Books

*List may vary due to destruction of texts*

Alberta Rules of Court

Alberta Rules of Court (annotated)

Black's Law Dictionary

Martin's Related Criminal Statutes

Martin's Criminal Code

Mewett & Manning on Criminal Law 3rd edition

The Law of Evidence

Federal Courts Practice

Every Canadian's Guide to the Law

Constitutional Law of Canada

Constitutional Law

Statutory Interpretation

Extradition to & from Canada

A Practical Guide to Canadian Extradition

Immigration Act of Canada

The Immigrants Handbook

Immigration Law

Immigration & Refugee Protection Act of Canada

Dictionaries

Thesaurus

Books are issued on a 3 day sign out period. Extensions on most books cannot be given due to the high demand of these books. List can vary due to book abuse.

*No hard covered texted are issued to Max Pod.*

**EXHIBIT EN-10**

**TO THE DECLARATION OF EVAN NUTTALL**

2005 ABQB 532

Alberta Court of Queen's Bench

Pelechytik v. Snow Valley Ski Club

2005 CarswellAlta 974, 2005 ABQB 532, [2005] A.W.L.D. 2974, [2005] A.J.
No. 875, 141 A.C.W.S. (3d) 504, 14 C.P.C. (6th) 319, 53 Alta. L.R. (4th) 117

# Brian Pelechytik (Plaintiff) and Snow Valley Ski Club (Defendant)

Master Breitkreuz

Heard: April 1, 2005
Judgment: July 12, 2005
Docket: Edmonton 0503-01562

Counsel: Barbara C. Howell for Plaintiff
T. Lee for Defendant

*Master Breitkreuz*:

## Introduction

1    The plaintiff/respondent, Brian Pelechytik ("Pelechytik") was injured while using a ski lift operated by the defendant/ applicant ("Snow Valley"). The ski lift ticket purchased by Pelechytik contained a waiver of liability clause. Snow Valley seeks summary dismissal of claim on the grounds that this waiver of liability clause provides a complete defence to Pelechytik's cause of action.

## Factual Background

2    The facts of this case are straightforward. Pelechytik purchased a ski lift ticket on November 8, 2003, at Snow Valley. He tried to use a handle tow to go up the hill. While standing in position waiting for the next handle, he was struck behind the knee by a handle which, instead of hanging straight down from the rope, was improperly in a horizontal position. He suffered a complete anterior cruciate ligament tear. Pelechytik brought this action alleging that Snow Valley was negligent in its maintenance, operation and supervision of the handle tow.

3    On the front of the lift ticket is printed "PLEASE READ THE EXCLUSION OF LIABILITY AND ASSUMPTION OF RISK NOTICE ON THE BACK." The reverse of the ticket contains these terms:

NOTICE TO ALL USERS OF THESE FACILITIES EXCLUSION OF LIABILITY — ASSUMPTION OF RISK — JURISDICTION THESE CONDITIONS WILL AFFECT YOUR LEGAL RIGHTS PLEASE READ CAREFULLY!

As a condition of the use of the ski area facilities, the Ticket Holder assumes all risk of personal injury, death or property loss resulting from any cause whatsoever including but not limited to: the risks, dangers and hazards of skiing, snowboarding and other recreational activities; the use of ski lifts; collision with natural or man-made objects or with skiers, snowboarders or other persons; travel within or beyond the ski area boundaries; or negligence, breach of contract or breach of statutory duty of care on the part of Snow Valley Ski Club and its employees, agents, representatives, sponsors, successors and assigns (hereinafter collectively referred to as the 'ski area operator'). The Ticket Holder agrees that the ski area operator shall not be liable for any such personal injury, death or property loss and releases the ski area operator and waives all claims with respect thereto.

. . . . .

THE SKI AREA OPERATOR'S LIABILITY IS EXCLUDED BY THESE CONDITIONS.

4    There were also brightly coloured signs containing these terms posted in the lift ticket purchase area and in various locations throughout the ski area. Mr. Hillman, Snow Valley's area manager, describes them as "numerous, prominent and garish." Mr. Hillman's Affidavit contains photographs showing the placement of some of these signs.

5    The Alpine Responsibility Code was also posted throughout the area, including the ticket purchase area. One of its provisions is: "You must have sufficient physical dexterity, ability and knowledge to safely load, ride and unload lifts. If in doubt, ask the lift attendant."

6    Snow Valley seeks summary dismissal of Pelechytik's claim, relying on the terms of the waiver.

**Issue**

7    The issue in this application is whether this is an appropriate situation for summary dismissal of Pelechytik's claim. This requires a consideration of:

>    (a) whether Snow Valley took reasonable steps to bring the waiver agreement to Pelechytik's attention, thereby binding him to those terms, and

>    (b) whether the negligence alleged falls within the scope of the waiver.

**Discussion**

***Summary Judgment***

8    Rule 159 of the Alberta Rules of Court provides that:

>    159(2) A defendant may, after delivering a statement of defence, on the ground that there is no merit to a claim or part of a claim or that the only genuine issue is as to amount, apply to the court for a judgment on an affidavit sworn by him or some other person who can swear positively to the facts, stating that there is no merit to the whole or part of the claim or that the only genuine issue is as to amount and that the deponent knows of no facts that would substantiate the claim or any part of it.

>    (3) On hearing the motion, if the court is satisfied that there is no genuine issue for trial with respect to any claim, the court may give summary judgment against the plaintiff or a defendant.

9    A defendant's burden in an action for summary dismissal under R. 159 has been variously expressed as having to establish that it is "plain and obvious that the action cannot succeed" (*Boudreault v. Barrett* (1998), 68 Alta. L.R. (3d) 83 (Alta. C.A.) at para. 9); that "there is no merit to the claim, that is, it does not raise a genuine issue for trial" (*Allied-Signal Inc. v. Dome Petroleum Ltd.* (1991), 81 Alta. L.R. (2d) 307 (Alta. Q.B.), at 319); or that it is "manifestly clear or beyond a reasonable doubt that there is not a triable issue" (*Mellon (Next friend of) v. Gore Mutual Insurance Co.*, [1995] A.J. No. 855 (Alta. C.A.) at para. 3). Merely showing that the defendant has a strong likelihood of success at trial is not sufficient (*Allied-Signal Inc.*, *supra*). Therefore, the Court's task in this application is to determine whether, on the pleadings and evidence, there is a genuine issue for trial. It is not to make conclusive findings on those issues: *Western Canadian Place Ltd. v. Con-Force Products Ltd.*, [1997] A.J. No. 1299 (Alta. Q.B.) at para. 50.

*Is Pelechytik Bound by the Waiver?*

10    The *Occupiers' Liability Act*, R.S.A. 2000, c. O-4, sets out the basis for Snow Valley's possible liability. Section 5 creates a duty of care which Snow Valley, as occupier of the ski hill, owes to Pelechytik as a visitor. Section 7 provides that the occupier need not fulfil this duty with respect to risks willingly accepted by the visitor. Section 8(1) allows an occupier to restrict or

exclude its liability by express agreement as long as it takes reasonable steps to bring that express agreement to the visitor's notice. Therefore, in order to escape liability for negligence, Snow Valley must prove that it took reasonable steps to bring the waiver to Pelechytik's notice.

11      The leading Canadian case on ticket conditions is *Union Steamship Ltd. v. Barnes*, [1956] S.C.R. 842 (S.C.C.) [*Union Steamships*]. In that case, the plaintiff was injured on a ship as a result of the defendant's negligence. The issue on appeal was whether the terms contained on the ticket, excluding the defendant for liability for negligence, were binding. As in the case at bar, the ticket contained a notice on the front, in red, that it was subject to conditions printed on the back, and the back contained the terms of the waiver. The plaintiff knew that there was some writing but did not read it. The issue was whether the defendant did what was reasonably sufficient to give the plaintiff notice of the conditions. The court found that it had, and the defendant was permitted to rely on the waiver.

12      The issue of ski ticket waivers has arisen before. The only Alberta decision on record is not very helpful, because in that case the terms of waiver did not include negligence, so the Court applied the *contra proferentem* principle and held that negligence was beyond the scope of the waiver: *Lyster v. Fortress Mountain Resorts Ltd.* (1978), 13 A.R. 162 (Alta. S.C.). However, there are several cases from British Columbia and Ontario which shed some light on this issue.

13      *McQuary v. Big White Ski Resort Ltd.*, [1993] B.C.J. No. 1956 (B.C. S.C.) [*McQuary*] and *Dawe v. Cypress Bowl Recreations Ltd.*, [1993] B.C.J. No. 2892 (B.C. S.C.) [*Dawe*] featured waivers on lift tickets and signs that were virtually identical to those in the case at hand. In both cases, the plaintiffs admitted to having some general knowledge that the tickets limited liability; this knowledge was sufficient to constitute notice of the release. Since Pelechytik does not admit to such knowledge, these cases are distinguishable on that point. However, in both *McQuary* and *Dawe* the Court also found that the terms, design and colouring of the tickets and signs constituted reasonable steps to bring the terms of the waiver to the plaintiffs' attention.

14      In another case involving very similar tickets and signage, an Ontario court found that "the only reasonable inference is that he saw the signs and saw there were legal conditions on the ticket and the voucher," and therefore found as a fact that the terms did come to the plaintiff's attention: *Argiros v. Whistler & Blackcomb Mountain*, [2002] O.J. No. 3916 (Ont. S.C.J.) at para. 15. The plaintiff in that case purchased multiple tickets and vouchers, all containing the terms of the waiver, and the photographs of the ticket sales area showed ten waiver signs. The Court also found the plaintiff's assertions that the terms were not pointed out to him, that he had not read them, and that he would not have understood them if he had to be irrelevant, because the test is objective: "reasonable steps."

15      These cases indicate that, as long as reasonable steps are taken to alert a visitor to the waiver clauses, an occupier can rely on these waiver clauses. The determination that reasonable steps were taken is a finding of fact in each case: *Union Steamship* at 856. The case of *Greeven v. Blackcomb Skiing Enterprises Ltd.*, [1994] B.C.J. No. 2056 (B.C. S.C.) is a good example. Again, the language and the design of the tickets and signs were substantially similar to those in *McQuary* and *Dawe*, and therefore to those used at Snow Valley. Unlike the claimants in those two cases, Ms. Greeven did not have general knowledge of limitation provisions. Furthermore, the Court found that the evidence of the placement of the signs was too vague to support a conclusion that the plaintiff must have seen them. The defendant's motion to dismiss the claim was denied.

16      In the matter at bar, Pelechytik has not admitted to actual knowledge, even in a general way, of limitation of liability. The evidence provided of the signage at Snow Valley is not satisfactory. Mr. Hillman states that "[a]ny person who purchased a ski lift ticket from the Defendant would have been facing a waiver sign as and when the lift ticket was purchased." (Affidavit of Jim Hillman at para. 4.) However, the photographs in Exhibit B of Mr. Hillman's affidavit do not bear this statement out. There is not a waiver sign visible at each sales point, and some that are visible are to the side of the purchaser, not facing him. Therefore, it is not plain and obvious on the evidence before me that Snow Valley took reasonable steps to bring the waiver to Pelechytik's attention, and it is a triable issue.

17      Snow Valley also argues that, by accessing the ski area and facilities, Pelechytik is deemed to have accepted the terms of the waiver posted on signs throughout. As I have noted, the adequacy of the waiver signage in the ticket kiosk area is not

clear; the same applies to the evidence of signs throughout the ski area. Further evidence is required to determine whether the waiver signage was sufficient. On the evidence before me, Snow Valley has not established beyond a reasonable doubt that the waiver signage was sufficient to deem Pelechytik to have accepted the terms.

18     Nor does the presence of Alpine Responsibility Code signs make it plain and obvious that Pelechytik agreed to forego his right to bring legal action for Snow Valley's negligence. The Code does not address limitation of liability in any way; it merely sets out the conduct expected of skiers. While this would conceivably be relevant to a contributory negligence defence, it is of no assistance in proving an agreement to limit or exclude Snow Valley's liability.

*Does the Negligence Alleged Fall within the Scope of the Waiver?*

19     In *McQuary*, *Dawe* and *Greeven*, the plaintiffs were all injured while actually skiing. In contrast, Pelechytik's injury was allegedly caused by a mechanical fault in the ski lift. In pleadings, Pelechytik raises the argument that the phrase "the use of ski lifts" in the waiver cannot, and should not, be construed to exclude liability for mechanical breakdown of lift equipment or for injuries caused by faulty, defective or improperly maintained or operated lift equipment. He further argues that even if the waiver clause does encompass categories of negligence, it would be contrary to public policy to allow such an exclusion to stand. There is not a Canadian case directly on point. Since this is a novel argument in Canada, it should be allowed to proceed to trial (The Honourable William A. Stevenson & The Honourable Jean E. Côté, *Alberta Civil Procedure Handbook 2005* (Edmonton: Juriliber, 2005) at 158 and authorities cited therein). While the chance of success may be small, failure is not inevitable: *Clarke v. Connell*, [1997] A.J. No. 609 (Alta. Q.B.) at para. 15. This is another reason why summary dismissal is not appropriate in this case.

**Conclusion**

20     On the facts of this case, I cannot say that it is manifestly clear that Pelechytik cannot succeed at trial. The question of whether or not Snow Valley took reasonable steps to bring the waiver of liability to Pelechytik's notice is a triable issue. So, too, is determining whether negligence in maintaining or operating ski lift equipment falls within the scope of the waiver's terms. Therefore, this application for summary dismissal is denied.

**Costs**

21     The plaintiff is awarded costs for successfully opposing the application.

*Application dismissed.*

**EXHIBIT EN-11**

**TO THE DECLARATION OF EVAN NUTTALL**

2005 ABQB 535

Alberta Court of Queen's Bench

Champion v. Ski Marmot Basin

2005 CarswellAlta 977, 2005 ABQB 535, [2005] A.W.L.D. 3050, [2005] A.W.L.D.
3123, [2005] A.W.L.D. 3125, [2005] A.J. No. 878, 141 A.C.W.S. (3d) 503, 379 A.R. 173

**Warren Champion and Her Majesty the Queen In Right of the Province of Alberta
(Plaintiffs) and Ski Marmot Basin, Rocky Mountain Skiing Inc., carrying on business
under the trade name and style of Ski Marmot Basin, Attorney General of Canada
and/or Parks Canada Agency, ABC Corporation and John Doe (Defendants)**

Master Breitkreuz

Heard: May 19, 2005
Judgment: July 13, 2005
Docket: Edmonton 0303-07118

Counsel: G. Honey for Plaintiff
T. Lee for Defendant

*Master Breitkreuz*:

**Introduction**

1    The plaintiff/respondent, Warren Champion ("Champion"), was injured by a fall from a T-bar lift at the ski facility operated by the defendants/applicants Ski Marmot Basin and Rocky Mountain Skiing Inc. ("the ski area operators"). The land was leased from the Queen in right of Canada. Champion initiated an action alleging negligence on the part of the ski area operators. The defendants seek summary dismissal of Champion's claim pursuant to Rule 159 of the Alberta Rules of Court on the ground that the waiver of liability printed on the lift ticket and on signs posted around the ski area constitute a complete defence to the claim. They also seek summary dismissal of claim against the Attorney General of Canada and/or Parks Canada ("Canada"), on the ground that Canada is not an "occupier" within the meaning of the *Occupiers' Liability Act*, R.S.A. 2000, c. O-4.

**Factual Background**

2    On April 21, 2001, Champion and his son went skiing at Marmot Basin. They tried to ride up a T-bar lift. The lift track was dangerously icy; it had not been groomed or roughened, as it had been on Champion's numerous previous visits to the ski hill.

3    The ice caused Champion's son to fall onto Champion's skis. This made Champion fall too, and he slid down the T-bar track, hitting two small trees. He sustained a knee injury which required surgery.

4    Shortly after his accident, Champion observed several other people fall while riding the T-bar. The T-bar operator closed the lift only after Champion asked him to do so.

5    On the front of the Marmot Basin lift ticket was printed "PLEASE READ THE EXCLUSION OF LIABILITY AND ASSUMPTION OF RISK NOTICE BELOW." The reverse side of the ticket contained the following terms:

   NOTICE TO USERS OF THESE FACILITIES EXCLUSION OF LIABILITY — ASSUMPTION OF RISK —
   JURISDICTION THESE CONDITIONS WILL AFFECT YOUR LEGAL RIGHTS PLEASE READ CAREFULLY!

As a condition of use of the ski area facilities, the Ticket Holder assumes all risk of personal injury, death or property loss resulting from any cause whatsoever including but not limited to the risks, dangers and hazards of skiing, snowboarding and other recreational activities; the use of ski lifts; collision with natural or man-made objects or with skiers, snowboarders or other persons; travel within or beyond the ski area boundaries; or negligence, breach of contract, or breach of statutory duty of care on the part of Ski Marmot Basin and its employees, agents, representatives and sponsors (hereinafter collectively referred to as "the ski area operator"). The Ticket Holder agrees that the ski area operator shall not be liable for any such personal injury, death or property loss and releases the ski area operator and waives all claims with respect thereto.

. . . . .

THE SKI AREA OPERATOR'S LIABILITY IS EXCLUDED BY THESE CONDITIONS PLEASE ADHERE TO THE ALPINE RESPONSIBILITY CODE AND BE RESPONSIBLE FOR YOUR OWN SAFETY IN ALL ACTIVITIES

This waiver was also printed on bright yellow, red and black signs which were posted throughout the ticket sales area and the ski hill.

6    The Alpine Responsibility Code mentioned in the waiver was also posted prominently throughout the ski area. One requirement of the Code is that skiers "must have sufficient physical dexterity, ability and knowledge to safely load, ride and unload lifts. If in doubt, ask the lift attendant."

7    The defendant ski area operators seek summary dismissal of Champion's claim on the ground that Champion agreed, through the terms on the ticket, to waive his right of action for their negligence. The defendant Canada seeks summary dismissal on the ground that it is not an "occupier" within the meaning of the *Occupiers' Liability Act*.

**Issues**

8    The first issue in this application for summary dismissal concerns the effectiveness of the waiver. There are two aspects to this issue:

(a) whether the ski area operators took reasonable steps to bring the waiver agreement to Champion's attention, thereby binding him to those terms, and

(b) whether the negligence alleged is encompassed in the terms of the waiver.

It should be observed that this Court need not decide these matters conclusively; it is only necessary to decide whether, on the pleadings and evidence before the Court, there is a triable issue: *Western Canadian Place Ltd. v. Con-Force Products Ltd.*, [1997] A.J. No. 1299 (Alta. Q.B.) at para.50.

9    The second issue is whether Canada is an "occupier" within the meaning of the *Occupiers' Liability Act*.

**Discussion**

***Summary Judgment***

10    Rule 159 of the Alberta Rules of Court provides that:

159(2) A defendant may, after delivering a statement of defence, on the ground that there is no merit to a claim or part of a claim or that the only genuine issue is as to amount, apply to the court for a judgment on an affidavit sworn by him or some other person who can swear positively to the facts, stating that there is no merit to the whole or part of the claim or that the only genuine issue is as to amount and that the deponent knows of no facts that would substantiate the claim or any part of it.

(3) On hearing the motion, if the court is satisfied that there is no genuine issue for trial with respect to any claim, the court may give summary judgment against the plaintiff or a defendant.

2

11    A defendant's burden in an action for summary dismissal under R. 159 has been variously expressed as having to establish that it is "plain and obvious that the action cannot succeed" (*Boudreault v. Barrett* (1998), 68 Alta. L.R. (3d) 83 (Alta. C.A.) at para. 9); that "there is no merit to the claim, that is, it does not raise a genuine issue for trial" (*Allied-Signal Inc. v. Dome Petroleum Ltd.* (1991), 81 Alta. L.R. (2d) 307 (Alta. Q.B.), at 319); or that it is "manifestly clear or beyond a reasonable doubt that there is not a triable issue" (*Mellon (Next friend of) v. Gore Mutual Insurance Co.*, [1995] A.J. No. 855 (Alta. C.A.) at para. 3).

*Is Champion Bound by the Waiver?*

12    The *Occupiers' Liability Act* provides the basis for the liability claimed. An "occupier" owes a duty of care to a visitor (s. 5), although it need not fulfil that duty with respect to risks willingly accepted by the visitor (s. 7). Under s. 8(1), an occupier may restrict or exclude its liability by express agreement as long as it takes reasonable steps to bring that express agreement to a visitor's notice. The ski area operators argue that, even if they were negligent, s. 8 applies to relieve them of liability.

13    The leading Canadian case on ticket conditions is *Union Steamship Ltd. v. Barnes*, [1956] S.C.R. 842 (S.C.C.) [*Union Steamships*]. In that case, the plaintiff was injured on a ship due to the defendant's negligence. The issue on appeal was whether the terms contained on the ticket excluding the defendant from liability for negligence, were binding. Like the Ski Marmot Basin ticket, the ticket contained a notice on the front, in red, that it was subject to conditions printed on the back. The back contained the terms of the waiver. The plaintiff knew there was some writing but did not read it. The Court found that the defendant had done what was reasonably sufficient to give the plaintiff notice of the conditions, and allowed it to rely on the release to deny liability.

14    The Alberta decision of *Lyster v. Fortress Mountain Resorts Ltd.* (1978), 13 A.R. 162 (Alta. S.C.) is not helpful, because in that case the terms of waiver did not expressly exclude negligence. However, there are several cases from British Columbia and Ontario on point.

15    In *McQuary v. Big White Ski Resort Ltd.*, [1993] B.C.J. No. 1956 (B.C. S.C.) [*McQuary*] and *Dawe v. Cypress Bowl Recreations Ltd.*, [1993] B.C.J. No. 2892 (B.C. S.C.) [*Dawe*], the waivers on the lift tickets and signs were virtually identical to those in the case at hand. In both cases, the plaintiffs admitted to having some general knowledge that the tickets limited liability; this knowledge was sufficient to constitute actual notice of the release. Importantly, in both *McQuary* and *Dawe* the Court also found that the terms, design and colouring of the tickets and the signs constituted reasonable steps to bring the terms to the plaintiffs' attention; even without actual notice, the waivers would apply.

16    In another case involving very similar tickets and signage, *Argiros v. Whistler & Blackcomb Mountain*, [2002] O.J. No. 3916 (Ont. S.C.J.), the plaintiff purchased several tickets and vouchers, each containing the terms of the waiver. The evidence showed ten waiver signs in the ticket sales area. These factors led the Ontario court to find that "the only reasonable inference" (at para. 15) was that the terms did, in fact, come to the plaintiff's attention. The plaintiff's assertions that the terms were not pointed out to him, that he had not read them, and that he would not have understood them if he had, were held to be irrelevant; the test is objective.

17    These cases demonstrate that, as long as reasonable steps are taken to alert a visitor to the waiver terms, an occupier can rely on the release. The question of reasonable steps is a finding of fact: *Union Steamship* at 856. A good example is *Greeven v. Blackcomb Skiing Enterprises Ltd.*, [1994] B.C.J. No. 2056 (B.C. S.C.). Once again, the language of the terms and the design of the tickets and signs were substantially similar to those in *McQuary* and *Dawe*, and therefore to those used at Snow Valley. Unlike the claimants in those two cases, Ms. Greeven did not have even general knowledge that there were limitation provisions. Furthermore, the Court found that the evidence of the sign placement was too vague to support a conclusion that the plaintiff must have seen them. The defendant was not entitled to enforce the waiver.

18    Champion does not admit to having any general knowledge of limitations on liability. However, based on the evidence before the Court of the tickets and signage, the ski area operators did take reasonable steps to bring the waiver to Champion's attention. The signs are prominent in the photographs of the ticket sales area; there is a sign at each cash register, and when

buying his ticket, Champion must have been facing a sign. In the words of British Columbia Supreme Court, "[t]he exclusion of liability conditions were there to be seen and read by the plaintiff both on the signs around the ski resort and on the tickets he purchased and if they were not seen and read, it was a result of the plaintiff's own carelessness" (*McQuary*, *supra* at para. 20).

*Does the Negligence Alleged Fall within the Scope of the Waiver?*

19      The terms of the waiver include all damage "resulting from any cause whatsoever including... the use of ski lifts... or negligence...." The ski area operators claim that the negligence Champion alleges is clearly captured by these terms. Champion argues that he could not have accepted the risk of injury from the unusually icy and poorly maintained conditions of the track, because he could not have foreseen that risk; in his numerous previous visits, he had never encountered similar dangers.

20      In the case of *Brown v. Blue Mountain Resort Ltd.*, [2002] O.J. No. 3650 (Ont. S.C.J.) [*Brown*], an Ontario court considered the scope of a ski resort's waiver. That waiver was, in all essential respects, identical to the one in the case at bar. The plaintiff was injured when she skied into a patch of slushy snow, allegedly a result of the resort's negligence in maintaining and operating its snow-making machine. She argued that this hazard was not one which would normally occur at a ski facility, and that negligence of this type was not contemplated by the terms of the release. The Court accepted that this argument raised a genuine issue for trial.

21      Champion's arguments are very similar. He claims that the ski area operators were negligent in maintaining and grooming the lift track, and that the hazard created by this negligence was not one normally encountered. Following *Brown*, *supra*, this is a genuine issue for trial. The ski area operators' motion for summary judgment on the waiver of liability issue is denied.

*Was Canada an "Occupier?"*

22      The *Occupiers' Liability Act* defines an "occupier" as

      1(c)(i) a person who is in physical possession of premises, or

      (ii) a person who has responsibility for, and control over, the condition of premises, the activities conducted on those premises and the persons allowed to enter those premises,

      and for the purposes of this Act, there may be more than one occupier of the same premises

23      The ski area operators leased the site of their facility from the Defendant Canada. Landlords are not generally considered occupiers within the meaning of the *OLA*: *Kiceluk v. Oliverio*, 291 A.R. 325, 2001 ABQB 704 (Alta. Q.B.) [*Kiceluk*] at para. 21. It is clear that the ski area, rather than Canada, was in physical possession; an occasional physical presence for inspections or repairs does not satisfy s. 1(c)(i): *Goldmanis v. Mador*, [1991] B.C.J. No. 3049 (B.C. S.C.) (considering an identical statutory definition).

24      Neither are the criteria in s. 1(c)(ii) satisfied. A power to admit and exclude visitors is necessary to be an "occupier:" *Kiceluk*, *supra* at para. 23. A reading of the lease agreement reveals that Canada did not retain that power, nor is such a power in evidence before me.

25      Accordingly, it is manifestly clear that this portion of Champion's claim cannot succeed at trial. The claim against the Attorney General of Canada and/or Parks Canada under the *Occupiers' Liability Act* is dismissed pursuant to R. 159.

**Conclusion**

26      In conclusion, the application for summary dismissal of the claim against the Attorney General of Canada and/or Parks Canada is granted; the application for summary dismissal against the ski hill operators is denied.

**Costs**

27      The Attorney General and Parks Canada are entitled to one set of costs against the plaintiff.

28     The usual practice in a summary judgment application is that the costs are awarded to the successful party. That is why I awarded costs against the plaintiff in favour of the Attorney General and Parks Canada.

29     However with respect to the costs issue between the successful plaintiff and the unsuccessful ski area operators, I have decided that costs should be awarded against the plaintiff. There is a consent order on the file dated April 21, 2005 in which the plaintiff agreed to have any affidavit in opposition to the application filed and served on or before April 29, 2005. Any cross examinations on that affidavit were to be completed on or before May 6, 2005. The plaintiff's brief was to be filed and served no later than May 16, 2005. The application was heard on May 19, 2005.

30     Defence counsel received the plaintiff's affidavit on May 18, the day before the application. He received the brief on the same day. This put defence counsel in the position where he could obviously easily obtain an adjournment to cross examine on the affidavit, or go ahead with the application without cross examination. He opted for the latter, undoubtedly because he knew that getting another afternoon special application date would take at least three months and perhaps longer. The other option was to proceed on the basis of excluding the plaintiff's affidavit. The matter proceeded on the basis that I would not exclude the plaintiff's affidavit but I would certainly exercise my discretion in the matter of costs against the plaintiff even if he was successful in opposing the application.

31     I will do that and grant the defendant ski area operators costs against the plaintiff in any event of the cause, the accounting for which will be deferred to the end of the proceedings.

*Motion granted in part.*

# EXHIBIT EN-12

# TO THE DECLARATION OF EVAN NUTTALL

2020 SCC 19, 2020 CSC 19

Supreme Court of Canada

Atlantic Lottery Corp. Inc. v. Babstock

2020 CarswellNfld 181, 2020 CarswellNfld 182, 2020 SCC 19, 2020 CSC 19, [2020] 2 S.C.R. 420, [2020] 2 R.C.S.
420, [2020] S.C.J. No. 19, 320 A.C.W.S. (3d) 162, 447 D.L.R. (4th) 543, 53 C.P.C. (8th) 1, 67 C.C.L.T. (4th) 1

## Atlantic Lottery Corporation Inc. (Appellant) and
## Douglas Babstock and Fred Small (Respondents)

VLC, Inc., IGT-Canada Inc., International Game Technology, Spielo International Canada ULC and Tech Link
International Entertainment Limited (Appellants) and Douglas Babstock and Fred Small (Respondents) and Attorney
General of Ontario, Attorney General of Manitoba, Attorney General of Saskatchewan, Bally Gaming Canada Ltd.,
Bally Gaming Inc., Western Canada Lottery Corporation, Alberta Gaming, Liquor, and Cannabis Commission, Canadian
Gaming Association, Canadian Chamber of Commerce and British Columbia Lottery Corporation (Interveners)

Wagner C.J.C., Abella, Moldaver, Karakatsanis, Côté, Brown, Rowe, Martin, Kasirer JJ.

Heard: December 3, 2019
Judgment: July 24, 2020
Docket: 38521

Proceedings: reversing *Atlantic Lottery Corporation Inc.-Société des loteries de l'Atlantique v. Babstock* (2018), 2018 NLCA
71, 2018 CarswellNfld 470, 29 C.P.C. (8th) 1, 53 C.C.L.T. (4th) 12, B.G. Welsh J.A., J.D. Green J.A., M.F. Harrington J.A. (N.L.
C.A.); reversing in part *Babstock v. Atlantic Lottery Corp. Inc. / Société de Loteries de l'Atlantique* (2014), 2014 CarswellNfld
281, 356 Nfld. & P.E.I.R. 293, 1108 A.P.R. 293, 2014 NLTD(G) 114, Alphonsus E. Faour J. (N.L. T.D.); and affirming *Babstock
v. Atlantic Lottery Corp.* (2016), 2016 CarswellNfld 532, 2016 NLTD(G) 216, 93 C.P.C. (7th) 307, Alphonsus E. Faour J. (N.L.
T.D.)

Counsel: Julie Rosenthal, Mike Eizenga, Sarah Stothart, Jonathan G. Bell, for Appellant, Atlantic Lottery Corporation Inc.
Ian F. Kelly, Q.C., Daniel M. Glover, for Appellants, VLC, Inc., IGT-Canada Inc. and International Game Technology.
Colm St. R. Seviour, Q.C., Koren A. Thomson, for Appellant, Spielo International Canada ULC.
Jorge P. Segovia, for Appellant, Tech Link International Entertainment Limited
Kirk M. Baert, Celeste Poltak, for Respondents
Brent Kettles, Tom McKinlay, for Intervener, Attorney General of Ontario
Denis Guénette, Tom Dobson, for Intervener, Attorney General of Manitoba
Jared G. Biden, for Intervener, Attorney General of Saskatchewan
Paul D. Dicks, Q.C., Michael D. Lipton, Q.C., Kevin J. Weber, for Interveners, Bally Gaming Canada Ltd. and Bally Gaming Inc.
Keith Kilback, Q.C., Alexander Shalashniy, for Intervener, Western Canada Lottery Corporation
Mandy L. England, Michael Sobkin, for Intervener, Alberta Gaming, Liquor, and Cannabis Commission
Brandon Kain, Gillian P. Kerr, Adam Goldenberg, for Intervener the Canadian Gaming Association
Matthew Milne-Smith, for Intervener, Canadian Chamber of Commerce
K. Michael Stephens, Shannon Ramsay, Aubin Calvert, for Intervener, British Columbia Lottery Corporation

*Brown J.* (Abella, Moldaver, Côté and Rowe JJ. concurring):

## I. Introduction

1    The appellant Atlantic Lottery Corporation Inc. ("ALC"), constituted by the governments of the four Atlantic provinces, is empowered to approve the operation of video lottery terminal games ("VLTs") in Newfoundland and Labrador by the *Video Lottery Regulations*, C.N.L.R. 760/96. The respondents Douglas Babstock and Fred Small ("the plaintiffs") applied for certification of a class action against ALC, on behalf of any natural person resident in Newfoundland and Labrador who paid to play VLTs in that province in the six years preceding the class action, or on behalf of the estate of any such person. The other appellants are suppliers of VLTs that ALC has added to the action as third-party defendants.

2    The plaintiffs' essential claim is that VLTs are inherently dangerous and deceptive. Indeed, they say that VLTs are so deceptive that they contravene the *Criminal Code*'s prohibition of games similar to "three-card monte" (*Criminal Code*, R.S.C. 1985, c. C-46, s. 206). Relying on three causes of action ("waiver of tort", breach of contract and unjust enrichment), the plaintiffs seek a gain-based award, quantified by the profit ALC earned by licensing VLTs. [1]

3    More particularly, and as to waiver of tort, the plaintiffs allege that ALC breached a duty to warn of the inherent dangers associated with VLTs, including the risk of addiction and suicidal ideation. This, they say, supports their claim in waiver of tort, which they also say is an independent cause of action that allows for a gain-based remedy to "be determined at trial of common issues without the involvement of any individual class member" (A.R., vol. II, at p. 104).

4    As to the claim for breach of contract, the plaintiffs allege a contract arising from ALC's offer of VLTs to the public, and the plaintiffs' corresponding acceptance by paying to play. As an implied term of this contract, they say that ALC was required to provide safe games that were fit for use and of merchantable quality, to use reasonable skill and care in its provision of VLT gaming, and to act in good faith. ALC breached these terms, they say, by supplying deceptive VLTs.

5    Finally, the plaintiffs say that ALC has been unjustly enriched at their expense.

6    The plaintiffs succeeded in obtaining certification at the Supreme Court of Newfoundland and Labrador, and that result was substantially affirmed by the Newfoundland and Labrador Court of Appeal. In my respectful view, however, none of these claims have any reasonable chance of success. I would therefore allow the appeals, set aside the certification order, and strike the plaintiffs' claims against ALC.

## II. Overview of Proceedings

### A. Supreme Court of Newfoundland and Labrador — *2014 NLTD(G) 114, 356 Nfld. & P.E.I.R. 293* (N.L. T.D.); *2016 NLTD(G) 216, 93 C.P.C. (7th) 307* (N.L. T.D.)

7    The matter came before the certification judge in the form of two applications: (1) ALC's application, made under R. 14.2(1)(a) of the *Rules of the Supreme Court, 1986*, S.N.L. 1986, c. 42, Sch. D (2014 NLTD(G) 114, 356 Nfld. & P.E.I.R. 293 (N.L. T.D.)), to strike the plaintiffs' claim on the basis that it disclosed no reasonable cause of action, and (2) the plaintiffs' application for certification of their claim as a class action under the *Class Actions Act*, S.N.L. 2001, c. C-18.1. The parties agreed that the certification judge's decision on ALC's application would also determine whether the plaintiffs had satisfied the first criterion for certification in s. 5 of the *Class Actions Act* — that "the pleadings disclose a cause of action".

8    The certification judge dismissed ALC's application, and further held that the plaintiffs had satisfied the requirements necessary for certification. In particular and because the plaintiffs intended to pursue a collective remedy (calculated on the basis of ALC's profits) without proving individual damage, he concluded that there were common issues among the class that would be better addressed through a class action.

### B. Newfoundland and Labrador Court of Appeal — *2018 NLCA 71, 29 C.P.C. (8th) 1* (N.L. C.A.)

9    ALC appealed the certification judge's decisions on both applications. Writing for the majority, Green J.A. substantially upheld the certification judge's conclusions, and allowed the plaintiffs' claims in waiver of tort, breach of contract and unjust enrichment to proceed to trial.

10      Regarding waiver of tort, the majority concluded that the doctrine could operate as an independent cause of action for disgorgement, where it would serve the purpose of deterring wrongful conduct. Further, according to the majority, plaintiffs alleging negligence need not prove damage to establish an entitlement to disgorgement. All this led the majority to conclude that the plaintiffs' claim for waiver of tort — that is, for disgorgement as a remedy for negligence in the absence of demonstrated damage — disclosed a reasonable cause of action (paras. 185 and 189).

11      Addressing the plaintiffs' allegations of criminal conduct, the majority concluded that expert evidence would be required to conclude whether VLTs are similar to three-card monte and therefore prohibited by s. 206 of the *Criminal Code*. Such claims, said the majority, would have to be determined at trial.

12      Finally, the majority held that the pleaded facts, particularly considering the allegations of criminal conduct, could reasonably support a claim for disgorgement as a remedy for breach of contract. In view of its conclusion on waiver of tort as an independent cause of action, the majority found it unnecessary to address "issues raised in argument under the heading of unjust enrichment *simpliciter*, i.e. whether the pleading discloses a cause of action in unjust enrichment, calling for the application of the traditional three-part test set out in such cases as [*Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629 (S.C.C.)]" (para. 230).

13      In dissent, Welsh J.A. would have allowed ALC's appeal and struck all the claims. In her view, the claims in contract and tort did not have a reasonable chance of success given that the plaintiffs did not plead damage to individual plaintiffs; it was plain and obvious that VLTs were not similar to three-card monte; and, there was a juristic reason for ALC's enrichment at the expense of the plaintiffs.

## III. Analysis

14      ALC's application to strike relies on r. 14.24(1) of the *Rules of the Supreme Court*, which allows the court to strike any portion of a statement of claim that discloses no reasonable cause of action. The parties agree that determining whether any reasonable cause of action is disclosed in the plaintiffs' statement of claim will also satisfy the first requirement of the plaintiffs' application for certification. The test to be applied under both applications, therefore, is whether it is plain and obvious, assuming the facts pleaded to be true, that each of the plaintiffs' pleaded claims disclose no reasonable cause of action. Simply stated, if a claim has no reasonable prospect of success it should not be allowed to proceed to trial (*Knight v. Imperial Tobacco Canada Ltd.*, 2011 SCC 42, [2011] 3 S.C.R. 45 (S.C.C.), at para. 17).

15      A central issue in this case arises from the plaintiffs' reliance on the doctrine of waiver of tort. The plaintiffs say that a claim relying on waiver of tort as an independent cause of action for disgorgement has at least a reasonable chance of succeeding at trial. Before the Court of Appeal's decision in this case, however, no Canadian authority had recognized such a cause of action, although the plaintiffs rely on a line of class action certification decisions in which courts have *refrained* from finding that it is plain and obvious that such an action *does not* exist. The plaintiffs place significant emphasis on *Pro-Sys Consultants Ltd. v. Microsoft Corp.*, 2013 SCC 57, [2013] 3 S.C.R. 477 (S.C.C.) ("*Microsoft*") where this Court, citing conflicting authorities on this point, declined to resolve it (para. 97).

16      In my view, developments since *Microsoft*, and distinguishing features of this case, allow us to definitively resolve whether the novel cause of action proposed by the plaintiffs exists in Canadian law. I say so for four reasons.

17      First, the argument in favour of recognizing the plaintiffs' novel cause of action relies on the relationship between the concept of waiver of tort and the broader law of restitution (or, as it is now more commonly referred to in Canada, the law of unjust enrichment). This area of our law has developed rapidly in recent years in ways that have deepened our understanding of unjust enrichment (see e.g. *Moore v. Sweet*, 2018 SCC 52, [2018] 3 S.C.R. 303 (S.C.C.); M. McInnes, *The Canadian Law of Unjust Enrichment and Restitution* (2014), at pp. vii-ix; J. D. McCamus, "Waiver of Tort: Is There a Limiting Principle?" (2014), 55 *Can. Bus. L.J.* 333, at p. 334; A. Burrows, *The Law of Restitution* (3rd ed. 2011), at pp. 3-9). More particularly, several commentators have, since *Microsoft*, made helpful contributions by specifically commenting on waiver of tort as an independent cause of action (see e.g. G. Weber, "Waiver of Tort: Disgorgement *Ex Nihilo*" (2014), 40 *Queen's L.J.* 389; S. Barton, M. Hines

and S. Therien, "Neither Cause of Action nor Remedy: Doing Away with Waiver of Tort", in T. L. Archibald and R. S. Echlin, eds., *Annual Review of Civil Litigation, 2015* (2015); E. M. Iacobucci and M. J. Trebilcock, "An Economic Analysis of Waiver of Tort in Negligence Actions" (2016), 66 *U.T.L.J.* 173). What was once seen as a state of legal uncertainty at the time *Microsoft* was decided has been made clearer.

18     Secondly, and since *Microsoft* was decided, this Court has recognized in *Hryniak v. Mauldin*, 2014 SCC 7, [2014] 1 S.C.R. 87 (S.C.C.) the need for a culture shift to promote "timely and affordable access to the civil justice system" (para. 2). Where possible, therefore, courts should resolve legal disputes promptly, rather than referring them to a full trial (paras. 24-25 and 32). This includes resolving questions of law by striking claims that have no reasonable chance of success (S. G. A. Pitel and M. B. Lerner, "Resolving Questions of Law: A Modern Approach to Rule 21" (2014), 43 *Adv. Q.* 344, at pp. 351-52). Indeed, the power to strike hopeless claims is "a valuable housekeeping measure essential to effective and fair litigation" (*Imperial Tobacco*, at para. 19).

19     Of course, it is not determinative on a motion to strike that the law has not yet recognized the particular claim. The law is not static, and novel claims that might represent an incremental development in the law should be allowed to proceed to trial (*Imperial Tobacco*, at para. 21; *Das v. George Weston Limited*, 2018 ONCA 1053, 43 E.T.R. (4th) 173 (Ont. C.A.), at para. 73; see also *R. v. Salituro*, [1991] 3 S.C.R. 654 (S.C.C.), at p. 670). That said, a claim will not survive an application to strike simply because it is novel. It is beneficial, and indeed critical to the viability of civil justice and public access thereto that claims, *including novel claims*, which are doomed to fail be disposed of at an early stage in the proceedings. This is because such claims present "no legal justification for a protracted and expensive trial" (*D. (B.) v. Children's Aid Society of Halton (Region)*, 2007 SCC 38, [2007] 3 S.C.R. 83 (S.C.C.) [hereinafter Syl Apps], at para. 19). If a court would not recognize a novel claim when the facts as pleaded are taken to be true, the claim is plainly doomed to fail and should be struck. In making this determination, it is not uncommon for courts to resolve complex questions of law and policy (see e.g. *Imperial Tobacco*; *Cooper v. Hobart*, 2001 SCC 79, [2001] 3 S.C.R. 537 (S.C.C.); *Syl Apps*; *Elder Advocates of Alberta Society v. Alberta*, 2011 SCC 24, [2011] 2 S.C.R. 261 (S.C.C.)).

20     Lax J.'s observations in *Andersen v. St. Jude Medical Inc.*, 2012 ONSC 3660 (Ont. S.C.J.) are particularly apposite, as she heard arguments on the scope of waiver of tort after a 138-day trial. The circumstances did not require her to resolve the issue, but Lax J. observed that the parties "did not rely on any evidence ... to support or oppose extending the waiver of tort doctrine to a negligence case", nor did the plaintiffs "lead any policy evidence to explain why waiver of tort should be available" (para. 585 (CanLII)). She concluded that "deciding the waiver of tort issue does not necessarily require a trial and that it may be possible to resolve the debate in some other way" (para. 587).

21     Thirdly, failing to address whether an independent cause of action for waiver of tort exists will perpetuate an undesirable state of uncertainty. As Greg Weber writes, "[w]aiver of tort has become a hollow and internally inconsistent doctrine, leaving judges and litigants confused about how and when a cause of action might support disgorgement" (p. 392). Uncertainty about whether an action lies for disgorgement without proof of damage has significant ramifications, which are most apparent in the context of class actions. For 16 years since *Serhan Estate v. Johnson & Johnson* (2004), 72 O.R. (3d) 296 (Ont. S.C.J.), such claims have been commonly advanced but never fully tried. In the meantime, certification judges have had "little alternative but to affirm that the question of the doctrine's availability is indeed a live issue for trial, which can and does result in certification to the detriment of the defendant, who is then practically compelled to pay a settlement to the plaintiff" (J. M. Martin, "Waiver of Tort: An Historical and Practical Study" (2012), 52 *Can. Bus. L.J.* 473, at para. 476 (footnote omitted); see also H. M. Rosenberg, "Waiving Goodbye: The Rise and Imminent Fall of Waiver of Tort in Class Proceedings" (2010), 6 *Can. Class Action Rev.* 37, at p. 38). Indeed, this Court's decision to refrain from striking the waiver of tort claim in *Microsoft* has been taken as an affirmative statement that such claims are viable (see e.g. C.A. Reasons, at para. 182; *Ewert v. Nippon Yusen Kabushiki Kaisha*, 2019 BCCA 187, 25 B.C.L.R. (6th) 268 (B.C. C.A.), at para. 73; *Authentic T-Shirt Co. ULC v. King*, 2016 BCCA 59 (B.C. C.A.), at paras. 41-42 (CanLII)). Nothing is gained, and much court time and considerable litigant resources are lost, by leaving this issue unresolved.

22     Finally, while waiver of tort as a novel cause of action was not a central issue in *Microsoft*, it is in the present appeals. The Court of Appeal accordingly canvassed the law comprehensively, and concluded not only that the plaintiffs' claim should

4

proceed to trial, but that waiver of tort should be definitively recognized as an independent cause of action. On appeal to this Court, the parties and interveners have similarly devoted substantial attention to the issue. The question is therefore ripe for decision, and these appeals presents an appropriate vehicle for deciding it.

### A. Disgorgement for Tortious Wrongdoing

#### (1) Disgorgement As a Novel Cause of Action

23      As I discuss below, the term "waiver of tort" is confusing, and should be abandoned. The concern is not for consistent terminology for its own sake, but rather for clarity of meaning: cases dealing with gain-based remedies tend to employ inconsistent nomenclature that leads to confused and confusing results. Even the term "restitution" has been applied inconsistently, sometimes referring to the causative event of unjust enrichment and sometimes referring to a measure of relief (McInnes (2014), at pp. 10-11). In my view, *restitution* properly describes the latter — meaning, restitution is the law's remedial answer to circumstances in which a benefit moves from the plaintiff to the defendant, and the defendant is compelled to restore that benefit. Further, restitution stands in contrast to another measure of relief, *disgorgement*, which refers to awards that are calculated exclusively by reference to the defendant's wrongful gain, irrespective of whether it corresponds to damage suffered by the plaintiff and, indeed, irrespective of whether the plaintiff suffered damage at all (McInnes (2014), at p. 11-12; see also L. D. Smith, "The Province of the Law of Restitution" (1992), 71 *Can. Bar. Rev.* 672; J. Edelman, *Gain-Based Damages: Contract, Tort, Equity and Intellectual Property* (2002), at pp. 65-93). While this Court's decisions have occasionally referred to disgorgement variously as "restitution damages" or "restitution for wrongdoing", the ambiguity inherent in such terminology calls for greater precision (see e.g. *Bank of America Canada v. Mutual Trust Co.,* 2002 SCC 43, [2002] 2 S.C.R. 601 (S.C.C.), at para. 25; *Kingstreet Investments Ltd. v. New Brunswick (Department of Finance)*, 2007 SCC 1, [2007] 1 S.C.R. 3 (S.C.C.), at para. 33).

24      In sum, then, restitution for unjust enrichment and disgorgement for wrongdoing are two types of gain-based remedies (McInnes (2014), at pp. 144-49; L. D. Smith, "Disgorgement of the Profits of Breach of Contract: Property, Contract, and 'Efficient Breach'" (1995), 24 *Can. Bus. L. J.* 121, at pp. 121-23; G. Virgo, *The Principles of the Law of Restitution* (3rd ed. 2015), at pp. 415-17; Burrows, at pp. 9-12). Each is distinct from the other: *disgorgement* requires only that the defendant gained a benefit (with no proof of deprivation to the plaintiff required), while *restitution* is awarded in response to the causative event of unjust enrichment (most recently discussed by this Court in *Moore*), where there is correspondence between the defendant's gain and the plaintiff's deprivation (Edelman, at pp. 80-86).

25      Here, the plaintiffs seek *disgorgement*, not restitution: they say that they are entitled to a remedy quantified solely on the basis of ALC's gain, without reference to damage that any of them may have suffered. There are two schools of thought on where disgorgement fits in the overall legal structure of private obligations. The prevailing view is consistent with that which I have just stated. Disgorgement, as a gain-based remedy, is precisely that: a *remedy*, awarded in certain circumstances upon the plaintiff satisfying all the constituent elements of one or more of various causes of action (specifically, breach of a duty in tort, contract, or equity).

26      Some scholars, however, see disgorgement as an independent cause of action, which addresses unjust enrichment but does not operate on the same basis as the principled unjust enrichment framework adopted by this Court (P. D. Maddaugh and J. D. McCamus, *The Law of Restitution*, vol. 1 (loose-leaf), at pp. 3-4 to 3-7; see also J. Beatson, "The Nature of Waiver of Tort" (1978-1979), 17 *U.W.O. L. Rev. 1*; D. Friedmann, "Restitution for Wrongs: The Basis of Liability", in W. R. Cornish et al., eds., *Restitution: Past, Present and Future: Essays in Honour of Gareth Jones* (1998), 133). And a handful of them have suggested that it should be possible to pursue a remedy of disgorgement in cases that are akin to negligence, but where the plaintiff cannot prove — or chooses not to prove — resulting damage (McCamus; C. Jones, "Panacea or Pandemic: Comparing 'Equitable Waiver of Tort' to 'Aggregate Liability' in Cases of Mass Torts with Indeterminate Causation" (2016), 2 *Can. J. of Compar. & Contemp. L.* 301). The plaintiffs' waiver of tort claim relies on this latter proposition.

27     As I will explain, disgorgement should be viewed as an alternative remedy for certain forms of wrongful conduct, not as an independent cause of action. This view follows naturally from the historical origins of unjust enrichment and gain-based remedies more generally.

28     The modern law of unjust enrichment originated in the writ of *assumpsit* (*Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762 (S.C.C.), at pp. 786-88). Use of *assumpsit* allowed plaintiffs to avoid the limits imposed by other forms of action, which might have prevented their claim from advancing (McInnes (2014), at p. 34; Martin, at pp. 482-84). While the writ was premised upon the defendant having undertaken to pay a sum of money to the plaintiff and having broken that promise, the specialized form of *indebitatus assumpsit* allowed plaintiffs to acquire the benefits of *assumpsit* where no such undertaking actually existed. It created the legal fiction of an implied contract, allowing plaintiffs to sue in *assumpsit*, "even where the imputation of a promise to pay was nonsensical, as when the defendant acquired a benefit through the commission of a tort." (McInnes (2014), at pp. 34-35; see also Martin, at pp. 489-96).

29     Where a tort was made out but the plaintiff chose to pursue a claim in *assumpsit* to recover the defendant's ill-gotten gains, the plaintiff was said to "waive the tort" (Edelman, at pp. 121-22). Despite its early acceptance, however, the term waiver of tort was a misnomer. Rather than forgiving or waiving the wrongfulness of the defendant's conduct, plaintiffs relying on the doctrine were simply electing to pursue an alternative, gain-based, remedy (Edelman, at p. 122; see also *United Australia Ltd. v. Barclays Bank Ltd.* (1940), [1941] A.C. 1 (U.K. H.L.), at pp. 13 and 18). The doctrine always operated as "nothing more than a choice between possible remedies", and *not* as an independent cause of action (*United Australia Ltd.*, at p. 13; Martin, at pp. 504-5). That this is so is apparent from decisions of this Court, including *Arrow Transfer Co. v. Royal Bank*, [1972] S.C.R. 845 (S.C.C.) where Laskin J. (as he then was), for the majority on this point, held that the plaintiff's claim for a gain-based remedy was dependent on the tort of conversion having been completed (p. 877).

30     Two points follow from this. First, and as this case demonstrates, the term waiver of tort is apt to generate confusion and should therefore be abandoned (Edelman, at p. 122). Secondly, and relatedly, in order to make out a claim for disgorgement, a plaintiff *must* first establish actionable misconduct.

31     Recognizing that disgorgement is simply a remedy for certain forms of wrongful conduct places the central issue in this case in context. By pleading disgorgement as an independent cause of action, the plaintiffs seek to establish an entirely new category of wrongful conduct — one that is akin to negligence but does not require proof of damage. Supporters of this type of claim assert that "there is simply no reason in principle why the rules for compensatory damages need to be identical to the rules for disgorgement" (McCamus, at p. 359) and that, given that the purpose of granting disgorgement is to deter wrongful conduct rather than to provide compensation, there is no reason to require proof of damage (p. 354).

32     I acknowledge that disgorgement is available for some forms of wrongdoing without proof of damage (for example, breach of fiduciary duty). But it is a far leap to find that disgorgement without proof of damage is available as a general proposition in response to a defendant's negligent conduct. Determining the appropriate remedy for negligence, where liability for negligence has not already been established, is futile and even nonsensical since doing so allows "the remedy tail [to] wag the liability dog" (*Haida Nation v. British Columbia (Minister of Forests)*, 2004 SCC 73, [2004] 3 S.C.R. 511 (S.C.C.), at para. 55). This observation applies with no less force to the plaintiff who seeks disgorgement, since the availability of gain-based relief lies in "aligning the remedy with *the injustice* it corrects" (E. J. Weinrib, "Restitutionary Damages as Corrective Justice" (2000), 1 *Theor. Inq. L.* 1, at p. 23 (emphasis added)).

33     It is therefore important to consider what it is that makes a defendant's negligent conduct wrongful. As this Court has maintained, "[a] defendant in an action in negligence is not a wrongdoer at large: he is a wrongdoer only in respect of the damage which he actually causes to the plaintiff" (*Clements (Litigation Guardian of) v. Clements*, 2012 SCC 32, [2012] 2 S.C.R. 181 (S.C.C.), at para. 16). There is no right to be free from the *prospect* of damage; there is only a right not to *suffer* damage that results from exposure to unreasonable risk (E. J. Weinrib, *The Idea of Private Law* (rev. ed. 2012), at pp. 153 and 157-58; R. Stevens, *Torts and Rights* (2007), at pp. 44-45 and 99). In other words, negligence "in the air" — the mere creation of risk — is not wrongful conduct. Granting disgorgement for negligence without proof of damage would result in a remedy "arising out

of legal nothingness" (Weber, at p. 424). It would be a radical and uncharted development, "[giving] birth to a new tort over night" (Barton, Hines and Therien, at p. 147).

34    The difficulty is not just normative, although it is at least that. The practical difficulty associated with recognizing an action in negligence without proof of damage becomes apparent in considering how such a claim would operate. As the Court of Appeal recognized, a claim for disgorgement available to any plaintiff placed within the ambit of risk generated by the defendant would entitle *any one* plaintiff to *the full gain* realized by the defendant. No answer is given as to why any particular plaintiff is entitled to recover the whole of the defendant's gain. Yet, corrective justice, the basis for recovery in tort, demands *just that*: an explanation as to why *the plaintiff* is *the* party entitled to a remedy (*Clements*, at para. 7; Weinrib (2000), at pp. 1-7). Tort law does not treat plaintiffs "merely as a convenient conduit of social consequences" but rather as "someone to whom damages are owed to correct the wrong suffered" (Weinrib (2000), at p. 6). A cause of action that promotes a race to recover by awarding a windfall to the first plaintiff who arrives at the courthouse steps undermines this foundational principle of tort law.

35    This is not the type of incremental change that falls within the remit of courts applying the common law (*Salituro*, at p. 670). It follows that the novel cause of action proposed by the plaintiffs has no reasonable chance of succeeding at trial.

*(2) Disgorgement for the Completed Tort of Negligence*

36    The Court of Appeal majority concluded that, even if disgorgement for wrongdoing is not an independent cause of action, the plaintiffs have adequately pleaded the elements of the tort of negligence, and may therefore seek disgorgement for tortious wrongdoing on that basis. While disgorgement for tortious wrongdoing was initially applied only in the context of proprietary torts, including conversion, deceit, and trespass, it found broader application in the late 20th century (Martin, at pp. 505-6). It has even been suggested that disgorgement may be available for negligence in certain circumstances, and the issue remains unsettled (Edelman, at pp. 129-30; C.-M. O'Hagan, "Remedies", in L. N. Klar et al., eds., *Remedies in Tort* (loose-leaf), vol. 4, at §200). While that may have to be decided in an appropriate case, as I will explain the plaintiffs have not adequately pleaded a claim in negligence, and it is unnecessary to resolve the question here.

37    Causation of damage is a required element of the tort of negligence. As I have explained, the conduct of a defendant in negligence is wrongful only to the extent that it *causes* damage (*Clements*, at para. 16). While the plaintiffs allege that ALC had a duty to warn of the inherent dangers associated with VLTs, including the risk of addiction and suicide, those dangers are not alleged to have materialized. The plaintiffs do not allege that proper warnings would have caused them to spend less money playing VLTs or to avoid them altogether.

38    It follows that I respectfully disagree with Court of Appeal's conclusion that the plaintiffs would not be "precluded from leading evidence that the breach of duty (assuming it can be proven) led to some form of injury" (para. 186). Again, causation of damage is a required element of the cause of action of negligence, and it must be pleaded. Here, not only have the plaintiffs *not* pleaded causation, their pleadings expressly disclaim any intention of doing so. The absence of a pleading of causation, they acknowledge, arises from an intentional litigation strategy to increase the likelihood of obtaining certification of their action as a class action by avoiding having to prove individual damage. This particular claim also has no reasonable chance of success.

**B. Alleged Criminal Conduct**

39    The plaintiffs further allege that the *Criminal Code* prohibits the operation of VLTs. While breach of statute is not a recognized cause of action (*R. v. Saskatchewan Wheat Pool*, [1983] 1 S.C.R. 205 (S.C.C.), at p. 225), the allegations of criminal conduct are intended to serve two purposes. First, the plaintiffs say that the presence of criminal conduct warrants exceptional relief for breach of contract, specifically disgorgement or punitive damages. Secondly, the plaintiffs argue that, if ALC's conduct is criminal, there is no juristic reason for ALC's enrichment at the plaintiffs' expense, which grounds their claim in unjust enrichment.

40    The plaintiffs' argument is that VLTs are so inherently deceptive that they should be considered a game "similar to" three-card monte within the meaning of s. 206 of the *Criminal Code*, which states in part:

**206 (1)** Every person is guilty of an indictable offence and liable to imprisonment for a term of not more than two years ... who

. . . . .

**(g)** induces any person to stake or hazard any money or other valuable property or thing on the result of any dice game, three-card monte, punch board, coin table or on the operation of a wheel of fortune;

. . . . .

**(2)** In this section, ***three-card monte*** means the game commonly known as three-card monte and includes any other game that is similar to it, whether or not the game is played with cards and notwithstanding the number of cards or other things that are used for the purpose of playing.

While s. 207(1)(a) of the *Criminal Code* exempts provincial lottery schemes from most gaming and betting prohibitions, that exemption does not extend to three-card monte (s. 207(4)(a)). Thus, the argument goes, if VLTs are games similar to three-card monte, their operation would be unlawful, even through a provincial lottery scheme.

41     It is well-settled that statutory interpretation requires discerning legislative intent by examining statutory text in its entire context and in its grammatical and ordinary sense, in harmony with the statute's scheme and objects. In determining what games can be considered "similar to" three-card monte, I also bear in mind that courts cannot create common law crimes through an act of judicial interpretation (*R. v. W. (D.L.)*, 2016 SCC 22, [2016] 1 S.C.R. 402 (S.C.C.), at para. 3).

42     The Court of Appeal concluded that expert evidence is required to determine the essence of three-card monte, which would then be used to evaluate whether VLTs share three-card monte's essential features (para 208). I find myself in respectful disagreement with that conclusion. While expert evidence may assist in deciding whether the defined elements of an offence are made out on the facts of a particular charge, expert evidence cannot purport to define the elements of an offence (*R. v. Levkovic*, 2013 SCC 25, [2013] 2 S.C.R. 204 (S.C.C.), at para. 73). While permissible expert evidence might therefore describe the *features* of VLTs for the purpose of establishing similarity, it is a court's role, and only a court's role, to discern Parliament's intention in prohibiting games "similar to" three-card monte.

43     Beginning with the text of the prohibition, I observe that s. 206(2) refers to "the game *commonly known* as three-card monte" (emphasis added). The *Canadian Oxford Dictionary* (2nd ed. 2004), defines "three-card monte" as a game played with three cards where "players bet on which of three cards lying face down is the queen." Similarly, and shortly before Parliament enacted this *Criminal Code* prohibition, the Quebec Court of Appeal described three-card monte as "a game played with three cards ... shuffled or manipulated by the dealer and placed face down and the opponent backs his ability to spot the position of a particular card" (*R. v. Rosen* (1920), 61 D.L.R. 500 (C.A. Que.), at pp. 502-3).

44     Section 206(2)'s text has a wider reach, however, capturing "similar" games, "whether or not the game is played with cards and notwithstanding the number of cards or other things that are used for the purpose of playing". The plaintiffs contend that this expanded definition is meant to capture all games of a broadly deceptive nature. In my view, however, it is apparent from the historical background, from statements indicating why the provision was introduced, and from the text of the provision itself, viewed in its surrounding context that this prohibition does not reach so far.

45     The state of the law prior to this provision's enactment lends important insight into its purpose. In *Rosen*, the Quebec Court of Appeal held that three-card monte did not constitute a contravention of the *Criminal Code*'s cheating at play offence (s. 209). Shortly thereafter, the Member of Parliament for Jacques Cartier introduced a private member's bill to outlaw three-card monte specifically. He stated during second reading that the proposed changes were a direct response to *Rosen* targeting the specific game of three-card monte (*House of Commons Debates*, vol. 2, 5th Sess., 13th Parl., April 11, 1921, at p. 1858). As to why it was necessary to further prohibit games *similar* to three-card monte, he explained:

If we made it a crime for people to play with three cards, they might play with four cards or they might play with other instruments than cards, and that is why we thought it proper to enlarge the clause so as to endeavour to cover other cases.

The Minister of Justice adopted the member's statements and opted to include the new provisions in broader Bill of proposed amendments to the *Criminal Code* (*House of Commons Debates*, vol. 2, at p. 1857; see also *House of Commons Debates*, vol. 4, 5th Sess., 13th Parl., May 6, 1921, at p. 3006).

46      While this Court has recognized that the statements of particular Members of Parliament cannot necessarily be taken as expressing the intention of Parliament as a whole (*R. v. Heywood*, [1994] 3 S.C.R. 761 (S.C.C.), at pp. 788-89), the statements recounted here were made by those directly responsible for introducing the three-card monte prohibition, and as such provide relevant evidence of legislative purpose. They indicate that the phrase "similar to" was included in s. 206(2) to capture games that involve betting on the location of a particular object after a series of movements, regardless of whether the game is played with three playing cards.

47      The text of the provision and its surrounding context further suggest that the prohibition of games *similar to* three-card monte was directed towards the game's concrete attributes and not towards the abstract feature of deception. One would expect that, had Parliament sought to prohibit broadly deceptive gambling games, it would have straightforwardly done so (R. Sullivan, *Sullivan on the Construction of Statutes* (6th ed. 2014), at pp. 207-8). It defies logic that Parliament would choose to create such an offence by prohibiting three-card monte. Moreover, three-card monte is listed alongside other types of gambling games that are defined by their physical characteristics (punch boards, coin tables, and wheels of fortune). It would be anomalous to interpret the inclusion of three-card monte in this list as an intention to prohibit all deceptive games (Sullivan, at pp. 230-34).

48      All this leads me to conclude that games "similar to" three-card monte involve, at a minimum, a player betting on the location of an object after a series of manipulations. Nothing in the pleadings describes VLTs as operating in this manner. Thus, the claim that VLTs are similar to three-card monte has no reasonable chance of success.

*C. Breach of Contract*

49      At first glance, the plaintiffs' breach of contract claim might merit different treatment than their claim in tort, since breach of contract — unlike the tort of negligence — does not require proof of loss as an element of the cause of action (*Rogers & Rogers Inc. v. Pinehurst Woodworking Co.* (2005), 14 B.L.R. (4th) 142 (Ont. S.C.J.) at para. 91). But that is of no moment here, since the plaintiffs have made it clear — both in their pleadings and at every level of court — that they seek only *non-compensatory* remedies for breach of contract, namely disgorgement and punitive damages. Whether the plaintiffs' breach of contract claim discloses a *reasonable* cause of action should be considered in light of the remedies the plaintiffs actually seek. The question to be decided here, then, is whether these remedies are available to the plaintiffs, assuming the truth of their pleadings.

*(1) Disgorgement for Breach of Contract*

50      The ordinary form of monetary relief for breach of contract is an award of damages, measured according to the position which the plaintiff would have occupied had the contract been performed (*Bank of America Canada*, at para. 25). Correspondingly, the orthodox position maintained that disgorgement of the defendant's profits was not an available remedy for breach of contract (H. D. Pitch and R. M. Snyder, *Damages for Breach of Contract* (2nd ed. (loose-leaf)), at pp. 1-36 to 1-39; S. Watterson, "Gain-Based Remedies for Civil Wrongs in England and Wales", in E. Hondius and A. Janssen, eds., *Disgorgement of Profits: Gain-Based Remedies throughout the World*, 29, at p. 55; see also *Baud Corp., N.V. v. Brook* (1978), [1979] 1 S.C.R. 633 (S.C.C.), at p. 673).

51      More recently, courts have accepted that disgorgement may be available for breach of contract in certain exceptional circumstances (*Attorney General v. Blake* (2000), [2001] 1 A.C. 268 (U.K. H.L.); *Bank of America Canada*, at paras. 25 and 30-31). In *Blake*, the defendant was a former member of the British secret intelligence service who had defected to become an agent for the Soviet Union. He was discovered and sentenced to 42 years' imprisonment, but escaped prison and fled the country. Blake later entered into a contract to publish his memoirs, in contravention of the confidentiality undertaking in his employment agreement with the intelligence service. The information in his memoirs was, however, "no longer confidential, nor was its disclosure damaging to the public interest" (p. 275). Further, Blake's fiduciary obligations ceased to exist when he was dismissed from his post. The sole question was, therefore, whether the Crown could pursue disgorgement for his breach of contract.

52      Lord Nicholls, for a majority of the House, held that disgorgement for breach of contract may be appropriate in exceptional circumstances, but only where, at a minimum, the remedies of damages, specific performance, and injunction are inadequate (*Blake*, at p. 285; *Morris-Garner v. One Step (Support) Ltd.*, [2018] UKSC 20, [2018] 3 All E.R. 659 (U.K. S.C.), at para. 64; see also Watterson, at p. 55). As to the types of circumstances that should be considered exceptional, Lord Nicholls concluded:

> No fixed rules can be prescribed. The court will have regard to all the circumstances, including the subject matter of the contract, the purpose of the contractual provision which has been breached, the circumstances in which the breach occurred, the consequences of the breach and circumstances in which relief is being sought. <u>A useful general guide, although not exhaustive, is whether the plaintiff had a legitimate interest in preventing the defendant's profit-making activity and, hence, in depriving him of his profit.</u>

> [Emphasis added; p. 285.]

53      Nothing in the law of Canada contradicts the "exceptional" standard articulated by Lord Nicholls in *Blake*. Indeed, this Court's statement in *Bank of America Canada*, at para. 31 — that "[c]ourts generally avoid [the restitution] measure of damage" — affirms this Court's view, like that expressed by the House of Lords in *Blake*, that disgorgement awards are not generally available. In particular, and again as was held in *Blake*, disgorgement for breach of contract is available only where other remedies are inadequate and only where the circumstances warrant such an award. As to those circumstances, courts should in particular consider whether the plaintiff had a legitimate interest in preventing the defendant's profit-making activity.

54      Ultimately, Lord Nicholls concluded in *Blake* that the circumstances before him were indeed "exceptional". The ordinary measure of expectation damages could not have vindicated the Crown's interest, as no economic loss resulted from the publication of Blake's memoirs. Further, in Lord Nicholls view, the Crown had a legitimate interest in Blake's profits because his confidentiality undertaking was "closely akin to a fiduciary obligation" (p. 287). I pause here because, I respectfully differ on this latter point. The imposition of "quasi-fiduciary" relationships by operation of law is a concept foreign to Canadian law (*RBC Dominion Securities Inc. v. Merrill Lynch Canada Inc.*, 2008 SCC 54, [2008] 3 S.C.R. 79 (S.C.C.), at paras. 51-54, per Abella J. (dissenting)). I therefore prefer the view of Professor McInnes, who states:

> To ... impose relief in a contractual context on the basis of an undefined notion of *quasi*-fiduciary duty dangerously ignores Justice Sopinka's warning that such obligations "should not be imposed ... simply to improve the nature or extent of the remedy". It is not merely that Lord Nicholls' approach fails to reveal a sound basis for liability; it also implicitly invites lower courts to similarly manipulate equitable doctrine for instrumental purposes. Such an exercise is inimical to the development of coherent principle.

> ("Gain-Based Relief for Breach of Contract: *Attorney General v. Blake*" (2001), 35 *Can. Bus. L.J.* 72, at p. 85, citing *Norberg v. Wynrib*, [1992] 2 S.C.R. 226, at p. 312)

55      As to what circumstances *will* create a legitimate interest in the defendant's profit-making activity, I agree with Lord Nicholls that the boundaries of this remedy are "best hammered out on the anvil of concrete cases" (*Blake*, at p. 291). I can, however, offer some observations.

56      Many scholars have recognized that it is difficult to reconcile disgorgement for breach of contract with private law principles (see e.g. E. J. Weinrib, "Punishment and Disgorgement as Contract Remedies" (2003), 78 *Chi.-Kent L. Rev.* 55; at p. 70; D. Winterton, "Contract Theory and Gain-Based Recovery" (2013), 76 *M.L.R.* 1129; McInnes (2001)). This Court has gone even further, cautioning that disgorgement awards may have the undesirable effect of deterring "efficient breach[es] of contract" (*Bank of America Canada*, at paras. 30-31, Weinrib (2003), at p. 73). More importantly, it is difficult to explain disgorgement for breach of contract from the standpoint of corrective justice (Weinrib (2003), at p. 57). Granted, some attempts have been made to articulate a corrective justice rationale, but those accounts have been met with substantial criticism (see P. Benson, "Contract as a Transfer of Ownership" (2007), 48 *Wm. & Mary L. Rev.* 1673; A. Botterell, "Contractual Performance, Corrective Justice, and Disgorgement for Breach of Contract" (2010), 16 *Legal Theory* 135; and A. R. Sangiuliano, "A

Corrective Justice Account of Disgorgement for Breach of Contract by Analogy to Fiduciary Remedies" (2016), 29 *Can. J.L. & Jur.* 149, at pp. 160-74).

57      In my view, the key to developing principles for gain-based recovery in breach of contract is to consider what legitimate interest a gain-based award serves to vindicate. A coherent approach that reconciles the relief awarded with the structure of breach of contract as a cause of action should be preferred (McInnes (2001), at pp. 88-93; see also N. W. Sage, "Disgorgement: From Property to Contract" (2016), 66 *U.T.L.J.* 244). To that end, it is useful to recall that courts have, in some exceptional circumstances, long awarded monetary amounts departing from the ordinary measure of expectation damages. That is to say, while disgorgement awards quantified solely by reference to the defendant's profit are a relatively recent development, other gain-based awards are nothing new. For example, this Court has awarded damages quantified by the amount a defendant saved through deficient performance, though the plaintiff would have been no better off had the contract been performed (*Sunshine Exploration Ltd. v. Dolly Varden Mines Ltd. (N.P.L.)* (1969), [1970] S.C.R. 2 (S.C.C.)). The Court of Appeal of Nunavut suggested a similar measure of relief in circumstances where the damage caused by the defendant's deficient performance was simply too difficult to quantify (*Inuit of Nunavut v. Canada (Attorney General)*, 2014 NUCA 2, 580 A.R. 75 (Nun. C.A.), at para. 88 ("*Inuit of Nunavut*")). And courts have also granted what might be termed "negotiating damages" to prevent a defendant from obtaining for free an advantage for which it did not bargain (*Wrotham Park Estate Co. v. Parkside Homes Ltd.*, [1974] 2 All E.R. 321 (Eng. Ch. Div.); *Smith v. Landstar Properties Inc.*, 2011 BCCA 44, 14 B.C.L.R. (5th) 48 (B.C. C.A.), at paras. 39-44; see also *Morris-Garner*, at paras. 91-100). As the Supreme Court of the United Kingdom recently explained in *Morris-Garner*, at para. 95:

> Negotiating damages can be awarded for breach of contract where the loss suffered by the claimant is appropriately measured by reference to the economic value of the right which has been breached, considered as an asset .... The rationale is that the claimant has in substance been deprived of a valuable asset, and his loss can therefore be measured by determining the economic value of the right in question, considered as an asset. <u>The defendant has taken something for nothing, for which the claimant was entitled to require payment.</u>

[Emphasis added.]

58      As these various examples demonstrate, an award that appears to be measured by a defendant's gain might arguably, in certain circumstances, serve a compensatory purpose that distinguishes it from disgorgement and which therefore tends to support recovery (McInnes (2001), at pp. 76-80; Weinrib (2003), at pp. 71-72; see also *Morris-Garner*, at paras. 39-40). Whether viewed as compensatory or not, these cases are indicative of the types of circumstances where a plaintiff is entitled to receive a monetary award that goes beyond the economic position that it would have occupied had its contract been performed (see Burrows, at pp. 672-77; McInnes (2014), at p. 285). While the circumstances in which a gain-based award will be appropriate cannot be clearly delineated in advance (*Blake*, at p. 285; *Morris-Garner*, at para. 94), one would expect future legitimate interests protected by a gain-based award to resemble those interests that have been protected in the past.

59      Returning to the present case, and applying the standard articulated in *Blake*, the plaintiffs' claim for disgorgement is plainly doomed to fail. I say this, first, because disgorgement is available for breach of contract only where, at a minimum, other remedies are inadequate. Circumstances of inadequacy arise when the nature of the claimant's interest is such that it cannot be vindicated by other forms of relief. This may arise where, for example, the plaintiff's loss is "impossible to calculate" or where the plaintiff's interest in performance is not reflected by a purely economic measure (*Inuit of Nunavut*, at para. 80; see also *Morris-Garner*, at paras. 39-40; Burrows, at p. 676). Where, as here, the argument is that the quantum of loss is equal to the defendant's gain, but the plaintiff would simply rather pursue disgorgement, a gain-based remedy is not appropriate.

60      My colleague Karakatsanis J. suggests that compensatory damages may be inadequate here because VLTs do not create records for particular customers, and that ALC's conduct may have contributed to the plaintiffs' lack of evidence. But the plaintiffs do not make these allegations. More importantly, compensatory damages are not inadequate merely because a plaintiff is unwilling, or does not have sufficient evidence, to prove loss (*Inuit of Nunavut*, at para. 85; see also *Morris-Garner*, at para. 90). Again, and as *Inuit of Nunavut* demonstrates, inadequacy flows *not* from the availability of evidence, but from the nature of the claimant's interest. There, the claimant's interest was in the Government of Canada's agreement to develop a general

monitoring plan to support collection and analysis of "information on the long term state and health of ... the Nunavut Settlement Area" (para. 9). While the Government of Canada's failure to do so resulted in an identifiable loss to the Inuit of Nunavut, it could not possibly be quantified in monetary terms. The Nunavut Court of Appeal therefore recognized that it would be appropriate to award gain-based damages measured by the amount the Government of Canada saved by breaching the agreement. This is a far cry from the plaintiffs' circumstances here. Their gambling losses are readily quantifiable and can be remedied through an award of compensatory damages.

61    Disgorgement for breach of contract is exceptional relief; it is not available at the plaintiff's election to obviate matters of proof. And there is nothing exceptional about the breach of contract the plaintiffs allege. Once the allegations of criminal conduct are put aside (given that I determined that they should be struck), the plaintiffs' claim is simply that they paid to play a gambling game and did not get exactly what they paid for. The plaintiffs cannot be said to have a legitimate interest in ALC's profit-making activity.

62    It follows that the plaintiffs' claim has no reasonable chance of achieving disgorgement damages for breach of contract.

*(2) Punitive Damages for Breach of Contract*

63    Punitive damage awards for breach of contract are also exceptional, but will be awarded where the alleged breach of contract is an independent actionable wrong (*Whiten v. Pilot Insurance Co.*, 2002 SCC 18, [2002] 1 S.C.R. 595 (S.C.C.), at para. 78). As this Court held in *Whiten*, the actionable wrong need not be tortious: punitive damages may also be awarded where the defendant breaches a contractual obligation of good faith (para. 79).

64    Having concluded that all of the plaintiffs' other claims are bound to fail, the only remaining actionable wrong is the claim that ALC breached an obligation of good faith owed to the plaintiffs under the alleged contract. To that effect, the plaintiffs' claim alleges:

[T]he nature of the contract between the parties and the vulnerability of the Plaintiffs implies a duty of good faith which requires the Defendant to consider the interests of the Plaintiffs as at least equal to its own and not to offer or supply an inherently dangerous service or product. The Defendant breached its implied duty of good faith by designing, testing, researching, formulating, developing, manufacturing or altering, producing, labeling, advertising, promoting, distributing, and/or selling VLTs which were inherently dangerous to users and which the Defendant knew or ought to have known would lead to dependency and addiction.

(A.R., vol. II, at pp.101-2)

65    As this Court explained in *Bhasin v. Hrynew*, 2014 SCC 71, [2014] 3 S.C.R. 494 (S.C.C.), however, not every contract imposes actionable good faith obligations on contracting parties. While good faith is an organizing principle of Canadian contract law, it manifests itself in specific circumstances. In particular, its application is generally confined to existing categories of contracts and obligations (para. 66). The alleged contract between ALC and the plaintiffs does not fit within any of the established good faith categories. Nor did the plaintiffs advance any argument for expanding those recognized categories.

66    Accordingly, the plaintiffs' claim for punitive damages has no reasonable chance of success.

*(3) Whether the Claim Should Survive For Nominal Damages*

67    The remaining question on breach of contract is whether the plaintiffs' claim should survive as a hollow cause of action that does not support any of the remedies they seek. In my view, it should not. While I agree with my colleague Karakatsanis J. that declaratory relief and nominal damages are available in theory as remedies for breach of contract, a reasonable claim is one that has a reasonable chance of achieving the outcome that the plaintiff seeks. That is not this claim. To be sure, the circumstances here are unusual. Not only did the plaintiffs plead only gain-based relief and punitive damages, both of which I have concluded are unavailable in the circumstances the plaintiffs also expressly disclaimed remedies quantified on the basis of individual loss. At no point did the plaintiffs argue that their claim should survive because nominal damages are available. In

my view, the plaintiffs' breach of contract claim should be assessed on the basis of the questions put before the Court - namely, whether a gain-based remedy or punitive damages are available in the circumstances. And on that basis, it is obvious that the plaintiffs' breach of contract claim does not disclose a reasonable cause of action. To allow this claim to proceed to trial would simply be to delay the inevitable, and would not reflect a "proportionate procedur[e] for adjudication" (*Hryniak*, at para. 27).

*(4) Certification*

68     Even were the breach of contract claim to survive, the application judge's certification decision would have to be revisited. Given my conclusion that each of the plaintiffs' claims should be struck, it is unnecessary to address certification in detail. I respectfully disagree with my colleague, however, that the plaintiff's breach of contract claim, standing alone, would satisfy the preferability requirement in s. 5(1)(d) of the *Class Actions Act* (Karakatsanis J. Reasons, at paras. 165-70). As I have explained, punitive damages and disgorgement are unavailable to the plaintiffs. Without those remedies, the plaintiffs would be pursuing a breach of contract action wherein each plaintiff effectively elects to pursue nominal damages in lieu of the actual damages they have suffered. Such an action would not further the principal goals of class actions, namely judicial economy, behavior modification, and access to justice (*Hollick v. Metropolitan Toronto (Municipality)*, 2001 SCC 68, [2001] 3 S.C.R. 158 (S.C.C.), at paras. 27-28).

### D. Unjust Enrichment

69     The plaintiffs also rely on the principled unjust enrichment framework (or what the Court of Appeal referred to as "unjust enrichment *simpliciter*"). This claim requires establishing that ALC was enriched, that the plaintiffs suffered a corresponding deprivation, and that the enrichment and corresponding deprivation occurred in the absence of any juristic reason therefor (*Moore*, at para. 37). The appellants argue that this claim is bound to fail because, even if ALC has been enriched at the plaintiff's expense, there is a juristic reason for the exchange.

70     The juristic reason element of the unjust enrichment analysis proceeds in two stages. First, the plaintiff must demonstrate that the defendant's enrichment cannot be justified by any of the established categories of juristic reason. If none of the established categories of juristic reason are present, the plaintiff has a *prima facie* case for unjust enrichment. At the second stage, the defendant can rebut the plaintiff's *prima facie* case by showing that there is a residual reason to deny recovery (*Moore*, at paras. 57-58).

71     Here, I do not have to go beyond the first stage of the analysis. The plaintiffs' own pleadings allege that there was a contract between ALC and the plaintiffs under which the plaintiffs paid to play VLTs. A defendant that acquires a benefit pursuant to a valid contract is justified in retaining that benefit (*Moore*, at para. 57). Nothing in the pleadings, apart from perhaps the allegations of criminal conduct that I have determined are bound to fail, could serve to vitiate the alleged contract between the plaintiffs and ALC. It follows that I agree with the appellants that the plaintiffs' unjust enrichment claim has no reasonable chance of success.

### IV. Conclusion

72     Each claim that the plaintiffs have pleaded is bound to fail because it discloses no reasonable cause of action. I would allow the appeals, set aside the certification order, and strike the plaintiffs' statement of claim in its entirety. The appellants have not sought costs, and I would therefore award none.

***Karakatsanis J.* (Wagner C.J. and Martin and Kasirer JJ. concurring):**

### I. Introduction

73     The plaintiffs in this proposed class action allege that the Video Lottery Terminal (VLT) games offered by Atlantic Lottery Corporation (ALC) in Newfoundland and Labrador are deceptive, harmful, and inherently addictive. They further contend that ALC, both a regulator and a business corporation, deliberately put people at risk of addiction by deceiving the paying public for the sole purpose of making money. The statement of claim seeks a gain-based remedy through seven possible causes of action.

74     The application judge at the Supreme Court of Newfoundland and Labrador dismissed ALC's application to strike the plaintiffs' statement of claim and certified the class action. The majority of the Court of Appeal of Newfoundland and Labrador struck two claims but allowed the remainder to proceed as a class action. ALC and several third parties now appeal to this Court.

75     There are two main issues before this Court: whether to strike the plaintiffs' claims and whether to certify the plaintiffs' class action. The Court's concern is not whether the plaintiffs' claim will be successful, but rather whether it should be allowed to proceed to trial, and proceed as a class action.

76     I agree with Brown J. that a mere breach of a duty of care, in the absence of loss, cannot ground a claim for disgorgement and that the term "waiver of tort" should not be used to refer to a cause of action. I also agree that VLTs cannot constitute "three-card monte" as that phrase is defined in the *Criminal Code*, R.S.C. 1985, c. C-46, and that the plaintiffs' claim in unjust enrichment must be struck. However, I disagree with his analysis of whether the plaintiffs' claim in breach of contract is a reasonable cause of action as well as his conclusion that there are no available remedies for that breach.

77     I agree with the courts below that common issues relating to breach of contract, punitive damages, and the availability of the remedy of disgorgement of ALC's gains are properly certified. However, I would not, on this record, certify the availability of aggregate monetary relief as a common issue. It follows that I would allow the appeals only in part, allowing the breach of contract claim to proceed and remain certified as a class action.

## II. Statement of Claim and Procedural History

78     ALC is a corporation incorporated under the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 (*CBCA*), whose shareholders are the governments of the four Atlantic provinces, including Newfoundland and Labrador. Under the *Video Lottery Regulations*, C.N.L.R. 760/96, made under the *Lotteries Act*, S.N.L. 1991, c. 53, ALC is authorized to offer gambling to the public. As part of this business, ALC offers games through VLTs at approved sites.

79     The plaintiffs, Douglas Babstock and Fred Small, are individuals seeking to be the representative plaintiffs in a class action against ALC. In their statement of claim, the plaintiffs bring a class action on behalf of persons and estates harmed by the VLT gambling that the defendant, ALC, manages in the Province of Newfoundland and Labrador. ALC has not yet filed its defence.

80     The plaintiffs state that ALC is both a regulator and a business corporation driven by profit motive, remitting profits to the province in the range of $60-90 million annually. The statement of claim alleges that ALC knows or ought to know that VLTs are, and have been designed to be, inherently deceptive, addictive, and dangerous, programmed to create cognitive distortions of consumers' perceptions of winning. The plaintiffs say that ALC acted in bad faith, and that the reprehensibility of ALC's conduct is relevant to the issue of remedy. They do not advance claims for personal injuries but instead seek, among other remedies, damages equal to the total unlawful gain obtained by ALC from the class members, disgorgement of ALC's profits, and punitive damages.

81     ALC joined several third parties in the action, including VLC, Inc.; IGT-Canada Inc.; International Game Technology; Spielo International Canada ULC; and Tech Link International Entertainment Limited (collectively, the third parties), who are the manufacturers and suppliers of VLTs and who supplied VLTs to ALC during the proposed class period.

82     The plaintiffs brought an application for certification under the *Class Actions Act*, S.N.L. 2001, c. C-18.1 (*CAA*), and ALC brought an application to strike the plaintiffs' statement of claim under r. 14.24 of the *Rules of the Supreme Court, 1986*, S.N.L. 1986, c. 42, Sch. D.

## III. Decisions on the Breach of Contract Claim and Certification

### A. Supreme Court of Newfoundland and Labrador (*2014 NLTD(G) 114, 356 Nfld. & P.E.I.R. 293* (N.L. T.D.); *2016 NLTD(G) 216, 93 C.P.C. (7th) 307* (N.L. T.D.) (Faour J.))

83    On ALC's application to strike the claim, the application judge found that breach of contract was a reasonable cause of action and that disgorgement was potentially available as a remedy. He rejected the argument that ALC's status as a regulator prevented the implication of any terms into its contracts with the plaintiffs, finding that it was not plain and obvious that ALC would be able to defend against every allegation on the basis of its regulatory status. He found that the plaintiffs' failure to plead damage or individual loss arising from the breach of contract, and to instead claim the defendants' gain from the breach, was not a bar to their cause of action. In his certification reasons (which touched on other claims beyond breach of contract), Faour J. found that the criteria for certification had been established.

**B. Court of Appeal of Newfoundland and Labrador (*2018 NLCA 71, 29 C.P.C. (8th) 1* (N.L. C.A.) (Green, Welsh, and Harrington JJ.A.))**

84    In the Court of Appeal, Green J.A., writing for the majority, upheld the application judge's conclusion that breach of contract was a reasonable cause of action on the basis that it is actionable in the absence of pleaded or proven loss. The majority found disgorgement to be a potential remedy given its uncertain parameters; it could not be said that the claim for disgorgement of profits was doomed to fail. The majority also refused to strike the plaintiffs' claim for punitive damages given their allegations that ALC had engaged in reprehensible and high-handed conduct. Finally, the majority concluded that the application judge had not erred in certifying the plaintiffs' class action.

85    Welsh J.A. dissented, finding that the claim for breach of contract should be struck because the plaintiffs did not plead loss or damage.

**IV. Analysis**

86    In these reasons, I consider two issues. First, is breach of contract a reasonable cause of action on these pleadings? Second, should the action for breach of contract remain certified as a class action?

**A. Standard on a Motion to Strike**

87    A pleading may be struck or amended on the ground that it discloses no reasonable cause of action or defence (*Rules of the Supreme Court, 1986*, r. 14.24(1)(a)). When considering whether to strike a pleading on this ground, the question is whether the claim has "no reasonable prospect of success" (*Knight v. Imperial Tobacco Canada Ltd.*, 2011 SCC 42, [2011] 3 S.C.R. 45 (S.C.C.), at para. 17), or whether it is "plain and obvious" that the action cannot succeed (*Hunt v. T & N plc*, [1990] 2 S.C.R. 959 (S.C.C.), at p. 980). This is a high standard that applies to determinations of fact, law, and mixed fact and law. The facts pleaded are assumed to be true "unless they are manifestly incapable of being proven" (*Imperial Tobacco*, at para. 22).

88    On a motion to strike, the statement of claim should be read "as generously as possible and to accommodate any inadequacies in the form of the allegations which are merely the result of drafting deficiencies" (*Operation Dismantle Inc. v. R.*, [1985] 1 S.C.R. 441 (S.C.C.), at p. 451), because "cases should, if possible, be disposed of on their merits" (*Montreal Trust Co. of Canada v. Hickman*, 2001 NFCA 42, 204 Nfld. & P.E.I.R. 58 (Nfld. C.A.), at para. 12). At times, a proposed cause of action is so obviously at odds with precedent, underlying principle, and desirable social consequence that regardless of the evidence adduced at trial, the court can say with confidence that it cannot succeed. But this is not often the case, and our common law system generally evolves on the basis of the concrete evidence presented before judges at trial.

89    This is why claims that do not contain a "radical defect" (*Hunt*, at p. 980) should nevertheless proceed to trial. Courts should consider whether the pleadings are sufficient to put the defendant on notice of the essence of the plaintiff's claim (*Holland v. Saskatchewan (Minister of Agriculture, Food & Rural Revitalization)*, 2008 SCC 42, [2008] 2 S.C.R. 551 (S.C.C.), at para. 15) and whether "the facts pleaded would support one or more arguable causes of action" (*Anderson v. Bell Mobility Inc.*, 2009 NWTCA 3, 524 A.R. 1 (N.W.T. C.A.), at para. 5). In *Markevich v. Canada*, 2003 SCC 9, [2003] 1 S.C.R. 94 (S.C.C.), this Court explained that a cause of action is "only a set of facts that provides the basis for an action in court" (para. 27).

90      The threshold to strike a claim is therefore high. Where a reasonable prospect of success exists, the matter should be allowed to proceed to trial (*Imperial Tobacco*, at paras. 17 and 21). The correct posture for the Court to adopt is to consider whether the pleadings, as they stand or may reasonably be amended, disclose a question that is not doomed to fail (*Hunt*, at p. 978, quoting *Minnes v. Minnes* (1962), 39 W.W.R. 112 (B.C. C.A.), at pp. 116 and 122).

## B. Breach of Contract

*(1) Breach of Contract as a Cause of Action*

91      The elements of a cause of action for breach of contract are the existence of a contract and the breach of a term of that contract. In order to strike the claim for breach of contract, ALC and the third parties must demonstrate either that a necessary fact is not pleaded or that there is a legal reason why no contractual term existed or could be breached. In my view, they have done neither. As I discuss below, the plaintiffs have pleaded everything necessary to sustain a claim of breach of contract in this case. I begin by reviewing the plaintiffs' statement of claim more broadly before turning to the breach of contract claim.

92      The plaintiffs allege that a disproportionate number of VLT gamblers have become addicted to gambling and are the source of a disproportionately large share of ALC's VLT revenues in the province. According to the pleadings, in Newfoundland and Labrador, 9.7 percent of VLT players are at moderate risk of problem gambling and an additional 8.6 percent are problem gamblers, compared to a problematic gambling rate of only about 3 percent for other forms of gambling. The plaintiffs have not pleaded that either of the representative plaintiffs are problem gamblers.

93      The statement of claim also alleges that VLTs are deceptive in that both the mechanics of the game and the odds of winning are concealed. The VLTs are said to have asymmetrical virtual reels that are programmed to weight the distribution of symbols so that the visual reels give a false impression of the odds of winning. The plaintiffs also allege that the machines include a "stop" button that creates the illusion of control over the outcome, but is deceitful in that it provides no such control: in reality, the outcome is based on a random number generator. The pleadings further state that ALC knows or ought to know of the deceptive nature of VLTs and that these deceptive design features can be eliminated such that VLTs become a reasonably safe form of gambling and generate a reasonable stream of profit.

94      Turning to the breach of contract claim, the plaintiffs allege that there was a contract between the parties "to provide a safe, interactive and entertaining way to play games of chance with the opportunity to win small cash prizes in exchange for small frequent cash bets" (Statement of Claim, at para. 46). Given the absence of a written contract between the parties, their claim rests on the existence of an implied contract. The plaintiffs have pleaded that ALC breached some of the contract's terms.

95      The first implied term is a warranty that the VLTs were of merchantable quality and fit for use — that they were not inherently dangerous. ALC is alleged to have breached this term by "designing, testing, researching, formulating, developing, manufacturing or altering, producing, labeling, advertising, promoting, distributing and/or selling" VLTs that were "inherently dangerous to users" (Statement of Claim, at para. 47). The plaintiffs allege that ALC knew or ought to have known using VLTs would lead to dependency and addiction. In the alternative, the plaintiffs state that ALC breached a second implied contractual term: to use reasonable care and skill in its provision of VLT gaming. The plaintiffs plead that a necessary incident of this second implied term was that ALC owed the plaintiff class a duty to warn of any inherent danger in the consumption of the games and to satisfy itself of the safety of the games, which they allege ALC did not do. Finally, the plaintiffs allege that ALC breached an implied term of good faith.

96      In this case, the plaintiffs have pleaded the nature of the contract between the parties, the terms they say are implied, and the manner in which ALC breached the contract between them. The existence and breach of these implied terms are thus matters that would usually be left for trial. Indeed, as *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619 (S.C.C.), confirmed, implied terms in a contract may be inferred

16

based on the presumed intention of the parties where the implied term must be necessary "to give business efficacy to a contract or as otherwise meeting the 'officious bystander' test as a term which the parties would say, if questioned, that they had obviously assumed" ....

(para. 27, quoting *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711 (S.C.C.), at p. 775)

97    This is the most commonly invoked manner of inferring the existence of implied terms in a contract and requires a factual determination based on the evidence adduced in a particular case. These terms are thus often referred to as being "implied in fact", and the existence of such a term in a contract is a question of fact that must be made out at trial (G. R. Hall, *Canadian Contractual Interpretation Law* (3rd ed. 2016), at pp. 176-78).

98    The third parties, however, submit that the parties would have been precluded from implying these contractual terms because ALC, one of the parties to the alleged contract, is a public regulator. They submit that the contract here is simply the right to play a VLT game that has been approved by ALC as a regulator, whose authority cannot be limited or fettered by implying terms in the contract of play.

99    I see no reason to find at this early stage that the terms the plaintiffs allege are implied in fact are unavailable at law. Without deciding whether ALC was acting in its capacity as a natural person in relation to its VLT operations, I note that ALC has authority to enter into contracts given that it has the capacity, rights, powers, and privileges of a natural person (*CBCA*, s. 15(1)). On a motion to strike, it is not enough for the third parties to point in broad strokes to ALC's role as a "regulator" to ground a legal impediment to having implied these contractual terms.

100    Indeed, the third parties have not pointed to anything in the regulatory scheme that would clearly preclude the terms the plaintiffs allege are implied when ALC sells games to playing members of the public. Under s. 5 of the *Lotteries Act*, the Lieutenant-Governor in Council is authorized to make regulations in relation to lottery schemes, including with respect to the amounts and values of prizes, the terms and conditions attached to prizes, and the consideration to be paid or given to secure a chance to win prizes (s. 5(d) and (e)). Section 8 of the *Video Lottery Regulations* delineates some of these conditions and prohibits operation of VLTs that do not comply with certain requirements — including the size of wagers, a player's monetary exposure in one play, and the minimum and maximum payout of prices for money accepted (between 80 percent and 96 percent). While some of the rules of the game are thus delineated in this regulatory scheme, the scheme leaves room to imply terms going to the core of the plaintiffs' grievance — concealment of the mechanics of the game, the odds of winning, and the asymmetrical visual reels that give players a false illusion of control.

101    In other words, at this preliminary stage, I see nothing in the regulatory scheme that would preclude the regular application of contract law or that would conflict with a contractual term relating to how ALC ensures the safety and transparency of the games it offers to the public. Further, it is not plain and obvious that implying the terms alleged by the plaintiffs would improperly touch on or fetter ALC's authority. Under the *Video Lottery Regulations*, ALC is authorized to approve video lotteries (that is, a scheme or enterprise of one or more VLTs) and their sites and advertisement (ss. 2(e), 3, 5, and 10); the manufacture, supply, and operation of VLTs (ss. 4 and 6); and the operation of video lottery games (s. 4). However, any impact that the alleged implied terms might have on ALC's authority, and the interaction, if any, of such a contract with fettering principles, is best determined with the benefit of a full and developed factual record (see *Andrews v. Canada (Attorney General)*, 2014 NLCA 32, 354 Nfld. & P.E.I.R. 42 (N.L. C.A.); *Levy v. British Columbia (Crime Victim Assistance Program)*, 2018 BCCA 36, 7 B.C.L.R. (6th) 84 (B.C. C.A.)). This is particularly so given the public policy issues at play, involving the implication of terms aimed at protecting public safety by preventing, or warning of, the danger of addiction.

102    It is thus not plain and obvious that the contractual terms alleged are unavailable at law. I would therefore conclude that the plaintiffs' statement of claim pleads a contractual term and a breach of that term — the necessary elements for a breach of contract claim.

*(2) Available Remedies For Breach of Contract*

103      Brown J. concludes that the cause of action for breach of contract, as framed, must fail because it is plain and obvious that there are no available remedies for this claim. As I elaborate below, I cannot agree that there is no valid cause of action for breach of contract on the basis that there is *no* available remedy. In my view, there are several remedies that are open to the plaintiffs on their pleadings, including nominal damages, declaratory relief, disgorgement, and punitive damages.

**(a) Nominal Damages or Declaratory Relief**

104      Unlike a claim in negligence, loss is not an essential element of a cause of action for breach of contract. In my view, there is a basis for an action for breach of contract and a basis to obtain remedies against ALC even in the absence of pleadings of specific personal loss. For example, a court finding breach of contract may make binding declarations of right, whether or not any consequential relief is or could be claimed, and whether or not a declaration was pleaded as relief sought (*Rules of the Supreme Court, 1986*, r. 7.16; see also L. Sarna, *The Law of Declaratory Judgments* (4th ed. 2016), at pp. 5-6; *Native Women's Assn. of Canada v. Canada*, [1994] 3 S.C.R. 627 (S.C.C.), at pp. 647-48).

105      In addition, nominal damages may be given in all cases of breach of contract as a manner of "affirming ... that there is an infraction of a legal right" (*"Mediana" (The)*, [1900] A.C. 113 (U.K. H.L.), at p. 116, per Lord Halsbury L.C.). Nominal damages are thus always available for causes of action, like breach of contract, that do not require proof of loss, even if they are not pleaded (see, e.g., *Place Concorde East Ltd. Partnership v. Shelter Corp. of Canada Ltd.* (2006), 211 O.A.C. 141 (Ont. C.A.), at paras. 56 and 75-78; *Wilson v. Saskatchewan Government Insurance*, 2012 SKCA 106, 405 Sask. R. 8 (Sask. C.A.), at para. 13; J. Edelman, *McGregor on Damages* (20th ed. 2018), at pp. 406-7; M. Gannage, "Nominal Damages for Breach of Contract in Canada" (2011), 69 *The Advocate* 833, at p. 834; J. Cassels and E. Adjin-Tettey, *Remedies: The Law of Damages* (3rd ed. 2014), at p. 355). Assuming that the plaintiffs can ultimately prove the existence of a contract and its breach by ALC, they may be entitled to an award of nominal damages.

106      Litigants have the right to pursue reasonable causes of action to vindicate their rights. In my view, the plaintiffs' breach of contract claim is a reasonable cause of action. As it is actionable without proof of loss, it always necessarily implies nominal damages. This alone precludes striking the claim.

**(b) Disgorgement of Profits**

107      While I agree with Brown J. that disgorgement is not an independent *cause of action* and has no reasonable chance of success as such, it does not follow that disgorgement cannot be pleaded as a *remedy* for breach of contract. As I will explain, disgorgement can be an appropriate remedy for breach of contract, though whether it is appropriate in this case is a matter for trial that cannot be resolved on the pleadings alone.

108      The customary remedy for a breach of contract is compensation, usually measured in the form of expectation damages (*Bank of America Canada v. Mutual Trust Co.*, 2002 SCC 43, [2002] 2 S.C.R. 601 (S.C.C.), at para. 26; L. D. Smith, "Disgorgement of the Profits of Breach of Contract: Property, Contract and 'Efficient Breach'" (1995), 24 *Can. Bus. L.J.* 121, at p. 123; *Baud Corp., N.V. v. Brook* (1978), [1979] 1 S.C.R. 633 (S.C.C.), at p. 645). This means the plaintiff is generally entitled "to be placed in the same situation, with respect to damages, as if the contract had been performed" (*Robinson v. Harman* (1848), 1 Exch. 850 (Eng. Exch.), at p. 855; see also *Fidler v. Sun Life Assurance Co. of Canada*, 2006 SCC 30, [2006] 2 S.C.R. 3 (S.C.C.), at para. 27).

109      Nevertheless, despite this usual approach, the compensation principle does not always apply; there are well-established exceptions to that principle and other forms of relief can be appropriate, such as specific performance of the contract or an injunction (*Waterman v. IBM Canada Ltd.*, 2013 SCC 70, [2013] 3 S.C.R. 985 (S.C.C.), at para. 36; *Semelhago v. Paramadevan*, [1996] 2 S.C.R. 415 (S.C.C.), at para. 14; R. J. Sharpe, *Injunctions and Specific Performance* (loose-leaf), at p. 2-1).

110      And, in some cases, disgorgement of a defendant's profits can be an appropriate remedy for breach of contract. Disgorgement is a measure of relief based solely upon the defendant's profit rather than the plaintiff's loss (Edelman (2018), at

pp. 472-73). It is an exceptional remedy, available where a plaintiff has shown that the ordinary remedies of contract law are inadequate to protect and vindicate their contractual right.

111      In *Attorney General v. Blake* (2000), [2001] 1 A.C. 268 (U.K. H.L.), the House of Lords ordered disgorgement of profit as a remedy for breach of contract. In 1989, George Blake, a former member of the United Kingdom's Secret Intelligence Service (and Soviet spy), entered into a contract to publish a book of state secrets that he had undertaken never to reveal, thereby breaching his contractual undertaking. By the time of publication, however, the information was not confidential and its disclosure caused no loss to the Crown. There was, therefore, nothing to compensate. Compensatory damages could neither vindicate the government's contractual right nor deter and denounce the wrong committed by the defendant.

112      The majority of the House of Lords concluded that disgorgement of the profits gained from that publishing contract — some £90,000 — was the appropriate remedy in all the circumstances for the breach of the undertaking. In determining that disgorgement was the appropriate remedy, Lord Nicholls explained that:

> Normally the remedies of damages, specific performance and injunction, coupled with the characterisation of some contractual obligations as fiduciary, will provide an adequate response to a breach of contract. It will be only in exceptional cases, where those remedies are inadequate, that any question of accounting for profits will arise. [p. 285]

113      Lord Nicholls held that "[n]o fixed rules can be prescribed" in this analysis and stressed the importance of having regard to all the circumstances, including:

(a) the subject matter of the contract;

(b) the purpose of the contractual provision which has been breached;

(c) the circumstances in which the breach occurred;

(d) the consequences of the breach; and

(e) the circumstances in which relief is being sought.

114      The majority of the House of Lords concluded that disgorgement was appropriate in the circumstances, including that: the Attorney General had a legitimate interest in preventing Blake from profiting from the disclosure of confidential information; Blake had a quasi-fiduciary obligation to the intelligence service; Blake's profits indirectly stemmed from his breaches in the 1950s (which brought him notoriety leading to the book deal); and allowing agents a financial incentive to violate their undertaking would endanger the effectiveness of the intelligence service (pp. 286-87).

115      While *Blake* set a standard for disgorgement in "exceptional circumstances", some have emphasized the need to further circumscribe and better reconcile the remedy with private law principles (see, e.g., A. Swan, J. Adamski and A. Y. Na, *Canadian Contract Law* (4th ed. 2018), at p. 582; S. M. Waddams, "Breach of Contract and the Concept of Wrongdoing" (2000), 12 *S.C.L.R.* (2d) 1, at pp. 7-13). The disgorgement remedy can appear more difficult to justify under traditional contract principles than compensatory or restitutionary damages, as the measure of relief is not based on what was been transferred or subtracted from the claimant (J. Edelman, *Gain-Based Damages: Contract, Tort, Equity and Intellectual Property* (2002), at p. 81).

116      But non-compensatory remedies for breach of contract are not inherently contrary to private law principles. For example, punitive damages may be awarded for breach of contract, even though they bear no relation to what the plaintiff should receive in compensation (see, e.g., *Whiten v. Pilot Insurance Co.*, 2002 SCC 18, [2002] 1 S.C.R. 595 (S.C.C.), at para. 92). Thus, the availability of punitive damages for breach of contract confirms that gain-based remedies, such as disgorgement, are compatible with the existing scheme of remedies for private wrongs (R. J. Sharpe, "Commercial Law Damages: Market Efficiency or Regulation of Behaviour?", in The Law Society of Upper Canada, ed., *Special Lectures 2005: The Modern Law of Damages* (2006), 327, at p. 346).

117     Indeed, it has been posited that the existence of disgorgement as a remedy is primarily justified by the need to deter wrongful conduct, underpinned by the recurring principle of contract law that a wrongdoer should not be permitted to profit from their wrong (Edelman (2002), at pp. 81-83; K. Barnett, *Accounting for Profit for Breach of Contract: Theory and Practice* (2012), at pp. 12 and 26; *Attorney General v. Guardian Newspaper Ltd.* (1988), [1990] 1 A.C. 109 (Eng. H.L.), at p. 286; J. D. McCamus, "Disgorgement for Breach of Contract: A Comparative Perspective" (2003), 36 *Loyola of Los Angeles L. Rev.* 943, at p. 945). Although compensatory damages will often help to achieve deterrence of wrongful conduct (*Royal Bank v. W. Got & Associates Electric Ltd.*, [1999] 3 S.C.R. 408 (S.C.C.), at para. 28), they will not always be adequate or appropriate in the circumstances of the breach. And since disgorgement awards are limited by the amount of profit, the measure of the award implicitly effects deterrence and is "dictated by the minimum necessary to make the wrong unprofitable" (Edelman (2002), at p. 83).

118     Further, it is clear that disgorgement awards are not limited to situations in which they serve a compensatory purpose. While the United Kingdom Supreme Court has recognized that some remedies that appear to be gain-based serve compensatory purposes (*Morris-Garner v. One Step (Support) Ltd.*, [2018] UKSC 20, [2018] 3 All E.R. 649 (U.K. S.C.), at para. 91), the remedy in *Blake* cannot be described as compensatory. The facts of *Blake* make clear that an award of disgorgement may be available without the claimant's having suffered a loss to be compensated, and Canadian courts have suggested that disgorgement may be available where "expectation damages are not readily quantifiable, *or* where the circumstances of the case call for a different measure of damages to provide an effective remedy" (*Inuit of Nunavut v. Canada (Attorney General)*, 2014 NUCA 2, 580 A.R. 75 (Nun. C.A.), at para. 85 (emphasis added)). Compensatory principles of contract law do not explain why a disgorgement remedy may be necessary to vindicate or protect a contractual right in a particular case.

119     For example, although it may not support disgorgement on its own, a self-interested and deliberate breach weighs in favour of disgorgement when awarding compensatory damages alone would fail to deter wrongdoers who are "prepared to hurt somebody" because they "may well gain by doing so" (Edelman (2002), at p. 84, quoting *Cassell & Co. v. Broome*, [1972] A.C. 1027 (U.K. H.L.), at p. 1094; see also P. Birks, "Restitutionary damages for breach of contract: *Snepp* and the fusion of law and equity" (1987), 4 *L.M.C.L.Q.* 421; American Law Institute, *Restatement of the Law, Third: Restitution and Unjust Enrichment* (2011), vol. 2, at §40).

120     Further, when calculating loss is impracticable, a narrow focus on compensation may relieve a wrongdoer from the obligation to remedy their wrong, whereas an award of disgorgement ensures that those who breach their contracts do not do so for free (see *Inuit of Nunavut*, at paras. 85 and 88; *Esso Petroleum Co. v. Niad Ltd.*, [2001] EWHC 458 (Eng. Ch.), at para. 63).

121     And there are multiple circumstances in which a plaintiff has a legitimate interest in preventing the defendant's profit-making activity, even when they themselves may have suffered no loss. These include where the defendant expressly contracted not to do the particular thing that constituted the breach (*Chitty on Contracts*, vol. I, *General Principles* (33rd ed. 2018), at para. 26-063; *Experience Hendrix LLC v. PPX Enterprises Inc.*, [2003] EWCA Civ 323 (Eng. C.A.), at paras. 30 and 36); where the defendant had a quasi-fiduciary duty to the plaintiff (*Blake*, at p. 287); and where the plaintiff's contractual right is quasi-proprietary, such as in *Blake*, where the information released by Blake "in a sense, belonged to the government" but was used for his own gain (S. Waddams, *Principle and Policy in Contract Law: Competing or Complementary Concepts?* (2011), at p. 201; see also D. Friedmann, "Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong" (1980), 80 *Colum. L. Rev.* 504).

122     I cannot agree that it is plain and obvious that a quasi-fiduciary duty should be rejected as a factor justifying a disgorgement remedy. This Court has explicitly referred to the existence of quasi-fiduciary duties as an unresolved question and it is not appropriate to resolve that question on this motion to strike in the absence of argument (see *RBC Dominion Securities Inc. v. Merrill Lynch Canada Inc.*, 2008 SCC 54, [2008] 3 S.C.R. 79 (S.C.C.), at para. 22). I would thus not rule out the possibility that contractual relationships based on trust, confidence, and the protection of vulnerability arising from the relationship could give rise to a disgorgement remedy even if they are not strictly fiduciary (see A. R. Sangiuliano, "A Corrective Justice Account of Disgorgement for Breach of Contract by Analogy to Fiduciary Remedies" (2016), 29 *Can. J.L. & Jur.* 149, at p. 178). In

such cases, as Lord Steyn wrote in *Blake*, it is arguable that "[t]he *reason* of the rule applying to fiduciaries" may apply to the defendant (at p. 292 (emphasis added)), even if the rule itself does not.

123     The overarching question in awarding disgorgement for breach of contract is whether, in all the circumstances, other remedies would not adequately protect or vindicate the contractual right (*Blake*, at p. 285; Edelman (2002), at pp. 154-55; Barnett, at p. 11; McCamus, at p. 961). I agree with Lord Nicholls's speech in *Blake* that when assessing whether disgorgement is appropriate, a non-exhaustive list of factors is to be preferred over a hard and fast rule. No single factor is necessarily crucial or dispositive; these considerations may work in tandem to support a disgorgement remedy (Waddams (2011), at pp. 200-1; see also *Blake*, at p. 285; *Chitty on Contracts*, at para. 26-063).

124     The plaintiffs' pleadings in this case correspond with several factors that, if established at trial, may point to a disgorgement remedy. For example, the pleading that ALC's breach was self-interested, deliberate, and in bad faith may engage the deterrence rationale. Similarly, the plaintiffs' pleading that they were vulnerable to ALC's abuse of its power and the public trust may engage some of the values underlying fiduciary relationships, as was the case in *Blake*. The pleading that the plaintiffs' relationship with ALC engages trust, confidence, and vulnerability tends to distinguish it from a standard commercial relationship, a factor which supports recovery (see *Vercoe v. Rutland Fund Management Ltd*, [2010] EWHC 424 (Eng. Ch. Div.), at paras. 340-43).

125     Thus, though I agree with Brown J. that disgorgement can only be awarded in exceptional circumstances for breach of contract, in my view, whether the circumstances of this case are exceptional is clearly a determination for the trial judge alone. I am not persuaded that the trial judge will inevitably conclude that there is nothing exceptional about this case, or that the plaintiffs' claim is simply that they paid to play a gambling game and did not get exactly what they paid for. The plaintiffs pleaded that ALC, a corporation charged with managing a profit-making lottery scheme offered to the public, intentionally deceived those playing members of the public by knowingly providing an unfair game and putting them at risk of gambling addiction in order to turn a profit. They specifically pleaded that they had a legitimate interest in ALC's performance of its contractual obligation to provide safe games and that remedies other than disgorgement would be inadequate to deter ALC from misconduct. In assessing whether other remedies would be inadequate to protect their contractual rights, a trial judge may also find that ascertaining the actual amount lost is impracticable since VLTs are designed for players to have the opportunity to "win small cash prizes in exchange for small frequent cash bets" and not to create records of who uses them or how much money they have lost. The trial judge may even conclude that ALC's conduct in approving such designs may have, purposefully or not, contributed to that impracticability, such that the plaintiffs were not simply *unwilling* to prove their loss. These are matters for the trial judge.

126     The plaintiffs' decision not to prove individualized loss, personal injury, or specific claims based on addiction is not fatal. As is evident from *Blake*, loss is not a legal prerequisite for disgorgement. The plaintiffs instead seek remedies based on a breach of contract allegedly suffered by all class members, and what ultimately matters is whether other remedies for breach of contract would be inadequate to vindicate and protect the plaintiffs' contractual rights.

127     Finally, Brown J. finds that because the plaintiffs have failed to demonstrate a causal link between the remedy sought and the alleged breach of contract, there can be no remedy of disgorgement on these pleadings. Pleadings, however, are not required to set out the evidence on which the parties will rely. Whether the plaintiffs will be able to prove causation between the breach and the gain to be disgorged is a matter of evidence, as I discuss below, but does not preclude disgorgement as an available remedy as a matter of law.

128     As Lord Steyn noted in *Blake*, when to award disgorgement is an issue "best hammered out on the anvil of concrete cases" (p. 291). This is best done based upon evidence at trial.

**(c) Punitive Damages**

129     The plaintiffs have also pleaded a sufficient basis to support a claim for punitive damages: their allegations of reprehensible conduct and deception in the performance of a contract have put the duty of honest performance in issue.

130     The objective of punitive damages is to punish the defendant rather than compensate a plaintiff (*Whiten*, at para. 36). They are to be awarded where the defendant's conduct is "so malicious, oppressive and high-handed that it offends the court's sense of decency" (*Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130 (S.C.C.), at para. 196). Critically, the focus of punitive damages is on the defendant's misconduct, not the plaintiff's loss (*Whiten*, at para. 73), and injury to the plaintiff is not a condition precedent to an award of punitive damages (H. D. Pitch and R. M. Snyder, *Damages for Breach of Contract* (loose-leaf), at pp. 4-1 to 4-2).

131     The misconduct at issue must "take it beyond the usual opprobrium that surrounds breaking a contract", and punitive damages should only be resorted to in "exceptional cases" (*Fidler*, at para. 62). In addition to this exceptional conduct requirement, the defendant's conduct giving rise to the claim must itself be an independent actionable wrong (*Whiten*, at para. 78; *Fidler*, at para. 63).

132     This Court confirmed in *Whiten* that an independent actionable wrong does not require an independent tort, and held that a breach of the contractual duty of good faith can constitute an "actionable wrong" to ground a claim for punitive damages (para. 79). I note that since the pleadings in this case were filed in 2012, this Court in *Bhasin v. Hrynew*, 2014 SCC 71, [2014] 3 S.C.R. 494 (S.C.C.), has recognized a duty of honest performance applicable to *all* contracts as a "general doctrine of contract law" (at paras. 74-75 and 93): parties "must not lie or otherwise knowingly mislead each other about matters directly linked to the performance of the contract" (para. 73). *Bhasin* was resolved on the basis of a breach of that duty alone.

133     The plaintiffs have pleaded a breach of the duty of honest performance recognized in *Bhasin*. They allege that the contractual relations between ALC and consumers of VLT gaming are subject to an implied term of good faith. In addition to this allegation, the pleadings are replete with allegations of dishonesty — that VLTs are "inherently deceptive", "give a false impression of the odds of winning", "manipulate" consumers, and contain a "stop" button that is "deceitful" (Statement of Claim, at paras. 12, 14, 19, and 21) — and allege ALC's full knowledge of that deception. In *Bhasin* itself, Cromwell J. recognized that allegations of dishonesty were sufficient to put the duty of honest performance in issue (para. 19).

134     Thus, I disagree with Brown J.'s conclusion that the alleged contract between ALC and the plaintiffs does not give rise to an established duty of good faith. The plaintiffs have specifically pleaded punitive damages, as well as facts to justify such damages with sufficient particularity (*Whiten*, at paras. 85-86). There is no reason to conclude that punitive damages are unavailable to these plaintiffs as a matter of law.

*(3) Conclusion on Motion to Strike the Breach of Contract Claim*

135     I therefore conclude that the plaintiffs' statement of claim discloses a reasonable cause of action for breach of contract, with several potential remedies available to the plaintiffs at law. There is no basis to strike their claim for breach of contract.

### C. Certification

136     There are five requirements for certification of a class action: (1) the pleadings must disclose a cause of action, (2) there must be an identifiable class of two or more persons, (3) the proposed representative must be appropriate, (4) there must be at least one common issue, and (5) the class action must be the preferable procedure (*CAA*, s. 5).

137     The parties agreed that the outcome of the motion to strike would determine the first factor of the certification analysis under s. 5(1) and the breach of contract claim therefore satisfies that requirement. There is no serious dispute that the proposed representatives are appropriate. The third parties dispute the remaining three requirements.

138     The class representative must show that there is some "basis in fact" for each remaining requirement (*Pro-Sys Consultants Ltd. v. Microsoft Corp.*, 2013 SCC 57, [2013] 3 S.C.R. 477 (S.C.C.), at para. 99; *Hollick v. Metropolitan Toronto (Municipality)*, 2001 SCC 68, [2001] 3 S.C.R. 158 (S.C.C.), at para. 25). Certification requires that the representative plaintiff provide a "certain minimum evidentiary basis" (*Hollick*, at para. 24 (emphasis omitted), citing *Taub v. Manufacturers Life Insurance Co.* (1998), 40 O.R. (3d) 379 (Ont. Gen. Div.), at pp. 380-81), and the "basis in fact" standard ensures that there is an evidentiary foundation

to support the certification order, even if that record is not exhaustive or one upon which the merits will be argued (*Fischer v. IG Investment Management Ltd.*, 2013 SCC 69, [2013] 3 S.C.R. 949 (S.C.C.), at para. 41, citing *McCracken v. Canadian National Railway*, 2012 ONCA 445, 111 O.R. (3d) 745 (Ont. C.A.), at paras. 75-76). The certification process "does not allow for an extensive assessment of the complexities or challenges a plaintiff may face in establishing its case at trial" and the approach is not to engage "in a robust analysis of the merits at the certification stage" (*Microsoft Corp.*, at para. 105), but to instead ensure that the action is suited to being a class proceeding (*Pro-Sys Consultants Ltd. v. Infineon Technologies AG*, 2009 BCCA 503, 312 D.L.R. (4th) 419 (B.C. C.A.), at para. 65; *Hollick*, at para. 16).

139    At first instance, the application judge decided to certify the action on certain common issues (see appendix). The majority of the Court of Appeal amended the certification order in light of the claims it struck, but otherwise found that ALC and the third parties' arguments on appeal were no more than an attempt to reargue the factual and discretionary issues before the application judge.

*(1) Identifiable Class of Two or More Persons*

140    The class is defined in the certification application as "Natural persons and their estates, resident in Newfoundland and Labrador, who, during the Class Period, paid the Defendant [ALC] to gamble on VLT games, excluding video poker and keno games, in Newfoundland and Labrador". The third parties submit that the class is "indeterminate" because there is "no conceivable way to verify who the class members are".

141    The identifiable class requirement ensures it is possible to determine who is entitled to notice, who is entitled to relief, and who will be bound by the final judgment (*Sun-Rype Products Ltd. v. Archer Daniels Midland Co.*, 2013 SCC 58, [2013] 3 S.C.R. 545 (S.C.C.), at para. 57). There must be some basis in fact that at least two persons will be able to self-identify as members of the class, and a person's claim to membership in the class must "be determinable by stated, objective criteria" (*Western Canadian Shopping Centres Inc. v. Dutton*, 2001 SCC 46, [2001] 2 S.C.R. 534 (S.C.C.), at para. 38; *Jiang v. Peoples Trust Co.*, 2017 BCCA 119, 408 D.L.R. (4th) 1 (B.C. C.A.), at para. 81).

142    In this case, the proposed class definition uses objective criteria that will allow for identification of those who can attest to playing the games, and there is a basis to believe that at least two persons will be able to establish that they paid ALC to gamble on VLT games during the proposed class period. This can be distinguished from the proposed class in *Sun-Rype Products Ltd.*, which was defined as those who had purchased products containing a particular ingredient, which was often used interchangeably with another, and with product labels that did not identify it. In that case, there was no basis in fact to show that the putative class members would have had the information to determine their own class membership (*Sun-Rype Products Ltd.*, at paras. 61-65). Here, there is no such evidentiary concern that would prevent individuals from determining their membership, and the fact that the number of class members or the identity of each class member is not or may not be determined is not a bar to certification (*CAA*, s. 8(d)).

*(2) Common Issues*

143    The common issue requirement for certification is met if the "claims of the class members raise a common issue, whether or not the common issue is the dominant issue" (*CAA*, s. 5(1)(c)). An issue is common where its resolution is necessary to the resolution of each class member's claim (*Dutton*, at para. 39). Issues are not common when they are dependent upon findings of fact that must be made with respect to each individual claimant (*Williams v. Mutual Life Assurance Co. of Canada* (2000), 51 O.R. (3d) 54 (Ont. S.C.J.), at para. 39, aff'd, (2003), 226 D.L.R. (4th) 112 (Ont. C.A.)). Findings made by the application judge on these issues are entitled to deference from an appellate court (*Microsoft Corp.*, at para. 111). As recognized in *Pioneer Corp. v. Godfrey*, 2019 SCC 42 (S.C.C.), at paras. 110-11, identification of an issue as common to the members of the class is a question of fact that attracts the standard of review of palpable and overriding error.

144    In light of the causes of action that have been struck from the plaintiffs' statement of claim, only four of the common issues as certified by the application judge remain relevant to the plaintiffs' breach of contract claim:

(e) Has the Defendant breached a duty owed in contract or tort?

(f) Can monetary relief be measured on an aggregate, class-wide basis and, if so, what is the amount of aggregate monetary relief?

(g) If the answer to Issue (f) is no, can loss or damage be measured by the gain to the Defendant, and if so, what is the appropriate restitutionary remedy and in what amount?

. . . . .

(i) Should punitive or exemplary damages be awarded against the Defendant and, if so, in what amount?

145    These issues overlap with one another, use unclear restitutionary language to describe the remaining claim for disgorgement of profits, and make reference to claims that have been struck. In my view, four core issues remain to be considered in this proposed class action:

(a) whether ALC breached a duty owed in contract;

(b) whether disgorgement of ALC's profits is an appropriate remedy;

(c) whether monetary relief can be measured on an aggregate, class-wide basis and, if so, the amount; and

(d) whether punitive or exemplary damages should be awarded against ALC and, if so, the amount.

I conclude that all but the issue relating to aggregate monetary relief are appropriate common issues.

**(a) Breach of Contract**

146    The third parties submit that liability is not a common issue because only some class members became problem gamblers. They argue that it will have to be individually determined whether each person became a problem gambler and whether their loss of control was caused by the characteristics of the machines.

147    I disagree. First, the third parties have approached this issue as though the plaintiffs' claim seeks recovery of losses particular to each problem gambler; this does not reflect the proposed class, nor the theory of the plaintiffs' case, as they chose not to prove individual loss or use personal injury as the measure of damages. The pleadings instead assert a civil wrong that is common to each member of the class. Second, the VLTs are the vehicle for a contract between ALC and the consumer. Each time a consumer pays money to play the VLT, they enter into the same implied contract, carried out in the same way, based on the programming of the VLTs. The expert's affidavit suggests that what players see on the VLT screen conceals and misrepresents how the game actually works. Whether the terms alleged by the plaintiffs are in fact implied will be the same for each consumer. Whether the functioning of the VLTs routinely violates those terms would also be the same for every consumer and will be necessary to resolve each member's claim (*Dutton*, at para. 39). I would not disturb the finding of the courts below that breach of contract is a common issue.

**(b) Disgorgement**

148    The plaintiffs seek an accounting or disgorgement of ALC's profits for the breach of contract claim. The third parties say that assessing ALC's gain from its breach of contract would require individual determination because some players have become problem gamblers and some have not. They submit that the amount of any benefit to ALC as a result of the breach of contract will have to be individually determined. In short, the third parties' submission is that success for one class member does not mean success for all.

149    While I agree that the required causal link for disgorgement may preclude certification of some aspects of the disgorgement analysis (such as quantum, discussed below in relation to aggregate monetary relief), I am not persuaded that *no* aspect of disgorgement as a remedy can be determined on a class-wide basis. In my view, whether a disgorgement award is appropriate, based on the multi-factored analysis described above, can be determined for the entire class at once based on evidence and analysis that will be common to all class members.

150     While compensatory damages are the normal measure of relief for breach of contract, it does not necessarily follow that they will be either practical or adequate for the class members in this case. The focus of the disgorgement analysis is on the gain of the defendant, and each of these contracts was allegedly entered into in materially the same circumstances and breached through the same conduct. If ALC's breaches are self-interested and deliberate in relation to the representative plaintiffs, then they are self-interested and deliberate in relation to the whole class; if it is impracticable to determine the amount of the representative plaintiffs' loss as a result of those breaches — because VLTs are operated with cash and do not produce receipts or other records for particular customers, or even that ALC's conduct contributed to that impracticability — then it is impracticable for the entire class. Whether the plaintiffs have a legitimate interest in ALC's profit-making activity would be common to all members of the VLT-playing public. The circumstances of the breach and the interest in deterring breaches of contracts of this nature will be similar for all members; a common inquiry into allegations of systemic conduct by a corporation in a monopolistic lottery scheme offered to the public will avoid duplication of fact-finding and legal analysis (*Dutton*, at para. 39).

151     An issue can be common "even if it makes up a very limited aspect of the liability question" (*Cloud v. Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (Ont. C.A.), at para. 53). Here, determining whether the circumstances of this case are exceptional, such that other contractual remedies are inadequate, is a substantial ingredient of each member's claim and will benefit all members of the class. I would therefore find that this aspect of ALC's potential liability to the plaintiffs in disgorgement is amenable to common determination, and would articulate the question as follows: "Would the ordinary remedies of contract law be inadequate to protect or vindicate the class members' contractual right such that disgorgement is available as a remedy?"

**(c) Aggregate Monetary Relief**

152     The third potential common issue relates to whether monetary relief can be measured on an aggregate, class-wide basis and, if so, in what amount. In my view, there is no "basis in fact" on the record before us to certify this as a common issue.

153     Section 29(1) of the *CAA* sets out three preconditions to an aggregate monetary award: (a) monetary relief must be claimed on behalf of some or all class members; (b) no questions of fact or law other than those relating to the assessment of monetary relief can remain to be determined in order to establish the amount of the defendant's monetary liability; and (c) all or part of the defendant's liability to some or all class members must be reasonably determined without proof by individual class members. The inquiry invites the Court to consider whether the non-individualized evidence presented by the plaintiffs is sufficiently reliable, whether use of the evidence will produce unfairness or injustice to the defendant (e.g., overstating the defendant's liability), and whether denying an aggregate approach would result in reduced or denied access to justice for the plaintiffs (see *Ramdath v. George Brown College of Applied Arts and Technology*, 2015 ONCA 921, 392 D.L.R. (4th) 490 (Ont. C.A.), at para. 76).

154     The key concern in certifying this issue is whether there is some basis in fact to determine part or the whole of ALC's total liability as a result of its breach of contract. The issue is primarily a question of causation. Whether the remedy is ultimately based on compensating class-wide loss or disgorging ALC's gains, causation between the breach of contract and the quantum awarded will have to be proven.

155     As Ernest J. Weinrib has recognized in the compensatory context, causation connects the plaintiff and defendant "as the doer and sufferer of the same injustice" ("Causal Uncertainty" (2016), 36 *Oxford J. Leg. Stud.* 135, at p. 136). The same reasoning requires a causal link between a wrong and a gain. Thus, while the appropriateness of a disgorgement remedy in contract is ultimately a contextual question, before making the award the court must be satisfied that the *breach* of contract is causally connected to the *gain* to be disgorged — a requirement also found in other contexts in which disgorgement is an available remedy. For example, in the context of a breach of fiduciary duty, disgorgement is a familiar remedy, but it is only available where the breach of the duty is linked to the gain (*3464920 Canada Inc. v. Strother*, 2007 SCC 24, [2007] 2 S.C.R. 177 (S.C.C.), at para. 77). Another example is that of an inventor seeking an accounting of profits, who "is only entitled to that portion of the infringer's profit which is causally attributable to the invention" — consistent with a common sense view of causation from the breach (*Monsanto Canada Inc. v. Schmeiser*, 2004 SCC 34, [2004] 1 S.C.R. 902 (S.C.C.), at para. 101).

156      In the context of a breach of contract, it is similarly important to connect the breach to the gain to be disgorged. Indeed, James Edelman writes that "the only difference between compensatory damages and disgorgement damages is that the former aim to put the claimant in the position as if the wrong had not occurred and the latter aim to put the defendant in that position" (Edelman (2002), at p. 103; see also Barnett, at p. 12; M. A. Eisenberg, *Foundational Principles of Contract Law* (2018), at p. 335). As noted by this Court in *Mutual Trust*, this remedy may be appropriate where "a defendant has, *as a result of his or her own breach*, profited in excess of his or her expected profit *had the contract been performed*" (para. 30 (emphasis added)). Applying a "but-for-the-breach" standard ensures a causal connection between the quantum of gain and the plaintiff's right (Smith, at p. 136; Barnett, at pp. 189, 192 and 210).

157      All this means that the plaintiffs need to provide some methodology that is "sufficiently credible or plausible to establish some basis in fact for the commonality requirement", that is, a realistic prospect of assessing class-wide monetary relief in the aggregate (*Microsoft Corp.*, at para. 118).

158      The plaintiffs seek disgorgement of the "unlawful gain" and have pleaded that VLTs could be "a reasonably safe form of gambling [that] generate[s] a reasonable stream of profit" absent the pleaded breaches (Statement of Claim, at para. 31). On this pleading, the plaintiffs must identify some methodology for determining the amount in excess of the "reasonable stream of profit" ALC would have gained absent the breach of contract. The plaintiffs' evidence on this point is limited, as their expert was asked only to estimate ALC's revenue from VLT line games that are derived from problem gamblers. However, the plaintiffs' class membership is not limited to problem gamblers, and instead captures all natural persons or estates who paid ALC to gamble on VLT games. Further, the expert does not provide any estimation or methodology to account for any revenue ALC might have made even while upholding and performing its contract with the class, by offering safe and non-deceptive VLT games to class members or by warning class members of the inherent dangers of the games.

159      To meet the required causal nexus and ensure that ALC's total liability is limited to that flowing from the breach and not overstated, some plausible methodology, grounded in the facts and data of the case, is needed to estimate ALC's financial liability from its breach of contract, including what ALC's profits might have been had it not breached its contractual obligations to class members. No methodology has been suggested.

160      I note that the plaintiffs have also pleaded that the deceptive nature of VLTs is so integrated into their profit generation that VLT gaming could not have been marketed at all without the wrongdoing. Although this pleading appears in the section pleading disgorgement as a cause of action (and would therefore be struck in its current form for disclosing no reasonable cause of action), I accept that it could be restored. On such a pleading, the amount to be disgorged to the class as a whole would be the entirety of ALC's profits from VLT gaming, and issues of causation are simplified. But a bare pleaded allegation is not enough to establish "some basis in fact". The purpose of the basis in fact requirement is to ensure that the class proceeding does not "founde[r] at the merits stage" (*Microsoft Corp.*, at para. 104). Here, the plaintiffs' expert has provided no evidence to suggest that VLTs could not be marketed without wrongdoing. This is a bare allegation and therefore cannot provide some basis in fact that monetary relief can ultimately be determined on a class-wide basis.

161      For these reasons, I am not satisfied that there is some basis in fact to certify whether the amount of monetary relief can be assessed on an aggregate, class-wide basis as a common issue. There is no basis in fact on either of the alternative pleadings that the quantum of monetary relief owed to all the class members could be reasonably determined.

162      The failure to certify the calculation of aggregate monetary relief as a common issue does not preclude the trial judge from ultimately turning to the aggregate award provisions in the *CAA* if appropriate (*Pioneer Corp.*, at para. 114, citing *Microsoft Corp.*, at para. 134).

**(d) Punitive Damages**

163      I agree with the application judge that the punitive damages claim is a common issue. As noted above, the focus of punitive damages is on the *defendant's* misconduct, not the plaintiff's loss (*Whiten*, at para. 73).

164    This Court has recognized that punitive damages may be amenable to determination as a common issue, including in cases where liability will relate to a class of victims as a group and the court will be making "exactly the kind of fact-finding that will be necessary to determine whether punitive damages are justified" (*Rumley v. British Columbia*, 2001 SCC 69, [2001] 3 S.C.R. 184 (S.C.C.), at para. 34). In this case, ALC's conduct and the alleged breach of the duty of good faith would be common to all class members. The application judge's finding that "a determination on this question will address the common interests of all members of the class" (NLTD Certification Reasons, at para. 119) is entitled to deference and I see no reason to interfere with it.

*(3) Preferable Procedure*

165    Section 5(2) of the *CAA* provides that in determining whether a class action is a preferable procedure for the fair and efficient resolution of the common issues, the court may consider all relevant matters including whether:

    (a) questions of fact or law common to the members of the class predominate over questions affecting only individual members;

    (b) a significant number of the members of the class have a valid interest in individually controlling the prosecution of separate actions;

    (c) the class action would involve claims that are or have been the subject of another action;

    (d) other means of resolving the claims are less practical or less efficient; and

    (e) the administration of the class action would create greater difficulties than those likely to be experienced if relief were sought by other means.

166    As noted in *Hollick*, preferability is best analysed through the lens of the three main advantages of class actions — judicial economy, access to justice, and behaviour modification — and must take into account the importance of the common issues in relation to the claims as a whole (paras. 27 and 30). The third parties submit that individual issues predominate over common issues and that the claims break down into an individualistic determination with respect to both liability and quantum. Again, however, I agree with the application judge that ALC and the third parties' objections do not address the action as framed, and instead proceed on the assumption that the plaintiffs are seeking recovery of losses suffered, as particularized to each class member.

167    The keystone of the plaintiffs' action is a deception common to each member of the class. Determining the content of a contract entered into by each member of the class, and whether that contract was systematically breached, does not require individualized assessments for each class member and is decidedly more practical and efficient than requiring each member to begin an action as an individual plaintiff. That alone would make this a preferable procedure.

168    Further, a common set of fact-finding will allow the trial judge to determine, without duplication, whether other contractual remedies will adequately vindicate and protect the contractual interest the class members had in playing a safe, honest game offered by a corporation charged with running a monopolistic public scheme.

169    On punitive damages in particular, ALC submits that a class action is not a preferable procedure, because granting punitive damages in the absence of other monetary relief would allow the plaintiffs to play the role of "a private Attorney General". However, punitive damages are not necessarily parasitic on the plaintiff's having suffered a loss or personal injury. The fact that punitive damages focus on the defendant's conduct makes a class proceeding "particularly well-suited" to such awards (*Chace v. Crane Canada Inc.* (1997), 44 B.C.L.R. (3d) 264 (B.C. C.A.), at para. 24), especially where the allegation of liability is founded on systemic wrongdoing (see, e.g., *Rumley*, at para. 34). Deterrence of wrongful conduct is a primary goal of class actions (C. Jones, "The Class Action as Public Law", in J. Walker and G. D. Watson, eds., *Class Actions in Canada: Cases, Notes, and Materials* (2014), 28, at p. 29), and punitive damages are measured, in part, to ensure deterrence (*Whiten*, at para. 111).

170    A class action is the preferable procedure for the plaintiffs' claim, even if some individualized assessments are ultimately needed (see, e.g., *Pederson v. Saskatchewan*, 2016 SKCA 142, 408 D.L.R. 661 (Sask. C.A.), at paras. 80-94; *Chalmers (Litigation Guardian of) v. AMO Canada Co.*, 2010 BCCA 560, 297 B.C.A.C. 186 (B.C. C.A.), at paras. 25-35; *Fakhri v. Alfalfa's Canada Inc.*, 2004 BCCA 549, 203 B.C.A.C. 227 (B.C. C.A.), at paras. 20-26). The existence of individual issues is no bar to a class action (*Microsoft Corp.*, at para. 140). The very point of a class action is that individuals can come together to pursue, as a class, a cause of action that they could, as a matter of law, already bring individually. The economy of the class action derives partly from the savings in litigation costs and partly from the removal of barriers that those individuals might otherwise face (*Rumley*, at para. 39). The latter point is particularly compelling in light of the many economic, social, and psychological barriers that individual players or problem gamblers may face in coming forward and advancing a claim for breach of contract against ALC through individualized avenues. This is especially so given that those individuals who have suffered particularly from ALC's alleged breach may be the least capable of advancing a claim. Class actions "overcome barriers to litigation by providing a procedural means to a substantive end" (*Fischer*, at para. 34). In this case, that end includes the potential to acknowledge, vindicate, and protect individual players' contractual interest in a safe and fair game, or to encourage behavioural modification and to punish allegedly deceptive, manipulative, and high-handed conduct in the provision of such games. Even if breach of contract were the only common issue, a trial to determine whether ALC systematically breached contracts with VLT players would go some way to acknowledging players' contractual interests and, potentially, vindicating and protecting those interests.

*(4) Conclusion on Certification*

171    For the above reasons, I conclude that the plaintiffs' claim should be certified as a class action on the common issues of breach of contract, punitive damages, and the appropriateness of a disgorgement remedy.

**V. Conclusion**

172    For these reasons, I would allow the appeals in part. I would strike disgorgement (referred to in the pleadings as "waiver of tort") and unjust enrichment as causes of action. I would certify the class action with common issues as follows:

(1) Has ALC breached a duty owed in contract?

(2) If there is a breach of contract, would the ordinary remedies of contract law be inadequate to protect or vindicate the class members' contractual right such that disgorgement is available as a remedy?

(3) If there is a breach of contract, should punitive or exemplary damages be awarded and, if so, in what amount?

173    Of course, the plaintiffs may seek to amend their pleadings in accordance with these reasons. As s. 37 of the *CAA* generally precludes costs awards in respect of applications for certification, I would order that the parties bear their own costs.

*Appeal allowed.*

*Pourvoi accueilli.*

**Appendix**

Common Issues as Certified by Faour J. (A.R., at p. 117)

(a) Does the *Criminal Code* authorize the operation of video lotteries by siteholders, in view of s. 206(1)(g) which prohibits games similar to "three card monte"?

(b) Does the *Criminal Code* authorize the operation of video lotteries by siteholders, in view of s. 201, which prohibits keeping a common gaming house?

(c) Has the Defendant been unjustly enriched?

(d) Has the Defendant breached s. 52 of the *Competition Act* [R.S.C. 1985, c. C-34]?

(e) Has the Defendant breached a duty owed in contract or tort?

(f) Can monetary relief be measured on an aggregate, class-wide basis and, if so, what is the amount of aggregate monetary relief?

(g) If the answer to Issue (f) is no, can loss or damage be measured by the gain to the Defendant, and if so, what is the appropriate restitutionary remedy and in what amount?

(h) Has the Defendant breached provisions of the *Statute of Anne, 1710* [9 Anne, c. 19], and should the remedy of treble damages be granted, and if so, what is the appropriate amount?

(i) Should punitive or exemplary damages be awarded against the Defendant and, if so, in what amount.

Footnotes

1      While the pleadings advance other causes of action, those claims were struck by the Newfoundland and Labrador Court of Appeal, and the plaintiffs have not cross-appealed that decision.

**EXHIBIT EN-13**

**TO THE DECLARATION OF EVAN NUTTALL**

2023 ABCA 45
Alberta Court of Appeal

Setoguchi v. Uber BV

2023 CarswellAlta 309, 2023 ABCA 45, [2023] 3 W.W.R. 373, [2023] A.W.L.D. 1079,
2023 A.C.W.S. 67, 477 D.L.R. (4th) 434, 52 Alta. L.R. (7th) 264, 89 C.C.L.T. (4th) 1

## Dione Setoguchi (Appellant / Plaintiff) and Uber B.V., Raiser Operations B.V., Uber Canada Inc. and Uber Technologies Inc. (Respondents / Defendants)

Thomas W. Wakeling, Dawn Pentelechuk, Bernette Ho JJ.A.

Heard: April 7, 2022
Judgment: February 7, 2023
Docket: Calgary Appeal 2101-0025AC

Proceedings: affirming *Setoguchi v. Uber B.V.* (2021), 24 Alta. L.R. (7th) 158, 63 C.P.C. (8th) 306, 72 C.C.L.T. (4th) 107, 2021 ABQB 18, [2021] 7 W.W.R. 120, 2021 CarswellAlta 37, J.D. Rooke A.C.J.Q.B. (Alta. Q.B.)

Counsel: C.G. Jensen, K.C., K. Ervin, S.A. Carrie, L. Brasil, for Appellant
D.M. Peebles, K.L. Smyth, C.H. Thomson, for Respondents

*Per curiam*:

**Introduction**

1      The representative plaintiff, Dione Setoguchi, appeals the decision of the certification judge dismissing her motion to certify a class proceeding against the respondents (Uber): Setoguchi v Uber BV 2021 ABQB 18 (Decision). The proceeding arises from a 2016 data breach involving the theft of personal information - names, phone numbers and email addresses - Uber had gathered from its drivers and users.

2      The appellant alleges that Uber failed to protect its collection of personal information; as a result, hackers were able to access and download the information. The certification judge found there was no "evidence or basis in fact in support of real (not *de minimis*) compensable harm or loss" to the putative class resulting from the data breach, as there was no evidence the stolen data had been used for any improper purpose.

3      The appellant argues the certification judge erred in his approach to damages and over-stepped his gatekeeping role by assessing the merits of the action and viewing the certification application through the lens of summary judgment, concluding that there can be no cause of action where there is a data breach but no evidence of compensable harm. She further argues that given the increasingly common occurrence of data breaches, the law must evolve to recognize that personal information has *inherent* value such that its loss should be treated as compensable harm *per se*. The certification judge therefore erred, on this view, in refusing to certify this admittedly novel claim and precluding her from testing this theory of liability through a merits trial.

4      Despite musing on his role as gatekeeper and the need to screen out unmeritorious claims, the certification judge did not dismiss the action for failing to meet the s 5(1)(a) of the Class Proceedings Act, SA 2003, c C–16.5 [CPA] criterion that "the pleadings disclose a cause of action", but instead because a class proceeding would not be "the preferable procedure for the fair and efficient resolution of the common issues" (CPA, s 5(1)(d)).

5      The central issues on this appeal relate to the certification judge's approach to ss 5(1)(a) and (d) of the CPA in light of this novel claim. First, this appeal examines whether the negligence claim, as pleaded, discloses a cause of action recognized in law (s 5(1)(a)), and whether the motion for certification should be dismissed on this basis. Next, to the extent that a cause of action exists and exhibits one or more issues common to the class members, the question is whether a class proceeding is the preferable means to resolve those common issues (s 5(1)(d)).

6      For the reasons that follow, the appeal is dismissed.

**Background**

7      In October 2016, external hackers illegally accessed electronic data that Uber collected from its drivers and users and stored in a third-party cloud-based service. According to Uber, this consisted of the personal information - names, phone numbers and email addresses - of 57 million Uber drivers and users worldwide, and the names and driver's licence numbers of approximately 600,000 drivers in the United States. Uber received a ransom demand and paid the hackers $100,000 USD in return for an assurance that they "would destroy and not disseminate" the data.

8      Uber revealed this incident through a press release issued in November of the following year, indicating it would monitor all affected accounts for fraud protection and provide drivers with free credit monitoring and identity theft protection. It reported the incident to regulatory authorities and has since been subjected to investigations and penalties worldwide that include $194 million CAD in fines and an order from authorities in the United States that Uber implement and maintain a robust privacy protection program for 20 years.

9      The appellant was an Uber user at the time of the data breach. She commenced a claim against Uber and applied to certify a class proceeding on behalf of "all persons in Canada whose Personal Information was recorded and/or stored by Uber, including but not limited to Uber Users and Uber Drivers, as of October 1, 2016, and whose Personal Information was accessed by unauthorized individuals in or around October 2016". However, the claim was eventually clarified as excluding residents of Quebec, and a separate class action, based partly on legislation unique to that province, has been brought and certified there: see *Fortier c Uber Canada inc.*, 2021 QCCS 4053.

10      The appellant's claim revolves around two aspects of this incident. First, Uber's storage of user data on a third-party cloud-based service - claimed to be more vulnerable to unauthorized access - without the users' consent. Second, Uber's "concealment" of the data breach from users and authorities. The appellant contends that users and drivers had a contractual relationship with Uber under the Uber user agreement and its applicable privacy policies, both of which included provisions as to Uber's obligations with respect to collecting, storing and protecting user data. The claim is said to involve roughly 800,000 Canadians.

11      The appellant initially pleaded numerous causes of action but now only seeks to certify claims in breach of contract and negligence. Causes of action for breach of statutory duties were abandoned at the certification application hearing, while breach of confidence and intrusion upon seclusion were not pursued on appeal.

12      The appellant claims that Uber breached its contractual obligations to the class members to protect their information under its user and privacy agreements by transferring the class members' information to a third-party cloud-based service and doing so without the class members' consent, and by concealing the data breach from users and authorities.

13      She also claims that Uber breached its duty of care to the class members in relation to collecting, storing, disclosing and using class members' information by disclosing the information to the third-party and authorizing its storage on a cloud-based service, failing to use adequate security measures to protect that information, and concealing the data breach.

14      As far as damages are concerned, no claim is advanced for psychological damages, and while it is anticipated that individual class members may, in the future, lead evidence of pecuniary loss, this type of damage is not being pursued on a class-wide basis. As Uber points out, in the intervening six years since the data breach, there is no suggestion that any of the class members have suffered fraud or identity theft.

**Grounds of Appeal and Standard of Review**

15    The appellant submits that the certification judge made the following errors:

(a) In law:

(i) in the characterization and consideration of the elements of the causes of action asserted;

(ii) by engaging in an impermissible review and weighing of evidence relating to the merits of the action in the consideration of the certification requirements;

(iii) in impermissibly assessing the merits of the action in the consideration of the certification requirements;

(b) In mixed fact and law:

(i) by failing to recognize that there was evidence of class-wide harm;

(ii) in concluding that a class proceeding is not the preferable procedure for the prosecution of the claims of proposed class members; and

(c) In fact:

(i) by palpably misconstruing the evidence.

16    Most aspects of a decision regarding the certification of a class action are entitled to deference. Whether the pleadings disclose a cause of action is a question of law reviewed for correctness. Otherwise, certifying a class action is a discretionary decision, which will not be overturned on appeal unless it reflects an error of principle or it is unreasonable: Spring v Goodyear Canada Inc 2021 ABCA 182 [Spring] at para 16.

**Analysis**

*A. Certification of Class Proceedings*

17    To obtain certification, an applicant must establish the five statutory requirements set out in s 5(1) of the CPA: 1) the pleadings disclose a cause of action; 2) there is an identifiable class of two or more persons; 3) the claims of the prospective class members raise a common issue; 4) a class proceeding would be the preferable procedure for the fair and efficient resolution of the common issues; and 5) the proposed representative plaintiff is adequate.

18    If all five requirements are met, the action must be certified; if they are not met, the application for certification must be dismissed: CPA, ss 5(3) and 5(4); *Spring* at para 17; Fisher v Richardson GMP Limited 2022 ABCA 123 [Fisher] at para 34.

19    The first requirement - that the pleadings disclose a cause of action - is satisfied through review of the pleadings; the other four require an adequate evidentiary record, establishing "some basis in fact" for the certification order: Pro-Sys Consultants Ltd. v Microsoft Corporation 2013 SCC 57 [Microsoft] at para 99; *Fisher* at para 35. Evidence is not admissible to assist a court in making a s 5(1)(a) determination as to whether the pleadings disclose a cause of action: Bruno v Samson Cree Nation 2021 ABCA 381 [Bruno] at para 64.

20    The test under s 5(1)(a) of the CPA is the same as on an application to strike a statement of claim for failing to disclose a cause of action, namely, whether taking the facts pleaded as true, it is plain and obvious the pleadings do not disclose a cause of action: Atlantic Lottery Corp Inc v Babstock 2020 SCC 19 [Atlantic Lottery] at para 14; *Bruno* at para 63; Flesch v Apache Corporation 2022 ABCA 374 [Flesch] at para 36. This requirement will be met unless it is plain and obvious the plaintiff's claim cannot succeed: *Microsoft* at para 63. The only difference is that, whereas on an application to strike a claim the onus is on the defendant to show there is no cause of action, on certification "the onus to show the existence of a cause of action falls upon

the party bringing the class action": Ward K. Branch & Mathew P. Good, *Class Actions in Canada*, 2d ed, loose-leaf updated to December 2022 (Vancouver, Western Legal Publications, 2000) at § 4:3.

***B. The Cause of Action Requirement - s 5(1)(a)***

*The Approach Below*

21     The appellant focused at the certification hearing on the proposed class having suffered a so-called "first loss", this being simply "the loss of the information to criminals who have accessed and downloaded the information": Transcript 4/40-41. But while the certification judge accepted that the hackers accessed and stole the personal information, he found the appellant had provided no evidence of actual harm or loss. There was no evidence the information compromised in the hack was released to anyone other than the hackers in the four years since the hack: Decision at para 34. Moreover, at the time of the application, there was no evidence of any confirmed case of fraud, identity theft or other illegal activity, or other economic loss to any class member as a result: para 7. Ultimately, he found that "*not only is there no evidence of harm or loss, there is evidence that there is no harm or loss*": para 10, emphasis in original.

22     This prompted the certification judge to advocate for a more robust screening or gatekeeping role when assessing whether the pleadings disclose a cause of action. In his view, "[o]ne should not be able to obtain certification only on speculation as to possible evidence of harm or loss and a carefully worded pleading": para 43.

23     He described the court's gatekeeping role to include putting a stop to claims where it is "plain and obvious" they will not succeed and for which there is no evidence or basis in fact to support a compensable harm or loss above a *de minimis* level: paras 35, 37. An evidentiary foundation for an actual loss is accordingly needed in cases where liability may move forward (paras 46-47), there having to be "some evidence or basis in fact for loss or damage" if the "screening process" is to be "meaningful": para 33.

24     Having found that the proposed class had not suffered any actual harm or damage as a result of the hack, the certification judge was clearly troubled by his perceived inability to deny certification under s 5(1)(a). He expressed his concern this way at para 43 of the Decision:

. . . Does this mean that absolutely no evidence of loss or harm is required? It seems that Setoguchi's Counsel believes so, on the basis of the current law. That concept, I believe, is too open and the subject of potential abuse, in the absence of some gate keeping function, especially in the context of certification of a class action. One should not be able to obtain certification only on speculation as to possible evidence of harm or loss and a carefully worded pleading. If that is not the principle that can now be carried forward based on this case, perhaps it will be in future cases.

25     The certification judge was of the view that where there is a breach but no compensable harm, there can be no cause of action. Nevertheless, he concluded as follows at para 58 of the Decision:

However, notwithstanding my belief that the certification application must present a way for the Court to exercise a gate keeping function in cases like this, and that *there must be some evidence of harm or loss to support certification, it appears clear that some basis in test has not yet been applicable to causes of action that are fully and completely pleaded*, including that there is harm and loss even where is evidence that there actually t. Thus, with regret, I must find that Uber is not successful in having certification denied on the basis that the pleadings fail to disclose a cause of action, except in so far as I may use it as gate keeping function. [Emphasis added]

Reading the Amended Statement of Claim generously, the certification judge appeared to accept that the appellant had met the requirement in s 5(1)(a) of the *CPA*, having "fully and completely" pleaded causes of actions in breach of contract and negligence merely by reference to harm or loss.

26     As we explain below, the certification judge was too quick to accept the claims in negligence had been "fully and completely" pleaded, thus meeting the s 5(1)(a) requirement. While he desired to import the "some basis in fact" standard into

the cause of action requirement by requiring evidence of loss or harm, it was, in fact, open to him to determine whether the facts as pleaded disclosed a cause of action in negligence. This would have prompted an assessment of whether the appellant's novel claim for damages is (or should be) recognized in law, and whether certification of the negligence claim could have been accordingly dismissed at the s 5(1)(a) stage. This approach does not depend on evidence of harm or loss and is entirely consistent with the well-known test under s 5(1)(a).

*No Requirement of "Some Basis in Fact" and Evidence of Loss or Harm under s 5(1)(a)*

27      A number of recent certification decisions, including the Decision under appeal, have been criticized for inserting an additional requirement into the statutory test in the form of evidence of loss or harm, ostensibly as part of a certification application needing to constitute a "meaningful screening device": see Mohsen Seddigh, "Class Action Certification: 'meaningful screening device' and the 'compensable loss' theory" (2021) 17:1 Can Class Action Rev 193. Uber, for its part, argued before the certification judge that where there is a lack of evidence of actual loss or harm, the court should deny certification on the basis that it must remain a "meaningful screening device": Decision at para 5; Transcript 83/11-84/5.

28      In *Flesch*, the appellant embraced the certification judge's approach, suggesting that a court in its gatekeeping function must identify a positive evidentiary element in determining whether the pleading sets out a cause of action, relying upon the Decision and *Engen v Hyundai Auto Canada Corp*, 2021 ABQB 740. However, this Court in *Flesch* rejected that approach, stating at para 37: "There is no reason to depart from the long-established and well-settled test for assessing whether pleadings disclose a cause of action for certification purposes. No substantive evidence is required to prove a cause of action . . . ". Simply put, evidence is not admissible to assist a court in making a s 5(1)(a) determination as to whether the pleadings disclose a cause of action: *Bruno* at para 64; *Flesch* at paras 34-35.

29      Accordingly, we reject any suggestion by the certification judge in this case that a plaintiff should be required to provide some evidence of loss or harm in order to meet the threshold under s 5(1)(a) of the CPA.

30      It does not follow, however, that the claim in negligence, as pleaded, met the test under s 5(1)(a).

*The Proposed Causes of Action*

31      As noted, the appellant is pursuing the certification of claims in breach of contract and negligence.

32      A breach of contract claim does not require proof of loss as an element of the cause of action: *Atlantic Lottery* at paras 49, 104. However, negligence does. The elements of the tort of negligence are well known: "(1) that the defendant owed the plaintiff a duty of care; (2) that the defendant's conduct breached the standard of care; (3) *that the plaintiff sustained damage*; and (4) that the damage was caused, in fact and in law, by the defendant's breach": 1688782 Ontario Inc. v Maple Leaf Foods Inc., 2020 SCC 35 at para 18, emphasis added.

33      The certification judge appeared to think he was required to find that a cause of action in negligence was properly pleaded simply by virtue of the pleadings having included vague references to damages. For instance, the Amended Statement of Claim referred to the proposed class having "suffered significant loss and damages including harm and injury to their interests" and "harm for which they claim damages", such "injuries" including "the unauthorized release, disclosure and use of their personal information": Appeal Record (AR) at 21. As he put it: "all that Setoguchi is required to do at the certification stage is to allege a *complete* cause or causes of action, including *alleged* harm or loss resulting, as she has done": Decision at para 13, emphasis in original.

34      A fundamental purpose of pleadings is to outline the case a defendant must meet. When a cause of action includes damage as one of its requirements, a plaintiff is required to plead facts sufficient to amount *at law* to damage. Pleadings alleging negligence, for instance, "must be supported by facts *capable of sustaining a determination* that a duty was owed, that an act or omission occurred breaching that duty, and *that damages resulted*": Tottrup v Lund, 2000 ABCA 121 at para 11, emphasis added. This means that a negligence claim can be struck where the plaintiff fails to plead an injury that is recognized as being compensable at law: Thompson v Webber, 2010 BCCA 308 at paras 3–4, 30–34, leave to appeal to SCC refused, 33825 (23

December 2010). It is no more sufficient for a plaintiff to plead "damages" or "injury" than it is to plead the existence of a "duty of care"; both are bare legal conclusions that require sufficient facts to sustain them. In this regard, the Amended Statement of Claim is deficient; it fails to particularize the harm or damages suffered as a result of the hack, how such loss or damage was caused by Uber, and the remedies sought for each cause of action. This is essential information for the determination of whether particular causes of action can survive scrutiny under s 5(1)(a).

35      As the certification judge recognized, pleadings are to be read generously, and in anticipation of what might be remedied through an amendment. We therefore focus on the appellant's theory of damages as articulated in her factum and during the appeal hearing.

36      It is true that some of the "injuries" pleaded have been recognized as potentially compensable at law in negligence. For instance, the Amended Statement of Claim provides: "The Plaintiff and Class Members will incur expenses for credit reporting, credit monitoring services, credit counselling, identity theft monitoring services, identity theft protective services and additional services": AR at 21-22. These kinds of out-of-pocket expenses incurred by customers in order to mitigate against the increased risk of harm following a data hack have been considered compensable damages, at least for purposes of passing the s 5(1)(a) threshold: see Campbell v Capital One Financial Corporation 2022 BCSC 928 [Campbell] at paras 53-54; Kaplan v Casino Rama 2019 ONSC 2025 [Kaplan] at para 22; Obodo v Trans Union of Canada, Inc., 2021 ONSC 7297 at paras 124, 160, var'd on other grounds in 2022 ONCA 81. And as the Federal Court of Appeal noted in Condon v Canada 2015 FCA 159 [Condon CA] at paras 18, 22, a certification judge should assume such expenses have been incurred, if pleaded, rather than seeking out evidence from the parties.

37      For certification purposes, however, the appellant focuses on the "first loss"; the theory of liability being that Uber breached its contract with its drivers and users and was negligent in failing to protect the personal information it collected, allowing hackers to access and download the information. As argued, because personal information has inherent value, the theft of personal information, common to all class members, is the compensable loss and, if liability is established, a minimum amount of damages, or "baseline damages" would be determined at the merits trial. This, she argues, is a sufficient "basis in fact" to support certification.

38      This is the only aspect of the negligence claim said to constitute "class-wide harm" so as to meet the commonality requirement in s 5(1)(c) of the CPA. Stated otherwise, issues relating to the appellant's negligence claim are only capable of being certified to the extent that they involve a loss common to all members of the proposed class. In this case, the appellant is not claiming pecuniary loss on a class-wide basis, meaning that the only issue in damages capable of being certified is the novel claim for "first loss" damages that do not depend on any actual harm or loss.

39      In determining whether the appellant's novel claim discloses a cause of action, there is no need to consider any facts other than the text of the pleading. It is not in dispute that the hack and subsequent "first loss" *occurred*. What *is* in dispute, however, is whether such a loss constitutes compensable harm at law, and whether the requirements of s 5(1)(a) are met. As part of the determination of whether "the pleadings disclose a cause of action", the appellant must establish that the remedies she seeks are available to her, assuming the truth of the facts as pleaded for the specific cause of action: *Atlantic Lottery* at para 49.

40      The appellant concedes her theory of compensable harm is novel (as well as her theory of liability, for that matter), and she can point to no authority that supports it, but states that no court has ever said, after a full merits trial, that loss of personal information *per se* is *not* compensable loss and argues she should be allowed to pursue her claim.

41      We disagree. The absence of a precedent ruling that a particular claim is not a recognized cause of action does not mean that it is a recognized cause of action. As noted in *Hobbs v Tinling (C.T.) & Co.*, [1929] 2 KB 1 at 21 (CA), per Scrutton LJ, "by destroying . . . evidence you do not prove its opposite". If there is no precedent, a court must turn to first principles for guidance: *Thorson v Attorney General of Canada*, (1974), [1975] 1 SCR 138 at 152, per Laskin J ("Counsel for the respondents contended that a provincial Attorney General could take declaratory proceedings, but he could cite no authority for this proposition nor could I find any. However, want of authority is not an answer if principle supports the submission"). It does not automatically follow that because a court has never ruled on a particular "novel" cause of action or theory of damages, it should be certified.

Undoubtedly, the certification stage is not the time to be overly restrictive in the interpretation of the pleadings. To do so may well inhibit development of the law, to which class proceedings have surely contributed. But neither can novelty insulate a claim that plainly and obviously cannot succeed. It is plain and obvious that a claim does not disclose a cause of action if there is a "very high degree of certainty" that it does not: *Bruno* at para 65. This is such a case; it is plain and obvious that the loss in question is not a compensable harm recognized in law. Whatever the likelihood is that the law would change in the future, it is so low as not to pass the threshold test.

42      In *Atlantic Lottery*, the Supreme Court of Canada tackled questions of law at the pleadings stage in the context of certification of class actions, ultimately finding that certain causes of action did not exist. In particular, the case demonstrated the application of the plain and obvious threshold in the context of a novel claim, namely the doctrine of waiver of tort. Observing that uncertainty in the law had existed for 16 years, and that no court had recognized the doctrine of waiver of tort, Brown J at para 21 concluded: "Nothing is gained and much court time and considerable litigant resources are lost, by leaving this issue unresolved". In settling the question and determining that no independent cause of action for waiver of tort exists in law, the Court had determined the availability of this cause of action raised a pure question of law that could not be affected by any evidence that might be adduced at trial.

43      Emboldened by the approach in *Atlantic Lottery*, other appellate courts have followed suit: see *Sharp v Royal Mutual Funds Inc. 2021 BCCA 307 [Sharp]*, leave to appeal to SCC refused, 39882 (17 March 2022); *Owsianik v Equifax Canada Co 2022 ONCA 813 [Equifax]*. In *Equifax*, the Ontario Court of Appeal heard a trilogy of class action appeals where the plaintiffs had (largely unsuccessfully) argued that the tort of intrusion upon seclusion, first recognized in *Jones v Tsige*, 2012 ONCA 32, should be expanded in data breach cases beyond the hackers, to find liable "Database Defendants" - those who collect and store the personal information of others for commercial purposes. The Court of Appeal declined to do so. Relying heavily on *Atlantic Lottery*, the court in *Equifax* found it appropriate to resolve the pure question of law presented, as "[t]here is no reason to think evidence adduced at the trial would have any effect on the determination of whether, as a matter of law, the tort could apply to Database Defendants whose failure to properly protect the data permits independent hackers to access the data": para 40. The court further found that where the validity of a claim turns entirely on a legal question, the court can determine the law and apply it to the facts as pleaded to decide whether the claim is "plainly doomed to fail and should be struck": para 42, citing *Atlantic Lottery* at para 19. That the legal question is complex, policy-laden or open to debate is not necessarily a barrier.

44      Although the s 5(1)(a) test is a low bar, it should not be treated as a perfunctory exercise. "Courts have no justification to ignore the plain text of an enactment and make this criterion completely disappear": *Bruno* at para 68. There are compelling reasons for a court to carefully consider whether the pleadings pass the plain and obvious test, by carefully scrutinizing whether the facts as pleaded establish the requisite elements of each cause of action. When a novel claim is presented, that may involve an assessment of whether each element of the cause of action as pleaded is (or should be) recognized in law.

45      In *Atlantic Lottery* at para 21, Brown J noted the deleterious consequences that can flow from courts permitting class actions to be certified and allowing them to proceed, not on the basis the claim can be made out, but rather that it is not "plain and obvious" the claim cannot succeed. A similar observation was made in *Equifax* at para 49 as follows:

> Not only did allowing these cases to proceed to trial result in uncertainty, that uncertainty arguably resulted in unfairness to Database Defendants. The certification of intrusion upon seclusion claims without a determination that the claim was viable in law gave a plaintiff an advantage in certification proceedings. Because damages for intrusion upon seclusion do not require proof of any actual pecuniary loss, but are instead awarded on a "symbolic" or "moral" basis, damages are well suited to an award on a class-wide basis. The nature of the damages to be awarded offered support for the plaintiff's argument that a class proceeding was the preferable proceeding for the resolution of common issues: *Class Proceedings Act, 1992*, s. 5(1)(d). Consequently, the presence of an intrusion upon seclusion claim, despite the uncertainty as to its legal viability, gave plaintiffs a leg up in the certification process and, as a result, in any settlement negotiations: see *Winder*, at para. 16; *Babstock*, at para. 21.

This concern is apposite here. While the appellant specifically declined to pursue a claim for intrusion upon seclusion, her theory of compensable harm and damages is the other side of the same coin. By avoiding any proof of pecuniary damages or actual

loss, the "baseline" damages are well suited to an award on a class-wide basis, which bolsters her argument for certification, which in turn fuels a settlement.

46     Aside from creating or perpetuating legal uncertainty, failing to determine a question of law at the pleadings stage, when appropriate to do so, is antithetical to the call in *Hryniak v Mauldin*, 2014 SCC 7 for affordable, timely and just resolution of disputes. In the boundless landscape of scarce judicial resources, there is nothing to be gained by certifying suspect novel claims, the validity of which will only be determined at a merits trial that may never occur. As noted by Stratas JA in Coote v Lawyers' Professional Indemnity Company, 2013 FCA 143 at para 13: "[d]evoting resources to one case for no good reason deprives the others for no good reason", cited in Mohr v National Hockey League, 2022 FCA 145 at para 50.

47     The next question is whether it is appropriate for this Court to determine whether it is plain and obvious that the appellant's theory of compensable loss and damage cannot succeed because it is not (or should not be) recognized in law. Since *Equifax* was released after the appeal hearing, we invited further submissions from the parties on this issue.

48     The appellant says the answer to this inquiry is "No". She says the question of whether loss of personal information to hackers is compensable loss depends on a properly developed record followed by argument on the record. She points to the extant dispute as to exactly what information was taken and how sensitive that information might be. She argues that this factual determination informs whether the loss of information to the hackers is compensable loss, an issue that would benefit from expert evidence.

49     Uber argues that this question falls to be answered on the facts as pleaded, and points to the appellant's theory that all that must be pleaded is that her personal information was the subject of a data breach. The data breach itself is the harm and no consequential loss or damage is required. Therefore, the evidence the appellant says is necessary to determine this question is irrelevant to the claim in negligence as framed and can be decided solely on the pleading itself.

50     We are not persuaded by the appellant's arguments. On her theory, determining the exact nature of the information taken arguably may affect the quantum of baseline damages, but does not change her fundamental argument that the hack itself, without any consequential loss or harm, is *per se* compensable. Further, we are confident that the nuances of the appellant's theory were thoroughly argued on appeal and below. Expert evidence would perhaps be relevant on the issue of quantum, but its admissibility on the ultimate legal question is far from clear.

51     In her supplemental submissions, the appellant states that the claim is not for "future harm"; rather, the hackers' theft of personal information, without proof of actual loss or damage, is compensable harm. Because the Amended Statement of Claim pleads that the class members are "continuously exposed to ongoing risk of identity theft and economic loss" (AR at 21) and this aspect of the claim was argued at some length during the appeal hearing, we will address the concept of damages for risk of future harm.

52     While the appellant asks the court to recognize the value of the information lost, ultimately her focus is not only the information itself but rather on the *consequences* of criminals being in the possession of the names, phone numbers and email addresses of the proposed class members. It is not the viewing or access to the information by others that is said to be harmful; the appellant herself recognizes that though the information is personal, it is not necessarily private. Rather, the first loss is said to be harmful insofar as the information in the hands of criminals, particularly when aggregated with other personal information, will make the proposed class members more susceptible to fraud, particularly phishing scams.

53     It is trite that in order to prove negligence, some harm, loss or injury - sometimes referred to as "compensable damage" - must result from the defendant's wrongful act. Conduct is negligent where it creates an unreasonable risk of harm: Mustapha v Culligan of Canada Ltd 2008 SCC 27 [Mustapha] at para 7. However, proof of negligent conduct without consequences will not ground a claim in negligence. For that reason, "negligence 'in the air' & — the mere creation of risk & — is not wrongful conduct": *Atlantic Lottery* at para 33; see also *Spring* at para 46.

54     Damages claimed for the *risk of future harm* or the *increased risk of harm* have generally not been recognized in Canadian tort law: Kaissieh v Done, 2022 ONSC 425 at paras 85–87; Palmer v Teva Canada Ltd., 2022 ONSC 4690 at paras 165, 167,

174, 177, 186, 206. This principle has also been applied in the data breach context to deny certification of negligence claims [1] related to such harm: Del Giudice v Thompson, 2021 ONSC 5379 at paras 222–233; Kaplan at para 21 ("the possibility that class members may experience identity theft or fraud in the future does not give rise to compensable damages").

55    We recognize that courts have at times allowed damage claims to proceed where there is alleged to be a *substantial* risk of future identity theft: Tucci v Peoples Trust Company 2017 BCSC 1525 [Tucci SC] at paras 175, 181, 201, var'd on other grounds in 2020 BCCA 246 (B.C. C.A.) (B.C. C.A.) (B.C. C.A.) (B.C. C.A.) (B.C. C.A.) (B.C. C.A.) [Tucci CA, ]; see also *Campbell* at para 126. As noted in *Tucci SC* at para 201, "[g]iven that the information is said to have been stolen by cybercriminals, it is certainly not plain and obvious that this risk will not be proven to be a sufficiently significant risk to be compensable in some manner". This risk of future fraud created by a data hack is sometimes analogized (as it was in *Tucci SC*) to medical monitoring costs associated with negligence that puts people at an ongoing heightened risk of developing a harmful condition that has not yet occurred. On this view, the negligence does not exist "in the air" because, unlike the negligent driver who fails to cause an injury (the example provided by Uber in this case), the increased risk of future harm continues to exist after the negligent act has passed: see, for example, Daniel J. Solove & Danielle Keats Citron, "Risk and Anxiety: A Theory of Data-Breach Harms" (2018) 96:4 Tex L Rev 737 [Solove & Citron] at 760-763.

56    However, even in the United States, where a number of federal circuit appeal courts have held that an increased risk of future identity theft stemming from a data breach can constitute an "injury", there must still be, at minimum, a *substantial risk* that harm will occur: see, for example, Galaria v Nationwide Mut. Ins. Co, 663 Fed.Appx. 384 at 388 (6th Cir 2016). This means that an injury will often be found in data breach cases only where there has been at least some attempted or actual misuse of the stolen information: Solove & Citron at 751-752, citing Krottner v Starbucks Corp, 628 F.3d 1139 (9th Cir 2010) and Remijas v Neiman Marcus Grp, 794 F.3d 688 (7th Cir 2015). These courts have also looked at the *type of data* stolen, noting that "less sensitive data, such as basic publicly available information . . . does not pose the same risk of future identity theft or fraud to plaintiffs if exposed": McMorris v Carlos Lopez & Associates, LLC, 995 F.3d 295 at 302 (2nd Cir 2021).

57    Applied to the present case, the appellant has no hope of establishing that the simple loss of publicly available information like names, phone numbers and email addresses amounts, without more, to compensable injury or loss.

58    Even if the proposed class members might all be marginally "worse off" than they would have been absent the alleged negligence by Uber, damage in tort law must be "real" as opposed to merely "negligible" or "trivial" in order to be actionable: *Greenway v* Johnson Matthey plc, [2018] UKSC 18 at paras 25–26. This point was illustrated by the Supreme Court of Canada in *Mustapha* at para 9:

> . . . I would not purport to define compensable injury exhaustively, except to say that it must be <u>serious and prolonged and rise above the ordinary annoyances, anxieties and fears that people living in society routinely, if sometimes reluctantly, accept.</u> The need to accept such upsets rather than seek redress in tort is what I take the Court of Appeal to be expressing in its quote from *Vanek v. Great Atlantic & Pacific Co. of Canada* (1999), 48 O.R. (3d) 228 (C.A.): "Life goes on" (para. 60). Quite simply, <u>minor and transient upsets do not constitute personal *injury*, and hence do not amount to damage.</u> [Italics in original; underline added]

Any damage suffered by the proposed class members from the "first loss" in the form of increased risk of fraud or identity theft, if recoverable at all, is similarly negligible or trivial, and therefore not compensable at law. In this sense, the certification judge was right to look for "real (not *de minimis*) compensable harm or loss".

59    When pressed at the appeal hearing, the appellant said she was not seeking to have a new tort recognized; her cause of action is in negligence. This requires proof of harm or loss. A claim for either nominal or symbolic damages cannot ground a claim in negligence. We do not agree that the facts pleaded "cry out for a remedy". The appellant is attempting to maneuver around her inability to demonstrate actual harm or loss from the data breach, by advancing a theory of damages not recognized in law. If accepted, this would be no mere incremental development of the law; rather, a "giant step in a very different direction": *Equifax* at para 63.

*Conclusion*

60    The appellant's novel "first loss" claim in negligence does not disclose a cause of action under s 5(1)(a) of the CPA. It follows that the appellant's negligence claim cannot be certified, any common issues amenable to certification being limited to breach of contract, for which no loss or harm is necessary. Accordingly, for the appellant to succeed in having her claim in breach of contract certified, she must establish that the certification judge erred with respect to his preferability analysis under s 5(1)(d) of the CPA.

61    The certification judge held that he would have granted certification of one of the appellant's breach of contract allegations had certification not been denied on the basis a class proceeding was not the preferable procedure.

**C. The Preferability Requirement - *s 5(1)(d)***

62    The certification judge found that all certification requirements had been satisfied, except for preferability: there was an identifiable class of two or more persons (s 5(1)(b)); claims of the class members raised common issues (s 5(1)(c)); and there was a satisfactory representative plaintiff (s 5(1)(e)).

63    Section 5(1)(d) of the CPA requires the court be satisfied that "a class proceeding would be the preferable procedure for the fair and efficient resolution of the common issues". This requirement puts an onus on the appellant to prove some basis in fact for two things: "(1) that a class proceeding would be a fair, efficient and manageable method of advancing the claim, and (2) that it would be preferable to any other reasonably available means of resolving the class members' claims": AIC Limited v Fischer 2013 SCC 69 [AIC] at para 48.

64    Preferability involves focusing on the common issues "in the context of the action as a whole and 'must take into account the importance of the common issues in relation to the claims as a whole'": *AIC* at para 21, citing *Hollick* at para 30. Accordingly, it is important to understand what the certification judge determined with respect to the commonality requirement under s 5(1)(c) of the CPA.

65    Of significance is the common issue found by the certification judge in relation to breach of contract. While denying certification of the breach of contract claim based on Uber's storage of the data in the cloud, the certification judge would have permitted the claim based on Uber's failure to notify its users of the data breach as contrary to an implied term of the contract: Decision at paras 64, 66. The following common issue was accordingly amenable to certification [2]:

> 1. Did the Defendants breach their obligations to protect the Class Members' personal information under the contract with the Class Members?
>
> . . .
>
> > (b) Did Uber breach the terms of the agreement and its obligations under the privacy policies by concealing the Uber hack and failing to inform Class members that their personal information had been exposed to unauthorized third parties?

The certification judge would also have sent to trial as a common issue the question of nominal damages and their compatibility with other types of damages.

66    As noted, breach of contract is actionable without a party having to suffer a loss. Where there is a breach but no damage or loss flowing from that breach, nominal damages are available: *Atlantic Lottery* at paras 67, 105; RINC Consulting Inc. (Roustan Capital) v Grant Thornton LLP, 2020 ONCA 182 at para 52. The amount awarded in nominal damages is usually trivial, though such an award is to be distinguished from compensatory damages in a small amount: *Tucci CA* at para 121. Compensatory damages require proof of loss because without a loss there is nothing to compensate: *Sharp* at para 113. Conversely, nominal damages are received to vindicate a right while having lost nothing; they are sometimes described as symbolic in nature.

67     The question, then, is whether a class proceeding is the preferable procedure for resolving the proposed class members' claims in breach of contract for nominal damages in light of the action as a whole.

68     The certification judge determined that a class proceeding would not be the preferable procedure in this case: there would be no benefit to judicial economy given that it is not clear that class-wide harm can be established, determining damages might require individual assessments for each class member, and there is no evidence of actual loss or harm so it is difficult to say whether resolving the common issues would significantly advance the action: Decision at paras 103-104. Moreover, it would not improve access to justice because damages are at best nominal (para 105), and while there may be some small benefit with respect to behavioural modification, that alone does not "bootstrap" to certification a case that seems "hopeless for recovery of actual losses" (paras 109, 115).

69     A certification judge's decision on preferability is entitled to particular deference because it involves weighing and balancing a number of factors: *AIC* at para 65. In our view, the appellant has failed to demonstrate any error in principle by the certification judge or that his decision was clearly wrong.

70     Preferability should consider "all reasonably available means of resolving the class members' claims' including avenues of redress other than court actions": *AIC* at para 19, citing *Hollick* at para 31. Such an inquiry has to be conducted through the lens of the three principal goals of class actions: judicial economy, behaviour modification and access to justice: *AIC* at para 22; *Hollick* at para 27. This is a *comparative* exercise, however, since the ultimate question is not whether a class proceeding will meet these goals, but rather "whether other available means of resolving the claim are preferable": *AIC* at para 23. Accordingly, the focus is "*not on the convenience or burden of a class action* suit *per se*, but on the *relative advantages* of a class action suit over whatever other forms of litigation [and, I would add, dispute resolution] might be realistically available to the plaintiffs": *ibid*, citing Klay v Humana, Inc., 382 F.3d 1241 at 1269 (11th Cir 2004) (emphasis added).

71     It is clear that the certification judge used his "gatekeeping function" under s 5(1)(d) to deny certification because the claim did not have what he considered to be sufficient merit in the form of some evidence or "some basis in fact" for "real" harm or loss. This was identified at the outset as the "real issue".

72     While the certification judge acknowledged that nominal damages can be claimed in breach of contract, the implication in his reasons is that nominal damages should not be certified in a class action. To be sure, breach of contract claims have been certified in data breach class actions notwithstanding a lack of damage or loss, thereby contemplating nominal damages: Condon v Canada 2014 FC 250 [Condon FC] at paras 49-51, var'd on other grounds in *Condon CA; Tucci SC* at paras 110-111, 195, aff'd *Tucci CA;* Agnew-Americano v Equifax Canada Co., 2019 ONSC 7110 at paras 295–301, var'd on other grounds in *Equifax*. This has led authors in the area to remark, in response to *Condon FC* in particular, that "[i]t follows that allegations of breach of contract, even when the damages claims are nominal rather than real, can justify certification of a privacy or data-protection class action": Shaun E. Finn & Danielle Miller Olofsson, *Privacy and Data-Protection Class Actions in Canada: A Practical Handbook* (Toronto: Thomson Reuters, 2020) at 104.

73     Certification of claims for nominal damages in breach of contract are usually made in the context of other causes of action also being certified. When the entirety of the class action is for nominal damages, the court can properly ask what purpose the action serves in the context of the objectives of class proceedings: *Flesch* at para 89.

74     Determining the common issues related to breach of contract and nominal damages in a class proceeding is clearly preferable to each class member bringing an individual suit, which would number in the thousands and, as the certification judge himself recognized, would be economically unfeasible. This is inevitably the case when class actions are compared to traditional litigation, but in a case limited to nominal damages, the issue is less straightforward. Since a claim for nominal damages can be as low as $1, and is not compensatory in nature, it is difficult to imagine many individuals being motivated to expend the time or energy to advance a suit, even if the economics of pursuing a claim was not an issue. In this regard, it was open to the certification judge to conclude that access to justice issues did not prevail.

75    Further, in considering judicial economy, it was open to the certification judge to weigh the considerable judicial resources to be expended, against the nature of the claim and its impact on class members: *Hollick* at para 29; *AIC* at para 21. This is not an impermissible assessment of the merits of the action, it is a critical look at the entirety of the action and what it hopes to achieve.

76    Finally, on the issue of behaviour modification, the appellant emphasized the deleterious effect of allowing corporations like Uber to gather personal information with virtual impunity, arguing that the goal of behaviour modification would be achieved here, where a nominal damage award of $100 to each of the roughly 800,000 class members would result in a sizable judgment. The certification judge concluded that certification may have some incremental merit on the facts of this case but was not necessary to achieve the goal of behaviour modification.

77    Even accepting the nominal damage award that the appellant suggests - amounting to 80 million dollars for the whole class - we are not persuaded that this has any additional behaviour modification benefit in this case. We are satisfied that the significant regulatory penalties already imposed - including approximately 194 million dollars in fines in the United States, United Kingdom and the Netherlands and an order from United States authorities that Uber maintain a robust privacy protection program for twenty years - suffice to alter the behaviour of both Uber and others in its position. Any incremental behavioural modification benefit of a damage award is negligible - certainly not enough to warrant a class proceeding: see *Fisher* at paras 16, 77. These regulatory sanctions, together with the negative press coverage, ostensibly have an appreciable deterrent effect on other potential wrongdoers: see Pro-Sys Consultants Ltd v Infineon Technologies AG, 2009 BCCA 503 at para 73, leave to appeal to SCC refused, 33522 (3 June 2010).

### Conclusion

78    The appeal is dismissed.

*Appeal dismissed.*

Footnotes

1     The idea that risk of future harm is not itself compensable is particularly prevalent in Quebec law: see, for example, Li c Equifax inc., 2019 QCCS 4340 at para 29. Some caution is warranted when relying on Quebec case law, however, as it relies on the Code *civil du Québec*, RLRQ c CCQ-1991, which in article 1611 explicitly precludes hypothetical damage ("Les dommages-intérêts dus au créancier compensent la perte qu'il subit et le gain dont il est privé. On tient compte, pour les déterminer, du préjudice futur lorsqu'il est certain et qu'il est susceptible d'être évalué").

2     This is presumably based on the fact that all members of the proposed class action were subject to the same contract. Certification of contract claims for data breaches can falter under the commonality requirement (s 5(1)(c)) where not all class members are subject to the same contract: Grossman v Nissan Canada, 2019 ONSC 6180 at paras 26, 53; *Kaplan* at paras 71, 90.



## *Setoguchi v. Uber B.V.*

Supreme Court of Canada Rulings on Applications for Leave to Appeal and Other Motions

Supreme Court of Canada

Record created: April 13, 2023.

Record updated: July 13, 2023.

File No.: 40681

**[2023] S.C.C.A. No. 190**  |  *[2023] C.S.C.R. no 190*

Dione Setoguchi v. Uber B.V., Raiser Operations B.V., Uber Canada Inc. and Uber Technologies Inc.

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR ALBERTA

# Case Summary

**Status:**

Application for leave to appeal dismissed with costs (without reasons) July 13, 2023.

**Catchwords:**

**Civil procedure — Class actions, Torts, Contracts — Civil procedure — Class actions — Certification of issues — Tort — Contract — Commercial entity collected personal information from its customers for profit — Information accessed and downloaded by third party criminals — Whether it is plain and obvious that criminals' actions cannot amount to compensable loss as against commercial entity — Whether viable claim in negligence or for nominal damages in breach of contract requires that customers whose information was taken show that the information was used to their detriment.**

(SEALING ORDER) (CERTAIN INFORMATION NOT AVAILABLE TO THE PUBLIC)

**Civil procedure — Class actions — Certification of issues — Tort — Contract — Commercial entity collected personal information from its customers for profit — Information accessed and downloaded by third party criminals — Whether it is plain and obvious that criminals' actions cannot amount to compensable loss as against commercial entity — Whether viable claim in negligence or for nominal damages in breach of contract requires that customers whose information was taken show that the information was used to their detriment.**

**Case Summary:**

(SEALING ORDER) (CERTAIN INFORMATION NOT AVAILABLE TO THE PUBLIC)

In October 2016, Uber B.V. and the other respondents ("Uber") experienced a data breach involving the theft of the personal information of millions of drivers and users. Uber received a ransom demand and paid the hackers in return for an assurance that the data would be destroyed, not disseminated. Uber disclosed the incident in

Setoguchi v. Uber B.V.

November 2017 and indicated that it would take some steps to monitor affected persons. It reported the incident and has been subject to investigations and penalties worldwide, including in Canada. Ms. Setoguchi, an Uber user at the time of the breach, commenced a claim which she sought to have certified on behalf of those in Canada whose information was accessed from Uber by unauthorized persons on or around that date, other than those in Quebec, whose interests were subject to a separate action. Ms. Setoguchi alleged breach of contract and in negligence. She alleged that, under the user and privacy agreements, Uber had breached the obligation to protect the information owed to the class members by transferring their information to a third-party cloud-based service without their consent, concealing the breach from users and authorities, disclosing the information to the third party, and failing to employ adequate security measures to protect the information.

The certification judge held that a class proceeding was not the preferable procedure because it was not clear that class-wide harm could be shown and because proceeding as a class would not improve access to justice because the damages would be nominal, at best. The Court of Appeal dismissed Ms. Setoguchi's appeal.

In October 2016, Uber B.V. and the other respondents ("Uber") experienced a data breach involving the theft of the personal information of millions of drivers and users. Uber received a ransom demand and paid the hackers in return for an assurance that the data would be destroyed, not disseminated. Uber disclosed the incident in November 2017 and indicated that it would take some steps to monitor affected persons. It reported the incident and has been subject to investigations and penalties worldwide, including in Canada. Ms. Setoguchi, an Uber user at the time of the breach, commenced a claim which she sought to have certified on behalf of those in Canada whose information was accessed from Uber by unauthorized persons on or around that date, other than those in Quebec, whose interests were subject to a separate action. Ms. Setoguchi alleged breach of contract and in negligence. She alleged that, under the user and privacy agreements, Uber had breached the obligation to protect the information owed to the class members by transferring their information to a third-party cloud-based service without their consent, concealing the breach from users and authorities, disclosing the information to the third party, and failing to employ adequate security measures to protect the information.

The certification judge held that a class proceeding was not the preferable procedure because it was not clear that class-wide harm could be shown and because proceeding as a class would not improve access to justice because the damages would be nominal, at best. The Court of Appeal dismissed Ms. Setoguchi's appeal.

## Counsel

Luciana P. Brasil, Charlotte K.B Harman, Carsten Jensen, K.C., Kajal Ervin (Branch, MacMaster), for the application.

Kara L. Smyth, Dana M. Peebles, Cassidy Bishop (McCarthy Tétrault LLP), contra.

**Chronology:**

1.  Application for leave to appeal:
    FILED: April 13, 2023.

DISMISSED WITH COSTS: July 13, 2023 (without reasons)

The application for leave to appeal from the judgment of the Court of Appeal of Alberta (Calgary), Number 2101-0025AC, *2023 ABCA 45*, dated February 7, 2023, is dismissed with costs.

**Procedural History:**

Application to certify class action denied
January 8, 2021

Setoguchi v. Uber B.V.

Court of Queen's Bench of Alberta
Rooke A.C.J.
*2021 ABQB 18*

Appeal dismissed
February 7, 2023
Court of Appeal of Alberta (Calgary)
Wakeling, Pentelechuk, Ho JJ.A.
*2023 ABCA 45*; *[2023] A.J. No. 115*

**End of Document**

**EXHIBIT EN-14**

**TO THE DECLARATION OF EVAN NUTTALL**

2011 SCC 15

Supreme Court of Canada

Seidel v. Telus Communications Inc.

2011 CarswellBC 553, 2011 CarswellBC 554, 2011 SCC 15, [2011] 1 S.C.R. 531, [2011] 6 W.W.R. 229,
[2011] B.C.W.L.D. 2556, [2011] B.C.W.L.D. 2557, [2011] B.C.W.L.D. 2558, [2011] B.C.W.L.D. 2563,
[2011] B.C.W.L.D. 2565, [2011] B.C.W.L.D. 2568, [2011] B.C.W.L.D. 2572, [2011] B.C.W.L.D. 2643,
[2011] B.C.W.L.D. 2651, [2011] S.C.J. No. 15, 16 B.C.L.R. (5th) 1, 199 A.C.W.S. (3d) 1064, 1 C.P.C. (7th)
221, 301 B.C.A.C. 1, 329 D.L.R. (4th) 577, 412 N.R. 195, 510 W.A.C. 1, 82 B.L.R. (4th) 1, J.E. 2011-498

# Michelle Seidel (Appellant) and TELUS Communications Inc. (Respondent) and Barreau du Québec, Canadian Arbitration Congress and ADR Chambers Inc. (Interveners)

McLachlin C.J.C., Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein, Cromwell JJ.

Heard: May 12, 2010

Judgment: March 18, 2011 [*]

Docket: 33154

Proceedings: reversing in part *Seidel v. Telus Communications Inc.* (2009), 88 B.C.L.R. (4th) 212, 2009 CarswellBC 608, 2009 BCCA 104, 68 C.P.C. (6th) 57, 304 D.L.R. (4th) 564, 267 B.C.A.C. 266, 450 W.A.C. 266, [2009] 5 W.W.R. 466 (B.C. C.A.); additional reasons at *Seidel v. Telus Communications Inc.* (2009), 2009 CarswellBC 2344, 2009 BCCA 383, [2010] 3 W.W.R. 672, 75 C.P.C. (6th) 15, 96 B.C.L.R. (4th) 24 (B.C. C.A.); reversing *Seidel v. Telus Communications Inc.* (2008), 295 D.L.R. (4th) 511, 85 B.C.L.R. (4th) 372, 2008 BCSC 933, 2008 CarswellBC 1490 (B.C. S.C.)

Counsel: Arthur M. Grant, Bruce W. Lemer, for Appellant
Robert S. Anderson, Q.C., Sean Hern, Nicholas T. Hooge, for Respondent
Babak Barin, Gaston Gauthier, Frédéric Côté, for Intervener, Barreau du Québec
Ivan G. Whitehall, Q.C., Alejandro Manevich, for Intervener, Canadian Arbitration Congress
Barry Leon, Andrew de Lotbinière McDougall, Daniel Taylor, for Intervener, ADR Chambers Inc.

*Binnie J.*:

1    This appeal concerns a dispute between TELUS Communications Inc. ("TELUS") and one of its customers, the appellant Ms. Seidel, arising out of a cell phone contract. The contract, drawn up by TELUS, provided that "[a]ny claim, dispute or controversy" shall be referred to "private and confidential mediation" and thereafter, if unresolved, to "private, confidential and binding arbitration". TELUS says that mediation and arbitration offer a low cost, quick, private and effective means of sorting out disputes according to rules the parties themselves have agreed to. Notwithstanding these provisions, Ms. Seidel filed a statement of claim in the Supreme Court of British Columbia setting out a variety of complaints including some that invoke rights, benefits or protections under the British Columbia *Business Practices and Consumer Protection Act*, S.B.C. 2004, c. 2 ("*BPCPA*"). This consumer legislation is designed, it is contended, to remedy the mischief described by Sharpe J.A. of the Ontario Court of Appeal:

> The seller's stated preference for arbitration is often nothing more than a guise to avoid liability for widespread low-value wrongs that cannot be litigated individually but when aggregated form the subject of a viable class proceeding.[...] When consumer disputes are in fact arbitrated through bodies such as NAF that sell their services to corporate suppliers, consumers are often disadvantaged by arbitrator bias in favour of the dominant and repeat-player corporate client.

> (*Griffin v. Dell Canada Inc.*, 2010 ONCA 29, 98 O.R. (3d) 481 (Ont. C.A.), at para. 30)

2      The choice to restrict or not to restrict arbitration clauses in consumer contracts is a matter for the legislature. Absent legislative intervention, the courts will generally give effect to the terms of a commercial contract freely entered into, even a contract of adhesion, including an arbitration clause. The important question raised by this appeal, however, is whether the *BPCPA* manifests a legislative intent to intervene in the marketplace to relieve consumers of their contractual commitment to "private and confidential" mediation/arbitration and, if so, under what circumstances.

3      My colleagues LeBel and Deschamps JJ. attempt to cast the appeal in terms of whether or not arbitrators should be seen as "second-class adjudicators" (at para. 55) and paint those with whom they disagree as exhibiting "an undercurrent of hostility towards arbitration" (at para. 101). Respectfully, I believe the Court's job is neither to promote nor detract from private and confidential arbitration. The Court's job is to give effect to the intent of the legislature as manifested in the provisions of its statutes.

4      The *BPCPA* issue was rightly entertained by the courts below rather than in the first instance by an arbitrator notwithstanding the adoption of the competence-competence principle in British Columbia, because it raised an issue of jurisdiction on undisputed facts on which an authoritative judicial interpretation was appropriate (see *Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, [2007] 2 S.C.R. 801* (S.C.C.), at paras. 84-86).

5      Section 172 of the *BPCPA* contains a remedy whereby "a person other than a supplier, *whether or not the person* bringing the action has a special interest or *any* interest under this Act or *is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court*" to enforce the statute's consumer protection standards. Under s. 3 of the *BPCPA*, any agreement between the parties that would waive or release "rights, benefits or protections" conferred by the *BPCPA* is "void". My opinion is that to the extent Ms. Seidel's claim in the Supreme Court invokes s. 172 remedies in respect of "rights, benefits or protections" conferred by the *BPCPA*, her court action must be allowed to proceed notwithstanding the mediation/ arbitration clause. This includes her claims for declaratory and injunctive relief and, if granted, ancillary relief in the form of restoration to consumers of any money acquired by TELUS in contravention of the *BPCPA*.

6      The reason for this conclusion is simple. Section 172 provides a mandate for consumer activists or others, whether or not they are personally "affected" in any way by any "consumer transaction". Section 172 contemplates such a person "bringing the action". The action is specified to be brought "in Supreme Court". The clear intention of the legislature is to supplement and multiply the efforts of the Director under the *BPCPA* to implement province-wide standards of fair consumer practices by enlisting the efforts of a whole host of self-appointed private enforcers. In an era of tight government budgets and increasingly sophisticated supplier contracts, this is understandable legislative policy. An action in the Supreme Court will generate a measure of notoriety and, where successful, public denunciation, neither of which would be achieved to nearly the same extent by "private, confidential and binding arbitration".

7      Private arbitral justice, because of its contractual origins, is necessarily limited. As the *BPCPA* recognizes, some types of relief can only be made available from a superior court. Accordingly, to the extent Ms. Seidel's complaints shelter under s. 172 of the *BPCPA* (and only to that extent), they cannot be waived by an arbitration clause and her court action may continue, in my opinion. As to her alternative complaints, whether under other sections of the *BPCPA*, the now repealed *Trade Practice Act, R.S.B.C. 1996, c. 457 ("TPA")* or at common law, the TELUS arbitration clause is valid and enforceable. As to those claims, her court action should be stayed pursuant to s. 15 of the *Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 ("*CAA*").

8      I should flag at the outset two issues that this appeal does *not* decide. Firstly, of course, Ms. Seidel's complaints against TELUS are taken to be capable of proof only for the purposes of this application. We are not assuming the allegations will be proven, let alone deciding that TELUS did in fact engage in the conduct complained of. Secondly, Ms. Seidel's action is framed as a class proceeding, for which she is seeking certification. The present appeal concerns only her individual action. Whether or not the s. 172 claims should be certified as a class action is a matter that will have to be determined by the courts of British Columbia, which have yet to address the issue.

9    The British Columbia Court of Appeal stayed all of Ms. Seidel's claims — both under the *BPCPA* and otherwise. I would therefore partly grant the appeal to allow her claims under s. 172 of the *BPCPA* to go forward as candidates for certification. In other respects, the appeal should be dismissed.

**I. Facts**

10    TELUS and Ms. Seidel entered into a written cellular phone services contract in 2000. By a statement of claim dated January 21, 2005, she claims that TELUS falsely represented to her and other consumers how it calculates air time for billing purposes. She seeks redress against what she contends are deceptive and unconscionable practices contrary to ss. 3, 4(3)(b) and 4(3)(e) of the *TPA* and ss. 4, 5, 8(3)(b) and 9 of the *BPCPA* (statement of claim, at paras. 11-12). She invokes both s. 171 and s. 172 remedies. Further, as stated, she seeks certification to act on her own behalf and as representative of a class of allegedly overcharged customers, pursuant to the *Class Proceedings Act*, R.S.B.C. 1996, c. 50 ("*CPA*").

11    I leave aside her claims under the *TPA* which are clearly subject to the arbitration agreement, and therefore not before the court. With respect to s. 172 of the *BPCPA*, however, she seeks a declaration that TELUS engaged in deceptive and unconscionable trade acts and practices under s. 172(1)(a). She also seeks an interim and permanent injunction under s. 172(1) (b), prohibiting TELUS from engaging in such acts and practices, and an order under s. 172(3)(a) restoring monies that TELUS acquired, she says, by contravening the *BPCPA*, including a proper accounting.

12    In 2007, in the course of Ms. Seidel's application to have her claim certified as a class action, TELUS applied for a stay on the basis of the arbitration clause pursuant to s. 15 of the *CAA*. In doing so, it relied on this Court's decisions in *Dell* and *Muroff c. Rogers Wireless inc.*, 2007 SCC 35, [2007] 2 S.C.R. 921 (S.C.C.), in which Quebec class certification proceedings were stayed pending the arbitration of consumer disputes. Ms. Seidel is obliged in the first instance, TELUS says, to have her entire complaint, including the *BPCPA* claims, dealt with by arbitration, as provided for in their service contract. Under the competence-competence principle, the arbitrator will determine what, if anything, is excluded from his or her jurisdiction and can thus be taken to the courts (R.F., at para. 30).

13    Unfortunately, the initial 2000 contract containing the original arbitration clause on which TELUS relies cannot be found. However, the 2003 contract is in evidence and contains the following arbitration clause. (An almost identical clause is found in the 2004 renewed contract):

> 15. ARBITRATION: <u>Any claim, dispute or controversy</u> (whether in contract or tort, pursuant to statute or regulation, or otherwise and whether pre-existing, present or future — except for the collection from you of any amount by TELUS Mobility) <u>arising out of or relating to: (a) this agreement; (b) a phone or the service; (c) oral or written statements, or advertisements or promotions relating to this agreement or service or (d) the relationships which result from this agreement</u> (including relationships with third parties who are not parties to this agreement), (each, a "Claim") <u>will be</u> referred to and determined by private and confidential mediation before a single mediator chosen by the parties and at their joint cost. Should the parties after mediation in good faith fail to reach a settlement, the issue between them shall then be <u>determined by private, confidential and binding arbitration</u> by the same person originally chosen as mediator. Either party may commence court proceedings to enforce the arbitration result when an arbitration decision shall have been rendered and thirty (30) days have passed from the date of such decision. <u>By so agreeing, you waive any right you may have to commence or participate in any class action against TELUS Mobility related to any Claim and, where applicable, you hereby agree to opt out of any class proceeding against TELUS Mobility otherwise commenced.</u> ...

[Emphasis added; A.R., at p.83.]

The last four lines of the arbitration clause purport to waive any right Ms. Seidel may have to commence or participate in a class action. It is suggested on behalf of TELUS that those last four lines constitute a separate bargain — distinct from the arbitration provision that precedes it — that survives any invalidity of the rest of the clause in relation to s. 172 proceedings. On this alternative submission, Ms. Seidel could still proceed in court with her individual s. 172 action but would be contractually barred from seeking its certification as a class proceeding. As will be seen, I would reject this submission of TELUS as well.

## II. Judicial History

### A. Supreme Court of British Columbia **Seidel v. Telus Communications Inc.,** *2008 BCSC 933, 85 B.C.L.R. (4th) 372* **(B.C. S.C.); Masuhara J.**

14      The applications judge concluded that *Dell* could not be said to have set out a test of general application. In his view, it rested on provisions specific to Quebec law and should not be taken to have overruled earlier B.C. precedent, including in particular, *MacKinnon v. National Money Mart Co.*, 2004 BCCA 473, 50 B.L.R. (3d) 291 (B.C. C.A.), ("MacKinnon 2004"). In *MacKinnon 2004*, the B.C. Court of Appeal had found that an arbitration agreement should be considered "inoperative" within the meaning of s. 15 of the *CAA* only if a class proceeding is certified under the *CPA* because it is the "preferable procedure" (s. 4(1)(d)), and that it is premature to determine whether the action should be stayed until the court has dealt with the certification application. The court therefore remitted the stay application back to the case management judge for reconsideration with the application for certification. Applying the *MacKinnon 2004* reasoning, Masuhara J. denied TELUS's application for a stay of the certification proceedings (at para. 84).

### B. British Columbia Court of Appeal (**Seidel v. Telus Communications Inc.,** *2009 BCCA 104, 88 B.C.L.R. (4th) 212* **(B.C. C.A.); Tysoe J.A. (Finch C.J.B.C and Rowles, Newbury and Neilson JJ.A. concurring))**

15      The Court of Appeal considered *Seidel* with a companion case, *MacKinnon v. National Money Mart Co.*, 2009 BCCA 103, 89 B.C.L.R. (4th) 1 (B.C. C.A.), ("MacKinnon 2009"). The appeal in *Seidel* was allowed. The appeal in *MacKinnon 2009* would also have been allowed but for the court's conclusion that issue estoppel applied. The appeal in that case was dismissed accordingly.

16      The central issue was whether this Court's decision in *Dell* had effectively overruled the earlier B.C. Court of Appeal decision in *MacKinnon 2004*.

17      For this purpose, in *MacKinnon 2009*, the court considered whether the legislative provisions governing arbitration in Quebec could be distinguished from the British Columbia *CAA*. It concluded that, since both pieces of legislation stemmed from the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3 ("New York Convention") and the *UNCITRAL Model Law on International Commercial Arbitration*, U.N. Doc. A/40/17 (1985), Ann. I ("Model Law"), any differences were technical rather than substantive.

18      As to the provisions of the *BPCPA* forbidding waivers of "rights, benefits or protections", the court considered that to the extent the arbitration clause is a waiver of anything, it is a waiver of forum, but forum (as such) is not included in the protection offered by s. 3 of the *BPCPA*, which only covers substantive consumer rights. Accordingly, the court applied *Dell* and held that the plaintiff was bound by the arbitration clause contained in the contract of adhesion in respect of all claims (*MacKinnon 2009*, at paras. 69-72).

19      In *Seidel*, the Court of Appeal also held, having regard to the competence-competence principle as it is incorporated in B.C. law, that it is for the arbitrator to consider whether the arbitration agreement existed in the original contract, and to determine which claims are subject to arbitration and which should go before a court (*Seidel*, at paras. 28-34).

20      In the result, the B.C. Court of Appeal entered a stay of Ms. Seidel's action in its entirety.

## III. Relevant Legislation

21      *Business Practices and Consumer Protection Act, S.B.C. 2004*. c. 2

[Waiver or release void except as permitted]

**3** Any waiver or release by a person of the person's rights, benefits or protections under this Act is void except to the extent that the waiver or release is expressly permitted by this Act.

. . . . .

[Unconscionable acts or practices]

8 (1) An unconscionable act or practice by a supplier may occur before, during or after the consumer transaction.

(2) In determining whether an act or practice is unconscionable, a court must consider all of the surrounding circumstances of which the supplier knew or ought to have known.

(3) Without limiting subsection (2), the circumstances that the court must consider include the following:

(a) that the supplier subjected the consumer or guarantor to undue pressure to enter into the consumer transaction;

(b) that the supplier took advantage of the consumer or guarantor's inability or incapacity to reasonably protect his or her own interest because of the consumer or guarantor's physical or mental infirmity, ignorance, illiteracy, age or inability to understand the character, nature or language of the consumer transaction, or any other matter related to the transaction;

(c) that, at the time the consumer transaction was entered into, the total price grossly exceeded the total price at which similar subjects of similar consumer transactions were readily obtainable by similar consumers;

(d) that, at the time the consumer transaction was entered into, there was no reasonable probability of full payment of the total price by the consumer;

(e) that the terms or conditions on, or subject to, which the consumer entered into the consumer transaction were so harsh or adverse to the consumer as to be inequitable;

(f) a prescribed circumstance.

. . . . .

[Damages Recoverable]

**171** (1) Subject to subsection (2), if a person, other than a person referred to in paragraphs (a) to (e), has suffered damage or loss due to a contravention of this Act or the regulations, <u>the person who suffered damage or loss may bring an action against a</u>

(a) supplier,

(b) reporting agency, as defined in section 106 [*definitions*],

(c) collector, as defined in section 113 [*definitions*],

(d) bailiff, collection agent or debt pooler, as defined in section 125 [*definitions*], or

(e) a person required to hold a licence under Part 9 [*Licences*] who engaged in or acquiesced in the contravention that caused the damage or loss.

. . . . .

[Court actions respecting consumer transactions]

**172** (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action, <u>may bring an action in Supreme Court</u> for one or both of the following:

(a) a declaration that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;

(b) an interim <u>or permanent injunction</u> restraining a supplier from contravening this Act or the regulations. ...

(3) If the court grants relief under subsection (1), the court may order one or more of the following:

(a) that the <u>supplier restore to any person any money</u> or other property or thing, in which the person has an interest, that may have been acquired because of a contravention of this Act or the regulations;

(b) if the action is brought by the director, that the supplier pay to the director the actual <u>costs</u>, or a reasonable proportion of the costs, of the inspection of the supplier conducted under this Act;

(c) that the supplier <u>advertise to the public</u> in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section.

*Commercial Arbitration Act, R.S.B.C. 1996, c. 55*

15 (1) If a party to an arbitration agreement commences legal proceedings in a court against another party to the agreement in respect of a matter agreed to be submitted to arbitration, a party to the legal proceedings may apply, before or after entering an appearance and before delivery of any pleadings or taking any other step in the proceedings, to that court to stay the legal proceedings.

(2) In an application under subsection (1), the court must make an order staying the legal proceedings unless it determines that the arbitration agreement is void, inoperative or incapable of being performed.

. . . . .

22 (1) Unless the parties to an arbitration otherwise agree, the rules of the British Columbia International Commercial Arbitration Centre for the conduct of domestic commercial arbitrations apply to that arbitration.

(2) If the rules referred to in subsection (1) are inconsistent with or contrary to the provisions in an enactment governing an arbitration to which this Act applies, the provisions of that enactment prevail.

(3) If the rules referred to in subsection (1) are inconsistent with or contrary to this Act, this Act prevails.

*Class Proceedings Act, R.S.B.C. 1996, c. 50*

4 (1) The court must certify a proceeding as a class proceeding on an application under section 2 or 3 if all of the following requirements are met:

(a) the pleadings disclose a cause of action;

(b) there is an identifiable class of 2 or more persons;

(c) the claims of the class members raise common issues, whether or not those common issues predominate over issues affecting only individual members;

(d) a class proceeding would be the preferable procedure for the fair and efficient resolution of the common issues;

(e) there is a representative plaintiff who

(i) would fairly and adequately represent the interests of the class,

(ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and

(iii) does not have, on the common issues, an interest that is in conflict with the interests of other class members.

(2) In determining whether a class proceeding would be the preferable procedure for the fair and efficient resolution of the common issues, the court must consider all relevant matters including the following:

(a) whether questions of fact or law common to the members of the class predominate over any questions affecting only individual members;

(b) whether a significant number of the members of the class have a valid interest in individually controlling the prosecution of separate actions;

(c) whether the class proceeding would involve claims that are or have been the subject of any other proceedings;

(d) whether other means of resolving the claims are less practical or less efficient;

(e) whether the administration of the class proceeding would create greater difficulties than those likely to be experienced if relief were sought by other means.

. . . . .

**13** The court may at any time stay any proceeding related to the class proceeding on the terms the court considers appropriate.

British Columbia International Commercial Arbitration *Centre's Domestic Commercial Arbitration Rules, Of Procedure*, as amended June 1, 1998 ("BCICAC Rules")

**20** [Jurisdiction]

(1) The arbitration tribunal may rule on its own jurisdiction, including ruling on any objections with respect to the existence or validity of the arbitration agreement

(2) A decision by the arbitration tribunal that the contract is null and void shall not entail the invalidity of the arbitration clause unless specifically found to be so by the arbitration tribunal.

(3) Any objection to the jurisdiction of the arbitration tribunal to consider a claim or counter-claim shall be raised in the statement of defense or statement of defense to counter-claim. The tribunal may consider a late objection if it regards the delay justified.

(4) A party is not precluded from raising a jurisdictional plea by the fact that it has appointed or participated in the appointment of an arbitrator.

## IV. Analysis

**22**    The underlying issue in this appeal is access to justice. Each of the disputants claims to be its supporter. Mediation and arbitration, TELUS says, reflect the values of freedom of contract and the autonomy of individuals to order their affairs as they see fit. A consumer can press an individual complaint which would not be worthwhile to pursue under the more costly proceedings of a court.

**23**    The virtues of commercial arbitration have been recognized and indeed welcomed by our Court in a series of recent decisions mainly from Quebec, including not only *Dell* and *Rogers Wireless* , but also *Bisaillon c. Concordia University*, 2006 SCC 19, [2006] 1 S.C.R. 666 (S.C.C.); *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, 2005 SCC 46, [2005] 2 S.C.R. 401 (S.C.C.); and *Desputeaux c. Éditions Chouette (1987) inc.*, 2003 SCC 17, [2003] 1 S.C.R. 178 (S.C.C.). See also, S. Thuilleaux, *L'arbitrage commercial au Québec: Droit interne — Droit international privé* (1991), at p. 5, and F. Bachand,

"Should No-Class Action Arbitration Clauses Be Enforced?", in A. W. Rovine, ed., *Contemporary Issues in International Arbitration and Mediation: The Fordham Papers 2008* (2009), 153, at p. 162.

24    Nevertheless, from the perspective of the *BPCPA*, "private, confidential and binding arbitration" will almost certainly inhibit rather than promote wide publicity (and thus deterrence) of deceptive and/or unconscionable commercial conduct. It is clearly open to a legislature to utilize private consumers as effective enforcement partners operating independently of the formal enforcement bureaucracy and to conclude that the most effective form is not a "private and confidential" alternative dispute resolution behind closed doors, but very public and well-publicized proceedings in a court of law.

25    Leaving aside British Columbia for a moment, a number of other provincial legislatures have intervened in the marketplace with greater or lesser limitations on arbitration clauses in consumer contracts. See, e.g.: in Quebec, *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts*, S.Q. 2006, c. 56, s.2; in Ontario, the *Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A, ss. 7-8 and 100; and in Alberta, the *Fair Trading Act*, R.S.A. 2000, c. F-2, which in s. 16 subjects consumer arbitration clauses to ministerial approval.

26    This case requires the Court to determine, in short, whether, as a matter of statutory interpretation, s. 172 of the *BPCPA* contains such a limitation and, if so, its extent and effect on Ms. Seidel's action. In addition, we need to address the procedural issue of whether these questions ought to be decided in the first instance by the court or an arbitrator.

*A. The Principle of Competence-Competence Must Be Respected*

27    It is convenient to deal first with the procedural issue.

28    British Columbia has adopted the competence-competence principle through the combined operation of s. 22 of the *CAA* and s. 20(2) of the BCICAC Rules which in turn reflect the provisions of the New York Convention and Model law. As such, "[t]he jurisdiction to determine jurisdiction is given to the arbitral tribunal by statute, as well as by the rules of arbitration used by most institutions"; see J. B. Casey and J. Mills, *Arbitration Law of Canada: Practice and Procedure* (2005), at p. 147.

29    I agree with my colleagues LeBel and Deschamps JJ. (at para. 114) that in these circumstances, absent legislated exception, any challenge to an arbitrator's jurisdiction over Ms. Seidel's dispute with TELUS should first be determined by the arbitrator, unless the challenge involves a pure question of law, or one of mixed fact and law that requires for its disposition "only superficial consideration of the documentary evidence in the record" (*Dell*, at para. 85). See also *Unifund Assurance Co. of Canada v. Insurance Corp. of British Columbia*, 2003 SCC 40, [2003] 2 S.C.R. 63 (S.C.C.), at paras. 37-38.

30    Whether or not s. 172 of the *BPCPA* has the legal effect claimed for it by Ms. Seidel was a question of law to be determined on undisputed facts. Accordingly, it was properly entertained by the Supreme Court of British Columbia in the first instance. The competence-competence principle was not violated.

*B. The Substantive Issue: Does Section 172 of the BPCPA Override the Mediation/Arbitration Provision in a Consumer Contract?*

31    For practical purposes, the answer to this question turns on whether the waiver contained in the TELUS arbitration clause is rendered null and void by s. 3 of the *BPCPA*, which, for convenience, I reproduce again:

> **3** Any waiver or release by a person of the person's rights, benefits or protections under this Act is void except to the extent that the waiver or release is expressly permitted by this Act.

I interpret this clause to mean that to the extent the arbitration clause purports to take away a right, benefit or protection conferred by the *BPCPA*, it will be invalid, and to that extent, Ms. Seidel will retain her individual cause of action under the *BPCPA* in the Supreme Court of British Columbia. If the arbitration clause is thus rendered invalid, the stay provisions of the *CAA* will not assist TELUS. However, the statutory right to bring an action in the Supreme Court of British Columbia appears only in s. 172. As explained earlier, Ms. Seidel's statement of claim contains a variety of different assertions and claims invoking different

statutes and causes of action. It is only to the extent that she can bring her case within s. 172 of the *BPCPA* that the legislative override in s. 3 will extricate her from the arbitration clause to which she agreed in the TELUS contract.

*(1) The "Rights, Benefits or Protections" Conferred by Section 172*

32      For ease of reference, I reproduce again the language of s. 172. It is headed "*Court actions* respecting consumer transactions". It is clearly framed to encourage *private* enforcement in the *public* interest:

> [Court actions respecting consumer transactions]
>
> **172** (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court for one or both of the following:
>
> > (a) a <u>declaration</u> that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;
> >
> > (b) an <u>interim or permanent injunction</u> restraining a supplier from contravening this Act or the regulations. ...
>
> (3) <u>If the court grants relief under subsection (1)</u>, the court may order one or more of the following:
>
> > (a) that <u>the supplier restore to any person any money</u> or other property or thing, in which the person has an interest, that may have been acquired because of a contravention of this Act or the regulations;
> >
> > (b) if the action is brought by the director, that the supplier <u>pay to the director the actual costs</u>, or a reasonable proportion of the costs, of the inspection of the supplier conducted under this Act;
> >
> > (c) that the supplier <u>advertise to the public</u> in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section.

It will be noted that whereas s. 171 damages may only be sought by "the person who suffered damage", a s. 172 claim may be initiated by virtually anyone ("a person other than a supplier, whether or not the person bringing the action has a special interest *or any interest* under this Act or is affected by a consumer transaction that gives rise to the action"). The fact that such persons do not necessarily act in their personal interest (as they don't need to have any) emphasizes the *public* interest nature of the s. 172 remedy. Opening the door to private enforcement in the public interest vastly increases the potential effectiveness of the Act and thereby promotes adherence to the consumer standards set out therein. The legislature clearly intended the Supreme Court to be able to enjoin a supplier guilty of infractions of the *BPCPA* from practising the offending conduct against any consumer (orders which only courts can issue), rather than just in relation to a particular complainant (as in a "private" and "confidential" arbitration created by private contract).

*(2) A Proper Interpretation of Section 172 of the BPCPA Must Be Approached Textually, Contextually and Purposively*

33      The text of the statute favours Ms. Seidel's interpretation. The operative language of s. 3 ("rights, benefits or protections") is all-encompassing. TELUS argues (and my colleagues LeBel and Deschamps JJ. agree, at para. 136) that the s. 172 right to "bring an action in Supreme Court" is merely procedural. With respect, this characterization is of no assistance to TELUS. Whether procedural or substantive, it is indubitably a "righ[t]" or "benefi[t]" conferred by the statute. If the legislature had intended to draw distinctions between procedural and substantive "rights, benefits or protections" in s. 3 of the *BPCPA*, it could easily have done so, but it chose not to. Ms. Seidel possesses a statutory "right" to take her complaint to the Supreme Court. My colleagues LeBel and Deschamps JJ. read down the expression "rights, benefits or protections" to exclude procedural rights. I can find no justification for modifying the legislation in this way.

34      My colleagues then focus on the word "may" appearing in s. 172 where it provides that an individual "may bring an action in Supreme Court". This shows, they say, that "the Supreme Court is not intended to be the only forum in which these remedies can be sought" (para. 154). With respect, the word "may" simply indicates the obvious intention that an individual (particularly one without "any interest" in a consumer transaction) has the option to complain or not to complain. How could it be mandatory? However, the statutory point is that *if* a s. 172 action is taken, it must be taken in the Supreme Court.

35      The internal structure of s. 172 also shows that the B.C. legislature was well aware that, in the consumer context, declarations and injunctions are the most efficient remedies in terms of protection of the interest of the broader public of consumers and deterrence of wrongful supplier conduct. Damages are often a less important form of relief considering the small amounts of money at stake. Thus, in s. 172, an order to "restore" money or property is framed as secondary relief that is contingent on the plaintiff first obtaining a declaration or injunction that, unlike an arbitral award, would be broadcast to the marketplace generally with full supporting reasons. On this point, my colleagues argue (at para. 152) that an arbitrator could make an order that "would fulfill the public purpose" of the *BPCPA* provision authorizing a superior court to order the supplier to

> advertise to the public in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section. [s. 172(3)(*c*)]

While the validity of such a hypothetical order is not before us, I think that TELUS would have a legitimate objection. It is true that arbitrators in B.C. have fairly broad remedial powers, but it is equally true that in the exercise of those powers the arbitrator would have to respect the parties' contractual agreement that the arbitration be "private and confidential". (Indeed my colleagues' entire argument is said to be based on respect for the intention of the parties.) I doubt that Ms. Seidel or TELUS would be free to turn a private and confidential arbitration into a public denunciation of the other under the guise of enforcement proceedings. The arbitrator is not a court and the parties are constrained by contract not to treat it like one.

36      As to the statutory context, s. 172 stands out as a public interest remedy (i.e. it is available whether or not the self-appointed plaintiff "is affected by a consumer transaction that gives rise to the action") as compared with s. 171 (where the plaintiff must be "the person who suffered damage or loss"). The difference in the personal stake (or lack of it) required of a plaintiff is scarcely accidental. Section 171 confers a private cause of action. Section 172 treats the plaintiff as a public interest plaintiff intended to shine a spotlight on allegations of shabby corporate conduct, and the legislative intent thereby manifested should be respected by the court. This appeal falls to be determined on the meaning of s. 172 of the *BPCPA*, not on general theories of the desirability of commercial arbitration.

37      As to statutory purpose, the *BPCPA* is all about consumer protection. As such, its terms should be interpreted generously in favour of consumers: *Smith v. Co-operators General Insurance Co.*, 2002 SCC 30, [2002] 2 S.C.R. 129 (S.C.C.), and *ACS Public Sector Solutions Inc. v. Courthouse Technologies Ltd.*, 2005 BCCA 605, 48 B.C.L.R. (4th) 328 (B.C. C.A.). The policy objectives of s. 172 would not be well served by low-profile, private and confidential arbitrations where consumers of a particular product may have little opportunity to connect with other consumers who may share their experience and complaints and seek vindication through a well-publicized court action.

*(3) Private Arbitration Is Antithetical to Achievement of the Purposes of Section 172*

38      Casting the legislative purpose still more broadly, the usual rationales for private arbitration are quite incompatible with achieving s. 172's objective. At the same time, private arbitration would be of considerable benefit to TELUS, i.e., "[t]here are real advantages to be gleaned from an arbitration agreement which guarantees confidentiality of the proceeding, avoids the dispute getting into the public domain, and ensures that sensitive information or harmful precedents remain confidential" (W. J. Earle, *Drafting ADR and Arbitration Clauses for Commercial Contracts* (loose-leaf), at pp. 2-13 to 2-14). Each one of these objectives — confidentiality, lack of precedential value and avoiding "the dispute getting into the public domain" — makes perfect sense from the perspective of TELUS, but equally each of them undermines the effectiveness of s. 172(1) of the *BPCPA*.

*(4) Private Arbitration Cannot Offer the Remedies Set out in Section 172*

39     Rule 29(1)(k) of the BCICAC Rules provides that an arbitrator may order "injunctions and other equitable remedies". On this basis, my colleagues LeBel and Deschamps JJ. conclude that "[t]he arbitrator can therefore ... grant the declaratory and injunctive relief sought by Ms. Seidel under ss. 172(1)(a) and (b) of the *BPCPA*" (para. 148). Yet it can hardly be denied that arbitrators, who derive their jurisdiction by virtue of the parties' contract, cannot order relief that would bind third parties, or that only superior courts have the authority to grant declarations and injunctions enforceable against the whole world. Ms. Seidel does not seek remedies applicable only between her and TELUS but between TELUS and the whole world. Provided TELUS complied with any order in relation to Ms. Seidel, it could carry on as before in relation to TELUS customers who are not parties to the arbitration and are therefore unaffected by its outcome, just as a successful defence by TELUS against Ms. Seidel's complaint would not create in its favour a precedent in future arbitrations raising the same or similar complaints.

40     In summary, s. 172 offer remedies different in scope and quality from those available from an arbitrator and constitutes a legislative override of the parties' freedom to choose arbitration. Unlike Quebec and Ontario, which have decided to ban arbitration of consumer claims altogether, or Alberta, which subjects consumer arbitration clauses to ministerial approval, the B.C. legislature sought to ensure only that certain claims proceed to the court system, leaving others to be resolved according to the agreement of the parties. It is incumbent on the courts to give effect to that legislative choice, in my view.

### C. This Outcome Is Not in Conflict with the Dell or Rogers Decisions of this Court

41     In *Dell* and its companion case *Rogers Wireless*, our Court rejected an attempt by consumers to pursue class actions in Quebec in disputes arising out of product supply contracts in the face of arbitration clauses. The outcome turned on the terms of the Quebec legislation. In *Dell*, Deschamps J. wrote for the majority: "This appeal relates to the debate over the place of arbitration in *Quebec's civil justice system*" (at para. 2; emphasis added). In particular, the issue was whether arbitration clauses in the consumer contracts were avoided by art. 3149 of the *Civil Code of Québec*, R.S.Q., c. C-1991. The majority concluded that art. 3149 did not assist the consumers because it only applies "where there is a relevant foreign element that justifies resorting to the rules of Quebec private international law" (para. 12). The minority contended that art. 3149 did allow consumers to avoid arbitration because "[p]rivate arbitration proceedings, even those located in Quebec, are just as removed from Quebec's judicial and quasi-judicial systems — and hence "international" — as legal proceedings taking place in another province or country" (at para. 202). *Rogers Wireless* (another Quebec case) was disposed of in accordance with *Dell*. The intricacies of the *Civil Code of Québec* are far removed from the issue in British Columbia. The Quebec legislation at the time contained no provision similar to s. 172 of the *BPCPA* directing specific statutory claims to a specific forum.

42     For present purposes, the relevant teaching of *Dell* and *Rogers Wireless* is simply that whether and to what extent the parties' freedom to arbitrate is limited or curtailed by legislation will depend on a close examination of the law of the forum where the irate consumers have commenced their court case. *Dell* and *Rogers Wireless* stand, as did *Despoteaux*, for the enforcement of arbitration clauses *absent legislative language to the contrary*.

### D. May Ms. Seidel's Section 172 Claims Proceed as a Class Action?

43     I have concluded that Ms. Seidel has a statutory right to assert her s. 172 right before the Supreme Court of British Columbia. The next question is whether she can proceed by way of class action, as she would like, or whether she may only proceed on an individual basis. The British Columbia courts did not reach this issue as the TELUS application for a stay was their exclusive focus, whether to deny it (as did the applications judge) or to grant it (as did the Court of Appeal).

44     The arbitration clause, it will be remembered, speaks not only of having claims "determined by private, confidential and binding arbitration" but goes on to say that "[b]y so agreeing, [the signatories waive] any right [they] may have to commence or participate in any class action against TELUS". An argument was raised that even if the *arbitration* aspect is invalidated by s. 3, the *concurrent waiver* of class action proceedings in the same clause remains valid and enforceable.

45     Ms. Seidel argues that class action waivers are unconscionable in any event. Picking up on some U.S. jurisprudence, she notes that "an important number of courts, principally state courts from California and Illinois, as well as the 9th Circuit, consider pre-dispute arbitration agreements to be unconscionable, especially when they are coupled with waiver of class proceeding

rights" (A.F., at para. 88). It is not necessary on this appeal to determine whether class action waivers are unconscionable (and I do not purport to do so) because in my view, as a matter of interpretation, the TELUS class action waiver is not severable from the arbitration clause as a whole, and as a whole it is rendered void by s. 3 of the *BPCPA*.

46      The TELUS clause is structured internally to make the class action waiver dependent on the arbitration provision. The wording makes it clear that it is only by virtue of their agreement to arbitrate that consumers bar themselves from a class action. The undertakings are linked by the term "[b]y so agreeing". What precedes (the arbitration clause) is the foundation for what follows (the class action waiver). If the arbitration provision is rendered invalid by s. 3 of the *BPCPA*, as I believe to be the case, the dependant class action waiver falls with it. The unitary nature of the clause is reinforced to some extent by its title, which is "Arbitration", not "Arbitration and Class Action Waiver".

47      I take this language to be clear. However if there is any ambiguity in the TELUS clause, it is resolved in favour of Ms. Seidel's right of access to the court by the principles of *contra proferentum*. "Whoever holds the pen creates the ambiguity and must live with the consequences": *Gibbens v. Co-operators Life Insurance Co.*, 2009 SCC 59, [2009] 3 S.C.R. 605 (S.C.C.), at para. 25; see also, *ACS Public Sector Solutions*, *per* Donald J.A., at para. 50. This, the Court said in *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102 (S.C.C.), "is particularly true where the clause is found in a standard printed form of contract, frequently termed a contract of adhesion, which is presented by one party to the other as the basis of their transaction" (at p. 108).

48      Accordingly, Ms. Seidel is not contractually barred from continuing to seek certification of her s. 172 claims as a class action.

49      Reference was made to s. 41(a) of the *CPA* which provides that no class action can be instituted where a representative action is available. However, under the *BPCPA*, only the Director may bring a representative action. Ms. Seidel may not do so. While consumer activists may bring actions despite the fact that they have not personally suffered any damage, such actions cannot be brought as representative actions under the *BPCPA*. This is to be contrasted with the situation under the now repealed *TPA*, where s. 18(3) allowed consumer-brought representative actions. Accordingly, s. 41(a) of the *CPA* is not a bar to Ms. Seidel's application for certification.

## V. Disposition

50      I would allow the appeal in part and lift the stay as regards the s. 172 claims made by Ms. Seidel. She may in that respect pursue the certification proceedings. On the other hand, I would uphold the stay in relation to her other claims which may, if she pursues them, go to arbitration. This may lead, if the arbitration is proceeded with, to bifurcated proceedings. Such an outcome, however, is consistent with the legislative choice made by British Columbia in drawing the boundaries of s. 172 as narrowly as it did.

51      As Ms. Seidel has enjoyed substantial success, she should have her costs in this Court and in the courts below, including costs on the application for leave to appeal to this Court. The stay proceedings raise quite distinct issues unrelated to the merits of her claim. The costs are therefore awarded to her in any event of the ultimate outcome of the litigation.

*LeBel, Deschamps JJ.* (dissenting):

52      In an effort to promote and improve access to justice, and to make more efficient use of scarce judicial resources, legislatures have adopted new procedural vehicles designed to modify or provide alternatives to the traditional court action. These alternatives include class actions and arbitration, both of which have been endorsed by this Court. Consumers in British Columbia, depending on the contractual arrangements they make, already have access to either arbitration or the courts to resolve their disputes. In this case, the consumer's contract provides that in the event of a dispute, the exclusive adjudicative forum is arbitration. This is a forum our courts have long accepted as an efficient and effective access to justice mechanism. Thus, the question in this case is instead whether access to justice means — and requires — access to a judge.

53      This appeal specifically calls upon this Court to determine whether a clause in a standard form consumer contract for the supply of mobile phone services which mandates that all disputes with the service provider be resolved by way of arbitration,

displaces the availability of class proceedings in the province of British Columbia. In our view, the British Columbia legislature has, by incorporating the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3 ("New York Convention"), and the *UNCITRAL Model Law on International Commercial Arbitration*, U.N. Doc A/40/17 (1985), Ann. I ("Model Law"), into its domestic arbitration legislation, made a clear choice. Absent a clear statement by the legislature of an intention to the contrary, a consumer claim that could potentially proceed either by way of arbitration or class action must first be submitted to arbitration.

54    Access to justice in Canada no longer means access just to the public court system. Historically, judges were reluctant to relinquish their grasp on dispute resolution, and they even viewed alternative dispute resolution as antithetical to the parties' interests. This era is gone. It is the role of the legislature, not the courts, to limit access to alternative dispute resolution mechanisms. Unlike several other provinces, British Columbia has not limited the resolution of consumer disputes to a single procedural regime. On the contrary, it has left room for arbitration and allowed arbitrators to exercise broad remedial powers, subject to the agreement of parties to a dispute. Given the current structure of consumer protection legislation in British Columbia, submitting a consumer's dispute with their mobile phone service provider to arbitration is entirely consistent with the important public purposes of protecting consumers, vindicating their rights and promoting access to justice.

55    Our colleague Binnie J. frames this case somewhat differently than the parties. He focusses first not on whether the arbitration clause agreed to by the parties to this dispute is inoperative — the issue on which the British Columbia courts focussed their decisions, and on which leave was granted — but rather on the interpretation of ss. 3 and 172 of the *Business Practices and Consumer Protection Act*, S.B.C. 2004, c. 2 ("*BPCPA*"). He considers s. 172 to be the result of a legislative decision to confer exclusive jurisdiction on the British Columbia Supreme Court to issue declaratory, injunctive and other equitable orders, the waiver of which is prohibited by s. 3. In our view, this interpretation represents an inexplicable throwback to a time when courts monopolized decision making and arbitrators were treated as second-class adjudicators. This approach completely disregards the modern state of the law in British Columbia, in which arbitrators have expanded powers comparable to those of the courts to hear representative proceedings and to issue equitable orders.

56    We disagree that the *BPCPA* manifests explicit legislative intent to foreclose the use of arbitration as a vehicle for the resolution of disputes under that Act in British Columbia. We would dismiss the appeal, thereby upholding the stay of court proceedings to allow the arbitration process contractually agreed to by the parties to run its course.

**I. Factual Background**

57    The appellant, Michelle Seidel, became a customer of the respondent TELUS Communications Inc.'s ("TELUS") mobile phone services in 2000. The parties have been unable to locate her original contract with TELUS, if one was in fact signed. Whether the original contract contained an arbitration clause cannot therefore be conclusively determined.

58    When Ms. Seidel renewed her cell phone service with TELUS in 2003, however, she did sign a contract. It included the following arbitration clause:

15. ARBITRATION: Any claim, dispute or controversy (whether in contract or tort, pursuant to statute or regulation, or otherwise and whether pre-existing, present or future — except for the collection from you of any amount by TELUS Mobility) arising out of or relating to: (a) this agreement; (b) a phone or the service; (c) oral or written statements, or advertisements or promotions relating to this agreement or to a product or service; or (d) the relationships which result from this agreement (including relationships with third parties who are not parties to this agreement), (each, a "Claim") will be referred to and determined by private and confidential mediation before a single mediator chosen by the parties and at their joint cost. Should the parties after mediation in good faith fail to reach a settlement, the issue between them shall then be determined by private, confidential and binding arbitration by the same person originally chosen as mediator. Either party may commence court proceedings to enforce the arbitration result when an arbitration decision shall have been rendered and thirty (30) days have passed from the date of such decision. By so agreeing, you waive any right you may have to commence or participate in any class action against TELUS Mobility related to any Claim and, where applicable, you hereby agree to opt out of any class proceeding against TELUS Mobility otherwise commenced. [A.R., at p. 83.]

13

Ms. Seidel renewed her TELUS service once again in 2004. The renewal form included a notification that the terms of the 2004 renewal supplemented the terms of her existing TELUS service contract, which continued to apply.

59     On January 21, 2005, Ms. Seidel commenced a class proceeding against TELUS, alleging breach of contract and deceptive and unconscionable practices contrary to the *BPCPA*. The essence of Ms. Seidel's allegations is that TELUS unlawfully charges its customers for incoming calls based upon when the caller connects to TELUS's network, but before the customer answers the call. This is said to include connection time and ring time. In her view, TELUS can lawfully charge only for "air time", or what is otherwise known as "actual talking time". To date, no certification hearing has taken place.

60     Ms. Seidel seeks the following remedies: a declaration that TELUS engaged in deceptive and unconscionable trade acts and practices; damages, including both punitive and exemplary damages; an order restoring the monies acquired by TELUS in contravention of the *BPCPA*; an accounting of amounts due; and both interim and permanent injunctions prohibiting the allegedly deceptive and unconscionable acts and practices. All these remedies are sought pursuant to the *BPCPA*.

## II. Judicial History

61     In order to place the decisions of the courts below in their proper context, it is important to begin by briefly reviewing the legal environment in place when they were rendered. The courts have in fact ruled a number of times on the issue of whether the certification of a class action should take precedence over contractual agreements to arbitrate.

### A. MacKinnon v. National Money Mart Co., *2004 BCCA 473, 50 B.L.R. (3d) 291* (B.C. C.A.) (MacKinnon 2004)

62     In *MacKinnon 2004*, a five-member panel of the British Columbia Court of Appeal was asked to decide whether an arbitration clause in a consumer contract is "inoperative" where an action for breach of that contract is brought as an intended class proceeding.

63     Levine J.A., writing for a unanimous court, found that an operational conflict exists between the *Class Proceedings Act*, R.S.B.C. 1996, c. 50 ("*CPA*"), and the *Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 ("*CAA*"): under the *CPA*, the court must certify a class proceeding if all the statutory criteria are met, but must also refer a matter to arbitration pursuant to the *CAA* unless the agreement to arbitrate is null or inoperative. In other words, the mandatory terms of the two Acts "mean that arbitration and class proceedings cannot operate at the same time with respect to the same dispute" (para. 53).

64     Levine J.A. rejected the sequential approach to interpretation advanced by Money Mart, according to which the stay application under the *CAA* had to be considered before the certification application under the *CPA*. Instead, relying in part on policy concerns associated with standard-form agreements and the use of arbitration to resolve consumer disputes, Levine J.A. crafted an approach that would give meaning to and recognize the importance of both statutory schemes. She concluded that an arbitration agreement becomes inoperative when, upon certification, a class proceeding is considered the "preferable procedure" (s. 4 (1)(d), *CPA*) for resolving the dispute.

### B. Union des consommateurs c. Dell Computer Corp., *2007 SCC 34, [2007] 2 S.C.R. 801* (S.C.C.)

65     In July 2007, this Court released its decisions in *Dell* and *Muroff c. Rogers Wireless inc.*, 2007 SCC 35, [2007] 2 S.C.R. 921 (S.C.C.). These decisions dealt with the relationship between arbitration clauses and class actions under the *Civil Code of Québec*, R.S.Q., c. C-1991 ("*CCQ*") and the *Code of Civil Procedure*, R.S.Q., c. C-25 ("*CCP*"). In TELUS's view, *Dell* and *Rogers Wireless* cast doubt on the validity of *MacKinnon 2004*. On July 23, 2007, TELUS accordingly applied for a stay under s. 15 of the *CAA*, arguing that the arbitration clause should prevail over the proposed class proceeding. In support of this application, TELUS filed an affidavit of a Quebec lawyer, who stated that there was no substantive difference between Quebec's legislation dealing with arbitration and class proceedings and that of British Columbia.

66     Decided against the backdrop of an application to certify a class action, *Dell* addressed the question of who, between the courts or an arbitrator, should first consider the validity and applicability of an arbitration agreement. After canvassing the

international and domestic authorities, the majority confirmed the primacy of the "competence-competence" principle and set out the applicable general test:

> First of all, I would lay down a general rule that in any case involving an arbitration clause, a challenge to the arbitrator's jurisdiction must be resolved first by the arbitrator. A court should depart from the rule of systematic referral to arbitration only if the challenge to the arbitrator's jurisdiction is based solely on a question of law. This exception is justified by the courts' expertise in resolving such questions, by the fact that the court is the forum to which the parties apply first when requesting referral and by the rule that an arbitrator's decision regarding his or her jurisdiction can be reviewed by a court. It allows a legal argument relating to the arbitrator's jurisdiction to be resolved once and for all, and also allows the parties to avoid duplication of a strictly legal debate. In addition, the danger that a party will obstruct the process by manipulating procedural rules will be reduced, since the court must not, in ruling on the arbitrator's jurisdiction, consider the facts leading to the application of the arbitration clause.

> If the challenge requires the production and review of factual evidence, the court should normally refer the case to arbitration, as arbitrators have, for this purpose, the same resources and expertise as courts. Where questions of mixed law and fact are concerned, the court hearing the referral application must refer the case to arbitration unless the questions of fact require only superficial consideration of the documentary evidence in the record. [paras. 84-85]

Thus, a challenge to the jurisdiction of the arbitrator will be determined by the court only if it concerns either a question of law or one of mixed fact and law that requires only superficial consideration of the evidence in the record and can be dealt with expeditiously.

67      As to the interaction between an arbitration clause and a class action, the majority in *Dell* focussed on the procedural nature of the class action. The possibility of using a particular procedural vehicle cannot alter substantive rights agreed to by the parties to a contract. Therefore, when contracting parties agree to refer to arbitration any dispute arising under their contract, they create a substantive right. Relying on *Bisaillon c. Concordia University*, 2006 SCC 19, [2006] 1 S.C.R. 666 (S.C.C.), the majority held that the choice to initiate a class action cannot serve as the basis for a court's jurisdiction to hear a dispute if the claims raised in that action, taken individually, would not do so. This is because the parties have, by virtue of their contractual agreement to arbitrate these claims, created a substantive right that ousts a court's jurisdiction.

68      Though the judges of the minority dissented in v, they did so on other grounds. They agreed, in respect of the competence-competence principle, with the "rule of chronological priority under which the arbitrators must have the first opportunity to rule on their jurisdiction" (para. 163). They also agreed "that a discretionary approach favouring resort to the arbitrator in most instances would best serve the legislator's clear intention to promote the arbitral process and its efficiency, while preserving the core supervisory jurisdiction of the Superior Court" (para. 176). Similarly, the minority agreed that a court that lacks jurisdiction over a dispute in the first place — because the parties have chosen to have disputes resolved through arbitration, for example — cannot acquire jurisdiction over it as a result of an application for certification of a class action (para. 150).

69      In oral argument in the instant case, emphasis was put on the fact that *Dell* was based on the interpretation of the provisions of the *CCQ* and the *CCP* on arbitration and class actions. It was submitted on this basis that the *ratio* of that case does not apply outside Quebec. While it is true that *Dell* involved the interpretation of Quebec legislation, the subject matter of that legislation was domestic commercial arbitration, and the key issue was the relationship between arbitration and individual court actions. Quebec's arbitration legislation is not unique to the civil law tradition, but was based on two international texts relating to arbitration: the Model Law and the New York Convention. The general test adopted in *Dell* for dealing with challenges to an arbitrator's jurisdiction in this context was based on the interpretation of these international documents. The approach in that case to determining the jurisdiction of the arbitrator, and more specifically the application of the competence-competence principle, is not unique to Quebec.

***C. British Columbia Supreme Court (2008 BCSC 933, 85 B.C.L.R. (4th) 372 (B.C. S.C.); Masuhara J.)***

70     Returning to the present appeal, the stay application brought by TELUS was argued before the case management judge, Masuhara J. The key question he had to address was whether the legal tests for certification of a class proceeding and for establishing the jurisdiction of an arbitrator in Quebec are, for all intents and purposes, the same as those in British Columbia. The answer to this question would ultimately determine the reach of both *Dell* and *Rogers Wireless* in the province. In Masuhara J.'s opinion, *Dell* requires an arbitrator to determine if the arbitration clause is valid before the court considers whether the class action should be certified. If this *ratio* extended to the common law provinces, he reasoned, it would call *MacKinnon 2004* into question.

71     Masuhara J. concluded that there was no substantial difference between the two provinces' approaches to class proceedings. However, he observed three main differences between the arbitration regimes that, in his view, precluded a finding that the "Quebec test" (at para. 75) set out in *Dell* applies in British Columbia. First, 15(2) of the *CAA* provides for broader exceptions from the automatic referral to arbitration than art. 940.1 of the *CCP* does in Quebec. Second, the *CAA* does not expressly grant arbitrators the authority to decide questions with regard to their own jurisdiction. The plain language of s. 15 of the *CAA* indicates that this jurisdiction resides exclusively with the court. Third, the *CAA* is not based on the New York Convention and the Model Law, and does not contain the provisions found in the Quebec legislation that expressly oust the jurisdiction of the courts.

72     In the event that he was wrong, and that *Dell* does in fact apply in British Columbia, Masuhara J. went on to consider the effect of that case on TELUS's stay application. He was not convinced that *Dell* had the effect of overturning *MacKinnon 2004*. First, *Dell*'s "Quebec test" had no bearing on the actual issue raised by TELUS's application: whether the court had jurisdiction to grant a stay of proceedings under the *CAA*. Second, two exceptions to the competence-competence principle were identified in *Dell*: where the challenge to the arbitrator's jurisdiction involves a question of law, or questions of mixed fact and law that require only a superficial examination of the evidence. Whether an action ought to be certified as a class proceeding is a question of law that falls within the exclusive jurisdiction of the court. Masuhara J. therefore dismissed TELUS's application for a stay of proceedings.

### D. British Columbia Court of Appeal

*(i)* MacKinnon v. National Money Mart Co*., 2009 BCCA 103, 89 B.C.L.R. (4th) 1 (B.C. C.A.) (*MacKinnon 2009*)

73     The Court of Appeal's decision in the case at bar (2009 BCCA 104, 88 B.C.L.R. (4th) 212 (B.C. C.A.), *per* Tysoe J.A. (Finch C.J.B.C. and Rowles, Newbury and Neilson JJ.A. concurring)) was released concurrently with *MacKinnon 2009*. Because Tysoe J.A. simply applied the reasoning in *MacKinnon 2009* to the facts of Ms. Seidel's case, we will discuss both sets of reasons.

74     In *MacKinnon 2009* and in the case at bar, the Court of Appeal again sat as a five-judge panel, because it was being explicitly asked to overrule its decision in *MacKinnon 2004* on the basis that that decision had been overtaken by *Dell*. Newbury J.A., writing for a unanimous court in *MacKinnon 2009*, concluded that the reasoning in *Dell* applied in British Columbia and therefore that *MacKinnon 2004* should no longer be followed. However, she focussed not so much on the alleged conflict of purposes between the statutory scheme for commercial arbitration and the one for class proceedings as on the legal status of class proceedings themselves.

75     After reviewing this Court's recent jurisprudence on class actions, Newbury J.A. began by observing that the commencement of a class proceeding cannot affect the substantive rights of the parties. A class proceeding is a procedural vehicle only: when contracting parties create a substantive contractual right to have their disputes resolved by way of arbitration, the class proceeding cannot be certified and "the court must generally respect the parties' choice of arbitration instead of judicial determination" (para. 66). The class proceeding cannot therefore be used either to circumvent the exclusive jurisdiction of the arbitrator or to modify the substantive rights of the parties to an arbitration agreement (para. 70).

76     Newbury J.A. also held that the differences in statutory language identified by Masuhara J. were not material to the question of whether the reasoning in *Dell* extends to British Columbia. The arbitration schemes of both provinces provide essentially for the same thing. Moreover, the question raised in the appeal logically paralleled the question considered by this Court in *Dell*:

[I]f Mr. MacKinnon had brought his action solely as an individual, he could not have prevented the court in either province from staying the action and referring it to arbitration. [para. 69]

77     Newbury J.A. therefore decided that the approach taken in *Dell* also applies in British Columbia. However, having found no basis for interfering with the case management judge's exercise of discretion in *MacKinnon 2009* in refusing to grant the stay on the basis of issue estoppel, she dismissed the appeal (para. 84). For this reason, the dispute was not referred to arbitration.

*(ii) Seidel v. TELUS Communications Inc.*

78     Tysoe J.A., writing for the Court of Appeal in the case at bar, applied the reasoning of his colleague in *MacKinnon 2009* to the issue of whether the stay should be granted on the basis of *Dell*. However, he then went on to consider three residual issues decided neither by Newbury J.A. in *MacKinnon 2009* nor by Masuhara J. that were specific to the case at bar: (1) whether the arbitration agreement was inoperative by virtue of s. 3 of the *BPCPA* (which renders void any waiver or release of rights, benefits or protections under that Act); (2) whether issue estoppel was available; and (3) whether the arbitration clause covered those of Ms. Seidel's claims that arose before February 2003, since no contract between the parties could be located from before that time.

79     Tysoe J.A. rejected the argument that the *BPCPA* conferred rights on members of the proposed class and that, by virtue of s. 3, those rights could not be waived. Specifically, s. 10(2) confers rights, benefits or protections applicable only to mortgage loans, and s. 172(1) simply identifies the British Columbia Supreme Court as the court in which the remedies provided for in that section can be sought. Section 172(1) does not explicitly exclude arbitral jurisdiction and cannot therefore render the arbitration agreement between Ms. Seidel and TELUS inoperative.

80     Regarding the availability of issue estoppel, Tysoe J.A. noted that there was no evidence that TELUS had ever promised not to apply for a stay of proceedings. Nor had it done anything in the course of the proceedings that would constitute a "step in the proceedings" within the meaning of s. 15(1) of the *CAA* and would accordingly bar it from applying for a stay. Moreover, TELUS applied for a stay only after *Dell* and *Rogers Wireless* had cast doubt on the correctness of *MacKinnon 2004*. And it did so promptly after their release.

81     Finally, in considering whether the arbitration agreement covered the pre-February 2003 claims, Tysoe J.A. noted that this issue involved the determination of a number of factual matters. As a result, it did not fall within either of the exceptions to the applicability of the competence-competence principle identified in *Dell* and therefore had to be resolved at first instance by the arbitrator. Tysoe J.A. therefore allowed TELUS's appeal and stayed Ms. Seidel's proposed class action in its entirety.

**III. Analysis**

*A. The Issues*

82     In the courts below, the parties' arguments were firmly focussed on one main issue, namely:

(1) whether the competence-competence principle is incorporated into the law of British Columbia by virtue of the stay provision — s. 15 of the *CAA* — and if so, whether judicial proceedings, including class proceedings, should be stayed where the parties have signed an agreement to arbitrate unless the narrow exceptions in *Dell* apply.

A second issue was raised almost incidentally:

(2) whether an arbitration clause in an agreement for mobile phone services constitutes an impermissible waiver of rights, benefits and protections provided for in the *BPCPA*.

In this Court, it is this second issue that has come to the forefront. It constitutes a question of law that, pursuant to the exception in *Dell*, should be considered in the first instance by a court rather than the arbitrator. Consequently, it will be necessary to resolve both these issues in these reasons.

## B. Positions of the Parties

### (i) The Appellant, Ms. Seidel

83     Ms. Seidel argues that the *CAA* was never intended to apply to consumer disputes; rather, its purpose was to regulate domestic commercial relationships between business persons operating at arms length in the province. By contrast, the *CPA* is intended to make class proceedings available in situations in which actions are ordinarily brought only on an individual basis, and its express purpose is to foster access to justice.

84     Ms. Seidel argues that the Court of Appeal's approach in *MacKinnon 2004* establishes the proper framework, as it allows both statutes to operate and to achieve their objectives. If the British Columbia legislature had intended to exclude arbitration proceedings from the "preferable procedure" analysis required by 4(1)(d) of the *CPA*, it would surely have done so expressly. In comparison with the provinces that have explicitly legislated against the inclusion in consumer agreements of arbitration clauses and clauses prohibiting participation in class proceedings, British Columbia has simply taken a different approach. But the effect of the Court of Appeal's decision in *MacKinnon 2009* was to exclude, from the outset, the possibility of certifying a proceeding as a class proceeding if it concerns a dispute, subject to an arbitration agreement. The Court of Appeal has also disregarded some significant policy arguments which suggest that arbitration is not an effective forum for remedying consumer claims, particularly when there are a large number of claims of low or nominal value.

85     Furthermore, Ms. Seidel argues, the Court of Appeal's conclusion that *Dell* applies is premised on two false assumptions. The first is that the laws of Quebec and British Columbia respecting arbitration and class proceedings are sufficiently similar. The second is that legislation dealing with procedural rights is subordinate to legislation dealing with substantive rights. Finally, on the issue of the waiver of rights under the *BPCPA*, Ms. Seidel argues that a person's rights under the Act include the substantive right to bring an action in the British Columbia Supreme Court under 172 for declarations and for injunctive relief. These are remedies that only a court can grant. An approach pursuant to which a consumer subject to an arbitration agreement would be required to have an arbitrator determine whether the *BPCPA* has been breached before being entitled to proceed to court to obtain declaratory or injunctive relief would strip the *BPCPA* of its legislative force, and achieving its objectives would become impossible.

### (ii) The Respondent, TELUS

86     TELUS asks this Court to adopt the reasoning in *MacKinnon 2009* as a correct statement of the law in British Columbia. The overarching principle from *Dell*, that a court may rule first on the arbitrator's jurisdiction only if there is a pure legal issue or an issue of mixed fact and law that can be expeditiously decided by the court on a minimal evidentiary record, also applies in British Columbia. The presence of an arbitration agreement precludes a court from considering the certification of the proposed class action and mandates the granting of the stay under s. 15 of the *CAA*, provided that the narrow exception from *Dell* does not apply. Unless this Court were to hold that a standard-form contract cannot establish a substantive right to arbitration or that arbitration clauses are inherently unfair to consumers, an agreement to arbitrate cannot be supplanted by the procedural right to commence a class action. Taking any necessary action and assessing Ms. Seidel's policy concerns with respect to the use of arbitration clauses in consumer agreements are matters best left to the legislature, which is in a better position to balance competing policies and objectives.

87     TELUS argues that the arbitration clause does not constitute a waiver of rights, benefits or protections under the *BPCPA* and therefore does not offend s. 3 of the *CAA*. The clause simply provides that it is an arbitrator, and not the court, who determines in the first instance whether the *BPCPA* has been breached. Moreover, the arbitrator has the authority to order the same relief as could a court. Ms. Seidel therefore does not lose any of the substantive rights, benefits or protections provided for in the *BPCPA* by having her dispute with TELUS resolved by way of arbitration. If the legislature intends to exclude arbitration as an appropriate forum for dispute resolution in a particular case, it must do so expressly.

88     Before we deal with this last argument, it will be necessary to resolve the issue that was the primary focus of argument in the courts below: whether the competence-competence principle applies in British Columbia law.

*C. Evolution of Arbitration in British Columbia and the Competence-Competence Principle*

89     Canadian courts, both in Quebec and in the common law jurisdictions, have endorsed the use of arbitration as a dispute resolution mechanism and now encourage its use (*Desputeaux c. Éditions Chouette (1987) inc.*, 2003 SCC 17, [2003] 1 S.C.R. 178 (S.C.C.), at para. 38). This was not always the case, however, as the courts originally displayed overt hostility to arbitration, effectively treating it as a second-class method of dispute resolution. As Casey and Mills observe in *Arbitration Law of Canada: Practice and Procedure*:

> Judicial hostility to "lesser" tribunals, and the lack of a modern legislative framework, inhibited the growth of arbitration in Canada, particularly relative to European countries. Until the 1990's, commercial arbitration in Canada was not regarded as a real substitute for the courts and the provinces were slow to recognize any distinction between domestic arbitration and international arbitration. (J. B. Casey and J. Mills, *Arbitration Law of Canada: Practice and Procedure* (2005), at pp. 2-3)

This hostility originated in the English common law (see, e.g., *Horton v. Sayer* (1859), 4 Hurl. & N. 643, 157 E.R. 993; *Lee v. Page*, (1861), 30 L.J. Ch. 857; *Edwards v. Aberayron Mutual Ship Insurance Society Ltd* (1876), 1875-76 L.R. 1 Q.B.D. 563 (Eng. Ex. Ch.); *Doleman & Sons v. Ossett Corp.*, [1912] 3 K.B. 257 (Eng. C.A.)).

90     In the early cases on arbitration, the courts displayed a distinct attitude that arbitration agreements, the purported effect of which was to oust the jurisdiction of the courts, were void on grounds of public policy. If, however, the agreement merely stipulated — in what became known as a *Scott v. Avery* clause — that arbitration was a condition precedent to bringing a court action, the court's jurisdiction was not ousted and the agreement would be valid (*Scott v. Avery* (1856), 5 H.L.C. 811 (U.K. H.L.), 10 E.R. 1121; see also, e.g., *Johnston v. Western Assurance Co.* (1879), 4 O.A.R. 281 (Ont. C.A.); *Nolan v. Ocean Accident & Guarantee Corp.* (1903), 5 O.L.R. 544 (Ont. Div. Ct.); *Cayzer Irvine & Co. v. Board of Trade* (1925), [1927] 1 K.B. 269 (Eng. K.B.), at p. 293; *Brand v. National Life Assurance Co. of Canada* (1918), 44 D.L.R. 412 (Man. K.B.); *Altwasser v. Home Insurance Co. of New York*, [1933] 2 W.W.R. 46 (Sask. C.A.); *Rootes Motors (Canada) Ltd. v. William Halliday Contracting Co.*, [1952] 4 D.L.R. 300 (Ont. H.C.); *Burns & Roe of Canada Ltd. v. Deuterium of Canada Ltd.* (1970), 15 D.L.R. (3d) 568 (N.S. T.D. ([In Chambers]), rev'd (1971), 21 D.L.R. (3d) 568 (N.S. C.A.), aff'd (1974), [1975] 2 S.C.R. 124 (S.C.C.); *Procon (Great Britain) Ltd. c. Golden Eagle Co.*, [1976] C.A. 565 (Que. C.A.), at 567).

91     The clearest articulation of why the courts considered arbitration agreements to be contrary to public policy is found in the following passage from *Brand*:

> From the earliest times both common law and equity courts have recognized and given effect to the principle that parties cannot, by contract, oust the courts of their jurisdiction, and that a provision to refer any dispute which might arise, not to the ordinary tribunals, but to some forum of their own selection, could not be pleaded in bar to an action upon the contract.
>
> At one time it was supposed that the principle underlying these decisions was that an agreement to prevent the enforcement of a cause of action through the medium of the ordinary tribunals of the country was void as contrary to public policy, and indeed expressions to that effect may be found in the reports of cases of comparatively recent date.
>
> . . . . .
>
> The true ground for holding that the jurisdiction of the courts cannot be ousted by an agreement between parties is that the courts derive their jurisdiction either from the statute or common law, and no mere contract *inter partes* can take away that which the law has conferred. [pp. 414-15]

92     This hostility towards arbitration animated the courts' approach in applications to stay proceedings in the face of arbitration agreements:

> While the Courts are guided by the principle that persons who make an agreement for arbitration should be bound by its terms, they do not lose sight of the principle that the jurisdiction of the Courts is not to be ousted by agreement between the parties; and in cases where it is thought better that the matters at issue should be decided by the Courts rather than by arbitration, the action is allowed to proceed and a stay of proceedings is refused. [*Altwasser*, at p. 50]

93     Not only were the courts overtly hostile to any mechanism that would oust their jurisdiction to hear and resolve disputes, they were also sceptical that arbitration was really more efficient or effective than a traditional judicial proceeding:

> One cannot but wonder about the efficacy of arbitration as a means of settling disputes of this kind. The present case occupied a great deal of time before the Board and before the two Courts. Costs are bound to be heavy. It would appear that the *Arbitration Act*, R.S.B.C. 1948, c. 16 instead of affording a quick, easy and cheap method of settlement provides one longer, more difficult and more expensive in the elucidation of matters such as these.

> (*Vancouver (City) v. Brandram-Henderson of British Columbia Ltd.* (1959), 18 D.L.R. (2d) 700 (B.C. C.A.), at p. 705, *per* Sidney Smith J.A.)

In short, in the early cases on arbitration, the courts were "very jealous of their jurisdiction" and did not look "with favour upon efforts of the parties to oust it by agreement" (*Rootes*, at p. 304).

94     The best example of this hostility can perhaps be found in this Court's decision in *National Gypsum Co. v. Northern Sales Ltd.* (1963), [1964] S.C.R. 144 (S.C.C.). In an agreement signed in New York, National Gypsum had undertaken that its vessel would travel to Montreal to pick up a load of wheat. The vessel failed to do so, and Northern Sales alleged that, as a result, it was unable to ship wheat it had contracted to deliver. Northern Sales sued for breach of contract. The agreement provided that any disputes were to be resolved by way of arbitration in New York. The issue before the Court was whether the agreement to arbitrate could be enforced under Quebec law.

95     The current provisions of the *CCP* were not in force at the time, and the rules regarding the jurisdiction of the courts in arbitration matters had not been codified. In cases in which the jurisdiction of the courts was challenged, that jurisdiction was defined on the basis of art. 13 of the *Civil Code of Lower Canada*, which provided that "[n]o one can by private agreement, contravene the laws of public order and good morals", and what was then art. 94 of the *CCP*, which governed the place where an action to claim a sum of money could be instituted. The Court endorsed the Quebec jurisprudence on this subject, as established in *Vinette Construction ltée v. Dobrinsky* (1961), [1962] B.R. 62 (Que. Q.B.), and *Gordon and Gotch (Australasia) Ltd. v. Montreal Australia New Zealand Line Ltd.*, (1940), 68 B.R. 428, and held that the undertaking to arbitrate was contrary to public policy.

96     These decisions reflected the view that only courts were capable of granting remedies for legal disputes and that, as a result, any effort by the parties to a dispute to contract in such a way as to oust the courts' jurisdiction was, in itself, contrary to public policy, regardless of the nature of the substantive legal issues in a given case.

97     In *Zodiak International Productions Inc. v. Polish People's Republic*, [1983] 1 S.C.R. 529 (S.C.C.), the Court, in reasons written by Chouinard J., distanced itself from the approach taken in *National Gypsum* and *Vinette* and, in so doing, advanced a more positive view of arbitration. Rather than viewing arbitration as a potential threat to the administration of justice, and therefore contrary to public order, the Court was starting to see that it could be beneficial to the administration of justice.

98     After *National Gypsum*, the Quebec legislature enacted art. 951 of the *CCP*:

> **951.** An undertaking to arbitrate must be set out in writing.

> When the dispute contemplated has arisen, the parties must execute a submission. If one of them refuses, and does not appoint an arbitrator, a judge of the court having jurisdiction makes such appointment and states the objects in dispute, unless the agreement itself otherwise provides.

Chouinard J. found in *Zodiak*  that the effect of enacting art. 951 had been to overtake *Vinette* and *National Gypsum*:

> The prevailing opinion since the coming into effect of the new *Code of Civil Procedure* is that the adoption of art. 951 in its present form sufficed to render the complete undertaking to arbitrate valid. The old *Code of Procedure* was silent as to the undertaking to arbitrate: it was not mentioned. The present situation is accordingly quite different from that prevailing

when *Vinette Construction* (*supra*) and *National Gypsum* (*supra*) were rendered, decisions which some have suggested have become obsolete. [p. 538]

Citing with approval Gagnon J.A. in *Granby (Ville) c. Desourdy Construction Ltée*, [1973] C.A. 971, Chouinard J. concluded that the enactment of art. 951 indicated an intention "to make a step forward" and that "it is the legislature, when it takes a position, who is the final arbiter in the matter" (at p. 542).

99     Recognizing how harmful the hostility shown by the courts might be to the modern development and maturation of arbitration in Canadian law, this Court stressed the value of commercial arbitration as a dispute resolution mechanism once again in *Zittrer c. Sport Maska Inc.*, [1988] 1 S.C.R. 564 (S.C.C.):

> This lack of interest by our courts and academic commentators may be explained by the importance at the time of the debate on the validity of the undertaking to arbitrate, a matter settled by this Court in *Zodiak*, *supra*. This long period of legal uncertainty did nothing to encourage the use of this method of settling disputes. [para. 598]

More recently, the Court again recognized "the existence and legitimacy of the private justice system" of arbitration in *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, 2005 SCC 46, [2005] 2 S.C.R. 401 (S.C.C.), at para. 38.

100     Lower courts across Canada swiftly followed this Court's lead in accepting and endorsing arbitration as a legitimate dispute resolution mechanism, and this shift in attitude clearly took root. The following passage from the reasons of Campbell J. in *Boart Sweden AB v. NYA Stromnes AB* (1988), 41 B.L.R. 295 (Ont. H.C.), is often cited as an example of this shift:

> Public policy carries me to the consideration which I conclude is paramount having regard to the facts of this case, and that is the very strong public policy of this jurisdiction that where parties have agreed by contract that they will have the arbitrators decide their claims, instead of resorting to the Courts, the parties should be held to their contract. [pp. 302-303]

See also, *Automatic Systems Inc. v. Bracknell Corp.* (1994), 12 B.L.R. (2d) 132 (Ont. C.A.), *per* Austin J.A. (international arbitration); *BWV Investments Ltd. v. SaskFerco Products Inc.* (1994), 125 Sask. R. 286 (Sask. C.A.), *per* Gerwing J.A. (international arbitration); *Quintette Coal Ltd. v. Nippon Steel Corp.* (1990), [1991] 1 W.W.R. 219 (B.C. C.A.), *per* Hutcheon J.A., concurring (international arbitration); *Burlington Northern Railroad v. Canadian National Railway* (1995), 59 B.C.A.C. 97 (B.C. C.A.), *per* Cumming J.A., dissenting, whose view was upheld by this Court ([1997] 1 S.C.R. 5 (S.C.C.)) (domestic arbitration); *Condominiums Mont Ste-Sauveur Inc. c. Constructions Serge Sauvé Ltée*, [1990] R.J.Q. 2783 (Que. C.A.), *per* Monet J.A. (domestic arbitration).

101     In the instant case, our colleague's reasons appear to embrace the pre-*Zodiak* undercurrent of hostility towards arbitration. Though Binnie J. does not take issue with our approach to the competence-competence principle, his reading of the relevant provisions of the *BPCPA* exhibits the same reluctance to fully accept arbitration as a legitimate form of dispute resolution that permeated the older jurisprudence. His hostility towards arbitration is now couched as an exercise in statutory interpretation of the *BPCPA*. Although Chouinard J. pointed out in *Zodiak* that the statutory interpretations adopted in *Vinette* and *National Gypsum* were misguided, our colleague's view appears to revive this outdated approach exemplified by the comment of Casey J.A. of the Quebec Court of Appeal in *Vinette*:

> The right to apply to the Courts for relief is one of the cornerstones of our legal system. Its importance cannot be exaggerated nor can any threat to its existence be tolerated .... If this be allowed to happen those who accept the clause today will have it imposed on them tomorrow. For this reason its use is contrary to the public interest: and this is why it offends against art. 13 *C.C.* [pp. 68-69]

Respectfully, Binnie J.'s approach to interpreting the *BPCPA* neglects the broader contextual backdrop in which legislatures and courts have progressively come to encourage the use of alternative dispute resolution, including arbitration.

102     Since *Zodiak*, there is a consistent trend that leads in one direction only: "Canadian courts have indicated their willingness to stay court proceedings in favour of arbitrations where either the domestic or international Acts apply, and will no longer

'jealously guard its jurisdiction against encroachment by arbitration'" (Casey and Mills, at pp. 228-29). See also the comments of L. Yves Fortier in "Delimiting the Spheres of Judicial and Arbitral Power: 'Beware, My Lord, of Jealousy'" (2001), 80 *Can. Bar Rev.* 143, at pp. 143-45. More importantly, the courts have gone from avoiding arbitration, and seeing it as contrary to public order and the proper administration of justice, to embracing it as a legitimate vehicle for fostering access to justice.

103     It is now settled that if a legislature intends to exclude arbitration as a vehicle for resolving a particular category of legal disputes, it must do so explicitly (*Desputeaux*, at para. 42). Arbitration in and of itself is no longer considered contrary to public order, and courts ought not to read in the exclusion of arbitration if the legislature has not clearly provided that it is to be excluded. Yet this is exactly the effect of the approach adopted by Binnie J.

104     In British Columbia, the current approach to arbitration was adopted in 1986 with the enactment of the *Commercial Arbitration Act*, S.B.C. 1986, c. 3 ("1986 *CAA*"). The 1986 *CAA* replaced the *Arbitration Act*, R.S.B.C. 1979, c. 18, which had essentially remained unchanged since 1893. The new legislation was modelled primarily on the recommendations of a 1982 Law Reform Commission of British Columbia *Report on Arbitration* ("LRC Report"). In enacting it, British Columbia took a "leadership role" by being the first common law province to modernize its approach to arbitration (J. K. McEwan and L. B. Herbst, *Commercial Arbitration in Canada: A Guide to Domestic and International Arbitrations* (2009), at p. 1-10). However, the 1986 *CAA* stopped short of adopting the New York Convention and Model Law approaches to recognition and enforcement of arbitral awards that had been gaining prominence on the international stage, particularly the enumerated grounds on which a court could refuse to recognize and refuse to enforce arbitral awards.

105     The 1986 version of s. 15 of the *CAA*, the stay provision, even incorporated the LRC Report's preference for giving the court broad jurisdiction to refuse to grant a stay. Section 15 provided that court proceedings should continue in place of arbitration if the court was satisfied that there was a "good reason" for doing so. "[G]ood reason" was defined expansively, as the court was authorized to consider: whether the matters in dispute were factually or legally complex; the comparative expense and delay associated with the two proceedings; whether other parties were affected by the dispute; and "any other matter the court considers significant".

106     Despite the fact that the LRC Report was based on a broad public consultation, "s. 15 had a rough landing" in British Columbia (C. J. Mingie, *British Columbia Commercial Arbitration — An Annotated Guide* (2004), at p. 37). Court decisions that addressed the issue of the s. 15 stay were inconsistent either with the Act itself or with each other (p. 37). Although this Court had begun to show support for arbitration legislation, the British Columbia courts did not always take a similar approach in considering the 1986 *CAA*.

107     As a result, just two years after the 1986 *CAA* was first enacted, the legislature amended it to limit the power of the courts to intervene where the parties have agreed that a matter should be submitted to arbitration (*Miscellaneous Statutes Amendment Act (No. 2), 1988*, S.B.C. 1988, c. 46). More specifically, the legislature amended s. 15 to more closely reflect the wording of the New York Convention and art. 8 of the Model Law, and thereby limit the grounds upon which a court could refuse to grant a stay of proceedings (see Mingie, at p. 37; *Gulf Canada Resources Ltd./Ressources Gulf Canada Ltée v. Arochem International Ltd.* (1992), 66 B.C.L.R. (2d) 113 (B.C. C.A.), *per* Hinkson J.A.).

108     Masuhara J. in the B.C. Supreme Court below accepted the argument that although the *International Commercial Arbitration Act*, R.S.B.C. 1996, c. 233, was modelled on the New York Convention and the Model Law, the *CAA* was not. And it was partly on this basis that he held that the competence-competence principle, according to which it is the arbitrator who must first consider the existence, validity and scope of the arbitration agreement, does not form part of the domestic arbitration law of British Columbia. The Court of Appeal rejected this argument in *MacKinnon 2009* and in the case at bar, but Ms. Seidel hopes to revive it in this Court.

109     However, it is clear from a review of the current *CAA* that British Columbia's modern commercial arbitration legislation was in fact "influenced in part by the Model Law" (McEwan and Herbst, at p. 1-7, citing *Lawyers' Arbitration Letters: 1980-1989* (1990), at pp. 218-19). This review shows that the legislature intended to incorporate the competence-competence principle into the province's domestic arbitration legislation.

110     Section 15 of the *CAA*, as amended in 1996, provides that a court must, if the parties have agreed that a matter should be submitted to arbitration, stay any legal proceeding brought in respect of that matter:

> 15 (1) If a party to an arbitration agreement commences legal proceedings in a court against another party to the agreement in respect of a matter agreed to be submitted to arbitration, a party to the legal proceedings may apply, before or after entering an appearance and before delivery of any pleadings or taking any other step in the proceedings, to that court to stay the legal proceedings.
>
> (2) In an application under subsection (1), the court must make an order staying the legal proceedings <u>unless it determines that the arbitration agreement is void, inoperative or incapable of being performed</u>.

The language used is virtually identical to that of art. 8 of the Model Law:

> 8. . . .
>
> (1) A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement <u>is null and void, inoperative or incapable of being performed</u>.
>
> (2) Where an action referred to in paragraph (1) of this article has been brought, arbitral proceedings may nevertheless be commenced or continued, and an award may be made, while the issue is pending before the court.

We see no meaningful difference between saying that the court must refer the parties to arbitration and saying that it must order a stay of proceedings.

111     It is true that the *CAA* does not itself include a provision that ousts the jurisdiction of the courts. However, the British Columbia International Commercial Arbitration Centre's *Domestic Commercial Arbitration Rules of Procedure* ("BCICAC Rules") apply, as they have been incorporated by reference (*R. v. Collins*, 2000 BCCA 437, 140 B.C.A.C. 311 (B.C. C.A.); *R. v. St. Lawrence Cement Inc.* (2002), 60 O.R. (3d) 712 (Ont. C.A.); *B.C.G.E.U. v. British Columbia (Minister of Health Services)*, 2007 BCCA 379, 245 B.C.A.C. 39 (B.C. C.A.); P.-A. Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at paras. 286 ff; see also s. 44(*h*) of the *Interpretation Act*, R.S.C. 1985, c. I-21). Section 22(1) of the *CAA* reads as follows:

> **22** (1) Unless the parties to an arbitration otherwise agree, the rules of the British Columbia International Commercial Arbitration Centre for the conduct of domestic commercial arbitrations apply to that arbitration.

Rule 20 of the BCICAC Rules addresses the arbitrator's jurisdiction:

> **20.** [Jurisdiction]
>
> (1) <u>The arbitration tribunal may rule on its own jurisdiction, including ruling on any objections with respect to the existence or validity of the arbitration agreement.</u>
>
> (2) A decision by the arbitration tribunal that the contract is null and void shall not entail the invalidity of the arbitration clause unless specifically found to be so by the arbitration tribunal.
>
> (3) Any objection to the jurisdiction of the arbitration tribunal to consider a claim or counter-claim shall be raised in the statement of defense or statement of defense to counter-claim. ...
>
> (4) A party is not precluded from raising a jurisdictional plea by the fact that it has appointed or participated in the appointment of an arbitrator.

23

112     We observe that the language used in Rule 20 is essentially identical to that of arts. 943, 943.1 and 943.2 of the *CCP* — which were at issue in *Dell* — and of art. 16 of the Model Law:

Article 16. [Competence of arbitral tribunal to rule on its jurisdiction]

(1) The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail *ipso jure* the invalidity of the arbitration clause.

(2) A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than the submission of the statement of defence. A party is not precluded from raising such a plea by the fact that he has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

(3) The arbitral tribunal may rule on a plea referred to in paragraph (2) of this article either as a preliminary question or in an award on the merits. If the arbitral tribunal rules as a preliminary question that it has jurisdiction, any party may request, within thirty days after having received notice of that ruling, the court specified in article 6 to decide the matter, which decision shall be subject to no appeal; while such a request is pending, the arbitral tribunal may continue the arbitral proceedings and make an award.

113     A British Columbia court must grant a stay of proceedings unless it concludes that the arbitration agreement is "void, inoperative or incapable of being performed". However, the fact that a court can rule on its jurisdiction does not mean that it is required to do so. An argument that an arbitration agreement is void, inoperative or incapable of being performed constitutes a direct challenge to the arbitrator's authority to consider and resolve the dispute. In *Dell*, both the majority and the minority had to decide whether the arbitrator or the court should rule first on the validity and applicability of the agreement, and they also discussed, by extension, the type of review the court should conduct to determine whether the agreement is "void, inoperative or incapable of being performed".

114     The majority recognized that there were two schools of thought on this point — one being that the court must rule first on the issue, and the other that the arbitrator should do so — and that the debate was not conclusively resolved by either the New York Convention or the Model Law. However, a consensus was building in the international community that a court should engage in only a *prima facie* analysis and intervene only if the test of manifest nullity was met (*Dell*, at paras. 75-76). From this, a general rule was identified. Challenges to the arbitrator's jurisdiction — namely arguments that an agreement is void, inoperative or incapable of being performed — should be resolved first by the arbitrator. A court should depart from this general rule only if the challenge is based on a question of law, or on questions of mixed fact and law that require only superficial consideration of the documentary evidence in the record, and is not merely a delaying tactic (see *Dell*, at paras. 84-86).

115     This general approach is consistent with the one — developed by the British Columbia Court of Appeal in its 1992 decision in *Gulf Canada* — that many provincial appellate courts were following across Canada before *Dell*. According to the test from *Gulf Canada*, the court was to grant the stay unless it was "clear" that the dispute fell outside the scope of the agreement. If it was "arguable" that the agreement applied to the dispute, the question was to be left to the arbitrator:

Considering s. 8(1) in relation to the provisions of s. 16 and the jurisdiction conferred on the arbitral tribunal, in my opinion, it is not for the court on an application for a stay of proceedings to reach any final determination as to the scope of the arbitration agreement or whether a particular party to the legal proceedings is a party to the arbitration agreement because those are matters within the jurisdiction of the arbitral tribunal. Only where it is clear that the dispute is outside the terms of the arbitration agreement or that a party is not a party to the arbitration agreement or that the application is out of time should the court reach any final determination in respect of such matters on an application for a stay of proceedings.

Where it is arguable that the dispute falls within the terms of the arbitration agreement or where it is arguable that a party to the legal proceedings is a party to the arbitration agreement then, in my view, the stay should be granted and those matters left to be determined by the arbitral tribunal. [paras. 39-40]

116    In *Dalimpex Ltd. v. Janicki* (2003), 64 O.R. (3d) 737 (Ont. C.A.), *per* Charron J.A. (as she then was), the Ontario Court of Appeal endorsed the *Gulf Canada* approach. It concluded that if "it is at least arguable that the disputes ... fall within the scope of the arbitration agreement", the "preferable approach is to leave any definitive pronouncement on the scope of the agreement to be determined by the arbitral tribunal as decision-maker of first instance" (para. 3) (see also, *Dawson (City) v. TSL Contractors Ltd.*, 2003 YKCA 3, 180 B.C.A.C. 205 (Y.T. C.A.), at para. 14). In *Dancap Productions Inc. v. Key Brand Entertainment Inc.*, 2009 ONCA 135, 246 O.A.C. 226 (Ont. C.A.), *per* Sharpe J.A., the Ontario Court of Appeal held that "[i]t is now well-established in Ontario" that a court should grant a stay of proceedings where it is "'arguable' that the dispute falls within the terms of an arbitration agreement" (at para. 32), and that the motion judge had therefore erred in ruling on the scope of the arbitration agreement. See also *Jean Estate v. Wires Jolley LLP*, 2009 ONCA 339, 96 O.R. (3d) 171 (Ont. C.A.), *per* Weiler J.A.; *No. 363 Dynamic Endeavours Inc. v. 34718 B.C. Ltd.* (1993), 81 B.C.L.R. (2d) 359 (B.C. C.A.), *per* Hollinrake J.A.

117    This requirement of deference to the arbitrator's jurisdiction is related directly to the role of the court that must, in considering an application for a stay of proceedings, determine whether the agreement is "void, inoperative or incapable of being performed". Given that the general rule is that arbitrators should be the first to consider challenges to their jurisdiction, the expressions "void", "inoperative" and "incapable of being performed" should be interpreted narrowly. There appears in fact to be a consensus to this effect in the authorities on all three of these criteria. See, e.g., *Kaverit Steel & Crane Ltd. v. Kone Corp.* (1992), 87 D.L.R. (4th) 129 (Alta. C.A.), *per* Kerans J.A. (in which it was held, at p. 138, that an arbitration agreement is not "inoperative" merely because a reference to arbitration might be "inconvenient"); *Mind Star Toys Inc. v. Samsung Co.* (1992), 9 O.R. (3d) 374 (Ont. Gen. Div.) (in which it was held that an arbitration agreement is not null and void merely because a claim of fundamental breach is made); *Scherk v. Alberto-Culver Co.* [417 U.S. 506 (U.S. Ill. 1974)], 417 506, *per* Stewart J. (in which it was held that if the *forum conveniens* test for jurisdiction were to be considered in determining whether an arbitration agreement was valid, it would almost always result in a finding against arbitration); J. Mustill and S. C. Boyd, *The Law and Practice of Commercial Arbitration in England* (2nd ed. 1989), at p. 465) (in which the authors write that "[i]ncapable of being performed" connotes something more than mere difficulty or inconvenience or delay in performing the arbitration); and McEwan and Herbst, at pp. 3-63ff). The British Columbia Court of Appeal even appeared to endorse this view in *MacKinnon 2004* (at para. 36).

118    It is clear that the task of the court responsible for considering whether the agreement is "void, inoperative or incapable of being performed" cannot properly be construed so broadly as to authorize it to determine whether a class action would be a "preferable procedure". Not only would such an approach require a degree of judicial scrutiny inconsistent with the competence-competence principle and with the superficial consideration on the basis of which a court can decide whether to grant a stay of proceedings, but the arbitration agreement would as a result be subject to the whim of the party wanting to avoid its application. More specifically, the word "inoperative" cannot be interpreted so broadly that a mere procedural decision of a party seeking to certify a class proceeding would suffice for that party to avoid the operation of the agreement to arbitrate.

119    In *Dell*, this Court interpreted an express legislative direction that arbitrators are to consider the scope of their own jurisdiction, coupled with the use of language similar to that of the New York Convention and the Model Law, as amounting to incorporation of the competence-competence principle into Quebec law. As the Court concluded in *Dell*, at para. 83, the actual words of the provision in question were not so important as the conclusion that they were based on those of the New York Convention and the Model Law:

Article 940.1 C.C.P. refers only to cases where the arbitration agreement is null. However, since this provision was adopted in the context of the implementation of the New York Covention (the words of which, in art. II(3), are "null and void, inoperative or incapable of being performed"), I do not consider a literal interpretation to be appropriate. It is possible to develop, in a manner consistent with the empirical data from the Quebec case law, a test for reviewing an application

to refer a dispute to arbitration that is faithful to art. 943 C.C.P. and to the *prima facie* analysis test that is increasingly gaining acceptance around the world.

Courts should therefore be mindful to avoid an interpretation that makes it possible to sidestep the competence-competence principle and turns the Convention's "inoperative" exception into a back door for a party wanting to "escape" the agreement.

120    In considering a statutory provision containing the language contemplated by *Dell* and based on that of the New York Convention and the Model Law, the British Columbia Court of Appeal accepted and endorsed the modern approach according to which arbitration is accepted in commercial matters. It recognized that the competence-competence principle is part of the province's law. It did not err in doing so.

121    Therefore, absent a challenge to the arbitrator's jurisdiction based solely on a question of law or on one of mixed fact and law requiring only superficial consideration of the evidence in the record, the existence or validity of an arbitration agreement to which the *CAA* applies must be considered first by the arbitrator. The court should grant the stay.

### D. British Columbia Business Practices and Consumer Protection Act

122    Because Ms. Seidel argues in part that the effect of the arbitration clause is to deny her the ability to exercise her rights under the *BPCPA*, it is important to discuss in some detail the rights and procedures provided for in that Act.

123    The purpose of consumer protection legislation like the *BPCPA* is to protect consumers from losses suffered when they purchase goods and services that do not meet existing standards. Thus, the *BPCPA* applies to a "consumer" — an individual, whether in British Columbia or not — who participates in a "consumer transaction". The term "consumer transaction" is defined as follows:

> **1** . . .
>
>> (a) a supply of goods or services or real property by a supplier to a consumer for purposes that are primarily personal, family or household, or
>>
>> (b) a solicitation, offer, advertisement or promotion by a supplier with respect to a transaction referred to in paragraph (a).

A "supplier" is "a person, whether in British Columbia or not, who in the course of business participates in a consumer transaction" either by supplying goods or services, or by soliciting, offering, advertising or promoting the supply of goods or services. The definition of "supplier" applies regardless of whether any privity of contract exists between the supplier and the consumer. See, generally, s. 1(1) of the *BPCPA*.

124    The provision of mobile phone services for personal use clearly falls within the definition of "consumer transaction", and Ms. Seidel and TELUS clearly fit the statutory definitions of "consumer" and "supplier", respectively.

125    Ms. Seidel alleges that TELUS, by unlawfully charging for the time after a cellular phone connects with the TELUS network but before the recipient answers the call, has breached its obligations under the *BPCPA*. More specifically, Ms. Seidel alleges breach of contract, and deceptive and/or unconscionable practices. The *BPCPA* defines a "deceptive act or practice", in the context of a consumer transaction, as "an oral, written, visual, descriptive or other representation by a supplier" (s. 4(1)(a)) or "any conduct by a supplier" "that has the capability, tendency or effect of deceiving or misleading a consumer or guarantor" (s. 4(1)(b)). Subsection 4(3) provides specific examples — without limiting the generality of s. 4(1) — of what constitutes a deceptive act or practice, which "may occur before, during or after the consumer transaction" (s. 4(2)).

126    Section 8 of the *BPCPA* also provides that an "unconscionable act or practice by a supplier may occur before, during or after the consumer transaction" (s. 8(1)), and that in determining whether an act or a practice is unconscionable, a court must consider "all of the surrounding circumstances of which the supplier knew or ought to have known" (s. 8(2)). Section

8(3) contains a list — again without limiting the generality of s. 8(2) — of specific circumstances that must be considered in this regard.

127    In the event that a supplier contravenes the *BPCPA*, a number of avenues of redress are available. First, s. 189 creates an offence, for which any person who contravenes the provisions listed in the section can be prosecuted. An individual convicted under s. 189 is liable to a fine of not more than $10,000, to imprisonment for not more than 12 months, or to both. A corporation convicted under s. 189 is liable to a fine of up to $100,000. See, generally, the penalties provided for in s. 190.

128    Second, in the event of a contravention, the Act authorizes a consumer to bring an action for compensatory damages:

[Damages Recoverable]

171 (1) Subject to subsection (2), if a person, other than a person referred to in paragraphs (a) to (e), has suffered damage or loss due to a contravention of this Act or the regulations, the person who suffered damage or loss may bring an action against a

(a) supplier,

. . . . .

who engaged in or acquiesced in the contravention that caused the damage or loss.

(2) A person must not bring an action under this section if an application has been made, on the person's behalf, to the court in respect of the same defendant and transaction under section 192.

(3) The Provincial Court has jurisdiction for the purposes of this section, even though a contravention of this Act or the regulations may also constitute a libel or slander.

We note, however, that because a person convicted of an offence may already be required to compensate an aggrieved consumer for pecuniary losses pursuant to s. 192, s. 171(2) operates to prevent double recovery.

129    The *BPCPA* also provides for declaratory and injunctive relief:

[Court actions respecting consumer transactions]

172 (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court for one or both of the following:

(a) a declaration that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;

(b) an interim or permanent injunction restraining a supplier from contravening this Act or the regulations.

(2) If the director brings an action under subsection (1), the director may sue on the director's own behalf and, at the director's option, on behalf of consumers generally or a designated class of consumers.

We emphasize that the relief available under s. 172(1) is not restricted to consumers directly affected by a particular consumer transaction.

130    If relief is granted under s. 172(1), s. 172(3) authorizes the following remedial orders:

(a) that the supplier restore to any person any money or other property or thing, in which the person has an interest, that may have been acquired because of a contravention of this Act or the regulations;

(b) if the action is brought by the director, that the supplier pay to the director the actual costs, or a reasonable proportion of the costs, of the inspection of the supplier conducted under this Act;

(c) that the supplier advertise to the public in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section.

131     Moreover, by virtue of s. 3, rights under the Act, and remedies for the violation of those rights, cannot be waived, through an arbitration clause or otherwise:

**3** Any waiver or release by a person of the person's rights, benefits or protections under this Act is void except to the extent that the waiver or release is expressly permitted by this Act.

132     The final aspect of the *BPCPA* that we must discuss is the nature of the action provided for in s. 172(1). Subsection 172(1) authorizes the director to bring an action for declaratory or injunctive relief, but it also authorizes any person other than a supplier to do so. In this sense, s. 172(1) creates a representative action. In the case of an action brought by the director, any ambiguity in this respect is removed by 172(2). As for an action brought by a person other than the director, the fact that the person need not have been affected by the consumer transaction, together with the potentially representative nature of the available remedies — declaratory and injunctive relief — makes his or her representative capacity just as evident.

133     The director is entitled to notice — by service of a copy of the writ of summons or notice of claim — of any action brought under either s. 171 or s. 172 (s. 173(1)). Upon being served, the director may apply to intervene in the action as a party, on any terms or conditions the court considers just (s. 173(2)). Since the scope of s. 172 and the conditions for applying it were not discussed in the courts below, the record does not reveal whether the director was in fact served with a notice of claim.

134     Having outlined the statutory schemes governing arbitration and consumer protection in British Columbia, we will now review the types of proceedings at issue in this appeal.

### E. Nature of the Class Action

135     This Court has endorsed the class action as a means of facilitating access to justice, promoting efficiency in and reducing costs associated with civil litigation, and deterring or modifying dangerous or risky behaviour (see e.g. *Western Canadian Shopping Centres Inc. v. Dutton*, 2001 SCC 46, [2001] 2 S.C.R. 534 (S.C.C.), at para. 28; *Hollick v. Metropolitan Toronto (Municipality)*, 2001 SCC 68, [2001] 3 S.C.R. 158 (S.C.C.), at para. 15; *Bisaillon*, at para. 16). The class action therefore has "a significant social and legal role" in Canadian law (*Marcotte c. Longueuil (Ville)*, 2009 SCC 43, [2009] 3 S.C.R. 65 (S.C.C.), at para. 43).

136     However, since a class action is only a way to group together a number of individual claims, it concerns the procedure for bringing an action. As this Court has put it, the certification of a class action confers a procedural right. It does not change either the substantive law or the substantive rights of the parties. A proposed class action "cannot serve as a basis for legal proceedings if the various claims it covers, taken individually, would not do so" (*Bisaillon*, at para. 17). The majority in *Bisaillon* explained how the procedural nature of a class action affects the jurisdiction of a court:

In short, the class action procedure cannot have the effect of conferring jurisdiction on the Superior Court over a group of cases that would otherwise fall within the subject-matter jurisdiction of another court or tribunal. Except as provided for by law, this procedure does not alter the jurisdiction of courts and tribunals. Nor does it create new substantive rights. [para. 22]

See also, the reasons of both the majority and the dissenting judges in *Dell* (paras. 105-106, 108 and 224), and of the dissenting judges in *Marcotte*, at para. 125, citing *Bisaillon* and *Dell*.

137     It bears repeating that an arbitration clause has always been understood as going to the court's jurisdiction to hear a claim. As we saw in our review of the historical development of arbitration, agreements to arbitrate were once seen to be contrary to

public order on the basis that they constituted an improper attempt to oust the jurisdiction of the courts. Arbitration clauses are no longer seen to be contrary to public order, but the fact remains that they constitute a jurisdictional choice made by the parties to the agreement. Indeed, in *Dell*, both the majority and the minority considered an agreement to arbitrate to constitute such a choice. The minority characterized this choice in favour of arbitration as conveying a substantive contractual right (at para. 160). See also, *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate* (2005), 2 B.L.R. (4th) 151 (Ont. S.C.J.), at para. 9, affirmed both by the Court of Appeal ((2006), 80 O.R. (3d) 533 (Ont. C.A.)), and by this Court ( 2007 SCC 55, [2007] 3 S.C.R. 679 (S.C.C.), *per* McLachlin C.J.), although neither commented on this legal principle.

138    The dissenting judges in *Dell* emphasized "that jurisdiction over the individual actions that form the basis of a class action is a prerequisite to the exercise of jurisdiction over the proceedings". They added that there is "no question that, if the arbitration agreement is valid and relates to the dispute, the Superior Court has no jurisdiction to hear the case and must refer the parties to arbitration" (para. 150). The substantive right to arbitration created in the agreement effectively ousts the jurisdiction of a superior court to hear the case as a court action. Therefore, merely commencing a class action cannot vest the court with jurisdiction that it would not otherwise have over the individual claims of members of the proposed class.

### F. Impact of the CAA on the Procedural Right Being Claimed and on the Validity of the Waiver

139    As we concluded above, the competence-competence principle forms part of the domestic arbitration law of British Columbia. Absent a challenge to the arbitrator's jurisdiction based on a question of law or on a mixed question of law and fact that requires only superficial consideration of the evidence in the record, the arbitrator has jurisdiction to entertain, in the first instance, a challenge to the existence, validity and scope of an arbitration agreement.

140    As we also mentioned, where, because of an arbitration agreement, a court would not have jurisdiction over a dispute, that jurisdiction cannot be conferred on it by commencing a class proceeding. This Court has made it clear that arbitration, as a legitimate private dispute resolution mechanism, applies to all kinds of disputes, except where the legislature has expressly provided that it intends to remove the subject matter from the reach of arbitration legislation. In British Columbia, no such explicit legislative direction has been enacted, and consumer disputes may be resolved by way of arbitration.

141    Ms. Seidel nevertheless argues that an arbitrator lacks the jurisdiction to grant either of the specific remedies contemplated in s. 172 of the *BPCPA*: a declaration (s. 172(1)(a)), or an interim or permanent injunction (s. 172(1)(b)). She submits that these remedies can be granted only by the British Columbia Supreme Court and, therefore, that s. 172(1) itself creates a substantive right to have a dispute resolved in the public court system. As a result, the agreement to submit this dispute to arbitration constitutes a waiver — in violation of s. 3 of the *BPCPA* — of the substantive right to those particular remedies. In effect, Ms. Seidel argues that the prospective arbitrator lacks jurisdiction to grant the remedy being sought and therefore lacks jurisdiction over the subject matter of her claim. (See, e.g., *Bisaillon*, at para. 29.) This argument raises a question of law which, pursuant to the exception in *Dell*, may be considered in the first instance by a court rather than the arbitrator. In light of ss. 171 and 172 and of the powers conferred on arbitrators in British Columbia, we are of the view that the legislature has not barred the submission of such claims to arbitration.

142    Ms. Seidel's argument is grounded in s. 3 of the *BPCPA*, which provides that any waiver of rights, benefits or protections under that Act is void. The real question here is whether the identification in s. 172(1) of the Supreme Court as the forum where an action may be brought constitutes a right, benefit or protection that cannot — by virtue of s. 3 — be waived. To answer this question, it must be determined, as a matter of law, what rights, benefits and protections are found in 172. In other words, when s. 3 operates to prevent a waiver of rights, benefits or protections, does it apply only to the remedy sought by the claimant or does it also encompass the choice of the forum in which the remedy can be obtained? In answering this question of law, we are of the view that means are just a way to attain an end. The remedy is the end, and the same remedies, and perhaps others as well, can be obtained through the arbitration process as they can through the public court system. The remedy sought by a claimant under s. 172 is a declaration or an injunction. Either an arbitrator or a court can adjudicate a monetary claim under s. 171. What is important here is that the adjudicator has jurisdiction to make a declaration or order an injunction, which are the same remedies as are contemplated in s. 172.

143    These comments foreshadow our views on the question whether arbitrators lack the specific jurisdiction to grant the declaratory relief and order the interim or permanent injunctions contemplated in ss. 172(1)(a) and (b), and to grant the ancillary remedies provided for in s. 172(3). If they do not have authority to do this, then to the extent that Ms. Seidel's claims include a request for declaratory and injunctive relief, the agreement to arbitrate would constitute a waiver contrary to s. 3 of the *BPCPA*, because recourse to arbitration would result in the loss of a right, benefit or protection within the meaning of s. 3 of the *BPCPA*.

144    In adjudicating disputes that are submitted to them, arbitrators are required to apply the law. Section 23 of the *CAA* provides:

> **23** An arbitrator must adjudicate the matter before the arbitrator by reference to law unless the parties, as a term of an agreement referred to in section 35, agree that the matter in dispute may be decided on equitable grounds, grounds of conscience or some other basis.

Similarly, rule 33 of the BCICAC Rules provides:

> **33.** An arbitration tribunal shall decide the dispute in accordance with the law unless the parties agree in writing in accordance with section 23 of the *Commercial Arbitration Act* that the matter in dispute may be decided on equitable grounds, grounds of conscience or some other basis.

145    Arbitrators exercising their jurisdiction under arbitration legislation are generally understood, provided that the arbitration agreement is broadly drafted, to have "jurisdiction to make any award a court could make, whether sounding in contract, tort, equity or by statute" (Casey and Mills, at p. 151).

146    But the British Columbia legislation goes further, as it explicitly grants arbitrators broad remedial powers. As we noted above, s. 22 of the *CAA* provides that, unless the parties agree otherwise, the BCICAC Rules apply to all arbitrations conducted under that Act. Rule 29 of the BCICAC Rules addresses the arbitrator's remedial jurisdiction:

> **29.** [General Powers of the Arbitration Tribunal]
>
> (1) Without limiting the generality of Rule 19 or any other Rule which confers jurisdiction or powers on the arbitration tribunal, and unless the parties at any time agree otherwise, the tribunal may:
>
> (a) order an adjournment of the proceedings from time to time;
>
> (b) make a partial award;
>
> (c) make an interim order or award on any matter with respect to which it may make a final award, including an order for costs, or any order for the protection or preservation of property that is the subject matter of the dispute;
>
> (d) order inspection of documents, exhibits or other property, including a view or physical inspection of property;
>
> (e) order the recording of any oral hearing;
>
> (f) at any time extend or abridge a period of time fixed or determined by it, or any period of time required in these Rules;
>
> (g) empower one member of the arbitration tribunal to make interim and other orders, including settling of matters at the pre-hearing meeting, that do not deal with the issues in dispute;
>
> (h) order any party to provide security for the legal or other costs of any other party by way of a deposit or bank guarantee or in any other manner the arbitration tribunal thinks fit;
>
> (i) order any party to provide security for all or part of any amount in dispute in the arbitration;

(j) order that any party or witness shall be examined on oath or affirmation, and may for that purpose administer any necessary oath or take any necessary affirmation;

(k) make an award ordering specific performance, rectification, injunctions and other equitable remedies.

147     In *Automatic Systems Inc.* and in *Wires Jolley*, the Ontario Court of Appeal drew a helpful distinction between the designation, at the procedural level, of a particular forum and the substantive protections provided by a particular legislative scheme. So long as the choice of a particular forum does not result in a loss of the substantive right to a remedy provided for in the legislation, the dispute can properly be resolved in the designated forum.

148     An arbitrator deriving his or her authority from the *CAA*, and by extension from the BCICAC Rules, also has broad remedial powers. Rule 29(1)(k) specifically authorizes the arbitrator to order "injunctions and other equitable remedies". The arbitrator can therefore, unless the parties have agreed otherwise, grant the declaratory and injunctive relief sought by Ms. Seidel under ss. 172(1)(a) and (b) of the *BPCPA*.

149     Our colleague argues that in the consumer context, the principles of access to justice require a public form of relief that is not limited to the parties to the consumer transaction in issue, and also require that the claims themselves be adjudicated in only one public forum: the courts. We would respond to this argument by observing that access to justice is protected both by the broad powers given to arbitrators and by the representative action provided for in the *BPCPA*.

150     Although third party consumers benefitting from a declaration or injunction issued by an arbitrator against TELUS would not be bound by the arbitrator's order, TELUS would be bound by it. Since no undertaking is sought from third party consumers, there is no detriment to them in an order that is not binding on them. The arbitrator has the authority to order the relief being sought as it relates to Ms. Seidel's claim against TELUS. Ms. Seidel and TELUS are both parties to the arbitration agreement.

151     Our colleague emphasizes the fact that the arbitration proceedings themselves take place in a private and confidential setting. However, what Ms. Seidel seeks is a result. There is no requirement that the arbitral award itself, which would incorporate the remedy she seeks, be private and confidential. First, a party is always free to submit an arbitral award to the court for enforcement pursuant to s. 29 of the *CAA*:

> **29** With leave of the court, an award may be enforced in the same manner as a judgment or order of the court to the same effect, and judgment may be entered in the terms of the award.

The procedure for enforcing an award is provided for in the arbitration clause agreed to by the parties to this dispute, which reads, in part, that "[e]ither party may commence court proceedings to enforce the arbitration result when an arbitration decision shall have been rendered and thirty (30) days have passed from the date of such decision."

152     Second, we reiterate that arbitrators who derive their authority from the *CAA* have broad remedial powers at their disposal, including the authority to grant "injunctions and other equitable remedies" (R. 29(1)(k), BCICAC Rules). They also must apply the law (s. 23, *CAA*; R. 33, BCICAC Rules). There is nothing in the record that would suggest that they cannot issue the same kind of injunctive relief as is contemplated in s. 172(1)(b) of the *BPCPA*. Therefore, an arbitrator could order a supplier, in this case TELUS, to advertise the particulars of any order or award granted against it to the public at large (s. 172(3)(c)). An order that the supplier do so would fulfill the public purpose that our colleague considers to be necessary if the broader goals of the *BPCPA* are to be attained. Given their broad remedial powers, arbitrators are authorized to grant this very public remedy.

153     This brings us to another aspect of the question: Does the reference in 172 to the British Columbia Supreme Court as the forum in which claims *may* be brought show that the legislature intended to confer exclusive jurisdiction on that court to adjudicate claims under the *BPCPA*? In our view, in light of the context, the words of the provision, and the authorities, this question must be answered in the negative.

154     Section 171, as we saw above, mainly concerns the recovery of damages. Our colleague Binnie J. agrees that the general rules for jurisdiction apply to such claims and that they can validly be adjudicated in the first instance by an arbitrator. Section

171 is relevant because it refers specifically to the Provincial Court, providing that that court has jurisdiction even though the contravention of the *BPCPA* may also constitute a libel and slander, which is a matter over which it would not otherwise have jurisdiction (see, for the general rules: *Supreme Court Act*, R.S.B.C. 1996, c. 443, s. 15; *Provincial Court Act*, R.S.B.C. 1996, c. 379; *Small Claims Act*, R.S.B.C. 1996, c. 430, s. 3). This can be compared with the reference in s. 172 to the British Columbia Supreme Court. There is no departure from the general rules in s. 172, and its purpose is to clarify that the Supreme Court, not the Provincial Court, may grant declaratory and injunctive relief. This reference does not, on its own, indicate that the Supreme Court's jurisdiction over the remedies provided for in s. 172 is exclusive. The use of the word "may" makes it even clearer that the Supreme Court is not intended to be the only forum in which these remedies can be sought. Here once again is the text of s. 172(1):

> **172** (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under the Act or is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court for one or both of the following:
>
>> (a) a declaration that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;
>>
>> (b) an interim or permanent injunction restraining a supplier from contravening this Act or the regulations.

155    Confirmation of this interpretation respecting jurisdiction can be found in cases concerning similar references to superior or statutory courts in the context of arbitration clauses. The argument made by Ms. Seidel was in fact raised in *Desputeaux*. In that case, the Court was asked to determine, *inter alia*, whether an agreement to refer a dispute over copyright to arbitration was enforceable in light of s. 37 of the *Copyright Act*, R.S.C. 1985, c. C-42, which read as follows:

> **37** The Federal Court has concurrent jurisdiction with provincial courts to hear and determine all proceedings, other than the prosecution of offences under section 42 and 43, for the enforcement of a provision of this Act or of the civil remedies provided by this Act.

It was argued that the effect of s. 37 was to prevent disputes under the *Copyright Act* from being heard and resolved in any forum other than a court — either the Federal Court or the Quebec Superior Court in that case.

156    This Court disagreed, concluding that the purpose of s. 37 was merely to designate a forum:

> The purpose of enacting a provision like s. 37 of the *Copyright Act* is to define the jurisdiction *ratione materiae* of the courts over a matter. It is not intended to exclude arbitration. It merely identifies the court which, within the judicial system, will have jurisdiction to hear cases involving a particular subject matter. It cannot be assumed to exclude arbitral jurisdiction unless it expressly so states. Arbitral jurisdiction is now part of the justice system of Quebec, and subject to the arrangements made by Quebec pursuant to its constitutional powers. [para. 42]

157    The Ontario Court of Appeal applied and elaborated upon *Desputeaux* in *Wires Jolley* , in which the issue was whether s. 23 of the *Solicitors Act*, R.S.O. 1990, c. S.15, conferred exclusive jurisdiction on the Superior Court of Justice. Section 23 provided:

> **23** No action shall be brought upon any such agreement, but every question respecting the validity or effect of it may be examined and determined, and it may be enforced or set aside without action on the application of any person who is a party to the agreement or who is or is alleged to be liable to pay or who is or claims to be entitled to be paid the costs, fees, charges or disbursements, in respect of which the agreement is made, by the court, not being the Small Claims Court, in which the business or any part of it was done or a judge thereof, or, if the business was not done in any court, by the Superior Court of Justice.

Applying *Desputeaux*, the Ontario Court of Appeal concluded that s. 23 was simply a forum designation provision:

[S]imply because the *Solicitors Act* refers to a Superior Court judge as having the jurisdiction to protect clients' rights, this does not mean that disputes arising between a solicitor and a client may not be submitted to arbitration. The Act simply identifies the person within the judicial system empowered to make a decision. The right to have an independent decision maker who can interpret the agreement and make a decision respecting a contingency fee dispute is preserved through arbitration and hence the public policy of the Act, the provision of a forum for legitimate dispute resolution, is not undermined. [para. 73]

Satisfied that the statutory rights going to the merits of the dispute would not be affected by the enforcement of the arbitration clause, the court held that the dispute could properly be submitted to arbitration.

158       This approach to determining whether a dispute can be submitted to arbitration rather than having a court resolve it appears to have existed before *Desputeaux*. For example, in *Automatic Systems*, the issue before the Ontario Court of Appeal was whether a construction lien claim could be resolved by arbitration, as stipulated in an agreement that was subject to legislation respecting international arbitrations. Austin J.A. considered whether the lien claimant would lose any right if the dispute was submitted to arbitration. He concluded that it was not apparent that the party seeking to resist arbitration "will lose any right it presently has" (para. 17).

159       In the instant case, s. 172(1) of the *BPCPA* designates the British Columbia Supreme Court as a forum in which an action *may* be brought. It is not nearly specific enough to indicate that the legislature intended to exclude arbitration as a mechanism for resolving disputes concerning claims under the *BPCPA*. The conclusion of the Ontario Court of Appeal in *Wires Jolley*  with respect to s. 23 of the *Solicitors Act* — that it identifies the person within the judicial system empowered to make a decision — also applies here to s. 172(1) of the *BPCPA*. Subsection 172(1) identifies the appropriate forum in the judicial system, but it does not exclude the jurisdiction of other fora, such as an arbitral tribunal.

160       We endorse the view that a clear statement of legislative intent is necessary for a court to conclude that a particular category of disputes cannot be submitted to arbitration. To hold otherwise would be to revert to the former judicial hostility towards arbitration, and to the pre-*Zodiak* view that there is a right to bring an action in the public court system that cannot be waived. Despite his assertion that "[a]bsent legislative intervention, the courts will generally give effect to the terms of a commercial contract freely entered into, even a contract of adhesion, including an arbitration clause" (at para. 2), we see our colleague Binnie J.'s reasons as an example of such a reversion.

161       The facts that the *BPCPA* addresses a public purpose and that it designates the Supreme Court as a forum for declaratory or injunctive relief in pursuit of that purpose are not nearly sufficient for us to conclude that s. 172 "constitutes a legislative override of the parties' freedom to choose arbitration" (reasons of Binnie J., at para. 40). We agree with our colleague that the legislature is free to rely on the initiative of private litigants to achieve the public purpose of remedying breaches of the *BPCPA* and that in these times of budgetary constraints it may not have much choice. By enacting s. 172, the legislature provided a means not only to have claims dealt with by the director or any person, both of whom seek orders on behalf of consumers, but also to have the arbitration rules apply. In doing so, it provided a way to use the private dispute resolution system to obtain the same declaratory or injunctive relief against a supplier as can be obtained by means of a class action. Access to justice can only be enhanced by this approach.

162       Finally, we note that our colleague's approach would result in bifurcated proceedings. He concludes that the arbitration clause applies to Ms. Seidel's claim for damages under either the common law or s. 171 of the *BPCPA*, but that her claims for declaratory and injunctive relief under s. 172(1) fall within the jurisdiction of the British Columbia Supreme Court. We question whether the additional time and costs inherent in bifurcated claims — and particularly claims split between two different fora — are likely to facilitate access to justice in this context.

163       Even if there was any doubt that the arbitration clause ousted the jurisdiction of the British Columbia Supreme Court, an action in which declaratory or injunctive relief is sought under s. 172(1) of the *BPCPA* together with ancillary relief under s. 172(3), could hardly satisfy the "preferable procedure" requirement under 4(1)(d) of the *CPA* for certifying the action as a class

proceeding. In *Marcotte*, the majority of this Court concluded that to authorize a class action for an action in nullity would serve no purpose, because "[a]n individual action of nullity could have resulted in a declaration in nullity that would have applied in respect of all citizens and ratepayers of the municipality" (para. 27). In other words, a declaration of nullity is an *in rem* remedy. This argument applies with equal force to the effect of declaratory or injunctive relief granted under the *BPCPA*. Since the director or any person can act as a claimant, a class proceeding in which declaratory or injunctive relief is sought could never satisfy the "preferable procedure" requirement under the *CPA*. This is because an individual action for such relief can, in addition to applying to the supplier, have the same effect as an action *in rem* in respect of all consumers in the province who might have the same claim. Moreover, s. 41 of the *CPA* would prevent certification as a class proceeding of a representative action such as this. Therefore, any argument based on the view that access to justice requires claims based on s. 172 of the *BPCPA* to be made by way of a class proceeding is without merit. Access to justice is fully preserved by arbitration, and there is no need to resort to a class proceeding to so preserve that access.

164     An arbitrator can grant the remedies contemplated in s. 172 of the *BPCPA* against TELUS. The arbitration agreement between Ms. Seidel and TELUS does not therefore constitute an improper waiver of Ms. Seidel's rights, benefits or protections for the purposes of s. 3 of that Act. Consequently, the *BPCPA*, in its current form, does not provide a court considering a stay application under s. 15 of the *CAA* with a reason for refusing to grant it. Section 3 of the *BPCPA* does not prohibit agreements under which consumer disputes are to be submitted to arbitration or that otherwise limit the possibility of having a proceeding certified as a class proceeding, since s. 172 of the *BPCPA* merely identifies the procedural forum in which an action with respect to the rights, benefits and protections provided for in s. 172 may be brought in the public court system. However, s. 172 does not explicitly exclude alternate fora, such as an arbitration tribunal from acquiring jurisdiction.

165     Nevertheless, Ms. Seidel raises a number of policy considerations that, in her opinion, preclude a finding that arbitration agreements can apply to consumer disputes. These include the following: (1) arbitration clauses in consumer contracts are a means of denying consumers access to justice; (2) some courts, mostly American, have concluded that arbitration clauses in consumer agreements are unconscionable, particularly when coupled with a waiver of class proceeding rights; (3) arbitration agreements in consumer contracts have the effect of inhibiting the development of the common law in this area; and (4) arbitration clauses in consumer agreements have the effect of negating the behaviour modification objective of class proceedings (see A.F., at para. 88).

166     These same concerns have been raised by certain commentators. See, for example, H. Bromfield, "The Denial of Relief: The Enforcement of Class Action Waivers in Arbitration Agreements" (2009), 43 *U.C. Davis L. Rev.* 315; J. R. Sternlight and E. J. Jensen, "Using Arbitration to Eliminate Consumer Class Actions: Efficient Business Practice or Unconscionable Abuse?" (2004), 67 *Law & Contemp. Probs.* 75; J. M. Glover, "Beyond Unconscionability: Class Action Waivers and Mandatory Arbitration Agreements" (2006), 59 *Vand. L. Rev.* 1735; G. Saumier, "Consumer Arbitration in the Evolving Canadian Landscape" (2008-2009), 113 *Penn. St. L. Rev.* 1203.

167     However, the belief that arbitration clauses in consumer agreements have the effect of preventing or denying access to justice is not unanimous. See, for example, A. D. Little, "Canadian Arbitration Law After *Dell*" (2007), 45 *Can. Bus. L.J.* 356, at pp. 378-79. And none of the discussions of jurisdiction have concerned situations in which the arbitrator's powers are as broad as in British Columbia.

168     We cannot agree with Ms. Seidel's argument that to have the dispute resolved by arbitration would negate the behaviour modification objective of the class proceeding. As we noted above, the parties have agreed in their contract that any arbitration award, which would include any declaratory or injunctive relief granted by the arbitrator, can be enforced by a court. Section 15 of the *CAA* empowers the court to do so upon granting leave. Moreover, as we mentioned above, the arbitrator would be free to grant the ancillary remedy provided for in s. 172(3)(c): to compel TELUS to advertise the particulars of any order or judgment issued against it to the public at large. Consequently, the potential for modifying TELUS's behaviour would not be negated by having this dispute resolved by arbitration.

169     This Court has held that standard-form contracts or contracts of adhesion are valid and enforceable. While we acknowledge that the arbitration clauses applicable to consumer disputes that are included in standard-form contracts may be

more problematic from a public policy standpoint, they are not *per se* invalid on the ground that they are contrary to public policy (see, e.g., *Dell*, at para. 228). Nor are they inherently unfair to consumers. To accept this argument, as our colleague Binnie J. implicitly appears to do, would be to return to the former view that arbitration is, in itself, contrary to public policy. Moreover, it would constitute a departure from the *ratio* of *Dell*.

170     As we mentioned above, this hostility to arbitration is no longer the norm, and the change in attitude was assisted in large part by legislative action. As the Court stated in *Desputeaux*, for example, the purpose of clarifying the meaning of "public order" in the arbitration context "was clearly to put an end to an earlier tendency by the courts to exclude any matter relating to public order from arbitral jurisdiction" (para. 53).

171     The courts have endorsed the view that for the purpose of determining whether a particular category of disputes can be submitted to arbitration, "public policy" does not require recourse to a different forum so long as the arbitration is conducted in accordance with the statutory regime. For example, in *Jean Estate v. Wires Jolley LLP*, 2009 ONCA 339, 96 O.R. (3d) 171 (Ont. C.A.), in which the legislature had not expressly excluded arbitration, the Ontario Court of Appeal rejected the application judge's conclusion that the relationship between members of the legal profession — who have a professional monopoly — and a vulnerable public must, as a matter of public policy, be resolved by the courts.

172     Furthermore, whether an arbitration clause in a consumer contract is unfair or unconscionable must always be determined on a case-by-case basis in light of the relevant facts. This Court has in fact acknowledged that, "under certain circumstances, arbitration may actually be an appropriate or preferable forum for the adjudication of consumer disputes" (*Dell*, at para. 223, *per* Bastarache and LeBel JJ., dissenting, but not on this point). Ms. Seidel nevertheless urges the Court to follow the decisions of a number of American courts, which have held that pre-dispute arbitration agreements, particularly when coupled with a class action waiver, are void by virtue of the unconscionability doctrine in contract law (see, e.g., *Ting v. AT & T*, 319 F.3d 1126 (U.S. C.A. 9th Cir. 2003); *Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862 (U.S. Cal. Ct. App. 4 Dist. 2002)). In Canada, an approach to this issue based on the unconscionability doctrine has not been adopted, however, and this Court has accepted the reality of standard form contracts in the consumer context. The courts have instead left the question whether arbitration is appropriate for particular categories of disputes to the discretion of the legislatures.

173     It is important to bear in mind that the British Columbia legislature remains free to address any unfairness or harshness that might be perceived to be the result of the inclusion of arbitration clauses in consumer contracts. In fact, the Court's decision in *Dell* is no longer relevant in the consumer context in Quebec, as the Quebec legislature had already amended the *Consumer Protection Act*, R.S.Q. c. P-40.1, before *Dell* was even argued (see, e.g., *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts*, S.Q. 2006, c. 56, s. 2). Those amendments were about to come into force at the time *Dell* was heard.

174     Ontario and Alberta have also seen fit to amend their consumer protection legislation to prohibit both waivers of class proceedings and arbitration clauses in agreements to which their consumer protection legislation applies (see, e.g., *Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sch. A, ss. 7(1), 7(5), 8(1) and 8(4); *Fair Trading Act*, R.S.A. 2000, c. F-2, s. 16: which states an action may not be commenced or maintained where the consumer has agreed in writing to submit the dispute to arbitration, and the arbitration agreement has been approved by the Minister). More importantly, these legislative choices too were made well before the Court heard and decided *Dell* and *Rogers Wireless*.

175     Thus, even before *Dell*, there was evidence of a trend in certain provinces to prohibit arbitration and class action waivers in the consumer context. This is a choice for the legislatures, not for the courts. The British Columbia legislature made a choice both by incorporating the provisions of the New York Convention and the Model Law and by refraining from enacting provisions expressly limiting arbitration clauses and waivers of class proceedings in the consumer context. It also made another choice: to confer broad remedial jurisdiction on arbitrators. These choices are ones to which this Court must defer. None of Ms. Seidel's policy concerns suffice to overcome this reality.

**IV. Disposition**

176     For these reasons, we would dismiss the appeal. The parties should bear their own costs.

*Appeal allowed in part.*

*Pourvoi accueilli en partie.*

Footnotes

\*          A corrigendum issued by the court on March 31, 2011 has been incorporated herein.

**EXHIBIT EN-15**

**TO THE DECLARATION OF EVAN NUTTALL**

2021 SCC 22, 2021 CSC 22

Supreme Court of Canada

Ethiopian Orthodox Tewahedo Church of Canada St. Mary Cathedral v. Aga

2021 CarswellOnt 7243, 2021 CarswellOnt 7244, 2021 SCC 22, 2021 CSC 22, [2021] S.C.J. No. 22, 15 B.L.R. (6th) 1, 163 O.R. (3d) 719 (note), 330 A.C.W.S. (3d) 668, 459 D.L.R. (4th) 425, 64 C.P.C. (8th) 229

**Ethiopian Orthodox Tewahedo Church of Canada St. Mary Cathedral, Messale Engeda, Abune Dimetros and Hiwot Bekele (Appellants) and Teshome Aga, Yoseph Beyene, Dereje Goshu, Tseduke Gezaw and Belay Hebest (Respondents) and Canadian Muslim Lawyers Association, Association for Reformed Political Action (ARPA) Canada, Canadian Civil Liberties Association, Evangelical Fellowship of Canada, Catholic Civil Rights League, Watch Tower Bible and Tract Society of Canada, British Columbia Humanist Association, Seventh-day Adventist Church in Canada, Christian Legal Fellowship, National Council of Canadian Muslims, Egale Canada Human Rights Trust and Canadian Centre for Christian Charities (Interveners)**

Wagner C.J.C., Abella, Moldaver, Karakatsanis, Côté, Brown, Rowe, Martin, Kasirer JJ.

Heard: December 9, 2020
Judgment: May 21, 2021
Docket: 39094

Proceedings: reversing *Aga v. Ethiopian Orthodox Tewahedo Church of Canada* (2020), 150 O.R. (3d) 516, 2020 CarswellOnt 138, 442 D.L.R. (4th) 257, 2020 ONCA 10, David M. Paciocco J.A., J.A. Thorburn J.A., K. van Rensburg J.A. (Ont. C.A.)

Counsel: Philip H. Horgan, Raphael T.R. Fernandes, for Appellants
Anthony Colangelo, for Respondents
Shahzad Siddiqui, for Intervener, Canadian Muslim Lawyers Association
John Sikkema, for Intervener, Association for Reformed Political Action (ARPA) Canada
Cara Zwibel, for Intervener, Canadian Civil Liberties Association
Albertos Polizogopoulos (written), for Intervenors, Evangelical Fellowship of Canada and the Catholic Civil Rights League
Jayden MacEwan, for Intervener, Watch Tower Bible and Tract Society of Canada
Wesley J. McMillan, for Intervener, British Columbia Humanist Association
Kevin L. Boonstra, for Intervener, Seventh-day Adventist Church in Canada
Derek Ross, for Intervener, Christian Legal Fellowship
Mannu Chowdhury, for Intervener, National Council of Canadian Muslims
Adam Goldenberg, for Intervener, Egale Canada Human Rights Trust
Barry W. Bussey (written), for Intervener, Canadian Centre for Christian Charities

*Rowe J.* **(Wagner C.J.C., Abella, Moldaver, Karakatsanis, Côté, Brown, Martin and Kasirer JJ. concurring):**

1      The respondents were expelled from the congregation of the Ethiopian Orthodox Tewahedo Church of Canada St. Mary Cathedral after a dispute arose about a movement within the church which some considered to be heretical. The respondents brought an action against the appellants, the church and members of its senior leadership, seeking a declaration that their expulsion was null and void, and other relief. The appellants brought a motion for summary judgment seeking to dismiss the action against them on the basis that the court had no jurisdiction to review or set aside the expulsion decision. The motion judge granted the motion for summary judgment in favour of the appellants and dismissed the action. The respondents appealed, and the Court of Appeal for Ontario allowed the appeal: 2020 ONCA 10, 150 O.R. (3d) 516.

2    On appeal to this Court, the appellants argue that the decisions of a religious voluntary association cannot be reviewed by a court absent an underlying legal right, and the Court of Appeal erred in effectively holding that membership itself constitutes an underlying legal right grounding jurisdiction, deviating from *Highwood Congregation of Jehovah's Witnesses (Judicial Committee) v. Wall*, 2018 SCC 26, [2018] 1 S.C.R. 750.

3    Jurisdiction to intervene in the affairs of a voluntary association depends on the existence of a legal right which the court is asked to vindicate. Here, the only viable candidate for a legal right justifying judicial intervention is contract. The finding of a contract between members of a voluntary association does not automatically follow from the existence of a written constitution and bylaws. Voluntary associations with constitutions and bylaws *may* be constituted by contract, but this is a determination that must be made on the basis of general contract principles, and objective intention to enter into legal relations is required. In this case, evidence of an objective intention to enter into legal relations is missing. As such, there is no contract, there is no jurisdiction, and there is no genuine issue requiring a trial. I would therefore allow the appeal and restore the order of the motion judge granting summary judgment and dismissing the action.

**I. Facts**

*A. The Parties*

4    The corporate appellant, the Ethiopian Orthodox Tewahedo Church of Canada St. Mary Cathedral ("Church Corporation"), is incorporated under the Corporations Act, R.S.O. 1990, c. C.38. The Church Corporation owns the church building and land, and is a local branch of a global Ethiopian Tewahedo Orthodox Church. The individual appellants include members of the leadership of the church: Messale Engeda is the Head Priest and Administrator, and Abune Dimetros is the Archbishop.

5    The respondents are all former members of the congregation of the Ethiopian Orthodox Tewahedo Church of Canada St. Mary Cathedral ("Congregation"). The Congregation is an unincorporated association. The respondents are not and were never members of the Church Corporation within the meaning of the *Corporations Act*.

*B. The Constitution and Bylaw*

6    The respondents rely on the 1977 Constitution and the Bylaw Promulgated to Legally and Unitedly Administer the Ethiopian Orthodox Tewahedo Church in the Diaspora, dated October 28, 1996 ("Bylaw"). The Constitution was amended in 2017 ("Revised Constitution"), but it is the 1977 Constitution that applies to this dispute. The 1977 Constitution is in the Amharic language. No translation of the 1977 Constitution was provided, but the appellants provided a chart that compares the 1977 Constitution and the Revised Constitution.

7    According to this chart, Articles 61 and 63 of the Revised Constitution correspond to Articles from the 1977 Constitution. Article 61 of the Revised Constitution addresses "Rights and Obligations of the Faithful of the Parish Church" and Article 63 addresses "Decision Against Violation of This Ecclesiastical Constitution... and Church Law", and includes provisions on the cancellation of membership. The Bylaw also addresses "Rights and Obligations of the Laity" at Article 44, and "Disciplinary Measures", including the cancellation of membership and excommunication, at Article 47.

*C. Expulsion of the Respondents from the Congregation*

8    To become a member of the Congregation, one must complete and submit a membership application form. A blank sample application form is appended as an exhibit to the affidavit of one of the appellants. The application form provided is in both English and Amharic. It contains a blank line labelled "Monthly membership contribution". The English translation contains no reference to the Constitution or the Bylaw.

9    In 2016, the five respondents and six others, including the appellants Abune Dimetros and Messale Engeda, were appointed to an *ad hoc* committee to investigate a movement some considered to be heretical. The guidelines of the committee provide that "[t]he committee will be guided by the rules and regulations of the Ethiopian Orthodox Tewahedo Church synod in the Diaspora" and that "[t]his matter is dogmatic and canon in nature and therefore the final decision will be made by the archbishop

of the diocese". The guidelines list the names of nine signatories, including some of the individual appellants and some of the respondents. The committee produced a report and made certain findings. The report was submitted to the Archbishop on March 13, 2016.

10    The Archbishop did not accept or implement the findings of the committee. This led to a dispute. On October 26, 2016, the appellant Messale Engeda sent a letter to each of the respondents, warning them that steps would be taken to expel them from the Congregation if they did not cease expressing dissatisfaction with the decisions of the Archbishop.

11    On May 24, 2017, each of the respondents received an identical letter advising them that they had been expelled from membership in the Congregation, in accordance with notices of expulsion from the Archbishop enclosed in the letters. The enclosed notice from the Archbishop read that "according to the bylaw of our Church chapter 57, article 4 and chapter 55, article 1 you have been suspended from your membership of Toronto St. Mary Cathedral". The contents of Bylaw Chapters 55 and 57 are not in the record. The appellants' record contains only Chapters 1 through 12.

### D. Legal Proceedings

12    The respondents brought an action against the appellants. Among other things, they plead that their expulsions violate the principles of natural justice, for example: they were given no particulars of the allegations against them leading to their expulsion, no opportunity to respond to the allegations, and no opportunity to have the decision reviewed internally. They claim this was in breach of the internal procedures governing the church. The respondents sought an order declaring the decision to expel them null and void, an order declaring that their rights under s. 2(a) of the Canadian Charter of Rights and Freedoms had been violated by the appellants, an order declaring the findings of the committee valid and enforceable, an order that the appellants announce the findings to the Congregation and render a decision based on findings according to church law, and various other relief.

13    The statement of claim does not explicitly allege breach of contract. However the respondents do plead that "[t]he Church failed to follow their own internal procedures and regulations in deciding to expel [the respondents]" and "the [appellants] have failed to comply with its own by-laws and constitution".

## II. Judicial History

### A. Summary Judgment Motion

14    The appellants brought a motion for summary judgment, seeking that the respondents' claims be dismissed. The appellants' position was that there is no free-standing right to procedural fairness absent an underlying legal right, and the respondents have no underlying legal right here.

15    Justice Sandra Nishikawa granted the motion for summary judgment and dismissed the action, determining that there was no genuine issue requiring trial on the record before her under rule 20.04(2)(a) of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194. Nishikawa J. held that this case falls squarely within the application of *Wall*, and that the respondents had failed to allege or provide evidence of an underlying legal right. She stated that the statement of claim does not allege breach of contract and in any event neither the Constitution nor the Bylaw constitutes a contract. An essential element of a contract is a mutual intent to be bound to its terms, but the respondents were not aware of the Bylaw or the terms until this proceeding. While Congregation members are required to complete an application form, the form does not mention being bound to the Bylaw.

### B. Court of Appeal for Ontario, 2020 ONCA 10, 150 O.R. (3d) 516

16    On appeal, the respondents argued that the Constitution and the Bylaw governing disciplinary measures are contractually binding and enforceable, and there is therefore a justiciable issue to be tried. The Court of Appeal noted that the jurisdiction of a court to address a voluntary association's own procedures requires an underlying legal right to be adjudicated, such as a contractual right. The Court of Appeal then stated that "[v]oluntary associations do not always have written constitutions and by-laws. But when they do exist, they constitute a contract setting out the rights and obligations of members and the organization":

para. 40. It cited *Ahenakew v. MacKay*, (2004), 71 O.R. (3d) 130 (C.A.), for the proposition that voluntary associations are "a complex of contracts between each and every other member. The terms of these contracts are to be found in the constitution and by-laws of the voluntary association": para. 40, citing *Ahenakew*, at paras. 20 and 26. The Court of Appeal noted that in *Senez v. Montreal Real Estate Board*, [1980] 2 S.C.R. 555, this Court considered the rights of a member of a real estate board who had been expelled from the organization, and held that "when an individual joins a voluntary association ... '*he accepts its constitution and the by-laws then in force, and he undertakes an obligation to observe them*'": para. 42 (emphasis in original), citing *Senez*, at p. 566.

17     Applying the law, the Court of Appeal concluded that there was evidence of an underlying contract between the parties. The Court of Appeal stated that the respondents applied to be members of the Congregation, completed membership forms, and offered consideration in the form of monthly payments. Upon approval of their applications, they entered into a mutual agreement to be part of the Congregation and abide by the governing rules, whether or not they were specifically aware of the terms. The Court of Appeal also concluded that there is evidence that the respondents would have been aware of the Constitution and the Bylaw: as members of the investigation committee, the respondents were advised that the committee would be guided by the rules and regulations of the Ethiopian Orthodox Tewahedo Church synod in the Diaspora, and four of the respondents "signed the guidelines specifically confirming their receipt and acceptance of this term": para. 48. The Court of Appeal also stated that there was evidence that the Church Corporation and its leadership recognized its contractual obligations to abide by the rules when seeking to expel a member, such as the letters sent to the respondents upon their expulsion. However, the Court of Appeal concluded that on the record, it was not possible to determine if there had been a breach of contract on the basis of failure to comply with the rules. Accordingly, what the rules of expulsion are and whether or not they were followed was a genuine issue requiring a trial.

### III. Submissions of the Parties

18     The appellants argue that there is no genuine issue requiring trial because *Wall* dictates that membership decisions of a religious association are not subject to the review of a court, absent an underlying legal right. The Court of Appeal erred in stating, as a blanket rule, that where a voluntary association has a written constitution or bylaws, these constitute a legally binding contract, because *Wall* held that standard contractual analysis applies, and that mutual intention to form contractual relations is required. The appellants also raise a number of other issues: they argue that charitable donations should not be construed as contractual consideration; that the claims and remedies pursued by the respondents are not justiciable due to the religious nature of the dispute; that the relief claimed by the respondents violates the Charter; and that by finding that there was consideration and mutual intention to form contractual relations, the Court of Appeal overturned the motion judge's factual findings without applying the palpable and overriding error standard.

19     The respondents point out that, unlike in *Wall*, the church in this case has a constitution and bylaws. The respondents submit that the Court of Appeal was alive to this distinction and correctly held that becoming a member of such a voluntary association entails agreement to the terms of the constitution and bylaws, following *Wall* and *Senez* . The respondents also address the other issues raised by the appellants.

### IV. Issue on Appeal

20     The only issue before this Court is: did the Court of Appeal err in holding that there is an underlying contract and therefore a genuine issue requiring a trial? For the reasons below, I conclude that it did. This disposes of all the issues as framed by the appellants. I would also dismiss the fresh evidence motion, for reasons explained below.

### V. Law

21     The law concerning the formation of contractual relations embodies practical wisdom. Many informal agreements that people undertake do not result in a contract. There are, for example, mutual undertakings between friends ("in the new year, we'll go to the gym together three times a week") or between members of a household ("you do the groceries, I'll clean the kitchen").

22      Without more, neither of these agreements creates a contract. What is missing is an objective intention to create legal relations. In neither of these examples do the parties (reasonably understood) intend to be subject to adjudication as to the performance of their commitments or to the imposition of remedies such as damages or specific performance.

23      This is so not merely for individuals dealing with one another. It is also true for individuals coming together in voluntary associations. Such associations are vehicles to pursue shared goals. To this end, many such associations will have rules, sometimes even a constitution, bylaws and a "governing" body to adopt and apply the rules. These are practical measures by which to pursue shared goals. But, they do not in and of themselves give rise to contractual relations among the individuals who join. The members of the local minor hockey league, or a group formed to oppose development of green spaces, or a bible study group, for example, do not enter into enforceable legal obligations just because they have joined a group with rules that members are expected to follow.

24      The practical wisdom embodied in the common law is that much of what we agree to in our day-to-day lives does not result in a contract. Where there is no contract, or other obligation known to law, there is no justiciable interest and no cause of action.

### *A. Genuine Issue Requiring Trial: If There Is No Jurisdiction, Then There Is No Genuine Issue Requiring A Trial*

25      This Court explained in *Hryniak v. Mauldin*, 2014 SCC 7, [2014] 1 S.C.R. 87, that there will be no genuine issue requiring trial under rule 20.04(2)(a) of Ontario's Rules of Civil Procedure "when the judge is able to reach a fair and just determination on the merits on a motion for summary judgment. This will be the case when the process (1) allows the judge to make the necessary findings of fact, (2) allows the judge to apply the law to the facts, and (3) is a proportionate, more expeditious and less expensive means to achieve a just result": para. 49. While the onus is on the moving party to establish the existence or lack thereof of a genuine issue requiring a trial, "[e]ach side must 'put its best foot forward' with respect to the existence or non-existence of material issues to be tried": Canada (Attorney General) v. Lameman 2008 SCC 14, [2008] 1 S.C.R. 372, at para. 11, citing *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.*, (1996), 28 O.R. (3d) 423 (C.J. (Gen. Div.)), at p. 434, aff'd [1997] O.J. No. 3754 (QL) (C.A.), and Goudie v. Ottawa (City) 2003 SCC 14, [2003] 1 S.C.R. 141, at para. 32.

26      The appellants' position on the motion for summary judgment was that the court had no jurisdiction to review or set aside the decision to expel the respondents. Obviously, if the court has no jurisdiction, then there is no genuine issue requiring a trial. While the onus was on the appellants as the moving parties to prove the absence of jurisdiction, and therefore the absence of a genuine issue requiring a trial, the respondents were required to "put their best foot forward" and adduce their best evidence to establish the evidentiary foundation for jurisdiction, and by extension a genuine issue requiring a trial.

### *B. Jurisdiction: If There Is No Contract or Other Legal Right, Then There Is No Jurisdiction*

27      Courts have jurisdiction to intervene in decisions of voluntary associations only where a legal right is affected. This proposition is not new. In *Dunnet v. Forneri*, (1877), 25 Gr. 199, the Ontario Court of Chancery held that religious bodies are "considered as voluntary associations; the law recognizes their existence, and protects them in their enjoyment of property, but *unless civil rights are in question it does not interfere with their organization*": p. 206 (emphasis added). In *Ukrainian Greek Orthodox Church of Canada v. Trustees of the Ukrainian Greek Orthodox Cathedral of St. Mary the Protectress*, [1940] S.C.R. 586, at p. 591, Crocket J. wrote that "unless some property or civil right is affected thereby, the civil courts of this country will not allow their process to be used for the enforcement of a purely ecclesiastical decree or order". The point was reiterated in *Lakeside Colony of Hutterian Brethren v. Hofer*, [1992] 3 S.C.R. 165, at p. 174, and most recently in Wall, at para. 24, where this Court held that "[j]urisdiction depends on the presence of a legal right which a party seeks to have vindicated".

28      Thus, while purely theological issues are not justiciable (*Wall*, at paras. 12 and 36), where a legal right is at issue, courts may need to consider questions that have a religious aspect in vindicating the legal right. As this Court explained in Bruker v. Marcovitz 2007 SCC 54, [2007] 3 S.C.R. 607, at para. 41, "[t]he fact that a dispute has a religious aspect does not by itself make it non-justiciable". Rather, as the trial judge in that case correctly held, "a claim for damages based on a breach of a civil obligation, even one with religious aspects, remains within the domain of the civil courts": *Bruker*, at para. 32. For example,

courts adjudicating disputes over church property may need to consider adherence to the church's internal rules, even where those rules are meant to give effect to religious commitments: *Wall*, at para. 38.

29    The legal rights which can ground jurisdiction include private rights — rights in property, contract, tort or unjust enrichment — and statutory causes of action: *Wall*, at paras. 13 and 25. This is borne out by the cases in which courts have intervened in voluntary associations. In *Lakeside*, this Court provided relief to members of a religiously-based agricultural colony who had been expelled and thus deprived of their right to live in the colony and to be supported by it. Gonthier J. noted, at p. 174, that these rights had both proprietary and contractual aspects. Similar rights were at stake in *Hofer v. Hofer*, [1970] S.C.R. 958, as well as a claim for a division of the colony's assets. Courts also have the jurisdiction to determine whether the deprivation of a person's ability to earn their livelihood was a breach of contract, as in *McCaw v. United Church of Canada*, (1991), 4 O.R. (3d) 481 (C.A.), and to decide between competing claims to property, as in *Polish Alliance of Association of Toronto Ltd. v. The Polish Alliance of Canada*, 2017 ONCA 574, 32 E.T.R. (4th) 64. By contrast, in *Wall*, because there was no legal right attached to the plaintiff's membership in his religious congregation, the courts had no jurisdiction to determine whether he was properly expelled.

30    It follows that, as this Court held in Wall, at para. 24, "there is no free-standing right to procedural fairness with respect to decisions taken by voluntary associations". In other words, natural justice is not a source of jurisdiction. Rather, where there is a legal right at issue, natural justice may be relevant to whether that legal right was violated. In *Lakeside*, the plaintiffs' contractual rights to remain in the colony were at issue; the colony's failure to provide natural justice was a basis for finding that those contracts had been breached. Similarly, in *Senez*, the plaintiff stood in a contractual relationship with the corporation of which he was a member. As a result, the corporation's failure to adhere to the terms of this contract in expelling him — which included an obligation to observe natural justice — constituted a breach. While *Senez* concerned a corporation, not a voluntary association, the role of natural justice in the contract is nonetheless instructive.

31    Of course, many voluntary associations will exercise some legal rights, for example, owning property or contracting for services. The question to be answered in a given case is not whether the voluntary association exercises legal rights in general, but whether the particular relief sought by the plaintiff is the vindication of a legal right. If not, then there is simply no cause of action (*Wall*, at para. 13) and no basis for relief.

32    In the present case, the only viable candidate for a legal right — and the only one referred to by the Court of Appeal or argued by the parties — is contract. I therefore turn to address when contracts exist within voluntary associations.

***C. Contracts in Voluntary Associations: If There Is No Intention to Enter Into Legal Relations, Then There Is No Contract***

33    In this section, I will explain when contracts exist within voluntary associations. In short: membership in a voluntary association is not automatically contractual. Rather, a contract exists only if the conditions of contract formation, including intention to create legal relations, are met. As a result, some but not all voluntary associations are constituted by contract.

*(1) The Conditions of Contract Formation*

34    As this Court held in Wall, at para. 29, "Where one party alleges that a contract exists, they would have to show that there was an intention to form contractual relations. While this may be more difficult to show in the religious context, *the general principles of contract law would apply*" (emphasis added). These principles are decisive of the present appeal.

35    A contract is formed where there is "an offer by one party accepted by the other with the intention of creating a legal relationship, and supported by consideration": *Scotsburn Co-operative Services Ltd. v. W. T. Goodwin Ltd.*, [1985] 1 S.C.R. 54, at p. 63. The common law holds to an objective theory of contract formation. This means that, in determining whether the parties' conduct met the conditions for contract formation, the court is to examine "how each party's conduct would appear to a reasonable person in the position of the other party": Owners, Strata Plan LMS 3905 v. Crystal Square Parking Corp. 2020 SCC 29, at para. 33.

6

36     For present purposes, it will suffice to focus on the requirement of intention to create legal relations. As G. H. L. Fridman explains, "the test of agreement for legal purposes is whether parties have indicated to the outside world, in the form of the objective reasonable bystander, their intention to contract and the terms of such contract": *The Law of Contract in Canada* (6th ed. 2011), at p. 15; see also S. M. Waddams, *The Law of Contracts* (7th ed. 2017), at p. 105. This requirement can be understood as an aspect of valid offer and acceptance, in the sense that a valid offer and acceptance must objectively manifest an intention to be legally bound: *Crystal Square*, at paras. 49-50.

37     The test for an intention to create legal relations is objective. The question is not what the parties subjectively had in mind but whether their conduct was such that a reasonable person would conclude that they intended to be bound: *Kernwood Ltd. v. Renegade Capital Corp.*, (1997), 97 O.A.C. 3; Smith v. Hughes1871L.R. 6 Q.B. 597, at p. 607. In answering this question, courts are not limited to the four corners of the purported agreement, but may consider the surrounding circumstances: Leemhuis v. Kardash Plumbing Ltd.2020 BCCA 99B.C. C.A. , 34 B.C.L.R. (6th) 248, at para. 17; *Crystal Square*, at para. 37.

38     Under the objective test, the nature of the relationship among the parties and the interests at stake may be relevant to the existence of an intention to create legal relations. For example, courts will often assume that such an intention is absent from an informal agreement among spouses or friends: *Balfour v. Balfour*, [1919] 2 K.B. 571 (C.A.); Eng v. Evans199183 Alta. L.R. (2d) 107 (Q.B.). The question in every case is what intention is objectively manifest in the parties' conduct.

39     These principles apply directly to whether a given voluntary association is constituted by contract. As Stephen Aylward writes in *The Law of Unincorporated Associations in Canada* (2020), at §1.32, "[t]he key to the formation of the association is an intention to form contractual relations on the part of its members. This is the critical distinction between informal social activities and an association of legal significance." The local stamp club or bridge night might have rules, but without more, nobody would suppose that the members intend them to be legally enforceable. Now, while the circumstances that may give rise to such an intention will vary from case to case, it is possible to make two general observations that bear on the present matter.

40     First, where property or employment is at stake, an objective intention to create legal relations is more likely to exist: J. R. S. Forbes, *The Law of Domestic or Private Tribunals* (1982), at pp. 20-21. When parties make an agreement that governs their right to remain in their home, or their ability to make a living, a reasonable observer would likely understand that the parties intended such an agreement to be enforceable. Thus, in *Hofer* and *Lakeside*, where the parties' agreement provided both for their right to live in the colony and for their right to be supported by it, this supported a finding that the parties had meant for the agreement to be legally binding. This was also the case in *McCaw*, where the parties' agreement determined whether the minister could earn his livelihood within the church, and in *Foran v. Kottmeier*, [1973] 3 O.R. 1002 (C.A.), where a nurses' registry distributed assignments of work to its members.

41     Second, and conversely, the existence of an objective intention to create legal relations may be "more difficult to show in the religious context": *Wall*, at para. 29. In *Pinke v. Bornhold*, (1904), 8 O.L.R. 575 (H.C.J.), the plaintiff had been expelled, without notice, from membership in a church to which he had made donations. In dismissing his claim for relief, the court held, at p. 578, that "[t]he plaintiff's subscriptions to the church and parsonage were voluntary. His civil rights were, therefore, not affected by the resolution of the trustees expelling him from membership." More recently, the Court of Appeal of Alberta considered a claim from individuals who had been expelled from a congregation of Jehovah's Witnesses. The court rejected the claim, holding that "whatever labour and other contributions were given by the appellants, were purely voluntary and would not provide the appellants with a property interest": *Zebroski v. Jehovah's Witnesses*, (1988), 87 A.R. 229 (C.A.), at para. 21. In the religious context, even the use of concepts such as authority and duty need not reflect an intention to create legal relations: the parties may be speaking of religious obligations rather than legal ones. While an objective intention to enter into legal relations is possible in a religious context — for example, a contract of employment between a minister of religion and their church — each case must be judged on its own particular facts: *E. v.* English Province of Our Lady of Charity, [2012] EWCA Civ 938, [2013] Q.B. 722, at para. 29; *Percy v. Board of National Mission of the Church of Scotland*, [2005] UKHL 73, [2006] 2 A.C. 28.

42     The upshot is this. Courts must have jurisdiction to give effect to legal rights — including legal rights held by members of religious associations and impermissibly affected in the operation of such associations (as the intervener Egale Canada Human

Rights Trust observed). However, courts should not be too quick to characterize religious commitments as legally binding in the first place (as the intervener the Association for Reformed Political Action (ARPA) Canada observed).

*(2) Web of Contracts Cases*

43      I pause here to say a few words about the so called "web of contracts" cases, and clarify how such cases should be understood and applied. As explained above, contracts exist in voluntary associations only where the conditions of contract formation are met. As a result, not all voluntary associations are constituted by contract. However, the Court of Appeal appeared to take a different view. Referring to *Senez* and *Ahenakew*, it held that membership in a voluntary association that has a written constitution and bylaws itself constitutes a contract. This theory "would effectively eliminate any requirement for a future court to justify intervention in disputes in religious organizations": M. H. Ogilvie, "Case Comments: Lakeside Colony of Hutterian Brethren v. Hofer" (1993), 72 Can. Bar Rev. 238, at p. 248. If mere membership in a voluntary organization with written rules created a "legal right" of the kind referred to in *Wall*, then court intervention would be automatic and all-pervasive. The requirement of a legal right would be meaningless: *Wall*, at para. 29. As I will explain, the case law does not support this view.

44      In *Senez*, a member of an incorporated real estate board was expelled and sued the board for damages. His employment depended on remaining a member, and he was legally obliged to pay dues to the board. There was, therefore, no question that the constitution and bylaws of the board were legally binding as between the board and the member. The question for this Court was whether an expulsion in breach of the corporation's bylaws was a delict (subject to a short limitation period under the applicable law) or a breach of contract (subject to a longer limitation period). It is in this context that Beetz J. held, at p. 567, that "the obligation of the corporation to provide the agreed services and to observe its own by-laws, with respect to the expulsion of a member as in other respects, is ... of a contractual nature". In short, *Senez* was about characterizing the legally binding rules of a corporation. It was not about whether the rules of an unincorporated association are legally binding in the first place.

45      It is true that, at pp. 570-71, Beetz J. referred to cases about voluntary associations, such as labour unions constituted by contract. These cases turn on the fact that voluntary associations lack legal personality, except where the legislature has expressly or by implication conferred it on them: *Berry v. Pulley* 2002 SCC 40, [2002] 2 S.C.R. 493, at para. 46; Aylward, at §1.3. A member who has been wronged by such an association cannot bring an action directly against the association, unless this has been provided for by statute. To fill this legal void, the common law developed the theory that some voluntary associations are constituted by a web of contracts between each member and every other: *The Satanita*, [1895] P. 248 (C.A.), aff'd *Clarke v. Dunraven* (1896), [1897] A.C. 59 (H.L.).

46      In cases such as *Lakeside* and *Hofer*, the existence of a web of contracts can be understood as founded on an objective interpretation of what the parties intended. Offer, acceptance, and consideration are all required, but under general contract law principles, these may often follow where an objective intention is present. Where it is shown that the members of the association objectively intended to form contractual relations, offer, acceptance, and consideration between each and every member can often be implied from the circumstances. An example of such a case is *The Satanita*, where participants in a yacht race were held to have formed contracts with each other in the following way:

> A certain number of gentlemen formed themselves into a committee and proposed to give prizes for matches sailed between yachts at a certain place on a certain day, and they promulgated certain rules, and said: "If you want to sail in any of our matches for our prize, you cannot do so unless you submit yourselves to the conditions which we have thus laid down. And one of the conditions is, that if you do sail for one of such prizes you must enter into an obligation with the owners of the yachts who are competing, which they at the same time enter into similarly with you, that if by a breach of any of our rules you do damage or injury to the owner of a competing yacht, you shall be liable to make good the damage which you have so done." If that is so, then when they do sail, and not till then, that relation is immediately formed between the yacht owners.

> (*The Satanita*, at p. 255, per Lord Esher M.R.)

47      By contrast, an objective intention to form legal relations may not give rise to a web of contracts between each member and every other where legal personality has been conferred on an association by statute. In *Orchard v. Tunney*, [1957] S.C.R.

436, this Court held that unions were constituted by a web of contracts among their members. This structure was necessary at the time to provide some recourse to aggrieved union members, but was overtaken by subsequent statutory reform: *Berry*, at paras. 37-39. Following *Taff Vale Railway Co. v. Amalgamated Society of Railway Servants*, [1901] A.C. 426 (H.L.), this Court held in *Berry* that by conferring significant rights and obligations on trade unions under statute, legislatures had implicitly intended to give them legal personality. A member who joins a union could therefore form a contract with the union itself. To maintain that each member had a contract with every other had become a legal fiction that was "no longer necessary": *Berry*, at para. 54. In Ahenakew, at para. 32, the Court of Appeal for Ontario held that the legislature had implicitly granted legal personality to political parties in the same way. The extent to which this reasoning applies to other kinds of unincorporated associations will depend on the statutory scheme in question, and if there is an applicable statutory regime at all: *Berry*, at para. 51; *Polish Alliance*, at para. 21.

48      All of these cases are about the legal structure of associations whose rules are manifestly meant to be legally binding. This is true both of cases where these rules constitute a web of contracts among the members and of cases where the legislature has displaced the web of contracts by giving the association legal personality. None of these cases hold that an association's rules — whether written or not — always constitute a contract, regardless of the intentions of the members. Like any other contract, the existence of a web of contracts requires an intention to create legal relations.

### D. Conclusion

49      In sum, courts can only intervene in the affairs of a voluntary association to vindicate a legal right, such as a right in property or contract. Membership in a voluntary association is not automatically contractual. Even a written constitution does not suffice. Membership is contractual only where the conditions for contract formation are met, including an objective intention to create legal relations. Such an intention is more likely to exist where property or employment are at stake. It is less likely to exist in religious contexts, where individuals may intend for their mutual obligations to be spiritually but not legally binding. A voluntary association will be constituted by a web of contracts among the members only where the conditions for contract formation are met.

### VI. Application

50      On this record, there is no evidence of an objective intention to enter into legal relations. As the motion judge correctly held, there is therefore no contract, no jurisdiction, and no genuine issue requiring a trial.

51      The motion judge found that the respondents failed to provide evidence of a contract, noting that an essential element of a contract is a mutual intent to be bound by its terms. The respondents argued on the summary judgment motion that the Constitution and the Bylaw constituted a legally binding contract, but the motion judge found that the respondents were not even aware of the Bylaw or its terms when they became members. More importantly, becoming a member of a *religious* voluntary association — and even agreeing to be bound by certain rules in that religious voluntary association — does not, without more, evince an objective intention to enter into a legal contract enforceable by the courts. Members of a religious voluntary association may undertake religious obligations without undertaking legal obligations.

52      Here, there is no evidence of an objective intention to enter into legal relations, and this is fatal to the respondents' claim. Regardless of whether or not the respondents committed to pay any money upon becoming members of the Congregation (which is disputed, as discussed below), and regardless of the fact that some of the respondents signed the guidelines of the investigation committee which reference the rules and regulations of the church (many years after the contract was supposedly formed, I add), absent an objective intention to enter into contractual relations, none of this matters. On the record before me, there is nothing that can be characterized as an objective intention to make an offer on the part of any of the appellants, and nothing that can be characterized as an objective intention to accept on the part of any of the respondents, or vice versa.

53      There is therefore no need to address the issue of whether the respondents made donations or paid membership fees, and if so, whether these payments could constitute consideration. There is also no need to address the issue of whether the Constitution

or Bylaw, if they constituted terms of a contract, would have given rise to a requirement to adhere to certain decision-making procedures, including a duty of procedural fairness, or any of the other issues raised by the appellants.

## VII. Fresh Evidence Motion

54    Prior to the hearing, the appellants brought a motion to adduce fresh evidence pursuant to s. 62(3) of the Supreme Court Act, R.S.C. 1985, c. S-26, and Rule 47 of the Rules of the Supreme Court of Canada, SOR/2002-156. The motion was deferred to the panel hearing the appeal.

55    The fresh evidence is an affidavit sworn by Hiwot Gudeta, one of the individual appellants (named as Hiwot Bekele in the title of proceedings). The affidavit provides evidence that the church treats financial contributions as charitable donations, and has appended as exhibits the membership application forms of the five respondents, which show no commitment to make financial contributions to the church. The affidavit also includes as exhibits the notice of appeal and factums of the parties from the Court of Appeal, and the statement of claim and reasons of the Court of Appeal, which are already in the record.

56    The test to admit fresh evidence on appeal is set out in *Palmer v. The Queen*, [1980] 1 S.C.R. 759, at p. 775:

> (1) The evidence should generally not be admitted if, by due diligence, it could have been adduced at trial provided that this general principle will not be applied as strictly in a criminal case as in civil cases ... .

> (2) The evidence must be relevant in the sense that it bears upon a decisive or potentially decisive issue in the trial.

> (3) The evidence must be credible in the sense that it is reasonably capable of belief, and

> (4) It must be such that if believed it could reasonably, when taken with the other evidence adduced at trial, be expected to have affected the result.

57    I would decline to admit the fresh evidence. It is relevant only to the issue of consideration, and specifically whether the respondents ever committed to make any financial contributions upon becoming members, and how the appellants would have understood such payments. Given the absence of evidence of objective intention to enter into legal relations, this is not a decisive issue and the evidence could not have affected the result. The motion is dismissed without costs.

## VIII. Disposition

58    The appeal is allowed, the order of the Court of Appeal is set aside, and the order of the motion judge granting summary judgment and dismissing the action is restored. The appellants will have their costs throughout.

*Appeal allowed; motion dismissed.*

*Pourvoi accueilli; requête rejetée.*

**EXHIBIT EN-16**

**TO THE DECLARATION OF EVAN NUTTALL**

© 2011 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written consent of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

A cataloguing record for this publication is available from Library and Archives Canada.

Fridman, G.H.L. (Gerald Henry Louis), 1928-
    The law of contract in Canada / by G.H.L Fridman.—6th ed.

Includes bibliographical references and index.
ISBN: 978-0-7798-3646-8 (HC).—ISBN: 978-0-7798-3647-5 (SC)

Composition: Computer Composition of Canada Inc.

Printed in Canada by Thomson Reuters



**THOMSON REUTERS**

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

**One Corporate Plaza**
**2075 Kennedy Road**
**Toronto, Ontario**
**M1T 3V4**

Customer Relations
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5164
Fax: 1-416-298-5082
www.carswell.com
E-mail www.carswell.com/email

cepting.[211] There may be situations in which enough time has elapsed since the offer was communicated to the offeree to render it now unreasonable for the latter to accept,[212] even though no formal revocation of the offer has taken place, and the offeree has no knowledge of any change of circumstances that would indicate that the offer is no longer open.[213] Such would be the case where goods offered for sale were perishable.[214] It was said in *Creelman v. R.*[215] that what would have to be shown was an "oppressive" delay on the part of the offeree before such late acceptance would be inoperative. In that case the Crown was not guilty of any such delay in accepting a tender made by the plaintiffs since the distance between the parties and the fact that the Crown, in the form of a government department, is a slow body to move and make decisions, made the length of time between tender and acceptance not unreasonable. The basis for refusing recognition to a delayed acceptance is the possibility of unfairness against the original offeror. Indeed, it may be argued that an offeree who purports to accept after an unreasonably inordinate delay from receipt of the offer is very much in the position of an offeree who knows that the offer was incorrectly, or inadvertently made to him, or was made in inaccurate terms; the late acceptance, after it may be assumed that an offer can no longer be valid as initially made, because circumstances have, or may have altered, is really an attempt to impose an obligation upon someone who no longer wishes to be bound, just as acceptance of a mistaken offer is an attempt to bind someone in a manner which he never intended.[216]

An acceptance that is unauthorized, where the acceptor is the agent of the true offeree, will not bind either party unless the acceptor was held out as having authority to accept, or the true offeree ratified the unauthorized acceptance.[217]

### (c)  What is acceptance?

To constitute acceptance, the offeree must signify the assent to the offer in the mode required by the terms of the offer, if any, or else in any manner deemed reasonable. Where no particular mode of acceptance is expressly required, an offer

---

211  *Real Estate Center Ltd. v. Ouellette* (1974), 8 N.B.R. (2d) 474 (N.B.C.A.); *Mitchell v. Bennett, Cole Adjusters Ltd.* (1986), 33 D.L.R. (4th) 398 (B.C.S.C.); *Case's Insulation & Siding Ltd. v. Gordon* (1991), 45 C.L.R. 252 (N.B.Q.B.); unless the time for acceptance has been extended, expressly or by implication: *Imperial Oil Ltd. v. C. & G. Holdings Ltd.* (1986), 58 Nfld. & P.E.I.R. 326 (Nfld. T.D.); affirmed (1989), 78 Nfld. & P.E.I.R. 1 (Nfld. C.A.).

212  *D.M. Vipond Co. v. Rustum Petroleums Ltd.*, [1987] 2 W.W.R. 570 (Alta. Q.B.).

213  From "There may be situations" to here was quoted by MacPhail J. in *Anderson v. Bernhard* (2009), 243 Man. R. (2d) 217 at 224 (Man. Q.B.).

214  *Shatford v. B.C. Wine Growers Ltd.*, [1927] 2 D.L.R. 759 (B.C.S.C.).

215  (1920), 20 Ex. C.R. 198 (Ex. Ct.).

216  From "it may be agreed" to here was quoted by MacPhail J. in *Anderson v. Bernhard* (2009), 243 Man. R. (2d) 217 at 224 (Man. Q.B.).

217  *McIsaac v. Fraser Mach. & Motor Co.* (1910), 44 N.S.R. 290 (N.S.C.A.). Hence, if the principal dies before the agent sends the acceptance, there is no contract: *Re Irvine*, [1928] 3 D.L.R. 268 (Ont. C.A.); the same result follows if the principal is dead at the time of acceptance: *MacKenzie v. Carroll* (1974), 6 O.R. (2d) 706 (Ont. H.C.).

**EXHIBIT EN-17**

**TO THE DECLARATION OF EVAN NUTTALL**

1970 CarswellAlta 159

Alberta Supreme Court, Appellate Division

Regehr v. Ketzakey Silver Mines Ltd.

1970 CarswellAlta 159, [1970] A.J. No. 14, 10 D.L.R. (3d) 171

## Regehr et al. v. Ketzakey Silver Mines Ltd. et al.

Cairns, Kane and McDermid, JJ.A.

Judgment: January 14, 1970

Counsel: *T. Mayson*, for defendant, Ketzakey Silver Mines Ltd.
*R. A. McLennan*, for defendants, J W. Berry, J P Mosling and W J. Hay.
*R. Sadownik* and *R. G. Wheatley*, for plaintiffs, H H. Regehr and G Erickson.

**The judgment of the Court was delivered by *McDermid, J.A.*:**

1    One Kirwan owned some mineral claims in the Yukon Territory. He sold the claims to the appellant company, Ketzakey Silver Mines Limited, (hereinafter called "the Company") which was incorporated for the express purpose of purchasing the claims by the defendants, Carl Edwin Case and Stanley Case. In consideration for the claims Kirwan was to receive $300,000 from the Company, $20,000 to be paid in cash and $280,000 to be paid within five years out of 10% of the gross value of ore produced and sold from the claims. Kirwan was sued by Henry H. Regehr and Erick Erickson, who claimed to be entitled to a 50% interest in the claims; they were successful and obtained a judgment against Kirwan for a cash sum and also 50% of the $280,000 to be paid out of production by the Company to Kirwan.

2    The appellants (defendants), James W. Berry, John Peter Mosling and William J. Hay (hereinafter called respectively, Berry, Mosling and Hay or collectively "the Berry Group") became interested in the claims. The Cases, besides owning shares in the Company, had advanced to the Company for the purposes of the Company doing work in connection with the claims, $36,920 for which they had received notes of the Company and Carl Edwin Case was also owed by the Company $8,400 for a tractor rental. The Berry Group obtained an option from the Cases to purchase 1,300,000 of the shares of the Company owned by the Cases, the notes issued by the Company to the Cases for the moneys advanced by the Cases, and the debt owing in respect of the tractor rental, the notes and the debt totalling in all $45,320.

3    Meetings were held in Edmonton, Alberta among Kirwan, Regehr and Berry and various solicitors which ultimately resulted in Kirwan releasing his right to receive $280,000 out of production from the Company and Regehr and Erickson releasing their claim against Kirwan. For releasing their claim Regehr and Erickson received 300,000 shares of the Company. Subsequently the Berry Group exercised their option and acquired from the Cases 1,300,000 shares of the Company and the debt of $45,320 owing to the Cases.

4     Apparently an effort was made to interest others in purchasing treasury shares of the Company, but when this proved unsuccessful, the said claims were sold to Silver Key Mines Ltd., a company in which the Berry Group were interested.

5    Under the terms of the agreement dated August 26, 1964, between the Company and Silver Key Mines Ltd. (herein called the "Vending Agreement") in return for the sale of the claims, Silver Key Mines Ltd. was to issue 1,060,000 of its shares and pay $2,000. The Vending Agreement provided:

This Agreement is conditional upon and subject to the due approval of the Vendor's (the Company's) shareholders being given to this Agreement and to an agreement bearing even date herewith entered into between the Vendor (the Company), Edwin Case, Stanley Case, James W. Berry, J. P. Mosling and William Hay, all as may be required under the laws of the

Province of Alberta and the Memorandum and Articles of Association of the Vendor, and if such approvals be not given within forty-five days of the date hereof then this Agreement shall be null and void and the Parties hereto shall not be under any obligation to each other whatsoever.

6    The agreement of even date above referred to (herein called "the Settlement Agreement") was an agreement between the Company, of the first part, Edwin Case and Stanley Case, of the second part, and the Berry Group, of the third part. It recited that the Company had agreed to sell the said claims to Silver Key Mines Ltd.; that the Berry Group had acquired from the Cases 1,300,000 shares of the Company and the indebtedness owing by the Company to the Cases; that the Company was indebted to the Berry Group for advances made by them on behalf of the Company; and that the Company wished to settle its indebtedness. Clauses 1, 2 and 3 of the agreement then provided:

   1. This Agreement is conditional upon and subject to the due approval of the Ketzakey (the Company) shareholders being given to this Agreement and to the Vending Agreement as may be required under the laws of the Province of Alberta and the Memorandum and Articles of Association of Ketzakey and if such approvals be not given within 45 days of the date hereof then this Agreement shall be null and void and the Parties hereto shall not be under any obligation to each other whatsoever.

   2. Upon the approval of Ketzakey's shareholders being given as in paragraph numbered 1 hereof provided, the Cases and the Principals shall forgive and discharge all debts, monies, claims and demands now due or hereafter accruing due to them or any of them from Ketzakey, and in consideration whereof Ketzakey shall transfer or cause to be transferred to H. A. Dyde, Q.C., of the City of Edmonton, in the Province of Alberta, as Trustee for the Cases and the Principals, and to be dealt with as the Cases and the Principals may by Agreement between themselves direct, 784,000 escrowed and 106,000 free shares of the capital stock of the Company, said shares being derived from the 1,060,000 shares of the Company to be issued by it to Ketzakey for Ketzakey's mining claims under and pursuant to the provisions of the Vending Agreement.

   3. After giving effect to the transfer and delivery of shares referred to in paragraph 2 hereof, there will remain with Ketzakey, 170,000 shares of the Company, and as further consideration for the transfer and delivery of the 106,000 free shares and 784,000 escrowed shares of the Company referred to in paragraph 2 hereof, the Cases and the Principals agree that the 1,300,000 share, which were the subject matter of the aforementioned Agreement of July, 1963, shall not rank, or be entitled to receive any additional shares of the Company, when the remaining 170,000 escrowed shares of the Company are distributed by Ketzakey to its shareholders so that the holders of the remaining 1,700,000 shares of Ketzakey shall be entitled to receive 170,000 escrowed shares of the Company on the basis of 1 escrowed share of the Company for every 10 shares of Ketzakey held and the Cases and the Principals agree to do and execute all deeds and documents as may be necessary or desirable to give full force and effect to the provisions of this paragraph.

7    I shall refer to the shares which were to be issued by Silver Key Mines Ltd. for the claims as the Silver Key shares in order to differentiate them from the Company shares.

8    An extraordinary general meeting was then called by the president of the Company for the purposes of approving the said Vending Agreement and Settlement Agreement and at the said meeting the said agreements were approved by a majority of the vote cast at the meeting.

9    The said Regehr and the executor of the estate of Erick Erickson, the said Erick Erickson having died before the action was commenced, commenced an action as plaintiffs on their own behalf and on behalf of the other shareholders of the Company (other than the individual defendants) against the Company, the Berry Group and the Cases. In their prayer for relief, amongst other remedies, the plaintiffs asked for a declaration that the said meeting was improperly constituted and invalid and that any resolutions passed by the said meeting were invalid. The learned trial Judge stated in his judgment:

   I will say at the outset; I am satisfied there must be judgment in favor of the plaintiffs, and on very simple grounds. Those grounds are these; that the notice and material with it which went out with respect to the extraordinary general meeting called for August 26, 1964, in my view are, as a combination, quite inadequate.

2

On this ground the trial Judge found that the meeting must at law fall. He then went on to say that his further remarks were *obiter*. He said:

I am further of the view that in fact the debts which were being paid with the great bulk of the million shares had in fact been forgiven.

10    Whether the debts had been forgiven, in my view, is the real nub of this case.

11    At the time in January, 1964, that Kirwan, Regehr and Erickson were attempting to come to a settlement the Company had the following debts:

```
$280,000  (on balance sheet shown as $279,764.96) to be
          paid out of production to Kirwan (50% of this
          was owed to Regehr and Erickson by Kirwan).
$45,320   owing to the Cases (the Berry Group had an
          option to acquire these debts.
 $7,969   which the Berry Group claimed. (I shall comment
          on this claim later.)
---------
$333,289
```

12    The evidence of Regehr was to the effect that he was told by Berry when he and Erickson agreed to accept 300,000 shares of the Company and release the Company from paying $140,000 out of production: "Then Mr. Berry said you forgive your $140,000, Kirwan will forgive his $140,000 and I will see to it that the Company is debt free and there will be value in the shares. If you want to settle along those lines with Mr. Kirwan, go ahead."

13    This evidence was denied by Berry but the learned trial Judge said:

And I say that chiefly on the basis that when the discussions took place between those interests represented by Mr. Regehr, and those interests of the company, and the interests of Mr. Berry, were being discussed and it was felt necessary that the financial background of this company be straightened out, that it was then essential to clear away the debt structure that encumbered this company. In order to do that the claims now in the hands of Mr. Regehr, Erickson and Kirwan, and which really represented the balance owing on the purchase price of the claims, were forgiven, and I am sure that it was understood that the other claims owing to Case, and assigned by Case to Berry and associates would also be forgiven.

14    In my opinion at the time Regehr and Erickson agreed to accept shares for their claims against Kirwan they did so on the understanding that, when the Berry Group exercised their option and acquired from the Cases the 1,300,000 shares of the Company and the debts of the Company owing to the Cases, the Berry Group would release such indebtedness so that the Company would be debt free.

15    Regehr and Erickson could have enforced the contract and required the Berry Group to execute appropriate releases to the Company: See *Beswick v. Beswick*, [1968] A.C. 58. The plaintiffs did not ask for this remedy and so I do not need to concern myself further with such contract and I turn to the question whether there was a legally enforceable agreement made by the Berry Group with the Company that the indebtedness would be released.

16    On February 7, 1964, Mr. H. A. Dyde, Q.C., the solicitor for the Company, wrote to Berry:

We have received from Edwin Case and Stanley Case share certificates of Ketzakey Silver Mines Limited to a total of 1,300,000 shares. Edwin Case has endorsed his certificates in blank and Stanley Case will be coming in in the next day or two to endorse his certificates.

We have drawn an assignment of Edwin Case's claim for tractor rental in the sum of $8,400. This has been signed by him and is held by us.

All the promissory notes referred to in the option agreement have been deposited with us. Edwin Case has endorsed the promissory notes which were drawn in his favour and Stanley will again be coming in the next day or two to endorse the notes which were drawn in his favour or of which he is the holder.

We understand that you are requiring a financial statement of Ketzakey Silver Mines Limited which will not show the obligations of these promissory notes, nor the obligation of the company to Kirwan. Obviously, any true financial statement must continue to show these obligations unless and until

(a) in the case of the notes these have been formally forgiven or otherwise disposed of so that the company no longer owes them, and

(b) in the case of Kirwan, his general release of his $280,000 claim has been deposited with the company. We do not think that the holding of the Kirwan releases by you constitutes deposit with the company.

We think that we have already advised you on the telephone that the transfers of claims are in the Royal Bank in Cassiar, B.C. and will not be released by the bank manager until a general release signed by Kirwan is filed with the bank. In view of the fact that the judgment in the Regehr and Erickson case also affected the monies payable by Ketzakey to Kirwan, we think the bank will also require to be filed with it a copy of the general release which has been executed by Regehr and Erickson and which does release Ketzakey Silver Mines Limited.

We have discussed with Edwin Case and Stanley Case the voting rights on the 1,300,000 shares. They are quite willing to give proxies if this is satisfactory to you. Such proxies would be revocable if default occurs in the payment on the promissory note for $30,000. The promissory note would, of course, be payable whether such revocation of the proxies occurred or not.

Perhaps the first decision that you must make is as to how you are to dispose of the promissory notes presently owing by the company to Messrs. Case. We presume that a formal forgiveness by you or by such person as holds the notes would be sufficient, provided such formal forgiveness were filed with the company's records. You may, however, have some alternative method of getting rid of these obligations of the company.

17    On February 10, 1964, shortly after the agreement had been made with Regehr and Erickson to accept shares, Berry wrote to Mr. H. A. Dyde, Q.C., the solicitor for the company. It is not contested that Berry was authorized to act for the Group. This letter reads in part:

2. W. J. Hay, J. P. Mosling, J. W. Berry and Associates agree to forgive the promissory notes of Edwin Case and Stanley Case that are endorsed over to us, and as outlined in option agreement between Edwin Case and Stanley Case to James W. Berry, J. P. Mosling and William Hay in July, 1963. Also we agree to release of tractor rental assignment in the amount of $8,400.00. In forgiving these notes and rental assignments, it is for the express purpose of freeing the Ketzakey Silver Mines Ltd. of these liabilities.

· · · · ·

5. As you know, it is imperative for Ketzakey Silver Mines Ltd. to get the "messiness" cleaned up, which you have done very well. Also we must have a good financial statement if we are to raise money for next years work. I know you and Ted realize this, and we will appreciate your making the statement as well as it can honestly be done.

18    The Company produced a *pro forma* balance sheet which was headed:

                KETZAKEY SILVER MINES LIMITED

```
                 (Incorporated under the Laws of Alberta)
PRO FORMA BALANCE SHEET AS AT FEBRUARY 29, 1964
     (prepared from the books without audit)
After giving effect to a proposed forgiveness by
shareholders of debts owing to them as follows:
     Account payable                        $ 8,400.00
     6% Notes payable                        36,920.00
     Accrued interest on 6% notes payable     4,088.70
     Agreement for purchase of claims       279,764.96
                                            ----------
                                           $329,173.66
```

19     It is clear there was a promise to release the debts, but was it legally binding on the Berry Group? The debts could have been released by instrument under seal, but such was not done, so the question becomes whether there was a contract to release the debt. In the letter quoted above from Berry to the Company's solicitor, he says the Berry Group agrees to release the debts, and then he says "we must have a good financial statement if we are to raise money for next year's work. I know you and Ted realize this, and we will appreciate your making the statement as well as it can honestly be done." To my mind this constituted an offer to the effect that we will release the debts, and you, the Company, prepare a financial statement showing no debts. The Company immediately accepted this offer by preparing a *pro forma* balance sheet. It is clear law that an offer can be accepted by the conduct of the offeree. In this case the offer was accepted by performance: See *Saint John Tug Boat Co. v. Irving Refinery Ltd.*, [1964] S.C.R. 614, 49 M.P.R. 284, 46 D.L.R. (2d) 1.

20     Next I consider whether there was consideration for the agreement. In *Fleming v. Bank of New Zealand*, [1900] A.C. 577, Lord Lindley, in giving the judgment of the Judicial Commission, said at p. 586:

The case [*Currie v. Misa* (1875), L.R. 10 Ex. 153, 1 App. Case 554] is an important authority on the meaning of consideration. Lush J., in giving the judgment of the Exchequer Chamber, said (at p. 162): "A valuable consideration in the sense of the law may consist either in some right, interest, profit, or benefit accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other: Com. Dig. Action on the case assumpsit B 1-15." This definition has been constantly accepted as correct. Their Lordships so treat it . . .

21     By preparing the *pro forma* balance sheet the Company suffered a detriment, and of course, depending upon the use that was made of the balance sheet, might undertake very great responsibilities. The Company was put to the trouble and expense of preparing the balance sheet and both Berry and Hay admitted receiving the balance sheet. In Boutilier, Re, *(sub nom. Dalhousie College v. Boutilier)* [1934] S.C.R. 642, [1934] 3 D.L.R. 593, the defendant had agreed to pay so much to the college and one of the questions was whether subsequent expenditures by a college constituted consideration. Crocket, J., in giving the judgment of the Court stated at p. 600:

To hold otherwise would be to hold that a naked, voluntary promise may be converted into a binding legal contract by the subsequent action of the promisee alone without the consent, express or implied, of the promisor. There is no evidence here which in any way involves the deceased in the carrying out of the work for which the promised subscription was made other than the signing of the subscription paper itself.

22     In the case at bar the situation was quite different for the Company performed the work at the express request of the Berry Group.

23     It must be remembered that the Berry Group, for all practical purposes were in control of the Company. Almost simultaneously with the promise to release the debts was the acceptance of the offer by the Company by preparing and presenting the balance sheet. Therefore, this is not the *Dalhousie* case for the naked, voluntary promise (if it was such), of the Berry Group was, at the request of the Berry Group, immediately converted into a legal binding agreement by performance by the Company.

24     Whether the consideration was adequate need not concern me. In *Calmusky v. Karaloff* (1946), [1947] S.C.R. 110, [1947] 1 D.L.R. 734, Estey, J., giving the majority judgment stated:

Under such circumstances, while the Courts will inquire as to whether advantage is taken or influence exerted, yet when it is found that neither of these exist and that the parties were equally in possession of all the facts, mere inadequacy of consideration is not a ground for disturbing the contract.

25     Once it is decided that there was a binding agreement between the Company and the Berry Group that the debts be forgiven, then the Settlement Agreement which in effect provided that assets of the Company be distributed in payment of non-existent debts and thus preferred the majority shareholders at the expense of the minority, could not be approved by the majority, even if proper notice had been given.

26     In *Zwicker v. Stanbury*, [1953] 2 S.C.R. 438, [1954] 1 D.L.R 257, the Supreme Court approved the principle enunciated in *Menier v. Hooper's Telegraph Works* (1874), L.R. 9 Ch. 350, which in turn had been approved by the Judicial Committee in *Burland v. Earle*, [1902] A.C. 83, where the Judicial Committee stated at p. 93:

The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, as was alleged in the case of *Menier v. Hooper's Telegraph Works*.

27     There was an attempt to show that the Company was indebted to the Berry Group for $7,969.06. In an affidavit it was stated such moneys had been expended for the benefit of the Company. An expenditure may be made for the benefit of a person without such person being liable to repay the same. Although the affidavit shows most of the debts were incurred in 1963, the *pro forma* balance sheet of February 29, 1964, does not show them. I do not think the evidence goes anywhere near to establishing they were debts of the Company, and in fact what evidence there is, demonstrates the Company would not be liable for them.

28     Counsel for the Berry Group argued:

There was never a finger raised by the Respondents to halt the implementation of the Vending Agreement and they were clearly aware that others were acquiring and disposing of property interests on the supposition that the Vending Agreement was valid. It is clear, therefore, that the Respondents were desirous of accepting the benefits of the Vending Agreement without the accompanying disabilities of the Settlement Agreement. In this it is submitted that they elected.

29     However, the plaintiffs were under no obligation to take any action in respect of the Vending Agreement or to warn the purchasing company, Silver Keys, as to the purchase. Silver Keys was quite aware as to what was going on because Berry and Case were directors of that company. It may be that the Vending Agreement will fall along with the Settlement Agreement. I do not think this Court should make any declaration as to the validity of the Vending Agreement in the absence of one of the parties to it. No declaration will be made regarding the resolution of the shareholders' meeting approving of the Vending Agreement. The learned trial Judge did state that in his opinion the material with respect to the Vending Agreement, if it had been alone, would probably have been sufficient.

30     The plaintiffs ask in their statement of claim for an order directing the Company to apply for winding-up pursuant to the provisions of Part 10 of the *Companies Act*, R.S.A. 1955, c. 53. Whether the Company should be directed to apply to be wound-up was not really argued before us nor was it considered by the trial Judge. I think, therefore, that this question had better be referred back to the Trial Division if the plaintiffs wish such an order. In the result there will be a declaration that the Settlement Agreement was invalid and the question of the winding-up of the Company will be referred back to the Trial Division. The respondents will have their costs.

**EXHIBIT EN-18**

**TO THE DECLARATION OF EVAN NUTTALL**

2017 ABCA 99

Alberta Court of Appeal

Mikkelsen v. Truman Development Corp.

2017 CarswellAlta 473, 2017 ABCA 99, [2017] A.W.L.D. 1698, [2017] A.W.L.D.
1699, [2017] A.W.L.D. 1701, [2017] A.W.L.D. 1704, [2017] A.W.L.D. 1705, [2017]
A.W.L.D. 1706, [2017] A.W.L.D. 1709, 277 A.C.W.S. (3d) 88, 67 B.L.R. (5th) 192

## Wayne Mikkelsen, Colin Wade Mikkelsen, Meghen Anine Mikkelsen and Alana Denise Mikkelsen (Respondents / Plaintiffs / Defendants by Counterclaim) and - Truman Development Corporation (Appellant / Defendant / Plaintiff by Counterclaim)

Peter Martin, Frans Slatter, Barbara Lea Veldhuis JJ.A.

Heard: February 7, 2017
Judgment: March 24, 2017
Docket: Calgary Appeal 1601-0039-AC

Proceedings: reversing in part *Mikkelsen v. Truman Development Corp.* (2016), 2016 CarswellAlta 149, 2016 ABQB 23, M.C. Erb J. (Alta. Q.B.); additional reasons at *Mikkelsen v. Truman Development Corp.* (2016), 2016 CarswellAlta 833, 2016 ABQB 255, M.C. Erb J. (Alta. Q.B.); and reversing in part *Mikkelsen v. Truman Development Corp.* (2016), 2016 CarswellAlta 833, 2016 ABQB 255, M.C. Erb J. (Alta. Q.B.)

Counsel: J.D. Murphy, J. Selnes, for Respondents
R.J. Simpson, Q.C., J.W. Rose, Q.C., for Appellant

*Per curiam*:

1    The appellant appeals a judgment directing the removal of caveats from the respondents' lands, and dismissing the appellant's counterclaim for enforcement of a joint venture agreement: *Mikkelsen v. Truman Development Corp.*, 2016 ABQB 23 (Alta. Q.B.). The appellant's arguments establish that the joint venture agreement was valid and binding, contrary to the findings at trial, but the outcome is unchanged because the parties subsequently terminated the joint venture agreement.

**Facts**

2    At trial the parties filed an extensive Statement of Admitted Facts, which is reproduced in para. 16 of the trial reasons. In summary, the respondent Wayne Mikkelsen owned a section of land near Langdon that his family had farmed for many years. The parties had some prior dealings in 1999 with respect to the purchase and sale of some Chestermere lands. In 2006 Mr. Trutina, the appellant's principal, had his lawyer prepare a joint venture agreement for the Langdon lands. The parties met at the Mikkelsen farm on January 17, 2007, and both signed the joint venture agreement. The appellant's lawyer noted some deficiencies in the execution of the agreement, and on February 14, 2007 Mr. Mikkelsen and his wife attended before a lawyer to re-sign the joint venture, and execute a release of dower.

3    The appellant filed caveats on the land. There were further discussions between the parties about Mr. Mikkelsen's desire to roll the land over to himself and his three children, the present respondents. On December 10, 2007 the parties met again and signed a Termination Agreement which stated: " . . . the Joint Venture Agreement . . . will be terminated as of this date and that the caveat in favor of Truman Development Corporation will be removed."

4    A discharge of one of the caveats was prepared. In the end, the caveats were not all removed. Mr. Mikkelsen did roll the lands over to himself and his three children. Mr. Trutina continued work on the potential planning, development, and subdivision

of the Langdon lands and neighbouring lands. He attended at a number of public meetings, and dealt with a number of public bodies respecting the potential development, and expended considerable sums in doing so. In 2011 Mr. Mikkelsen discovered that the caveats had not all been removed and commenced this action.

5    At trial, the parties disclaimed the various agreements they had signed. Mr. and Mrs. Mikkelsen alleged that they did not understand the nature of the joint venture agreement, they were surprised when Mr. Trutina showed up with it, he just "talked and talked", and they signed that agreement thinking it was only a "working arrangement". Mr. Trutina testified that he signed the Termination Agreement at a lunch meeting where he had been drinking, while he was taking pills for health reasons, and that he had not read the document before he signed it. He asserted that the Termination Agreement was only executed to permit the rollover to the children, after which time the joint venture would remain in effect.

6    The trial judge made a number of findings with respect to the validity and enforceability of the joint venture agreement:

   (a) the parties never reached a *consensus ad idem*. The Mikkelsens thought the joint venture was only a "working arrangement" subject to further negotiation (paras. 153, 158-9);

   (b) the joint venture was too uncertain to be enforced (paras. 160-1);

   (c) there was no duress, coercion or fraud that would undermine the joint venture agreement (paras. 165-7);

   (d) however, the terms of the joint venture were unconscionable (para. 168).

As a result, the joint venture was not a valid agreement.

7    Because the trial reasons concluded that the joint venture agreement was not enforceable, little discussion was directed to the validity of the Termination Agreement. One inference to be drawn from the reasons (see *infra*, para. 32) is that the Termination Agreement was enforceable, and that the joint venture agreement was (in any event) terminated at that time. The appellant argues that a new trial is required on the validity of the Termination Agreement.

8    The appellant had spent $438,368.06 on the planning and development of the Langdon lands, and certain adjacent lands in which the appellant also expressed interest. The trial judge concluded that $130,847.19 of these expenses were attributable to the Langdon lands, and in supplemental reasons awarded the appellant judgment on its counterclaim in that amount: *Mikkelsen v. Truman Development Corp.*, 2016 ABQB 255 (Alta. Q.B.). The supplemental reasons also awarded the successful respondents enhanced costs of $300,000, which were then reduced by $100,000 because of unfounded allegations of fraud that had been made against the appellant.

**Issues and Standard of Review**

9    The appellant challenges the trial findings on certain portions of the evidence, as well as many of the findings with respect to the validity of the joint venture agreement. It argues that no determination was made with respect to the validity of the Termination Agreement, which requires a new trial. Finally, it argues that a greater amount of the development costs should have been awarded on the counterclaim, and that the costs award is excessive.

10    The standards of review are summarized in *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235 (S.C.C.):

   (a) conclusions on issues of law are reviewed for correctness: *Housen* para. 8,

   (b) findings of fact, including inferences drawn from the facts are reviewed for palpable and overriding error: *Housen* paras. 10, 23; *L. (H.) v. Canada (Attorney General)*, 2005 SCC 25 (S.C.C.) at para. 74, [2005] 1 S.C.R. 401 (S.C.C.), and

   (c) findings on questions of mixed fact and law call for a "higher standard" of review, because "matters of mixed law and fact fall along a spectrum of particularity": *Housen* paras. 28, 36. A deferential standard is appropriate where the decision

results more from a consideration of the evidence as a whole, but a correctness standard can be applied when the error arises from the statement of the legal test: *Housen* paras. 33, 36.

Findings of credibility that underlie the factual findings are also entitled to deference on appeal.

11      Costs awards are discretionary and will not be interfered with unless it is shown the judge made an error in principle or the costs award is plainly wrong: *RVB Managements Ltd. v. Rocky Mountain House (Town)*, 2015 ABCA 304 (Alta. C.A.) at para. 6, (2015), 609 A.R. 55 (Alta. C.A.); *Hamilton v. Open Window Bakery Ltd.* (2003), 2004 SCC 9 (S.C.C.) at paras. 24-27, [2004] 1 S.C.R. 303 (S.C.C.); *M. (N.) v. W. (F.)*, 2004 ABCA 151 (Alta. C.A.) at para. 7, (2004), 348 A.R. 143 (Alta. C.A.).

### Credibility Findings

12      The appellant challenges the credibility findings made at trial. Such findings attract a very high level of deference on appeal. For example, the trial judge discounted Mr. Trutina's evidence because he indicated that a particular meeting happened on a day when the Mikkelsens were sailing out of the province. An error of that kind can easily be made, and does not necessarily reflect an unreliable witness. When Mr. Trutina attempted to correct his evidence he was criticized for adapting his answers to the other evidence.

13      On the other hand, little was made at trial of the fact that Mrs. Mikkelsen refused to admit making handwritten annotations on an early draft of the joint venture. The number of persons who might possibly have made those annotations was limited. The appellant introduced the evidence of a handwriting expert, who testified that there was only a "remote" possibility that the notations had been made by someone else. This evidence was dismissed at paras. 121-2 because there was "evidence for the Court to make a determination without assistance" on the issue. However, since there was a dispute over the authorship of the annotations, the expert evidence might well have made a difference, and in that sense was "necessary". This evidence was arguably important, because it demonstrated that the Mikkelsens were not surprised by Mr. Trutina's presentation of the joint venture agreement, but rather had had an opportunity to vary its terms. This was also directly relevant to whether the Mikkelsens believed it was merely a "working arrangement". Failure to recognize the relevance of tendered evidence is an error of law.

14      Some of the appellant's arguments on the credibility findings create some concern, but in the end it cannot be said that the trial judge's general findings of credibility rise to the standard of palpable and overriding error. The trial judge had the advantage of hearing all of the witnesses, and assessing their evidence in the context of the complete record, and appellate interference with the overall credibility findings is not warranted. The credibility findings were not based solely on the points raised by the appellant.

### *Consensus Ad Idem*

15      The trial judge concluded that the joint venture agreement was unenforceable because the parties never reached a *consensus ad idem*. The trial judge correctly noted at para. 162 that this is an objective test:

> 162 I find the parties did not reach *consensus ad idem*. Applying an objective analysis, it must be clear to a reasonable bystander on a consideration of the material facts that the parties intended to enter into a binding contract and that the essential terms can be determined with a reasonable degree of certainty.

The findings on this point reflect reviewable error. If one thing is clear, it is that the joint venture agreement is actually a binding and comprehensive joint venture for the development of the land. As the appellant reasonably argues, an objective bystander would have no doubt in thinking that the professionally drafted joint venture agreement was clearly intended to create legally binding obligations, and that it dealt with all the essential terms of a joint venture: *Ron Ghitter Property Consultants Ltd. v. Beaver Lumber Co.*, 2003 ABCA 221 (Alta. C.A.) at para. 8, (2003), 17 Alta. L.R. (4th) 243, 330 A.R. 353 (Alta. C.A.).

16      As the *Ghitter* case holds, the starting point of the analysis is the agreement itself. If the wording of the contract is plain and unambiguous, that is the end of the matter. The wording of this joint venture agreement is indeed plain and unambiguous; there is no room for arguing that it is merely a "working arrangement". The document is entitled "Joint Venture Agreement",

and is formally drafted and executed. It recites in its preamble that the parties have "agreed to form a Joint Venture for the specific purpose of facilitating the development" of the Langdon lands. It confirms in article 19.7 that it is "binding upon the parties hereto", and contains all the other usual indicia of a fully binding contract.

17    The trial reasons at para. 154 also mischaracterized the joint venture because it was described in the caveats as an "interim agreement". The full wording of the caveats refers to " . . . an Interim Agreement . . . whereby the Vendor agreed to sell the Lands to the Purchasers . . . ". Describing the joint venture as an interim agreement merely signifies it was signed in anticipation of a future closing date at which time the title and the purchase price were to be exchanged. It was still a final and binding agreement; in this context "interim" does not mean temporary or subject-to-finalization.

18    A party cannot sign a document that is obviously one thing (in this case a joint venture) and then argue that the document is something else (in this case a "working arrangement") just because they subjectively believed so: *Langley Lo-Cost Builders Ltd. v. 474835 B.C. Ltd.*, 2000 BCCA 365 (B.C. C.A.) at para. 77, (2000), 76 B.C.L.R. (3d) 278 (B.C. C.A.). This is essentially a plea of *non est factum*, which must fail on this record. The respondents were not unsophisticated, and had dealt with land before. When they attended before their lawyer to re-execute the joint venture agreement, they had ample opportunity to reflect on what it meant, and to discuss it with their lawyer. There is no explanation for why a mere "working arrangement" would need to be re-executed (with the addition of a waiver of dower) to make it legally binding. The joint venture agreement is not invalid because of a failure to reach a consensus.

**Uncertainty**

19    The trial reasons at paras. 160-1 also concluded that the joint venture agreement was too uncertain to be enforced, an issue that was not pled or argued. It was said that there was "no timeframe specified" about when the land would be developed. Development of land is, however, a very long term process. There are many hurdles to overcome, and it is not surprising that no specific time line could be outlined. The joint venture agreement contains all of the essential elements required to create an enforceable contract, including as to time (for example, in Articles 2.1, 14.1, 16.1, and 16.2 of the agreement). The development horizon may have been far into the future, and some of the actual deadlines subject to the decisions of third parties, but overall the agreement could be performed in accordance with its terms: *BCE Development Corp. v. Cascade Investments Ltd.* (1987), 80 A.R. 386 (Alta. Q.B.) at paras. 59-64, (1987), 55 Alta. L.R. (2d) 22 (Alta. Q.B.), aff'd 1987 ABCA 240 (Alta. C.A.) at para. 12 #4, (1987), 56 Alta. L.R. (2d) 349 (Alta. C.A.), leave to appeal refused [1988] 1 S.C.R. vi (S.C.C.); *Langley Lo-Cost Builders Ltd. v. 474835 B.C. Ltd.* at para. 63.

20    The trial reasons also noted at para. 161 that the joint venture contemplated the creation of a NewCo, something that was never done. The reasons concluded " . . . this means any characterization of the Agreement as a joint venture through NewCo was not concluded." The fact that a contract might not yet have been fully performed has nothing to do with its essential validity; at most it might reflect that one party or the other is in breach of its obligations.

21    The essence of the transaction was that the respondents would roll their land into a new company, and the appellant would provide the funds and expertise to develop it. A developer like the appellant would obviously not be prepared to commit significant funds to the venture unless there was some assurance that it would benefit from the development if and when it eventually happened. Given the lengthy timeline required to develop land, it is neither surprising nor an impediment to enforceability that this joint venture agreement might not have been concluded for years or even decades.

**Consideration**

22    The respondents also argued that the joint venture agreement was unenforceable because it was not supported by consideration. The joint venture agreement, on its face, reflects ample consideration from and to each party. The appellant was to expend funds on the development of the lands, and acquire an interest in NewCo that was to be the corporate vehicle for it. The respondents were to contribute the land and receive various forms of payment and other benefits. The fact that the trial reasons awarded the appellant $130,847.19 for development costs is ample proof that the appellant gave valuable consideration.

23      The trial reasons find at para. 163 that the respondents received " . . . flawed consideration in that Mr. Mikkelsen was to tie up the Langdon Land indefinitely with no benefit". The common law does not concern itself with the relative value of the consideration given, and does not attempt to measure "flawed consideration": *Kostic v. Piikani Nation*, 2017 ABCA 53 (Alta. C.A.) at para. 15; *Styles v. Alberta Investment Management Corp.*, 2017 ABCA 1 (Alta. C.A.) at para. 51. As has been repeatedly held, a peppercorn will provide ample consideration to support a transaction.

24      Further, the joint venture agreement recites that it is in consideration of the mutual covenants in it and "the payment of $10". The respondents argue that they never received the $10, but that merely means that the appellant may owe them $10. Failure to pay some or all of the consideration may demonstrate a breach of contract, but it does not mean that there is no consideration supporting the agreement. The consideration argument is without merit.

**Unconscionability**

25      The appellant also questions the finding that this joint venture agreement is so inherently unfair that it is unconscionable. The test for unconscionability is strict. It is usually founded in some misconduct or sharp practice at the formation of the contract, often when there is an imbalance in bargaining power: *Canadian Imperial Bank of Commerce v. Ohlson*, 1997 ABCA 413 (Alta. C.A.) at paras. 18-24, (1997), 57 Alta. L.R. (3d) 213, 209 A.R. 140 (Alta. C.A.); *Cope v. Hill*, 2007 ABCA 32 (Alta. C.A.) at paras. 16, 21. In *Harry v. Kreutziger* (1978), 95 D.L.R. (3d) 231 (B.C. C.A.) at p. 241, (1978), 9 B.C.L.R. 166 (B.C. C.A.) at p. 177 the doctrine was said to come down to the "single question of whether the transaction, seen as a whole, is sufficiently divergent from community standards of commercial morality that it should be rescinded". The Mikkelsens had dealt with land before, they had engaged in previous transactions with the appellant, they had input into the terms of the agreement, they were educated persons, they had legal advice, and there is no basis to find an imbalance in bargaining power here.

26      The trial reasons held:

> 155 Mr. Trutina asks this Court to accept that Mr. Mikkelsen would tie up nearly a full section of valuable land on a deal that he had considered for less than three hours for a $10 payment which likely was not paid, effectively giving half the land to Mr. Trutina on the mere hope of garnering a return from a development that might not materialize for decades. This makes no sense.

> 168 . . . I would further set it aside on the basis that the Agreement would result in a grossly unfair bargain where Mr. Mikkelsen was expected to sell half of his land at a fifty percent reduction in value, then effectively donate the other half to an unregistered NewCo on the basis of a possible development project, contingent on an event, annexation, occurring over which neither party have any control. There were no other assets in NewCo. To enforce such an agreement would be unconscionable.

This analysis reflects a fundamental misunderstanding of the transaction, and the law.

27      The joint venture followed a standard legal business model. A NewCo would be incorporated. The landowner would roll the land into Newco for one half the shares and 50% of the value of the land. The developer would acquire the other one half of the shares, and provide the cash and expertise necessary to develop the land. The Mikkelsens were not expected to "donate" anything. They were to receive one half of the value of the lands in cash, and one half of the shares in the company, reflecting the other half the value of the land. Further, the land was not being sold at a "fifty percent reduction in value". The joint venture agreement had originally been drafted in contemplation of a value of $16,000 per acre, which the Mikkelsens changed to $20,000 an acre (a total price increase of $1.2 million). The evidence at trial confirmed that this was the market value.

28      Unconscionability must not be confused with whether one side or the other got a "better deal": *Cain v. Clarica Life Insurance Co.*, 2005 ABCA 437 (Alta. C.A.) at para. 35, 384 (2005), 384 A.R. 11, 54 Alta. L.R. (4th) 146 (Alta. C.A.). As noted (*supra*, para. 23) the common law does not concern itself with the relative value of the consideration given, and does not attempt to measure "flawed consideration". A court is not able to set aside a transaction just because it does not agree with the business sense of the agreement entered into by the parties.

29     There may be some transactions that are so unfair that a trial judge can tell simply by looking at it that it is unconscionable. In this case the expert witnesses testified as to some of the complexities involved in developing land, but there was no expert evidence to disclose what would be the "normal" joint venture terms that would be entered into by a landowner and a developer. The trial judge had no standard against which to measure "unconscionability", and this was not a situation where judicial notice could be taken. The finding of unconscionability reflects reviewable error.

**Summary on the Joint Venture Agreement**

30     In summary, there is reviewable error in the findings, on each of the four issues just discussed, that the joint venture agreement was unenforceable. While the Mikkelsens may have had a misunderstanding or second thoughts about the agreement they entered into, the joint venture was a binding contract.

**The Termination Agreement**

31     The findings with respect to the validity of the joint venture agreement are, at the end of the day, potentially moot. Even if the joint venture agreement was validly entered into and was enforceable, it *prima facie* ceased to exist on December 10, 2007 when the Termination Agreement was signed. The key issue, therefore, becomes whether the Termination Agreement is enforceable. The appellant argues that a new trial is required to resolve this issue.

32     The appellant argues that the trial reasons did not decide this issue. The key passages are:

134 In August, 2011, three years after the termination agreement was signed, Mr. Mikkelsen attempted to pursue a new joint venture agreement with Mr. Trutina. It is evidence of his belief that the termination agreement had ended the relationship with Truman Development at that time. By signing the termination agreement, the parties mutually agreed not to be bound by the Agreement. In my view, the termination agreement is evidence of an acknowledgement by Mr. Trutina that the Agreement did not reflect both parties' understanding of what their deal was supposed to be. I find that he knew the Caveats should not have been maintained on the Langdon Land, which was remedied when he signed the termination agreement . . .

156 . . . I find the termination agreement reflected Mr. Trutina's acknowledgement that the Caveats should not have been maintained. Because the Agreement did not reflect what both parties understood the deal was to be, it was also a valuable promise from Mr. Mikkelsen to revisit with Mr. Trutina the prospect of an Agreement for the development of the Langdon Land after three years. He attempted to do so in 2011, fulfilling his promise.

157 By signing the termination agreement, Mr. Trutina demonstrated that he was prepared to try to put Mr. Mikkelsen at ease about their relationship (by agreeing to discharge the Caveats) and was further prepared to do or say whatever it took to get what he wanted from Mr. Mikkelsen . . .

While they unfortunately do not contain a blunt statement to that effect, the trial reasons are consistent with a finding that the Termination Agreement was enforceable on its face.

33     The appellant also challenged the Termination Agreement on the basis that there was no consideration for it. The Termination Agreement was supported by good consideration, because each party discharged the other from the requirement to perform its obligations under the joint venture agreement.

34     The essence of the appellant's argument, however, is that even if the Termination Agreement was, on its face, valid, it was delivered under conditions. Specifically, it was only signed to permit the tax rollover to occur. The appellant argues that the respondents are "estopped" from arguing that the Termination Agreement is effective to end the joint venture. The appellant argues that the trial reasons do not analyse its "estoppel" argument, which was pled and argued. Again, while the trial reasons do not contain an express discussion of the "estoppel" line of argument, the reasons as a whole are consistent with a finding that the Termination Agreement was absolute, and not just delivered to enable the rollover to occur.

35     The following findings and passages in the reasons are relevant:

6

• From the Statement of Admitted Facts (reasons, para. 16):

> • Mr. Trutina agreed to accommodate the Tax Rollover,

> • In December 2007 counsel was retained to implement the Tax Rollover, and that counsel asked the appellant's counsel for discharges of the caveats,

> • The appellant's counsel indicated that the caveats could be discharged if the joint venture was re-executed following the Rollover,

> • The parties discussed the issues respecting the caveats, and on December 10, 2007 they signed the Termination Agreement,

> • The appellant's counsel sent a discharge of a caveat in trust for a re-executed copy of the joint venture, but that trust condition was deleted on December 18, 2007 (reasons, para. 103),

> • In January, 2008, the transfer of land to the children related to the Tax Rollover was registered,

> • In June 2011 (over three years later) Mr. Mikkelsen contacted Mr. Trutina again asking for a removal of the caveats. When they were not removed, this litigation was started;

• Mr. Mikkelsen took the position throughout the parties' dealings that he intended to roll over the Langdon lands to his children (reasons, paras. 21, 29, 68, 83, 136-7, 145);

• In December 2007, Mr. Trutina instructed the appellant's lawyer to send a discharge of the caveat on the southwest quarter section on trust conditions as a "show of good faith", and then authorized the removal of the trust condition. No mention of the Termination Agreement was apparently made at that time, and the lawyer first found out about it in 2011 (reasons, paras. 103, 105; transcript, p. 483, l. 24-31);

• The appellant's argument that Mr. Trutina does not read English well, and that he did not read the Termination Agreement before he signed it, were rejected by the trial judge at paras. 132, 141. Mr. Trutina is a sophisticated businessman, the meaning of the Termination Agreement is plain, and it contains no conditions precedent or reservations;

• In August, 2011 Mr. Mikkelsen attempted to negotiate a new joint venture agreement, which was arguably consistent with a belief that there was no previous joint venture agreement still in existence (reasons, para. 134);

• "In my view, the termination agreement is evidence of an acknowledgement by Mr. Trutina that the [joint venture] Agreement did not reflect both parties' understanding of what their deal was supposed to be. I find that he knew the Caveats should not have been maintained on the Langdon Land, which was remedied when he signed the termination agreement." (reasons, para. 134);

• Mr. Trutina knew and acknowledged that he did not have a binding agreement in the Langdon lands, just an expectation that he might be given the first opportunity to purchase it, and this was "a gamble he routinely took" with respect to developable land (reasons, paras. 147-8, 153);

• " . . . The [joint venture] Agreement was not a valid contract so there was no need for a termination agreement. That said, I agree with the plaintiffs that the parties' mutual release of obligations under the Agreement could be valid consideration. I find the termination agreement reflected Mr. Trutina's acknowledgement that the Caveats should not have been maintained. Because the Agreement did not reflect what both parties understood the deal was to be, it was also a valuable promise from Mr. Mikkelsen to revisit with Mr. Trutina the prospect of an Agreement for the development of the Langdon Land after three years. He attempted to do so in 2011, fulfilling his promise." (reasons, para. 156);

• "By signing the termination agreement, Mr. Trutina demonstrated that he was prepared to try to put Mr. Mikkelsen at ease about their relationship (by agreeing to discharge the Caveats) and was further prepared to do or say whatever it took to get what he wanted from Mr. Mikkelsen." (reasons, para. 157);

• In the face of the respondents' demand that the caveats be removed, Mr. Trutina asked his lawyer if a promise to discharge caveats could be enforced, supporting an inference that such a promise had been given (reasons, para. 105; transcript, p. 482, l. 29-30). The lawyer did not testify that he was told that the Termination Agreement was only intended to facilitate the rollover.

These extracts, considered collectively, are inconsistent with any finding that the Termination Agreement was only signed to accommodate the tax rollover.

36      There are several options available on appeal where there is no explicit finding at trial of a critical fact. They include:

(a) remitting the matter back to the trial judge to decide the missing issue on the existing record (R. 14.75(1)(d); *R. c. Bellusci*, 2012 SCC 44 (S.C.C.) at paras. 41-2, [2012] 2 S.C.R. 509 (S.C.C.)),

(b) remitting the matter back for a new trial limited to that issue (R. 14.75(1)(d) and (f)), or

(c) sending the entire cause of action back for a new trial (R. 14.75(1)(f)).

It is, however, generally desirable for the Court of Appeal to attempt to resolve the issue on the existing record, if that is possible without prejudicing either party. O'Leary JA summarized the law in *Foley v. Alberta (Administrator, Motor Vehicle Accident Claims Act)*, 2002 ABCA 297 (Alta. C.A.) at para. 169, (2002), 15 Alta. L.R. (4th) 231, 330 A.R. 1 (Alta. C.A.):

169 The Court has jurisdiction to [decide the overlooked issue] under Rule 518(e) [now R. 14.75(1)(c)] of the *Alberta Rules of Court*. It is well established that appellate courts may make a fresh assessment based on the trial record when that is in the interests of justice and feasible on a practical level: *Hollis v. Dow Corning Corp.*, [1995] 4 S.C.R. 634 at para. 33. In fact, a reviewing court has an obligation to make a fresh assessment when it finds error in the first decision and a fresh assessment on the record is appropriate: *Nova, An Alberta Corp. v. Guelph Engineering Co.* (1989), 70 Alta. L.R. (2d) 97 at 110-12 (Alta. C.A.), *Prudential Trust Co. Ltd. v. Forseth*, [1960] S.C.R. 210 at 216, citing with approval *S.S. Hontestroom v. S.S. Sagaporack*, [1927] A.C. 37 at 47-8.

Whether the Court of Appeal should decide the issue on the existing record, or order a new trial, depends on the nature of the issue, the completeness of the record, and issues such as whether the missing finding depends on findings of fact or credibility.

37      The appellant argues that the trial judge failed to clearly decide a key issue, namely whether the Termination Agreement was only signed on conditions relating to the tax rollover. It argues that the only remedy is a new trial. There are, however, enough findings of fact and credibility on this record to make a new trial unnecessary. The passages from the reasons quoted *supra*, para. 32, are only consistent with a finding by the trial judge that the Termination Agreement was valid and unconditional. In any event, the factual finding summarized *supra*, para. 35, support the validity of the Termination Agreement. The findings of the trial judge are clearly that the Termination Agreement was part of a larger understanding by the parties that the original joint venture (although binding in law) did not reflect their true intentions. As such, it was designed to terminate the joint venture for all purposes, not just to accommodate the rollover. A new trial is not warranted on this issue.

**The Development Costs Allocation**

38      The trial reasons recognized that the appellant had expended significant funds on the potential development of the Langdon lands, which would eventually accrue to the benefit of the respondents. The supplemental reasons awarded the appellant a proportion of those costs. Since some of the costs benefited larger areas of land, the appellant was awarded only a proportion of the costs based on a "per owner" allocation. The appellant argues on appeal that a greater proportion of the development costs

should have been awarded. Specifically, the appellant argues that the costs related to the Langdon Waterworks study primarily or only benefited the respondents' lands. The supplemental reasons at para. 15, however, find to the contrary.

39      There was limited detail about the servicing costs. The Statement of Admitted Facts recites that the Langdon Waterworks Strategic Servicing Plan covered "the Langdon area which included the Langdon Land". The Langdon Waterworks Strategic Servicing Plan Agreement indicates in Schedule B that it covered six quarter sections of land, four of which are the Mikkelsens' Langdon Lands. The trial reasons do not explain why these costs were allocated on a "per owner" basis, rather than on a "per parcel" basis. Logically, the latter is the most appropriate methodology, and absent any explanation for the method of division, the conclusion reflects palpable and overriding error. The appeal should accordingly be allowed in part, and the appellant is entitled to judgment for two-thirds of the $321,368.88 Waterworks Strategic Servicing Plan costs, plus the additional expenses of $50,504.97, for a total of $264,750.89.

**Trial Costs**

40      The supplemental reasons also awarded the successful respondents enhanced costs of $300,000, which were then reduced by $100,000 because of unfounded allegations of fraud that had been made against the appellant. The appellant challenges the costs award. Costs awards are highly discretionary, and the trial judge did not consider any irrelevant factors, nor ignore any relevant factors. It is not an error of principle to consider unsuccessful or informal offers of settlement when awarding costs. Notwithstanding the errors in the trial reasons, the respondents are still the successful parties. The costs awarded are within a reasonable range, and no basis has been shown for appellate intervention.

**Conclusion**

41      In conclusion, this litigation can be resolved without a new trial. While there are flaws in the decision respecting the validity of the joint venture agreement, no reviewable error in the ultimate result has been shown. The appellant is entitled to recover $264,750.89 in development costs but the appeal is otherwise dismissed.

*Appeal allowed in part.*

2017 CarswellAlta 2438
Supreme Court of Canada

Wayne Mikkelsen, et al. v. Truman Development Corporation

2017 CarswellAlta 2438, 2017 CarswellAlta 2439, [2017] S.C.C.A. No. 176

## Wayne Mikkelsen, Colin Wade Mikkelsen, Meghen Anine Mikkelsen and Alana Denise Mikkelsen v. Truman Development Corporation

McLachlin C.J.C., Abella J., Moldaver J., Karakatsanis J., Wagner J., Gascon J., Côté J., Brown J., Rowe J.

Judgment: November 16, 2017
Docket: 37572

Proceedings: Leave to appeal refused, 2017 CarswellAlta 473, 277 A.C.W.S. (3d) 88, [2017] A.W.L.D. 1698, [2017] A.W.L.D. 1699, [2017] A.W.L.D. 1701, [2017] A.W.L.D. 1704, [2017] A.W.L.D. 1705, [2017] A.W.L.D. 1706, [2017] A.W.L.D. 1709, 2017 ABCA 99, 67 B.L.R. (5th) 192 (Alta. C.A.)Reversed (in part), 2016 CarswellAlta 149, 263 A.C.W.S. (3d) 370, [2016] A.W.L.D. 875, [2016] A.W.L.D. 876, [2016] A.W.L.D. 877, 2016 ABQB 23 (Alta. Q.B.)Reversed (in part), 2016 CarswellAlta 833, 267 A.C.W.S. (3d) 596, [2016] A.W.L.D. 2475, [2016] A.W.L.D. 2476, [2016] A.W.L.D. 2481, [2016] A.W.L.D. 2488, [2016] A.W.L.D. 2490, [2016] A.W.L.D. 2491, [2016] A.W.L.D. 2492, 2016 ABQB 255 (Alta. Q.B.)Additional reasons, 2016 CarswellAlta 149, 263 A.C.W.S. (3d) 370, [2016] A.W.L.D. 875, [2016] A.W.L.D. 876, [2016] A.W.L.D. 877, 2016 ABQB 23 (Alta. Q.B.)

Counsel: Counsel — not provided

Subject: Civil Practice and Procedure; Contracts; Property

**Per curiam:**

1    The application for leave to appeal from the judgment of the Court of Alberta (Calgary), Number 1601-0039-AC, 2017 ABCA 99, dated March 24, 2017, is dismissed with costs.

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**EXHIBIT EN-19**

**TO THE DECLARATION OF EVAN NUTTALL**

1956 CarswellBC 186
Supreme Court of Canada

Union Steamship Ltd. v. Barnes

1956 CarswellBC 186, [1956] S.C.R. 842, 5 D.L.R. (2d) 535

## Union Steamships Limited (Defendant), Appellant and Archie Barnes (Plaintiff), Respondent

Rand, Locke, Cartwright, Fauteux and Nolan JJ.

Judgment:* October 26, 1955
Judgment: October 27, 1955
Judgment: June 14, 1956
Judgment: October 2, 1956

Proceedings: On appeal from the Court of Appeal for British Columbia

Counsel: *L.S. Eckardt* and *A.H. Ainsworth*, for the plaintiff, respondent, at the first hearing.
*A. Bull, Q.C.*, and *J.I. Bird*, for the defendant, appellant, at the first hearing.
*L.S. Eckardt*, for the plaintiff, respondent, at the second hearing.
*J.I. Bird*, for the defendant, appellant, at the second hearing.

**Related Abridgment Classifications**
Evidence
I Proof
    I.6 Presumptions
        I.6.d Miscellaneous
Transportation
I Carriers
    I.5 Liability for injury
        I.5.a Injury to passengers
            I.5.a.v Limitation of liability

**Headnote**

Carriers --- Liability for injury — Injury to passengers — Limitation of liability — Passenger's notice of limitation

Ship — Notice of conditions — Printed on ticket in red — Whether reasonable attempt to attract passenger's attention.

If a ship's ticket limiting the liability of the carrier is accepted without objection by the person to whom it is tendered this person is as a general rule bound by its contents and his act amounts to an acceptance of the offer to him whether he reads the document or otherwise informs himself of its contents or not, and the conditions contained in the document are binding upon him; but if there be an issue as to whether the document does contain the real intention of both the parties the person relying upon it must show either that the other party knew that there was writing which contained conditions or that the party delivering the form had done what was reasonably sufficient to give the other party notice of the conditions, and that the person delivering the ticket was contracting on the terms of those conditions. In the present case, held, the endorsement on the face of the ticket printed in red ink and referring to the conditions endorsed on the reverse side constituted a reasonable attempt to bring to the passenger's attention the terms of the contract and his acceptance of the ticket without protest and embarking upon the voyage precluded him from reprobating its terms, relying upon the fact that he did not read it.

***Rand J. (dissenting)***:

1    The question raised is whether a common carrier of passengers by water is entitled to rely on a condition printed on a ticket providing exemption from liability for negligence as forming a term of the carriage.

2    The vessel was engaged in a coastal service in British Columbia. The means employed was the printing on the ticket in small type and red ink of a notice that conditions were set forth on the back; and a line was provided for the passenger's name, whether for signature or mere insertion is not made clear. The respondent and his family had been taken aboard about 5 o'clock a.m., December 29, 1951 by means of a sling. Accompanied by them and a steward, he went to the purser's office to purchase passage and state-room tickets to the next port of call. In the meantime, while the tickets were being purchased, the ship was already on her way out of the harbour. The respondent noticed printing on the face of the passage ticket but did not read it or sign it. He was in a hurry to get his children abed which called for some clothes in the baggage. The steward, accompanied by the respondent for the purpose of pointing out the piece of baggage to be brought up, left the state-room to go below. The respondent, passing through a door into a dark space, fell down a hatchway and was badly injured.

3    The rule of law governing that question I take to be this: was what was done by the carrier reasonably sufficient to bring to the attention of the passenger — himself acting with the alertness of the ordinary man — this exceptional condition? Although Canadian courts, in contrast with those of many jurisdictions in the United States, have declined to hold that a common carrier cannot contract out for negligence, yet the requirement of notice laid down is intended to ensure that effective means within the range of reasonable action in the circumstances shall be employed to apprise a passenger of exceptional terms, in derogation of its common law duty, on which the carrier professes to undertake the transportation. Whatever the practicality of the choice presented by such a notice may be, theoretically, what is done must be such as is deemed to have brought notice of it to the patron's attention.

4    In the circumstances here it seems almost absurd to say that the passenger, already on his voyage, can be said to have been given reasonable notice of such an extreme and unusual term of the ticket, or, as it is put, that the carrier had taken reasonable steps to bring it to his attention. Everything was hurried; his getting aboard, the vessel getting under weigh, the purchase of the tickets with the steward at his elbow, the settling of the family in the stateroom and the hastening for the baggage. One has only to imagine the incongruity of stopping to examine a ticket in such surroundings to ascertain its terms.

5    It is in these conditions that the company claims to be able to say to him: "We told you that we carried only at your own risk of injury through our negligence and this you accepted." The examination of the ticket would, in those circumstances, be made by no person and none would anticipate such a condition. With an intention to carry passengers only at their own risk, one would have thought that common candour would make this known not by small letters on a small ticket but, at least in addition, by means that would make that important fact known almost to the dullest. It was not a case of a special feature: it was a regular ticket sold at the regular fare for passage on the regular service. If the company should object to advertising its terms in the suggested manner, for what reason would that be?

6    I can think of none other than that such an advertisement would not promote patronage. This would mean that passengers generally did not read the conditions and that there was no reason to provoke discussion on the matter unnecessarily; it would be sufficient when the passenger was injured to invite his attention to the terms of the ticket. Accidents would be relatively few and injuries would not be as objectionable a means of publication as the open notice.

7    Such a conditioned service could amount to a virtual deception of passengers. That it could be reasonable to place carriage of this nature at the entire risk of the passenger I agree; the special circumstances of a local accommodation in given areas even at that risk could no doubt be of much convenience to residents along the coast. But equally the terms of the accommodation should be openly avowed.

8    I do not examine the question whether the undertaking, commenced when the passenger boarded and the ship weighed anchor, continued regardless of the terms on the ticket; I will assume that the passenger, knowing he must buy a ticket, agreed in advance that it should govern the carriage from the beginning.

9      That in these conditions the company has failed in its duty of constructive notification is supported by what has been laid down in the courts of England and Scotland. In *Henderson et al.* (*Steam-Packet Company*) *v. Stevenson* [1], which, as here, was a case of carrier by water, the language of Lord O'Hagan at p. 481, although more exacting, perhaps, than the decision of the House can be said to have been, is peculiarly apposite in indicating the back-ground of general considerations in which the question is to be viewed: —

> When a company desires to impose special and most stringent terms upon its customers, in exoneration of its own liability, there is nothing unreasonable in requiring that those terms shall be distinctly declared and deliberately accepted; and that the acceptance of them shall be unequivocally shewn by the signature of the contractor. So the Legislature have pronounced, as to cases of canals and railways, scarcely distinguishable in substance and principle from that before us; and if the effect of your Lordships' affirmation of the interlocutor of the Lord Ordinary be to compel some precaution of this kind, it will be manifestly advantageous in promoting the harmonious action of the law, and in protecting the ignorant and the unwary.

10      In *Parker v. The South Eastern Railway Company* [2], the duty of the company is stated by Mellish L.J. in these words: —

> But if what the railway company did is not sufficient to convey to the minds of people in general that the ticket contains conditions, then they have received goods on deposit without obtaining the consent of the persons depositing them to the conditions limiting their liability ... that if he knew there was writing on the ticket, but did not know or believe that the writing contained conditions, nevertheless he would be bound, if the delivering of the ticket to him in such a manner that he could see there was writing upon it, was, in the opinion of the jury, reasonable notice that the writing contained conditions.

11      *Hood v. Anchor Line* [3]. In this case a steamship passage ticket was enclosed in an envelope, delivered to the passenger, on the front of which was printed in capital letters a notice requesting the passenger to read the conditions of the enclosed contract. The ticket itself, on its face, contained a notice that it was issued subject to conditions thereinafter set out and at the foot was a printed request to the passenger to read the contract carefully. The House of Lords held the steamship company to have taken all reasonable steps to bring to the knowledge of the passenger the existence of the conditions. Viscount Haldane at p. 843 considered the duty of the steamship company to depend upon the accepted standards of conduct according to which

> a reasonable man ought to behave in these circumstances towards the neighbour towards whom he is bound by the necessities of the community to act with forebearance and consideration.

And on p. 844, he defined the duty of the company: —

> My Lords, I agree that the appellant here (the passenger) was entitled to ask that all that was reasonably necessary as a matter of ordinary practice should have been done to bring to his notice the fact that the contract tendered to him when he paid his passage money excluded the right which the general law would give him, unless the contract did exclude it, to full damage if he was injured by the negligence of those who contracted to convey him on their steamer. Whether all that was reasonably necessary to give him his notice was done is, however, a question of fact, in answering which the tribunal must look at all the circumstances and the situation of the parties.

12      In *Fosbroke-Hobbes v. Airwork Ltd., and British-American Air Services, Ltd.* [4], an aeroplane had been hired for the carriage of the hirer and a party of guests. Just as it was preparing to set off, an envelope containing a "ticket" was handed to the hirer by the pilot. The ticket was a document called a "special charter" which contained, among other things, a number of conditions, one of which exempted the owners from liability for their own or their servants' negligence. The ticket contemplated signature by the passenger and its return when signed to one of the owners' officials. Before the hirer had an opportunity of seeing the contents of the envelope, the aeroplane started on its journey and almost immediately crashed. It was held by Goddard J., now Lord Goddard L.C.J., that the condition exempting the owner from liability was not binding on the hirer.

13      Many cases have been brought to our attention in which some special character of the service or the passenger was involved such as workmen's tickets, excursion or special fares. In these instances the special feature itself to the ordinary patron

would suggest special terms; and this circumstance plus a notice of conditions on the face of the ticket, with or without other acts of notification, can, in general, under the circumstances in which such services are ordinarily engaged, be found to be a compliance with the obligation on the carrier.

14    For these reasons I am unable to say that the Court of Appeal was wrong in finding that the company had not taken sufficient steps to give notice of the condition to the respondent and the appeal must be dismissed with costs.

**The judgment of Locke, Fauteux and Nolan JJ. was delivered by *Locke J.*:**

15    This is an appeal from a judgment of the Court of Appeal for British Columbia [5]  which dismissed an appeal by the present appellant from the judgment for damages awarded by Wilson J. at the trial [6] .

16    The appellant owns and operates a line of steamships carrying passengers and freight along the west coast of British Columbia. During the early morning hours of December 29, 1951, the Catala, of the appellant's line, called at Brem River on Toba Inlet to pick up passengers. The only description of the facilities for the embarkation of passengers is that given by the respondent, who said that it was a "float landing" and that he and his wife and their children and his brother-in-law were picked up in a sling and lowered to the deck. Their luggage had been taken on board prior to this in the same manner.

17    The respondent and his wife and children were going to Westview, British Columbia, a settlement adjoining Powell River. The appellant did not maintain any place for selling tickets at Brem River and these were purchased by the respondent from the purser shortly after he went aboard. The only account of what took place when the tickets were bought is that of the respondent who said that he went to a wicket at the purser's office and bought tickets for himself and his wife, and for a stateroom, and that without looking at the tickets he put them in his pocket and went to the stateroom. He stated that he had no conversation with the purser about the tickets. A steward showed the respondent and his family to their room.

18    Apparently, the luggage had been placed in one of the holds and, shortly after they had gone to the stateroom, the respondent's wife asked him to get some articles out of their bags and he proceeded, with the steward who had shown them to their stateroom, to get the articles required. En route, in the darkness, he fell into a hatchway which was either unlighted or insufficiently lighted and suffered the injuries which gave rise to the action.

19    There are concurrent findings that these injuries were sustained due to the negligence of the steward and no question is raised as to this on the appeal, the only matter to be determined being whether, in view of the terms of the ticket purchased by the respondent, he has any enforceable claim.

20    On the face of the ticket it was stated to be good for the passage from Brem River to Powell River, where passengers for Westview would disembark, when stamped by the company's agent and presented with the coupon attached, and beneath this there appeared in red type the following words: —

> This ticket is issued subject to the conditions of carriage of passengers and baggage endorsed on the back hereof and those posted in the Company's office.

On the reverse side of the ticket there appeared in red type: —

> This ticket is good only for one month from date of issue as stamped on back. It is not transferable, no stop-over will be allowed and the person using it assumes all risk of loss or injury to person or property while on the vessel or while embarking or disembarking, even though such loss or injury is caused by the negligence or default of the shipowner, its servants or agents, or othewise howsoever.

> The holder hereof in accepting this ticket thereby agrees to all the conditions stipulated thereon.

Below this there was stamped: "Union Steamships Limited, December 29, 1951, S.S. Catala."

21     The respondent is a logger by occupation and had been engaged in logging camps on the British Columbia coast for some fifteen years and had frequently travelled on vessels of the appellant company. He had a public school education. Cross-examined, he said that he knew there was some writing on the front part of the ticket but he did not read it and he did not look on the back. He was not asked, either in direct or cross-examination, as to whether he knew that there were any conditions affecting his passage endorsed anywhere on the ticket nor, indeed, whether, by reason of having travelled many times on the Union Steamship vessels, he was aware that their tickets were endorsed with any clause limiting their liability for negligence.

22     The defendants did not call the purser or anyone else who was present when the tickets were sold to the respondent.

23     The learned trial judge made the following findings: —

Insofar as the form of the ticket is concerned it seems to me to be such that a reasonable attempt is made to bring to the attention of the passenger the conditions under which he is to be carried. The plaintiff did not in fact read the ticket and was unaware of the conditions endorsed thereon. He was not asked to agree to them, nor were they verbally or by any notice posted at the ticket booth brought to his notice.

Referring then to a passage said to have been taken from the judgment of Anglin J., as he then was, in *Grand Trunk Pacific Coast Steamship Company v. Simpson* [7] , as to the burden to proof, he held that "considering the hour and the circumstances, I think he had no reasonable opportunity to read the ticket", and that the defendant had not discharged the burden which rested upon it.

24     In the Court of Appeal [8] , O'Halloran J.A., who adopted the reasons delivered by Sidney Smith J.A., further expressed the opinion that the issuing of the ticket by the carrier and its acceptance by the respondent did not constitute a contract between them, the ticket being in reality no more than a receipt and that, accordingly, the conditions afforded no defence. Sidney Smith J.A., saying that the trial judge had said that the carrier had failed to satisfy him that reasonable means had been adopted to bring the limitative conditions to the attention of the respondent, considered that this finding of fact should not be disturbed. That learned judge did not mention the finding at the trial that the form of the ticket was a reasonable attempt to bring the conditions to the attention of the passenger. Davey J.A., who said that he was in substantial agreement with Sidney Smith J.A., referred to the finding at the trial that a reasonable attempt had been made, as far as the form of the ticket was concerned, to bring the special conditions to the respondent's notice but that the trial judge had properly treated that finding as indecisive, for the conditions would not bind the respondent "unless he should have known the ticket was a contract or that it contained the special condition".

25     The ticket which the respondent purchased from the purser does not, as in *Simpson's Case*, contain a long series of printed conditions. There is but the one condition which is the one in question. It is difficult to think of a means whereby the attention of the purchaser of a steamship ticket could be better directed to its terms than by printing in red letters the notice which appeared on the face of the ticket in this matter. The language of the condition is perfectly clear. It is printed in red and the concluding sentence reads: —

The holder hereof in accepting this ticket thereby agrees to all the conditions stipulated thereon.

The trial judge, while making the finding to which I have referred, was of the opinion, however, that, considering the hour and the circumstances, the respondent had no reasonable opportunity to read the ticket. As to this, it should be said that there is no evidence as to the lighting in the Catala, in front of the purser's office or in the passageway leading to the stateroom or in the stateroom itself. Neither the respondent nor the witnesses called on his behalf gave any evidence on this point and I think it should not be assumed against the appellant that there was not the usual lighting in steamers of this kind on the west coast, or that the respondent could not have readily read the conditions of the ticket had he taken the trouble to do so. The fact that it was early in the morning when the respondent and his family boarded the steamer does not seem to me, with respect, to affect the matter. It would, of course, be dark at this early hour in the morning in December, but I am unable to see how, in the absence of any evidence to indicate that the ship was not properly lighted, this can have any relevance.

26     In addition to saying that the ticket was issued subject to the conditions endorsed on the back of it, reference is made to "those posted in the company's office", and there is again no evidence as to whether any such conditions were so posted or what they were. In the absence of any such evidence, it is to the ticket alone that one must look if, indeed, a contract was made on its terms.

27     The question to be determined is one that is of general importance, particularly to carriers of passengers by sea who undertake the transport of passengers from places where there are no ticket offices in which tickets are sold, these, of necessity, being purchased aboard ship. In the case of a carrier such as the present appellant, it is a matter of common knowledge on the west coast that their passenger vessels stop at many small places between Alaska and Vancouver where it is not practical to maintain such offices and where there are no docks from which passengers may embark. Persons wishing to travel upon these vessels are well aware that these conditions prevail and that tickets for passage must be purchased on board from the purser.

28     There is a vast number of reported cases in which the liability of carriers of passengers for reward has been considered, where the tickets sold exempted the carrier from liability for the negligence of its employees. Any difficulty arising in determining the question of liability in a particular case appears to me to arise from the task of reconciling what has been said in some of the leading cases as to the applicable principles of law with statements made in others.

29     There was at the time in question no law which prevented the appellant company from entering into an agreement with a passenger which would relieve it from liability for injuries caused by the negligence of its employees. It is further to be remembered that the appellant obtained at the trial a finding that there had been on the part of the appellant a reasonable attempt to bring to the attention of the passenger the conditions under which he was to be carried. This finding in itself distinguishes the case from such cases as *Simpson's Case, supra*, where the jury had found that, while the plaintiff knew there was writing or printing on her ticket, the company had failed to do what was reasonably sufficient to give her notice of the conditions which it contained. I do not regard that case as declaring any principle which affects the present matter.

30     I do not think what was said by Mellish L.J. in *Parker v. The South Eastern Railway Company* [9], can be taken without qualification to state the true principle to be applied in such cases. That case was in regard to a contract for the storage of luggage in a railway station, and the question considered in the Court of Appeal was whether the trial judge had left the proper questions to the jury. Mellish L.J. said in part (p. 423): —

> I am of opinion, therefore, that the proper direction to leave to the jury in these cases is, that if the person receiving the ticket did not see or know that there was any writing on the ticket, he is not bound by the conditions; that if he knew there was writing, and knew or believed that the writing contained conditions, then he is bound by the conditions; that if he knew there was writing on the ticket, but did not know or believe that the writing contained conditions, nevertheless he would be bound, if the delivering of the ticket to him in such a manner that he could see there was writing upon it, was, in the opinion of the jury, reasonable notice that the writing contained conditions.

31     As to the first of these three propositions stated in such absolute terms, there is room, in my opinion, for grave doubt. It is unnecessary to consider its accuracy in disposing of the present matter. Mellish L.J., having thus stated the matter, concluded, however, by saying that the real question was whether the railway company did what was reasonably sufficient to give the plaintiff notice of the condition.

32     The matter is expressed somewhat differently in the judgment of Viscount Haldane L.C. in *Grand Trunk Railway Company of Canada v. Robinson* [10]. In that case, the plaintiff who was travelling at half fare on a freight train, in charge of a horse, was carried pursuant to a contract in a form approved by the Board of Railway Commissioners which bore across the fact of it, in large red type, the words "Read this Special Contract". The contract was made on his behalf by the owner of the horse and neither of the parties read its conditions, which provided that the passenger was carried at his own risk. It was not suggested in the case that the carrier made any misrepresentation as to the nature of the contract, or that the owner or the passenger did not have an opportunity to read its terms: they simply did not do so. As to this, the Lord Chancellor said (p. 748): —

Moreover, if the person acting on his behalf has himself not taken the trouble to read the terms of the contract proposed by the company in the ticket or pass offered, and yet knew that there was something written or printed on it which might contain conditions, it is not the company that will suffer by the agent's want of care. The agent will, in the absence of something misleading done by his company, be bound, and his principal will be bound through him. To hold otherwise would be to depart from the general principles of necessity recognized in other business transactions, and to render it impracticable for railway companies to make arrangements for travellers and consignors without delay and inconvenience to those who deal with them.

Later, he continued saying: —

The company owes the passenger no duty which the contract is expressed on the face of it to exclude, and if he has approbated that contract by travelling under it he cannot afterwards reprobate it by claiming a right inconsistent with it.

33    This is to be compared with the third of the propositions stated in the judgment of Mellish L.J. in *Parker's Case, supra*. The difference is material: it is if the person contracting knew that there was something written or printed on it *which might contain conditions*, and not if the writing on the ticket constituted reasonable notice *that the writing contained conditions*.

34    In *Hood v. Anchor Line* [11], Viscount Haldane reiterated what he had said in *Robinson's Case*, that the question as to whether what was reasonably necessary to be done to draw the passenger's attention to the terms of the contract was, in substance, one of fact. Lord Finlay L.C., referring to *Parker's Case*, said that it showed that (p. 842)

if it is found that the company did what was reasonably sufficient to give notice of conditions printed on the back of a ticket the person taking the ticket would be bound by such conditions.

Lord Parmoor, after saying that the Lord Ordinary had found that the respondent had done what was reasonably sufficient to give the appellant notice of the conditions, said that it was not material that other or different steps might have been taken, and that a clearly-printed notice on the envelope which enclosed the ticket and on the face of the ticket was as effective for this purpose as if the representative of the respondents had, at the time when he issued the ticket, verbally called the attention of the appellant to the conditions and asked him to read them.

35    The result of the decisions appears to me to be accurately summarized by Swift J. in *Nunan v. Southern Railway Company* [12] : —

A number of cases were cited to me to show how the Courts had dealt with the question of fact to be determined in this case in various circumstances. I have examined those cases for the purpose of ascertaining in what way a jury should be directed to approach the consideration of such a question of fact if the matter had been one to be decided by them. I am of opinion that the proper method of considering such a matter is to proceed upon the assumption that where a contract is made by the delivery, by one of the contracting parties to the other, of a document in a common form stating the terms upon which the person delivering it will enter into the proposed contract, such a form constitutes the offer of the party who tenders it, and if the form is accepted without objection by the person to whom it is tendered this person is as a general rule bound by its contents and his act amounts to an acceptance of the offer to him whether he reads the document or otherwise informs himself of its contents or not, and the conditions contained in the document are binding upon him; but that if there be an issue as to whether the document does contain the real intention of both the parties the person relying upon it must show either that the other party knew that there was writing which contained conditions or that the party delivering the form had done what was reasonably sufficient to give the other party notice of the conditions, and that the person delivering the ticket was contracting on the terms of those conditions.

This statement was adopted by the Court of Appeal in *Thompson v. London, Midland and Scottish Railway Company* [13], *per* Lord Hanworth M.R. at p. 47.

36     I have examined the reasons for judgment delivered at the trial which are contained in the file forwarded to this Court and are reproduced in the printed case at p. 111. There is an inaccuracy in the passage quoted from the reasons of Anglin J. in *Simpson's Case*. As quoted it reads: —

> The burden is on the defendant to show that it has done all that *it could* to bring the limitative conditions to the plaintiff's notice.

The sentence, as it appears in the Reports of this Court at p. 378 of 63 S.C.R. (and in [1922] 2 W.W.R. at p. 331), reads that the burden is

> to show that it has done all that *could reasonably be required* to bring the limitative conditions to the plaintiff's notice.

It is the latter of these statements that is supported by authority, the former is not, and if it were applied as the test it would be error. Whether it was applied does not appear to me to be clear since it was followed by a further quotation from the reasons of Anglin J. in which the expression "whether the carrier has done what was reasonably sufficient" appears.

37     The reasons do not suggest what other efforts the carrier might reasonably have been expected to make to bring the conditions to the passenger's attention. The suggestion that a carrier should be required to give a verbal notice, in addition to the printed notice, was rejected by Lord Finlay L.C. and Lord Parmoor in *Hood's Case*. The respondent admitted that he saw that there was writing on the face of the ticket and I think he must be taken to be thereby affected with knowledge that what was written referred to the contract of carriage and with notice of what would have been disclosed had he read it.

38     I can find no evidence in the record to support the statement that the respondent had no reasonable opportunity to read the ticket and it is to be noted that Davey J.A. was of the opinion that it could not be supported. In my opinion, the issue in the present matter is determined by the finding of fact that the endorsement on the face of the ticket printed in red ink and referring to the conditions endorsed on its reverse side constituted a reasonable attempt to bring to the passenger's attention the terms of the contract and I consider that his acceptance of the ticket without protest and embarking upon the voyage precludes him from reprobating its terms, relying upon the fact that he did not read it.

39     I would allow this appeal with costs throughout, if demanded.

**Cartwright J. (*dissenting*):**

40     This is an appeal from a unanimous judgment of the Court of Appeal for British Columbia [14] affirming a judgment of Wilson J. [15] in favour of the respondent for $10,328.50 damages for personal injuries.

41     In this court no question was raised as to the amount of damages or as to the injuries suffered by the respondent having been caused by the negligence of the appellant's servant. The submission of the appellant is that it is relieved from liability by the conditions printed on the ticket purchased by the respondent.

42     Counsel for the respondent does not attack the form of the ticket, which bore a notice on its face printed plainly in red ink stating that it was issued subject to the conditions on its back, conditions which, in turn, were clearly and legibly printed.

43     On the uncontradicted evidence the respondent did not read the ticket, he simply put it in his pocket and proceeded to his stateroom. There is no evidence that he had any actual knowledge of the fact that the appellant proposed to make it a condition of the contract of carriage that he must bear all the risk of injury resulting from the negligence of its servants, nor is there any evidence that he knew that the ticket had printed upon it either conditions or the terms of a proposed contract. The respondent stated that there was writing on the front part of the ticket but that he did not look at the writing "so as to read it".

44     On its facts this case does not fall within the line of cases in which a passenger knows that his ticket has printed upon it the terms of a proposed contract and, with such knowledge, does not bother to read it.

45      In my opinion the evidence supports the concurrent findings of fact in the courts below that the appellant has failed to satisfy the onus of shewing that reasonable means were adopted to bring the proposed condition relieving it from liability for the negligence of its servants to the attention of the respondent, "in", to use the words of Sidney Smith J.A., "the obvious realities of the situation".

46      I would dismiss the appeal with costs.

*Appeal allowed with costs, if demanded.*

Solicitors of record:
Solicitors for the plaintiff, respondent: *Jestley, Morrison, Eckardt* & *Goldie*, Vancouver.
Solicitors for the defendant, appellant: *Campney, Owen, Murphy* & *Owen*, Vancouver.


Footnotes

*       *Reporter's Note*: The appeal was first argued on Oct. 26 and 27, 1955, before Rand, Kellock, Estey, Locke and Fauteux JJ. On Jan. 24, 1956, the Court ordered a rehearing which took place on Jun. 14, 1956.

1       (1875), L.R. 2 H.L. Sc. 470.

2       (1877), 2 C.P.D. 416 at 423.

3       [1918] A.C. 837.

4       [1937] 1 All E.R. 108.

5       14 W.W.R. 673, [1955] 2 D.L.R. 564.

6       13 W.W.R. 72, [1954] 4 D.L.R. 267.

7       63 S.C.R. 361, [1922] 2 W.W.R. 320.

8       14 W.W.R. 673, [1955] 2 D.L.R. 564.

9       (1877), 2 C.P.D. 416.

10      [1915] A.C. 740.

11      [1918] A.C. 837.

12      [1923] 2 K.B. 703 at 707.

13      [1930] 1 K.B. 41.

14      14 W.W.R. 673, [1955] 2 D.L.R. 564.

15      13 W.W.R. 72, [1954] 4 D.L.R. 267.

**EXHIBIT EN-20**

**TO THE DECLARATION OF EVAN NUTTALL**

1981 CarswellAlta 301

Alberta Court of Queen's Bench

Lotepro Engineering & Construction Ltd. v. Air Canada

1981 CarswellAlta 301, [1981] A.J. No. 862, [1982] 2 W.W.R. 630, 12 A.C.W.S. (2d) 12, 36 A.R. 304

## LOTEPRO ENGINEERING AND CONSTRUCTION LTD. v. AIR CANADA and CANADIAN NATIONAL RAILWAY COMPANY

Rowbotham J.

Judgment: November 10, 1981
Docket: Calgary No. D. 52242

Counsel: *T.I. Parker*, for plaintiff.
*M. Rabin*, for respondents.


**Tariffs considered:**

Air Express Tariff 2-H (CTC(A) No. 34), s. 2.

***Rowbotham J.*:**

1    The issue raised in this action is the extent of liability of the defendants for the loss of goods consigned to them for shipment. The parties filed an agreed statement of facts, which reads as follows:

    1. The Plaintiff is a body corporate, incorporated under the laws of the Province of Alberta with a head office in the City of Calgary, in the Province of Alberta.

    2. The Defendants are corporations, established by Special Acts of the Parliament of Canada, with offices in the City of Calgary, in the Province of Alberta and carry on business under the name and style of Air Canada/CN Express.

    3. The Plaintiff was at all material times in the business of installing low temperature processing equipment in conjunction with the construction of gas plants for various oil companies in Canada. The Plaintiff had, at all material times, subcontracted to Aarvak Electric Ltd., (hereinafter referred to as 'Aarvak'), the electrical aspects of such an installation project at the Three Hills Mobil Gas Plant. Part of Aarvak Electric Ltd.'s responsibilities included the installation of an electrical control unit known as an annunciator panel (hereinafter referred to as the 'panel').

    4. On or about the 25th day of January, A.D. 1978, Aarvak, the agent, contractor or authorized representative of the Plaintiff did, on the instruction of the Plaintiff, cause to be delivered into the possession of the Defendants, one box of parts which contained the said panel at the offices of the Defendants at the air cargo terminal of the Calgary International Airport. The panel was to be returned to the manufacturer, in Toronto, to repair a defect.

    5. The party who delivered the shipment to the Defendants at the Calgary International Airport on behalf of Aarvak was a taxi driver retained by Aarvak for the purpose. This individual was not an employee of Aarvak.

    6. The said panel was at all material times the property of the Plaintiff. The panel was to be installed at the direction of the Plaintiff into the Three Hills Mobil Gas Plant pursuant to a contract between the Plaintiff and Mobil Oil Canada Ltd. For each day construction at the plant was delayed, the Plaintiff became obligated under its contract with the general contractor, Flint Engineering Ltd., to pay a certain sum as liquidated damages. At the time of acceptance of the panel for shipping,

no advice was given to the Defendants that the said panel was required for any particular purpose, and particularly that it was required for installation as part of a refinery control panel, and that its delay or mis-delivery would in turn delay completion of construction of the refinery or cause damage to the Plaintiff.

7. Upon delivery of the panel to the offices of the Defendants, on the above specified date, the Plaintiff through its agent, the taxi driver retained for the purpose by Aarvak, entered into an agreement with the Defendants entitled 'Air Express Shipping Contract', numbered AE 299 250, a copy of which is attached as Exhibit 1, (hereinafter the 'Agreement') under which the Defendants did agree to ship the panel by air to the manufacturer, Ronan Engineering Ltd. in Toronto. The shipment was described as one box of parts. The weight of the shipment was indicated as being 47 lbs. The shipment charges for the shipment, which was to be sent collect, were assessed at $38.00. There was no value declared and no excess valuation charges were assessed. These entries were placed on the Agreement form by an employee of the Defendants based upon information provided by the said agent of the Plaintiff.

8. The Air Express Shipment Contract, a copy of which is attached as Exhibit 2, is a multiple-copy form containing seven copies separated by carbon paper. Copy three of the form is retained by the customer. The Shipper's receipt is copy seven.

9. Copies one and seven of the form contain, at the bottom, the following clause:

It is mutually agreed that the goods herein described are accepted in apparent good order (except as noted) for transportation as specified herein, subject to governing classifications and tariffs in effect as of the date hereof, which are filed in accordance with law. Said classifications and tariffs which are available for inspection at all Air Canada Express services offices are hereby incorporated and made part of this contract,

10. The attention of the Plaintiff, its agent, contractor or authorized representative, was at no time directed to the above stated clause or the tariff to which it refers. (These tariffs and classifications are contained in a book which is located behind the air cargo express counter at the terminal.)

11. The tariff referred to in the clauses above, which was in effect at all material times, was Air Express Tariff 2-H (CTC(A) No. 34). This Tariff limits the liability for shipments of less than one hundred (100) pounds to fifty ($50.00) dollars unless otherwise specified. The relevant portions of Air Express Tariff are attached as Exhibit 3.

12. Section 2 of the Terms and Conditions for the Carriage of Air Express Traffic, being first revised page 4 of Air Express Tariff 2-H reads as follows:

(a) When in accordance with the terms of this contract the Carrier is liable for any damage (which damage shall mean herein any complete or partial loss or destruction, injury or delay) with respect to any shipment, whether such damage arises through negligence or otherwise, the amount for which the Carrier shall be liable in accordance with clauses 2(b) and 2(c) hereof shall not exceed, in any event, the actual value of the shipment which actual value shall mean the value of the shipment at the time and place of receipt hereof by the Carrier, including transportation and other charges if paid and the duty as payable or paid and not refundable.

(b) The maximum liability of the Carrier with respect to the shipment shall be limited for any shipment of 100 lbs. or less to Fifty ($50.00) Dollars and for any shipment in excess of 100 lbs. to an amount not exceeding Fifty ($.50) Cents per pound (actual weight) unless the shipper indicates in the Air Express Shipping contract his intention to take advantage of the provisions of Clause (c) hereof.

(c) The maximum liability of the Carrier shall be the amount of the value declared by the shipper and embodied in the Air Express Shipping contract and provided that valuation charges are assessed, in accordance with the applicable tariffs.

12. On or about the 27th day of January, A.D. 1978, the said panel was found to be missing whereupon enquiries as to its whereabouts were made by the Plaintiff, Ronan Engineering Ltd. and Aarvak Electric Ltd. The panel, which is assumed to have been lost en route, has never been returned to the Plaintiff, Aarvak or Ronan Engineering Ltd. by the Defendants.

13. The parties hereby agree that the loss of the said panel was caused through no fault of the Plaintiff.

14. On or about the 3rd day of February, A.D. 1978, the Plaintiff, so as to fulfill its contractual obligations to Mobil, and as a result of the Defendants' inability to produce the panel delivered into their care by the Plaintiff, ordered a second annunciator panel which was to be built by Ronan Engineering Ltd. The new panel was delivered to the Three Hills Mobil Gas Plant on or about the 14th day of February, A.D. 1978. The cost of the new annunciator panel was $2,012.50.

15. In addition, the Plaintiff was required to pay $256.00 to Shillington Technical Services Ltd. for time spent by Shillington on expediting re the lost panel, and $560.00 to Derek Brown, the Project Engineer for additional in-house engineering supervision. The Plaintiff also incurred miscellaneous expenses amounting to $132.00 as a result of the loss of the panel.

16. The Plaintiff was required to pay the sum of $4,669.00 in standby charges to Flint Engineering and Construction Ltd. pursuant to a clause in the contract between the Plaintiff and Flint engineering referred to in paragraph 6 hereof. During the period of standby time Flint Engineering did no other work.

17. It is agreed that at no relevant time did the Plaintiff have in its possession, or have available to it, a replacement annunciator panel.

2    The questions posed for determination by this court are:

(1) whether there is a limitation of liability in respect of the defendants in the circumstances outlined herein and, if so, the extent of any such limitation of the liability; and

(2) if there is no limitation of liability applicable in the circumstances outlined herein, whether the defendants are liable for the damages set forth in para. 16 hereof, there being no dispute as to the damages set forth in para. 14 and 15.

3    The first question posed for the determination of the court must be considered in two parts: first, was the plaintiff notified of the conditions set out in the fine print at the bottom of the "Air Express Shipping Contract" and reproduced in para. 9 of the agreed statement of facts, so that such notification was sufficient to incorporate Air Express Tariff 2-H (CTC(A) No. 34) as a term of the contract of carriage of goods made between the parties? Secondly, if the tariff is found to be part of a contract between the parties which limits the liability of the carrier, does the loss of the goods in question by the carrier constitute a fundamental breach of the contract or the breach of a fundamental term of it which results in the barring of the defendant from relying upon the limitations of liability provisions of the air express tariff referred to?

4    The agent of the plaintiff was afforded the opportunity of reading the contract and of asking the employee of the defendants to show him the classifications and tariffs referred to in the fine print at the bottom of the air express shipping contract from. The employee of the carrier did not direct the attention of the agent to these relevant classifications and tariffs.

5    The contract in question is a common form of contract of a quasi-legislative nature, where the acceptance of the contract by the shipper implies acceptance of its terms and conditions irrespective of whether or not actual notice of such terms and conditions were given to him: see *Union SS. Ltd. v. Barnes*, [1956] S.C.R. 842, 5 D.L.R. (2d) 535; and *B.G. Linton Const. Ltd. v. C.N.R.*, [1975] 2 S.C.R. 678, [1975] 3 W.W.R. 97, 49 D.L.R. (3d) 548, 3 N.R. 151. The agent of the shipper was afforded the opportunity of reading the face of the shipping contract and of asking to see the "governing classifications" and tariffs referred to therein. There was no duty imposed upon the defendants' employee to direct the attention of the plaintiff's agent to the clause in question and the tariff. The requirement of notice was met by permitting the agent of the plaintiff to read the contract and by having the tariff available for the information of the plaintiff's agent upon request. The plaintiff's agent, upon giving to the defendants' employee the pertinent details of the weight and destination of the parcel, could have raised the question of valuation of it, but he did not do so.

6 The second part of the question raised by the plaintiff concerns the matter of a "fundamental breach" or a "breach of a fundamental term" of the contract by the defendants and whether or not such breach is of such a fundamental nature as to terminate the contract and consequently bar the defendants from reliance upon the limitation of liability provisions contained in it. As Ritchie J. said in *B.G. Linton Const. v. C.N.R.*, supra, at p. 558, there is a wide difference between negligent performance of a contract and fundamental breach of it. He cited *Karsales (Harrow) Ltd. v. Wallis*, [1956] 1 W.L.R. 936, [1956] 2 All E.R. 866 (C.A.), as an example of the kind of situation in which a breach going to the root of the contract may exclude reliance on an exemption clause. To quote his remarks, he concluded that, if there is a fundamental breach that goes to the root of the contract, such as was found in *Karsales*, then "Under such circumstances it can be said that the contract has not been performed at all, whereas the present case [i.e., *B.G. Linton Const.*] is one of negligent performance."

7 The sole purpose of the contract in the present case was the carriage of goods from the shipper to the consignee. It would be reasonable to suppose that a total failure on the part of the defendants to deliver anything at all to the consignee would constitute a breach of the fundamental term of the contract rather than the negligent performance of it. However, the cases do not support this point of view.

8 The contract in question falls within the class of standard forms of contract referred to by Lord Diplock in *A. Schroeder Music Publishing Co. v. Macaulay (Instone)*, [1974] 1 W.L.R. 1308 at 1316, [1974] 3 All E.R. 616 (H.L.):

> This is of comparatively modern origin. It is the result of the concentration of particular kinds of business in relatively few hands. The ticket cases in the 19th century provide what are probably the first examples. The terms of this kind of standard form of contract have not been the subject of negotiation between the parties to it, or approved by any organization representing the interests of the weaker party. They have been dictated by that party whose bargaining power, either exercised alone or in conjunction with others providing similar goods or services, enables him to say: 'If you want these goods or services at all, these are the only terms on which they are obtainable. Take it or leave it.'

9 In the case at bar, the wording of s. 2(*a*) of Air Express Tariff 2-H (CTC(A) No. 34), which forms a part of the contract and which limits the liability of the carrier in the event of a breach of the contract, reads as follows:

> When in accordance with the terms of this contract the Carrier is liable for any damage (*which damage shall mean herein any complete or partial loss or destruction, injury or delay*) with respect to any shipment, whether such damage arises through negligence or otherwise, the amount for which the Carrier shall be liable in accordance with Clauses 2(b) and 2(c) hereof shall not exceed, in any event, the actual value of the shipment which actual value shall mean the value of the shipment at the time and place of receipt hereof by the Carrier, including transportation and other charges if paid and the duty as payable or paid and not refundable. (The italics are mine.)

10 The meaning of the phrase "loss or damage" was considered in *W. R. Johnston & Co. Ltd. v. Inter-City Forwarders Ltd.*, [1946] O.R. 754, 60 C.R.T.C. 143, [1947] 1 D.L.R. 8 (C.A.). This is a case where the facts were similar to the case at bar. In the *W. R. Johnston* case the loss of the goods in question was caused by the theft of them by a servant of the carrier, and none were delivered to the consignee. In the present case no reason has been advanced to explain the loss of the goods, but they were not delivered to the consignee. It seems to me to be clear law that the defendant may invoke the limitation of liability provision of the contract, despite the facts that the sole purpose of the contract was for the carriage of goods to a consignee and that no goods were in fact delivered to the consignee.

11 In *W. R. Johnston*, supra, it was held that the bill of lading, being in the prescribed form, was the only measure of the rights and duties of the parties, and its terms were clearly applicable to the circumstances there involved. In the case at bar, the air express shipping contract, being in the prescribed form, incorporating Air Express Tariff 2-H into its terms, comprised the overall and entire measure of the rights and duties of this plaintiff and these defendants.

12 The answer to the first question posed for the determination of the court is: "Yes, there is a limitation of liability in respect of the defendants in the circumstances outlined, and the extent of that limitation of liability is the amount of $50."

13      Because the answer to the first question is in the affirmative, it is not necessary to answer the second question concerning the extent of damages claimed by the plaintiff in para. 16 of the agreed statement of facts.

14      The defendants have tendered to the plaintiff the sum of $50 in damages before the commencement of the action, and the plaintiff has not succeeded in recovering damages in excess of that amount. The defendants are therefore entitled to the cost of the action.

*Action dismissed.*

**EXHIBIT EN-21**

**TO THE DECLARATION OF EVAN NUTTALL**

1995 ABCA 52

Alberta Court of Appeal

Budget Rent-A-Car of Edmonton Ltd. v. University of Toronto

1995 CarswellAlta 548, 1995 ABCA 52, [1995] A.W.L.D. 282, [1995]
A.J. No. 126, 165 A.R. 236, 53 A.C.W.S. (3d) 61, 89 W.A.C. 236

**Budget Rent-A-Car of Edmonton Ltd. Plaintiff (Appellant) v. The Governing Council of the
University of Toronto, A. Byron MacDonald and R. Blair Hicken Defendants (Respondents)**

Belzil, Côté, Russell

Oral reasons: February 2, 1995
Docket: Doc. Edmonton Appeal 9303-0563-AC

Counsel: *D.L. Pentelechuk* for the Plaintiff (Appellant).
*T.D. Marriott* for the Defendants (Respondents).

*Coté J.A.* **(for the Court):**

**MEMORANDUM OF JUDGMENT DELIVERED FROM THE BENCH**

1     The trial judge in the present case dismissed the suit by the car rental company against the renter for the serious damage to the rented vehicle, which she found to have been caused by theft. It is admitted that the rented car had been left running for some hours with the key in the ignition and some doors unlocked outside a popular bar in Edmonton between 1:00 a.m. and 3:00 a.m.

2     The contract (in its terms on the back) says that the renter will be responsible for theft if the renter was negligent. The renter also expressly covenants to keep the doors and windows and ignition all closed and locked when it is not in the car. The University of Toronto's agent signed the contract on the front, and he also initialled in two places the boxes calling for full collision coverage, or full collision insurance, and for personal insurance. The one calling for full collision insurance said it was subject to the exceptions herein.

3     The trial judge relied upon the majority judgment in *Tilden Rent-a-Car Co. v. Clendenning* (1978) 83 D.L.R. (3d) 400 (Ont. C.A.). We do have some doubts as to whether or not that majority judgment is correct, but in the present case it is completely unnecessary for us to decide that question. If the majority judgments in *Tilden Rent-a-Car Co. v. Clendenning* are correct, in our view they were not triggered here.

4     In the first place the renter, the Governing Council of the University of Toronto, was not inexperienced. In addition, the agent which it chose to effect the rental and sign the contract was, as the evidence shows, very experienced in signing such contracts. We do not agree that the relevant portions of the contract were in their physical arrangement in any way difficult to read, surprising or tricky. We have examined the original exhibit and are not just relying upon a photostat.

5     Most important, the clauses relied upon saying that the renter will be liable for negligence and will not leave the car in any sense unlocked are, in our view, in no way surprising, unusual, unexpected, onerous, or unfair. We say that both in the abstract, and in light of the personal circumstances outlined above, and in light of the arrangement of the contract, and in light of the collision and personal insurance coverage purchased, and in light of the postulated need to tell any authorized drivers of anything unusual or onerous in the contract.

6     Therefore, in our view, the defence relied upon by the trial judge cannot apply here. We see no other relevant or applicable defence, allow the appeal and enter judgment for the plaintiff against the defendants in the amounts prayed for.

7    (Discussion with counsel, which mentioned that quantum had been agreed upon, and revealed an offer to settle before trial.)

**Coté J.A.**

8    The plaintiff will have costs against the defendants jointly and severally in Queen's Bench and in the Court of Appeal. In Queen's Bench, after the date of service of the plaintiff's offer of judgment, those costs will be double what they otherwise would be. Before then, and in the Court of Appeal, they will be on the normal basis. By the normal basis, we mean the applicable column of Schedule C.



## Budget Rent A Car of Edmonton Ltd. v. University of Toronto (S.C.C.)

Supreme Court of Canada Rulings on Applications for Leave to Appeal and Other Motions

Supreme Court of Canada

Record created: April 3, 1995.

File No.: 24647

**[1995] S.C.C.A. No. 141**

The Governing Council of the University of Toronto, A. Byron MacDonald and R. Blair Hicken v. Budget Rent A Car of Edmonton Ltd.

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR ALBERTA

## Case Summary

**Status:**

Application for leave to appeal dismissed with costs (without reasons) October 12, 1995.

**Catchwords:**

**Commercial law — Contracts — Insurance — Negligence — Whether a consumer signing a standard form contract and paying extra consideration for insurance should be advised of fine print clauses which deny the insurance coverage in specific circumstances — Whether the party drafting exclusionary clauses can rely on them if they are not brought to the consumers' attention — Whether Tilden Rent-A-Car v. Clendenning *(1978), 83 D.L.R. (3d) 400* (Ont. C.A.) applies.**

## Counsel

Thomas D. Marriott (Brownlee Fryett), for the motion. Dawn L. Pentelechuk (Duncan & Craig), contra.

**Chronology:**

1. Application for leave to appeal:
   FILED: April 3, 1995. S.C.C. Bulletin, 1995, p. 650.

   SUBMITTED TO THE COURT: May 30, 1995. S.C.C. Bulletin, 1995, p. 995.

   DISMISSED WITH COSTS: October 12, 1995 (without reasons).

   S.C.C. Bulletin, 1995, p. 1568.

Budget Rent A Car of Edmonton Ltd. v. University of Toronto (S.C.C.)

Before: La Forest, Cory and Major JJ.

**Procedural History:**

Judgment       at first instance: Respondent's action dismissed. Alberta Court of Queen's Bench, Veit J., July 23, 1992.

Judgment on appeal: Appeal allowed.

Alberta Court of Appeal, Belzil, Coté and Russell

JJ.A., February 2, 1995.

[1995] A.J. No. 126.

---

**End of Document**

**EXHIBIT EN-22**

**TO THE DECLARATION OF EVAN NUTTALL**

1989 CarswellAlta 111

Alberta Court of Queen's Bench

North American Systemshops Ltd. v. King

1989 CarswellAlta 111, [1989] A.W.L.D. 749, [1989] C.L.D. 1053, [1989] A.J. No. 512, 16 A.C.W.S.
(3d) 24, 26 C.I.P.R. 165, 27 C.P.R. (3d) 367, 45 B.L.R. 242, 68 Alta. L.R. (2d) 145, 97 A.R. 46

## NORTH AMERICAN SYSTEMSHOPS LTD. v. KING et al.

Veit J.

Judgment: June 12, 1989
Docket: Edmonton No. 8703 15084

Counsel: *R.C. Burgener*, for plaintiff.
*K.R. Anderson* and *S.J. Hammel*, for defendants.

*Veit J.*:

1    This action deals with the rights of a copyright owner of computer software sold over the counter.

2    On 3rd April 1986 an authorized dealer of the plaintiff sold to the defendant, King & Company, a floppy disk copy of "With
Interest", a computer program developed by the plaintiff, in which the plaintiff claims a copyright. Shortly after the sale, having
been informed by its agent that the software purchaser reported a problem in printing the program, the president of the plaintiff
attended at the premises of the corporate defendant and corrected the problem, which originated in the defendant's printer and
not in the program. While at the defendant's premises, the plaintiff learned that "With Interest" had been installed on the hard
drives of other microcomputers owned by the defendants, although only one copy of the program had been purchased. On 30th
April 1987, or approximately one year after the discovery of the copies of the program, the plaintiff notified the defendant
company by letter that the latter was in breach of the plaintiff's copyright. The defendant immediately responded; it notified
the plaintiff that the program "With Interest" had been removed from the hard drives of its microcomputers, that the defendant
retained only the floppy disk, that, for the purposes of the demand letter, it did not contest the plaintiff's assessment of its rights,
and that it undertook not to use the floppy disk except in the manner outlined by the plaintiff. In November 1987 the plaintiff
issued a state ment of claim, subsequently amended, praying for: an accounting, an order declaring the infringing copies to
be the property of the plaintiff; an order prohibiting the defendants' use of unauthorized copies; an order of delivery of the
infringing copies to the plaintiff; damages in the amount of $15,000; punitive damages in the amount of $25,000; costs of the
action on a solicitor-client basis.

**1. Ownership of copyright**

3    All of the plaintiff's claims depend from ownership of copyright in "With Interest". The defendant does not dispute that a
computer program was subject to copyright or copyrightable, even prior to the explicit 1988 amendments to the Copyright Act.
The defendant does dispute that the plaintiff is the copyright owner of "With Interest".

4    The plaintiff is not a registered holder of the copyright; it relies on the Copyright Act which states:

34 ...

(3) In any action for infringement of copyright in any work in which the defendant puts in issue either the existence of
the copyright or the title of the plaintiff thereto,

(*a*) the work shall, unless the contrary is proved, be presumed to be a work in which copyright subsists; and

(*b*) *the author of the work shall, unless the contrary is proved, be presumed to be the owner of the copyright*.

(4) Where any question referred to in subsection (2) is at issue, and no grant of the copyright or of an interest in the copyright, either by assignment or licence, has been registered under this Act,

(*a*) *if a name purporting to be that of the author of the work is printed or otherwise indicated thereon in the usual manner, the person whose name is so printed or indicated shall, unless the contrary is proved, be presumed to be the author of the work* ... [emphasis added]

5    However, the defendant points to s. 13(3) of the same Act:

(3) Where the author of a work was in the employment of some other person under a contract of service or apprenticeship and the work was made in the course of his employment by that person, *the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright*, but where the work is an article or other contribution to a newspaper, magazine or similar periodical, there shall, in the absence of any agreement to the contrary, be deemed to be reserved to the author a right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical. [emphasis added]

6    As evidence of s. 13(3) right in a person other than the plaintiff, the defendant refers to the evidence of the plaintiff's witness Syrja to the effect that the unique aspect of the "With Interest" algorithm is a specific way of calculating interest and that Mr. Syrja first produced that unique way of calculating interest in the 1960s when he was an employee of Western Computing Limited:

Q. Well, what is it that makes your program unique, Mr. Syrja?

A. It's simply that I'm the only one that's putting out one that does it that way.

Q. Okay. And —

A. All the others are using the amortization tables.

Q. And isn't that the essence of what you claim ownership in?

A. The fact that I wrote a particular program that does calculations that way, yes.

Q. Okay. And the first time you wrote it was for Western Computing Limited and they owned it. Right?

A. That's right.

7    Moreover, the defendant relies on the evidence that the algorithm or solution used in "With Interest" has been written by Mr. Syrja in other computer languages or versions such as in NEAT-3, a NCR programming language, in Basic-4S Business Basic, and in the MS DOS version bought by the defendant.

8    In summary, the defendant's position is that the evidence establishes that Mr. Syrja has had only one original algorithm for calculating interest and that one is the property of Western Computing Ltd.

9    I will not consider whether each different version of the program in a different language is an original work. Given the legislative onus on the defendant who challenges the plaintiff's copyright, given that there is no copy of the first interest calculation program devised by Mr. Syrja, given the evidence from Mr. Syrja that there have been some changes in the program since he originally had the idea, notably in the area of calculations for leap years, I am not satisfied that the defendants have successfully displaced the legislative presumption.

10      The plaintiff is, therefore, for the purposes of this action, on the basis of the evidence before me, the owner of the copyright in "With Interest".

**2. Over-the-counter sale of computer program**

11      Next I turn to the assessment of the legal result of the sale of the floppy disk to the defendants. In its statement of claim the plaintiff posits:

> The program ... is sold under a licence statement which entitles the purchaser to make copies of the licensed program for backup purposes only ... The plaintiff further says that the defendants have breached the licensing agreement by making more than backup copies and by having multiple users.

At the trial the plaintiff argues that the use of the word "agreement" in the statement of claim was unintended and that the plaintiff does not anchor its claim in contract. Rather it alleges that the claim is limited to copyright. It relies on ss. 27(1) and 3(1) of the Act:

> 27. (1) Copyright in a work shall be deemed to be infringed by any person who, without the consent of the owner of the copyright, does anything that, by this Act, only the owner of the copyright has the right to do.

> 3. (1) For the purposes of this Act, "copyright" means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatever, to perform, or in the case of a lecture to deliver, the work or any substantial part thereof in public or, if the work is unpublished, to publish the work or any substantial part thereof, and includes the sole right

> (*a*) to produce, *reproduce*, perform or publish any translation of the work,

> (*b*) in the case of a dramatic work, to convert it into a novel or other non-dramatic work,

> (*c*) in the case of a novel or other non-dramatic work, or of an artistic work, to convert it into a dramatic work, by way of performance in public or otherwise,

> (*d*) *in the case of a literary*, dramatic or musical *work, to make any* record, perforated roll, cinematograph film or other *contrivance by means of which the work may be mechanically performed or delivered*,

> (*e*) subject to subsection (2), in the case of any literary, dramatic, musical or artistic work, to reproduce, adapt and publicly present the work by cinematograph, if the author has given the work an original character, and

> (*f*) in the case of any literary, dramatic, musical or artistic work, to communicate the work by radio communication,

> and to authorize any such acts. [emphasis added]

12      In this case, the parties agreed that the making of a copy of a computer program constituted the making of a "contrivance by means of which the work may be mechanically performed or delivered"; absent such agreement, one might have concluded that the forces at work in the performance of a computer software program were electromagnetic rather than mechanical.

13      The plaintiff alleges that the statutory framework has this result: so long as the copyright symbol is displayed on the software, when a copyright owner of a computer software program sells that program over-the-counter the onus shifts to the purchaser to ensure that the owner is willing to permit the purchaser to make the use of the program which the purchaser intends. In other words, the display of the copyright forces the purchaser to seek out, and abide by, a licence statement, or permission, or conditions of use from the copyright owner.

*(a) How was the sale made?*

3

14     In this case, the precise circumstances of the sale are not clear. The plaintiff's witness Syrja states that the floppy disk was inserted into the centre of the booklet "With Interest" and those contents were covered in cellophane which was then shrink-wrapped, or tightly reduced around the contents. Despite a discovery request by the defendant for an unopened, shrink-wrapped package, and an undertaking to provide one, no pristine package of "With Interest" has been introduced into evidence.

15     The witness Wallace, an employee of the authorized agent, was questioned about the sale.

Q. So how would you obtain copies of this?

A. We purchased them from North American Systemshops and then re-sell them.

Q. Do you recall the package that you sold to the defendants if I can call them King and Company?

A. Oh, yes. Mike came over and sat down and I gave them a package and he — we — I showed my copy running on my micro and went through the initial part of it and he left and took it away with him ...

Q. So to your knowledge does North American Systemshops put different registration numbers on their copies?

A. I would assume so.

Q. And do you recall the number of the defendant's micros?

A. No. Well, it was 10 but the one that I sold them I didn't know what the number was because, of course, it's packaged.

Q. Okay, now if we can just step back a minute here. When you ordered these from North American Systemshops, are you advised of the serial number of the diskette inside?

A. No.

Q. When it's shrink wrapped can you see the number of diskette inside?

A. No, because the diskette is inside — well, basically in the middle of [the] manual where the page folds, where the book folds.

16     On the evidence, I conclude that the program was sold to the defendants shrink-wrapped, that no copyright symbol was visible to the purchaser (since the copyright symbol on the booklet is on the inside front cover of the booklet and not on the outside cover and the copyright symbol on the floppy disk is in the same general location on the disk as the registration number and the evidence of the witness Wallace is that the registration number was not visible through the shrink-wrap), and that no licence statement was visible (the licence statement being on the inside back cover of the booklet and not being on the floppy disk). In addition, the evidence establishes that the copyright symbol comes up on the first screen when the program is used, but no licence statement comes up on the screen. Finally, I am satisfied that the user of the program would not have to refer to the booklet for general use of the program as the program was designed to be, and was in fact, "user-useful" in Mr. Syrja's phrase.

***(b) Do all copyright restrictions apply on the sale or only those restrictions brought to the attention of the purchaser?***

17     Since the copyright symbol is found on the first screen of the program, the plaintiff argues that the defendant must search out the plaintiff's permission to use this program in any way.

18     The defendant argues that the sale itself carries with it an implied right to make use of the copy of the program in any way the purchaser may devise. The defendant adopts the positions, including references to existing jurisprudence, taken by Sookman, Computer Law (1989), in particular, at pp. 2-48 and ff:

If copies of software are sold and not licensed, without restrictions binding on the purchasers, the purchasers of the copies sold are entitled to re-sell them, give them away, hire them, or destroy them, without infringing the copyright of the owner of the software. No term will usually be implied in such sales that the buyers can only re-sell the software but not let them out. These rights can substantially affect the revenues that a software publisher can earn and impinge on its ability to maintain the confidentiality of the software. For these reasons, software is frequently licensed rather than sold to end users ...

Shrink wrap licences commonly contain restrictions in the rights of use of the software, including restrictions relating to copying, modifying, renting, and re-selling, the software. Such licences often also exclude the conditions of merchantability and fitness for purpose implied under sale of goods legislation, contain limited repair and replace remedies, and limitation of damage provisions ...

The enforceability of shrink wrap licences has not yet been tested in the courts in Canada. It is submitted that they will not be enforceable against an ordinary vendee, unless there is some clear communication of the shrink wrap terms at the time of purchase to the party to whom the software is sold. The reason is that an ordinary vendee without knowledge of any restrictions affecting the use of goods is not bound to honour any restrictions concerning the goods since restrictive conditions do not run with them ...

If the vendor sells, imposing no restriction or condition upon his purchaser at the time of sale, he cannot impose a condition subsequently by a delivery of the goods with a condition endorsed upon them or on the package in which they are contained. Unless the purchaser knows of the condition at the time of sale, he has the benefit of the implied licence to use the article free from conditions. Furthermore, the buyer will only be restricted to the limitations expressly brought home to his attention, and has no obligations to make inquiries of the owner of the rights in the article to ascertain if there are other restrictions that have not been brought to his attention ...

In view of this law, which would likely be applied to restrictions imposed pursuant to shrink wrap licences, licensors of mass-marketed software should make every effort to ensure that prospective licensees are made aware of the terms to be imposed on them before the transaction is completed.

19    (The citation of the cases footnoted to this text are reproduced in App. 1 [post, p. 159] to these reasons.)

20    (I might add parenthetically at this point that the plaintiff assumes that the decision in this case will be of interest to all developers and purchasers of computer software programs. However, it appears to me that this is not the likely result. On the facts, it is to be noted that the evidence in this case establishes that it is no longer usual in the computer industry to sell software programs in the way in which "With Interest" was sold in 1986. Today, and for the last several years, it has been common to insert the floppy disk in a sealed envelope which prominently displays a warning that the disk is sold subject to the conditions of a licence agreement, the licence agreement, that a card referring to the licence agreement must be signed by the purchaser and returned to the copyright owner, etc. On the law, the Copyright Act has recently been amended specifically to deal with computer programs.)

21    It is true, as the plaintiff emphasizes, that the jurisprudence relied upon by Sookman is mainly patent based and not copyright based.

22    However, the reasons for decision in those cases often refer only to general principles of law, or even of common sense, to support the conclusions reached:

23    *Betts v. Willmott* (1871), 6 Ch. App. 239 at 245 (C.A.):

When a man has purchased an article he expects to have the control of it, and there must be some clear and explicit agreement to the contrary to justify the vendor in saying that he has not given the purchaser his license to sell the article, or to use it wherever he pleases as against himself.

And *Incandescent Gas Light Co. v. Cantelo* (1895), 12 R.P.C. 262 at 264 (Q.B.D.):

... the sale of a patented article carries with it the right to use it in any way that the purchaser chooses to use it, unless he knows of restrictions ... [which may be as limiting, unreasonable or absurd as the owner chooses]

It seems to be common sense, and not to depend upon any patent law, or any other particular law.

24    It is true that in every contract, including a contract for the sale of goods, the court may imply terms. However, it will not imply reasonable terms; it will only imply necessary terms: *Liverpool City Council v. Irwin*, [1977] A.C. 239, [1976] 2 W.L.R. 562, [1976] 2 All E.R. 39 at 44 (H.L.).

25    The law does imply that the purchaser has intended to divest itself of all rights in the article sold, unless restrictions are brought home to the purchaser:

26    *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605, 23 R.P.C. 173 at 180 (Ch. D.):

If a Patentee sells the patented article to a purchaser and the purchaser uses it, he, of course, does not infringe. But why? By reason of the fact that the law presumes from the sale an implied licence given by the Patentee to the purchaser that he shall use that which he has bought, and in the absence of condition, this implied licence is a licence to use or sell or deal with the goods as the purchaser pleases.

27    The jurisprudence does conclude that patented articles, and I am prepared to find that copyrighted articles belong to a similar category, are different from normal goods in that restrictions not only may be imposed on the sale, but the restrictions will run with the goods:

28    *Nat. Phonograph Co. of Australia Ltd. v. Menck*, [1911] A.C. 336, 28 R.P.C. 229 at 248 (P.C.):

[after referring to, and explaining, the earlier jurisprudence]

... it is open to the Patentee, by virtue of his statutory monopoly, to make a sale *sub modo*, or accompanied by restrictive conditions which would not apply in the case of ordinary chattels; secondly, that the imposition of these conditions of a sale is not presumed, but, on the contrary, a sale having occurred, the presumption is that the full right of ownership was meant to be vested in the purchaser; while, thirdly, the owner's rights in a patented chattel will be limited, if there is brought home to him the knowledge of conditions imposed ... upon him at the time of sale.

29    It appears to me that this general thrust of English jurisprudence is all the more applicable to the over-the-counter sale of computer software because of the way in which a computer program must be used, i.e., in order to be used it must be copied at least once into the computer's memory. In that way, the sale of computer software programs differs markedly from the sale of other types of copyrightable materials such as books.

30    Indeed, the American case referred to by Sookman is a most interesting summary of the background to the establishment of specific computer program copyright laws in the United States and determination that a court would not go beyond the narrow construction of even that statute.

31    The *Vault Corp.* case (*Vault Corp. v. Quaid Software Ltd.*, 847 F. 2d 255, affirming 655 F. Supp. 750 (C.A. 5th Circ., 1988)) may be best summarized in the Federal Reporter [847 F. 2d] headnote:

Producer of computer software program designed to defeat copyrighted anticopying program did not infringe on anticopying program producer's copyright by copying the anticopying program into its computer's memory for express purpose of devising means of defeating its protective function, in that copy was "created as an essential step in the utilization" of anticopying program, within meaning of exemption to copyright infringement statute.

32     The Fifth Circuit Court of Appeal mentions at pp. 256 and 260 the distinctive feature of a software program that it must be able to be copied to be used. That court, and the trial court from which the appeal was taken, both concluded that there was no breach of copyright in that case.

33     In the case at bar, the plaintiff manifestly did not bring home to the defendants, or any of them, that there were restrictions on the purchase. None of the simple, cheap, obvious methods to do this were used by the plaintiff. No implied restrictions were necessary to the sale; therefore the court should not, in the absence of explicit instructions brought to the notice of the purchaser, introduce any implied restrictions into the contract of sale.

34     On the contrary, the sale by the plaintiff of its product over-the-counter constitutes the implied granting by the plaintiff of an implied permission to the purchaser to do whatever the purchaser wished with the product.

35     In the result, the plaintiff's claim fails in its entirety.

**3. Breach of licence**

36     If I were wrong in my decision as to the results of the sale of the copy of the program by the copyright owner without prominently display ing a licensing agreement, I should then consider whether there was, on the evidence, a breach of the licence statement.

37     The licence statement is contained on the inside back cover of the booklet and reads as follows:

Not Copy Protected

**North American Systemshops Ltd. (NASL)**

**License Statement**

NASL recognizes that copies of the licensed program must be made for backup purposes. Therefore, we grant you this license. We DO NOT grant you the license to make copies for any other purpose. We also recognize that the program may be moved from one computer location to another, however, the program MAY NOT be used in one location while it is being used in another. Neither may the software be used by two different people in two different places at the same time. By use of the purchased program, the purchaser agrees to the terms and conditions of the license statement.

38     On the evidence in this case, I am only concerned about unlicensed use within the defendant's organization as the evidence is clear that none of the defendant, any of its partners or employees, made a copy of the program for personal use outside the office, sold a copy of the program to another, or allowed any other person to use the program.

39     The first thing to note about the statement is that the plaintiff used the word "copies" rather than the word "copy". Just as in the *Vault Corp.* case, there is in this statement recognition that archival copies may be needed for more than electrical or mechanical failure, and may be necessary to compensate for other mishaps.

40     The second thing to note is that the plaintiff chose the word "also" for use in the fourth sentence. The choice of that word, and indeed the licence statement as a whole, make it clear that the fourth and fifth sentences in the licence statement deal with a different issue than the first three sentences.

41     The third thing to note is that the language of the last sentence of the licence statement is the language of contract, despite the arguments of the plaintiff otherwise.

42     The fourth thing to note is that the wording of the fourth sentence of the licence statement explicitly recognizes that the program may be on two or more of the purchaser's computers at the same time.

43     The evidence establishes that the easiest, because more efficient and faster, way to use this computer program is to read it into the computer's memory permanently and to operate the program in that way rather than from floppy disk. Therefore, in the absence of a specific restriction by the plaintiff, the defendant was entitled to keep the floppy disk as a back-up and to copy the program into a computer's permanent memory bank for use.

44     Next, the evidence establishes that given the limited usefulness of the program in the defendant's business, and the fact that most of the individual uses were for one client, it is improbable both that the program was used in two locations at the same time and that the program was used by two different people in two different places at the same time.

45     As the plaintiff explicitly had no objection to the defendant moving the program from one of its microcomputers to another, and as it explicitly authorized the purchasers to make back-up copies, it appears to me that the core of the plaintiff's restriction in the fourth and fifth sentences of the licence statement is that the program shall not be used in two or more places at once. The plaintiff has not established, on a balance of probabilities, that the defendants breached this part of the statement.

**4. Damages**

46     If I were wrong in my assessment that there has been no breach by the defendant of the licence statement, I would have to consider the issue of damages.

*(a) Loss of profits*

47     The evidence is that none of the defendants copied "With Interest" for resale, for personal use, or to give to any other person. It is also clear that the program was not made available to another person for use or copying.

48     The evidence is that the program was placed on a maximum of six of the defendant's microcomputers ("I think 5" — Syrja; "2 other copies" — Wallace; "I could only have loaded it on the five machines possibly" — Troke; it was "loaded on four" machines — Fedoretz). The program sold for $59 a copy. Therefore, the maximum number of sales the plaintiff lost as a result of the actions of the defendants was five or $295. (The evidence is that this program was not a commercial success for the plaintiff; although Mr. Syrja testified to having invested $25,000-$30,000 in the development of the program, only 31 copies of it were sold.)

49     There is no evidence that the defendants made a profit through the use of the program; the only evidence advanced by the plaintiff on this point is the evidence that the users of the program accounted for the time spent running the program on individual client files. The plaintiff also has not led any evidence relating to the relative importance of this program to the overall profitability of the defendant chartered accountant company. The plaintiff failed to prove any loss of profits.

*(b) Punitive damages*

50     Finally, the plaintiff claims punitive damages. As I understand the plaintiff's position on this issue it is threefold:

51     — as a firm of chartered accountants, the defendants should have known better;

52     — as a firm of chartered accountants having experienced a previous licence dispute, the defendants should have known better;

53     — even if the defendants immediately complied with every demand made by the plaintiff, the defendant has failed to take software program restrictions purchased by them from other software program developers seriously.

54     As to these issues, it is rare that the courts will impose a harsher sanction on one who breaches a contract because of that person's status. The program "With Interest" was available for purchase by anyone. There is no logical nexus established between the status of the defendants as chartered accountants and the alleged breach of contract that would support such a finding in this case. The evidence establishes that chartered accountants in general, and these defendants in particular (even the

partner described by his colleague as a "computer nerd"), did not have in 1986 such a knowledge of restrictions on the use of computer software that their alleged abuse of any licence could be considered flagrant.

55      The evidence establishes that the individual defendants were not themselves involved in the day to day operation of the Edmonton Data Centre which was involved in an earlier licence dispute. The existence of that dispute should not fix the defendants with any particular knowledge of computer software licensing patterns. Indeed, the evidence of the plaintiff's witness Wallace makes it clear that the primary object of the earlier dispute was the resolution of the non-payment of a contract for the purchase of hardware and software; on that occasion, an alleged licence infringement was merely a minor collateral issue.

56      Finally, the plaintiff has no status to raise other alleged breaches of copyright, this not being a representative action. Nor has it, in fact, proved that the defendant is in breach of any other copyright. It cannot, therefore, claim in its action damages which others may have suffered.

57      In summary, therefore, I am of the view that the plaintiff has not established any entitlement to punitive damages.

58      If the parties cannot agree on costs, I may be spoken to within 30 days of this decision.

*Action dismissed.*

## APPENDIX I

*La Société d'Informatique R.D.G. Inc. v. Dynabec Ltée* (1984), 6 C.P.R. (3d) 299 (C.S. Que.) [affirmed 6 C.I.P.R. 185, 6 C.P.R. (3d) 322 (C.A. Que.)].

*CBS Inc. v. Ames Records & Tapes Ltd.*, [1982] Ch. 91, [1981] 2 W.L.R. 973, [1981] 2 All E.R. 812 (Ch. D., Whitford J.).

*Fetherling v. Boughner* (1978), 40 C.P.R. (2d) 253 (Ont. H.C.).

*Liverpool City Council v. Irwin*, supra.

*Vault Corp. v. Quaid Software Ltd.*, supra; related proceedings 775 F. 2d 638 (C.A. 5th Circ., 1985) (note that the Sookman reference to 655 F. 2d 750 appears to be in error).

*Nat. Phonograph Co. of Australia v. Menck*, supra.

*Betts v. Willmott*, supra.

*Gillette v. Rea* (1909), 15 O.W.R. 345, 1 O.W.N. 448 (Boyd C.).

*Badische Anilin und Soda Fabrik v. Isler*, supra.

*Incandescent Gas Light Co. v. Cantelo*, supra.

*Incandescent Gas Light Co. v. Brogden* (1899), 16 R.P.C. 179 (Q.B.D.).

Footnotes

1       Barry B. Sookman, *Computer Law: Acquiring and Protecting Information Technology* (Toronto: Carswell, 1989), p. 3-22.3

2       Ibid., pp. 2-46 and 47

3       Ibid., p. 3-101

**EXHIBIT EN-23**

**TO THE DECLARATION OF EVAN NUTTALL**

2007 SCC 34

Supreme Court of Canada

Union des consommateurs c. Dell Computer Corp.

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801, [2007] S.C.J. No. 34, 158 A.C.W.S. (3d) 870, 284 D.L.R. (4th) 577, 34 B.L.R. (4th) 155, 366 N.R. 1, 44 C.P.C. (6th) 205

**Dell Computer Corporation (Appellant) and Union des consommateurs and Olivier Dumoulin (Respondents) and Canadian Internet Policy and Public Interest Clinic, Public Interest Advocacy Centre, ADR Chambers Inc., ADR Institute of Canada, Inc., and London Court of International Arbitration (Interveners)**

McLachlin C.J.C., Bastarache, Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein JJ.

Heard: December 13, 2006
Judgment: July 13, 2007
Docket: 31067

Proceedings: reversed *Union des consommateurs c. Dell Computer Corp.* (2005), 2005 CarswellQue 3270, EYB 2005-91033, [2005] R.J.Q. 1448 ((C.A. Que.))

Counsel: Mahmud Jamal, Anne-Marie Lizotte, Dominic Dupoy for Appellant
Ronald Bourguignon, Yves Lauzon, Careen Hannouche for Respondents
Mistrale Goudreau, Philippa Lawson for Interveners, Canadian Internet Policy and Public Interest Clinic and Public Interest Advocacy Centre
J. Brian Casey, Janet E. Mills, John Pirie for Intervener, ADR Chambers Inc.
Stefan Martin, Margaret Weltrowska for Intervener, ADR Institute of Canada
Pierre Bienvenu, Frédéric Bachand, Azim Hussain for Intervener, London Court of International Arbitration

***Deschamps J.*:**

1    The expansion of trade is without question spurring the development of rules governing international relations. Alternative dispute resolution mechanisms, including arbitration, are among the means the international community has adopted to increase efficiency in economic relationships. Concomitantly, in Quebec, recourse to arbitration has increased greatly owing this mechanism's flexibility when compared with the traditional justice system.

2    This appeal relates to the debate over the place of arbitration in Quebec's civil justice system. More specifically, the Court is asked to consider the validity and applicability of an arbitration agreement in the context of a domestic legal dispute under the rules of Quebec law and international law, and to determine whether the arbitrator or a court of law should rule first on these issues.

3    To ensure the internal consistency of the *Civil Code of Québec*, S.Q. 1991, c. 64 ("C.C.Q."), it is necessary to adopt a contextual interpretation that limits the scope of the provisions of the title on the international jurisdiction of Quebec authorities to situations with a relevant foreign element. The prohibition in art. 3149 C.C.Q. against waiving the jurisdiction of Quebec authorities is found in that title and accordingly applies only to situations with a relevant foreign element. Since arbitration is in essence a neutral institution, it does not in itself have any foreign element. An arbitration tribunal has only those connections that the parties to the arbitration agreement intended it to have. The independence and territorial neutrality of arbitration are characteristics that must be promoted and preserved in order to foster the development of this institution. In the case at bar, the arbitration clause was not prohibited by any provision of Quebec legislation at the time it was invoked. Consequently, for the

reasons that follow, I would allow the appeal, refer Mr. Dumoulin's claim to arbitration and dismiss the motion for authorization to institute a class action.

## 1. Facts

4    Dell Computer Corporation ("Dell") is a company that sells computer equipment retail over the Internet. It has its Canadian head office in Toronto and a place of business in Montreal. In the late afternoon of Friday, April 4, 2003, the order pages on Dell's English-language Web site indicated a price of $89 rather than $379 for the Axim X5 300-MHz handheld computer and a price of $118 rather than $549 for the Axim X5 400-MHz handheld computer. The pages of the site where the products were advertised listed the correct prices, however. On April 5, on being informed of the errors, Dell blocked access to the erroneous order pages through the usual address, although the pages were not withdrawn from the site. On the morning of April 7, Olivier Dumoulin, a Quebec consumer, was told about the prices by an acquaintance who sent him the detailed links, which the parties described as "deep links". These links made it possible to access the order pages without following the usual route, that is, through the home page and the advertising pages. In short, the deep links made it possible to circumvent the measures taken by Dell. Using a deep link, Mr. Dumoulin ordered a computer at the price of $89. Shortly after Mr. Dumoulin placed his order, Dell corrected the two price errors. That same day, Dell posted a price correction notice and at the same time announced that it would not process orders for computers at the prices of $89 and $118. At trial, a Dell employee testified that over the course of that weekend, 354 Quebec consumers had placed a total of 509 orders for these Axim computers, whereas on an average weekend, only one to three of them were sold in Quebec.

5    On April 17, Mr. Dumoulin put Dell in default, demanding that it honour his order at the price of $89. When Dell refused, the Union des consommateurs and Mr. Dumoulin ("Union") filed a motion for authorization to institute a class action against Dell. Dell applied for referral of Mr. Dumoulin's claim to arbitration pursuant to an arbitration clause contained in the terms and conditions of sale, and dismissal of the motion for authorization to institute a class action. The Union contended that the arbitration clause was null and that, in any event, it could not be set up against Mr. Dumoulin.

## 2. Judicial History

6    The trial judge noted that according to the arbitration clause, arbitration proceedings were to be governed by the rules of the National Arbitration Forum ("NAF"), which is [TRANSLATION] "located in the United States". This led her to conclude that there was a foreign element for purposes of the rules of Quebec private international law and that the prohibition under art. 3149 C.C.Q., as interpreted in *Dominion Bridge Corp. c. Knai* (1997), [1998] R.J.Q. 321 (C.A. Que.), should apply. In her view, the arbitration clause could not be set up against Mr. Dumoulin. She then considered the criteria for instituting a class action and authorized the action against Dell ([2004] J.Q. No. 155 (C.S. Que.)).

7    The Court of Appeal dismissed Dell's appeal from that decision ([2005] R.J.Q. 1448, 2005 QCCA 570 (C.A. Que.)). It began by expressing its disagreement with the Superior Court's application of the rules of Quebec private international law. According to the Court of Appeal, this was not a situation in which the consumer had waived the jurisdiction of Quebec authorities. It noted that the parties had agreed that the dispute was governed by the laws applicable in Quebec and that the arbitration could take place in Quebec. In its view, the instant case could be distinguished from *Dominion Bridge*, a case in which a foreign element had triggered the application of art. 3149 C.C.Q. However, the Court of Appeal concluded that the arbitration clause was external to the contract. Since Dell had not proven that the clause had been brought to the consumer's attention, the effect of art. 1435 C.C.Q. was that the clause could not be set up against him. The Court of Appeal then briefly discussed whether an issue arising under the *Consumer Protection Act*, R.S.Q., c. P-40.1, could be referred to arbitration and held that the Quebec legislature did not intend to preclude arbitration in such matters. Finally, it discussed, but did not accept, the argument that the class action should take precedence over arbitration, mentioning that the disputes that may not be submitted to arbitration are identified in the *Civil Code of Québec* and certain specific statutes.

8    On November 9, 2006, the Quebec Minister of Justice tabled Bill 48, *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts* (2nd Sess., 37th Leg.) ("Bill 48"), in the National Assembly. One of the Bill's

provisions prohibits obliging a consumer to refer a dispute to arbitration. Bill 48, which came into force the day after the hearing of the appeal to this Court, does not include any transitional provisions applicable to this case.

**3. Positions of the Parties**

9      In this Court, the parties have reiterated the arguments raised in the Superior Court and the Court of Appeal. More specifically, Dell submits that the arbitration clause is not prohibited by any provision of Quebec legislation. It therefore is not contrary to public order, is not prohibited by art. 3149 C.C.Q., and is neither external nor abusive. Dell also contends that the courts are limited to conducting a *prima facie* analysis of the validity of an arbitration clause and must leave it to the arbitrator to consider the clause on the merits. According to Dell, this approach, which is based on the "competence-competence" principle, was implicitly adopted by this Court in *Desputeaux c. Éditions Chouette (1987) inc.*, [2003] 1 S.C.R. 178, 2003 SCC 17 (S.C.C.), and the Superior Court should have applied it in the case at bar and referred the matter to an arbitrator to assess the validity of the clause based on the Union's submissions. The Union did not express an opinion on the degree of scrutiny to which the validity of the arbitration clause should be subject but did take a position, contrary to Dell's, on every other issue.

10      After Bill 48 came into force, the Court asked the parties to make written submissions regarding its applicability to the instant case. Dell raised three arguments in support of its position that Bill 48 does not affect the case: that the Bill does not have retroactive effect; that the new legislation cannot apply to disputes already before the courts; and that Dell had a vested right to the arbitration procedure provided for in the contract with Mr. Dumoulin. The Union advanced only one argument: that the provision on arbitration clauses merely confirms an existing prohibition.

11      The parties have raised many issues. In my view, the most significant one in the context of this case concerns the application of art. 3149 C.C.Q. This question is not only a potentially decisive one for the parties, but also one that involves the ordering of the rules in the *Civil Code of Québec*; the answer to it will have repercussions on the interpretation of the other provisions of the title in which this article appears and on the interpretation of the Code in general. The analysis of this issue will lead me to consider the influence of international rules on Quebec law. These rules are also relevant to another issue: whether the competence-competence principle applies to the review of the application to refer the dispute to arbitration. The conclusion I will reach is that an arbitrator has jurisdiction to assess the validity and applicability of an arbitration clause and that, although there are exceptions, the decision regarding jurisdiction should initially be left to the arbitrator. However, in light of the state of the case, I will discuss all the issues that have been raised.

**4. Application of Article 3149 C.C.Q.**

12      It will be helpful to reproduce the provision in issue and discuss its context. It reads as follows:

> 3149. A Québec authority also has jurisdiction to hear an action involving a consumer contract or a contract of employment if the consumer or worker has his domicile or residence in Québec; the waiver of such jurisdiction by the consumer or worker may not be set up against him.

This provision appears in Title Three, entitled "International Jurisdiction of Québec Authorities", which is found in Book Ten of the *Civil Code of Québec*, entitled "Private International Law". The Court must decide whether it applies in the case at bar. In my view, it is applicable only where there is a relevant foreign element that justifies resorting to the rules of Quebec private international law. I will explain why.

***4.1 Context of Application of the Rules on the International Jurisdiction of Quebec Authorities***

*4.1.1 Purpose and Consequences of the Codification of Private International Law in the Civil Code of Québec*

13      When the Quebec legislature began the reform of the civil law in the mid-twentieth century, it did so in a way that was consistent with the civil law tradition in its purest form. As Professor Crépeau writes:

> [TRANSLATION] The Civil Code is an organic, ordered, structured, harmonious and cohesive whole that contains the substantive subject matters of private law, governing, in the civil law tradition, the legal status of persons and property,

relationships between persons, and relationships between persons and property. (P.-A. Crépeau, "Une certaine conception de la recodification", in *Du code civil du Québec: Contribution à l'histoire immédiate d'une recodification réussie* (2005), 23, at p. 40)

14    The codification process therefore entailed a reflection on all the principles and on how to organize them in one central document with a view to simplifying and clarifying the rules, and thus making them more accessible. The organization of rules is an essential feature of codification. Professors Brierley and Macdonald describe the impact of this feature on the mode of presentation and the interpretation of the *Civil Code* as follows:

> A number of assumptions as to form underpin a Civil Code. Their common character is linked to notions of rationality and systematization, nicely captured by Weber's expression — formal rationality. To say that a Civil Code is, and must be understood as, systematic and rationally organized implies that it reflects a consciously chosen, integrated design for presenting the law that has been consistently followed.
>
> . . . . .
>
> The rational and systematic character of the Code also bears on its mode of presentation. One of the central features of the Code is its taxonomic structure. This affects both its organization and its drafting style. Just as the very existence of a Code labelled "Civil Code" presupposes a larger legal universe that can be divided and subdivided — public law, private law; and, within private law, procedure and substance; and, within substantive private law, commercial law and civil law — the same taxonomic approach is carried through into the Code itself. Its primary division is into large books — for example, persons, property, modes of acquisition of property, commercial law — each of which is subdivided into titles. Within these titles the Code is subdivided into chapters that, in turn, are divided into sections and sometimes into subsections. All the concepts relating to a given area of the law are thus logically derived from first principles, meticulously developed, and systematically ordered.
>
> . . . . .
>
> In this architectonic mode of presentation, the inventory of subjects selected for inclusion and the manner of their placement serve to define the range of meaning that each of the subjects so included may have. The initial organizational choices bear directly on the manner in which the Code adapts to changing circumstances...

(J. E. C. Brierley and R. A. Macdonald, *Quebec Civil Law: An Introduction to Quebec Private Law* (1993), at pp. 102-4)

15    In his commentaries on the *Civil Code of Québec*, Quebec's Minister of Justice confirmed that the Code [TRANSLATION] "is a structured and hierarchical statutory scheme": *Commentaires du ministre de la Justice* (1993), vol. I, at p. VII. For this reason, it cannot be assumed that the jurists who took part in the reform placed the provisions of the *Civil Code of Québec* in one title or another indiscriminately or without a concern for coherence. A codification process presupposes an ordering of rules, and the provisions of the title on the international jurisdiction of Quebec authorities reflect this general philosophy of codification.

*4.1.2 Private International Law*

16    Private international law is the branch of a state's domestic law that governs private relationships that [TRANSLATION] "exten[d] beyond the scope of a single national legal system": É. Wyler and A. Papaux, "Extranéité de valeurs et de systèmes en droit international privé et en droit international public", in É. Wyler and A. Papaux (eds.), *L'extranéité ou le dépassement de l'ordre juridique étatique* (1999), 239, at p. 241. Since every state has the power to adopt its own system of rules, the result is a variety of conceptions of private international law. Thus, in some countries, this branch of law is limited to the conflict of laws, whereas in France, private international law has a broader scope, extending also to questions concerning the status of foreign nationals and the nationality of persons. In English private international law, an intermediate approach has been adopted that generally concerns three types of questions: (i) conflict of laws, (ii) conflict of jurisdictions and (iii) the recognition and enforcement of foreign judgments: *Dicey, Morris and Collins on the Conflict of Laws* (14th ed. 2006), vol. 1, at p. 4; P. North and J. J. Fawcett, *Cheshire and North's Private International Law* (13th ed. 1999), at p. 7. What is the situation in Quebec law?

*4.1.3 Legislative History of Quebec Private International Law*

17     The drafters of the original rules of Quebec private international law naturally drew on French law. Like the *Code Napoléon*, the *Civil Code of Lower Canada* contained only a few articles on this subject, and until the *Civil Code of Québec* was enacted in 1991, they and a few provisions of the *Code of Civil Procedure* and from specific statutes constituted the private international law of Quebec.

18     While Quebec's private international law was going through a period of relative stagnation in the nineteenth and early twentieth centuries, a growing number of states had recourse to codification, adopting increasingly comprehensive and systematic rules: B. Audit, *Droit international privé* (4th ed. 2006) at para. 37; A. N. Makarov, "Sources", in International Association of Legal Science, *International Encyclopedia of Comparative Law*, vol. III, *Private International Law* (1972), c. 2, at pp. 4-5. The subsequent project to codify Quebec's private international law was part of that trend; it was included in the mandate for the proposed general reform of the *Civil Code* that was assigned to the Civil Code Revision Office ("Office") in 1965.

19     In 1975, an initial draft codification of the rules of Quebec private international law was submitted to the Office by its private international law committee, which was chaired by Professor J.-G. Castel. The content of this report was amended slightly and was incorporated two years later into Book Nine of the *Draft Civil Code* (Civil Code Revision Office, *Report on the Québec Civil Code* (1978), vol. I, *Draft Civil Code*, at pp. 593 *et seq.*). The preliminary chapter and Chapter I of Book Nine contained general provisions. Chapter II concerned conflicts of laws, while Chapter III dealt with conflicts of jurisdictions. Chapters IV and V dealt with the recognition and enforcement of foreign decisions and arbitration awards. Finally, Chapter VI codified the immunity from civil jurisdiction and execution enjoyed by foreign states and certain other international actors.

20     The structure of Book Nine attests to the Quebec legislature's adoption of the intermediate approach of English private international law described by Dicey, Morris and Collins and North and Fawcett (mentioned above). The Office's decision was the result of a process that stretched over many years.

21     The Office explained that Chapter III on conflicts of jurisdictions was adopted to make up for a lack of specific rules on private international law that had obliged courts to resort to the *Code of Civil Procedure*'s provisions on the judicial districts in Quebec where proceedings could be instituted:

> To remedy this state of affairs and to distinguish between international and domestic jurisdiction, it seemed necessary to provide rules applicable exclusively to situations containing a foreign element. [Emphasis added.]

> (Civil Code Revision Office, *Report on the Québec Civil Code* (1978), vol. II, t. 2, *Commentaries*, at p. 965)

22     In the commentaries that accompanied the final text of the *Civil Code of Québec*, the Minister of Justice mentioned a number of times that the various sections of Book Ten of the *Civil Code* apply to legal situations [TRANSLATION] "with a foreign element". He expressly repeated this in the introduction to Title Three on the international jurisdiction of Quebec authorities (*Commentaires du ministre de la Justice*, vol. II, at p. 1998). The Minister also reiterated the Office's comments on the need for a set of jurisdictional rules for private international law distinct from the rules of the *Code of Civil Procedure* upon which the courts had relied until then:

> [TRANSLATION] Since there were no rules for determining whether Quebec authorities had jurisdiction over disputes with a foreign element, the courts had extended the domestic law rules of jurisdiction provided for in the *Code of Civil Procedure* to such situations.

> The general objective of Title Three is to remedy this deficiency by establishing specific rules for determining the international jurisdiction of Quebec authorities....

> (*Commentaires du ministre de la Justice*, at p. 1998)

23     These commentaries shed light on the distinction between rules of jurisdiction governing purely domestic disputes and those that, because of a foreign element, form part of private international law. Where domestic disputes are concerned, the

question of adjudicative jurisdiction is governed by the *Code of Civil Procedure*. In the case at bar, arts. 31 and 1000 C.C.P. are the provisions that confer jurisdiction over class actions on the Quebec Superior Court.

24     Given that domestic disputes are governed by the general provisions of Quebec domestic law, there is no reason to apply the rules relating to the international jurisdiction of Quebec authorities to a dispute that involves no foreign element.

### 4.2 Foreign Element Concept

25     What is this foreign element that is omnipresent in the literature on private international law? Very little has been written about it. Of course, disputes in which rules of private international law are relied on usually have an international aspect and, as a result, the courts have not needed to elaborate on the parameters of the foreign element concept. One reference to this concept can be found in *Regenair inc. c. Quebecor Printing Memphis Inc.*, [2001] R.J.Q. 966 (C.A. Que.), at para. 17, in which Philippon J.A., dissenting on another issue, described the initial step of the analytical approach in private international law:

> [TRANSLATION] First, it had to be determined whether the dispute related to an international situation or a transnational event or had a foreign element. [Emphasis deleted.]

26     This foreign element can be defined, however. It must be "[a] point of contact which is *legally relevant* to a foreign country", which means that the contact must be sufficient to play a role in determining whether a court has jurisdiction: J. A. Talpis and J.-G. Castel, "Interpreting the rules of private international law", in *Reform of the Civil Code* (1993), vol. 5B, at page 38 (emphasis added); J. Walker, *Castel & Walker, Canadian Conflict of Laws* (loose-leaf ed.), vol. 1, at p. 1-1; see also Wyler and Papaux, at p. 256.

27     Since our private international law is based on English law, it will be helpful to review the state of English law on this question. North and Fawcett define private international law as follows:

> Private international law, then, is that part of law which comes into play when the issue before the court affects some <u>fact, event or transaction that is so closely connected with a foreign system of law</u> as to necessitate recourse to that system. [Emphasis added; p. 5.]

This definition is similar to the one adopted by Canadian authors, and it includes a notion common to many systems of private international law: the factor connecting a matter with a particular system. It follows that the foreign element and the connecting factor are overlapping notions. One author describes the connecting factor concept as follows:

> The connecting factor is the element forming one of the facts of the case which is selected in order to attach a question of law to a legal system. The connecting factor determines the applicable law or the jurisdiction of a court. For instance, if the facts of a case present a question of intestate succession to movables, the element among those facts selected for the designation of the applicable law may be the last domicile, the last habitual residence, the nationality of the deceased or the situs of the movables. Likewise, one of these connecting factors may be employed to establish the jurisdiction of the courts to deal with intestate succession to movables. (F. Vischer, "Connecting Factors", in International Association of Legal Science, *International Encyclopedia of Comparative Law*, vol. III, *Private International Law*, 1999, c. 4, at p. 3)

See also Y. Loussouarn, P. Bourel and P. de Vareilles-Sommières, *Droit international privé* (8th ed. 2004), at p. 2. The connecting factor and foreign element concepts are recognized in Quebec private international law, too: Talpis and Castel, at p. 38; C. Emanuelli, *Droit international privé québécois* (2nd ed. 2006), at pp. 11-12.

28     These two concepts can, therefore, overlap. A connecting factor is a tie to either the domestic or a foreign legal system, whereas the foreign element concept refers to a possible tie to a foreign legal system. Thus, in a personal action brought in Quebec, the fact that a defendant is domiciled in Quebec is a connecting factor with respect to the Quebec legal system but not a foreign element, whereas the fact that a defendant is domiciled in England will be considered both a connecting factor with respect to English jurisdiction and a foreign element with respect to the Quebec legal system. Certain of the connecting factors

enumerated in Professor Vischer's definition above are common to most systems of private international law (see on this point the enumerations in Loussouarn, Bourel and de Vareilles-Sommières, at p. 2; North and Fawcett, at p. 5).

29      A state is free to determine what connecting factors or foreign elements it considers to be relevant. In Quebec, the legislature adopted a number of factors already found in the main Western private international law systems. In the title of the *Civil Code of Québec* on the conflict of laws, these factors are divided into four main categories, each of which is addressed in a separate chapter: (1) personal factors, with the main one being the place of domicile; (2) property-related factors; (3) factors related to obligations, such as the place where a contract is entered into; and (4) factors related to procedure, which is usually governed by the law of the court hearing the case (arts. 3083 to 3133 C.C.Q.).

30      The legislature also provided for certain connecting factors in respect of the international jurisdiction of Quebec authorities, which is the subject of a separate title. The place where one of the parties is domiciled heads the list of these factors, too. Article 3148 C.C.Q. shows this clearly:

> 3148. In personal actions of a patrimonial nature, a Québec authority has jurisdiction where
>
> (1) the defendant has his domicile or residence in Québec;
>
> (2) the defendant is a legal person, is not domiciled in Québec but has an establishment in Québec, and the dispute relates to its activities in Québec;
>
> (3) a fault was committed in Québec, damage was suffered in Québec, an injurious act occurred in Québec or one of the obligations arising from a contract was to be performed in Québec;
>
> (4) the parties have by agreement submitted to it all existing or future disputes between themselves arising out of a specified legal relationship;
>
> (5) the defendant submits to its jurisdiction.
>
> However, a Québec authority has no jurisdiction where the parties, by agreement, have chosen to submit all existing or future disputes between themselves relating to a specified legal relationship to a foreign authority or to an arbitrator, unless the defendant submits to the jurisdiction of the Québec authority.

See also arts. 3134, 3141 to 3147, 3149, 3150, and 3154, para. 2 C.C.Q. Other factors that are considered include the place where damage was suffered or an injurious act occurred (art. 3148(3) C.C.Q.), and the place where the property in dispute is located (arts. 3152 to 3154, para. 1 C.C.Q.).

31      It can be seen that what these traditional factors have in common is a concrete connection with Quebec; if private international law is invoked, it can be assumed that there is an equally concrete foreign element that can serve as a basis for applying a foreign legal system. Despite the developments I have just mentioned, we should question the postulate that the rules of Quebec private international law apply only where there is a foreign element.

32      In the Office's *Draft Civil Code*, it was clear that a foreign element was necessary. In its commentary on the provision on the law applicable to juridical acts, the Office stated the following:

> It should be noted that the text applies to juridical acts of an international character. The parties are not free to refer to a law not related to their act unless that act contains a foreign element. (Civil Code Revision Office, *Report on the Québec Civil Code*, vol. II, t. 2, *Commentaries*, at p. 977 (commentary on art. 21 of Book Nine of the *Draft Civil Code*))

In discussing art. 48 of Book Nine of the *Draft Civil Code*, the predecessor of art. 3148 C.C.Q. on the international jurisdiction of Quebec authorities, the Office stated that the jurisdictional rules set out in this article "are intended to apply to situations involving a foreign element" (Civil Code Revision Office, vol. II, t. 2, at p. 988).

33      The 1988 draft bill did not substantively alter the traditional foreign element requirement (*An Act to add the reformed law of evidence and of prescription and the reformed private international law to the Civil Code of Québec*). The wording of art. 3477 of the draft bill on the designation of the applicable law was substantially similar to that of the final version of the provision in the *Civil Code of Québec* (art. 3111). It read as follows:

> 3477. A juridical act containing a foreign element is governed by the law expressly designated in the instrument or the designation of which may be inferred with certainty from the terms of the act.
>
> A system of law may be expressly designated as applicable to the whole or a part only of a juridical act.

34      The reference in this article to the foreign element led professors Talpis and Goldstein to ask whether such a reference was necessary, since they considered the foreign element requirement to be essential:

> [TRANSLATION] It might first be asked whether it was necessary to specify that the parties may choose the applicable law only for a contract "containing a foreign element". <u>It is obvious that the existence of a foreign element is the *sine qua non* of recourse to *all* the rules in Book Ten of the future Civil Code</u>. However, since the Draft Bill does not include a specific provision on evasion of the law, this reference may have been intended to indicate that the will of the parties is not sufficient to turn a contract connected entirely with Quebec into an international one. [Emphasis added.]
>
> (J. A. Talpis and G. Goldstein, "Analyse critique de l'avant-projet de loi du Québec en droit international privé" (1988-1989), 91 *R. du N.* 456, at p. 476)

As for art. 3511 of the 1988 draft bill, which concerned the international jurisdiction of Quebec authorities, it already contained all the substantive elements of the future art. 3148 C.C.Q.

35      In Bill 125 of 1990, the *Civil Code of Québec*, however, the foreign element requirement was not retained with respect to the designation of the applicable law. The legislature incorporated a special rule into the provision. The final version of art. 3111 includes an addition to the text that was initially proposed:

> 3111. A juridical act, <u>whether or not it contains any foreign element</u>, is governed by the law expressly designated in the act or the designation of which may be inferred with certainty from the terms of the act.
>
> A juridical act containing no foreign element remains, nevertheless, subject to the mandatory provisions of the law of the country which would apply if none were designated.
>
> The law of a country may be expressly designated as applicable to the whole or a part only of a juridical act.

What this addition brings to the title on the conflict of laws is to make it possible for the parties to provide that a purely domestic juridical act will be governed by the law of a foreign jurisdiction. However, immediately after recognizing the autonomy of the will of the parties where the designation of the applicable law is concerned, the legislature hastened to limit it in the second paragraph of the provision. Thus, in the absence of a foreign element, a juridical act remains subject to the mandatory rules that would apply if no law were designated. As a result, the designation of the law of a foreign jurisdiction in an act that contains no foreign element is a special circumstance that was cautiously introduced into Quebec private international law and is confined to the rules applicable to the conflict of laws.

36      I should add that the wording of art. 3111 C.C.Q. is based on that of art. 3 of the *Convention on the Law Applicable to Contractual Obligations* (Rome Convention of 1980), which authorizes the "[choice of] a foreign law" where there is no foreign element. It is also conceivable that the determination of the law applicable to a juridical act will at times require a more complex analysis than the one to be made where adjudicative jurisdiction is in issue. Thus, a juridical act, such as a giving of security, that appears to have only domestic connections may in reality be part of an international transaction whose ramifications are not in issue in a given dispute. So there are several possible explanations for the exception provided for in Title Two on the conflict of laws.

37     In the title on the international jurisdiction of Quebec authorities, on the other hand, there is no exception to the foreign element requirement, and it is clear that a court asked to apply the rules of private international law must first determine whether the situation involves a foreign element. This position is consistent with the traditional definition of private international law and with the Office's intention. It must now be asked whether, in the case at bar, the choice of arbitration procedure gives rise to a foreign element warranting the application of art. 3149 C.C.Q. To answer this question, it will be necessary to consider how arbitration has been incorporated into Quebec law.

### 4.3 Arbitration in Quebec

#### 4.3.1 International Sources

38     International arbitration law is strongly influenced by two texts drafted under the auspices of the United Nations: the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3 ("New York Convention"), and the *UNCITRAL Model Law on International Commercial Arbitration*, U.N. Doc. A/40/17 (1985) ("Model Law").

39     The New York Convention entered into force in 1959. Article II of the Convention provides that a court of a contracting state that is seized of an action in a matter covered by an arbitration clause must refer the parties to arbitration. At present, 142 countries are parties to the Convention. The accession of this many countries is evidence of a broad consensus in favour of the institution of arbitration. Lord Mustill wrote the following about the Convention:

> This Convention has been the most successful international instrument in the field of arbitration, and perhaps could lay claim to be the most effective instance of international legislation in the entire history of commercial law. (M. J. Mustill, "Arbitration: History and Background" (1989), 6 *J. Int'l Arb.* 43, at p. 49)

Canada acceded to the New York Convention on May 12, 1986.

40     The Model Law is another fundamental text in the area of international commercial arbitration. It is a model for legislation that the UN recommends that states take into consideration in order to standardize the rules of international commercial arbitration. The Model Law was drafted in a manner that ensured consistency with the New York Convention: F. Bachand, "Does Article 8 of the Model Law Call for Full or Prima Facie Review of the Arbitral Tribunal's Jurisdiction?" (2006), 22 *Arb. Int'l* 463, at p. 470; S. Kierstead, "Referral to Arbitration under Article 8 of the UNCITRAL Model Law: The Canadian Approach" (1999), 31 *Can. Bus. L.J.* 98, at pp. 100-101.

41     The final text of the Model Law was adopted on June 21, 1985 by the United Nations Commission on International Trade Law ("UNCITRAL"). In its explanatory note on the Model Law, the UNCITRAL Secretariat states that it:

> ...reflects a worldwide consensus on the principles and important issues of international arbitration practice. It is acceptable to States of all regions and the different legal and economic systems of the world. (Explanatory Note by the UNCITRAL secretariat on the Model Law on International Commercial Arbitration, at para. 2)

In 1986, Parliament enacted the *Commercial Arbitration Act*, R.S.C. 1985, c. 17 (2nd Supp.), which was based on the Model Law. The Quebec legislature followed suit that same year and incorporated the Model Law into its legislation. Quebec's Minister of Justice at the time, Herbert Marx, reiterated the above-quoted comment by the UNCITRAL Secretariat: National Assembly, *Journal des débats*, 1st Sess., 33rd Leg., June 16, 1986, at p. 2975, and Oct. 30, 1986, at p. 3672.

#### 4.3.2 Nature and Scope of the 1986 Amendments to the Civil Code of Lower Canada and the Code of Civil Procedure

42     In 1986, the *Act to amend the Civil Code and the Code of Civil Procedure in respect of arbitration*, S.Q. 1986, c. 73 ("Bill 91"), which established a scheme for promoting arbitration in Quebec, was tabled in the legislature. Bill 91 added a new title on arbitration agreements to the *Civil Code of Lower Canada*. This title consisted of only six provisions setting out a few general principles relating to the validity and applicability of such agreements. The legislature's decision to place arbitration agreements among the nominate contracts in the *Civil Code of Lower Canada* is significant. After that, there was no longer

any reason to regard arbitration agreements as being outside the sphere of the general law; on the contrary, they were now an integral part of it: *Condominiums Mont Ste-Sauveur Inc. c. Constructions Serge Sauvé Ltée*, [1990] R.J.Q. 2783 (C.A. Que.), at p. 2785; J. E. C. Brierley, "Arbitration Agreements: Articles 2638-2643", in *Reform of the Civil Code* (1993), vol. 3B, at p. 1. The provisions added by Bill 91 would be restated without any major changes in the chapter of the *Civil Code of Québec* on arbitration agreements.

43     Bill 91 also had a considerable impact on the *Code of Civil Procedure*. Substantial additions were made to Book VII on arbitrations, which was divided into two titles. Title I is a veritable code of arbitral procedure that regulates every step of an arbitration proceeding subject to Quebec law, from the appointment of the arbitrator to the order of the proceeding to the award and homologation. Most of these rules apply only "where the parties have not made stipulations to the contrary" (art. 940 C.C.P.). Title II sets out a system of rules applicable to the recognition and execution of arbitration awards made outside Quebec.

44     Although Bill 91 was the Quebec legislature's response to Canada's accession to the New York Convention and to UNCITRAL's adoption of the Model Law, it is not identical to those two instruments. As the Quebec Minister of Justice noted, Bill 91 was [TRANSLATION] "inspired" by the Model Law and [TRANSLATION] "implement[ed]" the New York Convention: *Journal des débats*, 1st Sess., 33rd Leg., October 30, 1986, at p. 3672. For this reason, it is important to consider the interplay between Quebec's domestic law and private international law before interpreting the provisions of Bill 91.

45     This Court analysed the interplay between the New York Convention and Bill 91 in *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, [2005] 2 S.C.R. 401, 2005 SCC 46 (S.C.C.), at paras. 39 *et seq*. After noting that there is a recognized presumption of conformity with international law, the Court mentioned that Bill 91 "incorporate[s] the principles of the *New York Convention*" and concluded that the Convention is a formal source for interpreting the provisions of Quebec law governing the enforcement of arbitration agreements: para. 41. This conclusion is confirmed by art. 948, para. 2 C.C.P., which provides that the interpretation of Title II on the recognition and execution of arbitration awards made outside Quebec (arts. 948 to 951.2 C.C.P.) "shall take into account, where applicable, the [New York] Convention".

46     The same is not true of the Model Law. Unlike an instrument of conventional international law, the Model Law is a non-binding document that the United National General Assembly has recommended that states take into consideration. Thus, Canada has made no commitment to the international community to implement the Model Law as it did in the case of the New York Convention. Nevertheless, art. 940.6 C.C.P. attaches considerable interpretive weight to the Model Law in international arbitration cases:

> 940.6. Where matters of extraprovincial or international trade are at issue in an arbitration, the interpretation of this Title, where applicable, shall take into consideration
>
> > (1) the Model Law on International Commercial Arbitration as adopted by the United Nations Commission on International Trade Law on 21 June 1985;
> >
> > (2) the Report of the United Nations Commission on International Trade Law on the work of its eighteenth session held in Vienna from the third to the twenty-first day of June 1985;
> >
> > (3) the Analytical Commentary on the draft text of a model law on international commercial arbitration contained in the report of the Secretary-General to the eighteenth session of the United Nations Commission on International Trade Law.

47     In short, to quote Professor Brierley, Bill 91 opened Quebec arbitration law to "international thinking" in this area; this international thinking "has become a formal source of Quebec positive law": J. E. C. Brierley, "Quebec's New (1986) Arbitration Law" (1987-88), 13 *Can. Bus. L.J.* 58, at pp. 63 and 68-69.

*4.3.3 Status of Arbitration in Quebec Private International Law*

48     Bill 91 established the legal framework applicable to arbitration. Not all arbitration proceedings are subject to the same rules. First, Title I on arbitration proceedings applies only if the parties have not stipulated that they intend to opt out of it. In addition, the facts of the case must call for application of the *Code of Civil Procedure* either because the foreign parties have chosen it in accordance with a provision authorizing them to do so in a law that would otherwise govern this proceeding or because the circumstances of the proceeding necessitate the application of Quebec law. Second, Title II of Book VII of the *Code of Civil Procedure* contains special provisions on the recognition and execution of arbitration awards made outside Quebec. Third, art. 940.6 C.C.P. provides that Title I on arbitration proceedings is to be interpreted in light, where applicable, of the Model Law and certain documents related to it "[w]here matters of extraprovincial or international trade are at issue in an arbitration". As Professor Marquis notes, the words "mettant en cause des intérêts du commerce" in the French version of art. 940.6 have an [TRANSLATION] "unfamiliar sound in Quebec law": L. Marquis, "Le droit français et le droit québécois de l'arbitrage conventionnel", in H. P. Glenn, ed., *Droit québécois et droit français: communauté, autonomie, concordance* (1993), 447, at p. 483. In fact, they were taken straight from the French *Code of Civil Procedure*:

> 1492. Est international l'arbitrage qui met en cause des intérêts du commerce international [Arbitration is international where matters of international trade are at issue].

Because the same words are used, Quebec authors agree that art. 940.6 C.C.P. has imported the concept of international arbitration from French law: S. Guillemard, *Le droit international privé face au contrat de vente cyberspatial* (2006), at pp. 73-74; S. Thuilleaux, *L'arbitrage commercial au Québec: Droit interne — Droit international privé* (1991), at p. 129; L. Marquis, "La notion d'arbitrage commercial international en droit québécois" (1991-1992), 37 *McGill L.J.* 448, at pp. 465 and 469.

49     The matter of international trade test is different from connecting factors such as the parties' place of residence or the place where the obligations are performed. Thus, a contractual legal situation may have foreign elements without involving any matters of extraprovincial or international trade; in such a case, although the resulting arbitration will not be considered an international arbitration, it will nonetheless be subject to the rules of private international law. Since the case at bar does not involve international commercial arbitration, this explanation is intended merely to highlight the fact that the test under art. 940.6 C.C.P. is clearly distinct from the foreign element requirement. Where the Quebec legislature intended different rules to apply, it has made this clear.

50     The rules on arbitration proceedings set out in Title I of Book VII of the *Code of Civil Procedure* apply, to the extent provided for, to any arbitration proceeding subject to Quebec law. The parties are free to attribute foreign connections to an arbitration process, in which case the rules of private international law may be applicable. However, an arbitration clause is not in itself a foreign element warranting the application of the rules of Quebec private international law. The commentators are unanimous on this point:

> [TRANSLATION] It is clear that if an arbitration process is considered to be purely internal to Quebec, the law of Quebec will be applied to it. The rules of private international law will not be applicable. It is Quebec's *Code of Civil Procedure* (rules on arbitration) that will be applied. (J. Béguin, *L'arbitrage commercial international* (1987), at p. 67)

See also to the same effect, in respect of comparative law, E. Gaillard and J. Savage, *Fouchard, Gaillard, Goldman on International Commercial Arbitration* (1999), at p. 47.

51     The neutrality of arbitration as an institution is one of the fundamental characteristics of this alternative dispute resolution mechanism. Unlike the foreign element, which suggests a possible connection with a foreign state, arbitration is an institution without a forum and without a geographic basis: Guillemard, at p. 77; Thuilleaux, at p. 145. Arbitration is part of no state's judicial system: *Desputeaux*, at para. 41. The arbitrator has no allegiance or connection to any single country: M. Lehmann, "A Plea for a Transnational Approach to Arbitrability in Arbitral Practice" (2003-2004), 42 *Colum. J. Transnat'l L.* 753, at p. 755. In short, arbitration is a creature that owes its existence to the will of the parties alone: *Laurentienne-vie, cie d'assurance inc. c. Empire, cie d'assurance-vie,* [2000] R.J.Q. 1708 (C.A. Que.), at paras. 13 and 16.

52     To say that the choice of arbitration as a dispute resolution mechanism gives rise to a foreign element would be tantamount to saying that arbitration itself establishes a connection to a given territory, and this would be in outright contradiction to the very essence of the institution of arbitration: its neutrality. This institution is territorially neutral; it contains no foreign element. Furthermore, the parties to an arbitration agreement are free, subject to any mandatory provisions by which they are bound, to choose any place, form and procedures they consider appropriate. They can choose cyberspace and establish their own rules. It was open to the parties in the instant case to refer to the *Code of Civil Procedure*, to base their procedure on a Quebec or U.S. arbitration guide or to choose rules drawn up by a recognized organization, such as the International Chamber of Commerce, the Canadian Commercial Arbitration Centre or the NAF. The choice of procedure does not alter the institution of arbitration in any of these cases. The rules become those of the parties, regardless of where they are taken from.

53     I cannot therefore see how the parties' choice of arbitration can in itself create a foreign element. Such an interpretation would empty the foreign element concept of all meaning. An arbitration that contains no foreign element in the true sense of the word is a domestic arbitration. The rules on the international jurisdiction of Quebec authorities will apply only to an arbitration containing a foreign element, such as where a defendant in a case involving a personal claim is domiciled in another country.

54     It must now be determined whether the facts of the present case contain a foreign element.

### *4.4 Seeking to Identify a Foreign Element in the Facts of the Case at Bar*

55     The trial judge saw a foreign element in the fact that [TRANSLATION] "[t]he NAF is located in the United States" (para. 32). The Court of Appeal rejected this conclusion, and the Union has abandoned this argument. Like other organizations, such as the International Chamber of Commerce and the Canadian Commercial Arbitration Centre, the NAF offers arbitration services. The place where decisions concerning arbitration services are made or where the employees of these organizations work has no impact on the disputes in which their rules are used.

56     Thus, the location of the NAF's head office is not a relevant foreign element for purposes of the application of Quebec private international law. Moreover, Dell having conceded that the arbitration proceeding will take place in Quebec should put an end to the debate regarding the place of arbitration.

57     Another potential foreign element is found in the NAF's Code of Procedure (*National Arbitration Forum Code of Procedure*). Rules 5O and 48B of the NAF Code provide that, unless the parties agree otherwise, arbitrations and arbitration procedures are governed by the U.S. *Federal Arbitration Act*. In Quebec, designation of the applicable law is governed by Title Two of Book Ten of the *Civil Code of Québec* on the conflict of laws. The parties' designation of the applicable law under this title is not ordinarily recognized as a foreign element in the subsequent title on the international jurisdiction of Quebec authorities. In any event, since art. 3111 C.C.Q., which I discussed above, refers to designation of the law applicable to a juridical act containing no foreign element, the designation itself does not produce such an element.

58     The Union raised a final element: the language of the proceedings. According to the NAF Code, English is the language used in NAF proceedings, although the parties may choose another language, in which case the NAF or the arbitrator may order the parties to provide any necessary translation and interpretation services at their own cost (rules 11D and 35G of the NAF Code).

59     In my view, the language argument must fail. Although I agree that the use of a language with which the consumer is not familiar may cause difficulties, neither the French nor the English language can be characterized as a foreign element in Canada.

60     My colleagues Bastarache and LeBel JJ. nonetheless consider it logical to accept that an arbitration clause in itself constitutes a foreign element that can result in application of the provisions on the international jurisdiction of Quebec authorities. Their interpretation has consequences for agreements other than consumer contracts. Thus, it would also be impossible to set up against a Quebec worker *any* undertaking to submit to an arbitrator any future disputes with his or her Quebec employer relating to an individual contract of employment. Furthermore, *any* arbitration agreement concerning damage suffered as a result of exposure to raw materials originating in Quebec would be null (see arts. 3151 and 3129 C.C.Q.), even an

agreement between a Quebec supplier and a Quebec producer. This interpretation is hard to accept. It implies that the codifiers failed to achieve their objective of ordering the rules in both Book Ten on private international law and Chapter XVIII on arbitration agreements in Book Five. This is an important point, and it is not strictly confined to the foreign element argument. I will therefore consider it separately.

*4.5 Ordering of the Rules on Arbitration*

61     The chapter on arbitration is found in the important Book Five of the *Civil Code of Québec* on obligations. Book Five is divided into two titles, the first of which concerns obligations in general, while the second concerns nominate contracts. Chapter XVIII is the final chapter of the title on nominate contracts. It incorporates the provisions of Bill 91 enacted in 1986, which I have already discussed. It contains a general provision, art. 2638 C.C.Q., which is based on the recognition that an arbitration agreement is valid and can be set up against a party:

> 2638. An arbitration agreement is a contract by which the parties undertake to submit a present or future dispute to the decision of one or more arbitrators, to the exclusion of the courts.

In his commentary on this provision, the Minister of Justice stated that the essential purpose of the arbitration agreement is [TRANSLATION] "to displace judicial intervention" and that "by conferring jurisdiction on arbitrators, [one] ousts the usual jurisdiction of the judiciary": *Commentaires du ministre de la Justice*, vol. II, at p. 1649.

62     Chapter XVIII also contains a provision that enumerates the cases in which the jurisdiction of the Quebec courts cannot be ousted by the parties. This provision reads as follows:

> 2639. Disputes over the status and capacity of persons, family matters or other matters of public order may not be submitted to arbitration.
>
> An arbitration agreement may not be opposed on the ground that the rules applicable to settlement of the dispute are in the nature of rules of public order.

63     Thus, the codifiers laid down, for disputes containing no foreign element, specific rules dealing, on the one hand, with the effect of the arbitration agreement and, on the other, with cases in which arbitration is not available under domestic law. They therefore considered what matters should be arbitrable. Where disputes not involving private international law issues are concerned, these matters are set out in the provisions governing arbitration. Article 3148, para. 2 C.C.Q. does not simply restate the text of art. 2638 C.C.Q. Rather, it lays down the same rule as it applies to an arbitration agreement containing a foreign element. To give arts. 3149 and 3151 C.C.Q. general application, it would be necessary to infer that the codifiers were inconsistent in not including, in the chapter on arbitration, the exceptions relating to consumer contracts, contracts of employment and claims regarding exposure to raw materials.

64     Furthermore, to view art. 3149 C.C.Q. as being limited to private international law is consistent with the legislature's objective. This provision is one of the new measures the legislature inserted into the title on the international jurisdiction of Quebec authorities to protect certain more vulnerable groups: *Commentaires du ministre de la Justice*, vol. II, at p. 2011. Article 3149 C.C.Q. refers to two of these groups, Quebec consumers and workers, who cannot waive the jurisdiction of a Quebec authority. I agree with the following comment by Beauregard J.A. of the Quebec Court of Appeal in *Dominion Bridge* with regard to the legislature's general objective in enacting art. 3149 C.C.Q.:

> [TRANSLATION] In my view, it is clear that the legislature intended to ensure that employees could not be required to go abroad to assert rights under a contract of employment. [p. 325]

Thus, the reason why an arbitration clause cannot be set up against a consumer under the title on the international jurisdiction of Quebec authorities is clearly to protect a consumer in a situation with a foreign element.

65     In enacting art. 3149 C.C.Q., the legislature could not have intended to take an obscure approach requiring a decontextualized reading of the title on the international jurisdiction of Quebec authorities. The interpretation of art. 3149 C.C.Q.

must be consistent with the legislature's objective of protecting vulnerable groups and must be harmonized not only with the title on the international jurisdiction of Quebec authorities, but also with the entire book of the C.C.Q. on private international law and Chapter XVIII on arbitration (in Title Two of Book Five), and with Book VII of the *Code of Civil Procedure* on arbitration. This brings out the internal consistency of these rules, which interact harmoniously and without redundancy. The general provisions on arbitration are grouped together in the books, titles and chapters of the *Civil Code of Québec* and the *Code of Civil Procedure*, and specific exceptions are set out in these provisions. It would not be appropriate to shatter the consistency of the rules on arbitration and those on the international jurisdiction of Quebec authorities by placing all disputes concerning an arbitrator's jurisdiction within the scope of the rules on the jurisdiction of Quebec authorities regardless of whether there is a foreign element.

### *4.6 Conclusion on the Application of Article 3149 C.C.Q.*

66      The legal experts who worked on the reform of the Civil Code, the Minister of Justice who was in office at the time of the enactment of the *Civil Code of Québec*, and many Canadian and foreign authors recognized that a foreign element was a prerequisite for applying the rules on the international jurisdiction of Quebec authorities. The ordering effected in a codification process and the rule that a provision must be interpreted in light of its context require an interpretation of art. 3149 C.C.Q. that limits it to cases with a foreign element.

67      I will now discuss the other issues before this Court. They concern the degree of scrutiny of an arbitration clause by the Superior Court, and the validity and applicability of the arbitration clause.

### 5. Degree of Scrutiny of an Arbitration Clause by the Superior Court in Considering a Referral Application

68      The objective of this part is to determine whether it is the arbitrator or a court that should rule first on the parties'arguments on the validity or applicability of an arbitration agreement. I will accordingly consider the limits of intervention by the courts in cases involving arbitration agreements.

### *5.1 Competence of Arbitrators to Rule on Their Own Jurisdiction in International Law*

69      There are two opposing schools of thought in the debate over the degree of judicial scrutiny of an arbitrator's jurisdiction under an arbitration agreement. Under one, it is the court that must rule first on the arbitrator's jurisdiction; this view is based on a concern to avoid a duplication of proceedings. Since the court has the power to review the arbitrator's decision regarding his or her jurisdiction, why should the arbitrator be allowed to make an initial ruling on this issue? According to this view, it would be preferable to have the court settle any challenge to the arbitrator's jurisdiction immediately. This first school of thought thus favours an interventionist judicial approach to questions relating to the jurisdiction of arbitrators.

70      The other school of thought gives precedence to the arbitration process. It is concerned with preventing delaying tactics and is associated with the principle commonly known as the "competence-competence" principle. According to it, arbitrators should be allowed to exercise their power to rule first on their own jurisdiction (Gaillard and Savage, at p. 401).

71      The New York Convention does not expressly require the adoption of either of these schools of thought. Article II(3) reads as follows:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, <u>shall</u>, at the request of one of the parties, <u>refer</u> the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

72      According to some authors, this provision means that referral is the general rule: Gaillard and Savage, at pp. 402-4; F. Bachand, *L'intervention du juge canadien avant et durant un arbitrage commercial international* (2005), at pp. 178-79 and 183. Its wording indicates that the court must not rule on the arbitrator's jurisdiction unless the clause is clearly null and void, inoperative or incapable of being performed.

73      The fact that art. II(3) of the New York Convention provides that the court can rule on whether an agreement is null and void, inoperative or incapable of being performed does not mean that it is required to do so before the arbitrator does, however.

74      The Model Law, which, as I mentioned above, was drafted consistently with the New York Convention, is clearer. First of all, the wording of art. 8(1) of the Model Law is almost identical to that of art. II(3) of the New York Convention. What is more, art. 16 of the Model Law expressly recognizes the competence-competence principle. It reads as follows:

**Article 16. Competence of arbitral tribunal to rule on its jurisdiction**

(1) The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail *ipso jure* the invalidity of the arbitration clause.

(2) A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than the submission of the statement of defence. A party is not precluded from raising such a plea by the fact that he has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

(3) The arbitral tribunal may rule on a plea referred to in paragraph (2) of this article either as a preliminary question or in an award on the merits. If the arbitral tribunal rules as a preliminary question that it has jurisdiction, any party may request, within thirty days after having received notice of that ruling, the court specified in article 6 to decide the matter, which decision shall be subject to no appeal; while such a request is pending, the arbitral tribunal may continue the arbitral proceedings and make an award.

75      Some authors argue that the competence-competence principle requires the court to limit itself to a *prima facie* analysis of the application and to refer the parties to arbitration unless the arbitration agreement is manifestly tainted by a defect rendering it invalid or inapplicable: F. Bachand, "Does Article 8 of the Model Law Call for Full or Prima Facie Review of the Arbitral Tribunal's Jurisdiction?" According to Professor Bachand, this interpretation is confirmed by the legislative history of the Model Law. This approach has also been adopted in a number of countries; France, for example, has formally incorporated the approach in art. 1458 of its Code of Civil Procedure (*Code de procédure civile*). The *prima facie* test has also been adopted in Switzerland by way of judicial interpretation: decision of the 1st Civil Court dated April 29, 1996 in *Fondation M. v. Banque X*, BGE 122 III 139 (1996), cited by Gaillard and Savage, at p. 409.

76      The manifest nullity test is a fairly strict one:

[TRANSLATION] The nullity of an arbitration agreement will be manifest if it is incontestable.... As soon as a serious debate arises about the validity of the arbitration agreement, only the arbitrator can validly conduct the review.... An apparently valid arbitration clause will never be considered to be manifestly null. (É. Loquin, "Compétence arbitrale", in *Juris-classeurs*, *Procédure civile*, fasc. 1034, "Arbitrage" (1994), No. 105)

77      Despite the lack of consensus in the international community, the *prima facie* analysis test is gaining acceptance and has the support of many authors: Gaillard and Savage, at pp. 407-13; Bachand, "Does Article 8 of the Model Law Call for Full or Prima Facie Review of the Arbitral Tribunal's Jurisdiction?" This test is indicative of a deferential approach to the jurisdiction of arbitrators.

78      Having completed this review of international law, I will now consider the state of Quebec law on this issue.

***5.2 Quebec Test for Judicial Intervention in a Case Involving an Arbitration Agreement***

79      The legal framework governing referral to arbitration is set out in the *Code of Civil Procedure*. The relevant provisions read as follows:

> 940.1 Where an action is brought regarding a dispute in a matter on which the parties have an arbitration agreement, the court shall refer them to arbitration on the application of either of them unless the case has been inscribed on the roll or it finds the agreement null.
>
> The arbitration proceedings may nevertheless be commenced or pursued and an award made at any time while the case is pending before the court.
>
> 943. The arbitrators may decide the matter of their own competence.
>
> 943.1 If the arbitrators declare themselves competent during the arbitration proceedings, a party may within thirty days of being notified thereof apply to the court for a decision on that matter.
>
> While such a case is pending, the arbitrators may pursue the arbitration proceedings and make their award.
>
> 943.2 A decision of the court during the arbitration proceedings recognizing the competence of the arbitrators is final and without appeal.

80      It should be noted from the outset that art. 940.1 C.C.P. incorporates the essence of art. II(3) of the New York Convention and of its counterpart in the Model Law, art. 8. Furthermore, art. 943 C.C.P. confers on arbitrators the competence to rule on their own jurisdiction. This article clearly indicates acceptance of the competence-competence principle incorporated into art. 16 of the Model Law.

81      A review of the case law on arbitration reveals that Quebec courts have often accepted or refused to give effect to arbitration clauses without reflecting on the degree of scrutiny required of them: *C.C.I.C. Consultech International c. Silverman*, [1991] R.D.J. 500 (C.A. Que.); *Banque nationale du Canada c. Premdev Inc.*, [1997] A.Q. No. 689 (C.A. Que.); *Tremblay c. Acier Leroux inc.*, [2004] R.J.Q. 839 (C.A. Que.); *Blais & Langlois inc. c. Construction de la source inc.*, 2006 QCCA 461 (C.A. Que.); *Compagnie nationale algérienne de navigation c. Pegasus Lines Ltd. S.A.*, [1994] A.Q. No. 329 (C.A. Que.). However, it can be seen that where the analysis of a clause requires an assessment of contradictory factual evidence, Quebec courts can be reluctant to engage in a review on the merits. For example, in *Kingsway Financial Services Inc. c. 118997 Canada inc.* (C.A. Que.), the buyer sued the seller on the basis of error induced by fraud. The court hearing the case had to decide whether the seller had made false representations to the buyer. The Court of Appeal simply referred the case to arbitration.

82      One author suggests that Quebec courts are more deferential as regards the jurisdiction of arbitrators when hearing cases that simply concern the applicability of an arbitration clause, whereas if it is the validity of the same clause that is at issue, the rule they seem to observe is to dispose of the issue immediately: F. Bachand, *L'intervention du juge canadien avant et durant un arbitrage commercial international* (2005), at pp. 190-91. Although I agree that a distinction can be made between a case concerning validity and one concerning applicability, it cannot be said that the Quebec courts have uniformly used or identified this distinction as a criterion for intervening. Nor has it been adopted in the rest of Canada, where the *prima facie* analysis has also been extended to cases concerning the applicability of an arbitration clause: *Gulf Canada Resources Ltd./Ressources Gulf Canada Ltée v. Arochem International Ltd.* (1992), 66 B.C.L.R. (2d) 113 (B.C. C.A.); *Dalimpex Ltd. v. Janicki* (2003), 228 D.L.R. (4th) 179 (Ont. C.A.). I therefore consider it necessary to pursue the analysis beyond this distinction.

83      Article 940.1 C.C.P. refers only to cases where the arbitration agreement is null. However, since this provision was adopted in the context of the implementation of the New York Convention (the words of which, in art. II(3), are "null and void, inoperative or incapable of being performed"), I do not consider a literal interpretation to be appropriate. It is possible to develop, in a manner consistent with the empirical data from the Quebec case law, a test for reviewing an application to refer a dispute to arbitration that is faithful to art. 943 C.C.P. and to the *prima facie* analysis test that is increasingly gaining acceptance around the world.

84     First of all, I would lay down a general rule that in any case involving an arbitration clause, a challenge to the arbitrator's jurisdiction must be resolved first by the arbitrator. A court should depart from the rule of systematic referral to arbitration only if the challenge to the arbitrator's jurisdiction is based solely on a question of law. This exception is justified by the courts' expertise in resolving such questions, by the fact that the court is the forum to which the parties apply first when requesting referral and by the rule that an arbitrator's decision regarding his or her jurisdiction can be reviewed by a court. It allows a legal argument relating to the arbitrator's jurisdiction to be resolved once and for all, and also allows the parties to avoid duplication of a strictly legal debate. In addition, the danger that a party will obstruct the process by manipulating procedural rules will be reduced, since the court must not, in ruling on the arbitrator's jurisdiction, consider the facts leading to the application of the arbitration clause.

85     If the challenge requires the production and review of factual evidence, the court should normally refer the case to arbitration, as arbitrators have, for this purpose, the same resources and expertise as courts. Where questions of mixed law and fact are concerned, the court hearing the referral application must refer the case to arbitration unless the questions of fact require only superficial consideration of the documentary evidence in the record.

86     Before departing from the general rule of referral, the court must be satisfied that the challenge to the arbitrator's jurisdiction is not a delaying tactic and that it will not unduly impair the conduct of the arbitration proceeding. This means that even when considering one of the exceptions, the court might decide that to allow the arbitrator to rule first on his or her competence would be best for the arbitration process.

87     Thus, the general rule of the Quebec test is consistent with the competence-competence principle set out in art. 16 of the Model Law, which has been incorporated into art. 943 C.C.P. As for the exception under which a court may rule first on questions of law relating to the arbitrator's jurisdiction, this power is provided for in art. 940.1 C.C.P., which in fact recognizes that a court can itself find that the agreement is null rather than referring this issue to arbitration.

88     In the case at bar, the parties have raised questions of law relating to the application of the provisions on Quebec private international law and to whether the class action is of public order. There are a number of other arguments, however, that require an analysis of the facts in order to apply the law to this case. This is true of the attempt to identify a foreign element in the circumstances of the case. Likewise, the external nature of the arbitration clause requires not only an interpretation of the law, but also a review of the documentary and testimonial evidence introduced by the parties. According to the test discussed above, the matter should have been referred to arbitration.

89     Considering the status of the case, it would be counterproductive for this Court to refer it to arbitration, thereby exposing the parties to a new round of proceedings. It would therefore be preferable to deal with all the questions here. I have already discussed the application of art. 3149 C.C.Q. and the question of the foreign element. I will now consider the external clause issue.

**6. External Nature of the Arbitration Clause**

90     In 1994, the legislature introduced arts. 1435 to 1437 C.C.Q. — which lay down special rules on the validity of certain clauses typically found in contracts of adhesion or consumer contracts — into the law of contractual obligations. Although all these rules share a general purpose of protecting the weakest and most vulnerable contracting parties, they concern different types of clauses (external, illegible, incomprehensible and abusive) and are accordingly aimed at different types of abuse. For example, whereas the notion of the external clause (art. 1435 C.C.Q.) traditionally concerns contract clauses that are physically separate from the main document, that of the illegible clause (art. 1436 C.C.Q.) concerns clauses that are not separate from the main document but are, owing to their physical presentation, illegible for a reasonable person. Thus, a clause that is [TRANSLATION] "buried among a large number of other clauses" because of its location in the contract is characterized as illegible: D. Lluelles and B. Moore, *Droit des obligations* (2006), at p. 897; B. Lefebvre, "Le contrat d'adhésion" (2003), 105 *R. du N.* 439, at p. 479. An incomprehensible clause (art. 1436 C.C.Q.) is one that is drafted so poorly that its content is unintelligible or excessively ambiguous.

91    In the case at bar, the Union argues that, pursuant to art. 1435 C.C.Q., the arbitration clause is null because it is an external clause and because it has not been proven that Mr. Dumoulin knew of its existence. Article 1435 reads as follows:

> 1435. An external clause referred to in a contract is binding on the parties.
>
> In a consumer contract or a contract of adhesion, however, an external clause is null if, at the time of formation of the contract, it was not expressly brought to the attention of the consumer or adhering party, unless the other party proves that the consumer or adhering party otherwise knew of it.

92    This provision begins with a recognition that an external clause referred to in a contract is valid. However, its purpose is to remedy abuses resulting from the inclusion by reference of clauses that one of the parties is unaware of: Civil Code Revision Office, vol. II, t. 2, at pp. 601-2; *Commentaires du ministre de la Justice*, vol. I, at pp. 870-71. A party wishing to apply a clause that is external to a consumer contract or a contract of adhesion must prove that it was expressly brought to the attention of the consumer or adhering party, or that the consumer or adhering party otherwise knew of it.

93    In the absence of a statutory definition, the authors have undertaken to define the external clause concept. An external clause is a contractual stipulation [TRANSLATION] "set out in a document that is separate from the agreement or instrument but that, according to a clause of this agreement, is deemed to be an integral part of it": *Baudouin et Jobin: Les obligations* (6th ed. 2005), at p. 267. A clause is external if it is physically separate from the contract: Lluelles and Moore, at p. 748. A clause found on the back of a contract or in a schedule at the end of it is not an external clause, because it is an integral part of the contract; art. 1435 C.C.Q. does not apply to such a clause.

94    The case at bar is the first in which the Quebec Court of Appeal has had to consider whether a contract clause that can be accessed by means of a hyperlink in a contract entered into via the Internet can be considered to be an external clause. Previous disputes concerning the external nature of contractual stipulations have concerned paper documents.

95    Some aspects of electronic documents are covered by the law. In light of the growing number of juridical acts entered into via the Internet, the Quebec legislature has intervened and laid down rules relating to this new environment. Thus, the *Act to establish a legal framework for information technology*, R.S.Q., c. C-1.1, provides that documents have the same legal value whether they are paper or technology-based documents (s. 5). A contract may therefore be entered into using either an electronic medium — by, for example, filling out a form on a Web page - or paper: V. Gautrais, *Know your law: Guide respecting the management of technology-based documents* (2005), at p. 23.

96    Despite the efforts to harmonize the rules via legislation, there are legal rules that are not always easy to apply in the context of the Internet. This is true, for example, in the case of external clauses, since the traditional test of physical separation cannot be transposed without qualification to the context of electronic commerce.

97    A Web page may contain many links, each of which leads in turn to a new Web page that may itself contain many more links, and so on. Obviously, it cannot be argued that all these different but interlinked pages constitute a single document, or that the entire Web, as it scrolls down a user's screen, is just one document. However, it is difficult to accept that the need for a single command by the user would be sufficient for a finding that the provision governing external clauses is applicable. Such an interpretation would be inconsistent with the reality of the Internet environment, where no real distinction is made between scrolling through a document and using a hyperlink. Analogously to paper documents, some Web documents contain several pages that can be accessed only by means of hyperlinks, whereas others can be viewed by scrolling down them on the computer's screen. There is no reason to favour one configuration over the other. To determine whether clauses on the Internet are external clauses, therefore, it is necessary to consider another rule that, although not expressly mentioned in art. 1435 C.C.Q., is implied by it.

98    Thus, a number of authors have stressed that, for an external clause to be binding on the parties, it must be reasonably accessible: Lluelles and Moore, at p. 753; *Baudouin et Jobin: Les obligations*, at p. 268. A contracting party cannot argue that a contract clause is binding unless the other party had a reasonable opportunity to read it. For this, the other party must have had

access to it. Where a contract has been negotiated and all its terms and conditions are set out in the contract itself, the problem of accessibility does not arise, since all the clauses are part of a single document. Where the contract refers to an external document, however, accessibility is an implied precondition for setting up the clause against the other party.

99     The implied precondition of accessibility is a useful tool for the analysis of an electronic document. Thus, a clause that requires operations of such complexity that its text is not reasonably accessible cannot be regarded as an integral part of the contract. Likewise, a clause contained in a document on the Internet to which a contract on the Internet refers, but for which no hyperlink is provided, will be an external clause. Access to the clause in electronic format should be no more difficult than access to its equivalent on paper. This proposition flows both from the interpretation of art. 1435 C.C.Q. and from the principle of functional equivalence that underlies the *Act to establish a legal framework for information technology*.

100     The evidence in the record shows that the consumer could access the page of Dell's Web site containing the arbitration clause directly by clicking on the highlighted hyperlink entitled "Terms and Conditions of Sale". This link reappeared on every page the consumer accessed. When the consumer clicked on the link, a page containing the terms and conditions of sale, including the arbitration clause, appeared on the screen. From this point of view, the clause was no more difficult for the consumer to access than would have been the case had he or she been given a paper copy of the entire contract on which the terms and conditions of sale appeared on the back of the first page.

101     In my view, the consumer's access to the arbitration clause was not impeded by the configuration of the clause; to read it, he or she needed only to click once on the hyperlink to the terms and conditions of sale. The clause is therefore not an external one within the meaning of the *Civil Code of Québec*.

102     The Union submits that the NAF Code, too, is an external document and cannot be set up against Mr. Dumoulin, the consumer in the instant case. According to the Union, the hyperlink merely led to the home page of the NAF's Web site, and to access the NAF Code, consumers had to pursue their searches beyond the home page. At first glance, the need to pursue a search beyond the home page seems to me to be insufficient to support a finding that the NAF Code is an external document. Without further evidence regarding access problems, I find that the argument must be rejected. Furthermore, even if the NAF Code were an external document, this argument would not be sufficient to decide the issue of the arbitrator's jurisdiction. If the NAF Code were in fact an external clause and therefore null pursuant to art. 1435 C.C.Q., that would not affect the validity of the arbitration clause. The arbitration procedure would then simply be governed by the C.C.P.

103     In concluding, I would like to point out, relying only on the facts in the record and having heard no specific arguments on the issue of an illegible or incomprehensible arbitration clause, that I would have reached the same conclusion even if the Union had also argued that the clause was illegible or incomprehensible within the meaning of art. 1436 C.C.Q. As was mentioned above, the highlighted hyperlink appeared on every page the consumer accessed, and no evidence was adduced that could lead to the conclusion that the text was difficult to find in the document, or that it was hard to read or to understand.

104     I would also note that in this Court, the Union argued generally that the arbitration clause was abusive. This argument is based on the prohibition under art. 1437 C.C.Q. However, since no submissions were made in support of this allegation, I will simply find that the Union has not demonstrated its merits.

### 7. Availability of the Class Action Where There is an Arbitration Clause

105     As a separate ground in support of the argument that the arbitration clause cannot be set up against Mr. Dumoulin's motion, the Union relies on art. 2639 C.C.Q. and submits that because this is a class action, the dispute is of public order and therefore cannot be submitted to arbitration. Thus, Dell is not entitled to request that the dispute be referred to arbitration, and the class action must be heard on the merits. In my opinion, the Union's argument must be rejected. The class action is a procedure, and its purpose is not to create a new right.

106     The procedural framework for the class action was added to the *Code of Civil Procedure* in 1979. It is accepted that the class action has a social dimension: "Its purpose is to facilitate access to justice for citizens who share common problems and would otherwise have little incentive to apply to the courts on an individual basis to assert their rights" (*Bisaillon c. Concordia*

*University*, [2006] 1 S.C.R. 666, 2006 SCC 19 (S.C.C.), at para. 16) or might lack the financial means to do so. From this perspective, the class action is clearly of public interest. However, the first introductory provision of Book IX of the *Code of Civil Procedure* — Class Action — reminds us that, as important as it may be, the class action is only a legal procedure:

> 999. ...

>> (d) "class action" means the procedure which enables one member to sue without a mandate on behalf of all the members.

>>>>> . . . . .

107     This position was already accepted at the time Book IX was enacted:

> [TRANSLATION] The class action is not a right (*jus*); it is a procedure. It is not, in itself, even a means to exercise a right, a remedy in the sense of the maxim *ubi jus, ibi remedium*. It is merely a special mechanism that is applied to an existing means to exercise an existing right in order to "collectivize" it. (M. Bouchard, "L'autorisation d'exercer le recours collectif" (1980), 21 *C. de D.* 855, at p. 864)

The notion that the class action procedure does not create new rights has been reiterated on numerous occasions, including recently by this Court in *Bisaillon*, at paras. 17 and 22.

108     In the case at bar, the parties agreed to submit their disputes to binding arbitration. The effect of an arbitration agreement is recognized in Quebec law: art. 2638 C.C.Q. Obviously, if Mr. Dumoulin had brought the same action solely as an individual, the Union's argument based on the class action being of public order could not have been advanced to prevent the court hearing the action from referring the parties to arbitration. Does the mere fact that Mr. Dumoulin instead decided to bring the matter before the courts by instituting a class action affect the admissibility of his action? In light of the reasons of LeBel J., writing for the majority in *Bisaillon*, at para. 17, the answer is no: "[the class action] cannot serve as a basis for legal proceedings if the various claims it covers, taken individually, would not do so".

109     Moreover, the Union's argument that the class action is a matter of public order that may not be submitted to arbitration has lost its force as a result of this Court's decision in *Desputeaux*. In that case, one of the parties had invoked the same provision, art. 2639 C.C.Q., to argue that the dispute over ownership of the copyright in a fictitious character, Caillou, was a question of public order that could not be submitted to arbitration. The Court held that the concept of public order referred to in art. 2639 C.C.Q. must be interpreted narrowly and is limited to matters analogous to those enumerated in that provision: paras. 53-55. In the case at bar, neither Mr. Dumoulin's hypothetical individual action nor the class action is a dispute over the status and capacity of persons, family law matters or analogous matters.

110     Consequently, the Union's argument relating to the public order nature of the class action must fail. I must now rule on the application of Bill 48, which came into force after this appeal was heard.

**8. Application of the Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts**

111      Bill 48 was enacted on December 14, 2006. It introduces a number of measures, only one of which is relevant to the case at bar: the addition to the *Consumer Protection Act* of a provision on arbitration clauses. This provision reads as follows:

> 2. The Act is amended by inserting the following section after section 11:

>> 11.1. Any stipulation that obliges the consumer to refer a dispute to arbitration, that restricts the consumer's right to go before a court, in particular by prohibiting the consumer from bringing a class action, or that deprives the consumer of the right to be a member of a group bringing a class action is prohibited.

>> If a dispute arises after a contract has been entered into, the consumer may then agree to refer the dispute to arbitration.

The question that arises is whether this new provision applies to the facts of the instant case.

112    Pursuant to s. 18 of Bill 48, s. 2 came into force on December 14, 2006. Section 18 reads as follows:

> 18. The provisions of this Act come into force on 14 December 2006, except section 1, which comes into force on 1 April 2007, and sections 3, 5, 9 and 10, which come into force on the date or dates to be set by the Government, but not later than 15 December 2007.

Bill 48 has only one transitional provision, s. 17, which provides that the new ss. 54.8 to 54.16 of the *Consumer Protection Act* do not apply to contracts entered into before the coming into force of the Bill. The instant case is not one in which s. 17 is applicable. However, if ss. 17 and 18 are read together, it would seem at first glance that, aside from the provisions referred to in s. 17, Bill 48 applies to contracts entered into before its coming into force. Is this true? And is Bill 48 applicable in the case at bar?

113    Professor P.-A. Côté writes in *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 169, that "retroactive operation of a statute is highly exceptional, whereas prospective operation is the rule". He adds that "[a] statute has immediate effect when it applies to a legal situation that is ongoing at the moment of its commencement: the new statute governs the future developments of this situation" (p. 152). A legal situation is ongoing if the facts or effects are occurring at the time the law is being modified (p. 153). A statute of immediate effect can therefore modify the future effects of a fact that occurred before the statute came into force without affecting the prior legal situation of that fact.

114    To make it clear what is meant by an ongoing situation and one whose facts and effects have occurred in their entirety, it will be helpful to consider the example of the obligation to warrant against latent defects cited by professors P.-A. Côté and D. Jutras in *Le droit transitoire civil: Sources annotées* (loose-leaf ed.), at p. 2-36. This obligation comes into existence upon the conclusion of the sale, but the warranty clause does not produce tangible effects unless a problem arises with the property sold. The warranty comes into play either when the vendor is put in default or when a claim is made. Once all the effects of the warranty have occurred, the situation is no longer ongoing and the new legislation will not apply to the situation unless it is retroactive.

115    Can the facts of the case at bar be characterized as those of an ongoing legal situation? If they can, the new legislation applies. If all the effects of the situation have occurred, the new legislation will not apply to the facts.

116    The only condition for application of Dell's arbitration clause is that a claim against Dell, or a dispute or controversy between the customer and Dell, must arise (s. 13(C) of the Terms and Conditions of Sale). All the facts of the legal situation had therefore occurred once Mr. Dumoulin notified Dell of his claim. Thus, all the facts giving rise to the application of the binding arbitration clause had occurred in their entirety before Bill 48 came into force.

117    Since there is nothing in Bill 48 that might lead to the conclusion that it applies retroactively, there is no reason to give it such a scope.

118    Moreover, to interpret Bill 48 as having retroactive effect would be problematic. First, retroactive operation is exceptional: Côté, at pp. 114-15; R. Sullivan, *Sullivan and Driedger on the Construction of Statutes* (4th ed. 2002), at pp. 553-54. Where a law is ambiguous and admits of two possible interpretations, an interpretation according to which it does not have retroactive effect will be preferred: *Ford c. Québec (Procureur général)*, [1988] 2 S.C.R. 712 (S.C.C.), at pp. 742-45.

119    Second, I find it highly unlikely that the legislature intended that s. 2 should apply to *all* arbitration clauses in force before December 14, 2006. For example, neither a consumer who is a party to an arbitration that is under way nor a consumer whose claims have already been rejected by an arbitrator should be able to rely on s. 2 and argue that the arbitration clause binding him or her and the merchant is invalid in order to request a stay of proceedings or to have the unfavourable arbitration award set aside. Failing a clear indication to the contrary, when a dispute is submitted for a decision, the decision maker must apply the law as it stands at the time the facts giving rise to the right occurred.

120    I accordingly conclude that since the facts triggering the application of the arbitration clause had already occurred before s. 2 of Bill 48 came into force, this provision does not apply to the facts of the case at bar.

**9. Disposition**

121    For these reasons, I would allow the appeal, reverse the Court of Appeal's judgment, refer Mr. Dumoulin's claim to arbitration and dismiss the motion for authorization to institute a class action, with costs.

*Bastarache, LeBel JJ.* **(dissenting):**

**I. Introduction**

122    In this appeal, our Court must decide whether an arbitration clause in an Internet consumer contract bars access to a class action procedure in the province of Quebec. For the reasons which follow, we hold that the clause at issue is of no effect and cannot be set up against the consumer who seeks the authorization to initiate a class action. As a result, we would dismiss the appeal.

**II. Background**

123    Over the weekend between April 4, 2003 and April 7, 2003, Dell showed some erroneous prices on one page of its website, the "shopping page" for its Axim X5 line of handheld computers. On this specific page, the Axim X5 300 mhz and 400 mhz were announced at a price of $89 and $118 respectively. It appears that the actual pricing should have read $379 and $549 respectively and that the error was due to a technical problem with one of Dell's database systems.

124    The error was discovered by Dell on Saturday, April 5th. Dell immediately tried to correct it by erecting an electronic barrier to block access to the faulty page through the generally publicized homepage *www.Dell.ca*. However, Dell overlooked the fact that it was still possible to access the blocked page through a "deep-link", a direct hyperlink that permits web users to have access to a particular page without having to go through the website's homepage. It appears that many people were able to access the faulty page through this means and that an unusually high number of Axim X5 handheld computers were ordered at the erroneous prices over the weekend. The respondent Dumoulin is one of the persons who placed an order in this way, having ordered, on April 7th, an Axim X5 300 mhz at the erroneous price of $89 after having accessed the shopping page of the Axim X5 handheld computers through its deep-link.

125    On Monday, April 7th, at 9:30 a.m., the technical problem with the shopping page was fixed and access through the homepage was re-established at 2:30 p.m. Later that day, Dell published a correction notice on its website informing customers of the pricing error and of the fact that all orders for the Axim X5 handheld computers with incorrect pricing would not be processed.

126    The following day, Dumoulin received an e-mail informing him of the pricing error and also that his order would not be processed. He answered by putting Dell on notice to honour its advertised sale price. His request having been denied, Union des consommateurs, on behalf of Dumoulin, decided to file a motion in the Superior Court to be authorized to institute a class action.

127    Dell contested the motion by raising a declinatory exception to the Quebec Superior Court's jurisdiction based on the fact that the terms and conditions of the sale contained the following arbitration agreement:

**Arbitration**. ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE, WHETHER PREEXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, COMMON LAW, INTENTIONAL TORT AND EQUITABLE CLAIMS CAPABLE IN LAW OF BEING SUBMITTED TO BINDING ARBITRATION) AGAINST DELL, its agents, employees, officers, directors, successors, assigns or affiliates (collectively for purposes of this paragraph, "Dell") arising from or relating to this Agreement, its interpretation, or the breach, termination or validity thereof, the relationships between the parties, whether pre-existing, present or future, (including, to the full extent permitted by applicable law, relationships with third parties who are not signatories to this Agreement),

Dell's advertising, or any related purchase SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM ("NAF") under its Code of Procedure and any specific procedures for the resolution of small claims and/or consumer disputes then in effect (available via the Internet at http://www.arb-forum.com/, or via telephone at 1-800-474-2371). The arbitration will be limited solely to the dispute or controversy between Customer and Dell. Any award of the arbitrator(s) shall be final and binding on each of the parties, and may be entered as a judgment in any court of competent jurisdiction. Information may be obtained and claims may be filed with the NAF at P.O. Box 50191, Minneapolis, MN 55405, or by e-mail at file@arb-forum.com, or by online filing at http://www.arb-forum.com/. (Appellant's record, vol. III, at p. 384, *Dell's Online Policies*, Terms and Conditions of Sale (Canada), clauses 13(c))

Dell argued that on account of this clause, Dumoulin's dispute had to be submitted to compulsory arbitration.

### III. Judicial History

128      The Superior Court dismissed the declinatory exception (J.E. 2004-457, [2004] J.Q. No. 155 (C.S. Que.)). Langlois J. found that the arbitration agreement provided for an arbitration administered by the National Arbitration Forum ("NAF"), a U.S. based institute governed by American law, and that the agreement purported to derogate from art. 3149 of the *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*") which provides that the waiver of the jurisdiction of Quebec authorities cannot be set up against a consumer. In reaching this decision, Langlois J. followed an earlier decision of the Court of Appeal in *Dominion Bridge Corp. c. Knai* (1997), [1998] R.J.Q. 321 (C.A. Que.), where it was held that an agreement to arbitrate an employment dispute in a foreign jurisdiction could not be set up against the worker under art. 3149 *C.C.Q.*

129      The Quebec Court of Appeal dismissed the appeal, but on different grounds ([2005] R.J.Q. 1448, 2005 QCCA 570 (C.A. Que.)). Writing for a unanimous bench, Lemelin J. (*ad hoc*) overturned Langlois J. on the basis that, pursuant to Rule 32A of the *National Arbitration Forum Code of Procedure* ("*NAF Code*"), the seat of the arbitration could have been located in Quebec and that the factual situation was on that basis distinguishable from the one in *Dominion Bridge*. However, Lemelin J. did conclude that the arbitration agreement was null on another basis. Having found that the "Terms and Conditions of Sale" in which the agreement was included was itself an external clause pursuant to art. 1435 *C.C.Q.*, she further found that the arbitration agreement and its rules of procedure were not expressly brought to the attention of Dumoulin and that Dell had not established that the consumer had otherwise gained knowledge of it. She thus concluded that the arbitration agreement was null and that the Superior Court had not lost its jurisdiction over the class action proceedings.

### IV. Analysis

#### *A. Introduction*

130      In this case, we are dealing with an arbitration clause inserted into a consumer contract of adhesion. The primary question raised by this appeal can be stated in the following terms: did the courts below err in law by refusing to refer the parties to arbitration? Before analysing this question, however, it is helpful to first discuss the nature of exclusive contractual arbitration clauses, the history of their recognition in Quebec law, and the principles that inform the interpretation of the rules relating to arbitration.

#### *(1) The Nature of Exclusive Contractual Arbitration Clauses: a Jurisdiction Clause*

131      There are two types of contractual arbitration clauses. A complete undertaking to arbitrate, or an "exclusive arbitration clause", is that by which the parties undertake in advance to submit to arbitration any dispute which may arise regarding their contract, and which specifies that the award made will be final and binding on the parties. This may be contrasted with an arbitration clause that is purely optional (see *Zodiak International Productions Inc. v. Polish People's Republic*, [1983] 1 S.C.R. 529 (S.C.C.), at p. 533.

132      Exclusive arbitration clauses operate to create a "private jurisdiction" that implicates the loss of jurisdiction of state-appointed forums for dispute resolution, such as ordinary courts and administrative tribunals, rendering contractual arbitration

both different and exclusive of the later entities (see J. E. C. Brierley, "Arbitration Agreements, Articles 2638-2643" in *Reform of the Civil Code*: Texts written for the Barreau du Québec and the Chambre des notaires du Québec, (1993), at pp. 1, 2-3, 10). Contractual arbitration has also been described as creating a "private justice system" for the parties: [TRANSLATION] "From a theoretical standpoint, arbitration is a private justice system that ordinarily arises out of an agreement. Thus, it has a contractual source and an adjudicative function" (see S. Thuilleaux in *L'arbitrage commercial au Québec : Droit interne - Droit international privé* (1991), at p. 5 (footnotes omitted)).

133    What makes contractual arbitration a "private jurisdiction" or "private justice system" is the degree of freedom the parties have in choosing the manner in which their dispute will be resolved:

> Arbitration is therefore the settling of disputes between parties who agree not to go before the courts, but to accept as final the decision of experts of their choice, in a place of their choice, usually subject to laws agreed upon in advance and usually under rules which avoid much of the formality, niceties, proof and procedure required by the courts.

> (W. Tetley, *International Conflict of Laws: Common, Civil and Maritime* (1994), at p. 390)

Parties to contractual arbitration are free to choose the laws governing their agreement to arbitrate, the law of the arbitral proceedings, the law of the subject matter under dispute, as well as the rules of conflict applicable to all of the above. In addition, the above four laws need not be the same and may differ from the law of the place of arbitration. Thus, contractual arbitration proceedings can be seen to be *delocalized* from the jurisdiction where the arbitration is held (see Tetley, at pp. 391-92).

134    One of the major differences between courts and arbitration is that contractual arbitrators are not representatives of the state, but, rather, are privately appointed. On account of this, whether an arbitration is situated in Quebec or not, in order for an arbitral award to be legally enforceable, the laws of Quebec require the decision to first be recognized by Quebec courts. There is no difference here with how judgments from foreign courts must first be recognized before having force of law in the province. This is noted by R. Tremblay in "La nature du différend et la fonction de l'arbitre consensuel" (1988), 91 *R. du N.* 246, at p. 252:

> [TRANSLATION] However, care must be taken not to confuse the judicial function with the arbitration function. Judges derive their jurisdiction from a state's foundational institutions. Arbitrators, on the other hand, derive their jurisdiction from the mutual agreement of the parties. The difference is an important one. An arbitrator is chosen and appointed by the parties and is not a representative of the state. Arbitrators may rule on disputes, but their decisions are not enforceable unless they are homologated; unlike a judgment, an arbitrator's decision is not enforceable on its own.

135    Exclusive arbitration and forum selection clauses operate very similarly. The effect of both is to derogate from the jurisdiction of ordinary courts, who would otherwise have jurisdiction to hear the matter. Many authors of conflict of laws' textbooks simply refer to these clauses, without distinguishing between them, as "jurisdiction clauses": see for example J. G. Collier, *Conflict of Laws*, 3rd ed. (2001), at p. 96. In the common law provinces, courts will stay their jurisdiction in the presence of either a valid forum selection or arbitration clause. The power to do so stems from the courts' inherent jurisdiction; however, different statutes provide for certain factors that should be taken into account in determining whether to grant the stay depending on whether the court is faced with a forum selection or a domestic or international arbitration clause. Quebec has also tended to treat exclusive arbitration and forum selection clauses analogously, the history of which we will now turn to.

*2) Recognition of Jurisdiction Clauses in Quebec Law*

136    Prior to the coming into force of the *C.C.Q.*, the rules on jurisdiction of Quebec courts were not codified. Quebec courts relied on art. 27 of the *Civil Code of Lower Canada* ("*C.C.L.C.*") and art. 68 of the Quebec *Code of Civil Procedure*, R.S.Q., c. C-25 ("*C.C.P.*"), to delineate their jurisdiction in cases where it was challenged: see *Masson c. Thompson*, [1994] R.J.Q. 1032 (C.S. Que.). Article 27 *C.C.L.C.* provided that aliens although not resident in Lower Canada could be sued in Quebec courts "for the fulfilment of obligations contracted by them in foreign countries". Article 68 *C.C.P.*, which is still in force today, provides the domestic rules for determining in which judicial district of Quebec a personal action can be started. Relying on the general principles set out in this section, and art. 27 *C.C.L.C.*, Quebec courts have delineated a body of jurisprudential rules deciding when Quebec courts have jurisdiction to hear an action.

137     Prior to its amendment in 1992, the opening phrase of art. 68 *C.C.P.* stated: "Subject to the provisions of articles 70, 71, 74 and 75, *and notwithstanding any agreement to the contrary*, a purely personal action may be instituted...". This was interpreted by Quebec courts to be a prohibition against intentional derogation through contract from the jurisdiction of Quebec courts through forum selection and arbitration clauses: see S. Thuilleaux and D. M. Proctor, "L'application des conventions d'arbitrage au Canada: une difficile coexistence entre les compétences judiciaire et arbitrale" (1992), 37 *McGill L.J.* 470, at pp. 477-78.)

138     Then came the 1983 decision of this Court in *Zodiak International Productions*, where a party to a contract submitted to arbitration in Warsaw, but having lost, commenced a fresh action in the Quebec Superior Court against his co-contractor. Noting the tension between art. 68 *C.C.P.* and contractual arbitration clauses, the Court held that the Quebec legislator had nonetheless clearly intended to permit such clauses by introducing art. 951 *C.C.P.*, which states: "An undertaking to arbitrate must be set out in writing". Faced with this provision, Chouinard J., for the Court, cited with approval the words of Pratte J. in *Normandin Lumber Ltd. v. "Angelic Power" (The)*, [1971] F.C. 263 (Fed. T.D.)", who stated: "I do not see how the Quebec legislator could have regulated the form and effect of an agreement whose validity he does not admit" (p. 539). Shortly after this decision, in 1986, the Quebec legislator introduced amendments to the *C.C.L.C.* and the *C.C.P.* providing detailed rules on the validity, form and procedure governing contractual arbitration. (Today, these rules can be found in the specific chapter on arbitration in the Book of Obligations of the *C.C.Q.*, these being arts. 2638 to 2643, and in Book VII (on Arbitration) of the *C.C.P.*)

139     Following these changes, an inconsistency could be noted in the Quebec legislator's approach to forum selection clauses and arbitration clauses. By operation of art. 68 of the *C.C.P.*, the former were still held to be invalid: see Thuilleaux and Proctor, at pp. 477-78. It would seem that this difference was accidental rather than intentional. Draft bills from as early as 1977 assimilated forum selection and arbitration clauses. For example, art. 67 of Book Nine of the *Draft Civil Code of 1977* provided the following situations where Quebec authorities could refuse to recognize foreign decisions:

> 67. On application by the defendant, the jurisdiction of the court of origin is not recognized by the courts of Québec when:
>
> > 1. the law of Québec, either because of the subject matter or by virtue of an agreement between the parties, gives exclusive juristidction to its courts to hear the claim which gave rise to the foreign decision;
> >
> > 2. the law of Québec, either because of the subject matter or by virtue of an agreement between the parties, recognizes the exclusive of another court; or
> >
> > 3. the law of Québec recognizes an agreement by which exclusive jurisdiction is conferred upon arbitrators.

This oversight was corrected, however, through the introduction of art. 3148 in Book Ten of the new *C.C.Q.* The second paragraph of this provision clarifies the intention of the Quebec legislator to assimilate the effect of forum selection and arbitration clauses. It provides that "a Québec authority has no jurisdiction where the parties, by agreement, have chosen to submit all existing or future disputes between themselves relating to a specific legal relationship to a *foreign authority or to an arbitrator*...". Simultaneously to this provision being passed, the opening phrase of art. 68 *C.C.P.* was amended to remove the prohibition on contractual derogation from the jurisdiction of Quebec courts and to direct matters concerning the international jurisdiction of Quebec authorities to Book Ten of the *C.C.Q.* It now reads: "Subject to the provisions of this Chapter and the provisions of Book Ten of the Civil Code of Québec...".

140     Perhaps owing more to inadvertence than intention, some minor differences remain in the treatment of these two types of jurisdiction clauses in Quebec law. For example, there is no parallel provision to art. 940.1 *C.C.P.* for forum selection clauses, as there is for arbitration clauses, which permits parties to contest the validity of such clauses. This provision was introduced in the 1986 amendments to the *C.C.P.* and it provides that Quebec courts shall refer the parties to arbitration unless the case has been inscribed on the roll or it finds the agreement null, of which more will be said further below. Article 3148, para. 2 alone does not provide for challenging the validity of jurisdiction clauses. This has led to some criticism of the current set up of the rules on jurisdiction in the doctrine. For example, G. Saumier, in "Les objections à la compétence internationale des tribunaux québécois : nature et procédure" (1998), 58 *R. du B.* 145, criticizes the discrepancies between the rules applicable to forum

selection clauses and arbitration clauses: [TRANSLATION] "there is no justification, where the parties have agreed in advance on the appropriate forum for settling their disputes, for making a distinction between an arbitral tribunal and a state court" (p. 161). Saumier advocates uniform rules between the two, and in this respect, urges an overhaul of the rules on international competence of Quebec authorities in one comprehensive set of rules:

> [TRANSLATION] The fundamental reform of the rules of private international law brought about by the adoption of the *Civil Code of Québec* did not include a revision of the procedural rules applicable in matters of international jurisdiction. Thus, a party wanting to object to the international jurisdiction of a Quebec court must deal with a multitude of statutory schemes relating to time limits and waiver and with precedents that are not easily reconciled.... It is therefore imperative to adopt rules tailored to the international context that reflect the interests both of the parties and of the state judicial system and the arbitration system. [pp. 164-65]

See also the 2000 report of the Comité de révision de la procédure civile which similarly advocates the creation of one coherent and comprehensive chapter on private international law to be situated in the *Code of Civil Procedure*, which would include, among other things, the rules on Arbitrations currently located in Book VII of the *C.C.P.* (see Comité de révision de la procédure civile, *La révision de la procédure civile*, Document de consultation (février 2000) at pp. 113-14).

141    This short historical overview demonstrates, in our view, that one should not attach any significance to the structure of the *C.C.Q.* or the *C.C.P.* when interpreting the substantive provisions under review in this appeal. The coherence of the regime is not dependent on the particular Book of the *C.C.P.* that deals with arbitrations, or the particular title and Book of the *C.C.Q.* in which is found art. 3149. The *Civil Code* constitutes itself an *ensemble* which is not meant to be parcelled out into chapters and sections that are not interrelated. The way in which the law is presented in the Code corresponds to a methodology and a logic; it is not meant to insulate one substantive provision from all others. As pointed out by J. E. C. Brierley and R. A. Macdonald in *Quebec Civil Law: An Introduction to Quebec Private Law* (1993), at p. 25, "the codification of the private law of Lower Canada was, primarily, a technical reordering of a complex body of norms that was intended to make this private law more accessible in both its language and substance to legal professionals...". From its very inception, the Code's interpretation depended not on this reordering but on its place in the legal order and its relation to the theory of sources it presupposes (p. 97). Indeed, Brierley and Macdonald write, after having noted the assumptions as to form that underpin the Code: "[t]o assume that codal provisions are non-redundant is to assume that they are to be mutually cross-referenced within the Code and that each article must be read in conjunction with all others, regardless of their placement in the Code" (pp. 102-3). The Code is of course taxonomic; this invites to conceptual characterization, to "identifying the extensions of which a concept is susceptible, all the more so since these headings are themselves part of the enacted law" (p. 104). Moreover, "the best guide to ascertaining the legislative intention will still be the Code itself, read as a whole..." (p. 139). This is why headings will be considered indicators of scope and meaning and other codal articles will help fix the meaning of any given text (p. 139).

*3) The Principle of Primacy of the Autonomy of the Parties*

142    Quebec's acceptance of jurisdiction clauses over the past two decades is rooted in the principle of primacy of the autonomy of the parties. This has recently been confirmed by our Court in *Desputeaux c. Éditions Chouette (1987) inc.*, [2003] 1 S.C.R. 178, 2003 SCC 17 (S.C.C.), with respect to agreements to submit a dispute to an arbitral tribunal, and *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, [2005] 2 S.C.R. 401, 2005 SCC 46 (S.C.C.), with respect to agreements to submit it to a foreign authority.

143    In *Desputeaux*, our Court recognized that the limits to the autonomy of the contracting parties to choose to submit a dispute to arbitration had to be given a restrictive interpretation. More specifically, as will be discussed in further detail below, we held that the notion of "public order" at art. 2639, para. 1 *C.C.Q.* had to be given a narrow interpretation. Furthermore, we held that legislation merely identifying the courts which, within the judicial system, will have jurisdiction over a particular subject matter should not be interpreted as excluding the possibility of arbitration, except if it was clearly the legislator's intention to do so. In reaching these conclusions, we notably had regard to the legislative policy that now accepts arbitration as a valid form of dispute resolution and, moreover, seeks to promote its use.

144    Both art. 3148, para. 2 *C.C.Q.* and art. 940.1 *C.C.P.* can be interpreted as giving practical effect to the principle of primacy of the autonomy of the parties that has characterized the development of the law of arbitration in Quebec in the last two decades. The provisions purport most notably to promote legal certainty for the parties by enabling them to provide in advance for the forum to which their disputes will have to be submitted. They are also consistent with the international movement towards harmonizing the rules of jurisdiction.

145    This movement towards harmonization can be explained by the importance of legal certainty for commercial and international transactions. As noted by J. A. Talpis in "Choice of Law and Forum Selection Clauses under the New *Civil Code of Quebec*" (1994), 96 *R. du N.* 183, at pp. 188-89:

> Th[e] essential goal of predictability was surely on the mind of the drafters of the new *Civil Code of Quebec*, as it reaffirmed and extended the theory of party autonomy, a theory clearly among the foremost general principles of law recognized by civilized nations. It is a principle which makes the express or implied intention of the parties determinative of the legal system by which even the essential validity of a contract should be governed. In Quebec, it has a lengthy history and a great deal of current vitality.

> The fact is that considerations of commercial convenience and of conflicts theory weigh heavily in favor of this theory which rests mainly upon the interest of the parties to the contract, but is supported by those of the commercial community and of the courts as well. Consequently, it was considered by the legislature to be in the general social interest to provide a legal system favorable to the predictable resolution of the conflict of laws.

This clear intention of the Quebec legislator was acknowledged by our Court in *GreCon Dimter*, where we concluded that the fact that an action was incidental to a principal action heard by a Quebec court was not sufficient to trump an agreement to submit any claim arising from the contract to a foreign authority. More specifically, we concluded that art. 3148, para. 2 *C.C.Q.* was to be given primacy over art. 3139 *C.C.Q.*

*4) The Limits on the Autonomy of the Parties*

146    Naturally, the primacy of the autonomy of contracting parties permitting them to choose in advance the forum for resolving their disputes is not without limits. The Quebec legislator has restricted it in many different ways.

147    We noted the limits on the expression of the autonomy of the parties to submit their disputes to a foreign authority in *GreCon Dimter*, pursuant to art. 3148, para. 2. First, art. 3151 *C.C.Q.* confers to the Quebec authorities *exclusive* jurisdiction to hear in first instance all actions founded on civil liability for damage suffered as a result of exposure to or the use of raw materials originating in Quebec. Second, art. 3149 *C.C.Q.*, which confers jurisdiction to the Quebec authorities to hear an action involving a consumer contract or an employment contract if the consumer or worker has his domicile or residence in Quebec, states that the waiver of such jurisdiction by the consumer or worker may not be set up against him. The language of both provisions is clear with regard to the intention of the legislature to limit the autonomy of the parties.

148    Given the various location of rules relating to arbitration in the *C.C.Q.*, the definition of the limits on the autonomy of the parties to submit their disputes to an arbitral tribunal gives rise to some uncertainty, as illustrated by this case. The general provision is art. 2639 *C.C.Q.* which states that "[d]isputes over the status and capacity of persons, family matters or other matters of public order may not be submitted to arbitration". While it is the only exception created in the chapter on "Arbitrations", art. 2639 *C.C.Q.* is not the only legislative exception to arbitrability. This was recognized by Brierley when writing on the new chapter on arbitration in the *Civil Code*:

> It is possible that an implicit legislative intention to exclude arbitration can be detected, even if it has not been expressly forbidden (for example, when the matter is reserved for resolution to the courts or quasi-judicial state agencies). An imperative attribution of competence in certain areas might in fact contain a rule of public order which excludes arbitration. [Emphasis added] (Brierley, *Reform of the Civil Code*, at p. 4)

Furthermore, in order to be enforceable, an arbitration agreement has to be evidenced in writing under art. 2640 *C.C.Q.* and must otherwise be in compliance with all the conditions of formation of a contract. This latter point is true even when the arbitration agreement is contained in a contract since it is then considered to be a separate agreement pursuant to art. 2642 *C.C.Q.* The comments of the Minister of Justice on this article specifically recognize that an arbitration agreement is subject to the general rules of contract and can be challenged before the courts on the same basis as any other contract (Commentaires du ministre de la Justice (1993), t. II. As well, since arbitration clauses raise primarily a question of jurisdiction, there is the additional problem of which jurisdiction (the arbitrator or Quebec courts) ought to decide whether any of these limits apply in a given case. This brings us back to the primary issue raised by this case.

### B. Issues Raised by this Case

149    On the primary question of whether the lower courts erred in refusing to refer the parties to arbitration, it is not contested by the respondents that, if the arbitration agreement is valid and applicable to the dispute, the courts have no discretion and must not refuse to refer the parties to arbitration. On that point, art. 940.1 *C.C.P.* seems clear: if the parties have an agreement to arbitrate on the matter of the dispute, on the application of either of the parties, the court *shall* refer the parties to arbitration, unless the case has been inscribed on the roll or the court finds the agreement to be null. It is well established that, by using the term "shall", the legislator has indicated that the court has no discretion to refuse, on the application of either of the parties, to refer the case to arbitration when the appropriate conditions are met (see *GreCon Dimter*, at para. 44; *La Sarre (Ville) c. Gabriel Aubé inc.* (1991), [1992] R.D.J. 273 (C.A. Que.), at p. 277). On a plain reading of art. 940.1 *C.C.P.*, these conditions appear to be threefold: (i) the parties must have an arbitration agreement on the matter of the dispute; (ii) the case must not have been inscribed on the roll; and (iii) the court must not find the agreement to be null. Regarding the latter condition, it appears obvious to us that the reference to the nullity of the agreement is also meant to cover the situation where the arbitration agreement cannot, without being null, be set up against the applicant.

150    It is also well established that the effect of a valid undertaking to arbitrate is to remove the dispute from the jurisdiction of the ordinary courts of law (per *Zodiak International Productions*, art. 940.1 *C.C.P.* and art. 3148, para. 2 *C.C.Q.*). It is also accepted that jurisdiction over the individual actions that form the basis of a class action is a prerequisite to the exercise of jurisdiction over the proceedings (*Bisaillon c. Concordia University*, [2006] 1 S.C.R. 666, 2006 SCC 19 (S.C.C.). There is consequently no question that, if the arbitration agreement is valid and relates to the dispute, the Superior Court has no jurisdiction to hear the case and must refer the parties to arbitration.

151    In the case at bar, it is not contested by the respondents that the first two conditions for the application of art. 940.1 are met. What is at issue, though, is whether the Court of Appeal erred in law by refusing to refer the parties to arbitration on the basis that the arbitration agreement was null or cannot otherwise be set up against Dumoulin.

152    Many different grounds have been raised in order to demonstrate that the arbitration clause in the case at bar is null or otherwise cannot be set up against Dumoulin. It has notably been argued: (1) that the arbitration agreement cannot be set up against Dumoulin, a consumer, because it constitutes a waiver of the jurisdiction of the Quebec authorities under art. 3149 *C.C.Q.*; and (2) that it is null, (a) because it is over a consumer dispute which is in and of itself a matter of public order under art. 2639 *C.C.Q.*; (b) because it constitutes a waiver of the jurisdiction of the Superior Court over class actions and that such a waiver is contrary to public order under art. 2639 *C.C.Q.*; (c) because Dumoulin did not really consent to it as it was imposed on him through a contract of adhesion; (d) because it is abusive and offends art. 1437 *C.C.Q.*; and (e) because it is found in an external clause that was not expressly brought to the attention of Dumoulin as required under art. 1435 *C.C.Q.* Each of these arguments represents a sub-issue in this case and will be dealt with separately in section D below. But before we turn to the study of these sub-issues of the case, it is necessary to address two preliminary questions.

153    First, we have to decide whether the amendments the Quebec legislator recently brought to the *Consumer Protection Act*, R.S.Q., c. P-40.1 ("*C.P.A.*"), apply to this case. Bill 48, *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts*, 2nd Sess., 37th Leg., (now S.Q. 2006, c. 56), was assented to on December 14, 2006, the day after the hearing of this case before our Court. Section 2 of Bill 48 reads as follow:

2. The Act [the *Consumer Protection Act*] is amended by inserting the following section after section 11:

> 11.1. Any stipulation that obliges the consumer to refer a dispute to arbitration, that restricts the consumer's right to go before a court, in particular by prohibiting the consumer from bringing a class action, or that deprives the consumer of the right to be a member of a group bringing a class action is prohibited.
>
> If a dispute arises after a contract has been entered into, the consumer may then agree to refer the dispute to arbitration.

It is not disputed that, if this amendment applies to the case at bar, there would be no need to address the other sub-issues as the third condition for the application of art. 940.1 *C.C.P.* would clearly not be met.

154     Second, we have to determine the scope of the analysis a court should conduct under art. 940.1 *C.C.P.* in order to "find" whether the arbitration agreement is null. The appellant argues that this analysis should only be *prima facie*; the respondents argue it should be comprehensive. Depending on the answer to be given to this question, it is possible that only *some* of the grounds of nullity invoked by the respondents can be properly raised at the stage of a referral application, whereas the other grounds should be more appropriately left to the arbitrator to decide, subject to subsequent review by the courts.

### C. Preliminary Questions

#### 1) The Impact of Bill 48 on the Case at Bar

155     The main provision in Bill 48 relevant to this appeal is s. 2. It amends the *C.P.A.* by prohibiting and voiding any contractual clauses which oblige a consumer to submit a dispute to arbitration. Pursuant to the *C.P.A.* as amended, an arbitration agreement can validly be concluded by a merchant and a consumer only after a dispute has arisen. It is conceded that, if this amendment applies to the case at bar, the appeal should be dismissed as the arbitration agreement on which the appellant's declinatory exception is founded would clearly be of no effect. It should be noted that our interpretation of art. 3149 *C.C.Q.* achieves the same result as Bill 48. It might be argued that the introduction of Bill 48 is an indication that the Legislative Assembly did not share our view of art. 3149. Our response to this is that it is much more likely that the misinterpretation of art. 3149 in *obiter* in *Dominion Bridge*, and in the Court of Appeal in this case, caused the legislator to act swiftly in order to ensure the protection of consumers in the province.

156     Section 18 of Bill 48 provides that its provisions come into force on December 14, 2006, except for certain specific provisions that come into force at later dates (between April 1, 2007 and December 15, 2007). Since s. 2 of Bill 48 is now in force, the question before us is whether it has any effect on the pending case.

157     Under well-established principles of statutory interpretation, in general, new laws affecting *substantive* matters do not apply to pending cases. It is also well recognized that a new law will be applicable to a pending case if it clearly expresses an intent to retroactively modify the substantive rights at issue. Professor P.-A. Côté states the applicable principles in the following manner:

> In general, new statutes affecting substantive matters do not apply to pending cases, even those under appeal. Since the judicial process is generally declaratory of rights, the judge declares the rights of the parties as they existed when the cause of action arose: the day of the tort, of the conclusion of the contract, the commission of the crime, etc. However, a new statute bringing substantive modification is applicable to a pending case if it retroactively modifies the law applicable on the day of the tort, the contract, the crime, etc. A pending case, even under appeal, can therefore be affected by a retroactive statute, and even by one enacted while proceedings are pending in appeal.
>
> (P.-A. Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 179)

158     The rule is different for new laws affecting *procedural* matters. Such laws have immediate effect and apply to pending cases. As Professor Côté notes, this does not mean that such laws have retroactive effect:

> Because procedural provisions apply to pending cases, the term "retroactivity" has been used by analogy with the effect of statutes affecting substantive rights. But procedural enactments do not govern the law that the judge declares to have existed: they only deal with the procedures used to assert a right, and with the rules for conduct of the hearing. It is normal that a statute dealing with trial procedure will govern the future conduct of all trials carried out under its authority. This is not retroactivity but simply immediate and prospective application. [pp. 179-80]

159    We therefore have to decide whether s. 2 of Bill 48 is a provision affecting substantive or procedural matters. If it affects substantive matters, we will further have to decide whether it has retroactive effects.

160    In our view, s. 2 of Bill 48 is a provision dealing with substantive matters as it affects a contractual right of the parties: the right of a party to have his claim referred to arbitration, to the exclusion of the courts. It is true that, in some respects, this right resembles a procedural right: it determines how a right will be asserted. That said, it is obviously more than just a procedural right. It affects the jurisdiction of the courts and "it is well established that jurisdiction is not a procedural matter" (*Royal Bank v. Concrete Column Clamps (1961) Ltd.*, [1971] S.C.R. 1038 (S.C.C.), at p. 1040; see also Côté, at p. 183).

161    Furthermore, we are of the view that s. 2 of Bill 48 has no retroactive effect. Unless a statute provides otherwise, expressly or by necessary implication, it is not to be construed as having such effect. Wright J.'s dictum in *Athlumney, Re*, [1898] 2 Q.B. 547 (Eng. Q.B.), at pp. 551-52, still adequately reflects the law on this issue:

> Perhaps no rule of construction is more firmly established than this — that a retrospective operation is not to be given to a statute so as to impair an existing right or obligation, otherwise than as regards matter of procedure, unless that effect cannot be avoided without doing violence to the language of the enactment. If the enactment is expressed in language which is fairly capable of either interpretation, it ought to be construed as prospective only.

> (See also *Gustavson Drilling (1964) Ltd. v. Minister of National Revenue* (1975), [1977] 1 S.C.R. 271 (S.C.C.), at p. 279)

162    Nothing in Bill 48 leads us to think that its s. 2 should be read as having retroactive effect. The transitional provisions do not state it and cannot be interpreted in such a way. Therefore, the general presumption against the retroactivity of the statute has not been rebutted and s. 2 of Bill 48 should not be interpreted as having the effect of rendering null the arbitration agreement at bar as this agreement was concluded before the coming into force of the provision.

*2) The Scope of the Analysis Under Article 940.1 C.C.P.*

163    The appellant relies on the competence-competence principle in arguing that the extent of the review that a court should conduct under art. 940.1 *C.C.P.* should be limited to a *prima facie* investigation. This principle has been described as having two components (see e.g., E. Gaillard and J. Savage (eds.), *Fouchard, Gaillard, Goldman on International Commercial Arbitration* (1999), at p. 401). First, the competence-competence principle stands for the proposition that the arbitrators have the power to rule on their own jurisdiction. This principle is well established in our law and has received legislative recognition in art. 943 *C.C.P.* More importantly for present purposes, it is a rule of chronological priority under which the arbitrators must have the first opportunity to rule on their jurisdiction, subject to subsequent review by the courts. This aspect of the competence-competence principle is still subject to disagreement and gives rise to different applications.

164    In trying to determine the scope of this principle, one has to keep in mind the difference between the types of challenges that can be brought against an arbitrator's jurisdiction. They fall into two main categories. The first category encompasses the challenges regarding the *validity* of the arbitration agreement involving the parties. The second category encompasses the challenges regarding the *applicability* of the arbitration agreement to the specific dispute.

165    It is relatively well accepted that the competence-competence principle applies to the jurisdictional challenges regarding the *applicability* of the arbitration agreement (see e.g., *Kingsway Financial Services Inc. c. 118997 Canada inc.*, [1999] J.Q. No. 5922 (C.A. Que.). In any challenge to arbitral jurisdiction alleging that the dispute does not fall within the scope of the arbitration clause, it has been established that courts ought to send the matter to arbitration and allow the arbitrator to decide

the question, unless it is obvious that the dispute is not within the arbitrator's jurisdiction. (See L. Y. Fortier, "Delimiting the Spheres of Judicial and Arbitral Power: 'Beware, My Lord, of Jealousy'(2001), 80 *Can. Bar. Rev.* 143, at p. 146; P. Bienvenu, "The Enforcement of International Arbitration Agreements and Referral Applications in the NAFTA Region" (1999), 59 *R. du B.* 705, at p. 721; J. B. Casey and J. Mills, *Arbitration Law of Canada: Practice and Procedure* (2005), at p. 64; L. Marquis, "La compétence arbitrale : une place au soleil ou à l'ombre du pouvoir judiciaire" (1990), 21 *R.D.U.S.* 303, at pp. 318-9.) However, whether courts ought to generally send the matter to arbitration when the validity of the arbitration agreement itself is challenged, is more controversial.

166     In some cases, the courts have recognized that the arbitrators should be the first to rule on the validity of the arbitration agreement and have referred the parties to arbitration (see e.g., *World LLC c. Parenteau & Parenteau Int'l,* [1998] A.Q. No. 736 (C.S. Que.); *Automobiles Duclos inc. c. Ford du Canada ltée* (2000), [2001] R.J.Q. 173 (C.S. Que.); *Simbol Test Systems Inc. v. Gnubi Communications Inc.,* [2002] J.Q. No. 437 (C.S. Que.); *Sia v. Albury Grain Sales Inc.* (C.S. Que.)). In other cases, the courts have undertaken a comprehensive review of the validity of the arbitration clause before referring, or refusing to refer, the case to arbitration (see e.g., *Martineau c. Verreault,* [2001] J.Q. No. 3103 (C.S. Que.); *Chassé c. Union Canadienne, cie d'assurances,* [1999] R.R.A. 165 (C.S. Que.); *Lemieux c. 9110-9595 Québec inc.,* [2004] J.Q. No. 9489 (C.Q.); *Joseph v. Assurances générales des Caisses Desjardins inc.,* SOQUIJ AZ-99036669; *Bureau v. Beauce, Société mutuelle d'assurance générale,* SOQUIJ AZ-96035006 (C.Q.); *Richard-Gagné c. Poiré,* [2006] J.Q. No. 9350, 2006 QCCS 4980 (C.S. Que.)).

167     The difficulties caused by the lack of clarity in the drafting of the *C.C.P.* now confirms the need for a full review of the matter in order to determine the appropriate approach to the exercise of the supervisory power of the Superior Court.

168     The appellant argues for what has been called the "*prima facie* approach" following which a court seized of a referral application should refer the matter to arbitration upon being satisfied on a *prima facie* basis that the action was not commenced in breach of a valid arbitration agreement. The appellant, and the doctrine to which it refers, never gives a precise definition of the expression "*prima facie*" in this context. We interpret its submissions as meaning that the court seized of a referral application would have to decide if the arbitration agreement *appears* to be valid and applicable to the dispute only on the basis of the documents produced to support the motion, presuming that they are true, without hearing any testimonial evidence. The ruling of the court on the issue would not have the authority of a final judgment and the arbitral tribunal could conduct its own comprehensive review of the validity of the arbitration, subject to subsequent review by the courts.

169     On the contrary, the respondents argue for what has been called the "comprehensive approach" following which the objections to the validity of the arbitration agreement should be dealt with comprehensively before the matter is referred (or not) to arbitration. The court seized of a referral application could thus, for example, hear testimonial evidence before ruling on the validity of the arbitration agreement. Furthermore, its ruling would have the authority of a final judgment (*res judicata*) on the matter. As the intervener London Court of International Arbitration notes in its factum, the advocates of both approaches share a common objective, that is to promote the efficiency of the dispute resolution mechanisms. Where they disagree is on how best to achieve this objective.

170     The advocates of a comprehensive judicial review of the validity of the arbitration agreement under art. 940.1 *C.C.P.* rely on an "economy-of-means" rationale. They argue that it is a waste of time and money to refer the question of the validity of an agreement to an arbitral tribunal, whose very jurisdiction is challenged by one of the parties, in order to allow it to first rule on the question, as the parties will almost invariably have to return to the court either for a decision on the validity of the arbitration agreement pursuant to art. 943.1 *C.C.P.* (if the arbitral tribunal has declared itself competent) or to continue the proceedings that were interrupted by the referral application (if the arbitral tribunal has declared itself incompetent). They also argue that, as the jurisdiction of the arbitral tribunal depends entirely on the validity of the arbitration, it is illogical to ask the arbitral tribunal to first rule on the validity of the arbitration agreement.

171     Those who are in favour of limiting the review of the courts to a *prima facie* review focus on the prevention of dilatory tactics. They argue that a comprehensive review of the validity of an agreement, based on testimonial as well as documentary evidence, can take many months to decide, and that allowing such a review at the referral stage would afford a recalcitrant party the opportunity to delay unduly the commencement or progress of the arbitration. They further argue that the validity of the

arbitration agreement should be presumed and that limiting its comprehensive review by the court only to the motions brought pursuant to art. 943.1 *C.C.P.* does not entail the same problems as this provision explicitly provides that the arbitral tribunal may pursue the proceedings and make its award while such a motion is pending.

172     It is particularly significant to note that art. 940.1 *C.C.P.* clearly provides that a preliminary question be answered by the court concerning the agreement's validity; the provision does not specify that only a "*prima facie*" review be undertaken. The Quebec Superior Court, as a court designated by s. 96 of the *Constitution Act, 1867*, possesses inherent jurisdiction and has original jurisdiction in any matter unless jurisdiction is taken away by statute, according to arts. 31 and 33 *C.C.P.* (see also T. A. Cromwell in "Aspects of Constitutional Judicial Review in Canada" (1995), 46 *S.C. L. Rev.* 1027, at pp. 1030-31, cited to *MacMillan Bloedel Ltd. v. Simpson*, [1995] 4 S.C.R. 725 (S.C.C.), at para. 32). In matters involving an exclusive arbitration clause, the Quebec legislator has seen fit to divest Quebec courts of their jurisdiction pursuant to art. 3148, para. 2 *C.C.Q.*, subject to those exceptions discussed above, and subject to art. 940.1 *C.C.P.* which, on its face, clearly gives the Superior Court the power to consider the validity of the arbitration agreement.

173     According to contextual argument based on the French version of art. 940.1 *C.C.P.*, the word "constate" effectively means that courts can only undertake a *prima facie* review of the nullity of the arbitration agreement. But then art. 2642 *C.C.Q.* uses the same language with regard to the arbitrator's review of the arbitration clause: "... la constatation de la nullité du contrat par les arbitres ne rend pas nulle pour autant la convention d'arbitrage". Applying the reasoning that "constate" in art. 940.1 *C.C.P.* signifies a *prima facie* review pursuant to art. 2642 *C.C.Q.*, an arbitrator would be limited to a *prima facie* analysis of the validity of the contract containing the arbitration clause and would be unable to conduct any in-depth analysis or hear proof as to the alleged nullity of a contract. Such a result would confirm that the argument is flawed and illogical. Moreover, the verb "constate", in a legal context, does not appear to imply a superficial review. It may just as well indicate a review on the merits of an issue of fact and law. See G. Cornu, *Vocabulaire juridique*, (8th ed., 2000), at p. 208.

174     Furthermore, the Minister of Justice's comments on art. 2642 *C.C.Q.* support the proposition that a full review of nullity can be undertaken by the courts when the validity of the arbitration agreement is challenged. This article provides that an arbitration agreement contained in a contract is a separate agreement from the other clauses of the contract in which it is contained. As a consequence, the arbitration agreement must be subject to all of the general grounds for invalidating a contract at civil law, including those applying specifically to consumer or adhesion contracts. The comment of the Minister of Justice specifically recognizes that an arbitration agreement is subject to the general rules of contract and can be challenged before the courts on the same basis as any other contract:

> [TRANSLATION] This rule [art 2642 C.C.Q.] does not preclude a party from asking the court to rule on the nullity of the arbitration agreement if, for example, he or she did not give free and informed consent or did not have the capacity to contract. The general rules of the law of obligations apply to an arbitration agreement as to any contract. (*Commentaires du ministre de la Justice*, t. II, at p. 1651)

175     An argument was also presented on the basis of the *UNCITRAL Model Law on International Commercial Arbitration* of June 21, 1985 ("*Model Law*"), U.N Doc. A/40/17, Annex I, and the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3, ("*New York Convention*"), international documents the Quebec rules on arbitration are based on and which can be used to interpret the *C.C.P.* rules (see *GreCon Dimter*, at paras. 39-43, and art. 940.6 *C.C.P.*). It was argued that these provisions mandate that only a *prima facie* review of nullity be undertaken by courts. A review of these provisions has convinced us that the drafters of the *Model Law* and the *New York Convention* intended that courts and arbitrators have concurrent jurisdiction over such questions. In our view, the Quebec legislator, basing the Quebec rules on these international documents, adopted the same approach. The Report of the Working Group preparing the *Model Law* specifically states that it opted not to take a "manifestly" null and void approach:

> 77. A suggestion was made that [article 8 of the Model Law] should not be understood as requiring the court to examine in detail the validity of an arbitration agreement and that this idea could be expressed by requiring only a *prima facie* finding or by rephrasing the closing words as follows: "unless it finds that the agreement is *manifestly* null and void". In support of that idea it was pointed out that it would correspond with the principle to let the arbitral

tribunal make the first ruling on its competence, subject to later control by a court. However, the prevailing view was that, in the cases envisaged under paragraph (1) where the parties differed on the existence of a valid arbitration agreement, that issue should be settled by the court, without first referring the issue to an arbitral tribunal, which allegedly lacked jurisdiction. The Working Group, after deliberation, decided to retain the text of paragraph (1). (Report of the Working Group on International Contract Practices on the work of its fifth session (New York, 22 February — 4 March 1983) (A/CN.9/233))

The finding is confirmed by P. Binder in *International Commercial Arbitration and Conciliation in UNCITRAL Model Law Jurisdictions* (2nd ed. 2005), at p. 91.

176    Endorsing a concurrent jurisdiction approach to questions concerning the validity of the agreement is defendable on an "economy-of-means" rationale and consistent with the general policy favouring the autonomy of the parties. Although art. 940.1 *C.C.P.* is not clear regarding the extent of the analysis the court should undergo, we think that a discretionary approach favouring resort to the arbitrator in most instances would best serve the legislator's clear intention to promote the arbitral process and its efficiency, while preserving the core supervisory jurisdiction of the Superior Court. When seized with a declinatory exception, a court should rule on the validity of the arbitration only if it is possible to do it on the basis of documents and pleadings filed by the parties without having to hear evidence or make findings about its relevance and reliability.

177    This approach appears to be more consistent with the legislative framework which favours an *a posteriori* control of the arbitral process and sentences. As we have noted above, the affirmative ruling of an arbitrator on jurisdiction will always be subject to the comprehensive review of a court seized of the question pursuant to art. 943.1 *C.C.P.* Furthermore, art. 946.4(2) *C.C.P.* expressly provides, *inter alia*, that a court can refuse the homologation of an arbitration award on proof that the arbitration agreement that led to it was invalid. Both these means of exercising *a posteriori* control do not impede the efficiency of the arbitration proceeding since the latter takes place after the arbitral proceeding has been completed and the former does not suspend it.

178    That said, we believe courts may still exercise some discretion when faced with a challenge to the validity of an arbitration agreement regarding the extent of the review they choose to undertake. In some circumstances, particularly in those that truly merit the label "international commercial arbitration", it may be more efficient to submit all questions regarding jurisdiction for the arbitrator to hear at first instance. In other circumstances, such as in the present case where we are faced with the need to interpret provisions of the *Civil Code*, it would seem preferable for the court to fully entertain the challenge to the arbitration agreement's validity. In our view, the courts below were correct to fully consider Dumoulin's challenge to the validity of the arbitration agreement based on the application of art. 3149 *C.C.Q.*

### D. Possible Grounds of Nullity of the Arbitration Agreement

*1) Does the Arbitration Clause Constitute a Waiver of the International Jurisdiction of the Quebec Authorities that Cannot Be Set Up against Dumoulin?*

179    Here, we are faced with the task of interpreting art. 3149 *C.C.Q.* which is located in Section II, "Personal Actions of a Patrimonial Nature" included in Chapter II, "Special Provisions" of Title three, "International Jurisdiction of Québec Authorities" in Book Ten of the Civil Code, entitled "Private International Law". There are four provisions in Section II. First, there is art. 3148, para. (1) to (5) of which set out the general rules on when a Quebec authority has jurisdiction to hear a dispute. As discussed above, the second paragraph sets out when a Quebec authority loses jurisdiction to hear a dispute it would otherwise be competent bear. Then arts. 3149 to 3151, as mentioned earlier, appear as legislated limits on the autonomy of the parties.

180    For ease of reference, we set out arts. 3148, para. 2 and 3149 *C.C.Q.*:

> 3148. In personal actions of a patrimonial nature, a Québec authority has jurisdiction where

> . . . . .

However, a Québec authority has no jurisdiction where the parties, by agreement, have chosen to submit all existing or future disputes between themselves relating to a specified legal relationship to a foreign authority or to an arbitrator, unless the defendant submits to the jurisdiction of the Québec authority.

3149. A Québec authority also has jurisdiction to hear an action involving a consumer contract or a contract of employment if the consumer or worker has his domicile or residence in Québec; the waiver of such jurisdiction by the consumer or worker may not be set up against him.

181    The first phrase of art. 3149 confers jurisdiction on a "Québec authority" to hear an action involving a consumer or employment contract so long as the consumer or worker has his or her residence or domicile in Quebec. This phrase must be seen as giving additional protection to consumers and workers by conferring jurisdiction to Quebec authorities when these persons act as plaintiffs, since Quebec authorities already have jurisdiction where the consumer or worker is named as the defendant (per art. 3148(1)).

182    The second phrase of art. 3149 provides that the waiver of the jurisdiction of Quebec authorities by the consumer or worker cannot be set up against him or her. A consumer or worker waives the jurisdiction of Quebec authorities precisely through entering the type of agreement contemplated in art. 3148, para. 2, whereby parties "... have chosen to submit all existing or future disputes between themselves ... to a foreign authority or to an arbitrator". The effect of the second phrase is that a defending party cannot, in response to an action brought before a Quebec authority, the Superior Court for example, argue that the court has no jurisdiction to hear the matter by operation of a forum selection or arbitration clause.

183    Here, Dumoulin has his domicile in Quebec and the Superior Court is clearly a Quebec authority. It would seem that, for Dell to maintain that the Superior Court has no jurisdiction in this matter, it would have to argue that the arbitrator presiding over the NAF arbitration proceeding is a Quebec authority. It is only if this is the case that Dumoulin cannot be said to have waived the jurisdiction of a Quebec authority through the arbitration clause.

184    Thus, in determining whether art. 3149 *C.C.Q.* applies, the language invites us to ask whether the jurisdiction chosen in the contract through a forum selection or arbitration clause is a "Québec authority". If that jurisdiction is not a "Québec authority", art. 3149 comes into play to permit the consumer or worker to bring his or her dispute before a "Québec authority". The issue, then, is who is a "Québec authority"?

185    The respondents argue that art. 3149 must be read in light of the distinction made in the second paragraph of art. 3148 between a "Québec authority", a "foreign authority" and "an arbitrator", such that a "Québec authority" in art. 3149 cannot be a "foreign authority" or "an arbitrator". This is challenged by the appellant who argues that if the arbitration is to take place in Quebec, then art. 3149 does not apply at all. The argument being made is that the arbitration is not "international" since it was found that it would take place in Quebec. In such a case, the rules of private international law in Book Ten of the *C.C.Q.* do not come into play. This submission raises a new question that has become a central issue in this case: faced with an exclusive arbitration clause agreed on by the parties, to what extent — if any — must the facts disclose "foreign" elements, or be "international" for the rules of private international law to be engaged? The question calls for a detailed examination.

*a) Must the Arbitration Agreement Contain a "Foreign Element" in Order for Articles 3148, Para. 2 and 3149 — Rules of Private International Law — to Be Engaged?*

186    The introduction to any private international law (or "conflict of laws" as it is more commonly referred to in common law jurisdictions) textbook will state that this area of law comes into play in legal disputes involving foreign elements. But what does this general assertion mean? Is any foreign element sufficient to invoke private international law? In order to answer these questions, it is helpful to first explain the nature, purpose and structure of private international law.

187    Despite what its name might connote, and the existence of international agreements on various aspects of private international law, the latter is not international in the "public international law" sense. It is not "international" or universal norms that determine when such rules apply; rather, these are domestic laws created by the judiciary or the legislature within a given territory. J.-G. Castel, in *Canadian Conflict of Laws* (4th ed. 1997), at pp. 4-5, describes the character of the conflict of laws:

Principles and rules of the conflict of laws are not international, they are essentially national in character. Since they are part of the local law, they are formulated by the legislative bodies of the different legal units or are to be found in the decisions of their courts.

188     At their core, the rules of private international law/conflict of laws are local laws designed to provide answers in legal situations where two or more systems of law are capable of applying. Unfortunately, as discussed by Collier, at pp. 5-6, the names given to this area of law can be misleading with respect to its purpose:

Two names for the subject ["private international law" and "conflict of laws"] are in common use; however, they are interchangeable. Neither is wholly accurate or properly descriptive. The name 'conflict of laws' is somewhat misleading, since the object of this branch of the law is to eliminate any conflict between two or more systems of law (including domestic law) which have competing claims to govern the issue which is before the court, rather than to provoke such a conflict, as the words may appear to suggest. However, it was the name given to the subject by A. V. Dicey, when he published his treatise, the first coherent account by an English lawyer of its rules and principles, in 1896 and it has been hallowed by use ever since.

Another name is 'private international law', which is in common use in Europe. This is even more misleading than 'conflict of laws', and each of its three words requires comment. 'Private' distinguishes the subject from 'public' international law, or international law *simpliciter*. The latter is the name for the body of rules and principles which governs states and international organisations in their mutual relations. It is administered through the International Court of Justice, other international courts and arbitral tribunals, international organisations and foreign offices, although, as part of a state's municipal or domestic law, it is also applied by that state's courts. Its sources are primarily to be found in international treaties, the practice of states in their relations (or custom) and the general principles of municipal legal systems. Private international law is concerned with the legal relations between private individuals and corporations, though also with the relations between states and governments so far as their relationships with other entities are governed by municipal law, an example being a government which contracts with individuals and corporations by raising a loan from them. Its sources are the same as those of any other branch of municipal law, which is to say that [domestic] private international law is derived from legislation and decisions of [domestic] courts.

'International' is used to indicate that the subject is concerned not only with the application by [domestic] courts of [domestic] law but of rules of foreign law also. The word is inapt, however, in so far as it might suggest that it is in some way concerned with the relations between states (it is even more inapt if it suggests 'nations' rather than states)....

The word 'law' must be understood in a special sense. The application of the rules of [a country's or province's] private international law does not by itself decide a case, as does that of the rules of the law of contract or tort. Private international law is not substantive law in this sense, for, as we have seen, it merely provides a body of rules which determine whether the [domestic] court has jurisdiction to hear and decide a case, and if it has, what system of law, [domestic] or foreign, will be employed to decide it, or whether a judgment of a foreign court will be recognised and enforced by [a domestic] court.

189     As this last paragraph suggests, the rules of private international law specifically involve the three following areas: (1) choice of law; (2) choice of jurisdiction; and (3) recognition of foreign judgments (see also Tetley, at p. 791).

190     "Choice of law" rules attempt to resolve the issue of which law governs a legal dispute when it becomes possible for the laws from more than one legal system to apply. A classic example would be a car accident occurring in Quebec, involving a resident of Ontario and a resident of Quebec. Rules developed to determine whether Ontario or Quebec substantive law should govern the dispute (i.e., the *lex loci delicti* rule adopted in *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.), if Ontario authorities are seized of the question, and art. 3126 of Book Ten of the *C.C.Q.* if Quebec authorities are seized of the question) fall under the 'choice of law' category of private international law.

191     "Choice of jurisdiction" rules attempt to resolve the issue of which jurisdiction can hear a dispute when it becomes possible for more than one jurisdiction to be seized of the matter. The issues raised by this area are logically considered prior

to those raised under "choice of law". Consider the example given above. Which choice of law rule will be applied is not the first question to be addressed. A court hearing the dispute must first decide whether it can properly exercise jurisdiction over the dispute. Could the Alberta courts hear the dispute between the Quebec and Ontario motorists? Would the Ontario courts be better situated to hear the dispute? These are the types of questions "choice of jurisdiction" rules help to determine.

192    "Recognition of foreign judgments" rules operate to do just what the name suggests: they provide guidance on when the domestic jurisdiction can recognize and give force of law to foreign judgments.

193    A word should be said about the general structure of traditional private international law rules. Within each of the three areas discussed, different factors are identified to help resolve the issue at hand. The relevant factors to be considered are called "connecting factors". Connecting factors are defined by Tetley as facts which tend to connect a transaction or occurrence with a particular law or jurisdiction. These can be domicile, residence, nationality or place of incorporation of the parties; the place(s) of conclusion or performance of the contract; the place(s) where the tort or delict was committed or where its harm was felt; the flag or country of registry of the ship; the shipowner's base of operation, etc. (see Tetley, at pp. 41 and 195-96. Since private international law rules are domestic rules, as discussed above, it is the domestic courts or the legislature that determine what the relevant connecting factors will be. As well, the relevant connecting factors can vary depending on the area of private law under scrutiny. For example, in "choice of law" the factors one looks to in order to determine which law should apply in a family dispute may be different from the factors one looks at to determine which laws apply in torts or contracts.

194    The general claim is that the rules of private international law are engaged once a legal dispute presents foreign elements. The above discussion should bring to light the obvious link between this assertion and the connecting factors that will be considered in applying private international law rules. The connecting factors are indicators of the legally relevant foreign elements that can bring private international law rules into operation; they include such factors as different domiciles, residency or nationality of the parties, jurisdiction where legal proceedings were brought as compared to where the tort occurred, or where the contract was concluded, etc. For example, the choice of law rule set out at art. 3094 *C.C.Q.* reads:

> 3094. The obligation of support is governed by the law of the domicile of the creditor. However, where the creditor cannot obtain support from the debtor under that law, the applicable law is that of the domicile of the debtor.

This rule implies that the relevant foreign element would be a difference in domicile between creditor and debtor of support obligations; a wife domiciled in Quebec and a husband domiciled in New Brunswick, for example. That the parties might have been married in a jurisdiction other than Quebec would be an irrelevant foreign element in applying this rule. Thus, not all foreign elements will be relevant. The relevant foreign elements will be those raised by the applicable private international law rule.

195    Must there always be a foreign element to engage the rules of private international law? Since these are domestic laws, it is certainly possible for legislators to craft private international rules that can be engaged absent foreign elements. It is not as if there were any constitutional or international laws prohibiting the legislator from adopting such rules. One example is found in art. 3111 *C.C.Q.*, which acknowledges the capacity of parties to choose the rules that will govern their contractual relationship, whether they be domestic or foreign. The first paragraph of art. 3111 states:

> 3111. A juridical act, <u>whether or not it contains any foreign element,</u> is governed by the law expressly designated in the act or the designation of which may be inferred with certainty from the terms of the act.

The stated purpose of this particular rule of private international law, one that comes into operation absent any foreign element, is to respect the principle primacy of the autonomy of the parties:

> [TRANSLATION] The principle of autonomy of the will of the parties is firmly rooted in Quebec's legal traditions, and the proposed article confirms it.

> ...[T]he parties may choose the law applicable to their contract not only if the contract contains a foreign element, but also if it does not.

(Project de loi 125 : Code civil du Québec, *Commentaires détaillés sur les dispositions du Projet*, Livre X: Du droit international privé et disposition finale (Art. 3053 à 3144) (1991). Titre deuxième : *Des conflits de lois* (Art. 3059 à 3110). Chapitre troisième : Du statut des obligations (Art. 3085 à 3108), at p. 53)

As discussed earlier, this principle had significant influence in the crafting of the new private international rules in Book Ten of the *C.C.Q.* See Talpis, at p. 189:

[T]he New Code adopts a very subjective approach to party autonomy. Going well beyond the Rome Convention on the *Law Applicable to Contractual Relations* of June 19, 1980 and the *Swiss Code of Private International Law* of December 18, 1987, from which many of the rules on contractual obligations were drawn, *party autonomy under the new Code allows for an unrestricted choice of law*, even in the absence of a foreign element (Paragraph 2 of Art. 3111), for the severance of the contract (Paragraph 3 of Art. 3111), extension to succession (Paragraph 2 of Art. 3098), to certain aspects of civil responsibility (Art. 3127), and even to the external relationships of conventional representation (Art. 3116).

196      This brings us to art. 3148, para. 2 *C.C.Q.* which Talpis also argues allows for unrestricted choice (at p. 218). It has been the subject of some debate whether, in order to claim the application of art. 3148, para. 2, a foreign element need be shown to exist. Aside from the presence of an exclusive forum selection clause, or an arbitration clause, no other factor is mentioned in the provision as being necessary for its operation.

197      Two theories have been offered on whether the application of art. 3148, para. 2 requires the presence of a foreign element. The first is that, like in the case of art. 3111 *C.C.Q.*, the legislator intended that no foreign element be present for its operation; this would be consistent with the desire to give primacy to the autonomy of the parties. See S. Rochette, "Commentaire sur la décision *United European Bank and Trust Nassau Ltd. c. Duchesneau*-Le tribunal québécois doit-il examiner le caractère abusif d'une clause d'élection de for incluse dans un contrat d'adhésion?", Droit civil en ligne, *Repères*, Bulletin de droit civil EYB 2006-104816, who, writing on the subject of forum selection clauses, states: [TRANSLATION] "[A]rticles 3111 and 3148, para. 2 C.C.Q. in no way require that a contract contain a foreign element for effect to be given to a forum selection clause in favour of a foreign authority (pp. 3-4)".

198      This would also be consistent with a global trend occurring within the area of private international law with which we are dealing - choice of jurisdiction. In modern times, when it is recognized that respecting parties'jurisdiction clauses promotes commercial certainty, it is generally accepted that the rules and principles which confer jurisdiction in private international law fall within at least two categories: (i) consensual jurisdiction; and (ii) "connected" jurisdiction (some authors also point a potential third area of jurisdiction, "exclusive jurisdiction", on which it is not necessary to elaborate here): see J. Hill in "The Exercise of Jurisdiction in Private International Law", in *Asserting Jurisdiction: International and European Legal Perspectives* (2003), at p. 39; S. Guillemard and A. Prujiner in "La codification internationale du droit international privé : un échec?" (2005), 46 C. de D. 175; and G. Saumier. Consensual jurisdiction rules are those permitting the parties to determine by agreement the jurisdiction to govern their dispute. Hill, at p. 49, describes it as follows:

According to the submission principle, a court is competent-notwithstanding the fact that neither the events giving rise to the dispute nor the parties have any connection with the forum-if parties voluntarily submit to the court's jurisdiction. Such a submission may take the form of a voluntary appearance to defend the claim without challenging the court's jurisdiction or a contractual agreement, typically a jurisdiction clause forming part of a wider agreement. [Emphasis added.]

Under the second category, the "connected" jurisdiction rules employ connecting factors to assist in determining whether the jurisdiction seized can hear the matter. Thus, only the second category of jurisdiction is concerned with an examination of factual links to geographical territories.

199      On the other hand, it has been pointed out that unlike art. 3111, which specifically stipulates that the provision applies even in the absence of a "foreign element", art. 3148, para. 2 makes no such concession and that this silence should not be construed as a mere oversight. See S. Guillemard, "Liberté contractuelle et rattachement juridictionnel : le droit québécois face aux droits français et européen", *E.J.C.L.*, vol. 8.2, June 2004, at pp. 25-26, online:

[TRANSLATION] Must a case be intrinsically international for the designation of a foreign court or tribunal to be permissible, or can the designation of a foreign authority constitute in itself the foreign element required to make a dispute an international one? ...

The *Civil Code of Québec* does not expressly indicate how this question should be answered, but merely allows the parties to agree to a forum "[with respect] to a specified legal relationship". This statement merits special attention, since Quebec's codifiers were more specific where the normative connection is concerned. Under article 3111 C.C.Q., the parties may designate the law applicable to "[a] juridical act, whether or not it contains any foreign element". How should the silence of the provisions on the jurisdiction of courts be interpreted? Pierre-André Côté, a Quebec expert on statutory interpretation, gives the following warning: "Assuming a statute to be well drafted, an interpretation which adds to the terms ... is suspect". He cites the recommendation of Lord Mersey: "It is a strong thing to read into an Act of Parliament words which are not there, and in the absence of clear necessity it is a wrong thing to do". In other words, if, as the saying goes, the legislature "does not speak gratuitously", it certainly does not remain silent for no reason either. Since a comparison of the two provisions — on choice of law and on choice of forum — is perplexing because of the precision of one and the silence of the other, it must be concluded that selecting a forum is permitted in Quebec law only in a case with a foreign element. [Footnotes omitted.]

The author goes on to theorize, however, that the forum selection clause in itself may be the requisite foreign element since any other conclusion would fail to respect the principle of the primacy of the autonomy of the parties, at pp. 26, 28:

[TRANSLATION] Is it possible that the designation by the parties of a court of a state with no other connection whatsoever to the contract would not in itself constitute a sufficiently significant connection?

. . . . .

In our opinion, to require that one of the elements of the case be "objectively" foreign would be inconsistent with the principle of freedom of contract. This would amount to viewing the jurisdictional connection solely within the framework — if not the straitjacket — of the elements of the contract itself, as is the case with other connecting factors in this area. Moreover, this reasoning is illogical. As we have seen, there is generally no requirement of a connection between the court and a contract otherwise characterized as an international one.

Guillemard similarly recognizes that the same conclusion can be reached in the case of arbitration clauses, at p. 50:

[TRANSLATION] [W]e have observed that where the choice of forum is concerned, in Quebec law at least, the "artificial" internationality that results uniquely from the fact that the authority belongs to another legal system does not appear necessarily to be precluded. It would seem to us to be illogical if the same were not true in the arbitration sphere.

200    In our view, the proposition that forum selection and arbitration clauses constitute on their own the requisite foreign element such that their presence alone brings art. 3148, para. 2 into operation seems quite logical. In the case of forum selection clauses, the *effect* of such clauses will be to divest Quebec authorities of their jurisdiction to hear the matter in order for the dispute to be sent to another country or province to be heard under the laws of that jurisdiction. Similarly, the *effect* of exclusive arbitration clauses is to create a "private jurisdiction" that implicates the loss of jurisdiction of state-appointed authorities for dispute resolution, such as domestic courts and administrative tribunals.

201    We see no principled basis to distinguish between forum selection and arbitration clauses with regard to the question of whether they represent in and of themselves a foreign element. The fact that contractual arbitration may take place within the geographic territory of Quebec is not determinative of anything in that respect. First and foremost, the effect of both is to derogate from the jurisdiction of Quebec authorities and vest jurisdiction in some other entity. It seems to us that the rules in Title three of Book Ten of the *C.C.Q.* are concerned with "jurisdiction" with respect to judicial and quasi-judicial powers, not so much "jurisdiction" in the geographical sense (though the notions can obviously overlap). Jurisdiction can mean a number of things, depending on the context. In *Lipohar v. R.* (1999), 200 C.L.R. 485, [1999] HCA 65 (Australia H.C.), at p. 516, it was

said of "jurisdiction": "It is used in a variety of senses, some relating to geography, some to persons and procedures, others to constitutional and judicial structures and powers."

202    The fact that Title three is entitled "*International* jurisdiction of Quebec authorities" does not, in our view, mandate another conclusion. We do not take the reference to "international jurisdiction" to necessarily connote that questions of jurisdiction arise only when faced with geographical extra-territoriality. Private arbitration proceedings, even those located in Quebec, are just as removed from Quebec's judicial and quasi-judicial systems — and hence "international" — as legal proceedings taking place in another province or country. One should avoid placing undue emphasis on the reference to "international" in Title three for the same reasons discussed earlier concerning how one should not be mislead by the reference to "international" in the expression "private international law". Indeed, earlier draft versions of Title three used the title "Conflicts of Jurisdiction" (see J. A. Talpis and G. Goldstein, "Analyse critique de l'avant-projet de loi du Québec en droit international privé" (1988), 91 *R. du N.* 606 at p. 608). As well, "International jurisdiction of Quebec authorities" may be somewhat of a misnomer since Quebec authorities must exercise their adjudicative jurisdiction within the territorial limits of the province — hence the holding in *Morguard Properties Ltd. v. Winnipeg (City)*, [1983] 2 S.C.R. 493 (S.C.C.), that to be constitutional, assertions of jurisdiction over a legal dispute must have a real and substantial connection to the province.

203    As a final point, it should be noted that unlike many of the other provinces, Quebec has adopted arbitration rules that make no distinction between domestic and international arbitration. The Book on Arbitration in the *C.C.P.* covers both "domestic" and "international" arbitration; the rules are essentially identical. The purpose of this approach was to show deference to the parties'choice to arbitrate. In the common law provinces, some distinctions are made between "domestic" and "international" arbitrations for the purposes of court intervention and recognition of arbitral awards. The trend appears to be that court intervention is more tightly constrained in "international" arbitration than "domestic" arbitration. Courts are given more freedom to intervene and hear domestic arbitrations. (It would be an odd thing indeed if, in the face of this trend, this Court were to interpret Quebec law to permit greater court intervention in "international" arbitration only.) If Quebec does not make the distinction in the *C.C.P.* rules, it stands to reason that one should not distinguish for the purpose of Book Ten of the *C.C.Q.* This is especially so when it seems that the only reason the word "arbitrator" was included in art. 3148, para. 2 (which substantially duplicates the effects of art. 940.1 *C.C.P.*) was to make available the exceptions to art. 3148, para. 2 at arts. 3149 to 3151.

204    For these reasons, we would conclude that an arbitration clause is itself sufficient to trigger the application of art. 3148, para. 2, and hence the exceptions that apply to it, including art. 3149.

*b) The Quebec Court of Appeal's Decision in Dominion Bridge Corp.*

205    The appellant has relied on the decision in *Dominion Bridge Corp.*, in support of its position. There, the Court of Appeal, *in obiter*, interpreted art. 3149 such that it would permit workers or consumers to be bound to arbitration through an exclusive arbitration clause, so long as the arbitration occurs inside Quebec. Quebec courts have since followed this precedent, including Lemelin J. for the Court of Appeal below, although its wisdom has been questioned: see G. Goldstein and E. Groffier, *Droit international privé*, t. II, *Règles spécifiques* (2003), at p. 640.

206    It is clear that the decision in *Dominion Bridge*, was based on a mistaken belief that the intent of the legislator in enacting art. 3149 was to protect consumers and workers from moving their disputes outside Quebec. Explaining the basis of his conclusion, Beauregard J.A. speculates: [TRANSLATION] "The legislature's main intention was probably to protect a worker's right to sue his or her employer in Quebec" (p. 324). In fact, an examination of the comments made by the Minister of Justice when enacting this legislation reveals that the intent was to preserve consumer and worker access to Quebec courts and other state-appointed dispute resolution forums, not merely to keep them within the geographic territory of Quebec. The comments of the Minister of Justice on art. 3149 are as follows:

[TRANSLATION] This article is new law and is based on Switzerland's 1987 *Loi fédérale sur le droit international privé* and on the third paragraph of article 85 C.C.L.C. It confers jurisdiction over a consumer contract or a contract of employment on a Quebec authority where the consumer or worker is resident or domiciled in Quebec; this jurisdiction is in addition to the jurisdiction based on the criteria set out in article 3148.

The article provides consumers and workers with enhanced protection. [pp. 2010-11]

207    It is instructive to examine the provisions that art. 3149 is purportedly modelled upon. First, there is art. 85 *C.C.L.C.* which provides:

85. When the parties to a deed have for the purpose of such deed, made election of domicile in any other place than their real domicile, all notifications, demands and suits relating thereto may be made at the elected domicile, and before the judge of such domicile.

. . . . .

Save in the case of a notarial deed, an election of domicile shall be without effect as regards the jurisdiction of any court, when it is signed by a non-trader within the boundaries of the district in which he resides.

208    Then, there is art. 114 of the Swiss legislation on private international law (*Loi fédérale sur le droit international privé suisse de 1987, RO 1988 1776*), which provides:

[TRANSLATION] **Art. 114** Contracts with consumers

1. Where a consumer brings an action relating to a contract that satisfies the conditions set out in art. 120, para. 1, he may elect to do so <u>in the Swiss court</u>:

a. of his domicile or of his habitual place of residence, or

b. of the supplier's domicile or, in the absence of such domicile, of the supplier's habitual place of residence.

2. A consumer may not waive in advance the forum of his domicile or habitual place of residence.

209    Both provisions specifically maintain the jurisdiction of the courts to hear consumer disputes. As well, it should be noted the Minister of Justice's comments on arts. 3117 and 3118, which are rules that also seek to protect the consumer and worker when it comes to choice of law, end with the following statements, respectively:

[TRANSLATION] It should be noted that the consumer contract is defined in article 1384 and that article 3149 *confers jurisdiction on the Quebec courts* in certain circumstances where consumer contracts are in issue.

. . . . .

It should also be noted here that article 3149 <u>confers jurisdiction on the Quebec courts</u> in certain circumstances where contracts of employment are in issue. [Emphasis added] (Commentaires du ministre de la Justice, at pp. 1987-88)

210    There appears from the above to be an intention on the part of the Quebec legislator to safeguard consumer and worker access to the courts. It is interesting to note that in a more recent decision, *Rees c. Convergia, Convergia Networks Inc.*, [2005] J.Q. No. 3248, 2005 QCCA 353 (C.A. Que.), the Court of Appeal seems to recognize that this was the purpose of art. 3149 *C.C.Q.*: [TRANSLATION] "Evidently, *the legislature intended, in adopting article 3149 C.C.Q., to confer a separate and full jurisdiction on the Quebec courts* in two areas of economic activity where one of the contracting parties is particularly vulnerable" (para. 37 (emphasis added)).

211    A further problem with the interpretation of art. 3149 in *Dominion Bridge* is that it essentially equates a contractual arbitrator seated in Quebec with a "Québec authority". Applying this notion in most situations demonstrates the flaws in this approach. Assuming that being a decision-maker situated in Quebec is sufficient to make one a "Québec authority", it ignores the issue of whether the arbitrator must be from Québec. In this case, as we read the provisions on appointment of arbitrators in *NAF's Code*, Rules 20-24, there is no guarantee that an arbitrator will be from the complainant's jurisdiction. If the parties do not select an arbitrator on mutually agreeable terms, NAF chooses, permitting the parties to strike out each one candidate each from the short list. The only provision that touches on what jurisdiction the arbitrator may be from is Rule 21E. It reads as follows:

> E. Unless the Parties agree otherwise, in cases involving citizens of different countries, the Forum may designate an Arbitrator or Arbitrator candidate based, in part, on the nationality and residence of the Arbitrator or Arbitrator candidate, but may not exclude an Arbitrator solely because the person is a citizen of the same country of a Party.

It is nothing short of puzzling how an arbitrator not from Quebec, even though located in Quebec, could be a "Québec authority".

212    This approach also ignores another important issue: where does the arbitrator hold his authority from? Here, the arbitrator and arbitration proceedings under NAF are ultimately subject to U.S. law. We note that in this respect Rule 5O of NAF's *Code* stipulates that "Arbitrations under the Code are governed by the Federal Arbitration Act in accord with Rule 48B." Rule 48B stipulates that: "Unless the Parties agree otherwise, any Arbitration Agreement as described in Rules 1 and 2E and all arbitration proceedings, Hearings, Awards, and Orders are to be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16." No arbitrator who is bound by U.S. law could be a "Québec authority". The respondents also rightly raise the fact that Rule 11D provides that all arbitrations will be in English. One would think a "Québec authority" would be required to provide arbitration services in French. Finally, it seems completely incongruous how, in this case, in order to begin the process attributing to the purported "Québec authority" power to hear the dispute, the consumer must first contact an American institution, located in Minneapolis, who is in charge of organizing the arbitration.

213    It should be noted, as well, that assigning the status of "Québec authority" to a contractual arbitrator seated in Quebec would have unwanted consequences when applied to the other exceptions to art. 3148, para. 2, especially art. 3151. It surely could not have been intended that in reserving jurisdiction to "Québec authorities" to hear all "matters of civil liability for damage suffered in or outside Québec as a result of exposure to or the use of raw materials", that private arbitrators could be selected by the parties to hear such disputes before they arise. This is evident from the earlier version of this provision, art. 21.1 *C.C.P.*, assented to June 21, 1989, which reserves the exclusive jurisdiction to hear disputes over raw materials to Quebec courts:

**Civil Code of Lower Canada**

> 8.1. The application of the rules of this Code is imperative in matters of liability for damage suffered in or outside Québec as a result of exposure to or use of raw materials, whether processed or not, originating in Québec.

**Code of Civil Procedure**

> 21.1. The courts of Québec have exclusive jurisdiction to hear in first instance all demands or actions founded on liability under article 8.1 of the Civil Code of Lower Canada

In presenting these provisions, the Minister of Justice made the following declarations:

> [TRANSLATION] Mr. Speaker, the purpose of the bill is to ensure that Quebec legal rules applicable to certain matters are also mandatory for foreigners.
> . . . . .
> Since the damage in question is suffered as a result of the use of or exposure to raw materials originating in Quebec, it seemed important that all litigants, be they Quebecers, other Canadians or foreigners, be treated equally and that a single legal scheme governing liability, namely that of Quebec ... should apply to all of them. (Québec, Assemblée nationale, *Journal des débats*, 2nd Sess., 33rd Leg., Vol. 30, No. 126, June 21, 1989, at pp. 6941 and 6970)

It is clear that in introducing these provisions, the National Assembly wanted all litigants in this area to be subject to one single legal system-Quebec's-which of course includes Quebec courts.

*c) Conclusion on the Interpretation of Article 3149*

214    As identified at the outset of this section, the application of art. 3149 hinges on the question "Who is a Quebec authority?" and, in our view, on this question only. It is obvious from the above discussion that a "Québec authority" must mean a decision-maker situated in Quebec holding its authority from Quebec law. This is consistent with the meaning of "Québec

authority" discussed in Quebec doctrine. C. Emanuelli, in *Droit international privé québécois* (2nd ed. 2006), defines the terms as encompassing: [TRANSLATION] "Quebec courts and notaries and other Quebec authorities, such as the Director of Youth Protection and the Registrar of Civil Status" (art. 152). H. P. Glenn notes that [TRANSLATION] "[b]y simply referring to 'Québec authorities' without further clarification, Title Three establishes the rules respecting the international jurisdiction *of Quebec judicial and administrative authorities*" ("*Droit international privé*", in *La Réforme du Code civil* 1993, t.3, at p. 743 (emphasis added)). See also G. Goldstein and E. Groffier, who state: [TRANSLATION] "The new Code refers to Quebec or foreign 'authorities' rather than to courts. The intention is to include administrative authorities whose decisions may concern private law matters .... However, (non-state) arbitral tribunals do not appear to be regarded as 'authorities' for purposes of this Code" (*Droit international privé*, at p. 287). This is completely consistent with the distinction made between "Québec authorities", "foreign authorities" and "arbitrators" in art. 3148, para. 2.

215    While little has been written on the interpretation of art. 3149 itself, there is academic support for our position. N. W. Vermeys, in "Commentaire sur la décision *Dell Computer Corporation c. Union des consommateurs* - Quand « browsewrap » rime avec « arbitrabilité »" Droit civil en ligne, *Repères*, August 2005, EYB2005REP375, argues:

[TRANSLATION] "Article 3148 C.C.Q. seems to preclude compulsory arbitration where consumer contracts are concerned.... The effect of this article is that the 'arbitrator' concept is expressly excluded from that of the 'Quebec authority'. Since the Code prevents a consumer from waiving the jurisdiction of Quebec authorities, it would necessarily be impossible to set up an arbitration clause against the consumer".

Vermeys further rejects the argument that an arbitrator could fit within the word "court" in the C.P.A., s. 271, para. 3, in order to qualify as a "Québec authority" for the purposes of arts. 3148 and 3149:

[TRANSLATION] For this purpose, some may be tempted to argue that the definition of "court" in the CPA includes an arbitrator. However, to interpret the word "courts" this broadly would appear to me to be inconsistent with the current state of the law. As the Court [of Appeal] quite correctly stated, "the [Consumer Protection] Act does not define this term, so it is necessary to turn to article 4 C.C.P.: '"court" means one of the courts of justice enumerated in article 22 or a judge presiding in a courtroom'" (para. 51 of the decision in question).... [B]efore even consulting the *Code of Civil Procedure*, it should be determined whether the legislation is internally consistent. Several provisions of the Act, including sections 142, 143, 267 and 271, seem to imply that only courts within the meaning of the *Code of Civil Procedure* were contemplated by the legislature in drafting the CPA. [Footnote No. 20]

216    All of this leads to the conclusion that a contractual arbitrator cannot be a "Québec authority" for the purposes of art. 3149. Therefore, Dell cannot succeed here in trying to set up the exclusive arbitration against Dumoulin. This interpretation does not affect labour arbitrators, nor other forms of arbitration made available under Quebec statutes, because such arbitrators would qualify as "Québec authorities": see Tremblay, at p. 252: [TRANSLATION] "A distinction must also be made between civil or commercial arbitration and other types of arbitration, such as grievance arbitration in labour law. In grievance arbitration, even though the parties can choose the third party, *arbitration is compulsory by law*" (emphasis added). This explains why this Court's decisions in *Bisaillon*, and *Desputeaux* do not dictate our conclusion here. The former involved an arbitrator whose authority stemmed from Quebec's *Labour Code*, and the latter involved an arbitrator designated by s. 37 of the *Act respecting the professional status of artists*. Nor does our interpretation signify that arbitration clauses in consumer and worker contracts are always invalid. It simply means that the agreement to arbitrate in advance of the dispute, which is the effect of an arbitration clause included in a contract of adhesion, could not be set up against the consumer or worker. The consumer or worker could well decide they want to arbitrate; in that case recourse to art. 3149 is unnecessary. This is explained very well by Goldstein and Groffier, at p. 640:

[TRANSLATION] All that article 3149 C.C.Q. says is that the party contracting with the weaker party cannot impose such a clause on him or her regardless of what the weaker party intended and perhaps even though ... the weaker party originally opted for arbitration but subsequently changed his or her mind. While it is true that workers or consumers cannot waive the forum of their residence or domicile *in advance*, they can nevertheless waive it if they believe that would be in their

interest in the circumstances. To say the contrary would be tantamount to saying that in international situations, nothing relating to a contract of employment or a consumer contract is arbitrable.

217 Our conclusion on art. 3149 *C.C.Q.* is alone sufficient to dismiss the appellant's motion to refer the dispute to arbitration and it is therefore not strictly necessary to study the other possible grounds of nullity of the arbitration agreement. That said, we are of the view that the other questions raised by this appeal are sufficiently important to make it necessary for our Court to state its views on their respective merits.

*2) Is the Arbitration Agreement Null Because a Consumer Dispute Is a Matter of Public Order?*

218 Although the respondents did not specifically argue that a consumer dispute could never be arbitrated because it would constitute an arbitration over a matter of public order, we need to briefly state our position on the subject, as the question was discussed by the Court of Appeal. In our view, the Court of Appeal was correct in concluding that a consumer dispute can be arbitrated. Such a conclusion inevitably flows from the application of the reasoning we have adopted in *Desputeaux*, and is in accordance with the requirements of public policy, subject to the effect of art. 3149 *C.C.Q.*

219 Article 2639 *C.C.Q.* deals with the kind of disputes that cannot be submitted to arbitration. These are the "[d]isputes over the status and capacity of persons, family matters or *other matters of public order*". The question is therefore whether a consumer dispute constitutes such an other matter of public order. We believe that it does not. As we held in *Desputeaux*, the concept of public order in art. 2639, para. 1 *C.C.Q.* must be interpreted restrictively so as to respect the parties'autonomy to choose arbitration, as well as the clear legislative intention to respect such a choice. As there was no compelling reason to consider copyright disputes as analogous to disputes regarding the status and capacity of persons or family matters in *Desputeaux*, there is no such compelling reason regarding consumer disputes in the case at bar.

220 Furthermore, the fact that certain *C.P.A.* rules to be applied by the arbitrator are in the nature of public order does not constitute a bar for the hearing of the case by an arbitral tribunal. The second paragraph of art. 2639 *C.C.Q.* makes this clear. This was also recognized by our Court in *Desputeaux*:

> A broad interpretation of the concept of public order in art. 2639, para. 1 *C.C.Q.* has been expressly rejected by the legislature, which has specified that the fact that the rules applied by an arbitrator are in the nature of rules of public order is not a ground for opposing an arbitration agreement (art. 2639, para. 2 *C.C.Q.*). The purpose of enacting art. 2639, para. 2 *C.C.Q.* was clearly to put an end to an earlier tendency by the courts to exclude any matter relating to public order from arbitral jurisdiction. (See *Condominiums Mont St-Sauveur inc. v. Constructions Serge Sauvé ltée*, [1990] R.J.Q. 2783, at p. 2789, in which the Quebec Court ofAppeal in fact stated its disagreement with the earlier decision in *Procon (Great Britain) Ltd. v. Golden Eagle Co.*, [1976] C.A. 565; see also *Mousseau* [*v. Société de gestion Paquin ltée*, [1994] R.J.Q. 2004 (Sup.Ct.)], at p. 2009.) Except in certain fundamental matters, relating, for example, strictly to the status of persons, as was found by the Quebec Superior Court to be the case in *Mousseau, supra*, an arbitrator may dispose of questions relating to rules of public order, since they may be the subject matter of the arbitration agreement. The arbitrator is not compelled to stay his or her proceedings the moment a matter that might be characterized as a rule or principle of public order arises in the course of the arbitration. [para. 53]

221 Finally, the fact that the *C.P.A.* and the *C.C.Q.* are silent as to the arbitrability of a consumer dispute suggests its permissibility. An act should only be interpreted as excluding the possibility of arbitration if it is clear from it that the legislator purported to exclude the possibility of arbitration. No provisions of the *C.P.A.* or the *C.C.Q.* lead us to think that it is the case for consumer disputes. More specifically, we think the Court of Appeal was correct in finding that art. 271, para. 3 *C.P.A.* merely defines the jurisdiction *ratione materiae* of the courts and in concluding that, as we held in *Desputeaux*, such an article should not be interpreted as excluding the possibility of arbitration.

222 The Quebec legislature has never given any clear indications that consumer disputes are not arbitrable. No general rule to that effect can be found anywhere. The legislature adopted another approach. The *C.C.Q.* and the *C.P.A.* contain certain rules which govern the validity, applicability and enforceability of arbitration agreements in respect of consumers.

223     The respondents seem to argue that a consumer dispute can never be arbitrated because arbitration proceedings should be considered *inherently* unfair for the consumer. We are not convinced that this is the case. On the contrary, we think that under certain circumstances, arbitration may actually be an appropriate or preferable forum for the adjudication of consumer disputes.

*3) Is the Arbitration Agreement Void Because It Constitutes a Waiver of the Jurisdiction of the Superior Court Over Class Actions Contrary to Public Order?*

224     The respondents also argue that access to class actions is a matter of public order and therefore cannot be subject to arbitration under art. 2639. This argument must fail, because, as discussed above, art. 2639, para. 1 seeks to insulate only certain types of "matters" or disputes of public order from arbitration. Access to class actions is a procedural right and not a type of "matter" or dispute analogous to status and capacity of persons, or family law disputes.

225     The respondents alternatively argue that this Court should apply its decision in *Garcia Transport Ltée c. Cie Trust Royal*, [1992] 2 S.C.R. 499 (S.C.C.), to find that the rules on class actions are rules of public order, with the consequence that contractual provisions preventing the consumer from accessing class actions are of no effect. In *Garcia Transport*, the Court concluded that a provision in the *C.C.L.C.* was a rule of public order absent an explicit statement within the provision indicating this status. Finding that such status could be implied, the Court identified a number of factors that indicated legislative intent to accord the provision this status. The decision leaves no doubt, however, that it is the Quebec legislature that decides which laws apply as a matter of public order, not the courts. The role of courts in this regard is to determine whether sufficient legislative intent is present to clearly indicate that a law is intended to be one of public order, and this will occur only in those rare cases where the legislator has been less than explicit about its status. The following excerpt from J.-L. Baudouin, *Les obligations* (3rd ed. 1989) at p. 81 (cited in *Garcia Transport* at p. 525) accurately sets out the law:

> [TRANSLATION] Most of the time, the legislature intervenes directly to establish what is a matter of public order. Sometimes there is even an explicit statement in the statutory or regulatory provision that it is of public order; sometimes it indicates that there can be no contractual derogation from the rule, and that any such derogation will be null. Sometimes, on the contrary, the legislature clearly indicates that it is left to the parties themselves to settle the question and that the rule that is set out will apply only to supplement their agreement.... In other cases, finally, the formula used does not directly suggest that the statute is truly imperative. It is then for the courts to determine the legislative intention and to decide whether the provisions should be treated as being of public order, that is, to determine whether they are *imperative* provisions or merely *supplement* the will of the parties. [Emphasis in original]

226     In this case, there is no indication of a legislative intent to give the rules in Book IX on "Class Action" of the *C.C.P.* public order status. While art. 1051 *C.C.P.* states that the provisions of the other books of the *C.C.P.* that are inconsistent with the rules of Book IX do not apply, this rule merely intends to remedy practical difficulties in applying procedures that would be unfeasible in the class action context, such as strictly applying the rules on cross-claims and joinder. It does not elevate the right to institute class actions to the status of a rule of public order that cannot be waived. Furthermore, this Court's recent decision in *Bisaillon*, is clear authority that the class action, while having an important social dimension, is only a "procedural vehicle whose use neither modifies nor creates substantive rights" and can generally be waived (para. 17). It is the legislature, and not the courts, that can create exceptions to this.

*4) Is the Arbitration Agreement Null Because Dumoulin Did Not Consent to It as It Was Imposed on Him Through a Contract of Adhesion?*

227     The respondents also argue that the principle of the autonomy of the parties has no bearing on this case as the arbitration clause is found in a contract of adhesion. In other words, the respondents seem to argue that Dumoulin should not be bound by the arbitration agreement because he did not give a true consent to the contract in which it is contained, this contract being of adhesion. This argument must also fail. It is based on the false assumption that an adhering party does not truly consent to be bound by the obligations contained in a contract of adhesion. The notion of a contract of adhesion is only meant to describe the contract in which the essential stipulations were imposed or drawn up by one of the parties and were not negotiable (see

art. 1379 *C.C.Q.*). This does not mean that the adhering party cannot give a true consent to it and be bound by each one of its clauses, subject to the possibility that some might be void or without effect pursuant to some other provisions of the law. As stated by J.-L. Baudouin and P.-G. Jobin:

> [TRANSLATION] Since the adhering party's only choice is between entering into the contract on the terms imposed by the other party and not entering into it, the question that arises is whether this is a true contract, that is, an *agreement of the wills* of the parties. Some authors argue that a contract of adhesion is more akin to a unilateral juridical act, whereas a contract is a bilateral juridical act. However, most authors consider a contract of adhesion to be a true contract even though the role of the will of the adhering party is reduced to a minimum. Support for this position can be found in the variety of mechanisms that have been developed at law to correct the inequities and problems of consent that result from the adhering party's inability to negotiate .... [Emphasis in original] (Les obligations (6th ed. 2005), at p. 79)

228    We agree with the position defended by the majority of the doctrine and think it is therefore not sufficient for the respondents to raise the fact that the arbitration clause is found in a contract of adhesion in order to demonstrate that Dumoulin should not be bound by it. Reliance on some other provisions of the law is necessary.

*5) Is the Arbitration Clause Void Because It Is Abusive?*

229    Article 1437 *C.C.Q.* and s. 8 *C.P.A.* provide the basis for a judicial declaration of the nullity of an abusive clause. However, as was noted above, we are of the view that an arbitration clause cannot be said to be abusive only because it is found in a consumer contract or in a contract of adhesion. The agreement to arbitrate a consumer dispute is not inherently unfair and abusive for the consumer. On the contrary, it may well facilitate the consumer's access to justice. Therefore, the consumer that raises this ground of nullity must prove that, given the particular facts of his case, the arbitration agreement should be considered abusive. Most of the time, such proof will require testimonial evidence. If that is the case, the question will have to be dealt with by the arbitral tribunal, subject to the possibility for the consumer to ask for a revision of the arbitral tribunal's decision under art. 943.1 *C.C.P.* Such would have been the situation in the case at bar if it had not been for our conclusion regarding the applicability of art. 3149 *C.C.Q.*

*6) Is the Arbitration Agreement Null Because It Is an External Clause that Was Not Expressly Brought to the Attention of Dumoulin?*

230    Generally, the question of whether the arbitration agreement is null pursuant to art. 1435, para. 2 *C.C.Q.* will be more appropriately left to the arbitral tribunal to decide. Although it will often be possible for a court to decide on examination of the material supporting the referral application if the arbitration agreement was contained in an external clause, it will generally not be possible to determine, on such a review, if this external clause was expressly brought to the attention of the consumer or adhering party, or if the consumer or adhering party otherwise knew of it. For that reason, a review involving testimonial evidence will often be necessary and this review is better left to the arbitral tribunal. Such would have been the situation in the case at bar if it had not been for our conclusion regarding the applicability of art. 3149 *C.C.Q. in fine*.

231    That said, the finding of the Court of Appeal that the arbitration clause was external because the Terms and Conditions were external is significant, given the growing frequency with which on-line contracts are made and the impact such a finding could have on e-commerce. As the position adopted by the Court of Appeal is not free from doubts, we feel compelled to state our view on the matter.

232    The context of e-commerce requires courts to be sensitive to a number of considerations. First, we are dealing with a different means of doing business than has heretofore been generally considered by the courts, with terminology and concepts that may not easily, though nevertheless must be fit within the existing body of contract law. Second, as e-commerce increasingly gains a greater foothold within our society, courts must be mindful of advancing the goal of commercial certainty (see *Rudder v. Microsoft Corp.* (1999), 2 C.P.R. (4th) 474 (Ont. S.C.J.)). Finally, the context demands that a certain level of computer competence be attributed to those who choose to engage in e-commerce. As noted by the Ontario Superior Court of Justice in *Kanitz v. Rogers Cable Inc.* (2002), 58 O.R. (3d) 299 (Ont. S.C.J.):

We are here dealing with people who wish to avail themselves of an electronic environment and the electronic services that are available through it. It does not seem unreasonable for persons who are seeking electronic access to all manner of goods, services and products, along with information, communication, entertainment and other resources, to have the legal attributes of their relationship with the very entity that is providing such electronic access, defined and communicated to them through that electronic format. [para. 32]

233    As a preliminary matter, the appellant raised the objection that the Court of Appeal made its own factual findings by reviewing the transcripts and appeal record in order to find that art. 1435 *C.C.Q.* applied. The appellant submits that the Court of Appeal erred by not remitting the case to the court below for the necessary evidentiary findings to be made since the Superior Court made no finding of fact of this issue. This submission must be rejected. The power of the Court of Appeal to make a fresh assessment of facts on the record and offer a substituted verdict can be implied from s. 10 of the *Courts of Justice Act*, R.S.Q., c. T-16, which provides that the Court's power to hear appeals "shall carry with it all powers necessary to its exercise" (see also R. P. Kerans, *Standards of Review Employed by Appellate Courts* (1994), at p. 201).

234    We turn now to whether art. 1435 *C.C.Q.* applied in this case. Article 1435 *C.C.Q.* provides that external clauses are generally permitted, except in cases involving contracts of adhesion or consumer contracts, where, in order to be found valid, it must be proved that they have been brought to the party's attention or that the consumer or adhering party otherwise knew of it. The first question, then, is whether Dell's Terms and Conditions of Sale, hyperlinked to the bottom of the Configurator Page and containing the arbitration clause, constitute an external document.

235    The meaning of "external" is not defined in the *C.C.Q.*; however, both the doctrine and Quebec jurisprudence provide some insight into its meaning. Baudouin and Jobin provide a definition but they express ambivalence over whether, in general, hyperlinked documents are external within the meaning of art. 1435 *C.C.Q.*:

[TRANSLATION] [An external clause is] a stipulation set out in a document that is separate from the agreement or instrument but that, according to a clause of this agreement, is deemed to be an integral part of it and thus binding on the parties.... In a contract entered into via the Internet, the contracting party must use one or more hyperlinks to find the external clauses that govern the contract appearing on the screen; it might be asked whether these are in fact external clauses. The external clause concept needs to be clarified somewhat. For instance, a document that is appended to the contract and is immediately submitted to each party, or a stipulation found on the back of the instrument, is not an external clause. [Footnotes omitted; p. 267.]

236    The appellant's submissions were along similar lines, analogizing clicking a hyperlink on a web page to the turning of the page of a contract in paper form. There may be some merit to this argument, but it ignores the fact that a web page can contain several hyperlinks, which can obscure the relevant link containing important information about the consumer's legal rights.

237    S. Parisien provides better insight into when a hyperlinked document may be considered to have been expressly brought to the attention of the consumer at the moment of formation of the contract: [TRANSLATION] "A hyperlink to a document that is incorporated by reference should satisfy this condition if it is functional and clearly visible", in *Guide juridique du commerçant électronique* (2001), at p. 106). This is a reasonable approach to the issue; it is more realistic than a general finding that hyperlink documents are either always or never external. Applied to the facts of this case, the issue would be whether the relevant hyperlink's location and visibility on a web page obscures it to such an extent that it can properly be said to be external.

238    It is true, as noted by the Court of Appeal, that the hyperlink to the Terms and Conditions of Sale was in smaller print, located at the bottom of the Configurator Page. The evidence was that Dell places a hyperlink to its Terms and Conditions of Sale at the bottom of every shopping page on its site. This is consistent with industry standards. In fact, this is the placement that was at the time recommended by Industry Canada's Office of Consumer Affairs (*Your Internet Business: Earning Consumer Trust — A guide to consumer protection for on-line merchants* (1999), at p. 10). It is proper to assume, then, that consumers that were engaging in e-commerce at the time would have expected to find a company's terms and conditions at the bottom of the web page. In light of this, we conclude that the hyperlink to the Terms and Conditions was evident to Dumoulin. Furthermore,

the Configurator Page contained a notice that the sale was subject to the Terms and Conditions of Sale, available by hyperlink, thus bringing the Terms and Conditions expressly to Dumoulin's attention.

239     Upon clicking on the hyperlink, the first paragraph states, in block capital letters:

> PLEASE READ THIS DOCUMENT CAREFULLY! IT CONTAINS VERY IMPORTANT INFORMATION ABOUT YOUR RIGHTS AND OBLIGATIONS, AS WELL AS LIMITATIONS AND EXCLUSIONS THAT MAY APPLY TO YOU. THIS DOCUMENT CONTAINS A DISPUTE RESOLUTION CLAUSE.
>
> This Agreement contains the terms and conditions that apply to your purchase from Dell Computer Corporation, a Canadian Corporation ("Dell", "our" or "we") that will be provided to you ("Customer") on orders for computer systems and/or other products and/or services and support sold in Canada. By accepting delivery of the computer systems, other products and/or services and support described on the invoice, Customer agrees to be bound by and accepts these terms and conditions. (Appellant's record, vol. III, at p. 381)

240     This warning brings the existence of the dispute resolution clause directly to the attention of the reader at the outset, and one has only to scroll down to find clause 13(c), where the arbitration clause is set out to easily access all information needed about the conduct of the arbitration process. For this reason, we would reject the suggestion that the arbitration clause was buried or obscured within the Terms and Conditions of Sale. We adopt the reasoning in *Kanitz v. Rogers Cable Inc.*, at para. 31, regarding a very similar arbitration agreement located in a standard-form contract:

> [The arbitration clause] is displayed just as all of the other clauses of the agreement are displayed. It is not contained within a larger clause dealing with other matters, nor is it in fine print or otherwise tucked away in some obscure place designed to make it discoverable only through dogged determination. The clause is upfront and easily located by anyone who wishes to take the time to scroll through the document for even a cursory review of its contents. The arbitration clause is, therefore, not at all equivalent to the fine print on the back of the rent-a-car contract in the *Tilden* case or on the back of the baseball ticket in the *Blue Jays* case.

241     Lemelin J. concluded that it was significant that the *Code of Civil Procedure* governing the arbitration process could be accessed only through an outside website. However, what is relevant is whether the arbitration agreement itself, and not the *C.C.P.*, was evident and accessible through the Terms and Conditions of Sale.

## V. Disposition

242     For these reasons, we would dismiss the appeal with costs.

**Bastarache J., LeBel J., Fish J.:**

Dissenting.

*Appeal allowed.*

*Pourvoi accueilli.*

**EXHIBIT EN-24**

**TO THE DECLARATION OF EVAN NUTTALL**

2014 ONSC 2073

Ontario Superior Court of Justice

Magill v. Expedia Inc.

2014 CarswellOnt 4207, 2014 ONSC 2073, 239 A.C.W.S. (3d) 362

### Tim Magill, Plaintiff and Expedia, Inc., Defendant

Perell J.

Heard: March 26, 2014
Judgment: April 2, 2014
Docket: CV-09-381919CP

Counsel: Henry Juroviesky, for Plaintiff
Jeffrey S. Leon, Kirsten A. Thoreson, for Defendant

*Perell J.*:

#### A. Introduction

1      In this certified class action under the *Class Proceedings Act, 1992*, S.O. 1992, the Defendant Expedia, Inc. brings a motion for summary judgment.

2      Expedia is a travel company that provides bookings for air travel, rail travel, cruises, car rentals, and hotels. This class action concerns its charges to customers with respect to hotel reservations and custom vacation packages, including hotel reservations. Most particularly, the class action concerns: (1) Expedia's Tax Recovery Charge and (2) Expedia's Service Fees.

3      The Plaintiff, Mr. Magill, was an Expedia, Inc. customer, and he alleges, on behalf of a class of Expedia customers, that Expedia has breached the terms of its contract with its customers who booked hotel reservations using Expedia's online website.

4      In this summary judgment motion, for a variety of reasons associated with contract formation and contract interpretation, Expedia denies that it has breached its contract with Mr. Magill and with the Class Members.

5      For the reasons that follow, I agree that there is no genuine issue requiring a trial and that this class action should be dismissed.

#### B. Factual and Procedural Background

##### 1. Expedia's Contract with its Customers to Use its Website

6      Expedia owns and operates a website, expedia.ca. On the website, Expedia includes a set of terms, conditions and notices that governs its customers' usage of the website, including various statements and representations, which are "Expedia.ca Website Terms, Conditions and Notices."

7      The Website Terms of Use state:

> By accessing or using this Website in any manner, you agree to be bound by the [Website Terms of Use]. Please read the Agreement carefully.

> SERVICES ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND".

8     During the Class Period, the first version of the Terms of Use found on the website, stated:

Expedia.ca Website Terms, Conditions, and Notices

AGREEMENT BETWEEN CUSTOMER AND EXPEDIA, INC.

Welcome to the www.expedia.ca (the "Website"). This Website is provided solely to assist customers in gathering travel information, determining the availability of travel-related goods and services, making legitimate reservations or otherwise transacting business with travel suppliers, and for no other purposes. The terms "we", "us", "our", and "Expedia" refer to Expedia, Inc., a Washington corporation and/or our subsidiaries. The term "you" refers to the customer visiting the Website and/or booking a reservation through us on this Website, or through our customer service agents.

This Website is offered to you conditioned upon your acceptance without modification of all the terms, conditions, and notices set forth below (collectively, the "Agreement"). By accessing or using this Website in any manner, you agree to be bound by the Agreement. Please read the Agreement carefully. If you do not accept all of these terms and conditions, please do not use this Website. Be sure to return to this page periodically to review the most current version of the Agreement. We reserve the right at any time, at our sole discretion, to change or otherwise modify the Agreement without prior notice, and your continued access or use of this Website signifies your acceptance of the updated or modified Agreement.

9     During the Class Period, the second version of the Terms of Use stated:

Expedia.ca Website Terms, Conditions, and Notices

AGREEMENT BETWEEN CUSTOMER AND EXPEDIA, INC.

Welcome to www.expedia.ca (the "Website"). This website is provided solely to assist customers in gathering travel information, determining the availability of travel-related goods and services, making legitimate reservations, or otherwise transacting business with travel supplier, and for no other purpose. The terms "we", "us", "our", and "Expedia" refer to Expedia, Inc., a Washington corporation and/or our subsidiaries. The term "you" refers to the customer visiting the Website and/or booking a reservation through us on this Website, or through our customer service agents.

This website is offered to you conditioned upon your acceptance without modification of all the terms, conditions, and notices set forth below (collectively, the "Agreement"). By accessing or using this Website in any manner, you agree to be bound by the Agreement. Please read the Agreement carefully. If you do not accept all of these terms and conditions, please do not use this Website. Be sure to return to this page periodically to review the most current version of the Agreement. We reserve the right at any time, at our sole discretion, to change or otherwise modify the Agreement without prior notice, and your continued access or use of this Website signifies your acceptance of the updated or modified Agreement.

10    During the Class Period, the third version of the Terms of Use, stated:

Expedia.ca Website Terms, Conditions, and Notices

AGREEMENT BETWEEN CUSTOMER AND EXPEDIA, INC.

Welcome to www.expedia.ca (the "Website"). This Website is provided solely to assist customers in gathering travel information, determining the availability of travel-related goods and services or otherwise transacting business with travel supplies, and for no other purpose. The terms "we", "us", "our", and "Expedia" refer to Expedia, Inc., a Washington corporation and/or our subsidiaries. The term "you" refers to the customer visiting the Website and/or booking a reservation through us on this Website, or through our customer service agents.

This Website is offered to you conditioned upon your acceptance without modification of all the terms, conditions, and notices set forth below (collectively, the "Agreement"). By accessing or using this Website in any manner, you agree to be

bound by the Agreement. Please read the Agreement carefully. If you do not accept all of these terms and conditions, please do not use this Website. Be sure to return to this page periodically to review the most current version of the Agreement. We reserve the right at any time, at our sole discretion, to change or otherwise modify the Agreement without prior notice, and your continued access or use of this Website signifies your acceptance of the updated or modified Agreement.

11     Throughout the Class Period, the various versions of the Terms of Use contained a description or explanation of Expedia's Tax Recovery Charge and its Services Fee.

12     These terms from the Terms of Use that describe or explain Expedia's charges to its customers are the crux of this class action. This class action is fundamentally about the interpretation of the following language always found on the Website's Terms of Use:

> The tax recovery charge on hotel accommodations is a recovery of the estimated transaction taxes (e.g. sales and use, occupancy, room tax, excise tax, value added tax, etc.) that Expedia pays to the hotel supplier in connection with your hotel reservations. ... The actual tax amounts paid by Expedia to the hotel suppliers may vary from the tax recovery charge amounts, depending upon the rates, taxability, etc. in effect at the time of the actual use of the hotel by our customers.

> The service fees compensate Expedia for its costs in servicing your travel reservation. Our service fees vary based on the amount and type of hotel reservation.

13     There is no material or substantive difference between the various versions of the Expedia.ca Website Terms, Conditions and Notices. There is no dispute between the parties that there is a contract for the use of the Expedia website. As will be seen, the dispute is about what Expedia calls its Reservation Contract.

### 2. Expedia's Reservation Contract

14     There is a dispute between the parties about whether the contract formed by the Expedia.ca Website Terms, Conditions and Notices is a separate contract or whether it becomes a part of the contract that is formed if the customer goes beyond just using the website to actually booking a hotel reservation.

15     There is no dispute between the parties that by a customer using the website to actually book a hotel reservation, the customer enters into a contract with Expedia. Expedia describes this contract as a Reservation Contract.

16     Expedia submits that the Reservation Contract is separate and apart from the customer's agreement to be bound by the Website Terms of Use, which is a condition of using the website. It says that the contract to use the website exists whether or not any hotel reservations or other travel services are ever booked.

17     In other words, Expedia submits that to use its website, the customer enters into an agreement about the use of the website governed by the Terms of Use. It submits, however, that the Expedia.ca Website Terms, Conditions and Notices are not part of the Reservation Contract, the contract for booking hotel reservations.

18     Whether the contracts are separate and whether this even matters is something that I have to decide, so for present purposes, I will just describe how the Reservation Contracts come into existence.

19     Expedia submits that the Reservation Contracts are not single written documents, but are rather the electronic contracts formed between Expedia and its customers as part of the booking path on the website, as confirmed by a confirmation email.

20     The customer using the website is provided with information on the website about available hotel accommodation at their travel destination. The customer has many choices as he or she browses the website. In the booking paths for Expedia's services, the customer has the opportunity to review the rates, hotel details, and the rules and restrictions of the hotel before continuing to the checkout webpage provided by the website to enter into the Reservation Contract by making payment and subsequently receiving a confirmation of the booking.

21     In the booking path, after the customer makes a decision about the hotel and duration of his or her stay, the room rate per night in Canadian dollars will be specified as a line item. The Taxes and Service Fees per night in Canadian dollars will be specified. The number of nights is indicated, and the total cost is summarized.

22     In the booking path, the Tax Recovery Charge and Service Fees assessed to the customers are shown as a bundled line item. The two charges are not broken down for the customer. As explained below, for competitive and contractual reasons associated with the travel industry, Expedia intentionally bundles these charges precisely to preserve its travel trade secrets.

23     For details of Taxes and Service Fees, the customer may open a window that provides the following information:

**What are Taxes & Service Fees?**

The taxes are tax recovery charges Expedia pays to its vendors (e.g. hotels). ... For details please see out Terms of Use [hyperlinked]. The service fees cover Expedia's costs in servicing your reservation. ...

24     Customers agree to the Reservation Contracts by entering their credit card details and then transmitting those details to Expedia by clicking the "Complete this booking" button. Immediately above the "Complete this booking" button, the following alert appears:

By completing this booking I agree that I have read and accept the above Rules & Restrictions [as specified by the hotel] the terms of use [hyperlinked] and privacy policy [hyperlinked].

25     While completing the booking process, a customer wanting more information may choose to click on "Terms of Use" hyperlinks to open new windows containing the Website Terms of Use. If the customer accesses the link, he or she will find the following description or explanation of the Tax Recovery Charge and the Service Fees:

The tax recovery charge on hotel accommodations is a recovery of the estimated transaction taxes (e.g. sales and use, occupancy, room tax, excise tax, value added tax, etc.) that Expedia pays to the hotel supplier in connection with your hotel reservations. ... The actual tax amounts paid by Expedia to the hotel suppliers may vary from the tax recovery charge amounts, depending upon the rates, taxability, etc. in effect at the time of the actual use of the hotel by our customers.

The service fees compensate Expedia for its costs in servicing your travel reservation. Our service fees vary based on the amount and type of hotel reservation.

26     Expedia has no way of knowing whether a particular customer actually accessed the Website Terms of Use. Although the booking path specifies that by completing the booking, the customer has agreed to having read and accepted the Website Terms of Use, it is possible for customers to complete bookings and enter into Reservation Contracts without ever actually viewing the Website Terms of Use.

27     The details of the Reservation Contracts (including the room rates, the total price and the combined Tax Recovery Charge and Service Fee) are stated multiple times during the booking paths before customers arrive at the "Complete this booking" stage.

28     Upon completion of the booking, an email is immediately sent to the customer confirming the terms of the Reservation Contracts. The confirmation email states the reservation details, including the room rate per night, the total price and the combined Tax Recovery Charge and Service Fee.

29     The confirmation emails for the Reservation Contracts do not contain any reference to the Website Terms of Use and do not provide any descriptions of the Tax Recovery Charge or Service Fee. Rather, it simply states the amount for the combined charge.

### 3. Expedia's Business Model

30     Expedia's model for doing business with the consumers who are the Class Members of this class action is known as the "merchant model". Under the merchant model, Expedia is the merchant of record, collecting the customer's payments at

4

the time that the hotel room reservation is booked. As described further below, after the customer uses the hotel reservation, Expedia receives an invoice from the hotel and then pays the hotel.

31      As noted above, the customer using the website receives only a partial breakdown of the price charged by Expedia for booking the hotel reservation.

32      The disclosures made in this class action reveal that the price for the reservation actually has four components; namely: (1) the "Net Rate," which is the negotiated confidential rental rate charged by the hotel for the use of the room that will be paid by Expedia to the hotel; (2) the "Markup," an additional amount charged for the room and retained by Expedia; (3) a "Tax Recovery Charge," which is an estimate of the taxes that the hotel will be required to collect and remit on the Net Rate, and which Expedia will pay to the hotel. (The Plaintiff refers to the Tax Recovery Charge as the "Taxes Fee" in the Statement of Claim and in the common issues); and (4) a "Service Fee," an additional amount retained by Expedia and charged to the customer.

33      As described above, the charges for the Tax Recovery Charge and the Service Fee are combined when displayed to customers. The hotel room rate charged to the customer does not break down the Net Rate and the Markup.

34      The disclosures made in this class action reveal that the Tax Recovery Charge is calculated based on the Net Rate negotiated with each individual hotel, which Net Rate is not static, but can vary and change even throughout a single day, and the applicable taxes in the relevant jurisdiction of that hotel accommodation.

35      The Tax Recovery Charge is an estimate of the taxes that the hotel will be required to collect and remit on the Net Rate, though not necessarily equal to the actual taxes that the hotel will be required to collect and remit. The Tax Recovery Charge is an estimate because the charge for taxes is made at the time of booking but the actual tax charge may have changed at the time of the use of the accommodation, which will be in the future.

36      Expedia cannot know with certainty what taxes and tax rates will be applicable in the relevant jurisdictions at the time that the hotel accommodations will be provided and the taxes actually levied. Thus, in any particular case, Expedia may have underestimated or overestimated how much it must remit to the hotel for taxes.

37      The disclosures made in this class action reveal that the Service Fee is meant to cover Expedia's variable costs related to: (a) servicing reservation cancellations and modifications, which Expedia allows without charge, subject to hotel-specific policies; (b) credit card processing, fraud and charge backs from credit card companies; (c) the provision of customer service and call centres; and (d) infrastructure and technology systems, including the maintenance of Expedia's data centres and websites.

38      The disclosures made in this class action reveal that the Service Fee is an estimate because the specific costs of servicing individual reservations remains unknown and would vary depending on future events and factors, including: (a) the times of year the reservations are booked and used; (b) the number of calls that customers make to the call centres, which can vary for a number of reasons, including whether any natural disasters or geo-political events affect or cause the cancellation or modification of the reservations, and (c) what type of credit cards the customers chooses to pay for the reservations with and whether the credit cards are processed successfully, without any instance of fraud.

39      The Service Fees vary based on the amount and type of hotel reservation. Expedia's "types" of hotel reservations include: merchant hotel reservations, agency hotel reservations, stand-alone hotel reservations, and hotel reservations booked as part of a package. The standard industry practice is to vary Service Fees in package bookings from Service Fees in stand-alone bookings.

40      The disclosures made in this class action reveal that the Service Fee is calculated using one of two models, depending on the location of the hotel: (1) the set service fee model or (2) the adjustable service fee model.

41      In the set service fee model, which is most common, the Service Fee is calculated by multiplying a set service fee percentage by the total room rate, which consists of the amount of the room rate that is payable to the hotel and the amount of the room rate retained by Expedia. For a hypothetical example, if the room rate was $100 (with $75 going to the hotel and $25 being retained by Expedia), and the Service Fee was set at 3%, then Expedia would charge $3 in Service Fees (which would

then be combined with the Tax Recovery Charge (say $7.50), for a combined Tax Recovery Charge and Service Fee of $10.50). The total reservation price offered to the customer would be $110.50.

42    In the adjustable service fee model, used primarily for hotels located in Europe, the Service Fee is calculated by multiplying the tax rate percentage supplied by the hotel by the portion of the room rate that is allocated to Expedia. For a hypothetical example, if the room rate is $100 (with $75 allocated to the hotel and $25 allocated to Expedia) and the tax rate for a specific jurisdiction was 10%, then Expedia would charge $2.50 in Service Fees (which would then be combined with the Tax Recovery Charge of $7.50, for a combined Tax Recovery Charge and Service Fee of $10). The total reservation price offered to the customer would be $110.

43    Under the adjustable service fee approach, the Service Fee varies according to the tax percentage rate applicable to each hotel booking. There are thousands of different tax percentage rates that apply to bookings utilizing the adjustable service fee model.

44    Expedia says that it bundles the Tax Recovery Charge and the Service Fee to comply with the confidentiality provisions in the agreements with its suppliers. The bundling prevents Expedia's competitors, the hotels' competitors, and others from reverse-engineering Expedia's Net Rates, which are highly confidential trade secrets. An example of one common form of that confidentiality provision states:

> 13. Confidentiality: Without the express written consent of the disclosing Party, no Party shall disclose or allow the disclosure to any third party, or use other than as specifically permitted in this Agreement, any confidential proprietary or trade secret information of such disclosing Party.

45    After the customer uses the hotel reservation, Expedia receives an invoice for the Net Rate plus taxes from the hotel. Upon being invoiced, Expedia pays the hotel the Net Rate, plus an amount for the actual taxes that the hotel is required to collect and remit. As already noted, in any particular case, Expedia may have underestimated or overestimated the taxes that must be remitted to the hotel.

46    I pause here to note that subject to a non-disclosure order, Expedia provided Mr. Magill and the court with confidential information about its business plan, its revenue and expenses, and its commercial arrangements with suppliers. For the purposes of these Reasons for Decision, there is no need to disclose this confidential information.

### *4. The Class Action*

47    The Representative Plaintiff, Mr. Magill, alleges that Expedia breached its contract with Class Members.

48    Mr. Magill alleges that Expedia breached its contractual obligations by failing to adequately disclose the details of the Tax Recovery Charges and Service Fees. He also alleges that the website falsely described or characterized the nature of the Tax Recovery Charges and Service Fees charged.

49    In his Statement of Claim, Mr. Magill pleads as follows:

> The Plaintiff alleges that the Defendants' contractual definition of "Service Fees" found in its "Terms of Use" were breached by the Defendants by collecting hidden additional profit with the "Service Fees" along with its out-of-pocket costs. ...

> Therefore, pursuant to the Excessive Taxes and Fees Scheme, the Plaintiff pleads that the Defendants have breached their contractual obligations with respect to each and every customer from the inception of the relevant Class Period to the present because: (i) the Defendants collected a Tax Recovery Charge based upon the lower Wholesale Rate and did not represent this practice accurately or clearly to the customer, thus contravening the standard contract with consumers that warrants the nature and amount of the Tax Recovery Charge and (ii) the Defendants did not disclose the amount of taxes actually imposed by the taxing authorities and/or collected by the hotels, or the nature, purpose or amount of the service fee, in contravention of the Defendants standard contract with consumers that warrant composition of the Service Fee as "the costs in servicing your travel reservation."

50     Mr. Magill did not allege, and the action was not certified on the basis of, breaches of implied contractual terms.

51     Mr. Magill's action is based on an alleged breach of the expressed terms of the Terms of Use. The following common issues were certified:

A. Did the Class Members enter into a standard contract with Expedia, Inc.?

(i) What were the terms of said contract?

(ii) Did Expedia, Inc., as a standard billing practice, charge a "Taxes and Service Fee"?

B. Did Expedia, Inc. breach the contract in any of the following ways:

(i) By not disclosing whether the Taxes Fee was charged on the Retail Rate or the Wholesale Rate?

(ii) By charging the Taxes Fee based on the Wholesale Rate?

(iii) By not breaking out the Taxes and Service Fee into its components, that is, the Taxes Fee and the Service Fee?

(iv) By not disclosing and by infusing a profit element into the Service Fee?

**C. Expedia's Argument for a Summary Judgment**

52     Expedia makes four arguments in support of its summary judgment motion. Its ultimate submission is that there are no genuine issues requiring a trial and that the class action should be dismissed.

53     Expedia's first argument is that Mr. Magill's breach of contract claim depends upon a breach of the Terms of Use for the website that describe the Tax Recovery Charge and the Service Fee, but Expedia submits that these terms are not part of the Reservation Contracts pursuant to which the customers agree to pay the Tax Recovery Charge and the Service Fee.

54     Expedia submits that it is not possible to breach non-existing contractual terms and the Reservation Contracts do not include any descriptions, warranties, or terms about the purpose or nature of the Service Fee or the Tax Recovery Charge.

55     Expedia submits that the descriptions of the Tax Recovery Charge and the Service Fee found in the website's Terms of Use have no bearing on the exchange of services for payment agreed to under the Reservation Contracts. Expedia disputes Mr. Magill's contention that the website's Terms of Use are part of the Reservation Contract, and it submits that the Terms of Use are not referred to in the Reservation Contract or in the confirmation emails and that it is possible to make a reservation without actually reading the Terms of Use.

56     Expedia's second argument is that if the website's Terms of Use are part of the Reservation Contract, then the Terms of Use are mere representations and not contractual terms giving rise to a breach of contract claim.

57     Under contract law theory, in the absence of a concurrent promise, an innocent misrepresentation does not support a claim for damages, and, therefore, Expedia submits that the class action should be dismissed. (There is no allegation in the case at bar of negligent or fraudulent misrepresentation, which might support a claim for damages.)

58     Expedia's third argument is that if the website's Terms of Use are contractual terms of the Reservation Contract, then as matter of contract interpretation, it is not a breach of contract: (a) to not disclose whether the Taxes Fee was charged on the Retail Rate or the Wholesale Rate; (b) to charge the Taxes Fee based on the Wholesale Rate; (c) to not break out the Taxes and Service Fee; or (d) to not disclose that that was a profit element in the Service Fee.

59     Expedia submits that the plain words used on the website do not bear the interpretation urged by Mr. Magill and that it would result in a commercial absurdity to accept his interpretation.

60      Expedia submits that the customers contractually agree to the bundling of the Tax Recovery Charge and the Service Fee, which are repeatedly disclosed to the customer before a transaction is completed. Thus, it submits that the customers agree that there need not be a breakdown of the combined charges or details of how the Tax Recovery Charge is calculated. Expedia, therefore, submits that as a matter of contract interpretation, there are no express contractual terms that can be shown to have been breached and the class action should be dismissed.

61      Expedia's fourth argument is that as a matter of contract interpretation the Service Fee discloses that Expedia may include a profit element that does not have to be disclosed. Expedia submits that there were no "hidden" profits as a matter of interpretation because the plain language of the Service Fee description disclosed that additional funds going to Expedia would increase revenue, with the potential to increase profits.

### D. Mr. Magill's Responding Argument

62      Mr. Magill's responding argument is easy to state because, in essence, it is the converse or opposite to the four arguments of Expedia. He argues that the Terms of Use are warranties, not mere representations, and these contract terms are part of the contract between the Class Members and Expedia. Then, he argues that the disclosures made in this class action reveal that Expedia has breached the terms of its contract with the Class Members. Mr. Magill disputes Expedia's arguments about how the contract should be interpreted, and he submits that once the contract is properly interpreted, the disclosures made in this class action reveal that Expedia has breached its contract with the Class Members in several ways.

### E. Discussion and Analysis

#### 1. Introduction to Discussion and The Test for Summary Judgment

63      Although Mr. Magill did not bring a cross-motion for summary judgment, in effect, the motion was argued as if he had brought the motion. Indeed, had his interpretation argument being successful, I would have granted him a summary judgment with damages to be assessed. I make this point because there was no argument that the case at bar is not an appropriate case for a summary judgment.

64      I will not take the time to review the case law, including *Combined Air Mechanical Services Inc. v. Flesch*,[1] the recent decision from the Supreme Court of Canada, about the court's jurisdiction to grant a summary judgment, but I rather simply note that the evidentiary record before the court was more than adequate to decide whether there are any genuine issues for a trial.

65      There were no contentious factual issues and nothing that would require a trial in order to arrive at a determination of the contentious issues of law or of mixed fact and law. This motion for summary judgment can be determined by analyzing the merits of the competing arguments of the parties based on the evidentiary record now before the court.

#### 2. Did Expedia Breach its Contract with the Class Members?

66      This class action involves rudimentary principles of contract law. Contracts are composed of different types of statements. The major statements in a contract are: (1) pure representations, statements of fact about some matter relating to the contract made without promissory intent (made without an *animus contrahendi*) and enforced by the law with respect to misrepresentations (innocent, negligent, or fraudulent);[2] (2) conditions precedent, which must be satisfied to engage the parties' performance obligations;[3] (3) promises (warranties, intermediate terms, conditions), which are the performance obligations or undertakings of the parties and not mere representations and which are enforced by claims for damages and, for some contracts, by claims for specific performance;[4] (4) hybrid terms, which are both representations and promises, and for which the law imposes concurrent liability for misrepresentation and for breach of contract;[5] (5) time of the essence provisions;[6] (6) entire agreement clauses and interpretative directives; and (7) disclaimers and exculpatory provisions.[7]

67     There are also sometimes implied terms, but the case at bar involves only the express terms of the contract between the Class Members and Expedia. This class action ultimately comes down to the court classifying and interpreting the language in Expedia's Terms of Use for the website and the language that appears during the process of booking a hotel reservation on Expedia's website.

68     The contract language that is essential to this class action is as follows:

The tax recovery charge on hotel accommodations is a recovery of the estimated transaction taxes (e.g. sales and use, occupancy, room tax, excise tax, value added tax, etc.) that Expedia pays to the hotel supplier in connection with your hotel reservations. ... The actual tax amounts paid by Expedia to the hotel suppliers may vary from the tax recovery charge amounts, depending upon the rates, taxability, etc. in effect at the time of the actual use of the hotel by our customers.

The service fees compensate Expedia for its costs in servicing your travel reservation. Our service fees vary based on the amount and type of hotel reservation.

| | | |
|---|---|---|
| Room rate | C$xxx.xx per night | |
| Taxes & Service Fees | C$yyy.yy per night | What are Taxes & Service Fees? The taxes are tax recovery charges Expedia pays to its vendors (e.g. hotels). ... For details please see out Terms of Use [hyperlinked]. The service fees cover Expedia's costs in servicing your reservation. ... |
| Total room cost | C$zzz.zz | |

69     Expedia's first argument is that the language from the Terms of Use that explain the Tax Recovery Charge and the Service Fees do not part of the contract, the Reservation Contract, in which Expedia actually charges for "Taxes & Service Fees."

70     Expedia submits that the words from the Terms of Use are part of another contract; i.e. the contract that governs the use of its website.

71     With respect, Expedia's first argument makes no sense. Taxes & Service Fees are what Expedia charges as part of making hotel reservations and the question and answer language explaining what are those charges is an obvious part of the contract that makes those hotel reservations. Equally, the Terms of Use that are referred to in the Question and Answer are an obvious part of the Reservation Contract.

72     I agree that the Terms of Use, standing alone, are a separate or discrete contract. The Terms of Use standing alone provide a contract for customers who use the website but who do not go on to make a hotel reservation. However, the Terms of Use in that separate contract become terms of the Reservation Contract for those customers that so make a Reservation Contract.

73     I conclude that the following words are terms of a contract between Class Members and Expedia:

The tax recovery charge on hotel accommodations is a recovery of the estimated transaction taxes (e.g. sales and use, occupancy, room tax, excise tax, value added tax, etc.) that Expedia pays to the hotel supplier in connection with your hotel reservations. ... The actual tax amounts paid by Expedia to the hotel suppliers may vary from the tax recovery charge amounts, depending upon the rates, taxability, etc. in effect at the time of the actual use of the hotel by our customers.

The service fees compensate Expedia for its costs in servicing your travel reservation. Our service fees vary based on the amount and type of hotel reservation.

74     I pause here to note that this conclusion answers the first common issue that was certified for this class action.

75      I pause here to also note that in his factum, Mr. Magill argued that because of the position that Expedia took during a refusals motion, it was precluded from bringing a summary judgment motion beyond resolving what are the terms of the contract between Class Members and Expedia. This argument is without merit, and, in any event, it was not raised during the hearing of the summary judgment motion, where Mr. Magill argued the summary judgment motion on its merits.

76      I pause here also to note that I can also answer the second common issue question, which is: Did Expedia, Inc., as a standard billing practice, charge a "Taxes and Service Fee"?" The answer to that question is obviously, "yes".

77      Moving on in the analysis, standing alone, i.e. before becoming part of the Reservation Contract, some of the provisions of the Terms of Use contract might be classified as mere representations; i.e. not of contractual weight, and other terms of the Terms of the Use might be classified as promises. For present purposes, I do not need to classify the Terms of Use as they would be classified for the discrete contract governing the use of Expedia's website.

78      Rather, to address Expedia's second argument on this summary judgment motion, what I need to do is determine whether the Terms of Use that have become part of the Reservation Contract are a mere representation (i.e. without contractual weight) or whether they have contractual weight as promises.

79      As noted above, Expedia's second argument is that the following words in the Reservation Contract are mere representations:

>       The tax recovery charge on hotel accommodations is a recovery of the estimated transaction taxes (e.g. sales and use, occupancy, room tax, excise tax, value added tax, etc.) that Expedia pays to the hotel supplier in connection with your hotel reservations. ... The actual tax amounts paid by Expedia to the hotel suppliers may vary from the tax recovery charge amounts, depending upon the rates, taxability, etc. in effect at the time of the actual use of the hotel by our customers.

>       The service fees compensate Expedia for its costs in servicing your travel reservation. Our service fees vary based on the amount and type of hotel reservation.

80      The motive for Expedia's second argument is, as also noted above, that there is no breach of contract for term classified as a mere representation.

81      Whether a statement in a contract is: (1) a mere representation, enforced by the law of misrepresentations (innocent, negligent, fraudulent); (2) a promise (warranty, intermediate term, or condition) enforced by a claim for breach of contract; or (3) a hybrid statement that is both a representation and promise, and enforced by the law of contract interpretation is a matter of contract interpretation.

82      Representations are regarded as having lesser legal weight than promises and thus the underlying question is that of determining whether the parties had the intent of making the Terms of Use a statement binding as a promise or whether they intended a mere representation.

83      In my opinion, the words of the Terms of Use have contractual weight once they become part of the Reservation Contract. The classification and use of the Terms of Use as representations (even if that is what they were in the contract between the customer and Expedia to use the website) makes no practical sense or utility in the context of the Reservation Contract. Thus, Expedia's second argument fails.

84      The failure of Expedia's first and second arguments brings the analysis to the heart of Mr. Magill's class action and to the serious part of Expedia's summary judgment motion, which are its third and fourth arguments.

85      The failure of the first two arguments also brings the analysis to the remaining common issues which ask the question of whether Expedia breached the terms of its contract with the Class Members.

86    The questions upon which this class action are based turn on the language of the Terms of Use. More precisely, did Expedia breach the Reservation Contract by: (1) not disclosing whether the Taxes Fee was charged on the Retail Rate or the Wholesale Rate? (2) charging the Taxes Fee based on the Wholesale Rate? (3) not breaking out the Taxes and Service Fee into its components; or (4) not disclosing and by infusing a profit element into the Service Fee? The answer to all these questions are matters of contract interpretation.

87    For present purposes, it is necessary only to mention the most fundamental principles of contract interpretation. The rules of contract interpretation direct a court to search for an interpretation from the whole of the contract that advances the intent of the parties at the time they signed the agreement. [8]  In searching for the intent of the parties, the court should give particular consideration to the terms used by the parties, the context in which they are used, and the purpose sought by the parties in using those terms. [9]  The words of a contract must be interpreted in context. Although, with a few exceptions for situations of ambiguity, evidence of negotiations and of the parties' subjective intent is not admissible, in interpreting a commercial contract, the court should have regard to the surrounding circumstances; that is, the factual background and the commercial purpose of the contract. [10]  Provisions should not be read in isolation but in harmony with the agreement as a whole. [11]  The various clauses must be given an interpretation that takes the entire agreement into account. [12]

88    In my opinion, as a matter of contract interpretation the answer to all of the four questions set out above is "no". The answer is that there is no breach of contract. I agree with Expedia's third and fourth arguments that the words of the Reservation Contract upon which Mr. Magill's action is based do not have the meanings attributed to them.

89    The most straightforward explanation for why I agree with Expedia's third and fourth arguments is that there is no words in the Reservation Contract expressing a promise by Expedia: (1) to disclose that the tax fee is charged on the Retail Rate or Wholesale Rate; (2) to charge the tax fee of the Wholesale Rate; (3) to disclose the tax charge and the service charge separately; and (4) to not include a profit element in the services charge.

90    As a matter of contract interpretation, the promises alleged by Mr. Magill are never expressed, and they cannot be conjured up by some backwards aspirational twisting of the words that are expressed in the Reservation Contract.

91    What Expedia does express in the Reservation Contract is that its charge for taxes is a recovery of what Expedia pays to the hotels. The disclosures made in this class action reveal that that statement is true.

92    Because of the disclosures made in this class action, it is now known that Expedia's charging methodology is designed to estimate what Expedia must remit to reimburse the hotel as the tax collector. The disclosures made in this class action reveal that the recovery is an estimate and sometimes Expedia shortchanges itself and sometimes it over-estimates what it must eventually pay the particular hotel.

93    The interpretative fact, however, is that there is no promise made to the customer about whether the recovery made by the Tax Charge is calculated on the Net Rate or the Wholesale Rate. There is no promise to be found in the Reservation Contract to disclose the charging methodology. There is no promise to be found in the Reservation Contract to charge based on any particular rate.

94    Further, there is no promise to be found that precludes a profit element in the Services Fee and there is no promise to break out the charge for taxes from the Services Fee.

95    The disclosure made in this class action reveal that Expedia has a business reason for bundling the charge for taxes and the service charges, but that disclosure does not change the reality that there is no express language in the Terms of Use where Expedia promises to unbundle the charges. The disclosures made in the Class action provide an explanation why Expedia would not make a promise not to unbundle the charges but do not change the interpretative fact that Expedia did not make that promise.

96     The best interpretive argument that Mr. Magill can conjure up - and in my opinion it is not a viable argument - is that the following words from the Terms of Use preclude any profit in the Services Fee:

The service fees compensate Expedia for its costs in servicing your travel reservation.

97     Apart from the fact that it very unlikely that a customer who knows the amount of the bundled charge and who is prepared to pay it would begrudge Expedia from making a profit from its Service Fee (or feel any sympathy for Expedia if it experienced a loss), in covering costs, the contractual language of the Reservation Contract does not preclude a profit element. In a commercial context, the word "compensate" can include a profit element.

98     Further, the sentence from the Terms of Use: "The service fees compensate Expedia for its costs in servicing your travel reservation" must also be read in the context of the description and explanation that is expressed to the customer as part of the path to a booking on the website which states: "The service fees cover Expedia's costs in servicing your reservation." Covering Expedia's costs in servicing in servicing the particular customer's reservation does not preclude charging more than what is necessary to cover those costs.

99     Mr. Magill would interpret the Reservation Contract as if it said:

The service fees compensate Expedia <u>without any profit</u> for its costs in servicing your travel reservation. The service fees <u>are restricted to covering</u> Expedia's costs in servicing your reservation.

In my opinion, that is not the correct interpretation of the meaning of the words that appear in the Reservation Contract.

100    Mr. Magill argues against Expedia's interpretation of the meaning of the words of the Reservation Contract by submitting that Expedia's interpretation fails for not giving meaning to the words "its costs in." In other words, he submits that Expedia is reading the contract as stating: "The service fees compensate Expedia for servicing your travel reservation" without the qualification that the compensation is limited to costs without a profit element.

101     In my opinion, this counterargument does not succeed. I agree that if the contract simply stated that the service fees compensate Expedia for servicing your travel reservation, Expedia could charge a profit element, but I do not agree that adding the words "its costs in" creates a promise that Expedia cannot include a profit element in its Services Fee.

102     As a matter of clarity, I should point out that Expedia does not concede that it actually makes a profit in covering its costs in servicing the reservations. If this class action were to go forward based on an interpretation of the Reservation Contract that precluded any profit element in the Services Fee (which is not my interpretation), Expedia would argue that at best it broke even in covering its costs and may on an individual contract basis or in the aggregate have lost money in servicing the customer's reservation.

**F. Conclusion**

103     For the above reasons, I grant Expedia's motion for summary judgment and I dismiss Mr. Magill's class action.

104     If the parties cannot agree about the matter of costs, they may make submissions in writing beginning with Expedia's submissions within 20 days of the release of these Reasons for Decision, followed by Mr. Magill's submissions within a further 20 days.

105     With respect to costs, my tentative view is that Expedia should be awarded its costs of the summary judgment motion and for the action on a partial indemnity basis, but that these costs should be temperate.

106     This tentative view is based on the circumstance that the adverse costs consequences of class proceedings have spiraled out of control and threaten the access to justice goals of the legislation, particularly in the context of consumer claims, and because Expedia might have avoided this class action if having decided to explain why it charged for taxes and for a service fee,

it had gone on to be modestly more fulsome in its explanation. In the context of the court's discretion to award costs, this is not to say that Expedia did anything wrong or deserves to be taught a lesson, rather it is to say that based on the circumstances of this particular class action where the lack of merit of Mr. Magill's claim only became much clearer after the action was commenced, I have the tentative view that Expedia's claim for costs should be temperate.

*Motion granted.*

Footnotes

1   2014 SCC 7 (S.C.C.).

2   *Heilbut, Symons & Co. v. Buckleton* (1912), [1913] A.C. 30 (U.K. H.L.); *Kaufmann v. Gibson*, [2007] O.J. No. 2711 (Ont. S.C.J.); *Alevizos v. Nirula*, 2003 MBCA 148 (Man. C.A.).

3   *Zhilka v. Turney*, [1959] S.C.R. 578 (S.C.C.); *Barnett v. Harrison* (1975), [1976] 2 S.C.R. 531 (S.C.C.); *Dynamic Transport Ltd. v. O.K. Detailing Ltd.* ((1978), 85 D.L.R. (3d) 19 (S.C.C.)).

4   *Jorian Properties Ltd. v. Zellenrath* (1984), 46 O.R. (2d) 775 (Ont. C.A.); *Fraser-Reid v. Droumtsekas* (1979), 103 D.L.R. (3d) 385 (S.C.C.); *Southcott Estates Inc. v. Toronto Catholic District School Board*, 2012 SCC 51 (S.C.C.).

5   *Esso Petroleum Co. v. Mardon*, [1976] 1 Q.B. 801 (Eng. C.A.).

6   *Domicile Developments Inc. v. MacTavish* (1999), 45 O.R. (3d) 302 (Ont. C.A.).

7   *Tercon Contractors Ltd. v. British Columbia (Minister of Transportation & Highways)*, [2010] 1 S.C.R. 69 (S.C.C.).

8   *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.).

9   *Métropolitaine, cie d'assurance-vie c. Frenette*, [1992] 1 S.C.R. 647 (S.C.C.).

10   *Prenn v. Simmonds*, [1971] 3 All E.R. 237 (U.K. H.L.); *Reardon Smith Line v. Hansen-Tangen*, [1976] 3 All E.R. 570 (U.K. H.L.); *Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250 (Ont. C.A.).

11   *McClelland & Stewart Ltd. v. Mutual Life Assurance Co.*, [1981] 2 S.C.R. 6 (S.C.C.); *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57 (S.C.C.); *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.).

12   *Canadian Newspapers Co. v. Kansa General Insurance Co.* (1996), 30 O.R. (3d) 257 (Ont. C.A.) at p. 270, leave to appeal refd. (1997), [1996] S.C.C.A. No. 553 (S.C.C.); *Van Ginkel v. QGX Ltd.*, [2009] O.J. No. 6204 (Ont. S.C.J.) at para. 30.

**EXHIBIT EN-25**

**TO THE DECLARATION OF EVAN NUTTALL**

2009 CarswellOnt 4500

Ontario Superior Court of Justice

Pacific Express Travel Ltd. v. Expedia Canada Corp.

2009 CarswellOnt 4500, 179 A.C.W.S. (3d) 419

# Pacific Express Travel Ltd. (Plaintiff) and Expedia Canada Corp. and Expedia, Inc. (Defendants)

Herman J.

Heard: June 23, 2009
Judgment: July 24, 2009
Docket: CV-09-378692

Counsel: Garth Low for Applicant
Derek Ronde for Respondent

*Herman J.*:

1    Pacific Express is in the travel business. It booked more than 500 flights to China on behalf of customers on the Expedia web-site. Expedia has threatened to cancel these tickets. Pacific Express seeks an injunction to prevent the cancellations.

2    At the same time, Expedia seeks to enjoin Pacific Express from using its web-site to book tickets. Pacific Express concedes that it improperly used the site for commercial purposes and consents to the injunction.

**Background**

3    Pacific Express has been in operation since 2002 as a retail travel business. It is not, however, an accredited travel agency with the International Air Transport Association (IATA). This means that while it is able to book airline tickets, it cannot issue airline tickets. It has to go through an IATA-approved travel agency to obtain the actual tickets.

4    Mr. Zhong Zhang is the sole director and officer of Pacific. He has worked in the travel industry in China and Canada since 1992.

5    Expedia Inc. is a corporation incorporated under the laws of Washington State. It books airline tickets, hotel reservations, car rentals, cruises and various other vacation products via the World Wide Web and telephone travel agents.

6    Expedia has localized sites for various countries, including Canada. It carries on business in Canada in conjunction with Expedia Canada Corp., a wholly owned subsidiary. It does so through its website: Expedia.ca. The distinction between Expedia Inc. and Expedia Canada Corp. is not material for the purpose of this motion.

7    Expedia is also not an accredited travel agency. It uses the services of Tour East Holidays (Canada) Inc., a travel agency, to issue airline tickets.

8    In December 2008, Pacific Express started to book flights for customers on Expedia. Mr. Zhang says he did so because he found out he could get advantageous ticket prices.

9    Pacific Express booked over 500 tickets for its customers on Expedia. It used six different e-mail addresses.

10    In most cases, Pacific Express booked round-trip flights from Toronto to Beijing or Shanghai, China and then a third flight from Miami to San Juan, Puerto Rico or from Miami to Nassau scheduled several weeks or months after the return from

China. As a result of booking the further leg of travel beyond the return trip, the fuel surcharge was avoided and the ticket was therefore less expensive. The further leg of travel was not intended to be used. This practice is called "point beyond" or "throw-away" ticketing.

11    On or about December 21, 2008, Expedia's travel agency, Tour East, received an agency debit memo from Air Canada. Air Canada sought repayment of the fuel surcharge for one of the tickets that Pacific Express had booked. Expedia claims that the issue reached "relevant personnel" at Expedia in March 2009. Expedia conducted an investigation and discovered that Pacific Express had made hundreds of reservations using point beyond ticketing.

12    On April 8, 2009, Ms. Boraas-Carder, corporate counsel for Expedia, wrote to Mr. Zhang at Pacific Express alleging that Pacific Express had engaged in a pattern of fraudulent booking activity, that is, point beyond ticketing, with respect to at least 525 tickets. Ms. Boraas-Carder indicated that Expedia had received $1,440 worth of debit memos and anticipated being charged at least an additional $189,000 for illegitimate reservations made by Pacific Express. She alleged that Pacific Express had breached the terms and conditions of the Expedia.ca website. Expedia directed Mr. Zhang to immediately cease and desist from making further throw-away ticketing reservations, cancel and legitimately rebook all outstanding reservations and reimburse Expedia for the debit memos. Finally, Ms. Boraas-Carder advised Mr. Zhang to contact her by April 10 to confirm his agreement with the terms, failing which Expedia would cancel all pending false bookings without notice to him or his clients.

13    Mr. Zhang spoke to Ms. Boraas-Carder on April 13. Ms. Boraas-Carder sent a followup e-mail on April 22, 2009. Expedia had investigated Mr. Zhang's suggestion of cancelling only the final leg of the bookings but was of the opinion that the only way to avoid the debit memos was to cancel the bookings in their entirety. Expedia indicated that it would consider not cancelling the bookings if Pacific Express put sufficient money in escrow or provided a letter of credit or other guarantee to cover the expected debit memos.

14    Pacific Express did not respond to the April 22 e-mail. Ms. Boraas-Carder followed up by e-mail on May 4 indicating that Expedia would be taking action in the next couple of days and inviting Mr. Zhang to contact her. Pacific Express did not respond.

15    On May 7, Ms. Boraas-Carder sent Mr. Zhang another e-mail advising him that Expedia had reviewed all the possible options and had no choice but to cancel all outstanding trips. Ms. Boraas-Carder attached a list of 161 bookings which would be cancelled the next day. She asked Mr. Zhang to contact her if he wanted to discuss rebooking them.

16    Mr. Zhang and Ms. Boraas-Carder communicated with each other over the next few days but were unable to resolve the outstanding issues.

17    On May 11, 2009, Ms. Boraas-Carder sent Mr. Zhang an e-mail notifying him that twenty-one reservations had been cancelled. None of these flights had yet left Toronto and there was therefore sufficient time for them to be rebooked.

18    Pacific Express rebooked the twenty-one tickets on Air Canada, again using point beyond ticketing.

19    About 300 of the more than 500 flights that Pacific Express booked had returned from China by June 24, 2009, that is, when this motion was heard.

20    The parties now have a "standstill" agreement. Expedia will not cancel any further tickets pending the release of the decision on this motion. Pacific Express has agreed not to book any further tickets using Expedia's web-site.

**Commercial Use of Expedia.ca**

21    Mr. Zhang acknowledges that he improperly used the Expedia.ca website for commercial use. He says that he did not read every sentence in the membership agreement when he initially opened his account with the website.

22    Pacific Express agrees not to use the Expedia.ca website again and consents to the injunction that Expedia seeks.

**Point Beyond or Throw-away Ticketing**

23   Point beyond or throw-away ticketing occurs when a customer purchases an additional flight that the customer does not intend to use.

24   A typical trip that Pacific Express booked looks like this:

| Flight | From | To |
|--------|------|-----|
| AC031 | Toronto— Sat 11-Jul 2009 | Beijing— Sun 12 -Jul 2009 |
| AC032 | Beijing— Sun 02-Aug 2009 | Toronto— Sun 02-Aug 2009 |
| AA869 | Miami— Wed 11-Nov 2009 | San Juan, Puerto Rico Wed 11-Nov 2009 |

25   There was no intention that the Miami-San Juan ticket would be used.

26   Point beyond or throw-away ticketing is prohibited by the airlines. In this case, the reason for the prohibition is that Air Canada generally imposes a fuel surcharge on its Toronto/Beijing return flights due to the cost of fuel over such a long distance. The fuel surcharge was approximately $360 per ticket. The additional leg of travel from Miami to San Juan caused the surcharge to be removed. As a result, the ticket with the additional leg of travel was less expensive than the return Toronto/ Beijing ticket would have been without the additional leg.

27   IATA also has a resolution that forbids point beyond ticketing. It defines it as "the practice of selling a ticket with a fictitious point of origin or destination in order to undercut the applicable fare". An IATA travel agency may lose its licence if it engages in the practice.

28   Mr. Zhang claims that he was not aware that this practice was prohibited. He submits that Tour East is responsible for what occurred, since it is the travel agency that issued the tickets.

29   The prohibition of point beyond ticketing is not apparent on Expedia's web-site. A customer would find out about the prohibition in the following way. On the page with flight details, there is a section called "Flight rules and restrictions". In this section, there is a hyperlink to "airline liability limitations". This hyperlink leads the customer to the Warsaw Convention. Section 3 of the Warsaw Convention provides that flights are subject to the "applicable tariffs and the carrier's conditions of carriage and related regulations". The Tariff of Air Canada, the carrier in this case, includes a prohibition against point beyond ticketing.

30   The page with flight details also has a hyperlink to "Fare rules and restrictions". That page indicates that Expedia.ca must abide by the rules and restrictions imposed by the airlines.

31   Expedia submits that, by booking a ticket on Expedia.ca, Mr. Zhang was bound by its terms and conditions and the terms and conditions of the airline, that is, Air Canada.

32   Expedia does not accept Mr. Zhang's claim that he was not aware that point beyond ticketing was prohibited. Mr. Zhang has been in the travel business for many years. There was some evidence that suggested he might been made aware of the prohibition when he made bookings with another travel agency. Mr. Zhang challenges this evidence.

33   Regardless of whether Mr. Zhang knew that the practice was prohibited, it is my opinion that it is something he ought to have been aware of. His customers relied on his expertise in the travel business and relied on him to make legitimate flight bookings.

34   Expedia claims that it has no means to prevent such ticketing. It relies on its website's Terms of Use. According to Expedia, neither it nor its travel agency has any way of monitoring or detecting point beyond ticketing. Everything is done electronically. Expedia provides its customers with the option to book multi-leg flight reservations for legitimate trips. It does not find out that a customer did not take the additional leg of the trip unless the airline reports it to Expedia.

35    However, there is no evidence to suggest that Expedia's travel agency is relieved of the prohibition against point beyond ticketing on the basis that the bookings are done electronically.

**Should an injunction be granted?**

36    Pacific Express asks the court to enjoin Expedia from cancelling the travel bookings it made through Expedia.ca. Of the approximately 540 bookings Expedia made, there were about 250 flights that remained to be completed at the date this motion was argued. The flights had either not yet left Toronto or had not yet returned from China.

37    In order to obtain an injunction, Pacific Express must demonstrate that:

  (i) there is a serious question to be tried;

  (ii) it will suffer irreparable harm if an injunction is not granted; and

  (iii) the balance of convenience favours granting the injunction (*RJR-MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311 (S.C.C.), p. 334)

38    In addition, Pacific Express must provide an undertaking as to damages.

*Serious question to be tried*

39    The threshold to establish a serious question to be tried is generally a low one (*RJR-MacDonald Inc. v. Canada (Attorney General)*). In my opinion, the low threshold applies in this case.

40    Pacific Express's main arguments are that it was not aware it was doing anything wrong and that it was Expedia's travel agency, Tour East, that was in breach of the prohibition against point beyond ticketing.

41    Even if I were to accept Pacific Express's contention that it did not know that what it was doing was prohibited, it is my opinion that Pacific Express at the very least ought to have known that the practice was prohibited. In carrying on a travel business, it implicitly held out to its customers that it knew what it was doing and would not book illegitimate tickets.

42    Nonetheless, there is an argument that Expedia, through its travel agent, Tour East, was complicit in that it issued the tickets. I was not referred to any IATA rule that relieves an accredited travel agency of its obligations on the basis that the ticket is issued electronically.

*Irreparable harm to Pacific Express*

43    Pacific Express submits that it would suffer irreparable harm to its reputation should an injunction not be granted.

44    While Pacific Express may indeed suffer irreparable harm to its reputation, I have some difficulty giving significant weight to this for the following reasons. Firstly, any harm to reputation stems from Pacific Express's actions in booking tickets illegitimately. Secondly, Pacific Express was given the opportunity to rebook the tickets and thereby avoid the possibility of Expedia taking unilateral action as well as prevent harm to its reputation, but chose not to do so.

45    There is no evidence that Pacific Express could not rebook the tickets. It is accepted that the rebooked tickets may cost considerably more than the existing tickets. However, this does not constitute irreparable harm.

46    There is a concern that Pacific Express might have difficulty locating some of its customers who are already in China and advising them of the changed tickets. The evidence is that, as of June 24, 2009, over 300 of the flights will have returned from China and 44 flights will not have left Toronto yet. That leaves around 200 people who had left for China and had not yet returned.

4

*Balance of Convenience*

47      The inconvenience to both parties is monetary. Pacific Express could rebook the tickets and then sue Expedia, if it is of the view that Expedia is responsible for all or part of the loss. If it rebooked the tickets, its loss would be purely monetary, not reputational.

48      Similarly, Expedia could honour the tickets and sue for reimbursement for any debit memos it received from Air Canada. The letter from Expedia's counsel indicated that Expedia had received a request to reimburse $1,440. The only evidence it provided was a debit memo for one passenger totaling $360. Expedia says, however, that its cancellation of tickets would be mitigation of future damages, that is, future claims from Air Canada to reimburse it for the fuel surcharge. While Expedia claims that it stands to lose more than $180,000 (at $360 per ticket), this calculation is based on Air Canada claiming a fuel surcharge for all of the tickets. The amount may be substantially less.

49      Furthermore, while Expedia claims that it has no way of monitoring tickets to ascertain whether point beyond ticketing has occurred, it is nonetheless the case that its ticket agency is bound by the IATA rules that prohibit the practice.

50      Much of the problem might have been avoided or, at least, lessened had Expedia moved more quickly once it or its travel agent found out about the problem. Air Canada sent the debit memo in December 2008 but Expedia did not contact Pacific Express until April 2009. Expedia also could have made the prohibition more apparent on its web-site.

51      At the same time, Pacific Express did not act in a way so as to minimize harm to its customers once it was alerted to the problem.

52      In my opinion, the balance of convenience favours neither party. Unfortunately, the real harm that will be suffered if the tickets are cancelled will be the approximately 200 people who are now in China and believe that they have valid return flights to Toronto. If the tickets are cancelled, a number of them may show up at the airport for their return flight and find out that they do not have a return ticket. If they are able to book a return flight, it could well cost considerably more than the additional $360 fuel surcharge.

*Undertaking as to Damages*

53      Mr. Zhang provided an undertaking as to damages in his affidavit. However, Expedia questions the validity of that undertaking.

54      Pacific Express's financial statements for 2008 show net income after taxes of $36,529 and assets of $7,623.

*Clean Hands*

55      An injunction is an equitable remedy. It is often said that one "who comes in equity must come with clean hands". However, as Mr. Justice Sharpe notes in his text, *Injunctions and Specific Performance*, looseleaf (Aurora, Ont.: Canada Law Book, 2008), a plaintiff will only be denied a remedy on this basis if the absence of clean hands bears directly on the relief being sought.

56      Pacific Express engaged in two unauthorized practices. Even if I were to accept that Mr. Zhang was not aware that point beyond ticketing was prohibited when he booked the flights on Expedia.ca, that was not the case when he rebooked the twenty-one tickets that Expedia cancelled, again using point beyond ticketing.

57      In my opinion, the actions of Pacific Express relate to the relief it is seeking and are therefore a legitimate factor to take into consideration.

*Harm to Others*

58     It is arguably the customers, not Pacific Express or Expedia, who stand to lose the most, particularly the approximately 200 customers who are now in China and believe they have return tickets to Toronto. If their tickets are cancelled, they may find themselves paying substantially more than $360 to rebook their tickets.

59     Some of the harm to the customers may have been eliminated or at least reduced had Expedia moved more quickly once it found out about the problem. Similarly, that harm might have been reduced had Pacific Express responded when it received notice and immediately taken steps to rebook the tickets.

60     The customers are not parties to these proceedings. I have no evidence as to what the harm to them might be. They have not been notified of this proceeding nor have they been notified that there is any problem with their tickets. Am I able to grant an injunction to prevent harm to non- parties?

61     Expedia submits that the injunction test, in particular, the "irreparable harm" portion of that test, applies only to the parties. It pointed to two cases: *Morgentaler v. Ackroyd* (1983), 42 O.R. (2d) 659 (Ont. H.C.) at 666 and *Monsanto Canada Inc. v. Novopharm Ltd.* (1996), 72 C.P.R. (3d) 40 (Fed. T.D.).

62     In *Morgentaler*, the applicants opened a clinic offering abortion services contrary to s. 251 of the *Criminal Code*. They commenced an application claiming a declaration that s. 251 was unconstitutional. They sought an interim injunction to restrain the police from shutting down the clinic pending the determination of the constitutionality of the provision.

63     The applicants' main argument was the irreparable harm to potential women patients who would be unable to secure abortions if the clinic were shut down. Linden J. concluded that the irreparable harm arm of the test had not been met:

> Even if it were established that *these women* would suffer irreparable harm, such evidence would not indicate any irreparable harm to *these applicants*, which would warrant this court issuing an injunction at their behest.

64     In *Monsanto*, the plaintiff sought an interlocutory injunction to restrain the defendant from marketing a generic version of one of the plaintiff's drugs. In that case, one of the plaintiff's arguments was that a loss would be suffered by another party, which loss would be transferred to the plaintiff. The court referred to the decision in *Eli Lilly & Co. v. Novopharm Ltd.* (1996), 69 C.P.R. (3d) 455 (Fed. C.A.), in which Décary J.A. stated:

> It is trite law in our Court that a plaintiff seeking an interlocutory injunction must establish with clear evidence that *it*, as opposed to another person or party, will suffer irreparable harm.

65     Pacific Express pointed to the case of *Ontario (Attorney General) v. Harry* (1979), 22 O.R. (2d) 321 (Ont. H.C.), in which the court granted an interlocutory injunction to the Attorney General to restrain the defendants from conveying their interests in land until trial. While the court considered the impact on the public, it did so on the basis that the Attorney General brought the action as guardian of the public interest.

66     While Pacific Express does not claim to be the guardian of the public interest, it submits that it is acting as agent for the customers in seeking an injunction. However, Pacific Express did not plead agency. In fact, in its statement of claim, it makes no reference to the potential harm to customers but only claims harm to Pacific Express. Furthermore, Pacific Express did not provide any evidence that would enable me to conclude that there is an agency relationship. The most that can be said is that Pacific Express and its customers share an interest in the tickets not being cancelled.

67     At the same time, the relationship and obligations between Expedia and the customers is unclear.

68     In the case of *Canadian Broadcasting Corp. v. CKPG Television Ltd.* (1992), 64 B.C.L.R. (2d) 96 (B.C. C.A.), cited in *Kosub v. Cultus Lake Park Board*, [2007] B.C.W.L.D. 2075 (B.C. C.A.) [2007 CarswellBC 485 (B.C. C.A.)], the British Columbia Court of Appeal set out a list of factors that may be considered in assessing balance of convenience. One of those factors was "any factors affecting the public interest". However, this case does not stand for the proposition that, in the absence of irreparable harm to the plaintiff, the court can grant an injunction solely on the basis of harm to non-parties.

69     I would suggest that both Pacific Express and Expedia would be well advised to take steps to avoid or minimize the potential harm to the customers, particularly those who may find themselves without a return ticket through no fault of their own. These customers have not received notice of these proceedings and are not, to my knowledge, aware of the problem with their tickets. Either or both of Pacific Express and Expedia stand to be exposed to a far greater liability than the $360 fuel surcharge should the tickets be cancelled.

70     Each of the parties seeks to affect the interests of non-parties without having given them the benefit of notice. In my opinion, the customers should, at the very least, receive notice and the opportunity to remedy the situation.

**Conclusion**

71     Pacific Express has not established that it would suffer irreparable harm if the injunction is not granted. Any harm to its reputation would be as a result of its own actions and could have been avoided.

72     Pacific Express knew or ought to have known that the practice of point beyond ticketing was prohibited. Pacific Express was clearly aware that the practice was prohibited when it rebooked the cancelled tickets and, once again, used point beyond ticketing.

73     The potential loss to both Pacific Express and Expedia is monetary. The most significant harm may well be to the customers, particularly those who are currently in China. They have not received notice of these proceedings nor are they aware that there is a problem with their tickets.

74     Neither party has acted in a way that was responsive to the needs of the customers.

75     Pacific Express's request for an injunction is denied. However, before cancelling a ticket, Expedia must give adequate and timely notice to the customer and provide that customer with an opportunity to pay the fuel surcharge or rebook the ticket. Pacific Express is required to cooperate with Expedia, including providing Expedia with contact information if requested.

76     Pacific Express consents to the injunction sought by Expedia. Pacific Express is therefore enjoined from using Expedia.ca to book tickets.

77     The parties have provided costs outlines. In my opinion, neither party should be awarded costs given the disregard for the needs of the customers. The parties will therefore absorb their own costs.

*Application dismissed.*

**EXHIBIT EN-26**

**TO THE DECLARATION OF EVAN NUTTALL**

2014 SCC 43, 2014 CSC 43

Supreme Court of Canada

R. v. Spencer

2014 CarswellSask 342, 2014 CarswellSask 343, 2014 SCC 43, 2014 CSC 43, [2014] 2 S.C.R. 212, [2014]
8 W.W.R. 209, [2014] S.C.J. No. 43, 114 W.C.B. (2d) 282, 11 C.R. (7th) 52, 312 C.C.C. (3d) 215, 312
C.R.R. (2d) 349, 375 D.L.R. (4th) 255, 438 Sask. R. 230, 458 N.R. 249, 608 W.A.C. 230, J.E. 2014-1084

**Matthew David Spencer, Appellant and Her Majesty The Queen, Respondent
and Director of Public Prosecutions, Attorney General of Ontario, Attorney
General of Alberta, Privacy Commissioner of Canada, Canadian Civil Liberties
Association and Criminal Lawyers' Association of Ontario, Interveners**

McLachlin C.J.C., LeBel, Abella, Rothstein, Cromwell, Moldaver, Karakatsanis, Wagner JJ.

Heard: December 9, 2013

Judgment: June 13, 2014 [*]

Docket: 34644

Proceedings: affirming *R. v. Spencer* (2011), 283 C.C.C. (3d) 384, 528 W.A.C. 280, 377 Sask. R. 280, [2012] 4 W.W.R. 425,
[2011] S.J. No. 729, 2011 CarswellSask 786, 2011 SKCA 144, Caldwell J.A., Cameron J.A., Ottenbreit J.A. (Sask. C.A.); leave
to appeal allowed *R. v. Spencer* (2013), 580 W.A.C. 323 (note), 417 Sask. R. 323 (note), 446 N.R. 398 (note), 2013 CarswellSask
14, 2013 CarswellSask 13, Abella J., Cromwell J., LeBel J. (S.C.C.)

Counsel: Aaron A. Fox, Q.C., Darren Kraushaar, for Appellant
Anthony B. Gerein, for Respondent
Ronald C. Reimer, David Schermbrucker, for Intervener, Director of Public Prosecutions
Susan Magotiaux, Allison Dellandrea, for Intervener, Attorney General of Ontario
Jolaine Antonio, for Intervener, Attorney General of Alberta
Mahmud Jamal, Patricia Kosseim, Daniel Caron, Sarah Speevak, for Intervener, Privacy Commissioner of Canada
Anil K. Kapoor, Lindsay L. Daviau, for Intervener, Canadian Civil Liberties Association
Jonathan Dawe, Jill R. Presser, for Intervener, Criminal Lawyers' Association of Ontario

**Comment**

The significance of the Court's decision in *Spencer* should not be underestimated, though its future impact could be in doubt
because of proposed legislative changes still before the House and Senate.

Three aspects of *Spencer's* reasoning are of importance: the elaboration of the concept of "privacy as anonymity," the approach
to considering the contractual and regulatory framework, and the conclusion that the search here was not "authorized by law."
The first is consistent with the sophisticated understanding of Internet and computer usage that the Court has displayed in other
cases, while the latter two also have implications beyond the particular context of this dispute.

With its discussion of privacy as anonymity, the Court grapples with the difficult question of privacy in public spaces, while
recognizing that the Internet is a unique public space: as the classic New Yorker cartoon put it, "on the Internet, nobody knows
you're a dog." The Internet itself is a very public place, but a faceless one, and the privacy inherent in that is one of the attractions
for many of its users. That can be both a good and bad thing, but there can be no denying that, as the Court notes here, many
people rely on the fact that they cannot be identified with the content which they post or download. Recognizing that, as a value
judgment, people expect privacy with regard to their Internet usage even though that usage itself might be public leads to the

conclusion reached by the Court here: what people want to keep private is not so much the activity itself as their connection *to* the activity. The search here was not asking "what is this person's name?" but "what is the name of the person who downloaded child pornography?" While we will certainly disapprove of the activity, that does not mean the accused had no reasonable expectation of privacy.

It is also helpful that the Court found the contractual and regulatory framework not to undermine that reasonable expectation of privacy. In part, this was simply due to the fact that the provisions were confusing and could not reasonably have led a subscriber to any particular conclusion, but there is a broader point. As the Court stresses here, reasonable expectation of privacy is a normative concept, not merely a factual determination. It would not, in a normative sense, be reasonable for an ISP to say in their privacy policy, "we will hand over any information about you to anyone we want any time we want," though strictly speaking nothing in *PIPEDA* prevents this. Nothing prevents all ISPs from adopting this policy, which would mean that, as a matter of fact, the contractual scheme would remove all protection from everyone. That fact, however, would not make it reasonable for ISPs to disclose such information and ought not to lead to the normative conclusion that a reasonable expectation of privacy had disappeared. Subscriber agreements are private arrangements and typically are contracts of adhesion negotiated between parties without equal bargaining power: access to the Internet, or indeed to anything else, should not be made to depend upon contracting away one's constitutional rights.

Also inherent in the regulatory scheme not undermining the privacy right is a recognition that the mere fact that there is a process allowing confidential information to be obtained in some circumstances is not sufficient to lead to the conclusion that there is no reasonable expectation of privacy in the first place. Although this approach has been adopted in some Courts of Appeal, it is akin to suggesting that since there is a process permitting access to information about the contents of a Swiss bank account in some circumstances, there is therefore no reasonable expectation of privacy in a Swiss bank account. As the Court here observes, if anything the fact that there are provisions allowing for disclosure only in certain circumstances supports rather than defeats the claim of a reasonable expectation of privacy.

Both of these points — that contractual provisions should not affect a reasonable expectation of privacy and that a statutory scheme for disclosure only in certain circumstances enhances rather than diminishes a privacy claim — have significance beyond the Internet context.

Finally, the Court's conclusion that the search here was not "authorized by law" seems sensible and unassailable, as well as consistent with past jurisprudence. The Court has often made observations similar to that in *R. v. Mann*, 2004 SCC 52, 21 C.R. (6th) 1 (S.C.C.), that

[15] . . . Absent a law to the contrary, individuals are free to do as they please. By contrast, the police (and more broadly, the state) may act only to the extent that they are empowered to do so by law.

The particular claim here was that the police were authorized by law because section 487.014 of the *Criminal Code* preserved their ability to request voluntary disclosure of information; however, to suggest that the failure to remove an ability constitutes "authority" is to ignore exactly the distinction set out above. As the Court observed in *Spencer*:

[73] . . . Section 487.014(1) is a declaratory provision that confirms the existing common law powers of police officers to make enquiries . . . PIPEDA is a statute whose purpose, as set out in s. 3, is to increase the protection of personal information. Since in the circumstances of this case the police do not have the power to conduct a search for subscriber information in the absence of exigent circumstances or a reasonable law, I do not see how they could gain a new search power through the combination of a declaratory provision and a provision enacted to promote the protection of personal information.

It seems to be the case that many such requests, as that in *Spencer*, have been made by police to various ISPs and that they have been very frequently granted. The ruling in *Spencer* clearly shows that, for the moment at least, ISPs (and presumably others) must only disclose such information if they receive a production order or search warrant. But whether that remains the case for long might depend in part on the eventual fate of Bill S-4, the *Digital Privacy Act*, and Bill C-13, the *Protecting Canadians*

*from Online Crime Act*. The former amends section 7 of *PIPEDA* in various ways to *broaden* the circumstances in which an ISP can be asked to voluntarily provide information. The latter proposes to add to the *Criminal Code* section 487.0195, protecting anyone who does voluntarily provide documents from civil or criminal liability. In their combined effect, these two provisions are entirely contrary to the spirit of *Spencer*, though they might not be literally inconsistent with its finding.

It is clear that the Supreme Court is pulling in one direction with regard to digital privacy while the government pulls in exactly the opposite. The last chapter on these issues has not been written.

Steve Coughlan

Schulich School of Law, Dalhousie University

**Cromwell J. (McLachlin C.J.C. and LeBel, Abella, Rothstein, Moldaver, Karakatsanis and Wagner JJ. concurring):**

**I. Introduction**

1     The Internet raises a host of new and challenging questions about privacy. This appeal relates to one of them.

2     The police identified the Internet Protocol (IP) address of a computer that someone had been using to access and store child pornography through an Internet file-sharing program. They then obtained from the Internet Service Provider (ISP), without prior judicial authorization, the subscriber information associated with that IP address. This led them to the appellant, Mr. Spencer. He had downloaded child pornography into a folder that was accessible to other Internet users using the same file-sharing program. He was charged and convicted at trial of possession of child pornography and acquitted on a charge of making it available.

3     At trial, Mr. Spencer claimed that the police had conducted an unconstitutional search by obtaining subscriber information matching the IP address and that the evidence obtained as a result should be excluded. He also testified that he did not know that others could have access to the shared folder and argued that he therefore did not knowingly make the material in the folder available to others. The trial judge concluded that there had been no breach of Mr. Spencer's right to be secure against unreasonable searches and seizures. However, he was of the view that the "making available" offence required some "positive facilitation" of access to the pornography, which Mr. Spencer had not done, and further he believed Mr. Spencer's evidence that he did not know that others could access his folder so that the fault element (*mens rea*) of the offence had not been proved. The judge therefore convicted Mr. Spencer of the possession offence, but acquitted him of the making available charge.

4     The Court of Appeal upheld the conviction for possession of child pornography, agreeing with the trial judge that obtaining the subscriber information was not a search and holding that even if it were a search, it would have been reasonable. The court, however, set aside the acquittal on the making available charge on the basis that the trial judge had been wrong to require proof of positive facilitation of access by others to the material. A new trial was ordered on this charge.

5     The appeal to this Court raises four issues which I would resolve as follows:

   1. Did the police obtaining the subscriber information matching the IP address from the ISP constitute a search?

   In my view, it did.

   2. If so, was the search authorized by law?

   In my view, it was not.

   3. If not, should the evidence obtained as a result be excluded?

   In my view, the evidence should not be excluded.

   4. Did the trial judge err with respect to the fault element of the "making available" offence?

The judge did err and I would uphold the Court of Appeal's order for a new trial.

**II. Analysis**

*A. Did the police obtaining the subscriber information matching the IP address from the ISP constitute a search?*

6    Mr. Spencer maintains that the police were conducting a search when they obtained the subscriber information associated with the IP address from the ISP, Shaw Communications Inc. The respondent Crown takes the opposite view. I agree with Mr. Spencer on this point. I will first set out a summary of the relevant facts then turn to the legal analysis.

*(1) Facts and Judicial History*

7    Mr. Spencer, who lived with his sister, connected to the Internet through an account registered in his sister's name. He used the file-sharing program LimeWire on his desktop computer to download child pornography from the Internet. LimeWire is a free peer-to-peer file-sharing program that, at the time, anyone could download onto their computer. Peer-to-peer systems such as LimeWire allow users to download files directly from the computers of other users. LimeWire does not have one central database of files, but instead relies on its users to share their files directly with others. It is commonly used to download music and movies and can also be used to download both adult and child pornography. It was Mr. Spencer's use of the file-sharing software that brought him to the attention of the police and which ultimately led to the search at issue in this case.

8    Det. Sgt. Darren Parisien (then Cst.) of the Saskatoon Police Service, by using publicly available software, searched for anyone sharing child pornography. He could access whatever another user of the software had in his or her shared folder. In other words, he could "see" what other users of the file sharing software could "see". He could also obtain two numbers related to a given user: the IP address that corresponds to the particular Internet connection through which a computer accesses the Internet at the time and the globally unique identifier (GUID) number assigned to each computer using particular software. The IP address of the computer from which shared material is obtained is displayed as part of the file-sharing process. There is little information in the record about the nature of IP addresses in general or the IP addresses provided by Shaw to its subscribers. There is a description in *R. v. Ward*, 2012 ONCA 660, 112 O.R. (3d) 321 (Ont. C.A.), at paras. 21-26 which also notes some of differences that may exist among IP addresses. For the purposes of this case, what we know is that the IP address obtained by Det. Sgt. Parisien matched computer activity at the particular point in time that he was observing that activity.

9    Det. Sgt. Parisien generated a list of IP addresses for computers that had shared what he believed to be child pornography. He then ran that list of IP addresses against a database which matches IP addresses with approximate locations. He found that one of the IP addresses was suspected to be in Saskatoon, with Shaw as the ISP.

10    Det. Sgt. Parisien then determined that Mr. Spencer's computer was online and connected to LimeWire. As a result, he (along with any LimeWire user) was able to browse the shared folder. He saw an extensive amount of what he believed to be child pornography. What he lacked was knowledge of where exactly the computer was and who was using it.

11    To connect the computer usage to a location and potentially a person, investigators made a written "law enforcement request" to Shaw for the subscriber information including the name, address and telephone number of the customer using that IP address. The request, which was purportedly made pursuant to s. 7(3)(*c.1*)(ii) of the *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c. 5 (*PIPEDA*), indicated that police were investigating an offence under the *Criminal Code*, R.S.C. 1985, c. C-46, pertaining to child pornography and the Internet and that the subscriber information was being sought as part of an ongoing investigation. (The full text of the relevant statutory provisions is set out in an Appendix.) Investigators did not have or try to obtain a production order (i.e. the equivalent of a search warrant in this context).

12    Shaw complied with the request and provided the name, address and telephone number of the customer associated with the IP address, Mr. Spencer's sister. With this information in hand, the police obtained a warrant to search Ms. Spencer's home (where Mr. Spencer lived) and seize his computer, which they did. The search of Mr. Spencer's computer revealed hundreds of child pornography images and over a hundred child pornography videos in his shared LimeWire folder.

13      Mr. Spencer was charged with possessing child pornography contrary to s. 163.1(4) of the *Criminal Code* and making child pornography available over the Internet contrary to s. 163.1(3). There is no dispute that the images found in his shared folder were child pornography.

14      At trial, Mr. Spencer sought to exclude the evidence found on his computer on the basis that the police actions in obtaining his address from Shaw without prior judicial authorization amounted to an unreasonable search contrary to s. 8 of the *Canadian Charter Rights and Freedoms*. The trial judge rejected this contention and convicted Mr. Spencer of the possession count. On appeal, the Saskatchewan Court of Appeal upheld the judge's decision with respect to the search issue.

*(2) Was the Request to Shaw a Search?*

15      Under s. 8 of the *Charter*, "[e]veryone has the right to be secure against unreasonable search or seizure." This Court has long emphasized the need for a purposive approach to s. 8 that emphasizes the protection of privacy as a prerequisite to individual security, self-fulfilment and autonomy as well as to the maintenance of a thriving democratic society: *Canada (Director of Investigation & Research, Combines Investigation Branch) v. Southam Inc.*, [1984] 2 S.C.R. 145 (S.C.C.), at pp. 156-57; *R. v. Dyment*, [1988] 2 S.C.R. 417 (S.C.C.), at pp. 427-28; *R. v. Plant*, [1993] 3 S.C.R. 281 (S.C.C.), at pp. 292-93; *R. v. Tessling*, 2004 SCC 67, [2004] 3 S.C.R. 432 (S.C.C.), at paras. 12-16; *UFCW, Local 401 v. Alberta (Information and Privacy Commissioner)*, 2013 SCC 62, [2013] 3 S.C.R. 733 (S.C.C.), at para. 22.

16      The first issue is whether this protection against unreasonable searches and seizures was engaged here. That depends on whether what the police did to obtain the subscriber information matching the IP address was a search or seizure within the meaning of s. 8 of the *Charter*. The answer to this question turns on whether, in the totality of the circumstances, Mr. Spencer had a reasonable expectation of privacy in the information provided to the police by Shaw. If he did, then obtaining that information was a search.

17      We assess whether there is a reasonable expectation of privacy in the totality of the circumstances by considering and weighing a large number of interrelated factors. These include both factors related to the nature of the privacy interests implicated by the state action and factors more directly concerned with the expectation of privacy, both subjectively and objectively viewed, in relation to those interests: see, e.g., *Tessling*, at para. 38; *Ward*, at para. 65. The fact that these considerations must be looked at in the "totality of the circumstances" underlines the point that they are often interrelated, that they must be adapted to the circumstances of the particular case and that they must be looked at as a whole.

18      The wide variety and number of factors that may be considered in assessing the reasonable expectation of privacy can be grouped under four main headings for analytical convenience: (1) the subject matter of the alleged search; (2) the claimant's interest in the subject matter; (3) the claimant's subjective expectation of privacy in the subject matter; and (4) whether this subjective expectation of privacy was objectively reasonable, having regard to the totality of the circumstances: *Tessling*, at para. 32; *R. v. Patrick*, 2009 SCC 17, [2009] 1 S.C.R. 579 (S.C.C.), at para. 27; *R. v. Cole*, 2012 SCC 53, [2012] 3 S.C.R. 34 (S.C.C.), at para. 40. However, this is not a purely factual inquiry. The reasonable expectation of privacy standard is normative rather than simply descriptive: *Tessling*, at para. 42. Thus, while the analysis is sensitive to the factual context, it is inevitably "laden with value judgments which are made from the independent perspective of the reasonable and informed person who is concerned about the long-term consequences of government action for the protection of privacy": *Patrick*, at para. 14; see also *R. v. Gomboc*, 2010 SCC 55, [2010] 3 S.C.R. 211 (S.C.C.), at para. 34, and *R. v. Ward*, at paras. 81-85.

19      I can deal quite briefly with two aspects of the appeal. The trial judge in this case held that there was no subjective expectation of privacy in this case: 2009 SKQB 341, 361 Sask. R. 1 (Sask. Q.B.), at para. 18. However, as I will explain below, the trial judge reached this conclusion by incorrectly defining the subject matter of the search. On the proper understanding of the scope of the search, Mr. Spencer's subjective expectation of privacy in his online activities can readily be inferred from his use of the network connection to transmit sensitive information: *Cole*, at para. 43. Mr. Spencer's direct interest in the subject matter of the search is equally clear. Though he was not personally a party to the contract with the ISP, he had access to the Internet with the permission of the subscriber and his use of the Internet was by means of his own computer in his own place of residence.

20      The main dispute in this case thus turns on the subject matter of the search and whether Mr. Spencer's subjective expectation of privacy was reasonable. The two circumstances relevant to determining the reasonableness of his expectation of privacy in this case are the nature of the privacy interest at stake and the statutory and contractual framework governing the ISP's disclosure of subscriber information.

21      In this case, I have found it helpful to look first at the subject matter of the search, then at the nature of the privacy interests implicated by the state actions and then finally at the governing contractual and statutory framework. While these subjects are obviously interrelated, approaching the analysis under these broad headings provides a degree of focus while permitting full examination of the "totality of the circumstances".

**(a) The Subject Matter of the search**

22      Mr. Spencer alleges that the police request to Shaw is a state action that constitutes a search or seizure for the purposes of s. 8 of the *Charter*. We must therefore consider what the subject matter of that request was in order to be able to identify the privacy interests that were engaged by it.

23      In many cases, defining the subject matter of the police action that is alleged to be a search is straightforward. In others, however, it is not. This case falls into the latter category. The parties and the courts below have markedly divergent perspectives on this important issue, a divergence which is reflected in the jurisprudence: see, for example, the authorities reviewed in *Ward*, at para. 3.

24      Mr. Spencer contends that the subject matter of the alleged search was core biographical data, revealing intimate and private information about the people living at the address provided by Shaw which matched the IP address. The Crown, on the other hand, maintains that the subject matter of the alleged search was simply a name, address and telephone number matching a publicly available IP address.

25      These divergent views were reflected in the decisions of the Saskatchewan courts. The trial judge adopted the Crown's view that what the police sought and obtained was simply generic information that does not touch on the core of Mr. Spencer's biographical information. Ottenbreit J.A. in the Court of Appeal was of largely the same view. For him, the information sought by the police in this case simply established the identity of the contractual user of the IP address. The fact that this information might eventually reveal a good deal about the activity of identifiable individuals on the Internet was, for him, "neither here nor there": 2011 SKCA 144, 377 Sask. R. 280 (Sask. C.A.), at para. 110. (see also *R. v. Trapp*, 2011 SKCA 143, 377 Sask. R. 246 (Sask. C.A.), at paras. 119-24 and 134.) In contrast to this approach, Caldwell J.A. (Cameron J.A. concurring on this point) held that in characterizing the subject matter of the alleged search, it is important to look beyond the "mundane" subscriber information such as name and address (para. 22). The potential of that information to reveal intimate details of the lifestyle and personal choices of the individual must also be considered: see also *Trapp*, *per* Cameron J.A., at paras. 33-37.

26      I am in substantial agreement with Caldwell and Cameron JJ.A. on this point. While, in many cases, defining the subject matter of the search will be uncontroversial, in cases in which it is more difficult, the Court has taken a broad and functional approach to the question, examining the connection between the police investigative technique and the privacy interest at stake. The Court has looked at not only the nature of the precise information sought, but also at the nature of the information that it reveals.

27      A number of decisions of the Court reflect this approach. I begin with *Plant*. There, the Court, dealing with informational privacy, stressed the strong claim to privacy in relation to information that is at the "biographical core of personal information which individuals in a free and democratic society would wish to maintain and control from dissemination to the state": p. 293. Importantly, the Court went on to make clear that s. 8 protection is accorded not only to the information which is itself of that nature, but also to "information which *tends to reveal* intimate details of the lifestyle and personal choices of the individual": *ibid.* (emphasis added).

28     *Tessling* took the same approach, although it led to a different conclusion. The subject matter of the alleged search was held to be the heat emitted from the surface of a building. The Forward Looking Infra-Red (FLIR) imaging technique was used to help assess the activities that transpired inside a house, but the heat emissions by themselves could not distinguish between one heat source and another. In short, the heat emanations were, on their own, meaningless because they did not permit any inferences about the precise activity giving rise to the heat: paras. 35-36. The critical question was: what inferences about activity inside the home — admittedly a highly private zone — did the FLIR images support?

29     I turn next to *R. v. Brown*, 2008 SCC 18, [2008] 1 S.C.R. 456 (S.C.C.), and the companion appeal in *R. v. M. (A.)*, 2008 SCC 19, [2008] 1 S.C.R. 569 (S.C.C.). While the Court divided on other points, it was unanimous in holding that the dog sniff of Mr. Kang-Brown's bag constituted a search. As explained by both Deschamps and Bastarache JJ., the dog sniffing at the air in the vicinity of the bag functioned as an investigative procedure that allowed for a "strong, immediate and direct inference" about what was or was not inside the bag: Deschamps J., at paras. 174-75; Bastarache J., at para. 227. Thus, while the "information" obtained by the sniffer dog was simply the smell of the air outside the bag, the dog's reaction to it provided the police with a strong inference as to what was inside. As Binnie J. put it in *M. (A.)*. (which concerned a dog sniff of the accused's backpack), "[b]y use of the dog, the policeman could 'see' through the concealing fabric of the backpack": para. 67.

30     How to characterize the subject matter of an alleged search was addressed by the Court most recently in *Gomboc*. While the Court was divided on other matters, it was unanimous about the framework that must be applied in considering the subject matter of a "search". The Court considered the strength of the inference between data derived from a digital recording ammeter (DRA) and particular activities going on in a residence in assessing whether use of the DRA constituted a search. Abella J. (Binnie and LeBel JJ. concurring) took into account "the *strong and reliable inference* that can be made from the patterns of electricity consumption ... as to the presence within the home of one particular activity": para. 81 (emphasis added). The Chief Justice and Justice Fish referred to the fact that the DRA data "sheds light on private activities within the home": para. 119. Deschamps J. (Charron, Rothstein and Cromwell JJ. concurring) spoke in terms of the extent to which the DRA data was revealing of activities in the home: para. 38.

31     Thus, it is clear that the tendency of information sought to support inferences in relation to other personal information must be taken into account in characterizing the subject matter of the search. The correct approach was neatly summarized by Doherty J.A. in *Ward*, at para. 65. When identifying the subject matter of an alleged search, the court must not do so "narrowly in terms of the physical acts involved or the physical space invaded, but rather by reference to the nature of the privacy interests potentially compromised by the state action": *ibid*.

32     Applying this approach to the case at hand, I substantially agree with the conclusion reached by Cameron J.A. in *Trapp* and adopted by Caldwell J.A. in this case. The subject matter of the search was not simply a name and address of someone in a contractual relationship with Shaw. Rather, it was the identity of an Internet subscriber which corresponded to particular Internet usage. As Cameron J.A. put it, at para. 35 of *Trapp*:

> To label information of this kind as mere "subscriber information" or "customer information", or nothing but "name, address, and telephone number information", tends to obscure its true nature. I say this because these characterizations gloss over the significance of an IP address and what such an address, once identified with a particular individual, is capable of revealing about that individual, including the individual's online activity in the home.

33     Here, the subject matter of the search is the identity of a subscriber whose Internet connection is linked to particular, monitored Internet activity.

**(b) Nature of the Privacy Interest Potentially Compromised by the State Action**

34     The nature of the privacy interest engaged by the state conduct is another facet of the totality of the circumstances and an important factor in assessing the reasonableness of an expectation of privacy. The Court has previously emphasized an understanding of informational privacy as confidentiality and control of the use of intimate information about oneself. In

my view, a somewhat broader understanding of the privacy interest at stake in this case is required to account for the role that anonymity plays in protecting privacy interests online.

35      Privacy is admittedly a "broad and somewhat evanescent concept": *Dagg v. Canada (Minister of Finance)*, [1997] 2 S.C.R. 403 (S.C.C.), at para. 67. Scholars have noted the theoretical disarray of the subject and the lack of consensus apparent about its nature and limits: see, e.g., C. D. L. Hunt, "Conceptualizing Privacy and Elucidating its Importance: Foundational Considerations for the Development of Canada's Fledgling Privacy Tort" (2011), 37 *Queen's L.J.* 167, at pp. 176-77. Notwithstanding these challenges, the Court has described three broad types of privacy interests — territorial, personal, and informational — which, while often overlapping, have proved helpful in identifying the nature of the privacy interest or interests at stake in particular situations: see, e.g., *Dyment*, at pp. 428-29; *Tessling*, at paras. 21-24. These broad descriptions of types of privacy interests are analytical tools, not strict or mutually-exclusive categories.

36      The nature of the privacy interest does not depend on whether, in the particular case, privacy shelters legal or illegal activity. The analysis turns on the privacy of the area or the thing being searched and the impact of the search on its target, not the legal or illegal nature of the items sought. To paraphrase Binnie J. in *Patrick*, the issue is not whether Mr. Spencer had a legitimate privacy interest in concealing his use of the Internet for the purpose of accessing child pornography, but whether people generally have a privacy interest in subscriber information with respect to computers which they use in their home for private purposes: *Patrick*, at para. 32.

37      We are concerned here primarily with informational privacy. In addition, because the computer identified and in a sense monitored by the police was in Mr. Spencer's residence, there is an element of territorial privacy in issue as well. However, in this context, the location where the activity occurs is secondary to the nature of the activity itself. Internet users do not expect their online anonymity to cease when they access the Internet outside their homes, via smartphones, or portable devices. Therefore, here as in *Patrick*, at para. 45, the fact that a home was involved is not a controlling factor but is nonetheless part of the totality of the circumstances: see, e.g., *Ward*, at para. 90.

38      To return to informational privacy, it seems to me that privacy in relation to information includes at least three conceptually distinct although overlapping understandings of what privacy is. These are privacy as secrecy, privacy as control and privacy as anonymity.

39      Informational privacy is often equated with the secrecy or confidentiality. For example, a patient has a reasonable expectation that his or her medical information will be held in trust and confidence by the patient's physician: see, e.g. *McInerney v. MacDonald*, [1992] 2 S.C.R. 138 (S.C.C.), at p. 149.

40      Privacy also includes the related but wider notion of control over, access to and use of information, that is, "the claim of individuals, groups, or institutions to determine for themselves when, how and to what extent information about them is communicated to others": A. F. Westin, *Privacy and Freedom* (1970), at p. 7, cited in *Tessling*, at para. 23. La Forest J. made this point in *Dyment*. The understanding of informational privacy as control "derives from the assumption that all information about a person is in a fundamental way his own, for him to communicate or retain for himself as he sees fit" (*Dyment*, at p. 429, quoting from *Privacy and Computers*, the Report of the Task Force established by the Department of Communications/Department of Justice (1972), at p. 13). Even though the information will be communicated and cannot be thought of as secret or confidential, "situations abound where the reasonable expectations of the individual that the information shall remain confidential to the persons to whom, and restricted to the purposes for which it is divulged, must be protected" (pp. 429-30); see also *R. v. Sanelli*, [1990] 1 S.C.R. 30 (S.C.C.), at p. 46.

41      There is also a third conception of informational privacy that is particularly important in the context of Internet usage. This is the understanding of privacy as anonymity. In my view, the concept of privacy potentially protected by s. 8 must include this understanding of privacy.

42      The notion of privacy as anonymity is not novel. It appears in a wide array of contexts ranging from anonymous surveys to the protection of police informant identities. A person responding to a survey readily agrees to provide what may well be highly

personal information. A police informant provides information about the commission of a crime. The information itself is not private — it is communicated precisely so that it will be communicated to others. But the information is communicated on the basis that it will not be identified with the person providing it. Consider situations in which the police want to obtain the list of names that correspond to the identification numbers on individual survey results or the defence in a criminal case wants to obtain the identity of the informant who has provided information that has been disclosed to the defence. The privacy interest at stake in these examples is not simply the individual's name, but the link between the identified individual and the personal information provided anonymously. As the intervener the Canadian Civil Liberties Association urged in its submissions, "maintaining anonymity can be integral to ensuring privacy": factum, at para. 7.

43    Westin identifies anonymity as one of the basic states of privacy. Anonymity permits individuals to act in public places but to preserve freedom from identification and surveillance: pp. 31-32; see A. Slane and L. M. Austin, "What's In a Name? Privacy and Citizenship in the Voluntary Disclosure of Subscriber Information in Online Child Exploitation Investigations" (2011), 57 *Crim. L.Q.* 486, at p. 501. The Court's decision in *R. v. Wise,* [1992] 1 S.C.R. 527 (S.C.C.), provides an example of privacy in a public place. The Court held that the ubiquitous monitoring of a vehicle's whereabouts on public highways amounted to a violation of the suspect's reasonable expectation of privacy. It could of course have been argued that the electronic device was simply a convenient way of keeping track of where the suspect was driving his car, something that he was doing in public for all to see. But the Court did not take that approach.

44    La Forest J. (who, while dissenting on the issue of exclusion of the evidence under s. 24(2), concurred with respect to the existence of a reasonable expectation of privacy), explained that "[i]n a variety of public contexts, we may expect to be casually observed, but may justifiably be outraged by intensive scrutiny. *In these public acts we do not expect to be personally identified and subject to extensive surveillance, but seek to merge into the 'situational landscape'*": p. 558 (emphasis added), quoting M. Gutterman, "A Formulation of the Value and Means Models of the Fourth Amendment in the Age of Technologically Enhanced Surveillance" (1988), 39 *Syracuse L. Rev.* 647, at p. 706. The mere fact that someone leaves the privacy of their home and enters a public space does not mean that the person abandons all of his or her privacy rights, despite the fact that as a practical matter, such a person may not be able to control who observes him or her in public. Thus, in order to uphold the protection of privacy rights in some contexts, we must recognize anonymity as one conception of privacy: see E. Paton-Simpson, "Privacy and the Reasonable Paranoid: The Protection of Privacy in Public Places" (2000), 50 *U.T.L.J.* 305, at pp. 325-26; Westin, at p. 32; Gutterman, at p. 706.

45    Recognizing that anonymity is one conception of informational privacy seems to me to be particularly important in the context of Internet usage. One form of anonymity, as Westin explained, is what is claimed by an individual who wants to present ideas publicly but does not want to be identified as their author: p. 32. Here, Westin, publishing in 1970, anticipates precisely one of the defining characteristics of some types of Internet communication. The communication may be accessible to millions of people but it is not identified with its author.

46    Moreover, the Internet has exponentially increased both the quality and quantity of information that is stored about Internet users. Browsing logs, for example, may provide detailed information about users' interests. Search engines may gather records of users' search terms. Advertisers may track their users across networks of websites, gathering an overview of their interests and concerns. "Cookies" may be used to track consumer habits and may provide information about the options selected within a website, which web pages were visited before and after the visit to the host website and any other personal information provided: see N. Gleicher, "Neither a Customer Nor a Subscriber Be: Regulating the Release of User Information on the World Wide Web" (2009), 118 *Yale L.J.* 1945, at pp. 1948-49; R. W. Hubbard, P. DeFreitas and S. Magotiaux, "The Internet — Expectations of Privacy in a New Context" (2002), 45 *Crim. L.Q.* 170, at pp. 189-91. The user cannot fully control or even necessarily be aware of who may observe a pattern of online activity, but by remaining anonymous — by guarding the link between the information and the identity of the person to whom it relates — the user can in large measure be assured that the activity remains private: see Slane and Austin, at pp. 500-3.

47    In my view, the identity of a person linked to their use of the Internet must be recognized as giving rise to a privacy interest beyond that inherent in the person's name, address and telephone number found in the subscriber information. A sniffer dog provides information about the contents of the bag and therefore engages the privacy interests relating to its contents. DRA

readings provide information about what is going on inside a home and therefore may engage the privacy interests relating to those activities. Similarly, subscriber information, by tending to link particular kinds of information to identifiable individuals, may implicate privacy interests relating not simply to the person's name or address but to his or her identity as the source, possessor or user of that information.

48      Doherty J.A. made this point with his usual insight and clarity in *Ward*. "Personal privacy" he wrote "protects an individual's ability to function on a day-to-day basis within society while enjoying a degree of anonymity that is essential to the individual's personal growth and the flourishing of an open and democratic society": para. 71. He concluded that some degree of anonymity is a feature of much Internet activity and that, "depending on the totality of the circumstances, ... anonymity may enjoy constitutional protection under s. 8": para. 75. I agree. Thus, anonymity may, depending on the totality of the circumstances, be the foundation of a privacy interest that engages constitutional protection against unreasonable search and seizure.

49      The intervener the Director of Public Prosecutions raised the concern that recognizing a right to online anonymity would carve out a crime-friendly Internet landscape by impeding the effective investigation and prosecution of online crime. In light of the grave nature of the criminal wrongs that can be committed online, this concern cannot be taken lightly. However, in my view, recognizing that there *may* be a privacy interest in anonymity depending on the circumstances falls short of recognizing any "right" to anonymity and does not threaten the effectiveness of law enforcement in relation to offences committed on the Internet. In this case, for example, it seems clear that the police had ample information to obtain a production order requiring Shaw to release the subscriber information corresponding to the IP address they had obtained.

50      Applying this framework to the facts of the present case is straightforward. In the circumstances of this case, the police request to link a given IP address to subscriber information was in effect a request to link a specific person (or a limited number of persons in the case of shared Internet services) to specific online activities. This sort of request engages the anonymity aspect of the informational privacy interest by attempting to link the suspect with anonymously undertaken online activities, activities which have been recognized by the Court in other circumstances as engaging significant privacy interests: *R. v. Morelli*, 2010 SCC 8, [2010] 1 S.C.R. 253 (S.C.C.), at para. 3; *Cole*, at para. 47; *R. v. Vu*, 2013 SCC 60, [2013] 3 S.C.R. 657 (S.C.C.), at paras. 40-45.

51      I conclude therefore that the police request to Shaw for subscriber information corresponding to specifically observed, anonymous Internet activity engages a high level of informational privacy. I agree with Caldwell J.A.'s conclusion on this point:

[A] reasonable and informed person concerned about the protection of privacy would expect one's activities on one's own computer used in one's own home would be private ... In my judgment, it matters not that the personal attributes of the Disclosed Information pertained to Mr. Spencer's sister because Mr. Spencer was personally and directly exposed to the consequences of the police conduct in this case. As such, the police conduct *prima facie* engaged a personal privacy right of Mr. Spencer and, in this respect, his interest in the privacy of the Disclosed Information was direct and personal. [para. 27]

**(c) Reasonable Expectation of Privacy**

52      The next question is whether Mr. Spencer's expectation of privacy was reasonable. The trial judge found that there could be no reasonable expectation of privacy in the face of the relevant contractual and statutory provisions (para. 19), a conclusion with which Caldwell J.A. agreed on appeal: para. 42. Cameron J.A., however, was doubtful that the contractual and statutory terms had this effect in the context of this case: para. 98.

53      In this Court, Mr. Spencer maintains that the contractual and statutory terms did not undermine a reasonable expectation of privacy with respect to the subscriber information. He submits that the contractual provisions do nothing more than suggest that the information will not be provided to police unless required by law and that *PIPEDA*, whose purpose is to protect privacy rights, supports rather than negates the reasonableness of an expectation of privacy in this case. The Crown disagrees and supports the position taken on this point by Caldwell J.A. in the Court of Appeal.

54      There is no doubt that the contractual and statutory framework may be relevant to, but not necessarily determinative of whether there is a reasonable expectation of privacy. So, for example in *Gomboc*, Deschamps J. writing for four members

of the Court, found that the terms governing the relationship between the electricity provider and its customer were "highly significant" to Mr Gomboc's reasonable expectation of privacy, but treated it as "one factor amongst many others which must be weighed in assessing the totality of the circumstances": paras. 31-32. She also emphasized that when dealing with contracts of adhesion in the context of a consumer relationship, it was necessary to "procee[d] with caution" when determining the impact that such provision would have on the reasonableness of an expectation of privacy: para. 33. The need for caution in this context was pointedly underlined in the dissenting reasons of the Chief Justice and Fish J. in that case: paras. 138-42.

55    The contractual and regulatory frameworks overlap in the present case because the Shaw Joint Terms of Service make reference to *PIPEDA*, and the scope of permitted disclosure under *PIPEDA* turns partly on whether the customer has consented to the disclosure of personal information. I must first set out the details of these schemes before turning to their impact on the reasonable expectations analysis. In doing so, it becomes apparent that the relevant provisions provide little assistance in evaluating the reasonableness of Mr. Spencer's expectation of privacy.

56    Shaw provides Internet services to its customers under a standard form "Joint Terms of Service" agreement. Additional terms and conditions are provided in Shaw's "Acceptable Use Policy" and its "Privacy Policy". The terms of these agreements are posted online on Shaw's website and change from time to time. The investigators sought the subscriber information for the IP address used on August 31, 2007 in their request to Shaw.

57    Mr. Spencer was not personally a party to these agreements, as he accessed the Internet through his sister's subscription. It is common practice for multiple users to share a common Internet connection. A reasonable user would be aware that the use of the service would be governed by certain terms and conditions, and those terms and conditions were readily accessible through Shaw's website. This case does not require us to decide whether Mr. Spencer was bound by the terms of the contract with Shaw. Quite apart from contractual liability, the terms on which he gained access to the Internet are a relevant circumstance in assessing the reasonableness of his expectation of privacy. There are three relevant sets of provisions which, taken as a whole, provide a confusing and unclear picture of what Shaw would do when faced with a police request for subscriber information. The "Joint Terms of Service" at first blush appear to permit broad disclosure because they provide, among other things, that "Shaw may disclose any information as is necessary to ... satisfy any legal, regulatory or other governmental request". This general provision, however, must be read in light of the more specific provision relating to disclosure of IP addresses and other identifying information in the context of criminal investigations contained in the Acceptable Use Policy, which in turn is subject to the Privacy Policy.

58    The Acceptable Use Policy (last updated on June 18, 2007) provides that Shaw is authorized to cooperate with law enforcement authorities in the investigation of criminal violations, including supplying information identifying a subscriber *in accordance with its Privacy Policy*. The provision reads as follows:

> You hereby authorize Shaw to cooperate with (i) law enforcement authorities in the investigation of suspected criminal violations, and/or (ii) system administrators at other Internet service providers or other network or computing facilities in order to enforce this Agreement. Such cooperation may include Shaw providing the username, IP address or other identifying information about a subscriber, in accordance with the guidelines set out in Shaw's Privacy Policy.

> [Emphasis added.]

59    The Privacy Policy in the record (last updated on November 12, 2008) states that Shaw is committed to protecting personal information, which is defined as information about an identifiable individual. One of the ten principles set out in the Privacy Policy deals with limiting the disclosure of personal information (principle 5). The policy limits the circumstances under which personal information will be disclosed without the customer's knowledge or consent to "exceptional circumstances, as permitted by law". Shaw may disclose information to its partners in order to provide its services and, in such cases, the information is governed by "strict confidentiality standards and policies" to keep the information secure and to ensure it is treated in accordance with *PIPEDA*. The Privacy Policy also provides that "Shaw may disclose Customer's Personal Information to: ... a third party or parties, where the Customer has given Shaw Consent to such disclosure or if disclosure *is required by law*, in accordance with *The Personal Information Protection and Electronic Documents Act*" (emphasis added).

11

60      Whether or not disclosure of personal information by Shaw is "permitted" or "required by law" in turn depends on an analysis of the applicable statutory framework. The contractual provisions, read as a whole, are confusing and equivocal in terms of their impact on a user's reasonable expectation of privacy in relation to police initiated requests for subscriber information. The statutory framework provided by *PIPEDA* is not much more illuminating.

61      Shaw's collection, use, and disclosure of the personal information of its subscribers is subject to *PIPEDA* which protects personal information held by organizations engaged in commercial activities from being disclosed without the knowledge or consent of the person to whom the information relates: Sch. 1, clause 4.3. Section 7 contains several exceptions to this general rule and permits organizations to disclose personal information without consent. The exception relied on in this case is s. 7(3)(*c.1*)(ii). It permits disclosure to a government institution that has requested the disclosure for the purpose of law enforcement and has stated its "lawful authority" for the request. The provisions of *PIPEDA* are not of much help in determining whether there is a reasonable expectation of privacy in this case. They lead us in a circle.

62      Section 7(3)(*c.1*)(ii) allows for disclosure without consent to a government institution where that institution has identified its *lawful authority* to obtain the information. But the issue is whether there was such lawful authority which in turn depends in part on whether there was a reasonable expectation of privacy with respect to the subscriber information. *PIPEDA* thus cannot be used as a factor to weigh against the existence of a reasonable expectation of privacy since the proper interpretation of the relevant provision itself depends on whether such a reasonable expectation of privacy exists. Given that the purpose of *PIPEDA* is to establish rules governing, among other things, disclosure "of personal information in a manner that recognizes the right of *privacy* of individuals with respect to their personal information" (s. 3), it would be reasonable for an Internet user to expect that a simple request by police would not trigger an obligation to disclose personal information or defeat *PIPEDA*'s general prohibition on the disclosure of personal information without consent.

63      I am aware that I have reached a different result from that reached in similar circumstances by the Ontario Court of Appeal in *Ward*, where the court held that the provisions of *PIPEDA* were a factor which weighed against finding a reasonable expectation of privacy in subscriber information. This conclusion was based on two main considerations. The first was that an ISP has a legitimate interest in assisting in law enforcement relating to crimes committed using its services: para. 99. The second was the grave nature of child pornography offences, which made it reasonable to expect that an ISP would cooperate with a police investigation: paras. 102-3. While these considerations are certainly relevant from a policy perspective, they cannot override the clear statutory language of s. 7(3)(*c.1*)(ii) of *PIPEDA*, which permits disclosure only if a request is made by a government institution with "lawful authority" to request the disclosure. It is reasonable to expect that an organization bound by *PIPEDA* will respect its statutory obligations with respect to personal information. The Court of Appeal in *Ward* held that s. 7(3)(*c.1*)(ii) must be read in light of s. 5(3), which states that "[a]n organization may collect, use or disclose personal information only for purposes that a reasonable person would consider are appropriate in the circumstances". This rule of "reasonable disclosure" was used as a basis to invoke considerations such as allowing ISPs to cooperate with the police and preventing serious crimes in the interpretation of *PIPEDA*. Section 5(3) is a guiding principle that underpins the interpretation of the various provisions of *PIPEDA*. It does not allow for a departure from the clear requirement that a requesting government institution possess "lawful authority" and so does not resolve the essential circularity of using s. 7(3)(*c.1*)(ii) as a factor in determining whether a reasonable expectation of privacy exists.

64      I also note with respect to an ISP's legitimate interest in preventing crimes committed through its services that entirely different considerations may apply where an ISP itself detects illegal activity and of its own motion wishes to report this activity to the police. Such a situation falls under a separate, broader exemption in *PIPEDA*, namely s. 7(3)(*d*). The investigation in this case was begun as a police investigation and the disclosure of the subscriber information arose out of the request letter sent by the police to Shaw.

65      The overall impression created by these terms is that disclosure at the request of the police would be made only where required or permitted by law. Such disclosure is only permitted by *PIPEDA* in accordance with the exception in s. 7, which in this case would require the requesting police to have "lawful authority" to request the disclosure. For reasons that I will set out in the next section, this request had no lawful authority in the sense that while the police could ask, they had no authority to

compel compliance with that request. I conclude that, if anything, the contractual provisions in this case support the existence of a reasonable expectation of privacy, since the Privacy Policy narrowly circumscribes Shaw's right to disclose the personal information of subscribers.

66    In my view, in the totality of the circumstances of this case, there is a reasonable expectation of privacy in the subscriber information. The disclosure of this information will often amount to the identification of a user with intimate or sensitive activities being carried out online, usually on the understanding that these activities would be anonymous. A request by a police officer that an ISP voluntarily disclose such information amounts to a search.

67    The intervener the Attorney General of Alberta raised a concern that if the police were not permitted to request disclosure of subscriber information, then other routine inquiries that might reveal sensitive information about a suspect would also be prohibited, and this would unduly impede the investigation of crimes. For example, when the police interview the victim of a crime, core biographical details of a suspect's lifestyle might be revealed. I do not agree that this result follows from the principles set out in these reasons. Where a police officer requests disclosure of information relating to a suspect from a third party, whether there is a search depends on whether, in light of the totality of the circumstances, the suspect has a reasonable expectation of privacy in that information: *Plant*, at p. 293; *Gomboc*, at paras. 27-30, *per* Deschamps J. In *Duarte*, the Court distinguished between a person repeating a conversation with a suspect to the police and the police procuring an audio recording of the same conversation. The Court held that the danger is "not the risk that someone will repeat our words but the much more insidious danger inherent in allowing the state, in its unfettered discretion, to record and transmit our words": at pp. 43-44. Similarly in this case, the police request that the ISP disclose the subscriber information was in effect a request to link Mr. Spencer with precise online activity that had been the subject of monitoring by the police and thus engaged a more significant privacy interest than a simple question posed by the police in the course of an investigation.

### *B. Was the Search Lawful?*

68     A warrantless search, such as the one that occurred in this case, is presumptively unreasonable: *R. v. Collins*, [1987] 1 S.C.R. 265 (S.C.C.). The Crown bears the burden of rebutting this presumption. A search will be reasonable if: (a) it was authorized by law; (b) the law itself was reasonable; and (c) the search was carried out in a reasonable manner: p. 278. Mr. Spencer has not challenged the constitutionality of the laws that purportedly authorized the search. He did raise concerns about the reasonableness of the manner, but in my view, these are groundless. Accordingly, we need only consider whether the search was authorized by law.

69    The Crown supports the conclusions of Caldwell and Cameron JJ.A. in the Court of Appeal that any search was lawful, relying on the combined effect of s. 487.014 of the *Criminal Code* and s. 7(3)(*c.1*)(ii) of *PIPEDA*. I respectfully do not agree.

70    Section 487.014(1) of the *Criminal Code* provides that a peace officer does not need a production order "to ask a person to voluntarily provide to the officer documents, data or information that the person is not prohibited by law from disclosing". *PIPEDA* prohibits disclosure of the information unless the requirements of the law enforcement provision are met, including that the government institution discloses a lawful authority *to obtain*, not simply to ask for the information: s. 7(3)(*c.1*)(ii). On the Crown's reading of these provisions, *PIPEDA*'s protections become virtually meaningless in the face of a police request for personal information: the "lawful authority" is a simple request without power to compel and, because there was a simple request, the institution is no longer prohibited by law from disclosing the information.

71     "Lawful authority" in s. 7(3)(*c.1*)(ii) of *PIPEDA* must be contrasted with s. 7(3)(*c*), which provides that personal information may be disclosed without consent where "required to comply with a subpoena or warrant issued or an order made by a court, person or body with jurisdiction to compel the production of information, or to comply with rules of court relating to the production of records". The reference to "lawful authority" in s. 7(3)(*c.1*)(ii) must mean something other than a "subpoena or [search] warrant". "Lawful authority" may include several things. It may refer to the common law authority of the police to ask questions relating to matters that are not subject to a reasonable expectation of privacy. It may refer to the authority of police to conduct warrantless searches under exigent circumstances or where authorized by a reasonable law: *Collins*. As the intervener the Privacy Commissioner of Canada submitted, interpreting "lawful authority" as requiring more than a bare request

by law enforcement gives this term a meaningful role to play in the context of s. 7(3) and should be preferred over alternative meanings that do not do so. In short, I agree with the Ontario Court of Appeal in *Ward* on this point that neither s. 487.014(1) of the *Code*, nor *PIPEDA* creates any police search and seizure powers: para. 46.

72     I recognize that this conclusion differs from that of the Saskatchewan Court of Appeal in *Trapp*, at para. 66, and the British Columbia Supreme Court in *R. v. McNeice*, 2010 BCSC 1544 (B.C. S.C.), at para. 43. The Court of Appeal in *Trapp* read s. 487.014(1) together with s. 29(2)(g) of the *Freedom of Information and Protection of Privacy Act*, S.S. 1990-91, c. F-22.01, an analogous provision to s. 7(3)(*c.1*)(ii) of *PIPEDA*, although one from which the "lawful authority" requirement is absent. The court held that s. 487.014(1) gave the police a power to make any inquiries that were not otherwise prohibited by law. The court in *McNeice* took the same approach, although that case concerned s. 7(3)(*c.1*)(ii) of *PIPEDA*, the same provision at issue in this case.

73     With respect, I cannot accept that this conclusion applies to s. 7(3)(*c.1*)(ii) of *PIPEDA*. Section 487.014(1) is a declaratory provision that confirms the existing common law powers of police officers to make enquiries, as indicated by the fact that the section begins with the phrase "[f]or greater certainty": see *Ward*, at para. 49. *PIPEDA* is a statute whose purpose, as set out in s. 3, is to increase the protection of personal information. Since in the circumstances of this case the police do not have the power to conduct a search for subscriber information in the absence of exigent circumstances or a reasonable law, I do not see how they could gain a new search power through the combination of a declaratory provision and a provision enacted to promote the protection of personal information.

74     The subscriber information obtained by police was used in support of the Information to Obtain which led to the issuance of a warrant to search Ms. Spencer's residence. Without that information, the warrant could not have been obtained. It follows that if that information is excluded from consideration as it must be because it was unconstitutionally obtained, there were not adequate grounds to sustain the issuance of the warrant, and the search of the residence was therefore unlawful. I conclude, therefore, that the conduct of the search of Ms. Spencer's residence violated the *Charter*: *Plant*, at p. 296; *Hunter v. Southam*, at p. 161. Nothing in these reasons addresses or diminishes any existing powers of the police to obtain subscriber information in exigent circumstances such as, for example, where the information is required to prevent imminent bodily harm. There were no such circumstances here.

### C. Should the Evidence Have Been Excluded

75     Neither the trial judge nor the Court of Appeal found a breach of s. 8 in this case and, therefore, did not have to consider the question of whether the evidence obtained in a manner that violated Mr. Spencer's *Charter* rights should be excluded under s. 24(2) of the *Charter*. The question is whether the admission of the evidence would bring the administration of justice into disrepute. I accept, as both Mr. Spencer and the Crown agree, that we can determine this issue on the record before us. However, I disagree with Mr. Spencer's submission that the evidence should be excluded. In my view, it should not.

76     The test for applying s. 24(2) is set out in *R. v. Grant*, 2009 SCC 32, [2009] 2 S.C.R. 353 (S.C.C.). The court must "assess and balance the effect of admitting the evidence on society's confidence in the justice system having regard to: (1) the seriousness of the *Charter*-infringing state conduct ... (2) the impact of the breach on the *Charter*-protected interests of the accused ... and (3) society's interest in the adjudication of the case on its merits": para. 71.

77     Turning first to the seriousness of the state conduct, my view is that it cannot be characterized as constituting either "[w]ilful or flagrant disregard of the *Charter*": *Grant*, at para. 75. Det. Sgt. Parisien testified that he believed the request to Shaw was authorized by law and that Shaw could consent to provide the information to him. He also testified, however, that he was aware that there were decisions both ways on the issue of whether this was a legally acceptable practice. While I would not want to be understood to be encouraging the police to act without warrants in "gray areas", in light of the fact that the trial judge and three judges of the Court of Appeal concluded that Det. Sgt. Parisien had acted lawfully, his belief was clearly reasonable. In short, the police were acting by what they reasonably thought were lawful means to pursue an important law enforcement purpose. There is no challenge to any other aspect of the information to obtain the search warrant. The nature of the police conduct in this case would not tend to bring the administration of justice into disrepute.

78     The second *Grant* factor is the impact of the *Charter*-infringing conduct on Mr. Spencer's *Charter*-protected interests. That impact here was serious. As discussed above, anonymity is an important safeguard for privacy interests online. The violation of that anonymity exposed personal choices made by Mr. Spencer to be his own and subjected them to police scrutiny as such. This weighs in favour of excluding the evidence.

79     That brings me to the final factor, society's interest in an adjudication on the merits. As explained in *Grant*,

> while the public has a heightened interest in seeing a determination on the merits where the offence charged is serious, it also has a vital interest in having a justice system that is above reproach, particularly where the penal stakes for the accused are high. [para. 84]

80     The offences here are serious and carry minimum prison sentences. Society has both a strong interest in the adjudication of the case and also in ensuring that the justice system remains above reproach in its treatment of those charged with these serious offences. If the evidence is excluded, the Crown will effectively have no case. The impugned evidence (the electronic files containing child pornography) is reliable and was admitted by the defence at trial to constitute child pornography. Society undoubtedly has an interest in seeing a full and fair trial based on reliable evidence, and all the more so for a crime which implicates the safety of children.

81     Balancing the three factors, my view is that exclusion of the evidence rather than its admission would bring the administration of justice into disrepute, and I would uphold its admission.

### D. The Fault Element of the "Making Available" Offence

82     The Court of Appeal ordered a new trial on the "making available" count on the basis that the trial judge had erred in his analysis of the fault requirement for the offence. It found that the trial judge had erred by finding that the making available offence required that Mr. Spencer knew that some positive act on his part facilitated access by others to the pornography. This error, in the Court of Appeal's view, led the judge to fail to consider whether Mr. Spencer had been wilfully blind to the fact that the pornography was being made available to others through the shared folder. I respectfully agree with the Court of Appeal on both points and would affirm the order for a new trial.

83     There is no dispute that the accused in a prosecution under s. 163.1(3) must be proved to have had knowledge that the pornographic material was being made available. This does not require, however, as the trial judge suggested, that the accused must knowingly, by some positive act, facilitate the availability of the material. I accept Caldwell J.A.'s conclusion that the offence is complete once the accused knowingly makes pornography available to others. As he put it,

> [i]n the context of a file sharing program, the *mens rea* element of making available child pornography under s. 163.1(3) requires proof of the intent to make computer files containing child pornography available to others using that program or actual knowledge that the file sharing program makes files available to others. [para. 87]

While the trial judge's reasons may perhaps be open to more than one interpretation on this point, reading his reasons as a whole, I also agree with Caldwell J.A. that the trial judge erred in deciding that a positive act was required to satisfy the *mens rea* component of the making available offence: para. 81.

84     I further agree with Caldwell J.A. that wilful blindness was a live issue on the evidence and that it was because of the trial judge's error in relation to positive facilitation that he did not turn his mind to the evidence that could support an inference of wilful blindness. Wilful blindness is a substitute for knowledge. As explained by Charron J. in *R. v. Briscoe*, 2010 SCC 13, [2010] 1 S.C.R. 411 (S.C.C.), at para. 21,

> [w]ilful blindness does not define the *mens rea* required for particular offences. Rather, it can substitute for actual knowledge whenever knowledge is a component of the *mens rea*. The doctrine of wilful blindness imputes knowledge to an accused whose suspicion is aroused to the point where he or she sees the need for further inquiries, but deliberately chooses not to make those inquiries. See *Sansregret v. The Queen*, [1985] 1 S.C.R. 570, and *R. v. Jorgensen*, [1995] 4 S.C.R.

55. As Sopinka J. succinctly put it in *Jorgensen* (at para. 103), "[a] finding of wilful blindness involves an affirmative answer to the question: Did the accused shut his eyes because he knew or strongly suspected that looking would fix him with knowledge?"

[Emphasis added.]

85    The evidence calling for consideration of wilful blindness included, for example, evidence that in Mr. Spencer's statement to police he acknowledged that LimeWire is a file sharing program; that he had changed at least one default setting in LimeWire; that when LimeWire is first installed on a computer, it displays information notifying the user that it is a file sharing program; that at the start of each session, LimeWire notifies the user that it is a file sharing program and warns of the ramifications of file sharing; and that LimeWire contains built-in visual indicators that show the progress of the uploading of files by others from the user's computer: paras. 88-89.

86    Given that wilful blindness was a live issue and that the trial judge's error in holding that a positive act was required to meet the *mens rea* component of the making available offence resulted in his not considering the wilful blindness issue, I agree with Caldwell J.A. that the error could reasonably be thought to have had a bearing on his decision to acquit: para. 93; *R. v. Graveline*, 2006 SCC 16, [2006] 1 S.C.R. 609 (S.C.C.), at para. 14.

### III. Disposition

87    I would dismiss the appeal, affirm the conviction on the possession count and uphold the Court of Appeal's order for a new trial on the making available count.

*Appeal dismissed.*

*Pourvoi rejeté.*

### Appendix

*PERSONAL INFORMATION PROTECTION AND ELECTRONIC DOCUMENTS ACT*, S.C. 2000, C. 5

**7.** . . .

(3) [Disclosure without knowledge or consent] For the purpose of clause 4.3 of Schedule 1, and despite the note that accompanies that clause, an organization may disclose personal information without the knowledge or consent of the individual only if the disclosure is

. . .

(*c*) required to comply with a subpoena or warrant issued or an order made by a court, person or body with jurisdiction to compel the production of information, or to comply with rules of court relating to the production of records;

(*c.1*) made to a government institution or part of a government institution that has made a request for the information, identified its lawful authority to obtain the information and indicated that

. . .

        (ii) the disclosure is requested for the purpose of enforcing any law of Canada, a province or a foreign jurisdiction, carrying out an investigation relating to the enforcement of any such law or gathering intelligence for the purpose of enforcing any such law, or

. . .

(*d*) made on the initiative of the organization to an investigative body, a government institution or a part of a government institution and the organization

(i) has reasonable grounds to believe that the information relates to a breach of an agreement or a contravention of the laws of Canada, a province or a foreign jurisdiction that has been, is being or is about to be committed, or

(ii) suspects that the information relates to national security, the defence of Canada or the conduct of international affairs;

. . .

*Criminal Code of Canada*, R.S.C. 1985, c. C-46

**163.1** . . .

(3) [Distribution, etc. of child pornography] Every person who transmits, makes available, distributes, sells, advertises, imports, exports or possesses for the purpose of transmission, making available, distribution, sale, advertising or exportation any child pornography is guilty of

(a) an indictable offence and liable to imprisonment for a term not exceeding ten years and to a minimum punishment of imprisonment for a term of one year; or

(b) an offence punishable on summary conviction and is liable to imprisonment for a term not exceeding two years less a day and to a minimum punishment of imprisonment for a term of six months.

**487.014** (1) [Power of peace officer] For greater certainty, no production order is necessary for a peace officer or public officer enforcing or administering this or any other Act of Parliament to ask a person to voluntarily provide to the officer documents, data or information that the person is not prohibited by law from disclosing.

Footnotes

*        A corrigendum issued by the Court on June 17, 2014 has been incorporated herein.

**EXHIBIT EN-27**

**TO THE DECLARATION OF EVAN NUTTALL**

2018 MBQB 46
Manitoba Court of Queen's Bench

Fletcher et. al. v. Hull et. al.

2018 CarswellMan 109, 2018 MBQB 46, 290 A.C.W.S. (3d) 837, 40 C.P.C. (8th) 420

## LAUREL FLETCHER AND THE PAWSH DOG INC. (Plaintiffs) and SALLY HULL AND HULL'S HAVEN BORDER COLLIE RESCUE INC. (Defendants)

Dewar J.

Judgment: March 22, 2018
Docket: Winnipeg Centre CI 17-01-10515

Counsel: Troy Harwood-Jones, Justin Silicz, for Plaintiffs
Gavin Wood, for Defendants

*Dewar J.*:

1    This is a motion requesting an interim mandatory injunction requiring the defendants to return a dog called "Harry" to the plaintiff's place of business on Taylor Avenue in Winnipeg. It is opposed by the defendants.

2    A brief recitation of the facts, many of which are non-contentious, provides a backdrop to the decision that needs to be made.

3    The plaintiff Laurel Fletcher ("Fletcher") operates a company The Pawsh Dog Inc. ("Pawsh") which operates a business that provides daycare, hotel, training, and salon services for dogs with a facility located at 1580 Taylor Avenue in the City of Winnipeg.

4    The defendant Hull is the owner of a non-profit company called Hull's Haven Border Collie Rescue Inc. ("Hull's Haven") which rescues dogs from unhappy circumstances and finds new homes for them.

5    Harry is a seven or eight-year-old Xolo/Border Collie cross. He had been abused in his early life and had been rescued by Ms. Hull. She had originally adopted Harry out to a woman named Shelagh who, because of ill health, had been obliged to return Harry to Ms. Hull.

6    In a January 2013 edition of the Winnipeg Free Press, a journalist wrote a story about the rescue of Harry, his subsequent adoption by Shelagh, and his return to Ms. Hull. The article ended with the note "if you think you'd like to adopt Hairless Harry ..., you can email Sally ..." The article quoted Ms. Hull as describing Harry as follows:

He is such a wonderful dog we feel he'd make a fabulous storefront dog. You know, kind of like the Walmart greeter, but for a tire store or a clothing store or a bank. Then he'd be with people all day...

7    On January 30, 2013, Ms. Fletcher sent an email to Ms. Hull referencing the Free Press article and introducing herself and her business and expressing an interest in adopting Harry as a store mascot. She outlined in her correspondence the use to which Harry would be put. Her email included her criteria for a successful adoption, including the following:

Must be mentally stable enough to adapt to spending time with a variety of people doing a variety of activities. Most of my employees are long- term, so he will have the opportunity to bond and have "his people" but I don't want a dog that will immediately bond to one person and disregard others. He will get to come home to the farm with me on weekends, and also my staff often take our "store rescue" home for sleepovers, to the park, for walks, and other stuff. If he doesn't

go home for a sleepover, he would stay at the store hotel. We are staffed 24/7/365 so Harry would never have to be alone or in a kennel if he doesn't want to be.

8       There was some subsequent telephone discussion between Ms. Hull and Ms. Fletcher which resulted in Ms. Fletcher's adoption of Harry effective February 2013. According to Ms. Fletcher, the only other written evidence of the adoption contract was an email from Hull's Haven acknowledging the application form supplied by Ms. Fletcher and accepting the application. Ms. Hull however makes reference to a three-page document which she says was on the Hull's Haven webpage through which Ms. Fletcher's application was submitted, and which contains a number of provisions including the following:

**Mismatched Homes**

Adoption fees will be returned in full for any dog brought back into rescue within 14 days of adoption. Regardless of time in the adoptive home, all dogs, without exception must be returned to rescue if the adoptive family is no longer interested in keeping the dog or legal action may be taken. If the adoptive family has located new potential owners, they may not place the dog without written consent from a director of Hull's Haven Border Collie Rescue. Although HHBCR will take into consideration the family's wishes with regard to placement of the dog, HHBCR has the final determination. The family must meet the adoption criteria and an adoption agreement must be signed by the new family.

If the dog has been placed without consent from Hull's Haven Border Collie Rescue, the rescue reserves the right to repossess the dog. Adopted dogs may not be surrendered to any other pound, rescue or animal facility. If an adopted dog is discovered in a pound, rescue or other facility, any expenses incurred to return the dog back into the care of Hull's Haven Border Collie Rescue will be billed to the adoptive family on file with Hull's Haven Border Collie Rescue accordingly. No dog adopted from HHBCR may be euthanized without express written consent from HHBCR unless the dog is too old, ill or injured beyond saving. In the regard of illness or injury, HHBCR must be contacted.

If it is discovered that any dog adopted from Hull's Haven Border Collie Rescue is being kept in neglectful conditions as determined by the *Manitoba Animal Care Act*, Hull's Haven Border Collie Rescue reserves the right to repossess said dog at that time with no return of the adoption fee. This situation may or may not be discussed with the adoptive family prior to the seizure dependent on the condition of the adoptive pet. This also includes methods of training deemed cruel and inhumane by Hull's Haven Border Collie Rescue. No HHBCR dog may be kept outside on a permanent basis. All HHBCR dogs are to be kept as house pets.

9       It is these provisions upon which the defendants rely in resisting this motion.

10      As early as May 12, 2013, approximately four months after the adoption, Ms. Hull began communicating with Ms. Fletcher about Harry's care. She wrote on that date, amongst other things:

I am very sad to hear that Harry does not have a home or his own family. That wasn't what we had agreed upon when you adopted him.

11      In the exchange of texts following that day, Ms. Fletcher tried to assure Ms. Hull that Harry was being properly looked after including that she takes Harry home when she is able to supervise him, and that he often goes home with other employees. No comment is made by Ms. Fletcher on that date as to whether she agrees with Ms. Hull's statement that the agreement required Harry to have "a home or his own family."

12      In June 2016, Ms. Hull again texts Ms. Fletcher and advises that she has heard that Harry was up for adoption and seeks clarification. Ms. Fletcher responds that she knows nothing of that suggestion, and a discussion ensues as to how Harry is doing. Ms. Fletcher writes:

He's a good boy. Likes routine. Has everyone trained about all his likes and dislikes. Has more lotions and potions and creams than I do! I don't know where this up for adoption thing is starting, but it hasn't even been mentioned, so there must be some sort of confusion. He goes on lots of outings and sleepovers, so there are likely a million pictures of him

2

floating around. Me and a few staff take him home when we have no plans to go out or anything. He still hates to be kenneled or alone, so he goes "home" when one of us can be with him all the time until we come back to Pawsh the next day. Otherwise he stays at Pawsh where he can just do what he wants. Harry is exactly happiest when he is doing exactly what he wants to do.

13    Ms. Hull answered that email as follows: "LOL that's awesome."

14    Then, on August 29, 2017, Ms. Hull texted Ms. Fletcher demanding as follows:

Laurel I am going to take Harry back. I have proof he is neglected and you have not seen him in months. I adopted him to YOU not Pawsh. You have breached contract and I would recommend you don't fight me on this because I have witnesses and photos. I am shocked and disgusted that this poor dog who belonged to my friend who died of cancer is being neglected.

15    This demand came when Ms. Fletcher was in the hospital having just given birth to a baby following a complicated pregnancy. The demand was answered by Ms. Fletcher's husband and a series of texts were exchanged in which Mr. Fletcher maintained that Harry was well and Ms. Hull insisted that she wanted Harry back. Mr. Fletcher arranged for Harry to be taken to the vet and then reported to Ms. Hull as follows:

The vet has provided Harry 'with a clean bill of health. He has been carefully examined and his results documented. He has some scabs on his ears from shaking them against his head that we manage with a happy hoodie and antibiotic cream.'

16    He goes on to say:

If you would like to meet me or send someone with a signed document stating that they are picking Harry up on your behalf, I'm happy to meet them and let them bring him to you.

17    Further in his text he wrote:

I would also like to make it clear that Harry clearly belongs to Laurel and not you. We are simply releasing him to you so that you can see that he is okay.

18    In later exchanges, Mr. Fletcher wrote:

I want you to know that we truly want what's best for Harry and if there is a home that can meet all his needs that BOTH you and Laurel are comfortable with, we are happy to discuss it. He is a high maintenance guy that does best on a routine in familiar surroundings. He gets anxiety from change and unfamiliar people/situations.

If he is to go into a home, he will need someone completely devoted to him. Laurel also wants to be clear that if you find him unmanageable he is welcome to come home.

19    Ms. Hull attended upon the Pawsh facility on August 30, 2017 and took Harry away. She did not speak to either Mr. or Ms. Fletcher on that occasion and simply left a letter with an employee that said

To whom it may concern:

The dog known as Harry, adopted by Laurel (Skuba) Fletcher is being transferred back into the care of HHBCR.

20    Ms. Hull took Harry to a veterinarian on August 30, 2017. Dr. Hawkes noted severe tartar and gingivitis as well as made comment about an ear issue, prescribing certain medications for Harry's ear, ointment for his skin, and what appears to be a heartworm pill. Harry was scheduled for a dental cleaning and his ears and skin were to be rechecked in 10 days. This does not appear to be significantly worse than was recorded by the veterinarian who, at Mr. Fletcher's insistence, saw Harry on August 29, 2017. Indeed that veterinarian, Dr. Iacovides made comments about Harry's ears and skin and teeth. At the bottom of his report, he wrote "overall healthy dog; just dirty teeth."

21     In mid-September, counsel for the plaintiffs demanded the return of the dog. A statement of claim was issued on October 4, 2017 in which the return of Harry was claimed as was damages arising from the conversion as well as for defamation arising from a Facebook post made by Ms. Hull following her repossession of Harry. This motion was commenced on December 12, 2017.

**THE LAW**

22     The main form of relief requested in the notice of motion is as follows:

> A mandatory injunction requiring the Defendants to return the Plaintiff's dog Harrison, more commonly known as "Harry", to the Plaintiff's place of business located at 1580 Taylor Avenue, Winnipeg, Manitoba, where Harry was originally removed by Defendants on August 30, 2017, on or before 10 days after service of the Order.

23     This request prompted counsel on both sides to deposit with the court the usual leading authority relating to interlocutory injunctions, namely *RJR-MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311 (S.C.C.) at p.334. There, the court reiterated the three-part test that was laid down in *Metropolitan Stores (MTS) Ltd. v. Manitoba Food & Commercial Workers, Local 832*, [1987] 1 S.C.R. 110 (S.C.C.) as follows: (*RJR-MacDonald* at p. 334):

> *Metropolitan Stores* adopted a three-stage test for courts to apply when considering an application for either a stay or an interlocutory injunction. First, a preliminary assessment must be made of the merits of the case to ensure that there is a serious question to be tried. Secondly, it must be determined whether the applicant would suffer irreparable harm if the application were refused. Finally, an assessment must be made as to which of the parties would suffer greater harm from the granting or refusal of the remedy pending a decision on the merits. It may be helpful to consider each aspect of the test and then apply it to the facts presented in these cases.

24     Shortly before the filing of the briefs in this case, the Supreme Court of Canada had occasion to consider the topic of mandatory injunctions in the case of *R. v. Canadian Broadcasting Corp.*, 2018 SCC 5 (S.C.C.) ("*CBC*"). In the *CBC* case, the court unanimously modified the *RJR-MacDonald Inc.* and *Metropolitan Stores* test in the context of a mandatory injunction by replacing the "serious question to be tried" criterion with whether the applicant has shown "a strong *prima facie* case" Brown J went on to describe that to mean (at para. 17):

> 17 This brings me to just what is entailed by showing a "strong *prima facie* case". Courts have employed various formulations, requiring the applicant to establish a "strong and clear chance of success"; a "strong and clear" or "unusually strong and clear" case; that he or she is "clearly right" or "clearly in the right"; that he or she enjoys a "high probability" or "great likelihood of success"; a "high degree of assurance" of success; a "significant prospect" of success; or "almost certain" success. Common to all these formulations is a burden on the applicant to show a case of such merit that it is very likely to succeed at trial. Meaning, that upon a preliminary review of the case, <u>the application judge must be satisfied that there is a strong likelihood on the law and the evidence presented that, at trial, the applicant will be ultimately successful in proving the allegations set out in the originating notice.</u>

> [emphasis added]

25     The *CBC* case did not change the other criteria referred to in *RJR-MacDonald Inc.* and *Metropolitan Stores*.

26     The test for the court to apply in this case is therefore:

> (a) Have the plaintiffs demonstrated a strong *prima facie* case?

> (b) Have the plaintiffs demonstrated that irreparable harm will result if the relief is not granted? and

> (c) Have the plaintiffs shown that the balance of convenience favours granting the injunction?

27    There is one other area of law that needs to be reviewed before rendering a decision. This case deals with a domesticated dog, commonly referred to as a pet. One does not have to go far to see in life that many people treat their pets like children. They are loved, they are protected, and they are enjoyed. The law however does not treat pets like children. With the exception of *The Animal Care Act*, C.C.S.M., c. A84 (the *Act*), the law treats a pet as a chattel, and more specifically like livestock. Although counsel for the plaintiffs in his brief urged that animal companions must be treated differently from other property, there is not yet strong support for that notion. Indeed the case relied upon by the plaintiffs, namely *Gardiner-Simpson v. Cross*, 2008 NSSM 78 (N.S. Small Cl. Ct.) , a decision from the Nova Scotia Small Claims Court contained this language: (at paras. 3-5):

3 The love that humans can develop for their pets is no trivial matter, and the loss of a pet can be as heartbreaking as the loss of any loved one.

4 Emotion notwithstanding, the law continues to regard animals as personal property. There are no special laws governing pet ownership that would compare to the way that children and their care are treated by statutes such as the *Custody and Maintenance Act* or the *Divorce Act*. Obviously there are laws that prohibit cruelty to animals, but there are no laws that dictate that an animal should be raised by the person who loves it more or would provide a better home environment.

5 As such, slightly distasteful as it may be in the case of two loving and devoted pet owners, I must consider which one has the better property claim.

28    More latterly in this province, in this court, Toews J in *McIntosh v. Daoust*, 2016 MBQB 194 (Man. Q.B.) wrote (at para 11):

11 The affection that the defendant and the defendant's children may have for Fuhrious Finneous, and that he may have been treated as a family dog by the parties while the parties resided together, is not relevant to the determination of ownership of the dog. Furthermore, I disagree with the defendant that the best interests of the dog are relevant to the determination of this matter. While allegations of abuse may be relevant to other legal proceedings which the defendant may wish to explore if there is indeed any basis for such allegations, including any investigation or proceedings authorized by *The Animal Care Act*, C.C.S.M. c. A84, they are not relevant here.

29    I propose to deal with this case on the basis of the mandatory injunction principles referred to above, and the respective proprietary, as distinct from emotional, claims that each side has to Harry.

**ANALYSIS**

*(a) Whether the plaintiffs have demonstrated a strong prima facie case?*

30    The plaintiffs argue that they have demonstrated to an appropriate extent the merits of their position. In short, they argue that they acquired Harry from the defendants with no strings attached; that the right of the defendants to repossess Harry was never a term of the adoption agreement. The plaintiffs argue that the terms set out in the document relied upon by the defendants were unknown to them at the time of the adoption agreement. As such, once the adoption had been accepted and delivery made back in 2013, the defendants had no right to repossess Harry.

31    Alternatively, even if the written adoption agreement applies, the plaintiffs argue that the right of repossession in the document relied upon by the defendants is restricted to three circumstances:

(a) to the circumstance in which the adopting party transfers the dog to a third party without first obtaining the consent of the defendants;

(b) to the circumstance in which the dog was being kept in "neglectful conditions as determined by the *the Act*"; or

(c) possibly, to the circumstance where the dog was not kept as a house pet.

32      Even if the three-page terms of agreement formed part of the adoption arrangements, the plaintiffs submit that the circumstances which would justify a repossession under those terms do not exist. The plaintiffs submit that this case certainly does not involve the circumstance where they transferred the dog to a third party. Additionally, there has been no involvement by the government department that administers *The Manitoba Animal Care Act*, nor is there any evidence to demonstrate that Harry's condition would even qualify for their intervention. As to the provision in the written document relied upon by the defendants that Harry was to be kept as a house pet, Ms. Fletcher points to her initial email about the use to which Harry was going to be put and to Ms. Hull's apparent acceptance of that use in the texts which were sent in the years following the adoption. The plaintiffs essentially argue that the defendants have seized upon the "house pet" term as a convenient pretext to demanding repossession even though they were well aware as to where Harry was going to be spending his nights.

33      The defendants take the converse position. They argue that the three-page list of conditions were situated on the webpage where Ms. Fletcher made her application, and she could not have avoided seeing them. Furthermore, the defendants argue that they were entitled to repossess Harry if he was not customarily taken home to one family every night, and certainly if he was otherwise being mistreated.

34      The onus is upon the plaintiffs to establish a strong *prima facie* case. Here, there are issues between the parties as to the terms of the adoption agreement, and even if the terms are as stated by the defendants, there are issues as to whether the terms were breached. The affidavits and cross-examinations before me are unclear as to where on the webpage the adoption terms and conditions were published. I cannot tell from the evidence before me whether it was impossible to make an application without acknowledging by a click of a mouse that the applicant would be bound by the terms and conditions, or whether the terms and conditions, if on the webpage at all at the material time, were sufficiently located on the webpage to give a prospective applicant significant notice of their existence. Ms. Fletcher says she never saw them. Ms. Hull says they were there. There is no doubt that they were on the webpage at the time of the cross-examination of Ms. Fletcher, because she went to the page over the noon hour before her examination began. Ms. Hull has sworn to the existence of the terms and conditions on the webpage at the time of the adoption application.

35      I simply conclude that I cannot make a determination on this point on an interlocutory application. Both parties have an argument to make on it.

36      Even if I assumed that the terms and conditions formed part of the contract, the defendants maintain that the evidence is sufficient to demonstrate that Harry was supposed to go home consistently with Ms. Fletcher every night. The wording of the alleged terms and conditions suggest at least that requirement when it contains the wording that "all HHBCR dogs are to be kept as house pets." Yet the language contained in the initial email from Ms. Fletcher outlining her criteria for a successful adoptee and some of Ms. Hull's post-adoption texts or emails suggest that the strict wording contained in the alleged terms and conditions was not to be necessarily applied in the case of Harry. However, I have no idea on the information before me what the discussions were between Ms. Fletcher and Ms. Hull, if any, prior to the adoption.

37      As to the allegations of neglect, there are a number of affidavits from women in Ms. Hull's camp which provide anecdotal reports of Harry's care while in the possession of the defendants.

38      I have discounted a significant portion of those affidavits because in some respects they appear to be fuelled by personal animosity towards Ms. Fletcher, and because they are opinions expressed by people unrelated to *the Act*. Raising dogs is not like raising children; there are a number of different levels of care that responsible owners might provide. I have difficulty interpreting the alleged terms and condition. Do they require the intervention of an animal protection officer acting under the authority of *the Act*, or do they simply compare the level of care being given against *s. 6(1) of the Act* which lays down the criteria for determining when an animal is in distress. I am satisfied that some of the complaints relied upon by the defendants exceed the standards set forth by *the Act*. However, *s. 6(1)(d)* and *s. 6(1)(f)* are areas that to me on the evidence before me are still inconclusive. Nonetheless, I am content to say that the defendants have the uphill road to establish neglect in this case. What else am I to think given the comments made by the plaintiffs' veterinarian the day before Ms. Hull acquired possession of Harry. Nonetheless, the equivocation which I do have arises from the fact that August 30, 2017 is a particular point in time

whereas at least some of the complaints included in the affidavits filed by the defendant reference to earlier periods of time. One of the questions for the trial judge will be whether past mistreatment, if proven, which has been remedied at the date of the repossession of Harry triggers the right to repossess. Suffice it to say at this juncture, the defendants at least have an arguable position which takes away the ability of the plaintiffs to demonstrate a strong *prima facie* case on this issue.

39   In short, the plaintiffs have not demonstrated a strong *prima facie* case.

***(b) Have the plaintiffs demonstrated that irreparable harm will result if the relief is not granted?***

40   If the plaintiffs are correct, they can be compensated in damages. Although I accept that they have a fondness for Harry, the fact is that he was not a house dog. He was a working dog. The close attachment that one might have to a dog in their home on a daily basis simply does not appear to exist. By their own admissions in the text messages, Harry was going home to a number of people's houses. At best, he only went home with Ms. Fletcher when she could supervise him. The amount of time that Harry stayed overnight at Pawsh is not clearly defined. There appears to be more of a commercial attachment to Harry on the part of the plaintiffs than an emotional one, and under such circumstances it is more the loss of use of Harry in the period pending trial than the loss of the intangible love and affection for which compensation might be awarded. The more commercial the arrangement, the easier the assessment. I do not view this case as involving irreparable loss.

***(c) Have the plaintiffs shown that the balance of convenience favours granting the injunction?***

41   Although I frown upon the way in which Ms. Hull acquired possession of Harry, the fact is that there is no greater loss sustained by Ms. Hull if she had to retransfer possession than the loss sustained by Ms. Fletcher if Harry remained where he currently is. Ms. Hull has been content to let Harry out for the time being. Ms. Fletcher, although not having Harry in her business for the time being, does not suffer significantly by having Harry unavailable pending trial. There is reasonable suggestion in the evidence before me that she did not care for Harry every day - her employees did, even taking him home at night. The balance of convenience in this case is neutral.

*Conclusion*

42   When I look at these factors, the first two criteria are in favour of the defendants and the last criterion is neutral. I conclude that no injunction need be ordered. I am therefore dismissing the motion.

44   On the question of costs, I am prepared to permit counsel to speak to them because I have no knowledge of what efforts the respective parties have made to settle this motion. Having said that, I am not currently leaning towards a costs award in favour of the defendants. On the basis of the information before me, Ms. Hull appeared overzealous and to an extent insulting when she communicated with Mr. Fletcher on August 29, 2017, who clearly had his hands full at that time with the matters going on within his family, and who suggested ways to resolve matters. At the time, Ms. Hull seem to insist upon a resolution on her terms only, notwithstanding the vagaries of her position. It seems to me that her approach to Mr. Fletcher was significantly more aggressive than it needed to be and created a climate between the parties that led to this motion. Her suggestions in her affidavit that there was a voluntary surrender of Harry to her is a gross overstatement. There was a voluntary delivery of Harry to her, but I do not accept on the evidence before me that she could construe Mr. Fletcher's text message as signifying a permanent surrender. Her taking of Harry as she did took advantage of Mr. Fletcher and the defendants at a difficult time. Nonetheless, it is what it is, but unless there is good evidence that she made subsequent significantly good offers to avoid this motion, I am not currently favourably disposed to making much if any of an order of costs in her favour. Although telegraphing my thoughts, I simply say for the time being that costs may be spoken to.

*Motion dismissed.*

**EXHIBIT EN-28**

**TO THE DECLARATION OF EVAN NUTTALL**

2016 FC 1255, 2016 CF 1255
Federal Court

1395804 Ontario Ltd. v. Canada (Attorney General)

2016 CarswellNat 5931, 2016 CarswellNat 5932, 2016 FC 1255, 2016 CF 1255, 273 A.C.W.S. (3d) 618

### 1395804 ONTARIO LTD., OPERATING AS BLACKLOCK'S REPORTER (Plaintiff) and CANADA (ATTORNEY GENERAL) (Defendant)

R.L. Barnes J.

Heard: September 19, 2016; September 20, 2016; September 21, 2016; September 22, 2016; September 23, 2016
Judgment: November 10, 2016
Docket: T-1391-14

Counsel: Mr. Yavar Hameed, for Plaintiff
Mr. Alex Kaufman, Ms Orlagh O'Kelly, for Defendant

*R.L. Barnes J.*:

1    This is a case about copyright. More specifically, it is a case about the fair dealing provisions of the *Copyright Act*, RSC, 1985, c C-42 [the Act] in the context of third party use of content protected by a paywall.

2    The Plaintiff, carrying on business as Blacklock's Reporter [Blacklock's], contends that officials in the Department of Finance [the Department] violated its copyright by obtaining, reading and distributing two of its news articles without authorization.

3    The Attorney General argues that Blacklock's conduct is a misuse of copyright and that the conduct Blacklock's complains about constitutes fair dealing under section 29 of the Act.

**I. Background**

4    Blacklock's is a small Ottawa-based, online news agency. It is owned and operated by Tom Korski and Holly Doan. Mr. Korski is the managing editor and Ms. Doan is the publisher. Mr. Korski writes news copy for Blacklock's along with a number of free-lance reporters. Among other duties, Ms. Doan looks after the negotiation of licensing agreements for institutional subscribers.

5    Blacklock's employs a paywall to protect its news copy. In order to gain access to the full content of its news articles a paid subscription and a password are required. Single subscriptions are available through an online application. The application does not require a subscriber to acknowledge and accept any terms of use before the transaction is concluded. It does, however, refer to the purchase of custom bulk rates for institutional subscribers who would like to distribute or share Blacklock's content in-house. At the foot of the subscription application is a reference to "Terms and Conditions" but these are not particularized and would only be seen by a subscriber following a search of Blacklock's website.

6    Blacklock's complains that in October 2013 certain Department officials acquired and distributed two of its news articles without its consent and without payment. For this alleged infringement it seeks damages of $17,209.10.

7    The underlying relevant facts are largely undisputed. Indeed, the parties tendered an Agreed Statement of Facts which generally describes the conduct that is the subject of this proceeding.

1

8      In the course of writing a news story about changes to Canadian sugar tariffs, Mr. Korski interviewed the President of the Canadian Sugar Institute, Sandra Marsden. Mr. Korski also made enquiries of the Department seeking information about the tariff changes. The Department's media relations officer, Stéphanie Rubec, responded to Mr. Korski and provided an explanation. Further email exchanges between Mr. Korski and Ms. Rubec took place throughout the afternoon of October 9, 2013 culminating in a detailed response sent to Mr. Korski by Ms. Rubec at 7:25 pm. According to Mr. Korski, he had earlier signed off on his article and did not see Ms. Rubec's final response until sometime the next day. Mr. Korski's article was then published online on October 10, 2013 without any reference to Ms. Rubec's last response.

9      Mr. Korski's article carried the headline "$30,000,000 Sugar Tax is Averted". Notwithstanding Ms. Rubec's several on-the-record responses to Mr. Korski's questions, his article improperly attributed "did not comment" to the Defendant. [1]   The article quoted Ms. Marsden at length and included Mr. Korski's characterization of a "Department of Finance error" in the imposition of a $30 million sugar tax on the Canadian sugar industry.

10      Ms. Marsden's attention was drawn to Mr. Korski's article upon receipt of an email sent to her by Blacklock's at 9:12 am on October 10, 2013. The email included the following digest of Mr. Korski's article:

> $30,000,000 Sugar Tax Is Averted
>
> A Department of Finance error that meant a $30 million sugar tax is being remedied following appeals from industry. A trade group said a mistaken tariff hike on Brazilian imports would have forced the closure of at least one Canadian sugar refinery: "We would have been a casualty."
>
> Read more.
>
> [See Exhibit D-53]

11      At about the same time, a Twitter message was sent by Blacklock's to Ms. Marsden stating: "Lucy and Ethel at Finance Canada impose a $30M sugar tax by mistake at *blacklocks.ca*".

12      Because Ms. Marsden could not access the entire article without a subscription she went online and paid for a single annual subscription at a price of $148.00. She then copied Mr. Korski's article.

13      Ms. Marsden testified that she was immediately concerned about the accuracy of Mr. Korski's article and particularly, with his pejorative attribution of an "error" to the Department. She was concerned that this statement might be linked to her and cause damage to her working relationship with Department officials. In order to manage that relationship she sent Mr. Korski's article to Patrick Halley in the International Trade Policy Division by pasting the content of the article into an email. Ms. Marsden's email stated: "Most of the facts are accurate although I'm not all happy with the spin — obviously I wouldn't have characterized this as a 'sugar tax' nor a Department of Finance 'error'."

14      On October 11, 2013 Mr. Korski wrote a second article on the same subject. The title of the second piece was "It didn't make any sense..." Once again Mr. Korski cast the Department in an unfavourable light. Notwithstanding Mr. Korski's awareness of Ms. Rubec's detailed responses, this article contained the following opening sentence:

> The Department of Finance is at a loss to explain how it mistakenly set a $30 million sugar tax, then had to withdraw it by special amendment amid industry protest.

15      Using her subscription password Ms. Marsden obtained a copy of this article and again sent it by email to Mr. Halley. Ms. Marsden testified that she was unaware of Blacklock's Terms and Conditions for use and it never crossed her mind that, by sending the articles to Mr. Halley, she could be infringing Blacklock's copyright.

16      At the time of receiving the subject articles, the Department did not have a Blacklock's subscription. The evidence discloses, however, that Ms. Rubec had made an earlier enquiry to Ms. Doan about a bulk subscription allowing for general

departmental access. Ms. Doan provided multiple user rates of between $11,470.00 and $15,670.00 (see Exhibit P-61), but nothing further came of the matter.

17    When Mr. Halley received the first Blacklock's article he forwarded it by email to Ms. Rubec. Mr. Halley expressed some concern about the content of the story stating: "I think the spin can be corrected by going through the dates and facts, especially as sugar industry clearly understands what we did and does not agree with the reporter's characterization" (see Exhibit D-83). Ms. Rubec responded, in part, as follows: "The reporter wrote at about 4:30 that he would put us down as a no comment regardless and was set on his spin [...]. I'm going to ask the reporter to update his story with what I provided as lengthy information/ comment. I'll let you know what he says."

18    Mr. Halley also forwarded the first article to his departmental colleagues Dean Beyea and Scott Winter, advising them that he was in contact with Ms. Rubec "in Media Relations on whether follow-up is needed". Scott Winter, in turn, sent the article to his colleague, Karen LaHay. [2]

19    When Mr. Halley received Blacklock's second story "It didn't make any sense..." he sent it to another colleague, Michèle Govier. He also sent it to Mr. Beyea, Mr. Winter and Ms. LaHay with the comment: "Not totally accurate still but better than the first story" (see Exhibit D-84).

20    Mr. Winter was a senior policy analyst in Mr. Halley's working group and Mr. Beyea was Mr. Halley's immediate supervisor. Ms. LaHay was also a senior policy analyst who worked with Mr. Winter in Mr. Halley's group. Mr. Halley testified that each of these individuals was included in the circulation of the Blacklock's articles because of their possible involvement in a follow-up to the articles. Ms. Govier was included because she was working on a related anti-dumping file involving the sugar industry. Ms. Rubec was involved because she was the media relations officer who had been directly communicating with Mr. Korski on the story and who would be expected to communicate with him in the future.

21    The documentary record indicates that only six departmental officials received copies of one or both of the Blacklock's articles beginning with Mr. Halley. [3] Notwithstanding the stated departmental concerns about the content of Mr. Korski's articles no further follow-up was deemed necessary and the matter was dropped.

## II. Analysis

22    To resolve this matter I need only decide whether the conduct Blacklock's impugns is protected under the fair dealing provisions of the Act and, in particular, section 29. Although there are certainly some troubling aspects to Blacklock's business practices it is unnecessary to resolve the Attorney General's allegation that this litigation constitutes a form of copyright abuse by a copyright troll.

23    I accept Blacklock's point that it has established that its copyrighted material was used by the Department without payment or consent. Indeed, the Defendant admits those facts. The burden accordingly rests on the Attorney General to establish, on a balance of probabilities, that this acknowledged use is protected by section 29 of the Act.

24    Fair dealing by a user of copyrighted material is a well-recognized right under the Act. Section 29 provides basic legal protection where the purpose of use is "research, private study, education, parody or satire." The scope of protection afforded by section 29 is also well-understood. The policy rationale for protecting user rights has been described by Professor David Vaver in Intellectual Property Law: Copyright, Patents, Trade-marks, 2d ed (Toronto: Irwin Law, 2011) at page 215:

The *Copyright Act* lets users carry on a wide range of activities without needing to worry about copyright. What the Act specifically permits is not an infringement. Whoever does a permitted act is not just taking advantage of a limitation, exception, exemption, defence, "loophole," or gracious indulgence extended by a copyright owner. He is exercising a right inherent in the balance the *Copyright Act* strikes between owners and users. Both owner and user rights must receive the fair and balanced reading that befits remedial legislation. User rights need to be as liberally interpreted as owner rights

are, lest copyrights become "instruments of oppression and extortion" and unduly interfere with people's rights to deal as they wish with their own tangible property.

[Footnotes omitted.]

25      The two leading cases dealing with section 29 are *CCH Canadian Ltd. v. Law Society of Upper Canada*, 2004 SCC 13, [2004] 1 S.C.R. 339 (S.C.C.) [*CCH*] and *Public Performance of Musical Works, Re*, 2012 SCC 36, [2012] 2 S.C.R. 326 (S.C.C.) [*SOCAN*]. In *CCH*, Chief Justice McLachlin writing for the Court noted that, in order to maintain the proper balance between the protection of and access to copyrighted materials in the Act, the fair dealing provision "must not be interpreted restrictively" (paras 48, 54). The Court set out a two-part test for determining whether use of copyrighted material constitutes fair dealing, which it characterized not as a defence but as a "user's right" (para 48):

  1. Whether the dealing is for the purpose of "research" or "private study", also known as an allowable purpose; and

  2. Whether the dealing is "fair" (para 50).

26      While the Court in *CCH* did not define "research", it notably concluded that "'[r]esearch' must be given a large and liberal interpretation in order to ensure that users' rights are not unduly constrained" (para 51). With respect to the second part of the test, whether something is "fair" is a question of fact and depends on the facts of each case (*CCH*, para 52). Relevant factors to consider are:

  1. The purpose of the dealing, where an objective assessment is made of the "real purpose or motive" behind using the copyrighted work, such as for commercial purposes versus charitable purposes (para 54);

  2. The character of the dealing, examining how the works were dealt with, such as whether multiple copies of works are being widely distributed, or whether a single copy of a work is used for a legitimate purpose (para 55);

  3. The quantity or amount of the dealing, including the importance of the work allegedly infringed (para 56);

  4. Alternatives to the dealing, such as whether there is a non-copyrighted equivalent of the work that could have been used instead (para 57);

  5. The nature of the work, such as whether the work has been published or is confidential (para 58); and

  6. The effect of the dealing on the work, such as whether a reproduced work is likely to compete with the market of the original work (para 59).

27      In *CCH*, the issue was whether the Law Society of Upper Canada's [LSUC] provision of custom photocopy services to members of the LSUC was an infringement of legal publishers' copyrights, or whether it constituted "fair dealing". The Court's operative conclusion with respect to the service being an allowable purpose is as follows:

  64 The Law Society's custom photocopying service is provided for the purpose of research, review and private study. The Law Society's Access Policy states that "[s]ingle copies of library materials, required for the purposes of research, review, private study and criticism ... may be provided to users of the Great Library." When the Great Library staff make copies of the requested cases, statutes, excerpts from legal texts and legal commentary, they do so for the purpose of research. Although the retrieval and photocopying of legal works are not research in and of themselves, they are necessary conditions of research and thus part of the research process. The reproduction of legal works is for the purpose of research in that it is an essential element of the legal research process. There is no other purpose for the copying; the Law Society does not profit from this service. Put simply, its custom photocopy service helps to ensure that legal professionals in Ontario can access the materials necessary to conduct the research required to carry on the practice of law. In sum, the Law Society's custom photocopy service is an integral part of the legal research process, an allowable purpose under s. 29 of the *Copyright Act*.

28      The Court went on to conclude that the dealing was also fair, considering the LSUC provides single copies of works for the specific purposes allowed under section 29, the existence of an "Access Policy" provided to all users, the lack of alternatives to the custom photocopy service, the public interest in access to judicial decisions and other legal resources not being unjustifiably restrained, and the lack of evidence tendered to show the market for the publishers' work decreased as a result of the copies being made.

29      Also notable in the *CCH* decision is the following:

> [t]he availability of a license is not relevant to deciding whether a dealing has been fair ... If a copyright owner were allowed to license people to use its work and then point to a person's decision not to obtain a licence as proof that his or her dealings were not fair, this would extend the scope of the owner's monopoly over the use of his or her work in a manner that would not be consistent with the Copyright Act's balance between owner's rights and user's interests (para 70).

30      In *SOCAN*, the issue was whether the appellants were entitled to collect royalties from Bell for the provision of music "previews" — 30 to 90 second excerpts — that could be streamed online by consumers before purchasing the entire musical track. The previews helped users decide whether to purchase a permanent download of the work. In concluding that the use of the previews constituted "research" under section 29, Madam Justice Abella said:

> [18] The Federal Court of Appeal endorsed the Board's view that listening to previews was part of planning the purchase of a download of a musical work and was therefore "for the purpose of research", concluding:
>
>> ... it would not be unreasonable to give the word "research" its primary and ordinary meaning. The consumer is searching for an object of copyright that he or she desires and is attempting to locate and wishes to ensure its authenticity and quality before obtaining it.... "[L]istening to previews assists in this investigation". [para. 20]
>> . . . . .
>
> [21] It is true that an important goal of fair dealing is to allow users to employ copyrighted works in a way that helps them engage in their own acts of authorship and creativity: Abraham Drassinower, "Taking User Rights Seriously", in Michael Geist, ed., *In the Public Interest: The Future of Canadian Copyright Law* (2005), 462, at pp. 467-72. But that does not argue for permitting *only* creative purposes to qualify as "research" under s. 29 of the *Copyright Act*. To do so would ignore the fact that the dissemination of works is also one of the Act's purposes, which means that dissemination too, with or without creativity, is in the public interest. It would also ignore that "private study", a concept that has no intrinsic relationship with creativity, was also expressly included as an allowable purpose in s. 29. Since "research" and "private study" both qualify as fair dealing purposes under s. 29, we should not interpret the term "research" more restrictively than "private study".
>
> [22] Limiting research to creative purposes would also run counter to the ordinary meaning of "research", which can include many activities that do not demand the establishment of new facts or conclusions. It can be piecemeal, informal, exploratory, or confirmatory. It can in fact be undertaken for no purpose except personal interest. It is true that research can be for the purpose of reaching new conclusions, but this should be seen as only one, not the primary component of the definitional framework.
>> . . . . .
>
> [27] In mandating a generous interpretation of the fair dealing purposes, including "research", the Court in *CCH* created a relatively low threshold for the first step so that the analytical heavy-hitting is done in determining whether the dealing was fair. SOCAN's submission that "research" be restricted to the creation of new works would conflate the allowable purpose with the fairness analysis and unduly raise the bar for entering that analysis. Moreover, its restricted definitional scope of "research" contradicts not only the Court's admonition in *CCH* that "[i]n order to maintain the proper balance between the rights of a copyright owner and users' interests, [the fair dealing exception] must not be interpreted restrictively" (para. 48), but also its direction that the term "research" be given a "large and liberal interpretation" so that in maintaining that balance, users' rights are not unduly constrained (paras. 48 and 51).
>> . . . . .

[30] Similarly, in considering whether previews are for the purpose of "research" under the first step of *CCH*, the Board properly considered them from the perspective of the user or consumer's purpose. And from that perspective, consumers used the previews for the purpose of conducting research to identify which music to purchase, purchases which trigger dissemination of musical works and compensation for their creators, both of which are outcomes the *Act* seeks to encourage.

[Emphasis added.]

31    From the discussion of "research" in *SOCAN*, the following additional principles can be distilled:

1. Research does not need to be undertaken for the purpose of the user engaging in its own act of authorship or creativity;

2. Research is not limited to creative purposes but can be "piecemeal, informal, exploratory, or confirmatory", and can be undertaken for no purpose except personal interest;

3. The first step in the fair dealing analysis is a relatively low threshold and does not require the creation of a new work; and

4. The analysis should be undertaken from the perspective of the user or consumer's purpose.

32    In *Warman v. Fournier*, 2012 FC 803 (F.C.) at para 5, (2012), 414 F.T.R. 249 (Eng.) (F.C.), this Court also found fair dealing to exist where website operators reproduced a copyrighted article on their website, described as an "online political news discussion forum which is accessible to any member of the public and which is used for discussing political issues from a conservative viewpoint." Justice Rennie held that the use was for an allowable purpose (news reporting under section 29.2), and was fair, despite there being an arguable alternative to the dealing and despite the excerpts being widely distributed on the internet.

33    I am satisfied that the Department's acknowledged use of the two Blacklock's articles constituted fair dealing. There is no question that the circulation of this news copy within the Department was done for a proper research purpose. There is also no question that the admitted scope of use was, in the circumstances, fair.

34    The evidence establishes that Mr. Halley and Ms. Rubec were directly involved in responding to Mr. Korski. They each had legitimate concerns about the fairness and accuracy of Mr. Korski's reporting. In particular, Mr. Korski's attribution of "no comment" to the Department was a misrepresentation and his attribution of a mistake to the Department was, at best, ill-informed. Even Mr. Korski admitted that this pejorative description was based on assumptions about what had occurred. Based on what actually took place Blacklock's reference to "Lucy and Ethel" was also inapt and unfair. Mr. Halley and Ms. Rubec therefore had an interest in correcting the record with Blacklock's.

35    Mr. Halley's further limited distribution of the articles to five departmental colleagues for their review also falls squarely within the scope of permitted research. Everyone involved had a legitimate need to be aware in the event that further action was deemed necessary.

36    In finding the scope of use of the articles to be fair I have considered the following factors, all of which favour the Defendant's position:

(a) The articles were legally and appropriately obtained by Ms. Marsden who was a paid subscriber to Blacklock's. Blacklock's website was not hacked or accessed by illicit means. In the result, the articles were no longer behind Blacklock's paywall when the Department obtained them.

(b) Ms. Marsden sent the articles to Mr. Halley for a legitimate business reason (i.e., to protect her business reputation and to manage her working relationship with the Department);

(c) The Department received the articles unsolicited and used them (i.e., read them) for a legitimate business purpose (i.e., to consider whether the stories required a response or correction);

(d) The articles were circulated among only six Department officials all of whom had a reason to see them;

(e) No commercial advantage was sought or obtained by the Department's use of the articles nor were they republished in any form;

(f) The two articles represented only a small fraction of the protected news copy on Blacklock's website and one of them was shortly-after publically exposed on Blacklock's website;

(g) The articles contained information obtained from the Department in response to Mr. Korski's queries. As a source, the Department had a direct and immediate interest in their content. Indeed, a finding of copyright infringement against a news source for the simple act of reading the resulting copy is likely to have a chilling effect on the ability of the press to gather information. Such a result cannot be in the public interest;

(h) Mr. Halley and Ms. Rubec had a reasonable basis for their concern that the articles misrepresented some of the information they had conveyed to Mr. Korski and that a correction might be warranted. The involvement of their colleagues in a possible follow-up was, in the circumstances, reasonable;

(i) Neither Ms. Marsden nor the Department were aware of, or agreed to, Blacklock's Terms and Conditions. In any event and as noted below, those provisions did not unambiguously prohibit the circulation of Blacklock's copy for personal or non-commercial purposes. If Ms. Marsden, as a subscriber, had the right to use and distribute the articles for a non-commercial purpose, those who received the articles lawfully could reasonably expect to enjoy the same privilege;

(j) What occurred here was no more than the simple act of reading by persons with an immediate interest in the material. The act of reading, by itself, is an exercise that will almost always constitute fair dealing even when it is carried out solely for personal enlightenment or entertainment; and

(k) While the public interest is served by the vigilance of the press, copyright should not be a device that serves to protect the press from accountability for its errors and omissions. The Department had a legitimate interest in reading the articles with a view to holding Blacklock's to account for its questionable reporting.

37    I agree with Mr. Hameed that the deliberate breach of the accepted terms of access to and use of copyrighted material, whether protected by a paywall or not, is a relevant consideration in applying the fair dealing provisions of the Act. However, the owner of copyright must establish that the terms of use actually prohibit the access or distribution in question and that the person involved was aware of the limitations.

38    It is a simple exercise to bring the stipulated terms of use to the attention of a subscriber to a paywall-protected news service. All that is required is an acknowledgement at the time of acquiring access that the terms in question were read and accepted.

39    In this case Blacklock's failed to ensure that its subscribers were aware of the Terms and Conditions it sought to impose. According to Mr. Korski and Ms. Doan, an astute or sophisticated subscriber to Blacklock's would be aware of its limitations on use by the reference on the application form to bulk user access and by the generic reference to "Terms and Conditions" at the foot of every website page.

40    In my view Blacklock's approach is deficient and potentially misleading to subscribers like Ms. Marsden. Because the Terms and Conditions of use were not clearly brought to Ms. Marsden's attention for acceptance, she had no reason to think that by sharing the two Blacklock's articles she was breaching Blacklock's copyright or facilitating a breach by others.

41    The requirement for bringing contractual conditions to the attention of a subscriber at the time of purchase is well-known in the law. It is not something that is imposed by bare inference or by falling back on the supposed sophistication of users. At a minimum the party to be bound must be shown to have been aware of the Terms and Conditions at the time of purchase: see *Kobelt Manufacturing Co. v. Pacific Rim Engineered Products (1987) Ltd.*, 2011 BCSC 224 (B.C. S.C.) at para 124, (2011), 84 B.L.R. (4th) 189 (B.C. S.C.).

42     I do not accept that Ms. Marsden or the Department should be taken to be aware of Blacklock's web-based terms of use.[4] But even if they had been aware they would have been no further ahead. Blacklock's Terms and Conditions contain a material ambiguity concerning downstream distribution. On the one hand they seemingly prohibit distribution by subscribers but, on the other, they permit it for personal, or non-commercial uses:

> *Blacklock's Reporter* and its contents are the property of 1395804 Ontario Ltd., and are protected, without limitation, pursuant to Canadian and foreign copyright and trademark laws.

> You acknowledge and agree one subscription is allotted per subscriber. Distribution of articles, photographs, images, writings or other content of any kind by a single subscriber by paper, electronic file, disc, intranet or any and all methods is not permissible. For purchase of bulk subscriptions, see "Contact".

> Reproduction, duplication, or distribution of *Blacklock's Reporter* and/or all or any part of its content for anything other than your personal, non-commercial use is a violation not only of these Terms and Conditions but also of copyright laws unless you have written permission from *Blacklock's Reporter*. The content on *Blacklock's Reporter* is made available to you for non-commercial, personal, or educational purposes only. The content may not be modified in any manner and the intellectual property notice must be included on every display and copy of the content. No other use is permitted. Nothing contained herein shall be construed as conferring any right under any copyright of *Blacklock's Reporter* or any other person who owns the copyright in the content provided on *Blacklock's Reporter*.

> [Emphasis added.]

43     As the drafter of the above conditions, Blacklock's is bound to the interpretation most favourable to the users of its copy which, in this case, permitted Ms. Marsden's distribution to the Department for a non-commercial purpose, and by implication, permitted a similar use by Mr. Halley.

44     All of this is not to say that subscribers like Ms. Marsden have unlimited rights of use of copyrighted material. Absent consent, subscribers and downstream users are subject to the obligations imposed on them by the Act. But at the same time they enjoy the considerable protection afforded to them under the statutory fair dealing provisions.

45     Blacklock's maintains that this case challenges the viability of its business model including its right to protect news copy behind a subscription-based paywall. The suggestion that Blacklock's business cannot survive in the face of the minor and discrete use that took place here is essentially an admission that the market places little value on Blacklock's work-product. All subscription-based news agencies suffer from work-product leakage. But to customers who value easy, timely and unfettered access to news that may not be readily available from other sources, the price of a subscription is worth paying. It also goes without saying that whatever business model Blacklock's employs it is always subject to the fair dealing rights of third parties. To put it another way, Blacklock's is not entitled to special treatment because its financial interests may be adversely affected by the fair use of its material. Nothing in these reasons should however be taken as an endorsement of arguably blameworthy conduct in the form of unlawful technological breaches of a paywall, misuse of passwords or the widespread exploitation of copyrighted material to obtain a commercial or business advantage.

### III. Conclusion

46     For the foregoing reasons this action is dismissed with costs payable to the Defendant. I am given to understand that offers to settle may have been exchanged. I will therefore invite the parties to address this issue in writing within ten days of this decision. Neither submission is to exceed ten pages in length.

### JUDGMENT

*THIS COURT'S JUDGMENT is that* this action is dismissed.

*THE COURT FURTHER ORDERS* that the issue of costs is reserved pending the receipt of written submissions from the parties.

*Action dismissed.*

Footnotes

1    This is a practise Mr. Korski adopts when he does not accept or approve of the answers he is given from a source: see Exhibits D-33 and D-52 and confirmed by Mr. Korski's testimony.

2    Ms. LaHay also received a copy of the article by email from Mr. Halley on October 18, 2013.

3    I do not accept that the evidence establishes that the articles made their way to the Minister's office, but even if they did, nothing turns on that point.

4    Ms. Marsden testified that she only wanted copies of the two articles and had no reason to search Blacklock's website for its conditions of use when she completed the subscription application.