## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AIR CANADA AND AEROPLAN INC., | C.A. No. 23-1177-GBW |
| Plaintiffs, | |
| v. | **PUBLIC VERSION** |
| LOCALHOST LLC, | |
| Defendant. | |

## DECLARATION OF PAUL CLARK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### I.  INTRODUCTION

1.      I have been retained by Air Canada and Aeroplan Inc. (together, "the Air Canada Group") as an independent expert in this case.

2.      In this declaration, I offer my opinions regarding data scraping in conjunction with certain events involving Localhost LLC and the Air Canada Group.

### II.  BACKGROUND

3.      I am qualified to serve as a technical expert in this matter based upon my educational and professional experience, including my approximately 30 years of relevant educational and direct technical experience in the fields of electrical engineering, computer science, data security/cryptography, and information systems. My curriculum vitae is attached to this declaration as Appendix A.

4.      I received a Bachelor of Science in Mathematics from the University of California Irvine, a Master of Science in Electrical Engineering and Computer Science from the University of Southern California, and a Doctor of Science in Electrical Engineering and Computer Science

from The George Washington University with concentrations in Computer and Network Security, Graphics and Intellectual Property Law. My doctoral dissertation and professional work for the last 35 years included advanced secure solutions to the distribution of data.

5.     From the late 1980s to the mid-1990s, I was a Senior Security Engineer at Trusted Information Systems. In that role, I participated in the design and implementation of several networked systems providing integrity, authentication, and encryption services.

6.     Between January 1994 and July 1999, I was Chief Scientist for DynCorp Network Solutions. In that role, I designed and directed the implementation of several cryptographically enabled network systems including the IRS's Secure Submission and Retrieval System. That secure system received three Al Gore Hammer Awards for important contributions to improving the U.S. government.

7.     Since 1999, I have been President and Chief Technology Officer of SecureMethods, Inc. and Paul C. Clark LLC. SecureMethods specializes in the design, implementation, and deployment of advanced network applications for commercial and government clients, including the United States Department of Defense ("DoD"). SecureMethods provides a comprehensive scalable, COTSbased secure network architecture, implemented through the use of the SM Gateway. The SM Gateway is a next-generation security appliance developed by SecureMethods that is available on UNIX-based platforms using commercial, government, and Type I cryptography, implemented in both hardware and software. In my capacity as President and Chief Technology Officer of SecureMethods, I have technical and operational oversight of all projects and corporate technical operations. I provide guidance to senior technical personnel relating to design, implementation, and troubleshooting for a wide range of systems, both internal and external. My work includes network systems and security,

2

cryptographic applications, certification, key management, authentication, and integrity strategies for network applications. My firm specializes in complex software and hardware systems for commercial and DoD clients.

8.      From 2016 to present, I have also served as CEO of ClearGuide Medical Inc. Clearguide produces and sells FDA cleared devices providing AI and AR guided surgical procedures. Benchmarking, security, and performance are critical to the success of these real-time systems. As CEO and Chairman of ClearGuide Medical Inc. I am responsible for all corporate business and technical operations.

9.      I am the named inventor on four computer security-related U.S. patents:

- U.S. Pat. No. 5,448,045, titled "System for Protecting Computers via Intelligent Tokens or Smart Cards";

- U.S. Pat. No. 5,892,902, titled "Intelligent Token Protected System with Network Authentication";

- U.S. Pat. No. 8,695,066, titled "System and Method for Secure Communication Between Domains"; and

- U.S. Pat. No. 10,129,214, titled "System and Method for Secure Communication Between Domains."

## III.   THE AIR CANADA GROUP

10.     Air Canada is a well-known an airline that operates between Canada and the United States (among many other countries).

11.     I understand that Air Canada, through its wholly owned subsidiary Aeroplan Inc., operates the Aeroplan reward program. (Declaration of Derek Whitworth ("Whitworth Decl."), ¶ 3.)

3

12.     I also understand that Aeroplan allows members to accumulate points by purchasing travel on Air Canada and certain partner airlines, among other ways. (Whitworth Decl., ¶ 4.) Aeroplan members can redeem points for airline tickets and other rewards provided by the Air Canada Group and participating partners. (Whitworth Decl., ¶ 4.)

## IV.     AIR CANADA'S WEBSITE AND MOBILE APP

13.     The Air Canada Group operates a website (<www.aircanada.com>) and mobile app (Air Canada + Aeroplan). (Whitworth Decl., ¶ 7.) The website and app allow Aeroplan members and others to browse and search for available rewards. (Whitworth Decl., ¶ 7.) They can also browse and search for things like flight times, flight routes, and the Aeroplan points needed to get a flight. (Whitworth Decl., ¶ 7.)

14.     Generally speaking, websites and mobile apps serve as access points for users to obtain data/information from a database. This is achieved through the interactions of three mechanisms: (1) a *user interface application* (the part of the website and app that a user interacts with, including images, text, buttons, and other user-interface elements); (2) a *database* (where the relevant data is stored); and (3) an *application programing interface* ("API"), which serves as a digital gatekeeper between the user interface application and the database.

15.     Air Canada's website and mobile app allow users to access the Air Canada Group's data using these mechanisms.

16.     The following example shows how the user interface, API, and database work and interact with each other to provide a user with access to data. If a user is searching Air Canada's website for flights from the Philadelphia International Airport ("PHL") to the Frankfurt International Airport ("FRA"), she first inputs search parameters into the user interface application, such as the desired departure and return dates, along with the arrival and departure airports. (Whitworth Decl., ¶ 9.) When the user presses the "Search Flights" button, the user

4

interface application sends a request (a request that Air Canada refers to as a "shopping request") to the API. (Whitworth Decl., ¶ 9.) The API verifies that the request comes from an authorized source based on identifying characteristics, such as a header identifying the source of the request. (Whitworth Decl., ¶ 9.) In this case, the API would look for identifying characteristics that show the request is coming from either the website or mobile app. (Whitworth Decl., ¶ 9.)

17.     The following image shows an authorized request going from the user interface application to the API.



18.     If the API does not recognize the shopping request as coming from an authorized source, then it will not retrieve data from the database, and the user will see an error message displayed on the user interface application. (Whitworth Decl., ¶ 9.)

19.     But if the API *does* recognize the shopping request as one appearing to come from an authorized user interface application (in this case, if the API recognizes the request as coming from the Air Canada Group's website or mobile app), then the API will obtain the requested data from the database. (Whitworth Decl., ¶ 10.) The API then sends the data to the user interface application that requested the data. (Whitworth Decl., ¶ 11.) As shown in the following image, the API retrieves data from the database in response to an authorized request, and the API sends the requested data to the user interface application. (Whitworth Decl., ¶ 11.)

20.     The user interface application then presents the requested data to the user. (Whitworth Decl., ¶ 12.) For example, the following image illustrates how the user interface application displays data that was retrieved from the database in response to a user's request.



(Whitworth Decl., ¶ 12.)

## V.    DATA SCRAPING

21.    "Data scraping" is a term that refers to the practice of extracting data from a website using automated software, known as robots (or "bots"). These bots are known by many other names, including crawlers or spiders.

22.    Bots extract large quantities of data from websites in a variety of ways. A typical example involves bots running a large number of searches on a targeted website. The data scraper then uses the results of the searches for a variety of purposes.

23.    Data scrapers operate in two basic ways: screen scraping and API scraping.

24.    Screen scraping occurs when a data scraper uses bots to run searches on a website's user interface application and then extracts the data that the user interface application returns in response to the request. This type of scraping is, generally speaking, easier to detect and prevent by the owner of the scraped website because the data scraper's requests all come from a recognizable address (an "IP address") that can be blocked.

25.    API scraping occurs when the data scraper bypasses the user interface application and sends scraping requests directly to the website's middleware API. This type of scraping can be more difficult to detect and block because the sophisticated data scraper can falsify the header of the request, obfuscating the source of the request and making it more difficult to identify and block requests from the scraper.

26.    On top of the different types of data scraping, a scraper can scrape different volumes of data at various intervals. Many data scrapers send real-time scraping requests to the scraped website or app in response to a user's request on the data scraper's website or app. In that scenario, the data scraper only scrapes when asked to by a user of the scraper's website or app and only scrapes the data requested by that user.

27.     In contrast to real-time scraping, some scrapers cache data. Caching data is the process of collecting *all* data from a scraped website or app and storing it on the chance that a user of the data scraper's website or app will request some of the data. In other words, a caching data scraper anticipatorily builds an enormous cache of data in case a user might want to see any of it. In theory, this is done to make the data available more quickly for users of the data scraper's website or app.

## VI.     LOCALHOST & DATA SCRAPING

28.     My analysis leads me to conclude that Localhost's data scraping causes the Air Canada Group and its partners to experience high volumes of traffic, resulting in slow or even inoperable website or app conditions. These periods of inoperability are known as "brownouts" and make it difficult for customers to view or redeem awards on the Air Canada Group's website and/or mobile app. I explain the analysis that leads to this opinion below.

29.     As an initial matter, I understand that Mr. Ian Carroll, through Localhost, owns and operates the website Seats.aero.

30.     I further understand that Mr. Carroll publicly acknowledges that Seats.aero is a data-scraping website. He explains, "Seats.aero works by periodically visiting the public websites of airlines and retrieving the reward availability for each date and route. This common practice is usually called 'web scraping' or similar names and is used by all travel tools in some form." (Fagan Decl., Ex. 3 at 7.)

31.     Mr. Carroll has described his data scraping as caching, rather than real-time scraping, noting in one online post that "everyone caches availability, seats.aero is just the only one transparent about it." (Fagan Decl., Ex. 3 at 9.) As explained above, caching data is the process of anticipatorily building a cache of data.

8

32.     It is apparent that Seats.aero operates by scraping data from various airlines, including Air Canada. From my own use of Seats.aero, I have observed that a user can search the data accumulated on Seats.aero in a variety of ways. For example, a Seats.aero user can input some basic parameters, including the flight origin, destination, and date, and view all flights that match those parameters. Alternatively, a user can also view *all* available flights for which particular frequent flier points can be used (in other words, a user can view all flights that can be purchased using Aeroplan points or the points of some other frequent flier program). Regardless of how a Seats.aero user searches the data, Seats.aero will display an array of data on the flights, including the flight's origin and destination and the number of loyalty points that it takes to redeem the flight.

33.     It is further clear that Localhost populates the data on Seats.aero by running large volumes of searches at intervals instead of running real-time searches in response to user requests. Seats.aero indicates how recently information has been updated, indicating when Localhost ran its caching scraping requests. Specifically, the column titled "Last Checked" indicates when Seats.aero last checked Air Canada for flight data. The "Last Checked" column appears to vary between "Just Now" and "2 days ago." The following image shows when the data regarding various routes was "Last Checked":

| Date | Last Checked | Departs | Arrives | Economy | Prem Economy | Business |
|---|---|---|---|---|---|---|
| 2023-12-01 | 6 hours ago | GCM | IAD | 12,100 pts | Not Available | Not Available |
| 2023-12-01 | 4 hours ago | CPH | EWR | 32,800 pts | Not Available | 70,000 pts |
| 2023-12-01 | 1 day ago | ORD | SXM | 12,500 pts | Not Available | Not Available |
| 2023-12-01 | 2 days ago | VIE | AYT | 12,500 pts | Not Available | 20,000 pts |
| 2023-12-01 | 16 hours ago | BRU | AUH | 25,000 pts | Not Available | 45,000 pts |
| 2023-12-01 | 1 day ago | AUH | IAD | 55,000 pts | Not Available | Not Available |
| 2023-12-01 | 16 hours ago | IST | DXB | 12,500 pts | Not Available | Not Available |

34.     I observed that Localhost constructs (or "spoofs") the web headers for its API requests, making it appear as though the requests come from the Air Canada Group's website or mobile app. Doing this makes it difficult for the Air Canada Group's countermeasures to identify and block Localhost's requests. The following figure illustrates how Localhost's forged shopping requests obtain unauthorized data, and how it then uses that data to power Seats.aero:



35.     The volume of caching requests that Seats.aero sends to Air Canada is large. This is apparent from the volume of search results available at any given time on Seats.aero. I

understand that a Seats.aero Pro user has access to a full year's worth of data. Based on one
screenshot that I've seen from a Seats.aero Pro user's account, a Pro user had access, on one
particular day, to data regarding 265,552 Air Canada routes.



36.     This shows that Seats.aero sent *at least* 265,552 shopping requests to Air Canada
to obtain this data. And based on the "Last Checked" column, I conclude that these requests were
sent in the space of roughly two days.

37.     In my opinion, the number of total routes displayed on Seats.aero on a given day
is the *minimum* number of shopping requests that Seats.aero sent to Air Canada within the past
couple of days. I say *minimum* because Seats.aero likely sends Air Canada a large number of
requests that return no results and, thus, are not displayed on Seats.aero.

38.     I further understand that that for every shopping request a user sends to the Air
Canada Group, a number of collateral "availability requests" are sent to partner airlines who
operate any leg of a journey, asking for that partner airline's relevant flight information.
(Whitworth Decl., ¶ 32.) I understand from Air Canada that a single shopping request directed
toward the Air Canada Group can generate as many as 100–300 availability requests directed
toward partner airlines. (Whitworth Decl., ¶ 32.)

39.     To put this in perspective, consider the date on which the Air Canada Group
received 265,552 shopping requests from Seats.aero. Given that each shopping request can
generate as many as 100–300 availability requests, on the day that Aeroplan received 265,552

shopping requests, Aeroplan partner airlines could have received millions of availability requests that resulting from Seats.aero's scraping.

40.     Seats.aero's data scraping causes significant slowdowns and periods of inoperability on the Air Canada's Group's website and mobile app. This is evident from the events discussed below.

41.     On April 20, 2023, at 5:41am GMT, Mr. Carroll announced on the "Discord" online community for Seats.aero, "I'm excited to announce that we've added support for Air Canada Aeroplan! [. . . ] It will take a few days for us to get all of the routes and availability loaded up, but there's a good amount of data already." (Fagan Decl., Ex. 3 at 2.) Hours earlier, from 3:00 to 4:00 GMT, Amadeus—a company that monitors the Air Canada Group's API—observed that Air Canada's mobile app was lagging and experiencing interruptions in service because of a recorded *two-fold increase* in traffic to the API. (Whitworth Decl., ¶ 30.) I understand that this traffic increase was entirely attributable to a *three-fold increase* in one-way shopping requests (shown in purple in graph below).



(Whitworth Decl., ¶ 30.)

42.     As part of the April 20 incident, Amadeus also recorded a large number of interruptions to service. (Whitworth Decl., ¶ 31.) These interruptions resulted in slower website or app response times. Air Canada therefore categorized this increase in traffic as a "Major Incident," which is defined as an incident that caused the website, mobile app, or both to be inoperable for a period of time. (Whitworth Decl., ¶ 39.)

43.     In addition to increases to Air Canada's API, a technology subcontractor providing services to Star Alliance partners reported a high number of availability requests (or "Invocations" or "trx/s") coming from the Air Canada Group over the STARNET middleware on April 20, 2023, as shown below:



(Whitworth Decl., ¶ 32.)



(Whitworth Decl., ¶ 32.)

44.    It is my opinion that the high traffic experienced by both the Air Canada Group and the Star Alliance partners was attributable to Localhost's data scraping, which was announced just hours after the recorded increase in traffic.

45.    Records from Air Canada's IT Operations Centre also show additional incidents on May 4 and May 9, one of which lasted for over three hours. During these incidents, customers were unable to book flights online. (Whitworth Decl., Ex. 2 at 2–3.)

46.    I understand that these brownout events began happening after the April 20 incident described above. (Whitworth Decl., ¶ 49.) It is, therefore, my opinion that the May 4 and May 9 incidents are also attributable to Localhost's data scraping.

47.    After the April 20 incident, I understand that Amadeus and the Air Canada Group began investigating the source of the high traffic. (Whitworth Decl., ¶ 37.)  I further understand

that investigation culminated in the identification of Localhost's scraping as the source of the traffic. (Whitworth Decl., ¶ 37.)

48.     In response to this revelation, I understand that the Air Canada Group developed and released version 5.33.2 of the mobile app on May 12, 2023. I further understand that this version of the mobile app contained a security update that made it more difficult to request and scrape information from the Air Canada Group's API. (Whitworth Decl., ¶ 45.)

49.     On May 14, 2023, two days after Air Canada released the update, Ian Carroll announced on Discord that "It appears Air Canada tried to block us from searching for availability starting on Friday. I just put in a fix for it so you should see availability start to refresh again." (Fagan Decl. at 3.) The very next day, on May 15, 2023, the Air Canada Group again experienced an abnormal spike in shopping requests. This spike was reported by another third-party service provider—Amazon Web Services—a platform that monitors the Air Canada Group's APIs used to shopping and booking flight rewards. (Whitworth Decl., ¶ 47.) The traffic spike on May 15 led to slowdowns and inoperability on the Air Canada Group's Amazon Web Services platform for approximately an hour, during which time customers were unable to complete bookings. (Whitworth Decl., ¶ 47.)

50.     Based on the proximity in time to Carroll announcing his "fix" to circumvent the Air Canada Group's security update, it is my opinion that the May 15 traffic spike is attributable to Localhost's scraping.

51.     Additional events between May and August support the conclusion that Localhost's data scraping leads to increased traffic and, ultimately, brownouts, on the Air Canada Group's website and mobile app.

52.     For example, on May 23, 2023, Amadeus recorded yet another surge in shopping requests to the Air Canada Group's API. This caused response timeouts and an inability to book or shop flights because the Air Canada Group's server capacity was overwhelmed. (Whitworth Decl., ¶ 48.) I am informed told that a high volume of customers called the Aeroplan customer service number and complained that they could not book flights online. (Whitworth Decl., ¶ 48.)

53.     From my interview of Air Canada employees, I understand that throughout May, Air Canada took several additional steps to prevent Localhost's data scraping:

- May 26, 2023: the Air Canada Group released a security update for its website that was compatible with bot protection software. I understand that, upon activation, the enhanced bot protection software succeeded in driving traffic on the website from ██ + transactions per section to ██ transactions per second.

- May 31, 2023: the Air Canada Group worked with a third-party service provider (Amazon Web Services) to implement "rate limiting." Rate limiting is a technique that limits the number of requests coming from a single IP address.

54.     Despite the Air Canada Group taking these additional steps to limit Seats.aero's scraping, I understand that Ian Carroll announced on June 1, 2023, "Aeroplan banned our servers again. We got around the Aeroplan ban again. We will keep getting around it[.]" (Fagan Decl., Ex. 3 at 4–5.)

55.     During the months of July and August, I understand that the Air Canada Group took further actions to prevent Seats.aero's data scraping, namely:

- July 20, 2023: the Air Canada Group released a security update for its mobile app in version 5.35 of the mobile app. This security update was, yet again, intended to block data scraping such as that performed by Seats.aero.

- July 27, 2023: the Air Canada Group activated the security update in its mobile app that was contained in version 5.35.

56.     On August 17, 2023, Mr. Carroll announced, that "there has been a lot of instability with Aeroplan lately. This has been occurring because they have configured their security service (Akamai) with extreme anti-bot rules [. . . ] We have rolled back to our previous method of searching Air Canada [i.e., scraping the mobile app instead of the website], which we expect to be more stable and is actively updating data now." (Fagan Decl., Ex. 3 at 6.) This appears to be a reference to the challenges Seats.aero faced due to the actions the Air Canada Group took during the month of July.

57.     From my 30+ years in the computer and network security field, I know that it can be enormously time consuming to play this game of "cat-and-mouse" with a sophisticated attacker e.g., data scraper. It requires significant resources to respond to attacks and to continually develop new and innovative solutions to prevent the scraper from circumventing the technological protections in place.

58.     Accordingly, I understand that fighting Seats.aero's scraping has consumed a large amount of the Air Canada Group's digital products group's time. (Whitworth Decl., ¶ 57–61.) This rings true with my own experience, and I would expect that Seats.aero's continued data scraping will continue to require monitoring and diversion of significant resources to address.

59.     In preparing my declaration, I met with personnel from the Air Canada Group and reviewed the following materials:

| Reference | Document Description |
|---|---|
| Declaration of Derek Whitworth | Declaration of Derek Whitworth |
| Fagan Decl. Exhibit 3 | Screenshots taken from a forum on the website Discord.com called "Seats.aero Community." |
| Whitworth Decl. Exhibit 2 | Log of Major Incidents |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 19, 2023.

Paul Clark

# APPENDIX A

**PAUL C. CLARK**
*4705 Broad Brook Drive, Bethesda, Maryland, 20814*
*703.628.9500*
*paul@securemethods.com*

**SKILLS SUMMARY**    A senior executive with extensive IT design, development and deployment experience, Dr. Clark has twenty five years of direct technical and management experience in the computer and systems engineering environment.  He is the President of Paul C. Clark LLC.  His specialties include complex commercial development and deployment of scalable secure network and data processing systems. He has served as keynote speaker, expert witness for high profile commercial clients and before Congress. He has served on federal advisory committees and as an adjunct professor at The George Washington University.

**EMPLOYMENT**    **President and CTO**                                    July 1999 – Present
**SecureMethods Inc. / Paul C. Clark LLC**
*Bethesda, MD*

·   Serves as Managing Director

·   Manages operations and sales staff.

·   Manages commercial product development staff.

·   Provides product design, development and deployment guidance.

·   Provides sales engineering support and collected customer feedback.

·   Defines and communicates strategic technical vision.

·   Successfully directed the development and deployment of commercial products on multiple Windows and Unix Platforms

**Chief Scientist**                                    Jan. 1995 – July 1999
**DynCorp Network Solutions**
*Fairfax, VA*

·   Managed technical staff and deliverables for multiple large projects.

·   Provided project design, development and troubleshooting guidance.

·   Provided customer technical interface and problem resolution.

·   Designed and deployed next generation architecture for high volume network database and storage systems.

·   Created a suite of secure products marketed and sold to DoD and the Federal Government.

·   Provided corporate-wide technical consultation and support.

**Senior Security Engineer**                          Sept. 1990 – Jan. 1995
**Trusted Information Systems**
*Glenwood, Maryland*

·   Participated in the design and implementation of the reference implementation of Privacy Enhanced Mail (PEM) with public and secret key encryption to provide security services for electronic transmissions.

·   Designed NIST's Smartcard API (SCAPI).  Implemented the SCAPI for the NIST 250 and utilized it to perform cryptographic operations for PEM.

·   Implemented X.500 Certification and Distinguished Naming support for PEM. Functions supported included:  CA and user registration, revocation, and high speed database for certificate storage and retrieval.

·   Systems design and programming, including the TCB, for the Trusted Xenix and Trusted Mach MLS operating systems.  Tasks included MAC labeling and audit strategies, as well as application development.

·   Designed and implemented multilevel electronic mail and HTTP proxy for Trusted Mach. Task included cryptographic support for the TCB as well as application specific validation and semantic checking for up/downgrade.

·   Inventor of the Boot Integrity Token System (BITS), which provides hardware, enforced authentication within the boot sequence and guarantees operating system integrity using smart tokens. U.S. Patent Nos. 5,448,045; 5,892,902; 8,695,066; 9,391,957 and 10,129,214

**Technical Lead**                                      Nov 1989 – Sept 1990
**GTE Government Systems**
*Rockville, MD*

- Managed the SAFE91 testbed effort with responsibilities including: budgets,
  schedules, customer negotiations, briefings, training, and tasking of
  technical staff.  The testbed was created to simulate the client environment
  for the purpose of evaluating software packages and platforms for use by
  the client.

- Developed network load simulations for OS/2 LAN Manager to determine
  performance characteristics during periods of heavy traffic.  This task
  included the design and development of a multi-threaded connection server
  under OS/2 version 1.0

- Designed and implemented an X Windows interface for the Minstrel
  System.  This included the individual development of 20,000 lines of code
  in less than two months.

- Developed and taught DEC Windows and X Windows classes for GTE
  technical personnel.  Responsible for instruction and problem solving
  throughout the subsequent development cycle.

**Systems Engineer**                                    May 1985 – Nov. 1989
**Ultrasystems Defense and Space**

- Redesigned the Morse Mission Trainer while coordinating and tasking a
  team of programmers.  During this time, received the President's quarterly
  award for outstanding performance.  Task included systems and network
  and kernel level programming on SCO Xenix.

- Designed and implemented a database file server, benchmarked at over
  100 retrievals per second on a million entry database.  System
  implemented B* trees in C and ran on a Sun 3/260 workstation.

- Designed and implemented a satellite mission scheduler for multiple
  vehicles with multiple resources.  Task included defining areas of interest
  (AOIs), flight paths, and optimal time allocation of resources.

- Designed and implemented the Ultraplot graphics tool to produce line and
  scatter plots, as well as bar graphs and histograms from large datafiles.
  This utility was implemented utilizing the DI3000 (device independent)
  graphics package.

**HARDWARE**        Mainframe, Workstation, PC, including: IBM, DEC, Sun, HP, SGI, Intel

**SOFTWARE**        UNIX (Linux, System V, BSD, Solaris, AIX, IRIX, Xenix), MS DOS/Windows,
                    VMS, OS/2, X Windows, DEC Windows, Presentation Manger, TCP/IP, X25,
                    Xenix Net, IBM LAN, DEC Net, Ethernet, Token Ring

**EDUCATION**       **DSc. in Computer Science**
                    **Concentration in Security, Graphics, Intellectual Property Law**
                    *The George Washington University, 1994*

                    **M.S. in Electrical Engineering and Computer Science**
                    *University of Southern California, 1988*

                    **B.S. in Mathematics**
                    *University of California Irvine, 1986*

                    **Graduate level study in all major areas of computer science**

**REPRESENTATIVE PUBLICATIONS**

"BITS – A Smartcard Protected Operating System," with Lance Hoffman, Communications of the ACM, November 1994.

"Service Layering Promotes Secure Data Exchange in Diverse Environments," Computer News, October 23, 1995

"Threats Posed to Cryptographic Applications by Random Numbers," presented to the RSA Data Security Conference, January 1996.

"A Reference Model for Electronic Commerce," with Daniel J. Blum and John Jauregui, Messaging Magazine, December 1996, Volume 2, Number 7.

"Secure Compartmented Data Access over an Untrusted Network Using a COTS-based Architecture," with Marion C. Meissner, and Karen O. Vance, Presented to the Annual Computer Security Applications Conference (ACSAC'00), New Orleans, December, 2000. Later published in "Statistical Methods in Computer Security,"  Marcel Dekker, ISBN 0-8247-5939-7, edited by William W. S. Chen, 2005

**ADDITIONAL INFORMATION**

(1) Dr. Clark was a member of the Federal Advisory Committee for Key Management Infrastructure (KMI); he was Chairman of the Interoperability Working Group for Cryptographic Key Recovery.

(2) Dr. Clark served as a Cooperative Research and Development Agreements (CRADA) partner, which is a joint effort between the National Institute of Standards and Technology (NIST) and several companies formed to begin development of the elements of a Public Key Infrastructure (PKI).  A core element of this effort is the development of a Minimum Interoperability Specification for PKI components MISPC.

(3) Dr. Clark serves as an adjunct professor in the Electrical Engineering and Computer Science Department at The George Washington University. He teaches doctoral level cryptography and computer security courses.

(4) Speaker at The Federal Information Security Conference; presented "Embedded Security Deployment," Colorado Springs, CO, March 31, 2006

(5) Keynote Speaker for the Washington DC Bar Association; presented "Security for the Networked Computing Environment,"  August 8, 2005

(6) Appeared before Congressional committee to provide expert testimony; presented "Advanced Technology for Border Control," July 23, 1998.

(7) Keynote speaker at Mass Storage Conference; presented "Secure Data Access Over Public Networks," New Orleans, LA, October, 1996

(8) Keynote speaker at health care convention, presented "Security for Health Care Records," Nashville, TN, May, 1997.

(9) Keynote speaker at the USDA Plant and Genome Conference; presented "A Secure Architecture for Data and Systems," Nimes, France, October, 1997

(10) Speaker at IEEE Technical Meeting; presented "A Comprehensive Security Architecture," Virginia, June, 1996.

**LEGAL CASES**

Testifying expert for Google et al – ContentGuard v Google – Verdict for Google

Testifying expert for TransPerfect v MotionPoint – Verdict for Transperfect

Testifying expert for Cisco – VirNetX v Cisco – Verdict for Cisco

Testifying expert for CME – RealTime v CME – Summary judgment for CME

Testifying expert for IBM et al – Tecsec v IBM – Summary judgment for IBM

Testifying expert for Netflix et al – Parallel Networks v Netflix – Case dismissed

Testifying expert for Oracle - EpicRealm v Oracle – Summary judgment for Oracle

Testifying expert for Lucent - Microsoft v Lucent –Verdict for Lucent

Testifying expert for Oracle - Mangosoft v Oracle – Summary judgment for Oracle

Testifying expert for RSA Data Security – Digital Privacy v RSA – Summary judgment for RSA at the Markman