**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AIR CANADA AND AEROPLAN INC., | |
| Plaintiffs, | Case No. 1:23-cv-01177-GBW |
| v. | **JURY DEMAND REQUESTED** |
| LOCALHOST LLC, | |
| Defendant. | |

**LOCALHOST LLC'S RESPONSE TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

Dated: January 18, 2024

Charles J. Brown, III (DE 3368)
Gellert Scali Busenkell & Brown, LLC
201 N. Orange Street, Suite 300
Wilmington, DE 19801
Telephone: 302-425-5800
Email: cbrown@gsbblaw.com

Steven Susser, Esq.
(admitted *pro hac vice*)
Michael S. Schwartz
(admitted *pro hac vice*)
CARLSON, GASKEY & OLDS, P.C.
400 West Maple Road, Suite 350
Birmingham, MI 48009
P: (248) 988-8360
F: (248) 988-8363
Email: ssusser@cgolaw.com
Email: mschwartz@cgolaw.com

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ............................................................................................... 1

II.     NATURE AND STAGE OF THE PROCEEDING .............................................. 1

III.    FACTS ................................................................................................................ 2

    A.   Air Canada, Aeroplan, and Amadeus ......................................................... 2

    B.   Localhost and Seats.aero ............................................................................ 3

    C.   Data Gathering ........................................................................................... 4

    D.   Terms of Use .............................................................................................. 5

    E.   Alleged Harm ............................................................................................. 7

    F.   Harm to Localhost ...................................................................................... 8

IV.     ARGUMENT ...................................................................................................... 8

    A.   Irreparable Harm ........................................................................................ 9

        1.   Slow Searches – Air Canada and Partners ....................................... 10

        2.   Air Canada's Resources .................................................................. 14

        3.   Air Canada's Business Choice ......................................................... 14

        4.   Air Canada's Delay ......................................................................... 15

    B.   Likelihood of Success ............................................................................... 15

        1.   Choice of Law ................................................................................. 15

        2.   Contract Existence .......................................................................... 16

        3.   Relevance of Air Canada's Terms .................................................. 18

    C.   Balance of Hardships ................................................................................ 19

    D.   Public Interest ........................................................................................... 20

V.      CONCLUSION ................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Acierno v. New Castle County,*
40 F.3d 645, 655 (3d Cir. 1994) .................................................................... 9

*Amica Mut. Ins. Co. v. Fogel,*
656 F.3d 167, 171 (3d Cir. 2011) .................................................................. 16

*Antognoli v. Christiana Care Health Servs.,*
2023 Del. Super. LEXIS 743, *4 (Del. Super. Aug. 22, 2023) ..................... 16

*Bateman v. Ford Motor Co.*,
310 F.2d 805, 808 (3rd Cir. 1962) .................................................................. 9

*Bennington Foods LLC v. St. Croix Renaissance Group, LLP,*
528 F.3d 176, 179 (3d Cir. 2008) .................................................................... 9

*Certain Underwriters at Lloyds v. Chemtura Corp.*,
160 A.3d 457, 465 (Del. 2017) ...................................................................... 16

*Chin v. Chrysler LLC*,
538 F.3d 272 (3rd Cir. 2008) ......................................................................... 15

*Cordance Corp. v. Amazon.Com, Inc.,*
730 F. Supp. 2d 333 (D. Del. 2010) .............................................................. 19

*Flowserve Corp. v. Burns Int'l Servs. Corp.*,

423 F. Supp. 2d 433, 438 (D. Del. 2006) ........................................................ 9

*Gaudreau v. My Pillow, Inc.*,
2022 U.S. Dist. LEXIS 118524, *12 n. 2 (M.D. Fla. July 1, 2022) .............. 18

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180, 1202-1203 (9th Cir. 2022) ............................................... 4, 20

*Hite v. Lush Internet Inc.,*
244 F. Supp. 3d 444, 450 n. 3 (D.N.J. 2017) ................................................ 16

*Hope v. Warden York Cty. Prison*,
972 F.3d 310, 320 (3d Cir. 2020) .................................................................... 9

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
882 F.2d 797, 801 (3d Cir. 1989) .................................................................... 9

*Mallet & Co. v. Lacayo*,
16 F.4th 364, 380 (3d Cir. 2021) ................................................................. 8

*New Dana Perfumes Corp. v. The Disney Store, Inc.*,
131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) .................................................. 15

*Ninivaggi v. Univ. of Del.*,
555 F. Supp. 3d 44, 52 (D. Del. 2021) ........................................................ 19

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
290 F.3d 578,586 (3d Cir. 2002) ................................................................... 8

*Pharmacia Corp. v. Alcon Labs., Inc.*,
201 F. Supp. 2d 355, 383-84 (D.N.J 2002) ................................................ 15

*ProFoot, Inc. v. MSD Consumer Care, Inc.*,
2012 U.S. Dist. LEXIS 83427 (D.N.J. June 14, 2012) .............................. 15

*QVC, Inc. v. Resultly, LLC*,
99 F. Supp. 3d 525, 541-42 (E.D. Penn. 2015) ......................................... 14

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ........................................................................ 17

*Rood v. General Dynamics Corp.*,
444 Mich. 107, 119 (1993) .......................................................................... 17

*Tilden Rec. Vehicles, Inc. v. Belair*,
786 Fed. Appx. 335, 342 (3d Cir. 2019) ...................................................... 9

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*,
425 U.S. 748 (1976) .................................................................................... 20

**Other Authorities**

Lanham Act ..................................................................................................... 1

*Terms of Use*, 91 Minn. L. Rev. 459, 459 (2006) ...................................... 17

*The Law of Contract in Canada* (Toronto: Thomson Carswell, 2006) ....... 16

*Web Scraping and an Affirmative Right to Access Publicly Available Information Online*, 12 J.

Bus. Entrepreneurship & L. 203 (2019) ..................................................... 18

## I.      INTRODUCTION

There is a reason that it is so difficult to get a preliminary injunction. A preliminary injunction effectively finds a defendant liable before the plaintiff has demonstrated liability. This is the civil equivalent of finding a person guilty until he is proven innocent and so goes against the core of our judicial system. As a consequence, it is reserved for extraordinary situations. This is not an extraordinary situation as Air Canada's allegation of harm is limited to a one month window that happened eight months ago.

Air Canada's dearth of proof regarding irreparable harm might explain why it has to go to such lengths to try to convince the Court that Localhost is an evil doer bent on destroying the Air Canada-customer relationship. This characterization is not fair. All the uses of "fraud," "illegal," and "forged" do not obscure the fact that Localhost's data gathering is similar to our daily Google searches. Air Canada wishes to make data publicly available for some users but also wishes to prevent targeted users from treating that data as publicly-available.

## II.     NATURE AND STAGE OF THE PROCEEDING

Plaintiffs Air Canada and Aeroplan, Inc. ("AC") filed their Complaint on October 19, 2023. Although it had been aware of the alleged misconduct since at least April 25, 2023, AC waited six months to start a lawsuit against Defendant Localhost LLC ("LH") and another two months to file its Motion for Preliminary Injunction ("Motion") on December 21, 2023. AC's Complaint claims breach of contract, violation of the Computer Fraud and Abuse Act ("CFAA"), various claims under the Lanham Act, and trespass to chattels. The Motion, however, relies only on the breach of contract claim regarding AC's website Terms of Use (the "Terms").

The Terms have a clause mandating that Canadian law should apply and that disputes about the Terms should be submitted to the courts of Alberta, LH filed a Partial Motion to Dismiss to

1

enforce the mandate of AC's own Terms. That motion is pending. In this Motion, AC has taken the position that the Terms form a contract between AC and LH and it has asked that the Court use this alleged contract to enjoin LH from performing the data gathering that is essential to LH's business.

## III.    FACTS

### A.    Air Canada, Aeroplan, and Amadeus

AC is a Canadian airline with a market cap of over $5 billion (Schwartz Dec., Ex. 1). AC operates an award program called Aeroplan, which allows members to earn points that they can then spend on air travel. AC also participates in an airline alliance called "Star Alliance" (Dkt. 21, PageID#:801). According to AC, its participation in the Star Alliance allows Aeroplan members to earn Aeroplan points by flying on any of the 26 Star Alliance member airlines, use those points to book tickets on multiple airlines, and access partner lounges. (*Id.*).

Despite the attractive offerings, the Aeroplan program has met with mixed reviews at best because many users have found it difficult to redeem their accumulated points. In particular, users find the Aeroplan website's user interface frustrating and lacking in search functionality. One reviewer on TrustPilot stated in November 2020, before LH existed, that the "New Aeroplan website is a fiasco" that makes it "impossible to shop" (Schwartz Dec*.,* Ex. 2). Another customer posted a review on TripAdvisor in June 2022 – before Localhost did any AC data gathering -- entitled "The Bad Experience Begins with the SLOW WEBSITE" (*Id.*, Ex. 3).

Although the website user thinks that he is communicating with AC, AC uses an independent company called Amadeus IT Group, S.A. ("Amadeus") to operate the Aeroplan online award system (Dkt. 21, PageID#:802). It appears that AC operates the user-facing website, www.aircanada.com, and Amadeus handles the back-end searching operations (Schwartz Dec.,

Ex. 4). Amadeus has boasted of having the capacity to handle massive amounts of user searches – up to 100,000 requests per second during peak usage (*Id.*, Ex. 5 at p. 3).

### B.  Localhost and Seats.aero

The object of AC's wrath is a small company called Localhost ("LH"). LH owns and operates a website called Seats.aero, which helps consumers redeem their accumulated credit card and travel points for air travel (Carroll Dec., ¶1). Ian Carroll built Seats.aero and owns LH (*Id.*, ¶¶1-4). An avid traveler, Mr. Carroll found it difficult to search for point redemption trips using an airline's website search function (*Id.*, ¶3). So, at 22 years old, he began building a website that would become Seats.aero (*Id.*, ¶4). Now, two years later, Mr. Carroll (full time) and his wife (part time) operate the Seats.aero website from their home in Ann Arbor, Michigan (*Id.*).

LH gathers publicly available point pricing data from 14 online airline databases so that users can explore point travel options in one convenient hub (*Id.*, ¶10). In addition to AC, LH gathers data from AC partner airlines like United and SAS (*Id.*). With the exception of AC, none of these airlines have complained about LH's data gathering (*Id.*, ¶12).

Seats.aero offers search functionality that many airlines, like AC, cannot or do not provide, such as the ability to search for flight prices within a flexible date range (*Id.*, ¶5). Once a user has found a flight on Seats.aero, he is directed to the corresponding airline website for booking (*Id.*, ¶6). In this way, Seats.aero makes it easier for customers to book flights, including those on AC. Seats.aero is free for flights within two months; for broader searching, a user can pay ten dollars per month for a subscription (*Id.*, ¶7). Seats.aero has terms of use but these do not apply unless a customer agrees by clicking a button (*Id.*, ¶8).

Localhost began operations in May 2022 and began gathering AC data in April 2023 (*Id.*, ¶9).

### C.       Data Gathering

LH gathers this publicly available flight data to populate the flight information it provides to its users (Carroll Dec., ¶¶10, 13). "Data scraping" refers to using automated digital robots ("bots") to gather this publicly available web content (*Id*). While AC attempts to paint data scraping as illicit and nefarious, the practice is quite commonplace. Whenever you search Google you are seeing the results of data scraping – Google utilizes automated "Googlebots" to crawl and index websites (Schwartz Dec., Ex. 6). Notably, the Ninth Circuit recently found that data scraping is legal under the CFAA and approved the grant of a preliminary injunction protecting a data gathering company, like LH, from a website owner, like AC. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202-1203 (9th Cir. 2022).

Data scraping is also necessary for gathering  the award pricing information that LH needs to operate (Carroll Dec., ¶14). For flights paid in cash ("cash flights"), airlines publicly provide information to global distribution systems (*Id*., ¶15). This is how travel agents and websites like Expedia get pricing information for cash flights (*Id.*). However, there is no equivalent for award flight pricing ("award flights") (*Id*., ¶16). The only way for LH to offer award flight information is by gathering the data that airlines make publicly available (*Id*.).

There are similarities and differences between the way that a consumer accesses flight data and how LH accesses flight data. At a high level, an AC customer gets award flight information through (1) the user-facing website, which makes a request to (2) an application programming interface ("API"), operated by Amadeus, which, in turn, pulls the award flight information from (3) a variety of partner airlines and systems (*Id*., ¶18; Eder Dec., ¶28).

The role of Amadeus is important to this dispute. LH does not do any form of data gathering of flight information from AC's website (Carroll Dec., ¶20; Eder Dec., ¶32). Rather, all such data gathering is performed on the API operated by third-party Amadeus (*Id.*; Schwartz Dec., Ex. 4).

The nature of a request from an individual and from LH are similar, but LH avoids the AC website and goes directly to the Amadeus-run API so as to minimize any burden on AC's website (Carroll Dec., ¶21). Notably, AC allows knowledgeable users to gain access to the key that opens the API (*Id.*, ¶22; Eder Dec., ¶28). If AC did not make this information public, but rather restricted it to registered users under a passcode, LH would not be able to get access to the API (Carroll Dec., ¶22). But, as AC allows this public entry to its API, LH bypasses the website other than to obtain some initial information (not by scraping) to access the API (*Id.*, ¶23; Eder Dec., ¶30).

LH takes steps to ensure its data gathering presents a minimal burden to airline servers. For example, it limits its searches to a relatively constant rate of about five searches per second (Carroll Dec., ¶25). This should not present a burden to modern servers (Eder Dec., ¶¶45-47). And this constant rate, without significant fluctuations or spikes, does not present a risk of suddenly overloading AC's systems (*Id.*).

## D.    Terms of Use

AC's breach of contract claim is based on its Terms found on the AC website. When first opening the reward search page of AC's website, a hyperlink to the Terms is not visible until a user scrolls to the bottom of the page (Schwartz Dec., ¶9). At the bottom of the page, in small white font, the words "Terms of use" appear (*Id.*, Ex. 7). If a user clicks on those words, he is redirected to a page containing the Terms.

LH's searching, however, is done on the API, not the website, so LH's bots never load the link to these Terms (Carroll Dec., ¶ 30). LH was only made aware of the Terms on October 5,

2023 and has never agreed to them (*Id.*, ¶ 29). AC's theory is that LH agreed to the Terms by continuing to gather data after LH had notice of the Terms (Dkt. 16 at PageID#: 131).

The Terms' "Governing Law" section says that the Terms shall be interpreted "in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein" (Schwartz Dec., Ex. 8). The Terms further mandate "any dispute is to be submitted to the non-exclusive jurisdiction of the courts in the judicial district of Calgary, Province of Alberta" (*Id.*).

Despite the forum-selection clause, AC has asked this Court to enforce a section of the Terms entitled "Limitations of Use." Notably, this section states "[y]ou may only access or use the Website to determine the availability of and to purchase products, goods and services offered on the Website" (*Id.*). And determining the availability of flight services is exactly what LH is doing. Nevertheless, AC requests specific enforcement of this rather opaque language in the Terms that appears to be directed to data gatherers like Localhost:

> [I]n accessing or using the Website, you will not commit or participate in any of the following acts or actions []: directly or indirectly, access, use, encourage, solicit, permit, facilitate, aid, assist, or abet or participate in, including but not limited to, the selling, licensing, distribution or provision to any entity or person by any means whatsoever that allow, the access, use, or agree to provide the access or use, of the Website through any manual process or any automatic, electronic or technical device, including but not limited to automated scripts, robots, crawls, screen scrapers, web "bots", deep-links, indexes, spiders, click-spams, macro programs, or any other device, program, software, system, algorithm, methodology or technology, now known or that is afterwards discovered, that performs the same or a similar function, in order to, without limitation: "data mine"; "screen scrape"; data process; access, extract, copy, distribute, aggregate or acquire information; generate impressions or clicks; input or store information; search or generate searches; or manipulate or monitor any portion or content of the Website…

(*Id.*). The Terms defined "Website" to be any website that is owned *and* operated by AC, including www.aircanada.com (*Id.*). LH does not gather data from AC's website (Carroll Dec., ¶ 30).

6

### E.     Alleged Harm

In support of its motion, AC has advanced two buckets of harm. First, AC alleges that it and its partner airlines have experienced so called "Major Incidents" resulting in slow website, mobile app, and partner website response times and "brownouts" (Dkt. 16 at PageID#:125-27). AC alleges that these incidents have caused loss of consumer goodwill and damaged business partnerships (*Id.*). The incidents that AC refers to occurred in a roughly one-month span from April 20 to May 26, 2023 (*Id*).

AC has not alleged any additional LH-caused problems with its or its partners' websites in the nearly eight months through the present, during which time LH was performing its data gathering much the same as it had in April and May 2023 (Carroll Dec., ¶24). Although AC accuses LH of being uniquely responsible for any slowdown in the website, it has failed to tie any specific problem to an action taken by LH. Nor has it addressed any specific problem with a partner website – none of which it identifies by name. In contrast, LH has performed testing which indicates that its searching operations do not present a serious search burden to the AC Website or partner systems (*see* Eder Dec., ¶¶ 48-51).

As for the second bucket of harm, AC alleges that it has had to divert internal resources to address LH's data gathering (Dkt. 16 at PageID#:127-28). It claims that its digital products group has spent so much time on LH that it has not been able to develop some basic search functionality for its website. Significantly, however, it fails to present any support for this position. And, in a public podcast that took place about one month before AC suit, an Executive Vice President of AC said that AC itself could retrieve and store the entire award availability of its Star Alliance group but that this would cause difficulty to AC's (unnamed) partners (Schwartz Dec., Ex. 9).

### F.      Harm to Localhost

In contrast to the superficial harm alleged by AC, an injunction preventing LH from gaining data on AC flights would severely inhibit LH's business. LH's sole revenue is through its subscribers (Carroll Dec., ¶32). These subscribers value being able to search for rewards flights for every major airline all on Seats.aero (*Id.*). Seats.aero includes explore pages where a user can view flight offerings of various award programs (*Id.*, ¶33). The Aeroplan award page is by far the most popular on the Seats.aero website (*Id*). In December, the Aeroplan explore page had 40,900 unique visitors, which is almost double the next most popular program – United Airlines at 26,600 visitors (*Id.*, ¶34). If LH suddenly stopped providing its most popular information on Aeroplan offerings, it would experience numerous complaints, user frustration, and loss of goodwill; this, in turn, would result in lost subscribers and revenue (*Id.*, ¶¶35-36).

## IV.      ARGUMENT

The Third Circuit has cautioned that a preliminary injunction is "an extraordinary remedy" to be granted "only in limited circumstances." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 290 F.3d 578,586 (3d Cir. 2002). Under the traditional "status quo" preliminary injunction framework, the burden rests with the moving party to establish (1) that the movement will be irreparably injured if relief is not granted, and (2) a reasonable probability of eventual success in the litigation. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021). If both of these factors are met, courts may consider (3) the relative balance of hardships, and (4) whether granting relief would serve the public interest. *Id*.

However, AC does not seek an injunction that would maintain the status quo. Rather, AC seeks a mandatory injunction ordering LH to stop the data gathering necessary for its business. The Third Circuit has instructed that where the relief requested "is mandatory and will alter the

status quo, the party seeking the injunction must meet a *higher standard*." *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008)(emphasis added). This "particularly heavy burden" requires AC to show "a *substantial likelihood* of success on the merits and that their right to relief is *indisputably clear*." *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (emphasis added). As LH will show, there are significant holes in AC's support that prevents it from satisfying the standard burden, much less the heightened burden that applies here. AC's predicament brings to mind one judicial reference to the standard of proof for a preliminary injunction, "to doubt is to deny." *Bateman v. Ford Motor Co.*, 310 F.2d 805, 808 (3rd Cir. 1962).

### A.  Irreparable Harm

"[A] showing of irreparable harm has been considered the most important prerequisite for the issuance of an injunction." *Flowserve Corp. v. Burns Int'l Servs. Corp.*, 423 F. Supp. 2d 433, 438 (D. Del. 2006). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Past incidences do not establish irreparable harm. *Tilden Rec. Vehicles, Inc. v. Belair*, 786 Fed. Appx. 335, 342 (3d Cir. 2019) (the "preliminary injunction inquiry concerns threat of future harm, not past harm."). Nor does the unsubstantiated "possibility of a remote future injury." *See Acierno v. New Castle County,* 40 F.3d 645, 655 (3d Cir. 1994).

Here, LH contends that there is no harm to AC and that LH actually helps AC by making it easier for AC customers to book award flights - including a link to book tickets on AC's website. Indeed, the fact that Seats.aero is operational supports a finding that LH helps AC. After all, if AC's website were adequate, no one would need to go to the trouble of searching on Seats.aero.

9

1.      **Slow Searches – Air Canada and Partners**

LH will address the alleged website disruptions by combining AC with its partners because it is really the same topic, the difference being the effect of these alleged disruptions on (1) AC, versus (2) AC's partner airlines.  AC calls these slow searches "Major Incidents."  AC identifies five so called Major Incidents that took place in April and May 2023 and now says that LH was responsible for all of them.  But AC gives reason to doubt both the significance of these incidents and the causal link between them and LH.

a.      **No Recent Problems**

The first thing to point out is the absence of any reported problems over the past eight months. LH has been gathering data from AC since April 2023 and has done so at about the same rate every second through the present. Despite all that searching, AC could only find five events -- the most recent of these took place in May 2023, some eight months prior to AC filing its Motion. Notably, LH had not received notice of the Terms at this point (*see* Carroll Dec, ¶ 29). So, even under AC's contract formation theory there was no contract between LH during the only period in which AC alleges its systems have been disrupted. Apparently, the intervening eight months have been devoid of significant negative events.

b.      **Localhost's Minimal Data Gathering**

There is a reason that LH's data searching has gone smoothly. LH has from the beginning engaged in only modest data searching at the rate of about five searches per second (Carroll Dec., ¶24). Although this might sound like a lot, it is pedestrian in the context of modern servers (Eder Dec., ¶¶45-47).  For perspective, Amadeus, the company that operates the API from which LH gathers data, boasted that in 2021, it processed over 100,000 user transactions per second at peak time in its main data center (Schwartz Dec., Ex. 5). For context, LH five searches per second is

.005% of Amadeus' capacity. This is one out of 20,000 searches. A person would actually have a better chance of being struck by lightning during his lifetime (one in 15,300) than picking a LH search out of the total searches processed by Amadeus per second (Schwartz Dec., Ex. 10). It is difficult to see how this small percentage could compromise the API. And it is worth noting that the more AC customers who search for point redemptions on Seats.aero, the fewer AC customers are taxing AC's internal search option (*see* Carroll Dec., ¶ 26).

In this context, LH's data gathering is conservative. And what makes it more so is that LH's searches are at a fixed rate and skip loading the Website. To highlight this point, LH has retained a technical expert, Eric Eder, to conduct a series of tests of both the AC website and LH's search procedure, and evaluate AC's assertion that its servers cannot handle LH's modest testing. Mr. Eder owns CyberForce|Q LLC, a technology services firm that designs and implements security systems for customers, including those that need to maintain the United States Department of Defense's Cybersecurity Maturity Model Certification.

### c.    Expert Testing

Mr. Eder first determined that the server capacity taken up by an LH request is an order of magnitude smaller than a request made by a standard internet user (Eder Dec.., ¶¶40, 48). Specifically, a LH request was only 2.11% of the size and 1.11% the duration compared to a standard user request (*Id.*). Mr. Eder further observed that LH's five searches per second are both (1) a miniscule fraction of the server capacity of sophisticated internet service providers, such as Amadeus, and (2) a small fraction of the capacity of even common consumer-grade servers (*Id.*, ¶¶45-47). From this analysis, Mr. Eder concluded that it is improbable that any issues that have occurred with the AC Website and/or partner websites are attributable to LH, and that LH's activity does not present a significant risk of any future disruption (*Id.,* ¶¶48-51).

### d.      Causation

If AC were to get past these hurdles to establish some harm, it would still be left with nothing concrete to make LH its cause. Although LH is now the sole target of AC's wrath, when AC's Executive Vice President of Marketing and Digital, Mark Nasr, spoke to the public on an airline-centric podcast in September 2023, he had a more complex answer for why AC's customers sometimes had trouble getting award flight information.

When asked by the interviewer about the difficulty of booking award flights, Mr. Nasr had a response that he admitted went further than AC's lawyers would want him to go (Schwartz Dec, Ex. 9 at p. 5). In that response, Mr. Nasr did not mention LH. Rather, he cited to four things that he said were largely separate but that are going on at the same time. First, he said, AC has certain partners whose business strategies have changed (*Id.* at p. 2). Second, AC has partners with technical issues that cause problems booking partner awards through AC (*Id.*). Third, there are some AC customers who have engaged in fraud and program misuse around such issues as family pooling (*Id.*, at pp. 2-3). And, fourth, there are third parties that have built tools to assist with awards shopping (*Id.*)

These tool-building parties, he added, are "driving tax on an infrastructure and a set of partners and old legacy technology in the airline industry that wasn't designed for it." (*Id.* at p. 6). Essentially, Mr. Nasr says that AC's technology could handle the larger number of searches done by third-party searchers but some of AC's partners cannot. Mr. Nasr does not say which of AC's partners has the old technology. Presumably, Mr. Nasr would include LH in the category of what he call unauthorized users but he does not mention LH or Seats.aero by name. And, notably, he puts multiple companies in the unauthorized user category (*Id.* at p. 2).

Yet when it comes to its preliminary injunction motion, AC and its expert put the sole blame on LH. And the way AC's expert comes to this conclusion is somewhat forced. He compares the timing of a statement by LH with the timing of changes in search data volume and finds, on certain occasions, that they coincide (Dkt. 22 at PageID#:832-837). Yet AC's expert fails to explain why AC experienced Major Incidents on only five occasions when LH has used the same search volume every day since it started in April 2023. That consistency suggests that there are other, non-LH factors – perhaps some of those identified by Mr. Nasr – that caused the alleged Major Incidents. Indeed, the contemporaneous logs of the incidents on which AC relies for harm only mention Seats.aero in connection with one of five incidents.

### e.    Reputational Harm

As for the alleged reputational harm, this is easy to claim and difficult to prove. Here, AC has brought forth some episodic customer complaints but nothing to suggest that AC's reputation as a whole has been diminished by Localhost. Indeed, TripAdvisor shows that a plurality of the 30,121 AC reviews gave it the lowest rating of "Terrible" (Schwartz Dec., Ex. 3). As of January 17, 2024, the most recent three reviews were titled "Worst Airline Ever," "CAN'T SPEAK WITH A LIVE AGENT," and "Terrible." (*Id.*). Likewise, 91% of reviews on TrustPilot of the Aeroplan program give it one star out of five (*Id.*, Ex. 2). The most recent three comments as of January 13, 2024 were titled "Calling Aeroplan takes forever," "Points are now worthless – a million points gets two business class seats," and "Disappointing experience at every step" (*Id.*).

FlyerTalk is a website forum for travel-related comments. Even the FlyerTalk exhibit on which AC relies on for its reputational claims does not help it (*see* Dkt. 16, PageID#:127). The complaints on a forum about AC partner award travel began in December 2021, about 16 months before LH first began gathering data from the Amadeus API (Schwartz Dec., Ex. 11). A review of

13

the comments both before and after LH began data gathering shows a myriad of problems unrelated to LH (*Id.*). Stated simply, it appears that AC has been able to harm its own reputation – both in general and as to the performance of its website – without any help from LH.

### 2. Air Canada's Resources

The second bucket of harm, says AC, is the drain on AC's resources caused by what AC calls a "cat-and-mouse" scenario (Dkt. 16 at PageID#:127). AC claims that LH has diverted so many resources that it has not been able to deliver certain website features that users desire (*Id*). This is curious. AC is a mega-airline with a value of over five billion dollars (Schwartz Dec, Ex. 1). It has, according to Mr. Nasr, "some brilliant IT and digital people that have pushed the boundaries of industry capability and industry technology" (*Id*., Ex. 9 at p. 4). Yet, according to AC's Motion, AC's digital division has been stretched to the breaking point by LH, which is operated by a husband and wife team out of their home. This claim is suspicious on a number of levels, one being that AC uses third-parties like Amadeus and Akamai to do much of its investigation and repair of periodic glitches (Dkt. 21 at PageID# 809-814) .

### 3. Air Canada's Business Choice

What makes AC's claims of harm hollower is AC's decision not to implement mitigating steps that would prevent LH's data gathering. AC makes public the key to enter the API database operated by Amadeus (Carroll Dec., ¶22). If AC did not choose to make this key publicly available, it would be more difficult, if not impossible, for LH and other data gatherers to gain access to this data (*Id*.). *See QVC, Inc. v. Resultly, LLC*, 99 F. Supp. 3d 525, 541-42 (E.D. Penn. 2015)(finding absence of irreparable harm where website owner could take action to prevent any ill effects of web-crawling software).

14

### 4.      Air Canada's Delay

Further, the eight month delay between AC discovering LH's activity and bringing this Motion "knocks the bottom out of any claim of immediate and irreparable harm." *Pharmacia Corp. v. Alcon Labs., Inc.,* 201 F. Supp. 2d 355, 383-84 (D.N.J 2002). Courts in this circuit have repeatedly held that unexplained delays of similar duration are inconsistent with the showing of immediate irreparable harm necessary to obtain a preliminary injunction. *See ProFoot, Inc. v. MSD Consumer Care, Inc.*, 2012 U.S. Dist. LEXIS 83427 (D.N.J. June 14, 2012) (three-month delay in moving for a preliminary injunction); *New Dana Perfumes Corp. v. The Disney Store, Inc.,* 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) ("delay of two months in presenting a cease and desist letter, and another unexplained delay of five months in moving for injunctive relief").

### B.      Likelihood of Success

AC has also failed to establish a significant likelihood of success. Here, evaluating AC's contract claim is made more complicated by the international nature of this dispute. In addition, there is a threshold question as to whether the AC Terms even apply to LH's data gathering.

AC relies on its breach of contract claim alone to support its requested injunction. (Dkt. 16 at PageID#:108). AC's breach of contract claim is based on its theory that it made an "offer" to LH to use AC's website under the Terms and that LH accepted that offer by continuing to gather data from the API after receiving notice of the Terms (Dkt. 16 at PageID#:130-31).

### 1.      Choice of Law

Here, the likelihood of success prong implicates the law of two different countries and four possible forums. The procedural element of a preliminary injunction is determined according to the law of this Court. *Chin v. Chrysler LLC*, 538 F.3d 272 (3rd Cir. 2008). But, according to the Terms, the underlying law to apply is that of Alberta (*See* Schwartz Dec., Ex. 8).

This is made still more complicated by a preliminary question that must be answered before considering if the Terms are breached under Alberta law. First, the Court must decide whether or not a contract exists. Going deeper down the rabbit hole, the Court must also determine which law to apply to that determination, because the Terms' choice of law provision are only implicated if a contract exists. *See Hite v. Lush Internet Inc.,* 244 F. Supp. 3d 444, 450 n. 3 (D.N.J. 2017).

A federal court "generally applies the choice-of-law rules of the jurisdiction in which it sits." *Amica Mut. Ins. Co. v. Fogel,* 656 F.3d 167, 171 (3d Cir. 2011). Delaware follows the "most significant relationship" test for determining what law to apply to a contract, and this test appears to implicate the laws of Delaware (LH's place of incorporation), Michigan (the forum from which LH operates), Montreal, Canada (AC's headquarters), and Alberta, Canada (the law designated in the Terms). *See Certain Underwriters at Lloyds v. Chemtura Corp.*, 160 A.3d 457, 465 (Del. 2017). AC's brief suggests that Alberta law would be used to determine contract formation, but does not provide any analysis directed to how Delaware courts would determine which law to apply (Dkt. 16 at PageID#:130). Nor are there sufficient facts in the record to make the requisite determination under the "most significant relationship" test.

### 2.    Contract Existence

Whichever law applies, no contract was formed between AC and LH. "Under Delaware law, contract formation requires mutual assent, meaning a complete meeting of the minds of the parties." *Antognoli v. Christiana Care Health Servs.,* 2023 Del. Super. LEXIS 743, *4 (Del. Super. Aug. 22, 2023). Assent is determined objectively, "based on overt manifestations of assent." *Id.* The same is true under the laws of Canada and Michigan. *See* G.H.L. Fridman, *The Law of Contract in Canada* (Toronto: Thomson Carswell, 2006) at 13 ("the absence of assent prevents the creation of a binding contract"); *Rood v. General Dynamics Corp.*, 444 Mich. 107, 119

16

(1993)("it is difficult for a workable system of contract law to take account of assent unless there has been an overt expression of it").

AC cites to the declaration of a Canadian Attorney, Evan Nuttall[1], as sole support for its theory that the Terms would be recognized as a contract in Alberta (Dkt. 16 at PageID#130). However, by Mr. Nuttall's own admission he is "not aware of any Alberta legislation or reported decisions that directly address the formation and enforcement of browse wrap agreements" (Dkt. 19 at PageID#:192). So, there is no precedent in Alberta for acceptance of a contract by continuing to perform an act after the defendant has been sent a browse wrap agreement. Even accepting AC's conclusory assertion that Alberta law applies, LH suggests that it would make more sense for this Court to require that AC bring its contract claims in Alberta, where the court there could consider the factual scenario as an issue of first impression.

In the United States, it is true that some Courts have adopted AC's theory that a party accepts browse wrap terms when that party continues to use a website after receiving actual notice of the terms. *See, e.g., Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393 (2d Cir. 2004). Here, it is undisputed that LH received a demand letter from AC on October 5, 2023 which included the Terms. However, other courts and legal commentators believe that AC's theory improperly abandons the bedrock contract principal of assent. *See*, *e.g.*, Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 459 (2006) ("Ten years ago, courts required affirmative evidence of agreement to form a contract… Today, by contrast, more and more courts and commentators seem willing to accept the idea that if a business writes a document and calls it a contract, courts will enforce it as a contract even if no one agrees to it"); Amber Zamora, *Web Scraping and an Affirmative Right to*

---

[1] Notably, LH has not yet had an opportunity to depose Mr. Nuttal. This is problematic given that Mr. Nuttal's firm appears to do patent litigation work for AC and LH has not yet been able to explore this relationship (Schwartz Dec., Ex. 12).

*Access Publicly Available Information Online*, 12 J. Bus. Entrepreneurship & L. 203 (2019) ("[B]y enforcing these unilateral terms, courts remove the concept of assent and mutual agreement from online interactions."); *Gaudreau v. My Pillow, Inc.*, 2022 U.S. Dist. LEXIS 118524, *12 n. 2 (M.D. Fla. July 1, 2022) ("treating [browse wrap] terms – without unambiguous assent from the user – as if two contracting parties actually bargained for, understood, and agreed to them is a one-sided, indulgent legal fiction that bears little resemblance to traditional contract formation principles").

LH has never manifested assent to the Terms, and, in fact, specifically rejected the Terms in its reply to AC's demand letter. Further, LH's data gathering is the exact act which AC alleges is a breach of the Terms. AC does not explain how the same act can *both* serve as an agreement to be bound by a contract and simultaneously be a breach of that contract.

### 3.      Relevance of Air Canada's Terms

If the Court decides that a contract was formed and that it is appropriate for this Court to judge the dispute under Alberta law, then and only then is there a need to look at the non-jurisdictional Terms. Yet, AC does not fare much better there, as the specific language chosen by AC for the Terms dooms its chances.

First, the Limitations of Use do not appear to prevent LH's activity. The Terms make exclusive reference to proscribing activity relative to AC's website (*see* Schwartz Dec., Ex. 8) ("In accessing or using the Website, you will not…"). Importantly, *LH's does not perform any data gathering of flight information from AC's website* (Carroll Dec, ¶ 20; Eder Dec., ¶32). Rather, LH obtains flight information solely from the API operated by Amadeus (*Id*.). LH only contacts the website to begin the process of using the API, but this is not a data gathering function (*Id*.).

Second, the language of the Limitations of Use, produced in full above, is ambiguous bordering on unintelligible, or otherwise so broad as to be completely meaningless. The single run

18

on sentence includes nearly 50 commas and semicolons (*see* Schwartz Dec., Ex. 8). Moreover, even if the meaning of the phrase were clear, it would appear to be so broad as to encompass the activity of *every single user* of the AC website. For example, the phrase may be read to bar using a "manual process" to "acquire information" (*Id.*). On the other hand, the Limitation of Use section of the Terms also quite clearly states that "[y]ou may only access or use the Website to determine the availability of and to purchase products, goods and services offered on the Website" (*Id.*). Ironically, this is the precise wrongdoing that AC asserts against LH. At best, the portion of the Terms as to which AC seeks specific enforcement is ambiguous and this should be construed against AC. *See Ninivaggi v. Univ. of Del.,* 555 F. Supp. 3d 44, 52 (D. Del. 2021).

### C.      Balance of Hardships

The balance of hardships also favors the denial of a preliminary injunction. "In considering the balance of hardships, a court assesses the relative effect of granting or denying an injunction on the parties and weighs several factors, including the parties' size, products, and revenue sources." *Cordance Corp. v. Amazon.Com, Inc.,* 730 F. Supp. 2d 333 (D. Del. 2010).

AC has not alleged any issues with its website in the last eight months, and LH's testing indicates that there is no risk of future disturbances (Eder Dec., ¶51). Further, with the status quo maintained, there is nothing stopping AC from diverting more resources to the development of its award system's user functionality and infrastructure. On the other hand, the grant of an injunction would significantly inhibit LH's business (Carroll Dec., ¶31). LH is a small business run by a husband and wife out of their home. LH's sole source of revenue is its subscribers (*Id.*, ¶4). LH would likely receive a vast number of complaints and a loss of subscribers if it no longer supported Aeroplan, its most searched airline rewards programs (*Id.*, ¶¶ 35-36).

Notably, in a similar situation, the Ninth Circuit in *hiQ Labs v. LinkedIn Corp., Supra,* found that it was the data gatherer, not the website owner, that would be irreparably harmed if it were prevented from gathering the data necessary for its business. In that case, hiQ, a data analytics company, had obtained a preliminary injunction forbidding LinkedIn from denying hiQ access to publicly available LinkedIn member profiles. *hiQ,* 31 F.4th at 1184.

### D.    Public Interest

Another prong of Delaware's preliminary injunction test is whether the injunction will be in the public interest. Here, the public benefits by having the opportunity to continue to use the Seats.aero website while this case is pending. It bears repeating that the Seats.aero website would not exist but for the demand among airline customers for a more user-friendly search platform for award travel. The fact that it does means that the public sees Seats.aero as a positive.

While LH can offer a tangible benefit to keeping its website open, AC must resort to near platitudes to argue a public benefit. According to AC, the public has interest in contracts being honored (Dkt. 16 at PageID:#136-37). LH could just as easily state that the public has an interest in protecting against information monopolies, as well as protecting consumers' interest in the free flow of commercial information. *See hiQ Labs,* 31 F.4th at 1202 (noting that giving companies like LinkedIn the ability to decide who can collect and use publicly-available data risks the creation of an information monopoly that would disserve the public); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976) (holding that a consumer's interest in the free flow of commercial information is protected by the First Amendment).

## V.    CONCLUSION

For these reasons, AC's Motion should be denied and LH should be permitted to continue the data gathering necessary for its business.

Dated: January 18, 2024                    Respectfully Submitted,


                                           By: */s/ Charles J. Brown, III*
                                           Charles J. Brown, III (DE 3368)
                                           Gellert Scali Busenkell & Brown, LLC
                                           201 N. Orange Street, Suite 300
                                           Wilmington, DE 19801
                                           Telephone: 302-425-5800
                                           Email: cbrown@gsbblaw.com

                                           Steven Susser, Esq.
                                           (admitted *pro hac vice*)
                                           Michael S. Schwartz
                                           (admitted *pro hac vice*)
                                           CARLSON, GASKEY & OLDS, P.C.
                                           400 West Maple Road, Suite 350
                                           Birmingham, MI 48009
                                           P: (248) 988-8360
                                           F: (248) 988-8363
                                           Email: ssusser@cgolaw.com
                                           Email: mschwartz@cgolaw.com

                                           *Attorneys for Defendant*